UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONTEVILLE SLOAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GENERAL MOTORS LLC,<br><br>Defendant. | Case No. 16-cv-07244-EMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**<br><br>Docket No. 47 |

## I. INTRODUCTION

Plaintiffs have filed a class action against Defendant General Motors LLC ("GM") asserting that GM's Generation IV Vortec 5300 Engine used in GM's 2010-2013 vehicles is defective and that GM knew the engine was defective at the time it sold the vehicles to Plaintiffs but failed to disclose the alleged defect to consumers. Based on those allegations, Plaintiffs assert claims under various state consumer protection and fraud statutes, including California's Consumer Legal Remedies Act ("CLRA") and Unfair Competition Law ("UCL"). Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** GM's motion to dismiss with leave to amend.

## II. FACTUAL AND PROCEDURAL BACKGROUND

As a preliminary matter, the Court provides below a chart, which lists the name of each named Plaintiff, the state where Plaintiff purchased his or her car, the state of Plaintiff's residence, the car that was purchased and the date of purchase.

| Name | State of Purchase | Car | Date of Purchase |
|---|---|---|---|
| Raul Siqueiros | California | 2011 Chevrolet Silverado | N/A |
| Joseph Brannan | Alabama | 2010 GMC Yukon | 2011 |
| Larry Goodwin | Arkansas | 2011 Chevrolet Silverado | 2010 |
| Ted Edgecomb | Colorado | 2011 Chevrolet Silverado | 2011 |
| Marc Perkins | Delaware | 2011 Chevrolet Avalanche | 2011 |
| Donald Ludington | Florida | 2010 Chevrolet Tahoe | 2012 |
| Thomas Shorter | Florida | 2011 Chevrolet Silverado | N/A |
| Derick Bradford | Georgia | 2010 Chevrolet Silverado | 2014 |
| Gabriel Del Valle | Idaho | 2013 Chevrolet Avalanche | 2/2016 |
| Kevin Hanneken | Illinois | 2011 GMC Sierra 1500 | 2011 |
| Gail B. Lannom | Indiana | 2012 Chevrolet Tahoe | 01/2015 |
| Bradley K. Zierke | Iowa | 2012 Chevrolet Avalanche | 2011 |
| Dan Madson | Kansas | 2013 Chevrolet Silverado | 12/2013 |
| James Faulkner | Kentucky | 2011 GMC Sierra | 2015 |
| Joseph Olivier | Louisiana | 2013 GMC Sierra | N/A |
| Scott Smith | Massachusetts | 2011 GMC Yukon | 2012 |
| Ross Dahl | Minnesota | 2010 Chevrolet Silverado | 2010 |
| Drew Peterson | Minnesota | 2013 Chevrolet Silverado | 12/2012 |
| Michael Ware | Mississippi | 2013 Chevrolet Silverado | 2016 |
| Steve Kitchen | Missouri | 2013 Chevrolet Silverado | 07/2013 |
| John Neubauer | Nebraska | 2011 Chevrolet Silverado | 2012 |
| Barbara Molina | New Mexico | 2012 Chevrolet Avalanche | N/A |
| Steven Ehrke | North Carolina | 2013 Chevrolet Silverado | 2/2016 |
| Bill Mauch | North Dakota | 2011 Chevrolet Silverado | 2013 |
| Thomas Gulling | Ohio | 2013 Chevrolet Silverado | N/A |
| Ronald Jones | Ohio | 2013 Chevrolet Silverado | N/A |
| Mike Warpinski | Oklahoma | 2012 Chevrolet Express | 2014 |
| John Graziano | Pennsylvania | 2012 Chevrolet Silverado | 12/2011 |
| Monteville Sloan | South Carolina | 2013 Chevrolet Silverado | 08/2014 |
| Joshua Byrge | Tennessee | 2012 Chevrolet Silverado | 2016 |
| Rudy Sanchez | Texas | 2013 Chevrolet Silverado | 07/2013 |
| Christopher Thacker | Virginia | 2010 Chevrolet Silverado | 06/2014 |
| Randy Clausen | Washington | 2012 Chevrolet Suburban | 2013 |
| James Robertson | West Virginia | 2010 GMC Sierra | 2010 |
| Jonas Bednarek | Wisconsin | 2010 Chevrolet Suburban | 2010 |

Each Plaintiff purchased one of the following vehicles, which all have a Generation IV

Vortec 5300 Engine (the "Class Vehicles"): 2010-2013 Chevrolet Avalanche; 2010-2012 Chevrolet Colorado; 2010-2013 Chevrolet Express 1500; 2010-2013 Chevrolet Silverado 1500; 2010-2013 Chevrolet Suburban; 2010-2013 Chevrolet Tahoe; 2010-2013 GMC Canyon; 2010-2013 GMC Savana 1500; 2010-2013 GMC Sierra 1500; 2010-2013 GMC Yukon; and 2010-2013 GMC Yukon XL.

