UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONTEVILLE SLOAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GENERAL MOTORS LLC,<br><br>Defendant. | Case No. 16-cv-07244-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Docket No. 70 |

Plaintiffs allege that Defendant General Motors (GM) manufactured and sold a car engine that, due to several internal defects, consumes excessive amounts of oil, resulting in engine damage that presents a safety risk of sudden shutdowns or engine fires. GM moves to dismiss on several grounds which can broadly be grouped under challenges to personal jurisdiction for the out-of-state plaintiffs; failure to plead an unreasonable safety hazard or pre-sale knowledge that gives rise to a duty to disclose in support of the consumer protection and fraud claims; failure to adequately plead reliance on the omission; failure to allege the defect manifested during the implied warranty period; and various statute of limitations or pre-suit notice issues.

As explained below, Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiffs allege that the Gen IV Vortec 5300 engine suffers from an "inherent" "Oil Consumption Defect." SAC ¶ 7. The engine was installed in each of the Class Vehicles: the 2010-2014 Chevrolet Avalanche; 2010-2012 Chevrolet Colorado; 2010-2013 Chevrolet Express; 2010-2013 Chevrolet Silverado; 2010-2014 Chevrolet Suburban; 2010-2014 Chevrolet Tahoe; 2010-2013 GMC Canyon; 2010-2013 GMC Savana; 2010-2013 GMC Sierra; 2010-2014 GMC

Yukon; and the 2010-2014 GMC Yukon XL. *Id.* ¶ 2.

Plaintiffs identify five defects that "contribute" to the overall "Oil Consumption Defect." First, the "primary cause" are "piston rings . . . [that] do not maintain sufficient tension to keep oil in the crankcase." SAC ¶ 8. Second, the Active Fuel Management (AFM) system "contributes" to the defect by "spraying oil directly at the piston skirts," which "overloads and fouls the defective piston rings, triggering oil migration past the rings." SAC ¶ 9. Third, the PCV system "vacuums oil from the valvetrain into the intake system, where it is ultimately burned in the combustion chambers" contributing to excessive oil combustion. SAC ¶ 10. Fourth, the defective "Oil Life Monitoring System" does not monitor oil level, but rather, engine conditions like revolutions and temperature to predict oil quality. SAC ¶ 11. Because it does not take oil *level* into account, the system "directs drivers to travel thousands of miles with inadequate engine lubricity levels, wearing out and damaging moving internal engine components." *Id.* Fifth, the oil pressure gauge "*does not* provide any indication as to when the oil pressure . . . falls to levels low enough to damage internally lubricated parts or cause engine failure" and the oil canister symbol does not illuminate "until well past the time when the Class Vehicles are critically oil starved." SAC ¶ 13.

Plaintiffs also discuss the impact of the alleged defect on their own vehicles and on other consumers. The nature of these allegations is discussed in detail in the relevant sections below.

The chart below identifies each named plaintiff, the state of purchase, the date of purchase, and the vehicle purchased.

///

///

///

///

///

///

///

///

///

2

**Chart of Named Plaintiffs in SAC**

| Name | State of Purchase | Car | Date of Purchase |
| --- | --- | --- | --- |
| Raul Siqueiros | California | 2011 Chevrolet Silverado | N/A |
| Joseph Brannan | Alabama | 2010 GMC Yukon | 2011 |
| Larry Goodwin | Arkansas | 2011 Chevrolet Silverado | 2010 |
| Marc Perkins | Delaware | 2011 Chevrolet Avalanche | 2011 |
| Donald Ludington | Florida | 2010 Chevrolet Tahoe | 2012 |
| Thomas Shorter | Florida | 2011 Chevrolet Silverado | N/A |
| Derick Bradford | Georgia | 2010 Chevrolet Silverado | 2014 |
| Gabriel Del Valle | Idaho | 2013 Chevrolet Avalanche | 2/2016 |
| Kevin Hanneken | Illinois | 2011 GMC Sierra 1500 | 2011 |
| Dan Madson | Kansas | 2013 Chevrolet Silverado | 12/2013 |
| James Faulkner | Kentucky | 2011 GMC Sierra | 2015 |
| Joseph Olivier | Louisiana | 2013 GMC Sierra | N/A |
| Scott Smith | Massachusetts | 2011 GMC Yukon | 2012 |
| Ross Dahl | Minnesota | 2010 Chevrolet Silverado | 2010 |
| Drew Peterson | Minnesota | 2013 Chevrolet Silverado | 12/2012 |
| Michael Ware | Mississippi | 2013 Chevrolet Silverado | 2016 |
| Steve Kitchen | Missouri | 2013 Chevrolet Silverado | 07/2013 |
| Barbara Molina | New Mexico | 2012 Chevrolet Avalanche | N/A |
| Steven Ehrke | North Carolina | 2013 Chevrolet Silverado | 2/2016 |
| Thomas Gulling | Ohio | 2013 Chevrolet Silverado | N/A |
| Ronald Jones | Ohio | 2013 Chevrolet Silverado | N/A |
| Mike Warpinski | Oklahoma | 2012 Chevrolet Express | 2014 |
| John Graziano | Pennsylvania | 2012 Chevrolet Silverado | 12/2011 |
| Monteville Sloan | California | 2013 Chevrolet Silverado | 08/2014 |
| Joshua Byrge | Tennessee | 2012 Chevrolet Silverado | 2016 |
| Rudy Sanchez | Texas | 2013 Chevrolet Silverado | 07/2013 |
| Christopher Thacker | Virginia | 2010 Chevrolet Silverado | 06/2014 |
| Randy Clausen | Washington | 2012 Chevrolet Suburban | 2013 |
| James Robertson | West Virginia | 2010 GMC Sierra 1500 | 2010 |
| Jonas Bednarek | Wisconsin | 2010 Chevrolet Suburban | 2010 |
| Todd & Jill Cralley | California | 2010 Chevrolet Suburban | N/A |
| Edwin & Katelyn Doepel | Illinois | 2013 GMC Yukon | N/A |
| Dennis Vita | New York | 2013 GMC Sierra | N/A |
| William Martel | Oregon | 2011 Chevrolet Silverado | 2011 |
| Kelly Harris | N/A (Received from employer) | 2012 Chevrolet Silverado | 2012 |

## II.  LEGAL STANDARD

In considering a Rule 12(b)(6) motion to dismiss, a court must take all allegations of fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule

3

12(b)(6) dismissal." *Cousins v. Lockyer,* 568 F.3d 1063, 1067 (9th Cir. 2009). While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *see also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Id.*

Claims sounding in fraud or mistake are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires that a plaintiff alleging fraud "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir. 2009) (holding that nondisclosure claims sound in fraud and are subject to Rule 9(b)). To satisfy the heightened standard under Rule 9(b), the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir. 1985). The plaintiff must set forth "what is false or misleading about a statement, and why it is false." *In re Glenfed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994) (en banc), *superseded by statute on other grounds as stated in Ronconi v. Larkin,* 253 F.3d 423, 429 n. 6 (9th Cir. 2001).

## III. DISCUSSION

Defendant raises numerous challenges to Plaintiffs' Second Amended Complaint ("SAC"), including whether:

- there is personal jurisdiction for the out-of-state plaintiffs;
- the fraud and consumer protection claims have been adequately pleaded;
- the implied warranty claims fail for failure to allege the vehicles were unfit for use; and
- various statute of limitations or pre-suit notice procedural challenges bar Plaintiffs' implied warranty, unjust enrichment, and consumer protection claims.

4

Each challenge is analyzed below.

A.  <u>Personal Jurisdiction</u>

Defendant argues that *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal.*,137 S.Ct. 1773 (2017), requires dismissal for lack of personal jurisdiction of all claims by non-California named plaintiffs who did not purchase their cars in California.  Plaintiffs argue this challenge has been waived because Defendant made general appearances and did not object to personal jurisdiction in a timely fashion.  Defendant filed its first motion to dismiss on April 10, 2017, Docket No. 47, but the hearing was held on July 5, 2017, Docket No. 60, after the Supreme Court decided *Bristol-Myers* on June 19, 2017.  Defendant counters that there was no waiver, and, even if there were, it would not apply to the new plaintiffs who were added only to the Second Amended Complaint and for whom this motion is the first opportunity to challenge personal jurisdiction.  The Court requested, and the parties have filed, supplemental briefing.  *See* Docket Nos. 87 and 88.

As explained below, Defendant failed to raise its challenge to personal jurisdiction at the first available opportunity with respect to 27 non-California plaintiffs.[1]  However, this is Defendant's first opportunity to challenge personal jurisdiction with respect to five named plaintiffs who were added to the case in the Second Amended Complaint: the Doepels (Illinois), Vita (New York), Martell (Oregon), and Harris (Washington).

   1.  <u>Waiver of Challenge to Personal Jurisdiction as to Original Plaintiffs Already in Case</u>

Rule 12 permits a party to request dismissal on the basis that a court lacks personal jurisdiction.  *See* Rule 12(b)(2).  However, that defense is "waive[d]" if a party "fail[s] to . . . (i) make it by motion under this rule; or (ii) include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course."  Fed. R. Civ. P. 12(h)(1).  This "strict waiver

---

[1]  There are only 5 named plaintiffs who reside in California or who purchased vehicles in California, and for whom Defendant has not challenged personal jurisdiction (Sloan, Siqueiros, Del Valle, and the Cralleys).  Thus, the waiver applies to 27 plaintiffs who were previously named and for whom timely challenges were not made (Brannan, Goodwin, Perkins, Ludington, Shorter, Bradford, Hanneken, Madson, Faulkner, Olivier, Smith, Dahl, Peterson, Ware, Kitchen, Molina, Ehrke, Gulling, Jones, Warpinski, Graziano, Byrge, Sanchez, Thacker, Clausen, Robertson, and Bednarek).

rule" "extends only to defenses 'then available.'" *Glater v. Eli Lilly & co.*, 712 F.2d 735, 738 (1983) (quoting Fed. R. Civ. P. 12(g)). To show a defense was not previously available, a defendant must demonstrate that it "would have been directly contrary to controlling precedent in this Circuit." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135-36 (2d Cir. 2014).

Defendant did not challenge personal jurisdiction over the claims of the original Plaintiffs at the first opportunity. Though the issue had been percolating (the appeal of *Bristol-Myers* to the U.S. Supreme Court was already pending), Defendant failed to challenge personal jurisdiction over those Plaintiffs. Then, *Bristol-Myers* was decided approximately two weeks *before* the hearing on Defendant's first motion to dismiss. Defendant could have filed a notice of supplemental authority or could have requested leave from the Court to submit supplemental briefing, but it failed to do so. Moreover, Defendant did not object to personal jurisdiction at the hearing on its motion. Accordingly, the argument was waived.

Defendant has not shown that the exception for an argument previously "unavailable" applies here. Contrary to Defendant's contention, *Bristol-Myers* did not reverse any Ninth Circuit precedent foreclosing Defendant's challenge. Indeed, the Supreme Court expressly stated that its decision did not inaugurate a change in law. *See Bristol-Myers*, 137 S.Ct. at 1781 ("Our settled principles . . . control this case."); *id.* at 1783 ("Our straightforward application in this case of settled principles of personal jurisdiction will not result in the parade of horribles that respondents conjure up."). Further, the Supreme Court limited its holding and expressly stated that the very question raised by Defendant's challenge here was not addressed in *Bristol-Myers*. *Id.* at 1783-84 ("[S]ince our decision concerns the due process limits on the exercise of specific jurisdiction *by a State*, we leave open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." (emphasis added)).

Moreover, Defendant has not identified a single Ninth Circuit case overturned by *Bristol-Myers*. *See Alvarez v. Nbty, Inc.*, 2017 WL 6059159, at *4, n.2 (S.D. Cal. Dec. 6, 2017) (holding that personal jurisdiction defense was previously available because *Bristol-Myers* did not overturn controlling precedent). Nor has Defendant identified controlling precedent in the Ninth Circuit directly precluding its jurisdictional argument. Rather, Defendant's sole argument is that the

Supreme Court reversed the California Supreme Court and Defendant should not have been expected to take a position contrary to *that* court. This argument is unpersuasive for two reasons.

First, the California Supreme Court's decision in *Bristol-Myers* did not control Defendant's available defenses. Though a federal court looks to the long-arm statute of the state in which it resides to determine whether it may exercise personal jurisdiction over an out-of-state defendant, California law permits the exercise of personal jurisdiction to the maximum extent permitted under the U.S. constitution's due process clause. *See* Cal. Civ. Proc. Code § 410.10. Thus, the outer boundaries of California personal jurisdiction (and therefore this Court's) concerned a federal question over which the Ninth Circuit and U.S. Supreme Court had ultimate authority, not a question of state law over which the California Supreme Court's decisions controlled. The California Supreme Court's decision did not constitute controlling Ninth Circuit authority.

Second, the California Supreme Court's opinion was sharply divided in a four-three vote with a published dissent, *see Bristol-Myers Squibb Co. v. Sup. Ct.*, 1 Cal.5th 783 (2016), and the U.S. Supreme Court granted certiorari on January 19, 2017, *see* 137 S.Ct. 827 (2017). Thus, it is not credible to suggest that by the time Defendant filed its first motion to dismiss four months later on April 10, 2017, *see* Docket No. 47, it felt so constrained by the California Supreme Court's divided opinion that it could not have been expected to raise or at the very least preserve a personal jurisdiction challenge in this case. And even to the extent Defendant felt constrained by the California Supreme Court, that does not explain why Defendant did not take advantage of a two-week window between *Bristol-Myers* and the hearing on its first motion to dismiss to notify the Court it intended to challenge personal jurisdiction.

Finally, Defendant has argued that the waiver of personal jurisdiction is discretionary. The Court is not persuaded. Rule 12's language is mandatory, not discretionary. *See* Fed. R. Civ. P. 12(g)(2) (a party making a motion "*must not* make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion" (emphasis added)); Fed. R. Civ. P. 12(h)(1) ("A party *waives* any defense listed in Rule 12(b)(2)-(5) by: (A) omitting it from a motion in the circumstances described in Rule 12(g)(2) . . . ." (emphasis added)).

Defendant cites only one case to support this contention, *Greene v. Mizuho Bank, Ltd.*, 2017 U.S. Dist. LEXIS 202802 (D. Ill. Dec. 11, 2017), but *Greene* is distinguishable. There, the defendant filed a motion to dismiss for lack of personal jurisdiction *before* the Supreme Court's decision in *Bristol-Myers*, and sought reconsideration afterwards. In those circumstances, the court excused the fact that Defendant's initial personal jurisdiction challenge was based on a different theory and explained that it "retain[ed] the independent power to identify and apply the proper construction of governing law, even where the parties fail to advert to the applicable rule in their own briefing." *Id.* at *18 (quotations, citations, and alterations omitted). Importantly, there had been no waiver because the defendant had actually challenged personal jurisdiction before *Bristol-Myers*. In contrast, here, Defendant did not attempt to challenge personal jurisdiction prior to the present motion.

Even if the Court could exercise its discretion to excuse the waiver, however, such an excuse would be unwarranted. Defendant has not explained why it could not have alerted the Court to its intention to challenge personal jurisdiction at the hearing on its initial motion to dismiss. Moreover, the purpose of Rule 12(g)'s requirement that all challenges be presented in a single motion to dismiss is "to eliminate unnecessary delay at the pleading stage." Fed. Prac. & Proc. § 1384 (3d ed.). By failing to notify the Court that it intended to challenge personal jurisdiction at that initial hearing, Defendant forced the court to adjudicate plaintiffs' claims on the merits before considering a potentially dispositive threshold issue.

Because Defendant's challenge to personal jurisdiction with respect to the original named plaintiffs was not raised at the first available opportunity. Defendant's jurisdictional challenge to these Plaintiffs has been waived.

### 2. The Court Has Personal Jurisdiction Over the New Out-of-State Named Plaintiffs' Claims

Nevertheless, this motion is Defendant's first opportunity to challenge personal jurisdiction with respect to the plaintiffs *newly* named in the SAC, so that challenge must be considered on the merits. This challenge applies to Plaintiffs Mr. and Mrs. Doepel (Illinois), Plaintiff Vita (New York), Plaintiff Martell (Oregon), and Plaintiff Harris (Washington). Their claims only involve

two new states (New York and Oregon) because Plaintiffs Hanneken and Clausen, with respect to whom the personal jurisdiction challenge has been waived, also bring claims under Illinois and Washington law, respectively.

Whether the Court may assert specific jurisdiction over a nonresident defendant "focuses on the relationship among the defendant, the forum, and the litigation." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (quotation and citation omitted). "[T]he defendant's suit-related conduct must create a substantial connection with the forum State." *Id.* (quotation and citation omitted). Three requirements must be met: "(1) the defendant must either purposefully direct his activities toward the forum or purposefully avail himself of the privileges of conducting activities in the forum; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable." *Id.* (quotation and citations omitted).

a.   The Supreme Court's Holding in *Bristol-Myers*

Defendant challenges personal jurisdiction on the basis of *Bristol-Myers*, which relates to the second prong, whether "the claim . . . arises out of or relates to the defendant's forum-related activities." *Id.* In *Bristol-Myers*, plaintiffs from around the country sued Bristol-Myers Squibb Company (BMS) in California state court, alleging that its drug Plavix damaged their health and violated, *inter alia*, California products liability, negligent misrepresentation, and misleading advertising laws. BMS itself was an out-of-state defendant, incorporated in Delaware and headquartered in New York. It sold Plavix in California and engaged in other business activities there, but it "did not develop Plavix in California, did not create a marketing strategy for Plavix in California, and did not manufacture, label, package, or work on the regulatory approval of the product in California." 137 S.Ct. at 1778. The California Supreme Court had nevertheless reasoned that the exercise of specific jurisdiction over the out-of-state plaintiffs' claims was reasonable under its "sliding scale approach to specific jurisdiction" under which "the more wide ranging the defendant's forum contacts, the more readily is shown a connection between the forum contacts and the claim" because the claims by all plaintiffs were "based on the same allegedly defective product and the assertedly misleading marketing and promotion of that product." *Id.* at

1779 (quotations and citations omitted).