In their complaint, Plaintiffs allege that the Generation IV Vortec 5300 Engine consumes an "abnormally and improperly high quantity of oil that far exceeds industry standards for reasonable oil consumption. This excessive oil consumption results in low oil levels, insufficient lubricity levels, and corresponding internal engine component damage." FAC ¶ 5. The alleged cause of this excessive consumption is defective low-tension oil control rings that GM installed within those engines (the "Low-Tension Oil Rings"). FAC ¶ 7. The Low-Tension Oil Rings were originally designed to reduce friction between the oil rings and cylinder walls in order to improve fuel economy, horsepower and torque. FAC ¶ 7. However, this oil ring design "improperly allows engine oil to travel past the pistons and enter the engine's combustion chambers, where it is either consumed in the combustion process, or it hardens and accumulates therein" (the "Low-Tension Oil Ring Defect"). FAC ¶ 7.

Plaintiffs allege that the "Low-Tension Oil Ring Defect in the Class Vehicles results in excessive oil consumption, leading to increased friction and, thus, engine damage. That means that each Class Vehicle has suffered and will continue to suffer, internal component wear." FAC ¶ 143. Potential consequences include overheating, the engine catching on fire, and the engine shutting down unexpectedly. FAC ¶¶ 148-150. To prevent damage from critically low oil levels, GM implemented an Oil Life Monitoring System but Plaintiffs allege the system fails to advise drivers of insufficient oil levels in their vehicles. FAC ¶¶ 9, 141-142. However, none of the Plaintiffs allege that their vehicles actually experienced any excessive oil consumption. Further, not a single Plaintiff alleges that his or her vehicle experienced any damage due to excessive oil consumption from the Low-Tension Oil Rings.

Plaintiffs also allege that GM knew about the excessive oil consumption problem caused by the Low-Tension Oil Ring Defect in the Generation IV Vortec 5300 Engines. FAC ¶ 13. First,

Plaintiffs allege GM knew of the defect because GM abandoned the Low-Tension Oil Ring design in its redesign of the Generation V Vortex 5300 Engines, which began as early as May 2011. FAC ¶ 152. Second, Plaintiffs allege many consumers complained about excessive oil consumption, referencing 68 complaints made on carcomplaints.com and explicitly citing thirteen complaints made to such online forums and the National Highway Traffic Safety Administration ("NHTSA"). FAC ¶¶ 159-165. Third, Plaintiffs allege GM knew of the defect because GM issued one Technical Service Bulletin ("TSB") addressing the oil loss in vehicles with Generation IV Vortec 5300 engines. The TSB stated oil loss "could be caused by two conditions: (a) oil pulled through the Positive Crankcase Ventilation (PCV) system; or (b) oil spray that is discharged from the Advanced Fuel Management (AFM) system's pressure relief valve within the crankcase." FAC ¶ 157. GM suggested fixes for these issues but stated that if those fixes did not work, "[i]t may be necessary to replace all of the piston assemblies (pistons and rings) with new parts." TSB No. 10-06-01-008G: Engine Oil Consumption on Aluminum Block/Iron Block Engines with Active Fuel Management.

Despite this alleged knowledge, GM has never disclosed the Low-Tension Oil Ring Defect to consumers and "has allowed drivers of the Class Vehicles to continue driving those vehicles, despite knowing that they are consuming oil at an abnormally high rate." FAC ¶ 13. Therefore Plaintiffs seek relief from their injury, which they identify as the fact that "they paid more for their Class Vehicles than they would have paid had they known about the defect that GM failed to disclose, or they would not have purchased or leased their Class Vehicles at all." FAC ¶ 14. Moreover Plaintiffs allege GM "trumpeted the performance of the Generation IV Vortec 5300 Engines and continuously proclaimed that the class vehicles were dependable and of the highest quality, concealing and omitting the low-tension oil ring defect." FAC ¶ 166. Specifically Plaintiffs allege GM advertised the performance benefits of the Class Vehicles. FAC ¶¶ 168-187. GM told consumers that the class Vehicles were "dependable, long-lasting and of the highest quality", leading consumers to "believe that the Class Vehicles would be free from defects that result in excessive oil loss and engine damage." FAC ¶¶ 167. Plaintiffs seek relief under the following statutes: (1) Magnuson-Moss Warranty Act; (2) 32 state consumer protection and fraud-

based statutes such as the California Consumer Legal Remedies Act ("CLRA") and California Unfair Competition Law ("UCL"); and (3) 32 breach of implied and express warranty state statutes.