The U.S. Supreme Court disagreed. That Court emphasized that the interests to be considered in determining whether personal jurisdiction exists include "the interests of the forum State and of the plaintiff in proceeding with the cause in the plaintiff's forum of choice," but that the "primary concern is the burden on the defendant." *Id.* at 1780 (quotations and citations omitted). This analysis "obviously requires a court to consider the practical problems resulting from litigating in the forum, but it also encompasses the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question." *Id.* As the Supreme Court explained, the principle of personal jurisdiction is in part "a consequence of territorial limitations on the power of the respective States," as "[t]he sovereignty of each State . . . implie[s] a limitation on the sovereignty of all its sister states." *Id.* at 1780 (citations and quotations omitted). These federalism concerns underpinned *Bristol-Myers*.

Because of these significant interstate federalism concerns, the Supreme Court rejected the notion that mere factual or legal *similarity* between the California plaintiffs' claims and the non-resident plaintiffs' claims somehow sufficed to create personal jurisdiction. "The mere fact that *other* plaintiffs were prescribed, obtained, and ingested Plavix in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims." *Bristol-Myers*, 137 S.Ct. at 1781. Rather, "[w]hat is needed . . . is a connection between the forum and the specific claims at issue." *Id.* The plaintiffs could not demonstrate such a connection with respect to the out-of-state plaintiffs because defendant had not done anything related to *their* claims in California. Accordingly, the Supreme Court held that California state courts lacked specific personal jurisdiction over out-of-state defendants for claims brought by out-of-state plaintiffs, where there were no sufficient contacts between defendants' conduct in connection with those claims and the forum state, California. 137 S. Ct. at 1782-83. This conclusion was driven by the limitations of state sovereignty. Indeed, before analyzing the lack of a connection between California and the nonresident plaintiffs' claims, the Supreme Court emphasized that "at times, [the] federalism interest may be decisive" in the personal jurisdiction analysis. *Id.* at 1780 (quotation omitted). It noted that, "[e]ven if the

10

defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, *acting as an instrument of interstate federalism*, may sometimes act to divest the State of its power to render a valid judgment." *Id.* at 1780-81 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980) (alteration in original, emphasis added)).

### b. Defendant's Challenge Under *Bristol-Myers*

Defendant contends that *Bristol-Myers* applies in a straight-forward manner to this case because the out-of-state plaintiffs cannot allege any act in California that touches on their claims. Plaintiffs do not allege, for example, that the defective vehicles were designed or manufactured in California, that the decision not to disclose the defect was made in California, or that marketing materials omitting the defect and used nationwide were designed in or promulgated from California to their states. *Compare Bristol-Myers Squibb*, 137 S.Ct. at 1778 (noting that "[defendant] did not develop Plavix in California, did not create a marketing strategy for Plavix in California, and did not manufacture, label, package, or work on the regulatory approval of the product in California").

The Court agrees, and Plaintiffs appear to concede, that the out-of-state plaintiffs have not shown an independent relationship between their claims under the laws of Illinois, New York, Washington, and Oregon, and Defendant's contacts with the State of California which could satisfy *Bristol-Myers*. Plaintiffs argue, however, that *Bristol-Myers* does not apply to federal courts and that despite the lack of an independent connection between the out-of-state claims and Defendant's California contacts, the Court may exercise its discretion under the circumstances here to apply the doctrine of "pendent personal jurisdiction," citing *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174 (9th Cir. 2004).

The Court will first address the question whether *Bristol-Myers* applies straightforwardly to federal courts and second whether the doctrine of pendent personal jurisdiction permits the out-of-state Plaintiffs' claims to be heard in this Court, at least under the particular facts of the instant case.

11

i.    Does *Bristol-Myers* Apply to Federal Courts?

*Bristol-Myers* expressly left open the question whether its holding extended to federal courts. *Id.* at 1783-84. The Court is not persuaded that such a categorical extension is warranted. *Bristol-Myers* was animated by unique interstate federalism concerns. Indeed, the Supreme Court emphasized that, when analyzing the power of a state court to exercise personal jurisdiction, the inquiry regarding the prospective burden on an out-of-state defendant "encompasses the more abstract matter of submitting [the defendant] to the coercive power of a State that may have little legitimate interest in the claims in question." *Id.* at 1790. It noted that in certain cases this interest could be "decisive," irrespective of whether the exercise of jurisdiction by the state imposes a burden on the defendant. *Id.* at 1780-81 (quotation omitted). Thus, the Supreme Court's analysis in *Bristol-Myers* must be understood through the lens of those interstate federalism concerns, which the Court incorporated into its due process analysis.

As the Supreme Court has previously explained:

> [i]t is true that we have stated that the requirement of personal jurisdiction, as applied to state courts, reflects an element of federalism and the character of state sovereignty vis-à-vis other States. [. . .] The restriction on state sovereignty power . . . however, must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause. That Clause is the only source of the personal jurisdiction requirement and the Clause itself makes no mention of federalism concerns.

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, n. 10 (1982) (citations omitted). This passage make clear that the due process analysis encompasses the question of state sovereignty, but also that the due process analysis differs fundamentally when a case is pending in federal court and no such concerns are raised. *Id.* (discussing "the requirement of personal jurisdiction, *as applied to state courts*") (emphasis added).

In *Bristol-Myers*, the Supreme Court did not address the question of whether BMS would face any undue burden in California court; rather, the Court's analysis focused exclusively on the unfairness of submitting BMS to the jurisdiction to a foreign sovereign (California) with respect to claims having no independent connection to that sovereign. *Bristol-Myers*, 137 S.Ct. at 1780. The focus of the Court's analysis, as well as its preface that interstate sovereignty concerns may be

"decisive" even when a defendant faces no burden, *id.* at 1780-81, provide the backdrop against which *Bristol-Myers'* import must be understood.

In contrast to *Bristol-Myers*, the due process right does not obtain here in the same manner because all federal courts, regardless of where they sit, represent the same federal sovereign, not the sovereignty of a foreign state government. There is no risk of a state court exceeding the bounds of its state's sovereignty and subjecting residents of another state to the coercing power of its courts. Therefore, where a federal court presides over litigation involving a federal question,[2] the due process analysis does not incorporate the interstate sovereignty concerns that animated *Bristol-Myers* and which may be "decisive" in a state court's analysis. *Id.* Without those interstate federalism concerns, the due process analysis falls back on whether "the maintenance of the suit . . . offend[s] 'traditional notions of fair play and substantial justice,'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted), which itself focuses on the burden on the defendant (other than a concern about subjecting it to the power of a foreign sovereign).[3]

The Court thus returns to the traditional three-part test summarized above: "(1) the

---

[2] Plaintiffs have brought a claim under the Magnuson Moss Warranty Act, which confers the Court with federal question jurisdiction. The Court does not address whether and how *Bristol-Myers* would apply if jurisdiction arose exclusively on the basis of diversity.

[3] Ford has cited a number of federal district court cases applying *Bristol-Myers* to dismiss the claims of out-of-state plaintiffs, however, those cases do not analyze or discuss this crucial distinction and are therefore unpersuasive. *See Jordan v. Bayer Corp.*, 2017 U.S. Dist. LEXIS 109206, *8-11, 2017 WL 3006993, *4 (E.D. Mo. July 14, 2017) (dismissing out-of-state plaintiffs' claims without considering whether *Bristol-Myers* applies to federal courts in the same way); *Turner v. Boehringer Ingelheim Pharms, Inc.*, 2017 WL 3310696, *2 (E.D. Mo. Aug. 3, 2017) (same); *In re Dental Supplies Antitrust Litig.*, 2017 WL 4217115, *9, 2017 U.S. Dist. LEXIS 153265, *37-38 (E.D.N.Y. Sept. 20, 2017) (same); *Spratley v. FCA US LLC*, 2017 WL 4023348 (N.D.N.Y. Sept. 12, 2017) (same); *McDonnell v. Nature's Way Prods.*, LLC, 2017 U.S. Dist. LEXIS 177892, *10-12, 2017 WL 4864910 (N.D. Ill. Oct. 26, 2017) (the court applied *Bristol-Myers'* analysis to dismiss claims that an Illinois plaintiff sought to bring on behalf of out-of-state putative class members under out-of-state statutes, however, this analysis appears to conflate standing with personal jurisdiction). Ford also cited several other cases but they are inapposite for other reasons. *Ferrari v. Mercedes-Benz USA, LLC*, 2017 WL 3115198, *2 (N.D. Cal. July 21,2017) (inapposite because it does not discuss *Bristol-Myers* and how it applies to out-of-state plaintiffs in federal courts); *Andrew v. Radiancy, Inc.*, 2017 WL 2692840, *6–7 (M.D. Fla. June 22, 2017) (same); *Demedicis v. CVS Health Corp.*, 2017 U.S. Dist. LEXIS 19589, *10-12, 2017 WL 569157 (N.D. Ill. Feb. 13, 2017) (single plaintiff case without discussion of *Bristol-Myers*).

defendant must either purposefully direct his activities toward the forum or purposefully avail himself of the privileges of conducting activities in the forum; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable." *Axiom Foods*, 874 F.3d at 1068 (quotation and citations omitted).

Here it is undisputed that GM has availed itself of the privilege of conducting business in the state of California, so the first prong is not at issue. The Court will therefore proceed to analyze the second and third prongs below.

        ii.      Do the Nonresident Plaintiffs' Claims Arise Out of GM's Suit-related Contacts?

Plaintiffs concede that the out-of-state plaintiffs cannot demonstrate an *independent* connection between their claims and Defendant's contacts with California. Instead, they rely on the doctrine of "pendent personal jurisdiction," as elaborated by the Ninth Circuit in *Action Embroidery*. *See* 368 F.3d 1174. In *Action Embroidery*, the district court had dismissed the plaintiffs' California Cartwright Act claims against out-of-state defendants in the absence of any related contacts with California. The plaintiffs' federal Sherman Act claims were permitted to proceed because that statute creates nationwide personal jurisdiction by virtue of permitting nationwide service of process. *See* 15 U.S.C. § 22. On appeal, the Ninth Circuit reversed. It re-affirmed the principle that "[p]ersonal jurisdiction must exist for each claim asserted against a defendant," and recognized that California's long-arm statute "would not allow the exercise of personal jurisdiction over the[] state-law claims if they were standing alone." *Id.* However, the Ninth Circuit observed that several other circuits had adopted the doctrine of "pendent personal jurisdiction" in which "a court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Id.* Adopting the doctrine, the Ninth Circuit held that "[w]hen a defendant must appear in a forum to defend against one claim, it is often reasonable to compel that defendant to answer other claims in the same suit arising out of a common nucleus of

14

operative facts." *Id*. at 1181. It found that "judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties is best served by adopting this doctrine." *Id*. Whether to exercise pendent personal jurisdiction is afforded to the discretion of the district court. *Id*. In essence, *Action Embroidery* holds that a claim that itself lacks an independent connection to the federal forum nevertheless may have a sufficient nexus for purposes of the personal jurisdiction analysis if it arises out of a common nucleus of operative facts with other claims properly before the court.

To be sure, the relationship between the claims at issue in *Action Embroidery* and the forum state were arguably closer than those at issue here because the same plaintiffs already before the court asserted them in *Action Embroidery*. In contrast, here, the out-of-state plaintiffs ask the Court to exercise pendent personal jurisdiction over their claims based on its jurisdiction over the California plaintiffs' claims—a situation analogous to *Bristol-Myers*. Although the Court is mindful of these factual dissimilarities, the Ninth Circuit did not limit its holding in *Action Embroidery* to situations involving the same parties. Rather, it focused on whether the new *claims* arose out of the same nucleus of operative facts, not whether the claims belonged to the same plaintiffs. *See Action Embroidery*, 368 F.3d at 1181 ("[w]hen a defendant must appear in a forum to defend against one claim, it is often reasonable to compel that defendant to answer other *claims* in the same suit arising out of a common nucleus of operative facts" (emphasis added)); *see also id.* ("a court may assert pendent personal jurisdiction over a defendant with respect to a *claim* for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a *claim* in the same suit over which the court does have personal jurisdiction" (emphasis added)). Thus, the Ninth Circuit has not limited the doctrine of pendent personal jurisdiction to when a relationship is shown to "other claims by the same *plaintiff*" but rather to "other claims in the same *suit*," *id.* (emphasis added).[4]

---

[4] The Court is aware that some district courts around the country have declined to apply the doctrine of pendent personal jurisdiction to bootstrap one plaintiff's personal jurisdiction to another's, but those cases were not interpreting or applying the Ninth Circuit's standard in *Action Embroidery*. *See, e.g.*, *Spratley v. FCA US LLC*, 2017 WL 4023348, at *7 (N.D.N.Y. Sep. 12, 2017) (rejecting theory of "pendent personal jurisdiction" and dismissing claims against of out-of-state plaintiffs' state-law claims against Chrysler alleging concealing of a known safety defect);

United States District Court
For the Northern District of California

Despite the broad language of *Action Embroidery*, it may be argued that the nexus between the claims in suit and the forum state are typically more attenuated where a different non-resident plaintiff asserts the new claims than when the same resident plaintiff asserts new claims. Applying pendent personal jurisdiction to such a plaintiff's claims therefore constitutes a factual extension of *Action Embroidery*; the calculus may differ, particularly in light of *Bristol-Myers'* holding that a common nucleus of operative facts was not in and of itself sufficient to justify the exercise of a state court's sovereign power over an out-of-state defendant. Thus, it is by no means clear whether *Action Embroidery*'s pendent personal jurisdiction doctrine extends categorically to claims brought by different plaintiffs. However, there are several case-specific factors that weigh in favor of finding a requisite nexus and hence personal jurisdiction here.

First, this is a putative nationwide class action. The Court may well have jurisdiction over absent class members (including the named out-of-state plaintiffs) who are non-forum residents in any event. *See*, *e.g.*, *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 2017 WL 4224723 (N.D. Cal. Sep. 22, 2017) (rejecting the argument that *Bristol-Myers* precludes a court from exercising personal jurisdiction over the claims of absent class members who are out-of-state);[5] *In re Chinese-Manufactured Drywall Prods. Liability Litig.*, 2017 WL 5971622, at *12-13 (E.D. La. Nov. 30, 2017) (same); *cf. Swamy v. Title Source, Inc.*, Case No. 17-01175 WHA, 2017 WL 5196780 (N.D. Cal. Nov. 10, 2017) (rejecting the argument that *Bristol-Myers* precludes a court from exercising personal jurisdiction over the claims of out-of-state opt-in plaintiffs in a collective

---

*DeMaria v. Nissan N. Am., Inc.*, 2016 WL 374145, *8 (S.D. Ill. Feb. 1, 2016) (finding no personal jurisdiction for out-of-state plaintiffs "where each plaintiff's claim is predicated on the law of the particular state where he or she purchased a car and the claims of the other plaintiffs as alleged remain unrelated to anything that transpired in Illinois"); *Plumbers' Local Union No. 690 Health Plan v. Apotex Corp.*, 2017 WL 3129147, at *9 (E.D. Penn. Jul. 24, 2017) (finding no personal jurisdiction for out-of-state plaintiffs' claims under non-forum state laws because they "do not arise out of or relate to any of [defendants'] conduct within the forum state").

[5] Although *Fitzhenry-Russell* rejected the plaintiffs' argument that *Bristol-Myers'* reasoning was inherently limited to state courts because "federal courts routinely apply the specific jurisdiction analysis to defendants in cases that are before them solely on the basis of diversity," *id.* at *4, that case involved only claims under California state law, so arguably implicated interstate federalism concerns. It did not address a situation where, like here, subject matter jurisdiction is also premised on a federal question under the Magnuson Moss Warranty Act. *See* 15 U.S.C. § 2310(d). In any event, *Fitzhenry-Russell* did not fully analyze the federalism concerns which underpin *Bristol-Myers* but which are absent here.

action proceeding under the Fair Labor Standards Act). They are not strangers to this litigation.

Second, as discussed in more detail in the following section, the exercise of personal jurisdiction over the non-resident Plaintiffs' claims in this case will impose only a *de minimis* burden on GM. Because the Court has found a waiver of personal jurisdiction with respect to the non-California plaintiffs previously named in this suit, the Court's application of the pendent personal jurisdiction doctrine permits inclusion of only 5 additional Plaintiffs asserting claims under the laws of 2 additional states to this litigation. Those new claims overlap substantially with the claims (including federal claims) already before this Court, arising out of the same nucleus of operative facts.

Third, if the Court were to decline to exercise jurisdiction, GM would face piecemeal litigation and would have to defend itself in several different courts on nearly identical issues. Because the claims at issue arise out of the same nucleus of operative facts, the adjudication of facts in those disparate proceedings would be likely to overlap and possibly to conflict with proceedings in this case.

These factors weigh in favor of applying the doctrine of pendent personal jurisdiction as explicated in *Action Embroidery* to the non-resident plaintiffs in this case. The Court is satisfied that under *Action Embroidery* and the absence of interstate sovereignty concerns present in *Bristol-Myers*, there is a sufficient nexus between the claims of the 5 out-of-state plaintiffs and GM's contacts with California over which this Court has jurisdiction.

   iii. Is the Exercise of Jurisdiction Reasonable and Does It Comport With Fair Play and Substantial Justice?

This does not end the inquiry. The Court still must consider the third factor of the traditional test for specific personal jurisdiction which focuses on whether the exercise of jurisdiction is reasonable and comports with fair play and substantial justice. *See Axiom Foods*, 874 F.3d at 1068; *Int'l Shoe*, 326 U.S. at 316; *Bristol-Myers*, 137 S.Ct. at 1780 (noting that "the primary concern" continues to be "the burden on the defendant"); *Action Embroidery*, 368 F.3d at 1181 (focusing on whether it is "reasonable to compel [the] defendant to answer other claims in the same suit arising out of a common nucleus of operative facts). This focuses principally on the

burden on the defendant.