Plaintiffs first filed a class action complaint for declaratory and injunctive relief on December 19, 2016. Docket No. 2 ("Complaint"). On February 27, 2017 Plaintiffs filed a First Amended Complaint. Docket No. 29 ("FAC"). On April 10, 2017, GM filed the instant motion to dismiss the First Amended Complaint, arguing that Plaintiffs lack constitutional standing, have failed to adequately plead consumer protection and fraud claims, breach of express and implied warranty claims, and unjust enrichment, and that Plaintiffs' claims are barred by applicable statutes of limitation. Docket No. 47 ("GM Motion"). In response, Plaintiffs filed an Opposition to the Motion to Dismiss on May 25, 2017. Docket No. 57 ("Opp."). Then, on June 15, 2017 GM filed a Reply to Plaintiff's Opposition. Docket No. 58 ("GM Reply").

### III. DISCUSSION

A. Legal Standard

GM moves for dismissal for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Standing is "a threshold matter" that is necessary to establish subject matter jurisdiction. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007). In order to establish standing, the Plaintiffs must show (1) an injury in fact; (2) a "causal connection between the injury and the conduct complained of;" and (3) redressability of the injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* at 561.

GM has also moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). Under Rule 12(b)(6), a party may move to dismiss based on the failure to state a claim upon which relief may be granted. A motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). In considering such a motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal."

5

*Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). While "a complaint need not contain detailed factual allegations…it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal*, 556 U.S. at 678.

Claims sounding in fraud or mistake are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires that a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); see *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). To satisfy the heightened standard under Rule 9(b), the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

B. <u>Standing</u>

GM argues that Plaintiffs have not pleaded a concrete or certainly impending injury sufficient for Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In contrast, Plaintiffs allege that, "each Plaintiff suffered an injury in fact when they purchased vehicles containing the Low-Tension Oil Ring Defect because Plaintiffs would not have purchased these vehicles, or they would have paid less, had they known of the defect." Opp. at 5.

The Ninth Circuit has held that overpayment itself is "injury in fact" under Article III. In *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir.2012), the Ninth Circuit found Article III standing in a fraudulent omission case when "plaintiffs contend that class members paid more for [a product] than they otherwise would have paid, or bought it when they otherwise would not have done so". The facts in *Mazza* are similar to those in the present case. The plaintiffs in *Mazza* alleged that they would not have purchased Honda's vehicle with a faulty anti-collision braking system but for Honda's failure to disclose that the system does not warn drivers in time and does

6

not work in bad weather. 666 F.3d 581, 587–88 (9th Cir. 2012). Like GM here, Honda argued individuals in a class who have no "injury in fact" have no Article III standing, but the Ninth Circuit held that overpayment due to Honda's deceptive claims constituted an "injury in fact". *Id.* at 595. Similarly, in this case Plaintiffs' claims of overpayment for a defective product due to GM's fraudulent omissions constitute an injury in fact.

GM relies on *Birdsong v. Apple, Inc.*, 590 F.3d 955, 958 (9th Cir. 2009), where the Ninth Circuit found that overpayment for iPods was not an injury in fact. In *Birdsong*, however, the Ninth Circuit emphasized that the Plaintiffs were only at risk of any injury if they used the iPods in an unsafe manner; the products were not inherently defective. By contrast, in this case Plaintiffs allege that all engines incorporating the Low-Tension Oil Rings are inherently defective, and that they would not have paid the same amount had they known of the defect. *Mazza* is therefore the applicable authority, and the Court concludes that Plaintiffs have sufficiently alleged an "injury in fact." The Court therefore denies GM's motion to dismiss for lack of subject matter jurisdiction.

C. Consumer Protection and Fraud Claims

The core component of Plaintiffs' consumer protection and fraud claims is that GM had a duty to disclose the alleged Low-Tension Oil Ring Defect and failed to do so. FAC ¶¶ 229-1765. Though Plaintiffs bring claims under the consumer protection laws of 32 states, the parties focus their arguments on the UCL and CLRA.[1] California Plaintiff Siqueiros alleged GM violated the UCL, by "knowingly selling Class Vehicles that include defective engines with Low-Tension Oil Rings that cause excessive oil consumption and omitting mention of this defect to consumers."

---

[1] The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Practices are 'unlawful' when they violate other laws: §17200 "borrows" violations of other laws, treating them as unlawful practices that are independently actionable under the UCL." *Swearingen v. Late July Snacks LLC*, 2017 WL 1806483, at *3 (N.D. Cal. May 5, 2017) (citing *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone, Co.*, 20 Cal. 4th 163, 179 (1999)). "Practices are 'unfair' when grounded in 'some legislatively declared policy or proof of some actual or threatened effect on competition.'" *Id.* Practices are "fraudulent" when "members of the public are likely to be deceived". *Poldolsky v. First Healthcare Corp.*, 50 Cal. App. 4th 632, 647-48, *as modified* (Nov. 5, 1996), *as modified* (Nov. 20, 1996). The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code § 1770.