At the hearing, the Court asked GM to identify what prejudice it would suffer if it were required to litigate the out-of-state plaintiffs' claims in this Court. GM stated that it could not credibly suggest that it lacked resources to litigate in this district, but noted that a federal court sitting in Florida, for example, might be more familiar with Florida law than a federal court sitting in California. Though that may be the case, it is not clear how that translates into a burden, let alone an unreasonable one. In any case, the argument is unpersuasive because federal courts are frequently called upon to interpret the laws of the several States. *See*, *e.g.*, *Rabinowitz v. Samsung Electronics Am., Inc.*, Case No. 14-cv-00801-JCS, 2014 WL 5422576, at *7 (N.D. Cal. Oct. 10, 2014) (explaining that "federal courts have an equal ability to address claims arising out of state law" and "[d]istrict courts regularly apply the law of states other than the forum state" (citations and quotations omitted)). Furthermore, GM's argument is undercut by its own proposal that the Court transfer the claims of the out-of-state and California plaintiffs to a single court, the Eastern District of Michigan, which would similarly be called upon to apply non-Michigan state law. *See* Docket No. 90 at 10-12. Defendant therefore has not identified a legitimate burden.

Further, the Court is hard-pressed to find any unreasonable burden on the facts of this case. As discussed above, because the Court already has jurisdiction over the 5 California plaintiffs' claims and those of 27 nonresident plaintiffs, the sole question here is whether it would be unreasonably burdensome on Defendant for this Court to also exercise personal jurisdiction over the claims of 5 new plaintiffs, which introduce claims under only 2 additional states' laws (New York and Oregon). That burden is de minimis, particularly because the alternative would be for those plaintiffs to file new, separate cases under their states' laws.[6] Moreover, GM has not

---

[6] Another reason why the exercise of pendent personal jurisdiction here would not be unreasonable is that if each plaintiff were instead to file a separate case and then successfully petition to consolidate the cases in an MDL, then Defendant would still be required to litigate the same claims in whatever court is selected by the MDL panel. Although the MDL process does not relieve a plaintiff of the burden of demonstrating personal jurisdiction (the transferee court would analyze its personal jurisdiction according to whether each transferor court possessed it), it does suggest that it is not unreasonable, per se, to require Defendant to litigate the out-of-state plaintiffs' claims in this Court. It cannot be that the burden imposed on Defendant here is so unreasonable as to be a due process violation but that an effectively identical burden resulting from consolidation pursuant to the MDL statute would not be. Although a defendant might be

18

explained how it would be less burdensome to answer to those plaintiffs' claims in New York, Washington, Oregon, and Illinois rather than San Francisco, as those plaintiffs would likely be able to exercise personal jurisdiction over GM in their home states.

In addition, the overarching circumstances meriting the exercise of pendent personal jurisdiction—"judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties," *Action Embroidery*, at 1181—counsel in favor of jurisdiction. Judicial economy is better served by having the claims of all plaintiffs heard in this Court where they involve similar legal issues and all arise out of a common nucleus of operative facts relating principally to whether GM's engine was defective, whether the defect was material or posed an unreasonable safety risk, and when GM became aware of the defect. The alternative to hearing those claims in a single forum is to populate the dockets of up to fifty federal courts with nearly identical legal and factual issues.[7] Additionally, there is an interest in avoiding piecemeal litigation, particularly since Plaintiffs request injunctive relief and certification of a nationwide class. Having the same question proceed in different courts creates the possibility of overlapping nationwide classes, inconsistent outcomes, *cf.* Fed. R. Civ. P. 23(b)(2), and an obvious waste of judicial resources. Finally, the overall convenience of the parties—including Defendant's—is much better served by having the claims heard in a single forum rather than fifty.

In sum, under the particular facts of *this* case, all three prongs of the test for specific

---

expected to argue that the MDL cases should be consolidated in the district of its headquarters (*i.e.*, in a forum where it is subject to general personal jurisdiction), the MDL panel regularly transfers them elsewhere, without due process concerns. *See, e.g., In re Chrysler-Dodge-Jeep EcoDiesel Mktg. Sales Practices and Prods. Liability Litig.*, --- F.Supp.3d, 2017 WL 1282901 (J.P.M.L. Apr. 5, 2017) (consolidating cases in Northern District of California—not the home state of any defendant); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liability Litig.*, 148 F.Supp.3d 1367 (J.P.M.L. 2015) (centralizing cases in Northern District of California despite defendant's preference for Eastern District of Michigan).

[7] Though Plaintiffs would have the option of filing a single consolidated case in the Eastern District of Michigan because Defendant is subject to general jurisdiction in that state, they would not be required to do so because jurisdiction may lie in other courts of their choosing where personal jurisdiction may also obtain. *See Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987) (noting that "great weight is generally accorded plaintiff's choice of forum"), *cert. denied*, 485 U.S. 993 (1988). Moreover, even if a party were to request consolidation by the Judicial Panel on Multidistrict Litigation, there is no guarantee that such requests would be granted and, in any case, that procedure itself creates additional burdens on the parties.

personal jurisdiction have been satisfied here.  *See Axiom Foods*, 874 F.3d at 1068.  It is

undisputed that GM has availed itself of the privileges of conducting business in California,

satisfying the first prong.  In the absence of any particular federalism concerns, there is a sufficient

nexus between the additional non-California claims and GM's contacts with California to satisfy

the second prong.  The exercise of personal jurisdiction over the 5 new out-of-state plaintiffs'

claims would not offend fair play or substantial justice, satisfying the third prong.  Moreover, all

factors that inform the due process analysis are present here:  judicial economy, the avoidance of

piecemeal litigation, the overall convenience of the parties, and the minimal additional burden on

Defendant all counsel strongly in favor of exercising pendent personal jurisdiction over the 5 new

plaintiffs' claims under the facts of this case.

B.       Fraud and Consumer Protection Claims

        Plaintiffs bring fraud and consumer protection claims under the laws of several states

alleging Defendant unlawfully failed to disclose the excessive oil consumption defect to

consumers.  Defendant's motion to dismiss is argued pursuant to California law on the basis that it

is the most developed.[8]  Because the parties have focused on California law and Defendant has not

argued that the laws of any other state would preclude a claim viable under California law, the

Court's analysis also focuses on California authorities.[9]

---

[8]  The cases cited by Defendant do not appear to apply a standard different from California law.
*See McCabe v. Daimler AG*, 948 F.Supp.2d 1347, 1368 (N.D. Ga. 2013) (safety defects were
material facts for which a duty to disclose existed under Georgia law); *In re Takata Airbag
Products Liability Litig.*, 193 F.Supp.3d 1324, 1338 (S.D. Fla. 2016) (holding that under Florida
and Pennsylvania law plaintiffs sufficiently alleged a duty to disclose additional facts about the
safety of vehicles); *In re General Motors Ignition Switch Litig.* 2017 WL 2839154, *25, 46, 51
(S.D. N.Y. Aug. 9, 2017) (at motion to dismiss stage, finding that material omission was
adequately pleaded with respect to claims under Alabama law); *In re General Motors Ignition
Switch Litig.*, 2016 WL 3920353, *34, 38 (S.D.N.Y. July 15, 2016) (permitting failure to disclose
claim to proceed under Missouri and Oklahoma law where plaintiffs alleged the omitted
information pertained to safety defect); *Zwiercan v. General Motors Corp.*, 2003 WL 1848571, *2
(Pa. Ct. of Common Pleas, Mar. 18, 200) ("This Court's holding in *Zwiercan* is limited to finding
a duty to disclose known and serious life-threatening latent defects.").  Moreover, Defendant has
not argued that the laws of any other state differ in any material respect, or that a claim permitted
by California law would not be permitted in another state.

[9]  The parties are advised that in future briefing, to the extent they ask the Court to decide matters
on the basis of several states' laws, they must squarely address whether there are material
variations in state law.  This will also be mandatory with respect to any motion for class
certification in order to enable the Court to adequately analyze questions of predominance under

Plaintiffs' California claims are brought pursuant to the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, the Unfair Competition Law ("UCL"), Cal. Bus. & Profs. Code §§ 17200, *et seq*, and under the common law for fraudulent omission or concealment. The CLRA forbids "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Profs. Code § 17200.

A common law fraudulent omission claim requires demonstrating that:

> (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.

*Hahn v. Mirda*, 147 Cal.App.4th 740, 748 (2007) (quotation and citation omitted).

### 1. Duty to Disclose

The first question is whether Defendant had a duty to disclose. *See Falk v. Gen. Motors Corp.*, 494 F.Supp.2d 1088, 1094 (N.D. Cal. 2007). That duty may arise "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact." *Id.* (quoting *LiMandri v. Judkins*, 52 Cal.App.4th 326, 337 (1997)).

Plaintiffs argue that GM had a duty to disclose the defect based on the second and third

---

Rule 23(b)(3). *See In re Hyundai and Kia Fuel Economy Litig.*, --- F.3d ----, 2018 WL 505343, at *12-13 (9th Cir. Jan. 23, 2018) (holding that district court in finding that predominance was satisfied when certifying a settlement class abused its discretion "by failing to acknowledge . . . that the laws in various states were materially different than those in California, and that these variations prevented the court from applying only California law," and "failing to make a final ruling as to whether the material variations in state law defeated predominance under Rule 23(b)(3)").

prongs: *i.e.*, that GM either had a duty to disclose because it had exclusive knowledge of the defect (a material fact), or because it actively concealed that fact from Plaintiffs. GM disputes both of these points. The Court first analyzes whether Plaintiffs adequately plead that GM had pre-sale knowledge of the defect and that the defect was material. As to whether Defendant had exclusive knowledge of the defect (assuming pre-sale knowledge is established) and whether Plaintiff knew of the material facts, those facts are not disputed. As to whether Defendant actively concealed a material fact, that is discussed below in connection with fraudulent concealment, *see infra* at 53-54.

### 2. Pre-Sale Knowledge of Defect

To be liable for a failure to disclose, a defendant must have pre-sale knowledge of the defect. The Court previously concluded Plaintiffs had failed to plead such pre-sale knowledge for four reasons. First, the mere fact that GM subsequently re-designed its engine was not probative where the whole engine was re-designed, rather than just the allegedly defective low-tension oil rings. Docket No. 62 at 11. Second, the Court found 81 consumer complaints to the National Highway Traffic Safety Administration ("NHTSA") and consumer forums did not demonstrate knowledge because they did not explicitly state that the cause of the oil consumption was the Low-Tension Oil Ring Defect, and a majority of the complaints were posted in 2014 or later, after the marketing and sale of the 2010-2013 Class Vehicles. *Id.* at 12. Third, Plaintiffs failed to allege that 81 complaints posted over the course of 7 years was an unusually high number. *Id.* at 13. Fourth, the single Technical Safety Bulletin ("TSB") identified by Plaintiffs did not show knowledge of a low-tension oil ring defect (the sole defect previously alleged by Plaintiffs) where it explicitly identified other causes for the excessive oil consumption (the AFM and PCV systems). *Id.*

However, in the SAC, Plaintiffs have broadened their allegations concerning the nature of the defect. They no longer allege that the low-tension oil ring defect was the sole problem that caused excessive oil consumption. Rather, they allege an "Oil Consumption Defect" to which there were several contributing factors, including defective piston rings, a defective AFM system, a defective PVC system, and defective oil warning lights/pressure gauges. In addition to this

**United States District Court**
For the Northern District of California

broader definition, Plaintiffs have bolstered the complaint with additional consumer complaints and other allegations Plaintiffs contend support an inference of pre-sale knowledge.

The revised allegations alter the analysis. Most compellingly, Plaintiffs allege that Defendant issued two TSBs specifically related to two of the components they allege contributed to the overconsumption defect: the AFM and PCV systems. With respect to the AFM system, GM issued a TSB in August 2010 that "acknowledged that the AFM system's oil pressure relief valve contributed to oil consumption and carbon buildup on the piston rings." SAC ¶ 227. With respect to the PCV system, GM issued a TSB in March 2011 that "acknowledged [the] system contributed to oil consumption." SAC ¶ 231. Because Plaintiffs' class period covers sales from 2010-2013, these two TSBs—issued relatively early in the Class Period in mid-2010 and early-2011—permit the plausible inference that Defendant had knowledge prior to the Class Period. *Cf. In re MyFord Touch*, 46 F.Supp.3d at 958 ("[I]t is still reasonable to infer that, if Ford had issued four TSBs and two updates in 2012 alone, Ford should have known of problems with MFT by around 2011, *i.e.*, before it could recommend what repairs or updates needed to be done. Presumably, the TSBs and updates were [preceded] by an accretion of knowledge by Ford."); *MacDonald*, 37 F.Supp.3d at 1093-94 (TSBs issued five and nine months after purchase, even if only dealing with a particular model vehicle, support plausible inference of knowledge of defect prior to sale of other vehicles including same defective cooling pump); *Philips*, 2015 WL 4111448, at *9-10 (same).

With respect to the consumer complaints, Plaintiffs not only present a significantly larger number,[10] but also allege that the number of complaints far exceeds the number of similar complaints for competitor vehicles. *See* SAC ¶ 279 (only zero to five complaints regarding oil consumption with respect to 7 competitor vehicles in the 2007-2013 model years). Thus, unlike before, the Court now has a baseline upon which to conclude that Plaintiffs have plausibly pled an

---

[10] Plaintiffs identify a large number of consumer complaints about oil consumption on carcomplaints.com. *See* SAC ¶¶ 258-262 (68 re: 2007 Chevrolet Silverados, 33 re: 2008 Chevrolet Silverados, 43 re: 2009 Chevrolet Silverados, 12 re: 2010 Chevrolet Silverados, 180 re: 2007 Chevrolet Suburbans, 34 re: 2008 Chevrolet Suburbans, 17 re: 2009 Chevrolet Suburbans, 68 re: 2007 Chevrolet Avalanches, 13 re: Chevrolet Avalanches, 8 re: 2007 Chevrolet Tahoes, 10 re: 2008 Chevrolet Tahoes, 15 re: 2009 Chevrolet Tahoes, 22 re: 2007 GMC Yukons and Yukon XLs, 9 re :2007 GMC Sierra 1500).

unusual number of complaints.

It is true, as Defendant points out, that a number of the complaints relate to non-Class Vehicles (models of the same vehicles preceding the Class Period or other vehicles altogether). However, all the vehicles are equipped with the same allegedly defective engine and thus bolster the plausibility of inferring Defendant's general knowledge of the over-consumption problem associated with that engine. *Cf. MacDonald*, 37 F.Supp.3d at 1093-94 (TSB issued with respect to only one vehicle model permits plausible inference with respect to knowledge of same defective component in other vehicle model). Additionally, since the focus is on *pre*-sale knowledge with respect to Class Vehicles, the emphasis is rightly on complaints that arose prior to sale of the Class Vehicles. Thus, it is reasonable that complaints associated with earlier model years (several dating as far back as 2008), *see* SAC ¶ 249, support a plausible inference of knowledge with respect to later model years equipped with the same allegedly defective component.

That the complaints do not specifically identify the low-tension oil rings is no longer an issue because Plaintiffs now allege that there were various failing parts associated with the Gen IV Vortec 5300 engine that contributed to overconsumption. Where the complaints all relate to the same phenomenon (excessive oil consumption), the number is unusually high, and all complaints pertain to a group of vehicles with a common component (the engine), one plausible inference is that GM was generally aware of the over-consumption problem with the engine even if it had not yet isolated a specific cause for or solution to the problem. An inference of knowledge is further supported by several consumer complaints which state that the dealers to whom vehicles were presented for repair asserted that it was a "known" problem or common issue.[11]

To be sure, other inferences might plausibly be drawn from the complaints. For example,

_____

[11] *See, e.g.,* SAC ¶ 255 (two consumers told that overconsumption was "normal" in 2014 and 2015); ¶ 256 (owner of 2007 Chevy Silverado told overconsumption was "normal"); ¶ 258 (dealer told vehicle owner in 2010 that "Chevy had sent emails to them regarding this problem"); ¶ 259 (owner of truck purchased in 2008 told "several times" by GM that consumption was "normal"); ¶ 260 (owner of 2009 Silverado told consumption was "normal"); ¶ 267 (owner of 2007 Chevy Tahoe told that excessive consumption was a "known issue"); ¶ 269 (owner of 2009 Chevy Tahoe told this was "a known problem, and not specific to [that] car"); ¶ 271 (owner of 2007 GMC Sierra 1500 says "every dealer I talked to says its normal"); *id.* (owner reports that "[t]he dealership ignored [the problem] and told me it was normal").

24

since more complaints appear to be associated with earlier models of the vehicles, another plausible inference could be that the defect was substantially repaired or resolved with respect to later vehicles. However, "[t]hat [GM] is able to identify competing inferences from the same set of facts does not mean that Plaintiffs' claims should be dismissed." *MacDonald*, 37 F.Supp.3d at 1093.

At this pleading stage, Plaintiffs have included sufficient allegations to support a plausible inference that Defendant was aware of the oil consumption defect with respect to the Class Vehicles prior to their sale. Moreover, Defendant has not identified any basis to believe that Plaintiffs could have been aware of the severity of the defect before purchasing the vehicles, so Plaintiffs' allegations support a plausible inference that the details about the cause, extent, and resolvability *vel non* of the defect were within Defendant's exclusive knowledge.