7

FAC ¶¶ 291-299. Plaintiff Siqueiros also alleged GM violated the CLRA by engaging in unfair or deceptive acts when, in the course of its business, GM failed to disclose material information. FAC ¶¶ 232-233. Plaintiffs from other states assert similar arguments of failure to disclose under corresponding state consumer protection and fraud statutes. GM argues it did not have a duty to disclose and so all Plaintiffs' consumer protection and fraud claims should be dismissed.

Under California law, a defendant has a duty to disclose in four circumstances: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact." *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1094 (N.D. Cal. 2007) (quoting *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 337 (1997)).

As the California test suggests, a fraudulent omission claim requires proof that a defendant was aware of the defect at the time of sale to establish defendant had a duty to disclose. *See Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1145 (9th Cir. 2012) (finding the CLRA and UCL requires plaintiffs sufficiently allege defendant was aware of defect at the time of sale). As common sense would indicate, moreover, this is true not only under California law but also, as it appears, under the laws of the other states in which Plaintiffs have brought claims, as well as the common law of torts generally. *See, e.g., In re MI Windows & Doors, Inc. Prod. Liab. Litig.*, 914 F. Supp. 2d 744, 753–54 (D.S.C. 2012) (explaining that under South Carolina law, "[a] duty to disclose arises in two situations: (1) a contracting party who has superior knowledge, or knowledge that is not within the reasonable reach of the other party, has a legal duty to disclose information material to the bargain; and (2) parties in a fiduciary relationship must disclose material information to one another"); *OMI Holdings, Inc. v. Howell*, 918 P.2d 1274, 1299 (Kan. 1996) ("A party has a duty to disclose material facts if the party knows that the other is about to enter into the transaction under mistake as to such facts, and that the other, because of the relationship between them . . . would reasonably expect disclosure of such facts."); *Mason v. Chrysler Corp.*, 653 So. 2d 951, 954 (Ala. 1995); *see generally* Restatement (Second) of Torts § 551 (1977) ("One party to a business transaction is under a duty to exercise reasonable care to

disclose to the other before the transaction is consummated . . . (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."); Am. L. Prod. Liab. 3d § 25:11. Although both Plaintiffs and Defendant agree on this legal standard, they disagree about whether GM had a duty to disclose.

1. Materiality

A party's duty to disclose arises only where the fact in question is material. *Id.* Plaintiffs and GM disagree about the standard for determining whether a fact is material. GM argues that a material fact must implicate a safety concern, in absence of an affirmative misrepresentation. GM Motion at 13. On the other hand, Plaintiffs argue a material fact does not have to implicate a safety concern, but rather is any fact that a reasonable consumer would find important at the time of purchase. Opp. at 10. GM is correct. In *Wilson v. Hewlett-Packard*, 668 F.3d 1136, 1141-42 (9th Cir. 2012) the Ninth Circuit explicitly held that under California law, a "manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue." *Id.* at 1143-1144.

Plaintiffs point out that the California Court of Appeals itself has very recently clarified that requiring a safety concern for a fact to be material is a "misreading of California law." *Norcia v. Samsung Telecomms. Am.*, 2015 WL 4967247 at *6 (N.D. Cal. Aug. 20, 2015) (citing *Rutledge v. Hewlett-Packard Co.*, 238 Cal. App. 4th 1164, 1174-75 (2015)). Nevertheless, the Ninth Circuit has continued to follow the holding of *Wilson* even after *Rutledge*, holding that an omitted fact is not material where it does not implicate a safety concern. *See Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1025 (9th Cir. 2017) (finding a duty to disclose arises only if there are safety issues, absent an affirmative misrepresentation). This Court is not free to depart from the Ninth Circuit's holdings, even in the face of contrary state authority where that state authority predates the Ninth Circuit ruling. *See Mohamed v. Uber Techs.*, Inc., 848 F.3d 1201, 1211 (9th Cir. 2016). Thus, in order to establish GM's duty to disclose, Plaintiffs are required to show that it omitted a fact that is relevant to a safety concern. However, since *Wilson* and *Williams* apply only to

9

California law, the Court will treat GM's motion to dismiss on this ground as limited to the California claims.