3.    Materiality of Defect

Defendant argues that Plaintiffs fail to adequately plead that the information was material because they have not shown it pertained to an unreasonable safety risk. The Court previously dismissed Plaintiffs' allegation of a material defect on two grounds. First, the Court held that as a matter of law Plaintiffs must plead an unreasonable safety hazard under California law in order to demonstrate the defect was material. *See* Docket No. 62 at 9. Second, the Court held that Plaintiffs had failed to plead an unreasonable safety hazard because "no facts in this case suggest that the risk of excess oil consumption causes a safety risk," and "Plaintiffs admit that there [was] a functioning oil level gauge that will give advance warning of low levels." Docket No. 62 at 10-11. Moreover, "not a single plaintiff allege[d] that his or her vehicle experienced any damage due to excessive oil consumption;" no complaints of "sudden loss of power" were made; and Plaintiffs did not establish a "risk of sudden failure." *Id.*

In re-visiting the issue on this motion to dismiss the SAC, the Court notes that both parties in both rounds of briefing overlooked a crucial distinction California law makes with respect to defects arising in-warranty and those arising post-warranty. In its prior holding, the Court treated both situations in an identical fashion, relying on language in *Wilson v. Hewlett-Packard* stating that a "manufacturer's duty to consumers is limited to its warranty obligations absent either an

affirmative misrepresentation or a safety issue." 668 F.3d 1136, 1143-44 (9th Cir. 2012). The

Court also relied on language in *Williams v. Yamaha Motor Co.* cited by the parties stating that a

plaintiff must allege "the existence of an unreasonable safety hazard" to state a failure to disclose

claim. 851 F.3d 1015, 1025 (9th Cir. 2017) (quoting *Apodaca v. Whirlpool Corp.*, No. 13-00725

JVS (ANx), 2013 WL 6477821, at *9 (C.D. Cal. Nov. 8, 2013)). However, these quotations were

specific to the facts of both cases. A pivotal fact in both *Wilson* and *Williams* was that the alleged

defect did not manifest until *after* the warranty period. *See Wilson*, 668 F.3d at 1138 (laptop

charging defect did not arise until after expiration of two-year limited warranty); *Williams*, 851

F.3d at 1019 (explaining that the premature corrosion defect "will not manifest until the three-year

warranty period has expired"). Indeed, *Wilson* made clear that a safety issue must be alleged only

when it arises *after* the warranty period. *See* 668 F.3d at 1142, n.1 and 1144 (distinguishing cases

that found materiality in the absence of a safety defect on the basis that the defects arose "*within*

the express warranty period").

Thus, as *Apodaca*—the same case quoted by the Ninth Circuit in *Williams* for the legal

standard for claims alleging a failure to disclose—explains, the materiality analysis turns on

whether the defect arises *during or after* an express warranty period:

> First, a manufacturer has a duty to disclose *any* defects that fall
> *within* the warranty period, *whether relating to safety or to costly
> repairs*, that would have caused the consumer to not purchase the
> car if they had been disclosed. Second, the manufacturer also has a
> duty to disclose *safety issues* that fall *outside* of the warranty period.

*Apodaca*, 2013 WL 6477821, at *7 (quoting *Decker v. Mazda Motor of Am., Inc.*, No. 11-cv-0873,

2011 WL 5101705, at *4 (C.D. Cal. Oct. 24, 2011)) (emphasis added).[12] Although neither party

---

[12] It appears that post-*Wilson* California authority may permit an omission-based claim to proceed after the expiration of a warranty even without an allegation of an unreasonable safety hazard, at least when the omission is contrary to representations made by the defendant and material. *See Rutledge v. Hewlett-Packard Co.*, 238 Cal.App.4th 1164, 1171-76 (2015) (holding that plaintiff adequately pled materiality with respect to faulty inverter that caused laptop screen to dim even without safety issues and rejecting "argument that the expiration of the warranty period precludes a claim for fraudulent concealment under the UCL"). However, the Ninth Circuit continues to require that post-warranty omission claims allege a safety defect. *See Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1025 (9th Cir. 2017) (in absence of affirmative misrepresentation, duty to disclose arises post-warranty only if plaintiff alleges "existence of an unreasonable safety hazard"). The Court is obligated to follow the Ninth Circuit's more recent authority. *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016).

briefed the issue, the Court finds it necessary to analyze the viability of this claim separately with respect to in-warranty and post-warranty claims.

a.  Warranty Period Claims

As a preliminary matter, the Class Vehicles in this case consist of 2010-2014 model years. Several plaintiffs allege they experienced excessive oil consumption during the warranty period. *See*, *e.g.*, SAC ¶ 58 (Plaintiff Shorter); SAC ¶¶ 154-155 (Plaintiff Martell); SAC ¶ 202 (Plaintiff Bednarek).  Consumer complaints also indicate that excessive oil consumption was experienced within the warranty period. *See*, *e.g.*, SAC ¶¶ 255, 258, 265, 271, 272.  GM provides Class Vehicles with a three-year, 36,000 miles "bumper to bumper" warranty and a five-year, 100,000 mile powertrain warranty.  *See* SAC ¶¶ 223-31; *see also* ECF Docket No. 48-22 to 48-29.

Thus, Plaintiffs have plausibly alleged that the defect may arise during the limited warranty period.  To state a claim for failure to disclose the defect in these circumstances, Plaintiffs need only allege that the defect "would have caused [them] to not purchase the car if [it] had been disclosed" to show that it was material. *Apodaca*, 2013 WL 6477821, at *7 (quotation and citation omitted).  Plaintiffs have done so. *See*, *e.g.*, SAC ¶¶ 20, 394-395, 411, 443-444, 460.  Thus, Plaintiffs have adequately pleaded materiality for the in-warranty claims.

b.  Post-Warranty Period Claims

With respect to defects that manifested only after the warranty period, Plaintiffs must allege that the defect poses an unreasonable safety hazard.  As explained above, the purpose of this limitation in the post-warranty context is to protect against the de facto extension of a warranty.

Whether the defect poses an unreasonable safety hazard is a two-step inquiry.  "Where a plaintiff alleges a sufficiently close nexus between the claimed defect and the alleged safety issue, the injury risk need not have come to fruition." *Williams*, at 1028.  However, if the nexus is not "sufficiently close," then a plaintiff must allege examples of the safety risk coming to fruition to plausibly plead an unreasonable safety hazard. *Id.* (explaining  that "a party's allegations of an unreasonable safety hazard must describe more than merely conjectural and hypothetical injuries") (citation and quotation omitted).  A "sufficiently close nexus" exists when the causal chain

between the alleged defect and the ultimate safety hazard is adequately explained.[13] The nexus is

not sufficiently close, however, where the connection is not explained or appears illogical.[14]

　　Here, Plaintiffs adequately allege a sufficiently close nexus and have also provided

examples of injury that make their allegations of an unreasonable safety hazard plausible.

Plaintiffs allege the Oil Consumption Defect can lead to engine damage and engine failure,

exposing drivers to the risk of suddenly inoperable vehicles. SAC ¶ 245. They allege in detail

that the various defects cause excessive oil consumption. For example, the piston rings "fail to

achieve their intended purpose of keeping oil in the crankcase and out of the combustion

chamber," resulting in "excessive oil consumption." *Id.* ¶ 218; *see* SAC ¶¶ 214-222.

Additionally, the AFM system "overwhelm[s] the independently defective piston rings" by

"spray[ing] oil directly into the piston skirts (undersides) in quantities that the rings cannot

control" and therefore "allow[ing] excessive quantities of oil in the combustion chambers where it

is burned." SAC ¶¶ 223-225. The PCV system "also contributes to oil consumption and engine

---

[13] *See, e.g.*, *Apodaca v. Whirlpool Corp.*, 2013 WL 6477821, at *9 (C.D. Cal. Nov. 8, 2013) (plaintiff did not need to "wait until his dishwasher actually catches fire" to establish a sufficient nexus; although "catching fire would be the extreme result of th[e] causal chain, the [complaint] sufficiently alleges its possibility as a logical outcome"); *Ehrlich v. BMW of N. Am., LLC*, 801 F.Supp.2d 908, 918 (C.D. Cal. 2010) (sufficient nexus where defective windshield susceptible to cracking posed safety hazard because windshield was part of vehicle's safety restraint system, and cracked windshields could become dislodged, "compromising roof-crush resistance and causing serious head and neck injuries, failure of the passenger side airbag to deploy, or the ejection of passengers from the vehicle"); *Herremans v. BMW of N. Am., LLC*, 2014 WL 5017843, at *15 (C.D. Cal. Oct. 3, 2014) (sufficient nexus where water pump defect could cause engine to overheat, overheating could occur at any time, and if it happened while vehicle was being driven, it would experience failures that render vehicle unable to accelerate and cause steering and braking problems); *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F.Supp.2d 1220, 1236-37 (C.D. Cal. 2011) (safety risk adequately alleged where "[i]t is not implausible that the 'electrical faults' described in the TSB could give rise to the safety concerns alleged," insofar as water leak defect could cause "sudden and unexpected engine failure that could result in personal injury or death"); *Marsikian v. Mercedes Benz USA, LLC*, 2009 WL 8379784, at *6 (C.D. Cal. 2009) (holding that "[i]t is not implausible that the flooding [of a climate control system] would cause catastrophic engine and electrical system failure while the car is on the road" (quotation omitted)).

[14] *See, e.g.*, *Wilson*, 668 F.3d at 1144-45 (plaintiffs did "not allege *how* the weakening or loss of the connection between the power jack and the motherboard causes the Laptops to ignite," and "it [was] difficult to conceive (and the complaint [did] not explain) how the Laptops could ignite if they [were] 'unable to receive an electrical charge'") (emphasis added, citation omitted); *Elias v. Hewlett-Packard Co.*, 903 F.Supp.2d 843, 857 (N.D. Cal. 2012) (no sufficient nexus where "Plaintiff does not allege any explanation for how a lack of sufficient power causes laptops to catch fire" and "provides no explanation that clearly links the alleged insufficient power of the laptops to their catching fire").

damage by vacuuming oil from the valvetrain," which it is not supposed to do, further contributing to excessive oil consumption.  SAC ¶¶ 228-231.

The excessive consumption of oil, in turn, results in insufficient oil and lubricity.  SAC ¶ 244.  Low oil levels potentially cause the engine to seize or shut down unexpectedly (causing accidents or stranding occupants), to overheat and catch fire, or to produce engine misfires that cause sluggish throttle response, placing occupants in harm's way by undermining their ability to navigate traffic.  SAC ¶¶ 244-46.  Fouled spark plugs may also cause engine misfires, ignition failure, and sluggish throttle response, undermining drivers' ability to accelerate out of harm's way or even to drive at all.  *Id.* ¶ 246.

Standing alone, these allegations would likely be insufficient to support a finding of unreasonable safety risk not for lack of a causal chain, but because, as the Court previously explained, arguably "there is no more of a safety concern [here] than where, *e.g.*, a car gets less gas mileage than advertised," as "the more rapid consumption of gas might lead to a driver running out of fuel on a freeway or other dangerous location, [but] the driver has a fuel gauge to warn him or her of low fuel."  *See* Docket No. 62 at 10, n.2.

Unlike in their prior complaint, however, Plaintiffs now specifically allege in the SAC that the vehicle's warning systems are inadequate and therefore fail to warn drivers before oil levels are dangerously low.  For example, Plaintiffs allege that "the oil pressure gauge in the Class Vehicles fails to provide any indication as to when a vehicle is dangerously low on oil" and "do not indicate a dangerously low oil level until the vehicles have no oil pressure," which is "well beyond the point at which a lack of oil, and oil pressure, will damage or destroy an engine."  SAC ¶ 235.  Further, Plaintiffs allege that "the oil canister symbol will not illuminate, and the Class Vehicles will not provide *any* low oil pressure warning, until well past the time when the Class Vehicles are critically low on oil."  *Id.* ¶ 236 (emphasis added).  In particular, Plaintiffs claim they performed testing demonstrating that the low oil pressure indicator does not illuminate until the oil pressure drops below six PSI, below GM's minimum oil specification of 24 PSI.  *Id.*  According to Plaintiffs, "[a]n engine generating six PSI of oil pressure will suffer immediate internal destruction if put under operating loads."  *Id.*  Thus, "the Class Vehicles communicate *no* visible or audible

**United States District Court**
For the Northern District of California

warnings of destructive oil pressure levels until the engines internally seize or disintegrate." *Id.*

(emphasis added). Several Plaintiffs also allege that they suffered various forms of engine damage

without a warning from the vehicle.[15]

In light of these more detailed allegations including the lack of adequate warning,

Plaintiffs have pled a sufficiently close nexus between the alleged defects (overconsumption of

engine oil and a failure to provide adequate warning) and the safety risk (engine disintegration or

failure or engine fire) to plead an unreasonable safety hazard. Though Defendant argues that the

existence of its warning systems should preclude liability here, the cases Defendant cites are all

decided at the summary judgment or trial stage.[16] Plaintiffs have included sufficient allegations to

create a plausible assertion as to the inadequacy of the warning system and hence the existence of

safety risk.

The plausibility of the causal chain between the defect and the safety hazard is bolstered by

allegations that consumers, including Plaintiffs, have reported virtually every problem on the way

to the ultimate safety hazard. For example, Plaintiff Perkins alleges that as a result of the Oil

Consumption Defect and resulting loss of lubricity, the lifters in his vehicle's engine collapsed.

SAC ¶ 47. Plaintiffs Mr. and Mrs. Doepel allege that their vehicle's engine exhibited loud

knocking and emitted white smoke from the tail pipe as a result of the over-consumption of oil.

*Id.* ¶ 78. Plaintiffs Bradford, Kitchen, and Warpinski experienced failures with their lifters and

cam shafts, and Warpinski experienced engine knocking, shaking, and running through. *Id.* ¶¶ 64,

---

[15] *See* SAC ¶¶ 33-34 (the Cralleys had to replace their engine due to damage from excessive oil consumption but they "never saw a low oil warning light illuminate or appear in their vehicle"); *id.* ¶ 42 (Goodwin's vehicle "has been two quarts low on oil, without a low oil warning ever illuminating on his vehicle"); *id.* ¶¶ 78-79 (excessive oil consumption caused knocking sounds and white smoke, requiring purchase of new engine, yet the Doepels "never saw a low oil warning illuminate or appear in their vehicle"); *id.* ¶ 107 (Dahl noticed excessive consumption when his oil screen clogged and mechanic informed him his vehicle was low on oil, "although a low oil warning never illuminated").

[16] *See Gauthier v. AMF, Inc.*, 788 F.2d 634, 635-36 (9th Cir. 1986) (because Montana law had adopted Restatement position on warnings, failure to instruct jury on the legal effect of the adequacy of defendant's warnings, if jury were to find they were adequate, was abuse of discretion); *Rodriguez v. JLG Indus.*, 2012 WL 12883784, at *20-21 (C.D. Cal. Aug. 3, 2012) (denying defendant's motion for summary judgment in strict product liability case where jury could reasonably come to either conclusion on whether warnings were adequate).

124, 149.  Plaintiffs' allegations are supplemented by a multitude of consumer complaints alleging

a variety of similar problems.  *See*, *e.g.*, SAC ¶ 276 (car "started smoking really bad whenever I

would start it"); ¶ 278 ("[A]fter turning feels like the throttle goes flat"); ¶ 258 ("Traction control

problems, engine reduced power, this problem cripples the vehicle").[17]  A number of consumer

complaints also allege that their vehicles' operability became impaired.[18]

Defendant argues that the consumer complaints carry little weight because they did not

involve Class Vehicles.  However, the complaints involve the same alleged problem

(overconsumption of oil), the same types of intermediate problems (spark plugs, smoke, etc.), and

the same allegedly defective engine (Gen IV Vortec 5300).  Although it is plausible the problems

experienced by the non-Class Vehicles were caused by something other than the alleged engine

defect, it is at least equally plausible that the engine common to all the vehicles was the common

cause.  *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative

explanations, one advanced by defendant and the other advanced by plaintiff, both of which are

plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).  Plaintiff's

complaint may be dismissed only when defendant's plausible explanation is so convincing that

plaintiff's explanation is *implausible*." (emphasis in original)).

Finally, the Court must consider whether this safety risk was "unreasonable" such that the

---

[17] *See also* SAC ¶ 33 (spark plug fouling); ¶ 90 (spark plugs); ¶ 101 (spark plug, cam, and lifters failed); ¶ 108 (spark plugs); ¶ 133 (spark plugs); ¶ 155 (spark plugs, rough idle, engine shaking); ¶ 180 (spark plugs and smoke emission); ¶¶ 190-91 (spark plugs and misfiring); ¶ 256 (consumer claims vehicle "would continue to drive sluggish"); ¶ 261 (spark plugs fouled); ¶ 262 (observing "blue smoke when we start [the car]" and "terrible knocking" by the engine); ¶ 264 (noting "more serious symptoms of loud engine tapping and black smoke"); ¶ 268 (smoke coming out of exhaust); ¶ 269 (reporting that car "feels sluggish and seems to miss[fire?] at times but no check engine light"); ¶ 270 ("[e]ngine is making rattle noises"); 271 (reporting bad rings); 272 (reporting "spark plugs burning out or failing sluggish engine clicking noise in engine"); *id.* (stating "truck is running like crap").