Plaintiffs' allegations fail to state a safety concern sufficient to trigger GM's duty to disclose. Plaintiffs argue there is a safety concern because each Class Vehicle has a Generation IV Vortec 5300 Engine, which includes Low-Tension Oil Rings that cause excessive oil consumption. Additionally, Plaintiffs allege GM's Oil Life Monitoring System fails to advise drivers of insufficient oil levels in their vehicles, exacerbating the safety concern. FAC ¶¶ 141-142. As a result, Plaintiffs allege that each Class Vehicle is inherently defective. FAC ¶¶ 143-147. But as GM points out, not a single plaintiff alleges that his or her vehicle actually experienced excessive oil consumption. GM Reply at 1. In fact, not a single plaintiff alleges that his or her vehicle experienced any damage due to excessive oil consumption from the Low-Tension Oil Rings. Further, GM clarifies that the Oil Life Monitoring System does not measure the levels of oil but rather the quality of oil. Instead, there is a separate oil pressure indicator that *warns drivers of low oil levels*, a fact that both GM and CA Plaintiffs agreed to during oral argument. Because drivers will thus admittedly have warning before any engine damage, there is no risk of sudden or surprising failure, which might give rise to a serious safety concern.[2] Thus, GM argues that CA Plaintiffs have not alleged a safety concern because they "do not allege a single instance of a fire breaking out, or an engine suddenly shutting down". GM Motion at 14.

Plaintiffs rely on *Asghari v. Volkswagen Group of Am.*, Inc., 42 F. Supp. 3d 1306, 1330 (C.D. Cal. 2013), where the court found plaintiffs' allegation that the engine's excessive oil consumption can cause engine failure constituted a safety concern that could have been material to a reasonable consumer. There, the plaintiffs had not alleged engine failure, yet the court still found the risk to be a safety concern due to consumer complaints describing specific instances of engine failure due to low oil levels. *Id.* at 1339. But, unlike in this case, the *Asghari* plaintiffs actually alleged excessive oil consumption. More importantly, a number of consumers had

---

[2] In this sense, there is no more of a safety concern than where, *e.g.*, a car gets less gas mileage than advertised; while the more rapid consumption of gas might lead to a driver running out of fuel on a freeway or other dangerous location, the driver has a fuel gauge to warn him or her of low fuel.

10

complained of sudden loss of power while driving the allegedly defective cars; no similar complaints have been made with respect to the GM cars in this case; nor have Plaintiffs established a risk of sudden failure. This case is thus distinguishable from *Asghari*.[3]

Because no facts in this case suggest that the risk of excess oil consumption causes a safety risk, where Plaintiffs admit that there is a functioning oil level gauge that will give advance warning of low levels, the Court concludes that Plaintiffs have failed to allege that GM omitted disclosure of a material fact under California law. The Court therefore **DISMISSES** the California claims (for lack of material fact) with leave to amend. The Court does not, at this time, address the law of other states on the question of materiality since the parties have not briefed the issue outside of California law.

2. Knowledge

Plaintiffs allege GM had knowledge of the alleged Low-Tension Oil Ring Defect at the time of sale for three reasons: (1) GM abandoned the Low-Tension Rings in its redesign of the next generation engine; (2) there were 81 consumer complaints to the NHTSA and carcomplaints.com regarding excessive oil consumption; and (3) GM issued one Technical Service Bulletin ("TSB") discussing the problem of excessive oil consumption. FAC ¶¶ 151-158.

First, Plaintiffs argue that GM had knowledge of the defect because GM abandoned its low-tension ring experiment in its redesign of Generation V Vortex 5300 Engines, which began as early as May 2011, when GM was still selling Generation IV Vortec 5300 Engines. FAC ¶ 152. Plaintiffs allege GM redesigned the Generation V Vortex 5300 Engines with the intent to "remedy the excessive oil consumption problem plaguing the Class Vehicles. As part of that 2014 model year overhaul, GM abandoned its Low-Tension Oil Ring debacle and returned to using standard tension oil rings – while, at the same time, reintroducing an oil level sensor." FAC ¶ 11. According to Plaintiffs, this demonstrates that GM knew of the alleged defect in the low-tension oil rings.

---

[3] Similarly, in *Cholakyan v. Mercedes–Benz USA, LLC*, 796 F. Supp. 2d 1220, 1238 (C.D.Cal. 2011) and *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 957 (N.D. Cal. 2014), the plaintiffs had actually experienced malfunctions that themselves gave rise to a serious safety risk.

11

In *Falco v. Nissan North Am., Inc.*, 2013 WL 5575075 at *6 (C.D. Cal Oct. 10, 2013) the court found Nissan had prior knowledge of a defect because Nissan "replaced the chain guide of the timing Chain Tensioning System with a redesigned version of the part that does not suffer from the defect." However, in this case, unlike in *Falco,* GM redesigned the entire engine, not only the allegedly defective component. The fact that GM chose not to use the low-tension oil rings in the context of its redesign of the full engine is of little or no probative value as to whether it knew the rings were defective; it could have chosen not use the rings for independent design or engineering reasons. Thus, the mere fact that GM used different oil rings when redesigning its engines does not show its prior knowledge of the defect.[4]

Second, Plaintiffs allege GM had knowledge due to the 81 consumer complaints to NHTSA and consumer forums about excessive oil consumption and consequential engine damage. FAC ¶¶ 153-154. However, Plaintiffs concede that *none* of the complaints explicitly states that the cause of the excessive oil consumption was the Low-Tension Oil Ring Defect. FAC ¶ 164. Even if the complaints notified GM about the general excessive oil consumption problems, these complaints would not establish that GM knew that the Low-Tension Oil Rings caused the excessive consumption. Additionally, a majority of the complaints were posted in 2014 or later, "long after the marking and sale of new model year 2010 through 2013 vehicles had ended." GM Reply at 8. These complaints therefore do not establish GM's knowledge of the alleged oil-ring defect.