[18] *See* SAC ¶ 262 (2007 Chevy Suburban owner states that "[t]he vehicle was miss [sic] firing and running rough, so much so you could not drive it. . . .  It turned out to be two plugs fowled [sic] with oil."); ¶ 266 (2008 Chevy Avalanche owner reported "while on the highway, the engine started making a loud banging noise, oil pressure dropped off again, and lights came back on. Had to have it towed to a dealership on a Saturday"); ¶ 277 (Re 2010 Chevy Crew Cab z71, "[a] fouled no 1 cylinder spark plug left me on the side of the road . . . ."); *See* SAC ¶ 269 (2009 Chevy Tahoe owner stated that "[t]he engine light came on . . . and the car was sluggish at stops. We took it to the dealership right away . . . .").

omission may be considered material even for post-warranty claims, and thus may give rise to a duty to disclose. In considering this question, the Court is mindful that, in *Williams*, the Ninth Circuit rejected a claim that a boat motor experiencing premature corrosion posed an "unreasonable safety hazard" because of the plaintiffs' "own characterization of the defect" as one which "merely accelerates the *normal* and *expected* process of corrosion." *Williams*, 851 F.3d at 1028 (emphasis in original). The Ninth Circuit reasoned that "[w]ere we to conclude that [plaintiffs'] allegations of premature but otherwise normal wear and tear plausibly establish an unreasonable safety hazard, we would effectively open the door to claims that *all* of Yamaha's outboard motors eventually pose an unreasonable safety hazard." *Id.* (emphasis in original). Thus, "the nature of the alleged defect as being primarily one of accelerated timing rather than the manifestation of a wholly abnormal condition weighs against its characterization as 'unreasonable.'" *Id.* Arguably, the consumption of oil is normal and expected, and the excessive consumption of oil is another way of stating that such consumption is simply an accelerated but otherwise normal process.[19]

Williams might appear to stand for the proposition that a claim based on what is essentially premature or accelerated wear-and-tear that is otherwise normal or expected is categorically precluded. Such a broad interpretation, however, would conflict with prior Ninth Circuit precedent. In *Daniel v. Ford Motor Co.*, for example, the plaintiffs alleged that a rear suspension defect caused "premature tire wear," yet the Ninth Circuit held that "[a] reasonable fact finder could infer that a vehicle that experiences premature and more frequent tire wear would pose an unreasonable safety risk . . . ." 806 F.3d 1217, 1226 (9th Cir. 2015). Because *Williams* does not cite or discuss *Daniel*, the Court cannot infer that *Williams* announced a broad rule new rule and

---

[19] That seems to be the case even though the various defects causing overconsumption are not themselves "normal." For example, the piston rings failed to seal oil in the crankcase to keep it out of the combustion chamber (SAC ¶ 218), the AFM system sprays oil directly into the piston skirts in quantities that the rings cannot control (SAC ¶ 225), and the PCV system is solely intended to circulate fresh air to the engine's combustion chambers but inadvertently vacuums oil from the valvetrain into the combustion chamber too (SAC ¶¶ 229-30). The warning systems do not function normally because they do not inform drivers about insufficient oil levels until *after* engine damage or damage to other components like spark plugs and piston rings have already started to occur. SAC ¶¶ 235-236.

silently overturned prior precedent.

Regardless of how one might reconcile *Williams* and *Daniel*, the alleged facts in this case present a situation where safety risks, even if due to a gradual (and not sudden) process, may not be discovered in time to prevent harm. Plaintiffs have alleged enough detail to suggest that a reasonable jury on these allegations could conclude the safety risk was unreasonable in light of the inadequate warning system. In light of these allegations, the issue of unreasonableness is a question of fact more appropriately resolved at summary judgment or trial rather than on the pleadings. *See In re MyFord Touch Consumer Litig.*, 46 F.Supp.3d 936, 960 (N.D. Cal. 2014); *Daniel*, 806 F.3d at 1226.

In sum, assuming as the Court must that Plaintiffs' allegations concerning the failure of the warning systems and the severity of the overconsumption defect are true, a jury could conclude there was an unreasonable safety hazard for post-warranty claims, and that there was a material defect for in-warranty claims.

4.    Reliance

Defendant also argues that Plaintiffs do not adequately plead reliance because they do not plead with specificity that they reviewed or relied upon GM's advertising materials, such that omission of the material information could have influenced their purchasing decisions. Mot. at 11-12. Plaintiffs instead generally plead that they "relied on the omissions of GM with respect to the quality and reliability of the Class Vehicles" and "would not have purchased or leased" the vehicles "but for" the omissions. *See*, *e.g.*, SAC ¶ 411 (similar allegations are made with respect to the relevant counts).

"An essential element for a fraudulent omission claim is actual reliance." *Daniel*, 806 F.3d at 1225. "To prove reliance on an omission, a plaintiff must show that the defendant's nondisclosure was an immediate cause of the plaintiff's injury-producing conduct." *Id.* One way to do so is "by simply proving that, had the omitted information been disclosed, one would have been aware of it and behaved differently." *Id.* (quotation and citation omitted). Thus, reliance has two components. The first relates to whether one would have behaved differently, which "can be presumed, or at least inferred, when the omission is material." *Id.* (citation omitted); *see also In re*

33

*Tobacco II Cases*, 46 Cal.4th 298, 327 (2009) ("[A] presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. A misrepresentation is judged to be 'material' if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question, and as such materiality is generally a question of fact . . . .") (quotations omitted); *McAdams v. Monier, Inc.*, 182 Cal.App.4th 174, 184 (2010) (failure to disclose information "which would have been material to any reasonable person who purchased" the product permits a presumption of reliance). As explained above, Plaintiffs have demonstrated that the defect was material, so this component of reliance can be inferred at this stage. In any case, Plaintiffs have explicitly pled that they "would not have purchased . . . and/or paid as much for" the vehicles if they had been aware of the omitted information. *See*, *e.g.*, SAC ¶ 411.

The second component of reliance requires showing that Plaintiffs "would have been aware of a disclosure by [the defendant]." *Id.* at 1226. This component of the reliance analysis is different for omission and concealment than affirmative misrepresentation. In an affirmative misrepresentation case, a plaintiff obviously must plead that they in fact viewed or were exposed to the misleading misrepresentation; otherwise, they could not have relied on it. In contrast, the very premise of an omission case is that the plaintiff was never exposed to certain information that should have been disclosed.[20] Thus, the reliance analysis proceeds from a very different starting point. Here, the parties dispute the meaning of this distinction in an omission case. GM argues Plaintiffs must allege what advertisements they viewed to plead reliance; this argument appears to confuse the reliance analysis for affirmative misrepresentation with that for omission. Plaintiffs, on the other hand, argue that they are not required to plead what advertisements they viewed with specificity under Rule 9(b) in an omissions case; while Plaintiffs' argument is correct, the main issue, which Plaintiffs do not quite articulate, is that an omissions case does not necessarily require a plaintiff to have viewed an advertisement at all. Rather, a plaintiff's ultimate burden at trial is to

---

[20] Indeed, it would hardly make sense to hold that a plaintiff in an omission case must always plead that they viewed an advertisement to satisfy the reliance requirement, because such a categorical rule would overlook the possibility that a defendant who has not engaged in any advertising whatsoever may nevertheless have an obligation to disclose certain information.

present sufficient evidence to "establish a plausible method of disclosure and to establish that they *would have been aware* of information disclosed using that method." *Id.* at 1227 (emphasis added). For example, in *Daniel*, the plaintiffs met that burden at summary judgment by introducing evidence "that they interacted with and received information from sales representatives at authorized Ford dealerships prior to purchasing their Focuses." *Id.* at 1226. That was sufficient even though "Ford presented evidence that conclusively establishes that Plaintiffs did not view any advertising materials produced by Ford prior to purchase." *Id.* To the extent what advertisements Plaintiffs saw may have some relevance as to what channels of disclosure were available to the Defendant disabuse consumers of the omission, *Daniel* makes clear that the actual viewing of advertisements is not required in an omission case.

In *Daniel*, Ford had argued that the plaintiffs could not simply show that they could have received the information through dealerships, but had to demonstrate that the dealerships were contractually obligated to pass on disclosures from Ford or would have done so voluntarily. The Ninth Circuit disagreed. Rather, it was sufficient "that Ford communicates indirectly through its authorized dealerships," that the plaintiffs "received information about the 'characteristics,' 'benefits,' and 'quality,' of the Ford Focus from Ford's dealerships," that the warranty required plaintiffs "to return to Ford dealerships to perform warranty repairs," and that Ford "circulated its special service messages and technical service bulletins when issues arose with the Focus." *Id.* at 1227. Based on that evidence, the Ninth Circuit held "a reasonable fact finder could conclude that Ford knew that its customers depended at least in part on its authorized dealerships for information about its vehicles and that Ford's authorized dealerships would have disclosed the alleged rear suspension defect to consumers if Ford had required it." *Id.*

The proper focus in an omission case such as this is, therefore, what channels of information customers depend upon and whether the defendant could have taken action to disseminate information through those channels (*e.g.*, by requiring dealerships to disclose it as in *Daniel*). This analysis is consistent with the fact that an omission-based fraud claim is premised on the defendant's affirmative *duty* to disclose. *See*, *e.g.*, *LiMandri*, 52 Cal.App.4th at 337; *Daugherty v. Am. Honda Motor Co.*, Inc., 144 Cal.App.4th 824, 838 (2006). A defendant must

35

exercise "reasonable care" to bring the information to the plaintiff's attention when under such a duty. *See* Restatement (Second) of Torts § 551, Comment on Subsection (2) (1977) ("If reasonable care is exercised, the fact that the information does not reach the person entitled to it does not subject [the defendant] to liability."); *Hoffman v. 162 North Wolfe LLC*, 228 Cal.App.4th 1178, 1187, n.11 (2014) (noting that "Section 551 of the Restatement Second of Torts has been cited with approval and relied upon by several California courts"). Thus, focus is on whether the Defendant *could have* disclosed the information to Plaintiffs through the exercise of reasonable care, and whether Plaintiffs *would have* received it had Defendant done so. What matters in an omission case under *Daniel* is whether the plaintiff had an *opportunity* to receive and therefore rely on the omitted information, not whether they actually received some other, irrelevant information. Although the actual receipt of some information from a defendant might tend to demonstrate that the plaintiff had an opportunity to receive additional information, it is not necessarily the only way to establish such an opportunity.

Here, the Plaintiffs who purchased their vehicles (both new and used[21]) directly from authorized GM dealerships have adequately pleaded that they had an opportunity to receive the information at the dealerships had it been disclosed to them. Although they have not specifically alleged that they interacted with and received information from sales representatives at the dealerships, it is plausible to infer that they did so (at least at the pleading stage) because it would be highly improbable for a person to walk into a dealership and purchase a vehicle without interacting with a sales representative.

Further, it is fair to treat Plaintiffs' opportunity to receive information from GM's authorized dealerships as an opportunity to receive the information directly from GM because an agency relationship has plausibly been pled. Though Plaintiffs have not explicitly alleged an agency relationship, the complaint includes allegations from which an agency relationship may

---

[21]  Defendant argued that plaintiffs who purchased used vehicles (Bradford, Del Valle, the Doepels, Faulkner, Ware, Ehrke, Warpinski, Sloan, Byrge, and Thacker) failed to allege that they viewed GM marketing materials or had direct contact with GM, but several of them purchased used vehicles from GM dealerships. As explained above, the more relevant question is not whether the vehicle was new or used, but whether it was purchased from an authorized GM dealership or some other entity.

**United States District Court**
For the Northern District of California

1   plausibly be inferred.  For example, the complaint alleges that GM "instructed" dealerships how to

2   respond to excessive oil complaints.  *See* SAC ¶¶ 15, 18.  Moreover, the express warranties

3   submitted by Defendant state that "GM requests that the vehicle be returned to the selling dealer

4   for all warranty repairs," and that "[i]f you are unable to return to the selling dealer, contact a GM

5   dealer in the United States or Canada for warranty service."  *See, e.g.,* Oxford Decl., Ex. 22 at 1

6   (Docket No. 48-22) (2010 Chevrolet Limited Warranty).[22]  Thus, for pleading purposes, Plaintiffs

7   have adequately alleged an agency relationship between the dealerships and GM.  *Cf. In re*

8   *MyFord Touch*, 46 F.Supp.3d at 956 (holding that "the scope of the agency is a factual one for the

9   jury to resolve, especially as information about Ford's precise relationship with its dealers . . . is

10  largely within Ford's possession, custody or control" and holding that allegations that Ford sent

11  instructions to dealers about how to repair vehicle defect was sufficient at pleading stage).

12  Because Plaintiffs have adequately pled an agency relationship between GM and its authorized

13  dealerships, Plaintiffs' interactions with the dealerships are sufficient under *Daniel* to constitute

14  the opportunity through which they would have received the omitted information from GM had

15  GM undertaken reasonable steps to disseminate it through its dealerships.

16          However, a small number of Plaintiffs alleged that they purchased vehicles from an entity

17  other than a GM dealership.[23]  The inference that effective disclosure would have been made by

18  Defendant cannot be drawn as to those Plaintiffs because it is not clear what relationship, if any,

19  those dealerships had with GM and whether or not they generally passed information from GM on

20  to consumers, as in *Daniel*.  The Court acknowledges that Plaintiffs make general allegations

21  concerning GM's advertising campaigns targeting the public, including through brochures, online,

22  television, radio, and print advertisements, annual reports, and so on.  *See* SAC ¶¶ 281-302.  At

23  least some of those could plausibly have been possible channels for GM to disclose the omitted

24  information.  However, Plaintiffs do not allege that they would have received the disclosed

25

26  [22]  Though the warranty is not attached to the complaint, it may be incorporated by reference.

27  [23]  These are Plaintiffs the Doepels (Toyota dealer, SAC ¶ 76); Ware (Barnes Crossing Hyundai
28  Mazda, SAC ¶ 117); Warpinski (Toyota dealer, SAC ¶ 146); Byrge (Honda dealer, SAC ¶ 168);
    and Thacker (Ford dealer, SAC ¶ 178).

information if it had been disclosed through those mediums, and the Court cannot draw that inference from the pleadings without more specific allegations as to, *e.g.*, the likelihood that GM's disclosure channels would have found their way through these non-GM entities or the pervasiveness of that advertising or other public dissemination which would have reached consumers. *Compare In re Tobacco II Cases*, 46 Cal.4th 298, 327 (2009) (explaining that where "a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements") *with Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581, 595-96 (9th Cir. 2012) (holding that a presumption of reliance is not justified where "it is likely that many class members were never exposed to the allegedly misleading advertisements, insofar as advertising of the challenged system was very limited," and interpreting *Tobacco II* "in the context of a 'decades-long' tobacco advertising campaign where there was little doubt that almost every class member had been exposed to defendants' misleading statements"). The Court dismisses their claims with leave to amend.

In dismissing those claims with leave to amend, the Court rejects Defendant's argument that Rule 9(b) requires Plaintiffs to allege with specificity in what particular advertisements the omitted information should have been included. Claims based on an omission "can succeed without the same level of specificity required by a normal fraud claim." *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997). As Judge Tigar has observed, "[t]his is because a plaintiff alleging an omission-based fraud will not be able to specify the time, place, and specific content of an omission as would a plaintiff in a false representation claim." *MacDonald v. Ford Motor Co.*, 37 F.Supp.3d 1087, 1096 (N.D. Cal. 2014). In this context, as in *MacDonald*, the "whom" is GM, the "what" is the oil consumption defect, the "when" is prior to the sale of class vehicles, and the "where" is the "various channels of information through which Ford sold Class Vehicles." *Id.* What the non-dealership Plaintiffs are missing is a plausible allegation that they would have received the information if disclosed through those various channels of information.

Defendant relies on *Marolda v. Symantec Corp.*, 672 F.Supp.2d 992 (N.D. Cal. 2009) in arguing to the contrary. In *Marolda*, the plaintiff had identified a particular advertisement as

misleading or deceptive but failed to include any identifying information about that advertisement or its purported omissions in the complaint. The court held that "[i]n this case" more detail had to be pled about the particular advertisement. *Id.* at 1002.

Virtually every court to consider of *Marolda* where there are claims like the instant case—alleged omission regarding a material safety defect in a vehicle—has rejected its applicability. *See*, *e.g.*, *MacDonald*, 37 F.Supp.3d at 1096 (distinguishing *Marolda* as "dissimilar" because it "concerned an alleged omission within a particular advertisement, which the plaintiff had failed to produce or adequately describe"); *Philips v. Ford Motor Co.*, Case No. 14-CV-02989-LHK, at *12 (N.D. Cal. 2015) (stating that "*Marolda* involved an alleged fraudulent omission within a particular advertisement produced by the defendant" and agreeing its requirements were not appropriate for all cases, siding instead with *MacDonald*); *Velasco v. Chrysler Grp. LLC*, 2014 WL 4187796, at * (C.D. Cal. Aug. 22, 2014) (distinguishing *Marolda* and following *MacDonald* to conclude that reliance met Rule 9(b) requirements despite failure to identify a particular advertisement in undisclosed safety defect automobile case).[24] However, one court, *Parenteau v. GM, LLC*, 2015 WL 1020499, at *7 (C.D. Cal. Mar. 5, 2015), is an outlier case that follows *Marolda* in an omission context, but is inconsistent with the Ninth Circuit's holding in *Daniel* that the focus should be on the defendant's opportunity to disseminate the information to the plaintiff, *not* whether the plaintiff has in fact viewed any advertisements. *See Daniel*, 806 F.3d at 1226 (holding that jury's finding of reliance adequate even though "Ford presented evidence that conclusively establishes that Plaintiffs did not view any advertising materials produced by Ford prior to purchase").

Accordingly, as in *MacDonald*, *Philips*, and *Velasco*, the non-dealership Plaintiffs would likely meet their burden under Rule 9(b) even without specifically identifying a particular

---

[24] Defendant also relies on *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 102 (S.D.N.Y. 1997), but that is distinguishable for the same reason as *Marolda*. There, the plaintiffs had alleged "reliance on representations, advertisements and other promotional materials prepared and approved" by the defendant, but "fail[ed] to specify the period during which he read, saw, or heard [those] representations, advertisements and promotional materials." *Id.* In contrast, Plaintiffs here have not failed to be specific about which advertisements they read and relied on because they do not allege that they did so.

advertisement in which the omitted information should have been included, so long as they provide plausible allegations, consistent with *Daniel*, that they would have received the information in some way had Defendant exercised reasonable care.[25]  The dealership Plaintiffs have met their burden because the mere fact that they purchased their vehicles from an authorized dealership supports a plausible inference under *Daniel* that they interacted with a sales agent and would have received the material information during the purchase process.

### 5.    Conclusion Regarding Fraud and Consumer Protection Claims

Plaintiffs have adequately pleaded a claim for fraudulent omission.  The omission was material for the in-warranty claims because Plaintiffs allege that they would not have purchased the vehicle if they had known, and it is material for the post-warranty claims because it related to an unreasonable safety hazard.  The safety hazard is adequately pleaded because there is a sufficient nexus between the alleged defect and the safety risk and because Plaintiffs have adequately supported their allegation with several factual assertions of engine damage and other reliability or operability problems.  Most importantly, Plaintiffs have adequately alleged that there was no adequate warning system before potentially catastrophic damage (and therefore safety issues) could arise.