Furthermore, the Ninth Circuit has held that consumer complaints suffice to establish knowledge only where there were an *unusual* number of complaints, such that the manufacturer would be on notice of a specific problem. In *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1026 (9th Cir. 2017), the Ninth Circuit found plaintiffs adequately pleaded the defendants' knowledge where complaints regarding the outboard motor corrosion "were so frequent that individual

---

[4] GM makes a further argument that the Federal Rules of Evidence 407 bars evidence of a redesign to show a defect or knowledge of defect: "When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove…a defect in a product or its design." Because the Court concludes that the redesign evidence is not sufficient to show knowledge, it does not reach the question whether such evidence would be admissible under Rule 407.

12

Customer Relations supervisors personally handled as many as 40 or 50 different consumer complaints, or more, regarding the issue, which was an unusually high number of complaints for Yamaha to receive regarding corrosion this soon in the life of the engines." *Id.* (internal quotation marks omitted). By contrast, in *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1148 (9th Cir. 2012), the Ninth Circuit found plaintiffs' 14 complaints, 12 of which were undated, did not support an inference that HP was aware of the defect at the time of sale. In this case, Plaintiffs do not allege that the 81 complaints posted over the course of seven years was an unusually high number of complaints. Thus, the complaints do not show GM's knowledge of the alleged defect.

Finally, Plaintiffs argue that GM had knowledge of the defect because of one TSB addressing the oil loss in vehicles with Generation IV Vortec 5300 engines. The TSB explicitly stated oil loss could be caused by two conditions, neither of which were the Low-Tension Oil Rings. FAC ¶ 157. Plaintiffs, argue, however, that the TSB recommends replacing the piston and ring assemblies, indicating that GM knew about the Low-Tension Oil Ring Defect. Docket No. 48 (Oxford Decl.) Ex. 19. The TSB, however, does not indicate that the piston assemblies must be replaced. Rather that replacement is specified as an occasional repair if other remedies fail, and even then it does not mention replacement with a different ring configuration. The TSB does not suggest that GM knew that all of the engines were inherently defective; indeed, the Low-Tension Oil Rings are not even mentioned.

Plaintiffs point to two cases in which courts held that TSBs established the manufacturer's knowledge, but the TSBs in those cases explicitly addressed the claimed defect. *See Falco v. Nissan North Am., Inc.*, 2013 WL 5575075 at *6 (C.D. Cal Oct. 10, 2013); *Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 999 (N.D. Cal. 2013). By contrast, in *Grodzitsky v. Am. Honda Motor Co., Inc.*, 2013 WL 690822 at *2 (C.D. Cal. Feb. 19, 2013), the court found plaintiffs had not adequately alleged knowledge because the three TSBs only discussed general problems with windows and did not explicitly mention the alleged window regulator defect. As in *Grodzitsky*, the TSB Plaintiffs here rely on addresses the general problem of excessive oil consumption, and does not mention the alleged specific defect. It therefore cannot establish GM's knowledge of the defect.

13

Because Plaintiffs have not adequately alleged that GM knew of the alleged Low-Tension Oil Ring defect, Plaintiffs have failed to allege that GM engaged in any fraudulent omission. The Court therefore grants GM's motion to dismiss Plaintiffs' consumer claims for failure to state a claim under California and all other states' laws asserted herein. As noted above, all states have a knowledge requirement. The dismissal is with leave to amend.

D. Pre-Suit Notice

GM asserts that three Plaintiffs are barred from this suit by failure to serve pre-suit notice. Plaintiffs Bradford, Smith and Robertson allege claims under Massachusetts, Georgia and West Virginia laws, which GM argues require pre-suit notice by the individual plaintiffs. GM Reply at 12. However, GM does not cite to any case law or statutory language supporting this argument. In fact, Massachusetts, Georgia and West Virginia consumer protection statutes that GM cites do not appear to require pre-suit notice by individual plaintiffs. Mass. Gen. Laws Ch. 93A, § 9(3); Ga. Stat. § 10-1-399(b); W. Va. Code § 46A-6-106(c). As a result, Plaintiffs Bradford, Smith, and Robertson have satisfied their pre-suit notice requirements through a notice letter with a return receipt dated October 28, 2016. FAC ¶¶ 527, 899, 1676.