However, only the dealership Plaintiffs have adequately pled reliance at this stage.  The non-dealership Plaintiffs have not, for reasons explained above, so the Court **GRANTS** Defendant's motion to dismiss with respect to Plaintiffs the Doepels, Ware, Warpinski, Byrge, and

---

[25]  The other cases cited by Defendant do not require otherwise. In *Asghari v. Volkswagen Grp. Of Am., Inc.*, 42 F.Supp.3d 1306, 1325-26 (C.D. Cal. 2013), another safety defect case involving excessive oil consumption, the court held that Rule 9(b) was satisfied where the "what" was the excessive oil defect, the "why" was selling more vehicles at a higher price and misleading owners to avoid warranty repairs, and the "how" was denying the problem by asserting it was normal upon receiving a complaint.  Thus, *Asghari* supports this Court's holding.  In *Davidson v. Apple, Inc.*, 2017 WL 976048 (N.D. Cal. Mar. 14, 2017), the alleged omission pertained to defective touchscreens on iPhones.  The court rejected the applicability of *Marolda* but found that a Plaintiff's statement that he "purchased an iPhone 6 Plus from a Best Buy store in Illinois" without information about the date of the purchase or the specific store, or any allegation that he was exposed to any information about iPhones whatsoever before making the purchase, failed to satisfy Rule 9(b).  *Id.  Davidson* did not hold that a plaintiff must plead actual exposure to information, nor did it analyze *Daniel*.

1   Thacker with leave to amend.

2   C.      Implied Warranty Claims

3          Plaintiffs bring claims for breach of the implied warranty of merchantability under the

4   Magnuson-Moss Act (Count 1), California's Song-Beverly Act, § 1791.1 (Count 4), and UCC

5   section 2-314 as enacted in 22 other states (Counts 9, 14, 19, 28, 33, 42, 47, 58, 63, 67, 72, 77, 82,

6   87, 97, 102, 117, 122, 127, 136).  The UCC provides that "a warranty that the goods shall be

7   merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods

8   of that kind" and that "[g]oods to be merchantable must be at least such as . . . are fit for the

9   ordinary purposes for which such goods are used."  UCC § 2-314.

10         Defendant challenges these claims on the basis that (1) Plaintiffs fail to plead the vehicles

11  were not fit for ordinary use because none claim they could not use them; (2) Plaintiffs did not

12  suffer harm or damage to their vehicles within the durational period for implied warranty; (3) lack

13  of privity under New York and Oregon law; (4) non-cognizability of Ohio "implied warranty in

14  tort" under Magnuson-Moss; and (5) failure to provide pre-suit notice.  Each is discussed below.

15         1.      Fit For Ordinary Use

16         To state a claim for breach of the implied warranty of merchantability, a plaintiff must

17  plead that "the product did not possess even the most basic degree of fitness for ordinary use."

18  *Mocek v. Alfa Leisure, Inc.*, 114 Cal.App.4th 402, 406 (2003).  Defendant argues that Plaintiffs

19  cannot make that showing because none of them allege they were forced to stop driving their cars

20  or that vehicle operation was drastically undermined.  However, whether a defect is so severe that

21  "the cars at issue could not be said to provide safe, reliable transportation" is a question of fact for

22  the jury.  *In re MyFord Touch*, 46 F.Supp.3d at 980.  In light of the Court's holding above that

23  Plaintiffs have adequately pled an unreasonable safety hazard, including several examples of

24  engine damage, fouled spark plugs, engine misfires, emission of white smoke, and so on, Plaintiffs

25  have created a fact question for the jury regarding the reliability and safety of the vehicles.  *Id.*

26         Defendant's cases do not support the proposition that a vehicle is fit for ordinary use so

27  long as it continues to provide transportation, irrespective of safety concerns.  *American Suzuki*

28  *Motor Corp. v. Sup. Ct.*, cited by Defendant, reversed class certification in a case where plaintiffs

41

alleged the vehicle design created an unreasonable risk of vehicle roll-over but failed to allege a single example of such a roll-over, thus leading the court to conclude the alleged risk was "speculative." 37 Cal.App.4th 1291, 1295-96 (1995). Here, the safety risk has been plausibly alleged for purposes of Rule 12(b)(6). Moreover, later California authority has distinguished *American Suzuki* and explicitly "reject[ed] the notion that merely because a vehicle provides transportation from point A to point B, it necessarily does not violate the implied warranty of merchantability. A vehicle that smells, lunches, clanks, and emits smoke over an extended period of time is not fit for its intended purpose." *Isip v. Mercedes-Bens USA, LLC*, 155 Cal.App.4th 19, 27 (2007). Similarly, here, a finder of fact based on the allegations of the SAC could reasonably conclude that vehicles in which spark plugs and lifters fail unexpectedly, white smoke is emitted, or engines become sluggish or suddenly shut down are not fit for ordinary use.[26]

By pleading a material safety-related defect, Plaintiffs have adequately pled that the vehicle was unfit for ordinary use.[27] The Court **DENIES** GM's request to dismiss on this basis.

2.    Durational Limit on Implied Warranty Claims

Defendant also argues that Plaintiffs' implied warranty claims fail because none of them allege that the harms they suffered occurred within the one-year warranty period of merchantability. *See* Cal. Civ. Code § 1791.1(c). California appellate courts, however, have held

---

[26] The other cases cited by Defendant are also distinguishable because they do not involve safety or other defects that impair vehicle operability. *See Avedisian v. Mercedes-Benz USA, LLC*, 43 F.Supp.3d 1071, 1079 (C.D. Cal. 2014) (recognizing that "a defect need not render a vehicle inoperable to establish a breach of implied warranty" so long as the vehicle is "in safe condition and substantially free of defects," and concluding that peeling chrome "did not impact the operability of Plaintiff's vehicle"); *Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F.Supp.2d 962, 980 (C.D. Cal. 2014) (no breach of implied warranty where premium automatic braking feature achieved only "negligible" reduction in speed, but vehicle otherwise was fully functional and operator could still brake and no safety risk was shown); *Kent v. Hewlett-Packard Co.*, 2010 U.S. Dist. LEXIS 76818, *12 (N.D. Cal. Jul. 10, 2010) (plaintiffs alleged that computers froze and locked up with frequency due to defect, but failed to state claim for breach of implied warranty where they did "not allege that they have been forced to abandon the use of their computers completely, that the computers freeze multiple times per day, or that they in fact have lost data as a result of the malfunctions," nor "how often [their] computers exhibit the subject problems").

[27] GM also states in a footnote that Count 51 under La. Civ. Code Art. 2524 fails for the same reasons because the statute only requires that "the thing sold must be reasonably fit for its ordinary use." GM does not cite any caselaw suggesting that this standard differs from California law on the breach of implied warranty.

that this durational limit "does not create a deadline for discovering latent defects or for giving notice to the seller." *Mexia v. Rinker Boat Co., Inc.*, 174 Cal.App.4th 1297, 1301 (2009). Rather, "[i]n the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery." *Id.* at 1305. Therefore, that the engine damage was not discovered within the one-year period is not determinative because the underlying defect was already allegedly present before the discovery.

Defendant cites *Valencia v. Volkswagen Grp. of Am., Inc.* to argue for a "limited reading" of *Mexia*. 119 F.Supp.3d 1130, 1139-40 (N.D. Cal. 2015) (holding that plaintiffs failed to plead brake defect manifested within one year of purchase, and vaguely alleging that they experienced "symptoms" within one year was insufficient). However, the Ninth Circuit has expressly disapproved of *Valencia*, holding that *Mexia*—as the highest state court authority—"must be followed." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1223 (9th Cir. 2015) (reversing district court's grant of summary judgment with respect to late discovery of latent defect). All the other federal district court cases cited by Defendant pre-date *Daniel*.

Thus, Plaintiffs' claims are not barred by failure to specify that the harms manifested within 1 year of purchasing new vehicles or 3 months of purchasing used vehicles. They allege the defect was inherent to the engine design and, therefore, existed at the time of purchase. That is a "latent" defect arising at the time of purchase and cognizable under *Mexia*.

Defendant also cursorily asserts that Plaintiffs "do not allege manifestation within the unspecified implied warranty periods under their States' laws," Mot. at 9, but does not discuss the laws of any state other than California. The question whether those states' laws differ from California's with respect to latent defects is therefore inadequately briefed and waived on this motion. *See*, *e.g.*, *Parrish v. Mabus*, 679 Fed.Appx. 620, 621 (9th Cir. Mar. 9, 2017) ("A bare assertion in a brief with no supporting argument, or an argument made only in passing, is insufficient to avoid waiver.").

The Court **DENIES** Defendant's request to dismiss Plaintiffs' implied warranty claims for failure to assert manifestation of the defect within the limitations period.

43

3. <u>Privity Under New York and Oregon Law</u>

GM argues that New York and Oregon law require privity of contract as an essential element of an implied warranty claim unless a plaintiff alleges personal injury. *See, e.g.*, *Prue v. Fiber Composites, LLC*, 2012 U.S. Dist. LEXIS 54027, *30-32 (E.D.N.Y. Apr. 17, 2012), citing *Arthur Jaffee Assocs. v. Bilsco Auto Serv.*, 89 A.D.2d 785 (1982); *Davis v. Homasote*, 281 Ore. 383, 386 (1978). GM argues that Plaintiff Vita (New York) and Plaintiff Martell (Oregon) therefore fail to state a claim because they purchased their vehicles from dealers and do not allege personal injuries. *See* SAC ¶¶ 130, 152.

Plaintiffs counter that New York law finds privity where dealerships act as GM's sales agent. *See Gordon v. Ford Motor Co.*, 239 A.D. 2d 156 (N.Y. App. Div. May 6, 1997) (denying motion to dismiss because "privity would exist if the dealerships with which plaintiffs dealt were defendant's sales or leasing agents"). Defendant points out, however, that Plaintiffs fail to allege that the dealership acted as GM's sales agent in the complaint. That is true, but as explained above, Plaintiffs have pleaded sufficient information to permit a plausible inference of such an agency relationship in light of allegations that GM instructed dealers how to respond to excessive oil consumption complaints and its warranty requires presentation to a dealership. *See supra* at 36-37.

Defendant's request to dismiss Plaintiff Vita's implied warranty claim under New York law is **DENIED**.

Plaintiffs also counter that Oregon law permits "a plaintiff within the normal distribution chain [to] recover property damages from a seller with whom he is not in privity based on breach of an implied warranty." *McFadden v. Dryvit Sys., Inc.*, 2004 WL 2278542, at *8 (D. Or. Oct. 8, 2004).[28] However, as Defendant points out, *McFadden* distinguishes property damage and personal injury from mere economic loss. *Id.* Privity is not required for the former, but is required for the latter. *Id.* Plaintiff Martell therefore cannot proceed on a claim for economic loss because of lack of privity. Although he claims that his engine has been damaged, SAC ¶ 155, that

---

[28] Plaintiffs do not argue that privity exists by virtue of an agency relationship under Oregon law.

United States District Court
For the Northern District of California

does not appear to be the type of property damage that gives rise to a cognizable claim. *See East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858 (1986) ("In the traditional 'property damage' cases, the defective product damages *other* property." (emphasis added)). *See also McFadden*, 2004 WL 2278542, at *6 (plaintiffs were "seeking damages to repair their homes, not simply to replace the defective EIFS [which leaked and trapped water, causing physical damage to their homes]"). Thus, because Plaintiff Martell fails to establish privity or allege cognizable property damage, GM's request to dismiss his implied warranty claim under Oregon law is **GRANTED** with leave to amend only if he can plausibly allege he was in privity with GM.

### 4. Implied Warranty In Tort

Defendant argues that Ohio Plaintiffs Gulling and Jones' claims for "implied warranty in tort," SAC Count 92 ¶¶ 1241-47, must be dismissed because the Magnuson Moss Warranty Act does not cover such claims.

The Magnuson-Moss Warranty Act, 15 U.S.C. § 2300, *et seq.*, sets forth minimum federal standards for express and implied warranties for consumer products, and creates federal jurisdiction over civil actions premised on violations of those standards or failure to comply with "a written warranty, implied warranty, or service contract," when certain amount-in-controversy thresholds are satisfied. *See* 15 U.S.C. § 2310(d)(1), (d)(3). Plaintiffs do not respond to Defendant's contention that a claim for implied warranty in tort (as opposed to contract) may not proceed under the Magnuson-Moss Warranty Act. Nevertheless, Defendant appears to be correct that a non-contract implied warranty claim may not proceed under Magnuson Moss. *See In re Porsche Cars, N. Am., Inc. Plastic Coolant Tubes Prods. Liab. Litig.*, 880 F.Supp.2d 801, 819-20 (S.D. Ohio 2012) ("Although Ohio courts recognize two forms of implied warranty claims— implied warranty in tort and implied warranty of merchantability (contract)—only the latter can form the basis of a Magnuson-Moss claim."). The Court therefore **GRANTS** GM's request to dismiss Count 92.

Defendant also argues that Plaintiffs Clausen, Harris, Ludington, Shorter, Bednarek, Hanneken, and the Doepels do not bring implied warranty claims under their states' laws, so their Magnuson-Moss claims should be dismissed because they have abandoned express warranty

45

claims except for purposes of a future appeal in light of the Court's prior ruling regarding express warranty. *See* SAC at 59, n. 40. Plaintiffs do not respond to this request, and Defendant's assertion that these Plaintiffs have not brought a separate implied warranty claim in the SAC is correct. In the absence of either an express or implied warranty claim, Plaintiffs have not identified any other actionable claim under the Magnuson-Moss Warranty Act. *See* 15 U.S.C. § 2310(d) (permitting cause of action only for "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract"). The Court therefore **GRANTS** GM's request to dismiss Magnuson-Moss Act claims of Plaintiffs Clausen, Harris, Ludington, Shorter, Bednarek, Hanneken, and the Doepels.

### 5. UCC § 2-607: Pre-Suit Notice

Defendant argues that seven Plaintiffs' implied warranty claims are barred because they failed to make notice to the seller within a reasonable time after discovering the alleged breach, a necessary step under their states' laws. *See* UCC § 2-607(3). Plaintiff responds that Plaintiff Ludington provided GM with notice on behalf of the class on October 27, 2016, and therefore, sufficient notice has been made. *See* SAC ¶ 303. No case-law is cited by either side regarding the sufficiency of class-wide notice under the laws of the states in question. Although the parties addressed this question in a categorical fashion, the Court analyzes it on a state-by-state basis.

#### a. Alabama (Ala. Code § 7-2-607) – Plaintiff Brannan

Alabama law requires direct notice from the buyer to the manufacturer where the manufacturer (and not the seller) is being sued. *See Hobbs v. Gen. Motors Corp.*, 134 F.Supp.2d 1277, 1285 (M.D. Ala. 2001); *see also In re MyFord Touch*, 46 F.Supp.3d at 974. Additionally, the filing of a lawsuit does not constitute sufficient notice under Alabama law. *Hobbs*, 134 F.Supp.2d at 1285 (stating that the notice must "precede the filing of the complaint" in cases involving economic harm).

The question therefore is whether Plaintiff Luddington's class-wide notice suffices. Generally speaking, the sufficiency of notice is "tested in light of the facts of the particular case" to determine whether it is "sufficient to inform the seller of the breach and its possible

46

ramifications," unless notice is inadequate as a matter of law. *Page v. Camper City and Mobile Home Sales*, 292 Ala. 562, 565 (1974). Class-wide notice provided by a plaintiff in another state likely is insufficient as a matter of law. Courts applying Alabama law have refused, for example, to accept the argument that notice is not required where a manufacturer is already "aware" of alleged defects. *See*, *e.g.*, *Smith v. Apple*, No. 08-AR-1498-S, 2009 WL 3958096, at *1 (N.D. Ala. Nov. 4, 2009) ("[A] general awareness on Apple's part of alleged defects in its iPhone does not extinguish the purpose of the notice requirement, nor does it substitute for that requirement under Alabama law."). The purpose of pre-suit notice under Alabama law is to provide the seller an opportunity to cure the defect or the parties an opportunity to settle. Notice provided by a person in another state that purports to be made on behalf of all purchasers around the country—perhaps numbering in the hundreds of thousands—does not create a meaningful opportunity for the seller to cure or settle. Indeed, how would Plaintiff Ludington's notice have made GM aware that Plaintiff Brannan in particular was experiencing problems with his vehicle?

The Court therefore **GRANTS** GM's request to dismiss Plaintiff Brannan's implied warranty claim for failure to give pre-suit notice under Alabama law.

### b. Arkansas (Ark. Code § 4-2-607) – Plaintiff Goodwin

Under Arkansas law, notice is required before suit can be brought for implied warranties. *See Hartness v. Nuclkes*, 475 S.W.3d 558, 563 (Ark. 2015) (notice unreasonable when given for first time in lawsuit). The class-wide notice is insufficient here too. A "[r]easonable notice by [the buyer] would have informed [the seller] exactly how the vehicle failed to live up to [the buyer's] expectations." *Id.* at 563. It "would have given [the seller] an opportunity to cure any defects and would have allowed [it] to mitigate any damages." *Id.* And it would "give[] both parties an opportunity to document the condition of the car once the restoration was complete."

Although "[t]he requirements of notification are not stringent" and "[n]o particular form of notice is required," the notice must still "be sufficient to inform the seller that the transaction is claimed to involve a breach and thus to open the way for negotiation of a normal settlement." *Jarrett v. Panasonic Corp. of N. Am.*, 8 F.Supp.3d 1074, 1083 (E.D. Ar. 2013). Plaintiff Ludington's class-wide notice does nothing to inform GM that Plaintiff Goodwin claims his

47

transaction involved a breach.  Thus, a reasonable jury could not conclude that notice by a person in another state that does not specifically identify Plaintiff Goodwin or his vehicle afforded GM such an opportunity as guaranteed by Arkansas law.  Accordingly, the Court **GRANTS** GM's request to dismiss Plaintiff Goodwin's claim for breach of implied warranty.

c.     Georgia (Ga. Stat. § 11-2-607) – Plaintiff Bradford

Georgia law also requires notice before a breach arises, but it does not appear to preclude, as a matter of law, the giving of notice through a lawsuit.  *See Wal-Mart Stores, Inc. v. Wheeler*, 262 Ga.App. 607, 609-611 (2003).  "[T]he question of reasonableness of notice is ordinarily a factual one[.]"  *Great Western Press, Inc. v. Atlanta Film Converting Co.*, 223 Ga.App. 861, 862 (1996).  Moreover, Georgia law does not "require a buyer to do a futile and useless thing," so notice is not required when it would be futile.  *BDI Distributors, Inc. v. Beaver Computer Corp.*, 232 Ga.App. 316, 317 (1998).