E. Express Warranty

Plaintiffs assert claims for breach of express warranty under the federal Magnuson Moss Act, as well as under various state statutes. The Magnuson Moss Act does not include any substantive warranty requirements; it merely provides a federal remedy for breach of warranties under state law. Thus, Magnuson Moss claims "stand or fall with [plaintiffs'] express and implied warranty claims under state law." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008).

GM argues that these claims fail for two reasons. First, as Plaintiffs allege, the GM warranty covers "repairs to correct any vehicle defect . . . *related to materials or workmanship occurring during the warranty period.*" FAC ¶ 220. But Plaintiffs allege a *design* defect, namely that GM's decision to include low-tension oil rings in the Generation IV Vortec 5300 engines renders them susceptible to excessive oil consumption. GM argues that this sort of design defect is not covered under the plain terms of the warranty. Several courts applying California law have

14

reached a similar result. *See, e.g.*, *Sharma v. BMW of N. Am., LLC*, No. C-13-2274 MMC, 2014 U.S. Dist. LEXIS 84406, at *11 (N.D. Cal. June 19, 2014) ("Under California law, a warranty that provides protection against 'defects in materials or workmanship' does not cover design defects."); *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 978 (C.D. Cal. 2014) (same); *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 830 (2006) (same).

Plaintiffs point to two district court decisions holding that a warranty's reference to "workmanship" could be construed to include design defects, *see* Opp. at 21 (citing *Koulajian v. Trek Bicycle Corp.*, 1992 WL 28884, at *2 (S.D.N.Y. Feb. 11, 1992) ("[T]he warranty's reference to 'workmanship' could refer to bicycle designs as well as to implementation of those designs in the manufacturing process."); *In re Saturn L-Series Timing Chain Prods. Liab. Litig.*, 2008 WL 4866604, at *15 (D. Neb. Nov. 7, 2008)). The *Saturn* case, however, considered this issue in the context of an unjust enrichment claim, not an express warranty claim. It therefore applied different legal standards than those relevant here. *Koulajian* was decided under Indiana law, but the Eighth Circuit has since held that under Indiana law, a warranty covering defects in materials and workmanship does not cover design defects. *Bruce Martin Constr., Inc. v. CTB, Inc.*, 735 F.3d 750, 753-54 (8th Cir. 2013). Thus, neither of Plaintiffs' authorities is persuasive. GM is correct, on the other hand, that the overwhelming weight of state law authority holds that design defects are *not* covered under similar warranties.[5] Plaintiffs cite no case holding any state law of warranties is to the contrary. Furthermore, that view appears consistent with the ordinary meaning of the term "materials and workmanship." Plaintiffs do not allege that that there was a flaw in materials or workmanship in the specific low tension oil rings in their cars, but rather that it was GM's design decision to include such rings in *all* cars with the same engine that led to their injury. The Court agrees that that allegations do not appear to fall within the terms of the warranty.

Second, even assuming the express warranty did apply, GM argues that the warranty

---

[5] *See, e.g.*, *Coba v. Ford Motor Co.*, 2016 U.S. Dist. LEXIS 136283, *25- 27 (D.N.J. Sept. 20, 2016); *Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516 (7th Cir. 2003); *Troup v. Toyota Motor Corp.*, 545 Fed. Appx. 668 (9th Cir. 2013); *Robinson v. Kia Motors, Am., Inc.*, 2015 WL 5334739, *12 (D.N.J. Sept. 11, 2015); *Schechner v. Whirlpool Corp.*, 2017 U.S. Dist. LEXIS 20282, *18-19 (E.D. Mich. Feb. 14, 2017).

15

claims fail because Plaintiffs do not allege that they presented their vehicles to dealers for repair during the warranty period, as required under the terms of the warranty. Plaintiffs argue that they were not required to comply with this requirement because it would have been "futile" to do so. Opp. at 22-24. Plaintiffs base this contention on a handful of online consumer complaints cited in the FAC in which customers reported that they were told that the level of oil consumption they were experiencing was normal. FAC ¶¶ 159-163.

This Court rejected a similar argument in *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 970–71 (N.D. Cal. 2014). While explaining that "futility may, in theory, be a basis for an excuse," the Court noted that the plaintiffs in that case "cited no cases establishing a futility exception to the presentation required by the express terms of the express warranty." *Id.* The same is true here. More importantly, even assuming that the futility argument was possible, the Court held in that case that there were "insufficient allegations in the complaint to make futility plausible." There, the Court found that 39 consumer complaints did "not meet the requisite plausibility standard of *Iqbal* and *Twombly*." The record is even thinner here, as of the 13 consumer complaints Plaintiffs cite in their FAC, only three stated that the dealer had informed them that the level of oil consumption was normal. In short, the fact that three individuals, out of the thousands who own similar vehicles, were told that it was not necessary to repair their cars cannot plausibly establish that it would have been futile for Plaintiffs to attempt to repair their cars per the terms of their warranties. The court therefore **GRANTS** GM's motion to dismiss Plaintiffs' express warranty claims with leave to amend.