Plaintiffs' allegations are sufficient to create a question of fact whether the failure to provide notice separate from the lawsuit was unreasonable under Georgia law.  Plaintiffs also allege that participation in informal mediation would have been futile, and that GM failed to cure the defects or all damage caused when repairs were attempted by consumers, including Plaintiffs.  *See*, *e.g.*, SAC ¶¶ 340, 425.  Accordingly, because Georgia law does not preclude notice to be given through a lawsuit itself and also permits a plaintiff to file suit when notice would have been futile, the Court **DENIES** GM's motion to dismiss Plaintiff Bradford's warranty claims.

d.     Minnesota (Minn. Stat. § 336.2-607) – Plaintiffs Dahl and Peterson

Minnesota law requires notice of a breach, but the "bar for sufficiency is low" as long as the notice lets the seller know about the basis for the claimed breach and a delay does not prejudice the seller.  *See City of Wyoming v. Procter & Gamble Co.*, 210 F.Supp.3d 1137, 1157 (D. Minn. 2016) (declining to dismiss claim where plaintiffs failed to provide notice before initiation of lawsuit where no showing of prejudice was made).  Moreover, it does not appear that class-wide notice is insufficient per se where there is reason to think the defendant is already aware of similar claims.  *Id.* (refusing to dismiss in part because defendant had been "locked in litigation" over the same issue "in courts all across the country" and "it could hardly be said that

48

Plaintiffs' complaint was the first time Defendants received notice of the kind and type of claims raised by Plaintiffs"). Rather, notice might be "bootstrap[ed] . . . onto notices given by other persons" if they are "clearly similarly situated." *Drobnak v. Andersen Corp.*, 2008 U.S. Dist. LEXIS 1343, *16-17 (D. Minn. Jan. 8, 2008) (notice was not sufficient because it was not given by similarly situated persons).

Here, Plaintiffs Dahl and Peterson allege the same defect, the same type of legal claim, and the same type of injury as Plaintiff Luddington. Thus, Minnesota law likely permits Plaintiffs Dahl and Peterson to rely on Plaintiff Luddington's notice. Accordingly, the Court **DENIES** GM's motion to dismiss the Minnesota plaintiffs' claims.

     e.  New York (N.Y. U.C.C. § 2-607(3)(a)) – Plaintiff Vita

New York law does not categorically bar notice to be given through a lawsuit itself. *See Panda Capital Corp. v. Kopo Intern., Inc.*, 242 A.D.2d 690, 692 (1997) (holding that "the complaint and subsequent amended complaint in this action themselves constituted such notice" and that it was "at the very least an issue of fact as to whether reasonably timely notice of breach was given").

Plaintiff Vita does not state when he purchased his vehicle, but states that he purchased it "new" and that it was a 2013 GMC Sierra, so it is reasonable to infer he purchased it in or around 2013. SAC ¶ 130. He was first added to the Second Amended Complaint, filed Aug. 31, 2017. *See* Docket No. 67. Thus, approximately 3.5 years have passed since he purchased the vehicle. It is not clear, however, when he discovered the defect, except that he alleges he "noticed excessive oil consumption when his vehicle had approximately 80,000 miles on the odometer." *See* SAC ¶ 132. Thus, it is plausible that he did not discover the defect until well after his initial purchase. Given the lack of clarity, it is not possible to conclude, as a matter of law on the pleadings, that his notice through the lawsuit was unreasonable. *Compare Tomasino v. Estee Lauder Cos.*, 44 F.Supp.3d 251, 260-61 (E.D.N.Y. 2014) (notice unreasonable as a matter of law when provided 3 years after purchase date where defect related to cosmetic product intended for immediate consumption and cosmetic failed to produce claimed anti-aging effects). Accordingly, Plaintiff

Vita's allegations are sufficient to create a question of fact as to the reasonableness of his notice.[29]

The Court **DENIES** GM's motion to dismiss Plaintiff Vita's implied warranty claim for failure to give timely notice.

       f.    South Carolina (S.C. Code § 36-2-607) – Plaintiff Sloan

South Carolina appears to follow a lenient standard for notice—"virtually any notification that fairly apprises the seller of the problems will suffice." *U.S. v. So. Contracting of Charleston, Inc.*, 862 F.Supp. 107, 111 (D. S.C. 1994). So long as the buyer communicates that a problem exists, notice is sufficient and there is no need to "assert the intention to make a claim for damages or pursue any other remedy" to fulfill the requirement. *Id.* at 112 (citation and quotation omitted).

Here, Plaintiff Sloan alleges he "has complained about the excessive oil consumption to Nevado Chevrolet," apparently a dealership (but not the one he purchased from). SAC ¶ 165. The parties have not identified, and the Court has not located, South Carolina authority on whether notice to an authorized dealer other than the seller is sufficient, or whether notice to a dealer in lieu of a manufacturer is sufficient where the manufacturer is being sued. In light of the apparently lenient standard, Plaintiff Sloan's complaint to a dealership, GM's express warranty's instructions that problems be reported to a dealer, and Plaintiff Luddington's purported class-wide notice, the Court **DENIES** GM's motion to dismiss Plaintiff Sloan's implied warranty claim at this time.

D.    Statutes of Limitation

Defendant raises many arguments regarding whether Plaintiffs' claims have been brought within the applicable statutes of limitation. Each argument is discussed below.

    1.    Implied Warranty Claims

UCC section 2-725 states that "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued" and that "[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the

---

[29] Because the filing of the complaint on Aug. 31, 2017 creates a question of fact, it is unnecessary to reach the question whether Vita may bootstrap off of Luddington's third-party notice under New York law.

breach." UCC § 2-725. Defendant argues that the cause of action accrued at the time of initial retail sale because Plaintiffs allege an inherent defect, which itself constitutes the breach. *See MacDonald*, 37 F.Supp.3d at 1101-02. Accordingly, GM requests dismissal of 17 plaintiffs who allege a purchase date more than four years prior to the litigation and 10 plaintiffs who did not plead a purchase date.

A threshold issue concerns whether the cause of action accrues as of the time of initial retail sale or the subsequent delivery of a used vehicle. GM is correct that, for purposes of implied warranty claims against the *manufacturer*, the accrual date is the time of initial retail sale, not subsequent re-sale to purchaser of a used vehicle. *See*, *e.g.*, *Lecates v. Hertrich Pontiac Buick Co.*, 515 A.2d 163 (Del. Sup. Ct. 1963) (holding that for purpose of implied warranty claim, cause of action accrues as of original sale date of vehicle, not when used car was purchased). That is the operative date for statute of limitations purposes.

Plaintiffs argue that 10 plaintiffs who did not plead a purchase date should not have their claims dismissed because "[s]tatute of limitations is . . . an affirmative defense that a plaintiff has no obligation to plead around in his or her complaint." *MyFord Touch*, 46 F.Supp.3d at 961. However, this rule only applies when there is no "statute-of-limitations problem apparent from the face of the complaint." *Id.* The model year for certain vehicles that Plaintiffs allege they purchased new may suggest that the four-year limitations period has been exceeded; thus, although a statute of limitations is generally an affirmative defense, it is fair to address it at this time where a problem may be apparent based on Plaintiffs' allegations.

Because this inquiry is fact-specific, it is summarized with respect to each Plaintiff in the chart below. However, as explained below the chart, the doctrine of fraudulent concealment may operate to toll the statute of limitations for those Plaintiffs who failed to file timely claims.

///

///

///

///

///

## Implied Warranty – Chart of Statute of Limitations (Before Consideration of Tolling)

| Name | Used/New | Initial Purchase | Model | Complaint | Holding |
|------|----------|------------------|-------|-----------|---------|
| Siquieros (¶ 25) | New | N/A | 2011 | 12/19/16 | **UNTIMELY** – Implausible new MY 2011 vehicle purchased after 12/19/12 |
| M/M Cralley (¶ 30) | New | N/A | 2010 | 8/13/17 | **UNTIMELY** – Implausible new MY 2011 vehicle purchased after 8/13/12 |
| Brannan (¶ 37) | Used | 2011 | 2011 | 12/19/16 | **UNTIMELY** – Vehicle purchased before 12/19/16. |
| Goodwin (¶ 40) | New | 2010 | 2010 | 2/27/17 | **UNTIMELY** – Vehicle purchased before 2/27/12. |
| Perkins (¶ 45) | New | 2011 | 2011 | 2/27/17 | **UNTIMELY** – Vehicle purchased before 2/27/12. |
| Bradford (¶ 62) | Used | N/A | 2010 | 2/27/17 | **UNTIMELY** – Implausible MY 2010 vehicle originally purchased after 2/27/12. |
| Faulkner (¶ 87) | Used | N/A | 2011 | 12/19/16 | **UNTIMELY** – Implausible MY 2010 vehicle originally purchased after 2/19/16. |
| Smith (¶ 99) | New | 2012 | 2011 | 2/27/17 | **TIMELY** – Face of complaint does not suggest vehicle was purchased before 2/27/12. |
| Dahl (¶ 105) | New | 2010 | 2010 | 12/19/16 | **UNTIMELY** - Vehicle purchased before 12/19/12. |
| Molina (¶ 127) | Used | N/A | 2012 | 12/19/16 | **TIMELY** – Face of complaint does not suggest MY 2012 vehicle was purchased before 12/19/12. |
| Warpinski (¶ 146) | Used | N/A | 2012 | 2/27/17 | **TIMELY** – Face of complaint does not suggest MY 2012 vehicle was purchased before 2/27/13. |
| Martell (¶ 152) | New | N/A | 2011 | 8/31/17 | **UNTIMELY** – Implausible new MY 2011 vehicle purchased after 8/31/13. |
| Graziano (¶ 158) | New | 2011 | 2012 | 12/19/16 | **UNTIMELY** – Vehicle purchased before 12/19/12. |
| Byrge (¶ 168) | Used | N/A | 2012 | 2/27/17 | **TIMELY** – Face of complaint does not suggest MY 2012 vehicle purchased before 2/27/13. |
| Thacker (¶ 178) | Used | N/A | 2010 | 2/27/17 | **UNTIMELY** – Implausible new MY 2010 vehicle originally purchased after 2/27/13. |
| Robertson (¶ 194) | New | 2010 | 2010 | 2/27/17 | **UNTIMELY** – Vehicle purchased before 2/27/13. |

| Name | Used/New | Initial Purchase | Model | Complaint | Holding |
|------|----------|------------------|-------|-----------|---------|
| Del Valle (¶ 67) | Used | N/A | 2013 | 12/19/16 | **TIMELY** – Face of complaint does not suggest MY 2013 purchased before 12/19/12. |
| Olivier (¶ 94) | New | N/A | 2013 | 2/27/17 | **TIMELY** – Face of complaint does not suggest MY 2013 vehicle purchased before 2/27/13. |
| Peterson (¶ 111) | New | 12/2012 | 2012 | 12/19/16 | **UNTIMELY**– Plaintiff Peterson alleges only "December 2012" without specificity, but claim would be untimely if purchased before 12/19/12.  In light of problem apparent from face of complaint, Plaintiff should clarify the purchase date. |
| Ware (¶ 117) | Used | N/A | 2013 | 2/27/17 | **TIMELY** – Face of complaint does not suggest MY 2013 vehicle purchased before 2/27/13. |
| Kitchen (¶ 121) | Used | N/A | 2013 | 2/27/17 | **TIMELY** – Face of complaint does not suggest vehicle purchased before 2/27/13. |
| Vita (¶ 130) | New | N/A | 2013 | 8/31/17 | **TIMELY** – Face of complaint does not suggest vehicle purchased before 8/31/13. |
| Ehrke (¶ 136) | Used | N/A | 2013 | 12/19/16 | **TIMELY** – Face of complaint does not suggest vehicle purchased before 12/19/12. |
| Gulling ¶ 139 | N/A | N/A | 2013 | 12/19/16 | **TIMELY** – Face of complaint does not suggest vehicle purchased before 12/19/12. |
| Jones ¶ 142 | N/A | N/A | 2013 | 12/19/16 | **TIMELY** – Face of complaint does not suggest vehicle purchased before 12/19/12. |
| Sloan ¶ 163 | Used | N/A | 2013 | 12/19/16 | **TIMELY** – South Carolina has a 6 year statute of limitations, so vehicle purchased after 12/19/10. *See* S.C. Code Ann. § 36-2-725; *Green v. Bradley Co.*, 194 F.Supp.3d 479, 484 (D.S.C. 2016). |

Though claims by Plaintiffs Siquieros, the Cralleys, Brannan, Goodwin, Perkins, Bradford, Faulkner, Dahl, Martell, Graziano, Thacker, Robertson and Peterson appear to be untimely, Plaintiffs argue that all the implied warranty claims are tolled pursuant to the fraudulent concealment doctrine.  *See* SAC ¶¶ 308-313.  This doctrine applies when a defendant's "own

deception, has caused a claim to become stale and a plaintiff dilatory." *Regents of Univ. of Cal. v. Super. Ct.*, 20 Cal.4th 509, 533 (Cal. 1999).[30]  To toll the statute of limitations under the doctrine, a plaintiff must plead "(a) the substantive elements of the fraud, and (b) an excuse for late delivery of the facts." *Sater v. Chrysler Grp., LLC*, 2015 WL 736273, at *9 (C.D. Cal. Feb. 20, 2015) (fraudulent concealment adequately pled where defendant "intentionally kept" plaintiff ignorant of information, "continued to manufacture" product without disclosing defect, and delay in discovery was reasonable at least until vehicle was recalled); *see also Roberts v. Electrolux Home Prods., Inc.*, 2013 WL 7753579, at *8 (C.D. Cal. Mar. 4, 2013) (fraudulent concealment adequately pled where manufacturer failed to disclose material facts about the dryer's defect within its exclusive knowledge and late discovery was excused by such exclusive knowledge).

Plaintiffs sufficiently plead fraudulent concealment.  As explained above, they adequately allege that Defendant knew about the defect by the beginning of the Class Period, as demonstrated in part by the issuance of two TSBs to dealers specifically identifying two components allegedly contributing to the overall defect.  Additionally, Plaintiffs allege that several different dealerships informed separate individuals across the span of several years that the oil consumption was "normal."  Though Defendant points out these were statements by the dealer and not necessarily the manufacturer, Plaintiffs have adequately pled an agency relationship as explained above to create a question of fact for discovery.  Additionally, Defendant continued to sell the allegedly defective engines without any disclosure.  It is plausible that Plaintiffs' delayed discovery, in the absence of any manufacturer recall and given the active concealment by Defendant of the alleged defect, was reasonable.

The Court therefore holds that the statute of limitations for the otherwise untimely claims has been tolled (for purposes of Rule 12(b)(6)) under the doctrine of fraudulent concealment.  Defendant's motion to dismiss the implied warranty claims on statute of limitations grounds is thus **DENIED**.

---

[30]  Defendant has not challenged cases cited by Plaintiffs to demonstrate that the doctrine is recognized under the laws of other states as well.  *See* Opp. at 19, n. 15.

2.    Consumer Protection Claims

Defendant challenges the consumer protection claims as untimely.  GM's arguments fall into three categories: (1) some Plaintiffs' states do not recognize the discovery rule; (2) some do, but the conditions for invoking the rule are inadequately pleaded; and (3) some Plaintiffs do not satisfy other conditions for the statute of limitations.  Each argument is discussed below.

a.    No Discovery Rule States

**Louisiana (Olivier)**:  Louisiana does not recognize the discovery rule for claims under the Louisiana Unfair Trade Practices Act, La. Rev. State. § 51:1401, *et seq.  See Morris v. Sears, Roebuck & co.*, 765 So.2d 419, 422 (La. App. 2000) ("Any claims that plaintiffs may have had under the LUPTA ceased one year after they came into existence without regard to plaintiffs' knowledge of or ability to act on the alleged cause of action.").  Plaintiffs maintain that the statute of limitations cannot run, however, "until a continuing violation ceases." *CheckPoint Fluidic Sys. Int'l, Ltd. v. Guccione*, 888 F.Supp.2d 780 (E.D. La. 2012).  However, Defendant correctly points out that *CheckPoint* applied the continuing violation rule reluctantly under binding Fifth Circuit precedent, but pointed out that more recent Louisiana appellate authority had held that the continuing violation doctrine does not apply to LUTPA claims.  *See CheckPoint*, 888 F.Supp.2d at 792 ("Although this Court concludes that the better view of Louisiana statutory law and jurisprudence is that the continuing violation doctrine does not apply under LUTPA, if La. R.S. 51:1409(E) is preemptive, the Louisiana Supreme Court has not ruled squarely on the issue, and the Fifth Circuit's opinion to the contrary has not been overruled.").  Because this Court is not bound by the Fifth Circuit, it will follow more recent Louisiana appellate authority as the highest state authority on the issue. *See Glod v. Baker*, 899 So.2d 642, 646-49 (La. Ct. App. 2005) (holding that LUTPA is a peremptive statute because it creates a right and specifies the time in which the right must be exercised, so the continuing violation doctrine does not apply).  Further, Plaintiffs have not argued or identified, and the Court has not located, a case that permits the LUTPA statute of limitations to be tolled by the defendant's fraudulent concealment.  GM's request to dismiss Plaintiff Olivier's LUTPA claim is therefore **GRANTED** because he purchased a new 2013 GMC Sierra and did not bring a cause of action until February 28, 2017, after the one-

year statute of limitations.