F.  Implied Warranty

Plaintiffs also assert claims based on GM's alleged breach of the implied warranty of merchantability. The implied warranty of merchantability provides that "'a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind' and that '[g]oods to be merchantable must be at least such as ... are fit for the ordinary purposes for which such goods are used.'" UCC § 2–314. Courts have held that "a breach of the implied warranty of merchantability means the product did not possess even the most basic degree of fitness for ordinary use." *Mocek v. Alfa Leisure, Inc.*, 114 Cal. App. 4th

16

402, 406 (2003). Under that standard, GM argues, Plaintiffs' claims must fail, because the ordinary purpose of a car is to provide transportation, and no Plaintiff alleges that he or she was forced to stop driving his or her vehicle, or that any excessive oil consumption interfered with the safe operation of the vehicles. Indeed, as noted above, none of the Plaintiffs alleges that they experienced excessive oil consumption at all. Plaintiffs, on the other hand, argue that they have alleged an engine defect which can lead to engine damage and safety concerns. That defect therefore necessarily interferes with the ordinary operation of the car.

In *MyFord Touch*, this Court addressed similar claims and found that dismissal under Rule 12(b)(6) was not warranted, because "it is a question of fact for the jury as to whether the problems with MFT posed enough of a safety risk that the cars at issue could not be said to provide safe, reliable transportation." 46 F. Supp. 3d at 980. However, in *MyFord Touch*, this Court concluded that Plaintiffs had adequately alleged a safety risk for the purpose of stating a claim under the UCL and CLRA. For the reasons discussed above, in this case the Court comes to the opposite conclusion. Here, no Plaintiff has alleged that he experienced any engine problems, or even any excessive oil consumption. Most of the complaints cited in the FAC similarly do not claim any serious engine problems beyond the fact of the excessive oil consumption itself, although one claimed that he experienced the engine "misfir[ing] and run[ning] rough." FAC ¶ 159. Furthermore, Plaintiffs concede that all of the cars at issue have a functioning oil level gauge that can provide advance warning when oil levels are low. There is thus no credible risk of sudden engine failure because of the excess oil consumption. Plaintiffs' allegations in this case are not sufficient to create a fact question for the jury whether the cars at issue "could not be said to provide safe, reliable transportation." *MyFord Touch*, 46 F. Supp. 3d at 980. The Court therefore **GRANTS** GM's motion to dismiss Plaintiffs' implied warranty claims with leave to amend.

G. <u>Unjust Enrichment</u>

Finally, Plaintiffs assert common law claims for unjust enrichment. GM argues that these claims fail for a number of reasons. First, GM makes a cursory argument that there is no standalone cause of action for unjust enrichment. But GM itself appears to acknowledge that this is foreclose by the Ninth Circuit's decision in *Astiana v. Hein Celestial Grp.*, 783 F.3d 753, 762

17

(9th Cir. 2015), under which the court may construe an unjust enrichment claim as a quasi-contract claim for restitutionary relief.  Second, GM argues that such a claim cannot be brought where there is an express contract governing the purchases at issue.  But as Plaintiffs argue, under FRCP 8(d), a party is permitted to assert inconsistent alternative claims for relief.  Moreover, in *Astiana* the Ninth Circuit held that "even if a cause of action [for unjust enrichment] is duplicative of or superfluous to other claims, this is not grounds for dismissal. *Id.*  Relying on that holding, this Court previously denied a motion to dismiss unjust enrichment claims where the plaintiffs had also pled claims based on the warranty contracts that existed between the parties.  *In re Safeway Tuna Cases*, No. 15-CV-05078-EMC, 2016 WL 3743364, at *2 (N.D. Cal. July 13, 2016).

However, the unjust enrichment claims all depend on the allegation that GM wrongfully obtained a benefit by concealing the low-tension oil ring defect.  As explained above, the allegations regarding GM's knowledge and concealment of the defect are not sufficient to rise to the level of plausibility.  The Court therefore **GRANTS** GM's motion to dismiss the unjust enrichment claims.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** GM's motion to dismiss in its entirety. The Court grants Plaintiffs leave to file a Second Amended Complaint within thirty (30) days of the filing of this order.

This order disposes of Docket No. 47.

**IT IS SO ORDERED**.

Dated: August 1, 2017

EDWARD M. CHEN
United States District Judge