**Florida (Shorter and Luddington)**:  Florida does not recognize the discovery rule under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 502.201, *et seq.*, either.  *See Yusuf Mohamed Excavation v. Ringhaver Equip. Co.*, 793 So. 2d 1127, 1128 (Fla. App. 2001) (holding that the "delayed discovery" rule does not apply to FDUTPA and that the four-year statute of limitations applies).  However, the doctrine of fraudulent concealment, discussed above, can toll FDUTPA claims.  *In re Takata Airbag Prods. Liab. Litig.*, 193 F.Supp.3d 1324, 1344, 1346 (S.D. Fla. 2016).  Thus, the Court **DENIES** GM's motion to dismiss Plaintiff Shorter and Ludington's consumer protection claims.[31]

**Kansas (Madison):** Kansas does not recognize the discovery rule, so the three year statute of limitations applies.  *See* Kan. Stat. § 50-623 *et seq.*; Kan. Stat. § 60-512; *Louisburg Bldg. & Dev. Co. v. Albright*, 252 P.3d 597, 607 (Kan. App. 2011), *aff'd in pertinent part* 393 Kan. 1107 (2012) (three-year limitations period "starts running with the occurrence of the alleged conduct constituting the violation, not the discovery of the violations").  However, Kansas recognizes the doctrine of fraudulent concealment.  *See Freebird, Inc. v. Merit Energy Co.*, 883 F.Supp.2d 1026, 1034-36 (D. Kans. 2012).  The Court thus **DENIES** GM's motion to dismiss Plaintiff Madison's consumer protection claim.[32]

**New York (Vita):**  Similarly, claims under the New York General Business Law, § 349 are not "dependent upon any date when discovery of the alleged deceptive practice is said to occur."  *Marshall v. Hyundai Motor Am.*, 51 F.Supp.3d 451, 461-62 (S.D.N.Y. 2014).  However, New York permits tolling of these claims by the doctrine of fraudulent concealment.  *See State ex rel. Spitzer v. Daicel Chemical Industries, Ltd.*, 42 A.D.3d 301, 303 (N.Y. Sup. Ct. 2007).  The Court **DENIES** GM's motion to dismiss Plaintiff Vita's consumer protection claim.[33]

---

[31]  Plaintiff Shorter bought a new 2011 Chevrolet Silverado but did not file a claim until December 19, 2016.  Plaintiff Ludington bought a used 2010 Chevrolet Tahoe in 2012 but did not assert a claim until December 19, 2016.  No date of discovery is alleged.

[32]  Plaintiff Madison purchased a vehicle in December 2013 but did not make a claim until February 28, 2017.

[33]  Plaintiff Vita bought a new 2013 GMC Sierra but did not assert a claim until August 31, 2017.

**Ohio (Jones and Gulling):**  Similarly, under Ohio law, "the statute of limitations begins to run when the violation occurs, not when the consumer discovers the violation."  *Quetot v. M&M Homes, Inc.*, 2013 Ohio 752, ¶ 12 (Ohio App. 2013); *see also* Ohio Rev. Code § 1345.01 (Ohio Consumer Sales Practices Act); Ohio Rev. Code § 1345.10(C) (providing for two-year statute of limitations).  However, Ohio also recognizes the doctrine of fraudulent concealment.  *See Thornton v. State Farm Mut. Auto. Ins. Co.*, 2006 WL 3359448, at *6-7 (N.D. Ohio Nov. 17, 2006).  Thus, the Court **DENIES** GM's motion to dismiss Plaintiff Jones and Gulling's consumer protection claims.[34]

**Wisconsin (Bednarek)**:  Wisconsin law provides for a three-year statute of limitations, also not dependent upon the date of discovery.  *See* Wis. Stat. § 100.18(11)(b)(3); *Selzer v. Brusnell Bros.*, 652 N.W.2d 806, 815 (Wis. App. 2002).  However, under Wisconsin law the statute of limitations is tolled in the case of a continuing violation.  *See Werner v. Pittway Corp.*, 90 F.Supp.2d 1018, 1033-34 (W.D. Wis. 2000) (plaintiff alleging misleading advertisements failed to state continuing violation where they did not "demonstrate that they received one of defendants' allegedly misleading statements" and "relied" on it).  Plaintiff Bednarek bought his vehicle in 2010 and did not file a claim until February 2017; however, because Plaintiffs allege that Defendant's concealment of the defect has continued to the present, the Court **DENIES** the request to dismiss Plaintiff Bednarek's consumer protection claim.

To summarize, the Court **GRANTS** the request to dismiss Plaintiff Olivier's consumer protection claim under Louisiana law because tolling is not permitted, but **DENIES** the request to dismiss the claims of Plaintiffs Shorter and Luddington (Florida), Madison (Kansas), Vita (New York), Jones and Gulling (Ohio), and Bednarek (Wisconsin) because the fraudulent concealment or continuing violation doctrine tolls their claims.

        b.         <u>Inadequate Pleading for Discovery Rule</u>

Defendant argues that six plaintiffs fail to allege the time of discovery or that reasonable diligence would not have permitted earlier discovery, as required.  *See Gerstle v. Am. Honda*

---

[34]  Plaintiffs Jones and Gulling bought 2013 Silverados but did not assert claims until over two years later, on December 19, 2016.

*Motor Co.*, 2017 U.S. Dist. LEXIS 62809, at *19 (N.D. Cal. Apr. 17, 2017) (plaintiffs are required to "plead facts which show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence"). "The burden of pleading and proving belated discovery of a cause of action falls on the plaintiff." *Investors Equity Life Holding Co. v. Schmidt*, 195 Cal.App.4th 1519, 1533 (2011). Plaintiffs must show they acted "reasonably and diligently" to benefit from the discovery rule. *Gerstle*, 2017 U.S. Dist. LEXIS 62809 at *21.

Plaintiffs claim they may invoke the discovery rule because their complaint alleges generally that "Plaintiffs could not have discovered through the exercise of reasonable diligence that their Class Vehicles were defective within the time period of any applicable statutes of limitation," SAC ¶ 306, and that they "could [not] have known that the Class Vehicles are equipped with Generation IV Vortek 5300 Engines with the Oil Consumption Defect," SAC ¶ 307. These bare and conclusory allegations are insufficient for the Court to determine "the time and the manner by which each plaintiff discovered the defect." *Gerstle*, 2017 U.S. Dist. LEXIS 62809 at *21. Plaintiffs have not argued or cited cases indicating that these claims may be tolled by the doctrine of fraudulent concealment. Accordingly, the Court **GRANTS** Defendant's request to dismiss the consumer protection claims of Plaintiffs Goodwin (Arkansas), Bradford (Georgia), Hanneken (Illinois), Smith (Massachusetts), Sanchez (Texas), and Thacker (Virginia). These plaintiffs shall have leave to amend to attempt to satisfy the requirements of the discovery rule.

### c.   Other Conditions Under Delaware & Louisiana Law

GM contends that Plaintiff Perkins (Delaware) does not allege if or when he complained to a GM dealer about excessive oil consumption, a complaint which would have started running the three-year limitations period under 10 Del. Code § 8106. *See Stenta v. GMC*, 2009 Del. Super. LEXIS 199, *20-23 (Del. Super. May 29, 2009). However, because the statute of limitations is an affirmative defense and no problem is apparent from the face of the complaint, Plaintiff Perkins is not required to affirmatively plead when he first made a complaint that would have accrued his cause of action. Accordingly, the Court **DENIES** GM's request to dismiss Plaintiff Perkins' claim at this time.

Louisiana law recognizes a civil action for a breach of warranty against redhibitory

defects; "a defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale." *See* La. Civ. Code Art. 2520. A defect is also redhibitory "when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price," in which case the remedy is limited to "a reduction of the price." *Id.* However, Louisiana law requires a claim for breach of warranty against redhibitory defects to be made within one year of the buyer's discovery of the defect or four years after delivery to the buyer, whichever occurs first. *See* La. Civ. Code Art. 2534. As discussed above in the context of the implied warranty claim, Plaintiff Olivier's claim should not be dismissed on the basis of the four-year statute of limitations because the complaint does not indicate that he is outside of it. Thus, it may only be dismissed if he discovered the defect more than one year before filing the complaint. There is no indication in the complaint that he discovered the defect more than one year before filing suit, and because statute of limitations is an affirmative defense, Plaintiff Olivier was not required to plead around it. Accordingly, the Court **DENIES** GM's request to dismiss Plaintiff Olivier's redhibitory defects claim under Louisiana law.

E.    Unjust Enrichment Claims

Defendant principally argues that Plaintiffs have failed to state a claim for unjust enrichment because restitution is a remedy, not a cause of action; thus, because Plaintiffs have failed to state any viable causes of action, they no longer have a basis to seek an unjust enrichment remedy. However, in light of the Court's holding denying GM's request to dismiss the consumer protection and fraud claims, it does not follow that the remedy is no longer available to them and should be dismissed. Moreover, as Plaintiffs point out, the Ninth Circuit has held that "[w]hen a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). Thus, that restitution may be a remedy is not a basis for dismissing the unjust enrichment claims, and Defendant has not argued that a quasi-contract claim seeking restitution is insufficiently pled or precluded as a matter of law. The Court declines to dismiss on this basis.

59

Defendant also argues that 22 plaintiffs' claims are barred by the applicable statute of limitations for unjust enrichment in their state. Plaintiffs do not dispute Defendant's representations regarding each state's statute of limitations except for Alabama and New York (discussed in footnotes), *see* Mot. at 23, nn. 12, 13, 14, but argue that the claims are tolled by virtue of the delayed discovery rule or fraudulent concealment. For the same reasons as above, however, Plaintiffs have failed to adequately plead tolling under the delayed discovery rule. They have, however, adequately pleaded fraudulent concealment.

The table below summarizes the Court's holding with respect to each Plaintiff based on the foregoing.

**Statutes of Limitation for Unjust Enrichment Claims**

| Plaintiff | Purchase Date | Limitations Period | Filing Date | Tolling Permitted? | Holding on Motion to Dismiss |
|---|---|---|---|---|---|
| Siqueiros (¶ 25) | New MY 2011 | 3 years (CA) | 12/19/16 | Discovery rule | **GRANT** |
| M/M Cralley (¶ 30) | New MY 2010 | 3 years (CA) | 8/31/17 | Discovery rule | **GRANT** |
| Brannan (¶ 37) | 2011 | 6 years (AL)[35] | 12/19/16 | | **DENY** – not clear that claim was not brought within 6 years |
| Goodwin (¶ 40) | 2010 | 3 years (AR) | 2/27/17 | Fraudulent concealment | **DENY** |
| Perkins (¶ 45) | 2011 | 3 years (DE) | 2/27/17 | Fraudulent concealment | **DENY** |
| Ludington (¶ 50) | 2012 | 4 years (FL) | 12/19/16 | Delayed discovery | **GRANT** |
| Shorter (¶ 56) | New MY 2011 | 4 years (FL) | 12/19/16 | Delayed discovery | **GRANT** |

---

[35] Plaintiffs and Defendant cite the same Alabama case, but disagree whether a two or six year statute of limitations period applies. The distinction turns on whether the unjust enrichment claim sounds in tort (2 years) or contract (6 years). *See Auburn Univ. v. IBM Corp.*, 716 F.Supp.2d 1114, 1118 (M.D. Ala. 2010). Here, Plaintiff Brannan's unjust enrichment claim arises from GM's alleged "selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to GM's concealment of the Oil Consumption Defect." SAC ¶ 447 (Count 11). This claim may sound in either tort (fraud) or contract (implied and express warranty). At this stage and in the absence of authorities to the contrary, the Court relies on the 6-year statute of limitations at this stage.

| Plaintiff | Purchase Date | Limitations Period | Filing Date | Tolling Permitted? | Holding on Motion to Dismiss |
|---|---|---|---|---|---|
| Hanneken (¶ 71) | 2011 | 5 years (IL) | 2/27/17 | Delayed discovery | **GRANT** |
| Madison (¶ 82) | 2013 | 3 years (KS) | 2/27/17 | Delayed discovery | **GRANT** |
| Smith (¶ 99) | 2012 | 3 years (MA) | 2/27/17 | Delayed discovery | **GRANT** |
| Dahl (¶ 105) | 2010 | 6 years (MN) | 12/19/16 | Fraudulent concealment | **DENY** |
| Molina (¶82) | Used MY 2012 | 4 years (NM) | 12/19/16 | Delayed discovery | **GRANT** |
| Vita (¶ 130) | New MY 2013 | 6 years (NY)[36] | 8/31/17 | Delayed discovery | **DENY** – 6 year SOL applies, not 3 years |
| Warpinski (¶ 146) | 2014 | 2 years (OK) | 2/27/17 | Delayed discovery | **GRANT** |
| Martell (¶ 152) | 2011 | 2 years (OR) | 8/31/17 | Delayed discovery | **GRANT** |
| Graziano (¶ 158) | 2011 | 4 years (PA) | 12/19/16 | Delayed discovery | **GRANT** |
| Sanchez (¶ 172) | 2013 | 2 years (TX) | 2/27/17 | Delayed discovery | **GRANT** |
| Clausen (¶ 183) | 2013 | 3 years (WA) | 2/27/17 | Delayed discovery | **GRANT** |
| Harris (¶ 189) | 2012 | 3 years (WA) | 8/31/17 | Delayed discovery | **GRANT** |
| Robertson (¶ 194) | 2010 | 5 years (WV) | 2/27/17 | Delayed discovery | **GRANT** |
| Bednarek (¶ 199) | 2010 | 6 years (WI) | 2/27/17 | Delayed discovery | **GRANT** |

## IV.   CONCLUSION

In sum, the Court:

- **DENIES** Defendant's motion to dismiss claims by the out-of-state plaintiffs for

---

[36] Defendant maintains that unjust enrichment claims based on tortious conduct are subject to a three-year limitations period rather than six under New York law. *See Maya NY, LLC v. Hagler*, 106 A.D.3d 583, 585 (2013). *Maya*, in fact, does not make that statement, but rather, as Plaintiffs point out, explains that "[u]nder New York law, there is no identified statute of limitations period within which to bring a claim for unjust enrichment, but where, as here, the unjust enrichment and breach of contract claims are based upon the same facts and pleaded in the alternative, a six-year statute of limitations applies." *Id.* at 585. Defendant does not contest that statement. Accordingly, the Court follows New York law's six-year general statute of limitations. *See* N.Y. C.P.L. § 213(2) (for actions based "upon a contractual obligation or liability") and § 213(8) (for actions "based upon fraud").

lack of personal jurisdiction because the challenge is waived with respect to the original named plaintiffs and the exercise of personal jurisdiction over the new named plaintiffs' claims is permitted under the pendent personal jurisdiction doctrine;

- **DENIES** Defendant's motion to dismiss the fraud and consumer protection claims because Plaintiffs have adequately pled materiality, pre-sale knowledge, and reliance, except with respect to the non-dealership Plaintiffs the Doepels, Ware, Warpinski, Byrge, and Thacker, for whom GM's motion is **GRANTED**, with leave to amend;

- **GRANTS** Defendant's request to dismiss the consumer protection claims on statute of limitations grounds as follows:
  - o  Where tolling is unavailable under the relevant state law (Plaintiff Olivier);
  - o  Delayed discovery rule tolling is available but inadequately pled (Plaintiffs Goodwin, Bradford, Hanneken, Smith, Sanchez, and Thacker), with leave to amend;

- **DENIES** Defendant's request to dismiss consumer protection claims on statute of limitations grounds because tolling is available for Plaintiffs Shorter, Luddington, Madison, Vita, Jones, Gulling, and Bednarek.

- **DENIES** Defendant's request to dismiss the implied warranty claims for Plaintiffs Smith, Molina, Warpinski, Byrge, Del Valle, Olivier, Peterson, Ware, Kitchen, Vita, Ehrke, Gulling, Jones, and Sloan because the face of the complaint does not demonstrate their claims are time-barred;

- **DENIES** Defendant's request to dismiss the implied warranty claims for Plaintiffs Siquieros, the Cralleys, Brannan, Goodwin, Perkins, Bradford, Faulkner, Dahl, Martell, Graziano, Thacker, Robertson because, although they failed to bring their claims within the applicable limitations period, their claims may be tolled by the fraudulent concealment doctrine;

- **GRANTS** Defendant's request to dismiss the implied and express warranty claims of Plaintiff Martell (Oregon), with leave to amend, because Oregon law requires privity, which has not been demonstrated;

- **GRANTS** Defendant's request to dismiss the Magnuson Moss Warranty Act

62

claims of:

- o  Plaintiffs Clausen, Harris, Ludington, Shorter, Bednarek, Hanneken, and the Doepels because they do not bring implied warranty claims, and the express warranty claims are pled only to preserve them on appeal, having been previously dismissed by the Court;

- o  Plaintiffs Gulling and Jones' claims for "implied warranty in tort" under Ohio law;

- **GRANTS** Defendant's request to dismiss claims of Plaintiffs Brannan and Goodwin for failure to give pre-suit notice, but **DENIES** the request for Plaintiffs Bradford, Dahl, Peterson, Vita, Sloan, due to the variations in state law discussed above;

- **GRANTS** Defendant's request to dismiss unjust enrichment claims as time-barred, with leave to amend, because Plaintiffs Siquieros, the Cralleys, Ludington, Shorter, Hanneken, Madison, Smith, Molina, Warpinski, Martell, Graziano, Sanchez, Clausen, Harris, Robertson, and Bednarek fail to adequately plead delayed discovery;

- **DENIES** Defendant's request to dismiss the unjust enrichment claims on statute of limitations grounds for Plaintiffs Brannan and Vita because the claims are brought within the statute of limitations, and for Plaintiffs Goodwin, Perkins, and Dah because tolling is permitted and adequately pleaded under the fraudulent concealment doctrine.

This order disposes of Docket No. 70.  Consistent with this order, Plaintiffs may file an amended complaint within 30 days.

**IT IS SO ORDERED**.

Dated: February 7, 2018

_____
EDWARD M. CHEN
United States District Judge