1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

MONTEVILLE SLOAN, et al.,

8

Plaintiffs,

9

v.

10

GENERAL MOTORS LLC,

11

Defendant.

Case No. 16-cv-07244-EMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; AND DENYING DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT WITNESS**

Docket Nos. 175, 184, 201

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

I.    INTRODUCTION .................................................................................................... 5

II.   BACKGROUND ..................................................................................................... 5

  A.   Factual Background ............................................................................................ 5

  B.   Procedural Background ...................................................................................... 7

III.  DISCUSSION ........................................................................................................ 10

  A.   Legal Standard ................................................................................................. 10

    1.   Summary Judgment ...................................................................................... 10

    2.   Class Certification ........................................................................................ 11

    3.   Exclusion of Expert Testimony ................................................................... 12

  B.   Analysis ............................................................................................................ 13

    1.   Summary Judgment ...................................................................................... 13

      a.   Existence of a Safety Defect ..................................................................... 13

        i.   Testimony of Individual Plaintiffs ........................................................ 14

        ii.  Expert Evidence ..................................................................................... 16

        iii. Defendant's Response ............................................................................ 18

      b.   Concealment ............................................................................................... 24

        i.   GM's Awareness .................................................................................... 24

        ii.  Active Concealment ............................................................................... 27

        iii. Intent to Deceive .................................................................................... 31

      c.   Analysis of Individual Counts .................................................................. 32

        i.   Are Certain Claims Time Barred? ......................................................... 32

          (a)   Count 4 (CA – Implied Warranty) ................................................... 32

          (b)   Count 6 (CA – Unjust Enrichment) ................................................. 35

(c) Count 90 (NC – Implied Warranty) ................................................................ 36

(d) Count 91 (NC – Fraudulent Omission) ........................................................... 38

(e) Count 127 (TX – Unjust Enrichment) ............................................................ 39

ii. Are Certain Claims Barred by the Economic Loss Doctrine? ............................... 40

(a) Count 5 (CA – Fraudulent Omission) ............................................................ 41

(b) Count 76 (NJ – Fraudulent Omission) ........................................................... 43

(c) Count 88 (NC – Unfair and Deceptive Trade Practices Act) ........................... 44

iii. Are Unjust Enrichment Claims Barred by Express Contracts and/or Adequate Legal Remedies? – Count 6 (CA – Unjust Enrichment), Count 77 (NJ – Unjust Enrichment), Count 92 (NC – Unjust Enrichment), Count 127 (TX – Unjust Enrichment) ............... 48

iv. Are Certain Claims Barred Because No Evidence Shows Vehicles Are Unmerchantable? .................................................................................................. 49

(a) Count 4 (CA – Implied Warranty) ................................................................ 49

(b) Count 75 (NJ – Implied Warranty) ............................................................... 52

(c) Count 90 (NC – Implied Warranty) .............................................................. 53

(d) Count 125 (TX – Implied Warranty) ............................................................. 55

v. Do Magnuson-Moss Warranty Act ("MMWA") Claims Fail for Lack of Predicate Claims? (Count 1) ................................................................................................ 56

vi. Do Certain Claims Fail Because No Evidence Shows GM's Knowledge or Duty to Disclose? ........................................................................................................... 57

(a) California (Counts 2 – Consumer Protection, 5 – Fraudulent Omission, and 7 - Unfair Competition Law ("UCL")) .................................................................. 57

(b) New Jersey (Counts 74 – Consumer Protection and 76 – Fraudulent Omission) . ............................................................................................................... 60

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(c)   North Carolina (Counts 88 – UDTPA and 91 – Fraudulent Omission) ............ 62

(d)   Texas (Counts 123 – TDTPA and 126 – Fraudulent Omission) ...................... 63

2.   Exclusion of Expert ...................................................................................... 64

a.   Legal Standard .................................................................................... 64

b.   Analysis .............................................................................................. 65

3.   Class Certification ........................................................................................ 68

a.   Rule 23(a) Requirements .................................................................... 70

i.   Numerosity .................................................................................. 70

ii.   Commonality ............................................................................... 70

(a)   Common Defect or Different Engines with Different Designs? ...................... 72

(b)   Is a Class-Wide Inference About GM's Knowledge Possible? ........................ 76

(c)   Can Reliance Be Established on a Class-Wide Basis? ..................................... 76

(d)   Is an Individualized Inquiry Required on Merchantability (for Implied

Warranty) Claims? .......................................................................................... 80

(e)   Is an Individualized Inquiry Required for Unjust Enrichment Claims? ........... 82

(f)   Is the Issue of Damages a Class-Wide Issue? ................................................. 82

iii.   Typicality ................................................................................... 85

iv.   Adequacy ................................................................................... 87

b.   Rule 23(b) Requirements .................................................................... 88

i.   Predominance ............................................................................. 88

ii.   Superiority .................................................................................. 90

iii.   Conclusion as to Class Certification ......................................... 91

IV.   CONCLUSION ............................................................................................ 92

United States District Court
Northern District of California

# I.     <u>INTRODUCTION</u>

In this suit, Plaintiffs allege that Defendant General Motors ("GM" or "Defendant") knowingly manufactured and sold a car engine with inherent defects that caused excessive oil consumption and engine damage.  The alleged defects affect 2010 to 2014 model-year GM vehicles.  Plaintiffs assert claims under various state consumer-protection and fraud statutes on behalf of a nationwide class as well as various statewide classes.  Plaintiffs filed their class action complaint on December 19, 2016.  Docket No. 2.  They have since amended their pleadings several times; the operative complaint is the Fifth Amended Complaint ("5AC").  *See* Docket No. 157.  Before the Court are (1) a Motion for Class Certification brought by the Accelerated Plaintiffs (the "Accelerated Plaintiffs" are Raul Siqueiros (California), John Knoll (New Jersey), William Davis, Jr. (North Carolina), and Rudy Sanchez (Texas), who represent the states serving as bellwethers for purposes of class certification),[1] Docket No. 175, (2) Defendant's Motion for Partial Summary Judgment, Docket No. 184, and (3) Defendant's Motion to Exclude Certain Testimony of Plaintiffs' Expert Witness, Docket No. 201.

# II.     <u>BACKGROUND</u>

A.     <u>Factual Background</u>

Although Plaintiffs' description of the alleged defects' impact on individual Plaintiff's own vehicles has evolved, the core facts of this case remain the same.  Plaintiffs allege that the Gen IV Vortec 5300 engine suffers from an "inherent" "Oil Consumption Defect."  5AC ¶ 7.  The "primary cause" of the alleged defect is the piston rings installed by GM.  *Id.* ¶ 8.  These piston rings "do not maintain sufficient tension to keep oil in the crankcase," and the oil migration that occurs as a result allows oil to "burn[] or accumulate[] as carbon buildup on the combustion chamber's surfaces."  *Id.* ¶¶ 8–9.  Plaintiffs allege that the Oil Consumption Defect causes safety problems in three ways:  (1) oil consumption can lead to a lack of adequate lubrication in the

---

[1] On April 24, 2018, the Court approved the parties' plan to limit bellwether class certification to five states: California, New Jersey, North Carolina, Ohio, and Texas.  *See* Docket No. 113. Because the claims of the Ohio Plaintiff were previously dismissed, *see* Docket No. 195, class certification of the Accelerated Plaintiffs now covers only California, New Jersey, North Carolina, and Texas.

United States District Court
Northern District of California

engine and dropping oil pressure levels in vehicles, *id.* ¶ 19; (2) the presence of excess oil in the

combustion chamber can cause spark plug fouling, which can cause engine problems, *id.*; and (3)

when drivers experience these problems while driving, they may be forced to pull over and stop

alongside a road or highway (or they may be stranded in such a location with an inoperable

vehicle), which places a person in danger, *id.* ¶ 16.

Initially, Plaintiffs sought to include all four Gen IV engine designs (the LC9, the LMG,

the LH9, and the LMF) in the class definition, but in the Reply in Support of Plaintiffs' Motion for

Class Certification, Plaintiffs limited the proposed class definition to vehicles with LC9 engines

with Active Fuel Management ("AFM").  *See* Reply in Support of Motion for Class Certification

("CC Reply") at 7, Docket No. 207.  The LC9 engine was installed in the 2010-2014 Chevrolet

Avalanche; 2010-2014 Chevrolet Silverado; 2010-2014 Chevrolet Suburban; 2010-2014

Chevrolet Tahoe; 2010-2014 GMC Sierra; 2010-2014 GMC Yukon; and the 2010-2014 GMC

Yukon XL.  *Id.* ¶ 2; *see also* CC Reply at 7.[2]

Plaintiffs seek to certify the following classes:

> 1. **California Class.** All current and former owners or lessees of a
> Class Vehicle that was purchased or leased in the State of
> California. The California Class seeks class certification of claims
> for: (a) violation of the California Consumer Legal Remedies Act,
> Cal. Civ. Code § 1750 *et seq.*; (b) violation of the Song-Beverly
> Consumer Warranty Act for breach of implied warranty, Cal. Civ.
> Code § 1790 *et seq.*; (c) fraudulent omission; (d) unjust enrichment;
> and (e) violation of the California Unfair Competition Law, Cal.
> Bus. & Prof. Code § 17200 *et seq.* Plaintiffs move for the
> appointment of Raul Siqueiros . . . as the class representative[] for
> the California Class.[3]

> 2. **New Jersey Class.** All current and former owners or lessees of a
> Class Vehicle that was purchased or leased in the State of New
> Jersey. The New Jersey Class seeks class certification of claims for:
> (a) violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann.
> § 56:8-1 *et seq.*; (b) breach of implied warranty of merchantability;
> (c) fraudulent omission; (d) and unjust enrichment. Plaintiffs move

---

[2] Because Plaintiffs narrowed the class definition to include only LC9 engines, the Chevrolet Colorado, Chevrolet Express, GMC Canyon, and GMC Savana (which were mentioned in the Fifth Amended Complaint) are no longer part of the class definition.  *See* CC Reply at 7.

[3] Because Plaintiffs narrowed the class definition to include only LC9 engines, the (previously named) Cralleys no longer seek to serve as California class representatives because their vehicle did not have such an engine.  *See* CC Reply at 1 n.2.  Their names have been omitted here.

United States District Court
Northern District of California

1      for the appointment of John Knoll as the class representative for the
2      New Jersey Class.

2          3. **North Carolina Class.** All current and former owners or lessees
3      of a Class Vehicle that was purchased or leased in the State of North
       Carolina. The North Carolina Class seeks class certification of
4      claims for: (a) violation of the North Carolina Unfair and Deceptive
       Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq.*; (b) breach of
5      implied warranty of merchantability; (c) fraudulent omission; (d)
       and unjust enrichment. Plaintiffs move for the appointment of
6      William Davis, Jr. as the class representative for the North Carolina
       Class.

7          4. **Texas Class.** All current and former owners or lessees of a Class
       Vehicle that was purchased or leased in the State of Texas. The
8      Texas Class seeks class certification of claims for: (a) violation of
       the Texas Deceptive Trade Practices – Consumer Protection Act,
9      Tex. Bus. & Com. Code § 17.01 *et seq.*; (b) breach of implied
       warranty of merchantability; (c) fraudulent omission; (d) and unjust
10     enrichment. Plaintiffs move for the appointment of Rudy Sanchez as
       the class representative for the Texas Class.

11

12     Notice of Motion for Class Certification ("Notice") at 1–2, Docket No. 175.[4]

13     B.     Procedural Background

14          Plaintiffs first filed their Complaint in December 2016, *see* Docket No. 2, followed by a

15     First Amended Complaint ("FAC") in February 2017, *see* Docket No. 29.  The named Plaintiffs

16     who filed the original Complaint sought to represent classes from thirteen states. *Id.* at 25–26.  On

17     August 1, 2017, the Court dismissed the FAC in its entirety with leave to amend.  *See* Docket No.

18     62 ("FAC Order").  Later that same month, Plaintiffs filed a Second Amended Complaint

19     ("SAC"), *see* Docket No. 67, which added named plaintiffs from twenty additional states, *id.* at

20     55–56.  After extensive briefing, the Court dismissed the Second Amended Complaint in part.  *See*

21     Docket No. 99 ("SAC Order").  In March 2018, Plaintiffs filed a Third Amended Complaint

22     ("TAC"), *see* Docket No. 107, which added a plaintiff from one additional state, *id.* at 11.

23     Plaintiffs subsequently sought leave to file a Fourth Amended Complaint ("4AC"), *see* Docket No.

24     120 ("First Mot. for Leave"), in order to "substitute William Davis, Jr., a member of the putative

25     North Carolina class, in place of the current North Carolina class representative, Steven Ehrke,

26

27     ───────────────
       [4] As noted above, Plaintiffs also sought to certify an Ohio class, but the Court previously
28     dismissed all claims of the named Plaintiff from Ohio for lack of personal jurisdiction.  *See*
       Docket No. 195.

who is no longer able to participate in this litigation." First Mot. for Leave at 1. No other change to the Complaint was sought. *Id.* The Court granted the parties' joint stipulation to the filing of a Fourth Amended Complaint, permitting substitution of the North Carolina class representative.[5] *See* Docket No. 122.

After filing a Fourth Amended Complaint in November 2018, *see* Docket No. 123, Plaintiffs again sought leave to file an amended complaint (the Fifth Amended Complaint) in May 2019, *see* Docket No. 141 ("Second Mot. for Leave"). The purpose behind the request to file a Fifth Amended Complaint was the substitution of "Thomas Szep in place of the current Ohio class representatives, Thomas Gulling and Ronald Jones, who are for personal reasons no longer able to participate in this litigation." Second Mot. for Leave at 1. No other modification of the Fourth Amended Complaint was sought. *Id.*

Defendant opposed Plaintiffs' Motion for Leave to File a Fifth Amended Complaint, *see* Docket No. 153 ("Opposition to 5AC"), on the grounds that "add[ing] an Ohio plaintiff . . . comes too late and would be unfair and prejudicial to GM based on the history of this case and governing legal standards." Opposition to 5AC at 1. More specifically, GM argued that "[c]hanging the parties and allegations after discovery is closed would deprive GM of the ability to fully defend itself. It would embroil the court again in pleadings and motions practice, upheave the current schedule, and disrupt the class certification proceedings set to begin in a few weeks." *Id.* at 2. On July 2, 2019, the Court granted Plaintiffs' Motion for Leave to File a Fifth Amended Complaint. *See* Docket No. 156. Plaintiffs filed a Fifth Amended Complaint that same day, *see* Docket No. 157, and Defendant subsequently filed a Motion to Dismiss Plaintiff Szep's Claims in the Fifth Amended Complaint, *see* Docket No. 158.

In moving to dismiss Plaintiff's Szep's claims in the Fifth Amended Complaint, Defendant challenged the Court's personal jurisdiction over GM as to the claims of Plaintiff Szep, the named

---

[5] The Fourth Amended Complaint included named Plaintiffs from California, Alabama, Arkansas, Delaware, Florida, Georgia, Idaho, Illinois, Kansas, Kentucky, Louisiana, Massachusetts, Minnesota, Mississippi, Missouri, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, and Wisconsin. *See* Docket No. 124.

Plaintiff from Ohio.  *See* Docket 158.  Plaintiffs argued that the Court had specific personal jurisdiction over GM as to the claims of Plaintiff Szep since his claims related to those of the California Plaintiffs.  *See* Docket No. 161.  GM argued that, in light of the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773 (2017), it was improper for the Court to exercise pendent personal jurisdiction over the claims of an out-of-state Plaintiff who lacked an independent relationship to the State of California.  *See* Docket No. 158.  Although the Court previously declined to apply *Bristol-Myers* in light of the existence of federal question jurisdiction, it found that—as it pertained to Plaintiff Szep's claims—no federal question jurisdiction existed.  *See* Docket No. 195.  As a result, the Court followed "the growing weight of authority" that has applied *Bristol-Myers* to federal courts sitting in diversity and concluded that the exercise of pendent personal jurisdiction as to Plaintiff Szep's claims would be improper.  *Id.*  Consequently, it dismissed the claims of the Ohio Plaintiff for lack of personal jurisdiction.  *Id.*

After the issuance of that order, Defendant filed a Motion for Reconsideration of the Court's SAC Order.  *See* Docket No. 221.  That motion sought reconsideration of the Court's refusal to dismiss the claims of the Plaintiffs from Illinois, New York, Oregon, and Washington, in light of the Court's subsequent decision to dismiss the claims of the Ohio Plaintiff.  On February 11, 2020, the Court granted Defendant's Motion for Reconsideration of the Court's SAC Order and dismissed the claims of the Plaintiffs from Illinois, New York, Oregon, and Washington.  *See* Docket No. 235.

As noted above and in the Court's prior orders, in order to address manageability concerns, the parties agreed to follow a bellwether process wherein Plaintiffs' initial motion for class certification would be limited to California, New Jersey, Ohio, North Carolina, and Texas.  *See* Docket No. 113.  Because of the Court's order dismissing the claims of Plaintiff Szep, no Ohio class remains.  A Motion to Certify the Class in the four bellwether states was filed with the Court on September 3, 2019.  *See* Docket No. 175.  GM's Motion for Partial Summary Judgment was filed on October 8, 2019.  *See* Docket No. 184 ("MSJ").  GM responded with a Motion to Exclude Certain Testimony of Plaintiffs' Expert Witness.  *See* Docket No. 201.  A hearing on the issue of

United States District Court
Northern District of California

class certification, GM's Motion for Partial Summary Judgment, and GM's Motion to Exclude

Expert Testimony took place on January 21, 2020.  *See* Docket No. 209.

### III.  DISCUSSION

A.  Legal Standard

    1.  Summary Judgment

      Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment

[to a moving party] if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is

genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  "The mere existence of a

scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could

reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence

must be viewed in the light most favorable to the nonmoving party and all justifiable inferences

are to be drawn in the nonmovant's favor.  *See id.* at 255.[6]

      Where a defendant moves for summary judgment based on a claim for which the plaintiff

bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a

showing sufficient to establish the existence of an element essential to [the plaintiff's] case."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Fontenot v. Upjohn Co.*, 780 F.2d

1190, 1194 (5th Cir. 1986) (stating that, "if the movant bears the burden of proof on an issue,

either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must

establish beyond peradventure all of the essential elements of the claim or defense to warrant

judgment in his favor") (emphasis omitted).

---

[6] Evidence may be presented in a form that is not admissible at trial so long as it could ultimately be capable of being put in admissible form.  *See* Fed. R. Civ. P. 56(c)(2) (providing that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence").  *See, e.g.*, *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) (stating that "[e]ven the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an admissible form at trial'").

United States District Court
Northern District of California

2.      Class Certification

The "class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted).  For that reason, "a class representative must be part of the class and possess the same interest and suffer the same injury as [her fellow] class members." *Id.* at 2550 (citation omitted).  Rule 23 "ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate" by requiring compliance with the requirements of both Rule 23(a) and (b).  *Id.* at 2550.

Rule 23(a) permits a class to be certified only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)–(4).  These requirements are frequently referred to as numerosity, commonality, typicality, and adequacy.  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

If Plaintiffs demonstrate they have identified an ascertainable class and meet the requirements of Rule 23(a), Plaintiffs must show they also satisfy at least one prong of Rule 23(b). *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).  Here, Plaintiffs seek certification under Rule 23(b)(3), which provides:

> the court finds that the question of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).  In evaluating the predominance and superiority factors, the Court must consider:

> (A) the class members' interests in individually controlling the

prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

*Id.*

The burden is on the "party seeking class certification [to] affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350; *see also Howard v. CVS Caremark Corp.*, 628 F. App'x 537 (9th Cir. 2016).  The Court must in turn conduct a "rigorous analysis" to ensure that the prerequisites of Rule 23 are met, which may require "prob[ing] behind the pleadings before coming to rest on the certification question."  *Id.* (citation omitted).

### 3.    Exclusion of Expert Testimony

The Federal Rules of Evidence permit an expert to testify where he or she "is qualified as an expert by knowledge, skill, experience, training, or education" and his or her testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," "is based on sufficient facts or data," "is the product of reliable principles and methods; and" "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  The expert's testimony must "be both relevant and reliable."  *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001).

That expert evidence must be both reliable and relevant was made clear in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  *See id.* at 590–91.  "Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).  As to relevance, the evidence must assist the trier of fact to understand or determine a fact in issue.  *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1154 (E.D. Wash. 2009).  The burden is

on the proponent of the expert testimony to prove admissibility.  *Lust By & Through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

B.    Analysis

    1.    Summary Judgment

The Court first addresses GM's Motion for Partial Summary Adjudication because of its potential impact upon class certification.  Because several of Plaintiffs' claims turn on the existence of a vehicle safety defect and on the question whether GM concealed information about the alleged Oil Consumption Defect, those issues are analyzed as threshold matters before the Court turns to the propriety of summary judgment as to each of Plaintiffs' claims.

    a.    Existence of a Safety Defect

Whether a safety defect exists bears on a number of Plaintiffs' claims.  For example, the implied warranty claims of the California and Texas Plaintiffs turn on whether the vehicles are "in safe condition and substantially free of defects."  *Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 27, 65 Cal. Rptr. 3d 695 (2007); *Becerra v. Gen. Motors LLC*, 241 F. Supp. 3d 1094, 1115 (S.D. Cal. 2017) (citing *Otis Spunkmeyer, Inc. v. Blakely*, 30 S.W.3d 678, 688 (Tex. App. 2000)) (recognizing that an implied warranty claim may exist where an alleged defect fundamentally affects the safety and operability of the vehicles).  In addition, the fraudulent omission and consumer protection claims of the California Plaintiff turn on whether GM had a duty to disclose information about the alleged defect, and such a duty exists where the defect presents a safety issue.  *See Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1141 (9th Cir. 2012).

As noted above, Plaintiffs contend that the Oil Consumption Defect causes safety problems in three ways: (1) oil consumption can lead to a lack of adequate lubrication in the engine and dropping oil pressure levels in vehicles; (2) the presence of excess oil in the combustion chamber can cause spark plug fouling, which can cause engine problems; and (3) when drivers experience these problems while driving, they may be forced to pull over and stop alongside a road or highway (or they may be stranded in such a location with an inoperable vehicle), which places a person in danger.

United States District Court
Northern District of California

i.    <u>Testimony of Individual Plaintiffs</u>

The Accelerated Plaintiffs allege a range of experiences with the Oil Consumption Defect.

Plaintiff Siqueiros purchased his vehicle in October 2011.  *See* Plaintiff Raul Siqueiros's Response

to Defendant General Motors LLC's First Set of Interrogatories ("Siqueiros Int."), Docket No.

185-17.  He first noticed the oil level in his vehicle going down a couple of months after he

purchased it.  Deposition of Raul Siqueiros ("Siqueiros Depo.") at 23–24, Docket No. 185-16.

However, in April 2016 (four and a half years after he purchased the vehicle and at around 94,000

miles, *see id.* at 41–42), Mr. Siqueiros was driving on the highway when the vehicle lost power

and slowed dramatically, and the check engine light came on.  *Id.* at 38–39.  Mr. Siqueiros

estimated that he had been driving "around 50 miles an hour" when the vehicle suddenly slowed

to about 15 miles per hour; he lost control of the vehicle, which started to go more and more

slowly until he was able to pull over.  *Id.*  He alleges that, prior to the check engine light

illuminating during that incident, no dashboard warning light ever appeared to alert him that his

vehicle was consuming oil.  *Id.* at 40.  At that point, Mr. Siqueiros took the vehicle to be serviced,

and a diagnostic test revealed that the crankshaft lifter and camshaft had been damaged.  *Id.* at 41.

Plaintiffs assert that these are problems commonly associated with low oil levels, *see* Opposition

to Motion for Summary Judgment ("MSJ Opp.") at 6, 7–8, Docket No. 192, and GM engineers

have acknowledged as much, *see* Deposition of Thomas Halka ("Halka Depo.") at 68–70, Docket

No. 193-1 (stating that low oil levels can lead to damaged crankshaft bearings); Tappen Depo. at

41 (describing wear on camshafts as one of the possible damages that could result from oil

consumption).  (In addition, three years after the incident in which Mr. Siqueiros's vehicle lost

power on the highway, GM's oil consumption testing revealed that Mr. Siqueiros's vehicle

consumed one quart of oil every 1,000 miles.  *See* Ball Report at 11.)  Later, in June 2016, the

check engine light once again came on and the engine rattled.  Siqueiros Depo. at 84–85.

Although no longer seeking to represent the California class, the Cralleys also experienced

problems with their vehicle related to the alleged Oil Consumption Defect.[7]  The Cralleys

---

[7] For the sake of simplicity, when discussed alongside the remaining Plaintiffs in this case, the
Cralleys are still referred to as "Plaintiffs" in this order.

purchased a 2010 Chevrolet Suburban in February 2010.  *See* Plaintiffs Todd and Jill Cralley's

Response to Defendant General Motors LLC's First Set of Interrogatories ("Cralleys Int."),

Docket No. 194-20.  They first noticed that their vehicle was consuming oil excessively in 2012 or

2013, when a GM technician inspected the vehicle and informed them that it was one or two

quarts below the recommended level.  *See* Deposition of Todd Cralley ("Cralley Depo.") at 26,

Docket No. 194-21.  Later, in 2015 and 2017, their vehicle experienced a rough idle, and in 2017,

the check engine light came on.  *Id.* at 81, 90.  (It is not indicated in the deposition whether any

other warning light came on at any point.)  Mr. Cralley also testified that the car shook "violently"

on at least one occasion and that "there were other times where [he] was driving the vehicle and

[he] had no power"; he testified that his wife also experienced the lack of power.  *Id.* at 81.  Mr.

Cralley explained that "[g]etting up to a reasonable speed was a chore for the vehicle" and that it

would sometimes have trouble "clearing intersections."  *Id.* at 83.  When Mr. Cralley took the

vehicle to be serviced for these problems, the servicer "diagnosed the vehicle []as having fouled

and damaged spark plugs."  *Id.* at 82.  GM engineers noted that fouled spark plugs and pistons can

sometimes result from oil consumption problems.  *See* Deposition of Yoon Lee ("Lee Depo.") at

29, 31–32, Docket No. 193-5; Halka Depo. at 32 ("Generically you can get spark plug fouling

from excessive oil consumption."); *id.* at 76 (discussing spark plug warranty issues related to oil

consumption).

Plaintiff Knoll purchased his vehicle in January 2013.  *See* Plaintiff John Knoll's Response

to Defendant General Motors LLC's First Set of Interrogatories ("Knoll Int."), Docket No. 185-28.

In late 2015, when Mr. Knoll's vehicle had around 90,000 miles on it, he experienced a tapping

sound in his engine and discovered that the vehicle was 3.5 quarts low on oil.  *See* Deposition of

John Knoll ("Knoll Depo.") at 24, 127–28, Docket No. 185-27.  He testified that he has never seen

the oil pressure warning light come on.  *Id.* at 125.  He also testified that he has had to change the

spark plugs several times per year, that his check engine light would come on repeatedly, *id.* at

58–59, and that his vehicle would sometimes run erratically, *id.* at 122–24.  However, the vehicle

has never stalled.  *Id.* at 123.  Furthermore, Mr. Knoll testified that he is not concerned about a

safety issues related to oil consumption.  *Id.* at 146.

15

United States District Court
Northern District of California

Mr. Davis purchased his vehicle in June 2012.  *See* Plaintiff William Davis, Jr.'s Response to Defendant General Motors LLC's First Set of Interrogatories ("Davis Int."), Docket No. 185-33.  He first noticed that his vehicle was consuming oil excessively in 2013, although he could not remember when exactly during that year he noticed.  Deposition of William Davis, Jr. ("Davis Depo.") at 91, Docket No. 185-32.  Around June 2017, the engine in Mr. Davis's vehicle began running rough and misfiring.  *Id.* at 95–96.  The check engine light was coming on, and Mr. Davis testified that at one point, he could barely drive it to the dealership to have it examined.  *Id.* at 96.  When he got it to the dealership, they "put that engine flush in and kept it overnight and let it soak, and that was supposedly going to clear up the oil from around the rings on the piston and make it run properly."  *Id.* at 96.  Then, in late 2017, the vehicle stopped running altogether and had to be towed to the shop; this incident left Mr. Davis's wife stranded on the side of the road with their grandchild.  *Id.* at 98.  As a result of that incident, Mr. Davis's service provider replaced the spark plugs and the Number 7 coil in the vehicle; they also changed the oil.  *Id.* at 97–98.  There is no indication that the servicer identified any other problems or performed any other repairs.  *See id.* at 98.  Mr. Davis also testified that his vehicle would get low on oil before any electronic warning light could illuminate in the vehicle.  *Id.* at 139–40.

Lastly, Mr. Sanchez purchased his vehicle in 2013.  Deposition of Rudy Sanchez ("Sanchez Depo.") at 16, Docket No. 185-42.  He first noticed that his vehicle was low on oil in December 2016, *see* Plaintiff Rudy Sanchez's Response to Defendant General Motors LLC's Second Set of Interrogatories ("Sanchez Int."), Docket No. 185-45.  He discovered the low oil level when he was driving the vehicle (while it had around 27,000 miles on it) and heard a "clattering" sound; he pulled over, checked the oil with the dipstick, and found that it was about 4.5 quarts short of the normal level.  Sanchez Depo. at 16–18.  At that point, Mr. Sanchez took the vehicle to be serviced and began checking his oil every day.  *See* Sanchez Int.  He also alleged that no warning light came on to indicate that his vehicle was low on oil.  *See* Sanchez Depo. at 49.

ii.      Expert Evidence

In addition to this evidence from the Accelerated Plaintiffs, Plaintiffs also provided an expert report.  *See* Amended Expert Report of Jeffrey K. Ball ("Ball Report"), Docket No. 193-12.

1    That report asserts that the Oil Consumption Defect led to spark plug fouling, which can lead to

2    "poor engine performance, reduced fuel economy, reduced power output, and rough engine

3    running."  Ball Report at 18.  In addition, Dr. Ball wrote:

> The inadequate lubrication of critical engine parts can cause
> drivability problems, lack of power, abnormal engine noise,
> abnormal vibration or shaking, piston cracking, head cracking and
> can ultimately lead to engine seizure.  These symptoms present the
> driver with a problem which must be dealt with in some manner. As
> the driver attempts to deal with the problem, they may be placed at
> an elevated risk of accident or injury depending on where the failure
> occurs.

9    *Id.*  Along similar lines, Dr. Ball's report states that the Oil Consumption Defect caused problems

10   which could very well have required drivers "to pull-over on the side of the road or le[ft] them

11   stranded on the side of the road.  A motorist who has slowed in traffic or has pulled over on the

12   side of a road, is placed at an elevated risk of injury from other passing motorists."  *Id.* (discussing

13   examples from GM's warranty claims).  A driver's decision to pull over could result from the

14   engine light illuminating or from the need to respond to one of the problems caused by low oil

15   levels (such as those noted above: "drivability problems, lack of power, abnormal engine noise,

16   abnormal vibration or shaking, piston cracking, head cracking and . . . engine seizure"), should

17   such a problem emerge prior to the engine light illuminating.  *Id.*[8]

18          Dr. Ball's report further alleges that he conducted testing to detect the oil pressure level at

19   which the oil pressure warning light would come on.  *Id.* at 19.  His report asserts that the warning

20   light would not come on until the oil pressure was "well below the GM recommended minimum

21   pressures."  *Id.* at 20.  Thus, he concluded that class vehicles could be driven—without any

22   warning to drivers—at oil pressure levels "below GM's recommended minimum oil pressure" and

23

24   ---

[8] The Court distinguishes the danger of being stranded on the side of the road (that Dr. Ball
25   describes in this case) from the simple inability to start one's vehicle, which courts in other cases
have concluded does not constitute a safety risk.  *See, e.g.*, *Smith v. Ford Motor Co.*, 462 F. App'x
26   660, 663 (9th Cir. 2011) (agreeing with district court that ignition-lock defect did not pose a safety
risk as a matter of law where the defect "may prevent the driver from starting the engine, thereby
27   leaving the driver stranded on the roadway").  In *Smith*, the alleged defect implicated drivers'
ability to start their engines at any time; it did not involve allegations—like those here—in which
28   drivers might experience serious engine trouble while driving and be forced to pull to the side of a
highway, road, or other unsafe location.

United States District Court
Northern District of California

that operating the vehicles "down to the oil pressure that triggers the warning light may lead to component damage and possible engine failure." *Id.* at 20.  Specifically, GM recommends oil pressure levels of "24 psig, 35 psig, and 38 psig at 1000, 2000, and 3000 rpm respectively," *id.* at 19, but Dr. Ball concluded that warning lights would not come on until approximately 6 psi, 9 psi, and 11 psi (Chevrolet)/12 psi (GM) at those respective rpm levels, *id.* at 20.[9]  While GM engineers acknowledged that low oil levels could lead to damaged crankshaft bearings, rod bearings, valve guides, electric guides, push rod tips, piston pins, and piston rings, as well as engine seizure and total engine failure, *see* Halka Depo. at 68–70; *see also* Tappen Depo. at 48 (testifying that "metal-to-metal contact" and "internal engine damage" can result from oil pressure levels getting too low), Plaintiffs conceded at the hearing that there is no empirical data in the record indicating how long a person could drive at those levels before such engine damage would result.  Their primary evidence is Dr. Ball's testimony that "[o]perating Class Vehicles at oil pressures below GM's recommended minimum oil pressure and down to the oil pressure that triggers the warning light may lead to component damage and possible engine failure."  Ball Report at 20.

### iii.  Defendant's Response

Defendant responds to Dr. Ball's report with several points.  First, Defendant notes that Plaintiff Knoll "testified that he is not concerned about a safety issue with his Sierra."  MSJ at 11.  However, Mr. Knoll's deposition testimony is actually somewhat ambivalent on this issue.  When asked if he was "concerned about a safety issue relating to oil consumption," Mr. Knoll said "no," but he added that "where people may have the same inherent problem have their – their motors may have seized because of lack of oil, lack of lubrication.  That might be a safety concern."  Knoll Depo. at 146.  In any event, Mr. Knoll's statement is just one lay witness' opinion and does not undermine Dr. Ball's testimony.

Defendant also repeatedly asserts that "[n]one of the engines examined during the course

---

[9] GM engineer Grant Tappen testified that he did not know the pressure at which the oil pressure sensor alerts in class vehicles.  *See* Deposition of Grant Tappen ("Tappen Depo.") at 42, Docket No. 193-2.

United States District Court
Northern District of California

of the Red-X study[10] had suffered a seizure event or a fire, or otherwise posed a potential safety risk."  MSJ at 4; *see also id.* at 27 ("There is no evidence of vehicle fires, engine seizures, or any endangering of any person due to oil consumption."); Defendant's Reply in Support of Motion for Summary Judgment ("MSJ Reply") at 17, Docket No. 205 ("There is no record evidence that the California plaintiffs' vehicles are unsafe.  Their engines never caught fire or seized, and no injury resulted from the alleged oil consumption issues.").  However, Defendant's focus on an extreme safety hazard is too narrow.  An engine fire is not the only possible manifestation of a safety risk.  As noted above, several Plaintiffs testified to experiencing a total or near total loss of engine power: Mr. Siqueiros testified that his vehicle lost power while he was driving on the highway, Siqueiros Depo. at 38–39; Mr. Cralley testified that there were times when he was driving his vehicle and had no power and had trouble "clearing" intersections, Cralley Depo. at 81, 83; and Mr. Davis testified that his vehicle once stopped running altogether and had to be towed to a repair shop, leaving his wife stranded on the side of the road with their grandchild.  Davis Depo. at 98.  A sudden loss of power can present a safety hazard.

Although Defendant contends that these incidents cannot be linked to oil consumption, the repairs that were performed on Plaintiffs' vehicles after these incidents suggest that the problems were symptomatic of oil consumption.  For example, Mr. Siqueiros's vehicle was found to have a damaged crankshaft lifter and camshaft, which—as noted above—GM engineers have acknowledged can result from oil consumption.  *See* Halka Depo. at 68–70 (stating that low oil levels can lead to damaged crankshaft bearings); Tappen Depo. at 41 (describing wear on camshafts as one of the possible damages that could result from oil consumption).  Mr. Cralley's vehicle was diagnosed as "having fouled and damaged spark plugs," Cralley Depo. at 82, which GM engineers stated can result from oil consumption problems.  *See* Lee Depo. at 29, 31–32; Halka Depo. at 32 ("Generically you can get spark plug fouling from excessive oil consumption."); *id.* at 76 (discussing spark plug warranty issues related to oil consumption); *see*

---

[10] The Red-X study involved a group of GM engineers that conducted a "teardown" review of engines in order "to assess the root cause of oil consumption in those engines."  MSJ at 4.  GM explains that "Red-X is a problem solving approach used by GM to identify root cause[s] in complex systems."  *Id.* at 4 n.14.

1    *also* Ball Report at 18.  Mr. Davis's vehicle also needed to have its spark plugs replaced after it

2    stopped running.  Thus, evidence in the record suggests that the engine trouble experienced by Mr.

3    Siqueiros, the Cralleys, and Mr. Davis could well have been caused by oil consumption problems.

4            Defendant also argues that "[t]he National Highway Transportation Safety Administration

5    ["NHTSA"], the federal agency tasked with monitoring vehicle safety and initiating recalls for

6    safety issues, expressly confirms that 'excessive oil consumption' is not a vehicle safety defect."

7    MSJ at 28 (citing *Motor Vehicle Safety Defects and Recalls: What Every Vehicle Owner Should*

8    *Know*, NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION (Aug. 2017), https://www-

9    odi.nhtsa.dot.gov/recalls/documents/MVDefectsandRecalls.pdf) (hereinafter *Recalls*).  In the

10   document cited by Defendant, NHTSA lists "Excessive oil consumption" under the heading

11   "Examples of Defects Not Considered Safety-Related."  *Recalls* at 4 (relying on 49 U.S.C. §

12   30102 for the definition of "motor vehicle safety" as "the performance of a motor vehicle or motor

13   vehicle equipment in a way that protects the public against unreasonable risk of accidents

14   occurring because of the design, construction, or performance of a motor vehicle, and against

15   unreasonable risk of death or injury in an accident, and includes nonoperational safety of a motor

16   vehicle").  However, *Recalls* specifically sets forth information related to government-ordered

17   recalls, and the fact that NHTSA has not classified excessive oil consumption as a safety-related

18   defect in the context of recalls does not preclude this Court from concluding that the Oil

19   Consumption Defect alleged in this case constitutes a safety defect for purposes of applying

20   various state laws.  *Cf. Smith*, 749 F. Supp. 2d at 989 (finding "the standards set forth under the

21   Safety Act," which are those referred to in *Recalls*, "relevant to a determination of whether an

22   alleged defect in an automotive part presents a safety concern," but not dispositive).

23           Finally, Defendant argues that Plaintiffs could and did monitor the oil levels in their

24   vehicles, such that oil consumption—if it was in fact occurring—could not result in dangerously

25   low levels of oil without detection.  It is true that Mr. Siqueiros, Mr. Cralley, and Mr. Davis, who

26   experienced the most significant safety-related incidents, were aware of potential oil-consumption

27   problems prior to the dangerous incidents of power loss they experienced.  *See* Siqueiros Depo. at

28   23–24, 41–42, 38–39 (stating that Mr. Siqueiros noticed dropping oil levels shortly after

United States District Court
Northern District of California

20

purchasing his car but did not experience engine power loss until more than four years later);

Cralley Depo. at 26, 81 (stating that Mr. Cralley first noticed oil consumption in 2012 or 2013, but

did not experience rough idling, violent shaking, or power loss until 2015 and/or 2017); Davis

Depo. at 91, 95, 96, 98 (stating that Mr. Davis first noticed oil consumption in 2013, but did not

experience his engine running rough, misfiring, or losing power until 2017).  This suggests that

Plaintiffs may have had notice of the need to monitor their vehicles' oil levels, and, indeed, each

of those Plaintiffs indicated that they actively monitor their oil levels.  *See* Siqueiros Depo. at 26–

27 (stating that Mr. Siqueiros uses the dipstick to check his oil level "every couple weeks or so");

Cralley Depo. at 15–17 (stating that Mr. Cralley began to "actively monitor the dip stick" and add

oil to his car as needed); Davis Depo. at 66–67 (stating that Mr. Davis uses the dipstick to check

his oil levels monthly).

However, even if Plaintiffs monitored their oil levels regularly, which according to

Plaintiffs' evidence, could not be monitored safely by relying on dash warning lights, such

vigilance would still not foreclose the possibility of an unexpected safety problem.  For one thing,

the evidence that Plaintiffs monitored their oil levels raises the question: how quickly are vehicles

with the alleged defect consuming oil?  It also raises the question: how quickly and/or severely are

vehicle engines damaged as a result of low oil?  In other words, could drivers who rely on GM's

recommended oil change and servicing schedule lose oil so quickly that they experience engine

damage and/or safety-related problems before low oil levels can be detected at their next

recommended service appointment or before they otherwise have reason to suspect declining oil

levels?  This is an especially important inquiry in light of Dr. Ball's conclusion, discussed above,

that vehicle warning lights would not illuminate until the oil pressure was "well below the GM

recommended minimum pressures."  Ball Report at 20.

Plaintiffs' expert Dr. Ball reports that GM defines "excessive oil consumption" as the loss

of "more than 1 quart per 2000 to 3000 miles of driving."  Ball Report at 10 (citing GM-

000579841).  Dr. Ball also indicated that GM conducted oil consumption tests of several of the

vehicles involved in this lawsuit.  Those oil consumption tests indicated that Mr. Siqueiros's 2011

Chevrolet Silverado loses approximately 0.94 quarts of oil every 1,000 miles during combined

1   city/highway driving, and that Mr. Knoll's 2012 Chevrolet Silverado consumes approximately

2   1.115 quarts of oil every 1,000 miles during combined city/highway driving. *See* Ball Report at

3   11. (However, GM also notes that, in August 2016, an oil consumption test was performed by a

4   dealership that was servicing Mr. Knoll's vehicle, and that test "found that the rate of oil

5   consumption in Knoll's vehicle was normal for its age, mileage, and condition." MSJ at 11 (citing

6   Knoll Depo. at 134–35).)

7        The oil consumption rates for Mr. Siqueiros and Mr. Knoll's vehicles indicate that a

8   vehicle affected by the Oil Consumption Defect could run completely out of oil between oil

9   changes, even if a driver adhered to the 5,000-mile servicing schedule recommended by GM. *See*

10   Ball Report at 11. Furthermore, at the hearing, Plaintiffs explained that the effect of low oil levels

11   can depend on conditions; for example, were a vehicle with low oil to climb a steep incline, what

12   limited oil is left may pool away from the pickup tube in the oil pan and put additional stress on

13   the engine. In sum, the fact that some owners would measure their oil levels manually (and would

14   have to do so with regular frequency), does not negate a safety risk attendant to the Oil

15   Consumption Defect, particularly when there is a likelihood (at least inferably on summary

16   judgment) that many—if not most—drivers are unlikely to check their oil manually.

17        In addition, oil level depletion (which leads to inadequate lubrication and ultimately engine

18   damage) is only one manifestation of the Oil Consumption Defect alleged in this case. Another

19   aspect of the problem pertains to spark plug fouling, which results from the presence of too much

20   oil in the combustion chamber. As noted above, multiple Plaintiffs have experienced spark plug

21   fouling and associated engine trouble. Dr. Ball also noted in his expert report that the Oil

22   Consumption Defect can lead to spark plug fouling, which can lead to "poor engine performance,

23   reduced fuel economy, reduced power output, and rough engine running." Ball Report at 18. This

24   problem poses yet another safety risk, as does the possibility that engine trouble could leave

25   drivers stranded on the side of a road or highway or stuck in some other dangerous location.

26        Finally, the parties disagree as to the prevalence of the alleged Oil Consumption Defect.[11]

27

28   [11] Because the Court declines to exclude Dr. Ball's expert report as requested by GM, the analysis
here relies on the information in that report. For discussion of the Court's decision not to exclude

United States District Court
Northern District of California

1    GM asserts that the warranty claim rate for oil consumption in the Gen IV aluminum block engine

2    fell to .4% in the 2010 model year.  *See* MSJ at 6 (citing a 2012 email from GM engineer Steven

3    Pfromm); MSJ Reply at 2.  Plaintiffs paint quite a different picture.  Through their expert, Dr.

4    Ball, Plaintiffs report that GM's data indicates an overall warranty claims rate for piston assembly

5    replacement (for model years 2010–2014) of at least 3.2%.  Supp. Ball Report at 2.  (The annual

6    rate ranged from 0.81% in 2014 to 4.10% in 2010.  *Id.* at 3.)  However, GM argues that the alleged

7    3.2% piston assembly replacement rate is over-inclusive of the alleged Oil Consumption Defect

8    because that rate "includes all piston ring warranty claims regardless of whether the customer

9    complained of oil consumption issues."  *See* Declaration of Steven Pfromm ("Pfromm Decl.") at

10   3, Docket No. 202.  It further argues that "[w]hen the data is limited to piston repairs with an

11   associated report of excessive oil consumption," the percentage of warranty claims . . . decreases

12   for each model year."  *Id.* (noting a range from .77% in 2014 to 3.49% in 2010).

13       In response, Plaintiffs are quick to point out that—through this declaration—GM has

14   contradicted its earlier contention that the warranty claim rate for oil consumption in the Gen IV

15   aluminum block engine was .4% in the 2010 model year.  In addition, Plaintiffs also contend—

16   again through their expert, Dr. Ball—that the 3.2% rate is actually *under-inclusive* of vehicles that

17   experienced the alleged Oil Consumption Defect.  Dr. Ball asserts that the number of vehicles that

18   received piston cleaning (as opposed to those who ultimately received piston replacement) is the

19   better measure of the prevalence of the alleged Oil Consumption Defect.  Thus, because the

20   vehicles that received piston *replacement* represent only 27% of those that initially required piston

21   *cleaning*, Dr. Ball believes that the true warranty claims rate for excessive oil consumption was

22   much higher than the 3.2% of vehicles that received piston replacement.  *See* Supp. Ball Report at

23   3–4 (noting an estimated warranty claim rate ranging from 3.01% in 2014 to 15.19% in 2010).

24   Although Dr. Ball's conclusions will be subject to examination during trial, on motion for

25   summary adjudication, the Court must draw all reasonable inferences in Plaintiffs' favor.

26   Accordingly, the possibility that 3-15% of model-year vehicles were affected by the alleged Oil

27

28   Dr. Ball's Report, *see* Section III.B.2, below.

1    Consumption Defect supports Plaintiffs' allegation that there was a widespread safety defect in the

2    class vehicles.

3            Taking all of this evidence together, the Court finds the Plaintiffs have presented sufficient

4    evidence that the alleged Oil Consumption Defect is a safety defect within the context of implied

5    warranty, fraudulent omission, and consumer protection claims.  *See Brand v. Hyundai Motor*

6    *Am.*, 226 Cal. App. 4th 1538, 1547 (2014), *as modified on denial of reh'g* (July 16, 2014); *Otis*

7    *Spunkmeyer*, 30 S.W.3d at 688; *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 836

8    (Ct. App. 2006).  As noted above, at the summary judgment stage, evidence must be viewed in the

9    light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the

10   nonmovant's favor.  *See Liberty Lobby*, 477 U.S. at 255.

11                           b.      Concealment

12           Next, the Court turns to the question whether there is sufficient evidence that GM

13   concealed information about the alleged Oil Consumption Defect to deny partial summary

14   adjudication.  The answer to this question bears on several of Plaintiffs' claims, for example:

15   Counts 4 and 90 (the implied warranty claims of the California and North Carolina Plaintiffs,

16   which could be time barred without the application of fraudulent concealment tolling), Counts 2,

17   7, 74, 88, and 123 (the various consumer protection claims, which require knowledge and/or

18   concealment on the part of GM), and Count 91 (the fraudulent omission claim of the North

19   Carolina Plaintiff, which requires a duty to disclose on the part of the Defendant, which can turn

20   on whether concealment occurred).[12]

21                           i.      GM's Awareness

22           GM was aware of an oil consumption problem with Gen IV engines as early as the end of

23   2008 or early 2009.  *See* Deposition of Grant Tappen (a GM engineer) ("Tappen Depo.") at 49–50,

24   Docket No. 193-2 (answering "yes" to the question: "[Y]ou became aware of an oil consumption

25   issue with the V8s within about three months from when you started working on Gen IV [in late

26

27   _____

28   [12] Concealment by GM would also be relevant to the Court's analysis of Counts 5, 6, 76, and 126, but summary judgment as to those claims has been granted for Defendants on other grounds, as discussed below.

United States District Court
Northern District of California

2008?]" and stating that his team "found that oil was getting past the piston rings and was causing the piston rings to get stuck, oil deposits in the piston ring, piston ring lands on the pistons").  In June 2009, GM undertook a Red-X investigation of model-year 2007 vehicles to assess the root cause of oil consumption problems in LC9 engines (one of the engine designs in the Gen IV family).  *See* Executive Report – 5.3 LC9 – Oil Consumption at 1, Docket No. 193-4.  In January 2010, the results of the investigation were presented in an Executive Report, which identified problems with the AFM valve and also concluded that "[o]il consumption clearly follows piston/ring assembly."  *Id.* at 1, 12.

In response to those findings, at the outset of production for 2010 model-year vehicles, GM changed the piston ring material it had been using (switching from '251 piston ring material to '278 piston ring material).  *See* Deposition of Richard Ricchi ("Ricchi Depo.") at 24, Docket No. 185-6.  And in October 2010 (after the start of production for 2010 model-year vehicles), GM added an umbrella shield to the AFM oil pressure relief valve.  *See* Deposition of Steven Pfromm ("Pfromm Depo.") at 27, Docket No. 185-3.  GM contends that these changes led to a 75% drop in warranty claims for oil consumption (in model-year 2010 engines as compared to earlier years). *See id.* at 46.  In February 2011, GM also introduced a redesigned rocker cover that improved performance of the positive crankcase ventilation ("PCV") system.  *See* GM Engineering Work Order #1286837 (May 5, 2010), Docket No. 185-13.  GM contends that, as a result of all of these changes, "[t]he warranty claim rate for oil consumption in the Gen IV aluminum block engines fell from 5.2% in the 2007 model year to 0.4% in the 2010 model year."  *See* MSJ 3–6.

However, evidence suggests that GM's efforts at fixing the defect did not entirely resolve the problems with oil consumption.  For one thing, in Dr. Ball's Supplemental Expert Report (discussed in greater detail below, *see* Section III.B.2), he exhibits GM's year-to-year piston assembly replacement warranty trends as follows:

**Table 2. Year-to-Year Piston Assembly Replacement Warranty Trends**

| Engine | 2010 | 2011 | 2012 | 2013 | 2014 |
|--------|------|------|------|------|------|
| LC9 | 4.10% | 3.35% | 2.51% | 3.29% | 0.81% |

*See* Supplemental Expert Report of Jeffrey K. Ball ("Supp. Ball Report") at 3, Docket No. 201-

25

United States District Court
Northern District of California

1.[13]  He contends that these numbers show that, "although GM attempted to mitigate the excessive oil consumption by applying an AFM shield (breakpoint 10/2010) and a redesigned PCV baffle (break point 02/2011), the warranty rates did not show substantial reduction."  *Id.* at 4.  Notably, in 2013, GM actually saw an *uptick* in piston assembly replacement warranty claims over previous years.  GM contends that this increase was the result of short-term (and subsequently resolved) problems with the supplier of the rocker covers that were used at a manufacturing facility in Silao, Mexico.  MSJ at 6 n.31 (citing Gen 4 Oil Consumption at GM-000569378, Docket No. 185-8; Pfromm Depo. at 32–33).  However, even if that is the case, Plaintiffs point out there is reason to suspect the warranty rates for the later years were actually higher than what GM reported to Dr. Ball.  For one thing, Plaintiffs contend that "the email that GM relies upon for [the 75% reduction figure] is from 2012.  It is of little surprise that, as of this date, GM had yet to receive the same amount of warranty claim for 2010 model year vehicles as it had for earlier model year vehicles."  MSJ Opp. at 7 (citing a 2012 email from Mr. Pfromm, Docket No. 194-15).  Plaintiffs also note that "Plaintiff Siqueiros's Oil Consumption Defect warranty work (warranty camshaft and lifter replacement) is not present in GM's warranty data production," which demonstrates that the warranty information above is under-representative.  MSJ Opp. at 7.

In addition, during their depositions, GM engineers testified that even vehicles up through the 2014 model year (that is vehicles that post-dated either or both of the engine modifications intended to address the issue of oil consumption) continued to present with problems of oil consumption.  *See* Deposition of Lisa Toth ("Toth Depo.") at 167–69, Docket No. 193-20 (answering "They presented oil consumption complaints, yes" in response to the question "And all of them – and the '10 through the '14, of all those exhibits all presented the same oil consumption complaint?"); Halka Depo. at 253 (testifying that the AFM cover improved oil consumption but did not "cure" or "stop" the problem); Lee Depo. at 148–49 (characterizing the result of the engine modifications as "an improvement" in response to the question "do you believe that GM cured the

---

[13] As is discussed below, Dr. Ball's report concludes that the actual piston assembly replacement warranty rates are much higher than what was reported by GM.  He believes that the true rates are 2010 - 15.19%, 2011 - 12.39%, 2012 - 9.30%, 2013 - 12.18%, and 2014 - 3.01%.  *See* Supp. Ball Report at 4.

oil consumption defect with the 2010 and 2011 breakpoint improvements?"); Pfromm Depo. at 29 (discussing the fact that vehicles that had the AFM shield installed sometimes returned again with oil consumption issues).

Internal GM documents also suggest that problems with oil consumption persisted beyond the "breakpoints" (the term that GM uses to refer to the engine modifications that were implemented in October 2010 and February 2011). *See* Docket No. 194-8 (2012 email referring to "oil consumption complaints after the [breakpoints]" and noting examples of oil consumption problems "on vehicles built after the improvements"); Docket No. 194-9 (2013 email noting that new engine problems "seem[] to confirm that the new valve cover baffle does not completely kill the PCV pull over on the Gen4 engines with higher flow lifters"); Docket No. 194-30 (2013 email from Mr. Halka noting: "We are still getting Gen IV LC9 engines returned due to poor oil consumption.  They are very similar to the 2007 M.Y. issue – full face top ring at 30k to 50k miles (good O.C. when new). . . . Even though this engine will be out of production soon, we will be getting many back for warranty fix.  We are already getting word than [sic] ones we fixed at 50k to 80k miles are now consuming oil at 140k (no surprise.....)."); Docket No. 193-15 (2014 email from Mr. Halka stating: "We continue to see alum blocks up through 2013 with oil consumption."); Docket No. 194-10 (2015 email from Mr. Halka, responding to the question "Do you feel we still need the below kits service put together for oil consumption?" with: "Yes, we should.  Gen IV still has problems.").

Thus, evidence suggests that GM was aware that oil consumption problems persisted even after engine modifications were completed.

### ii.   Active Concealment

Plaintiffs allege concealment at many points throughout their Complaint, *see, e.g.*, 5AC ¶ 303 ("GM omitted and/or concealed the Oil Consumption Defect"); *id.* ¶ 324 ("GM knowingly omitted and concealed information about material defects in the Class Vehicles"); *id.* ¶ 330 ("GM concealed from and failed to disclose to Plaintiffs and the other Class members vital information about the Oil Consumption Defect"); *id.* ¶ 333 ("Despite its knowledge of the defect, GM failed to disclose and concealed, and continues to conceal, this critical information from Plaintiffs and the

United States District Court
Northern District of California

1   other Class members").  However, many of these allegations do little more than use the word

2   "conceal" or describe actions or omissions that are passive without describing any specific

3   *affirmative* acts of concealment.

4           Plaintiffs do allege that "GM affirmatively and actively concealed the Oil Consumption

5   Defect when it issued the [Technical Service Bulletins ('TSBs')] . . . that instructed dealers to

6   offer purported repairs that it knew would not cure the Oil Consumption Defect."  *Id.* ¶ 334.

7   Specifically, in August 2010, GM issued a Technical Service Bulletin directing servicers of

8   vehicles experiencing excessive oil consumption to install a new AFM shield and to clean the

9   vehicle's pistons.  *See* August 2010 Technical Service Bulletin, Docket No. 193-21.  If the

10   cleaning procedure failed to fix the problem, a servicer could subsequently replace a vehicle's

11   piston assembly.  *Id.*  However, in February 2010, GM engineer Gary Cygan, Jr. gave a

12   presentation in which he noted that the "[p]iston cleaning procedure [was] ineffective."  5.3L LC9

13   Oil Consumption at PDF p. 8, Docket No. 193-22.  Mr. Cygan was asked about that comment in

14   his deposition, and he explained it by saying: "The oil consumption before and after the piston

15   cleaning procedure was the same."  Deposition of Gary Cygan, Jr. at 121:24–122:6, Docket No.

16   193-8.  Nonetheless, in all twelve of the TSBs relating to the Oil Consumption Defect, GM

17   instructed servicers to begin by cleaning the pistons.  *See* Technical Service Bulletins, Docket

18   Nos. 193-21, 193-23 to 194-5.  Thus, despite the fact that GM knew that the piston cleaning

19   procedure was ineffective by February 2010, it still directed servicers of GM vehicles to complete

20   the procedure as part of the recommended response to oil consumption problems without

21   addressing the root problem.

22           Several courts have discussed the issue of active concealment in vehicle-defect cases.  In

23   *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088 (N.D. Cal. 2007), plaintiffs alleged that GM

24   actively concealed the existence of defective speedometers.  The court concluded that the fact that

25   GM replaced broken speedometers with equally defective ones, "suggests that GM tried to gloss

26   over the problems with its speedometers . . . [by] giving the impression that any defects were

27   unique cases."  496 F. Supp. 2d at 1097 (finding active concealment adequately pled).  Similarly,

28   in *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936 (N.D. Cal. 2014), plaintiffs alleged

28

United States District Court
Northern District of California

1  that Ford actively concealed information about a defective "infotainment" system in some of its

2  vehicles.  This Court—in the context of a motion to dismiss—found that it would be active

3  concealment "[i]f, as Plaintiffs allege, Ford pretended to fix the problems with MFT instead of

4  actually admitting that the problems could not be fixed." 46 F. Supp. 3d at 961 (citing *Ho v.*

5  *Toyota Motor Corp,* 931 F. Supp. 2d 987, 999 (N.D. Cal. 2013) (Conti, J.) as finding that plaintiffs

6  had adequately pled active concealment by alleging, *inter alia,* that defendants repaired the class

7  vehicles' headlamps only temporarily or replaced them with other defective parts).  Together,

8  these cases suggest that active concealment exists where—as here—a company implements a "fix"

9  it knows is not effective.

10      *Gray v. Toyota Motor Sales, U.S.A.*, No. CV 08-1690 PSG JCX, 2012 WL 313703 (C.D.

11  Cal. Jan. 23, 2012), *aff'd sub nom. Gray v. Toyota Motor Sales, U.S.A., Inc.*, 554 F. App'x 608

12  (9th Cir. 2014) poses, in contradistinction to the instant case, a situation where no actual

13  concealment was found.  In *Gray*, plaintiffs alleged that Toyota actively concealed information

14  about the Prius's real-world fuel efficiency.  The court rejected plaintiffs' argument that "Toyota's

15  instruction to customers to try adjusting their driving habits or increasing their tire pressure

16  amount[ed] to active concealment of the results of Toyota's internal fuel efficiency testing."

17  *Gray*, 2012 WL 313703, at *9 (citing *Daugherty*, 144 Cal. App. 4th at 828).  It concluded:

18  "Plaintiffs do not allege that Toyota sought to suppress information in the public domain or

19  obscure consumers' ability to gauge their own mileage.  Given the *early reports* regarding the

20  Prius's fuel efficiency, the *obviousness* of the MPG calculation, and the large sample size of Prius

21  Hybrids being driven under real-world conditions, absent any further representation by Toyota that

22  the EPA estimates could be achieved easily under real world conditions, the Court finds that

23  Toyota's statements do not amount to active concealment." *Id.* (citing *Paduano v. Am. Honda*

24  *Motor Co.*, 169 Cal. App. 4th 1453, 1469–73 (2009) (emphasis added)).

25      *Gray* contrasts with the facts in the instant case.  Unlike in *Gray*, the defect here is not an

26  "obvious" one or one that is easily gauged by a typical driver.  In addition, while the advice given

27  to customers in *Gray* could well have improved fuel efficiency for some vehicles, the prescribed

28  remedy in this case (piston cleaning) was known by GM to be ineffective.  As a result, *Gray* is

distinguishable and does not undermine Plaintiffs' active concealment allegations here.[14]  Instead, the facts are more analogous to *Falk*, *Ho*, and *MyFord Touch* and support a finding of active concealment.

Plaintiffs have shown that there is at least a genuine issue of material fact as to whether GM actively concealed information about the alleged Oil Consumption Defect.  Because the summary judgment stage requires that evidence be viewed in the light most favorable to the nonmoving party and that all justifiable inferences be drawn in the nonmovant's favor, *see Liberty Lobby*, 477 U.S. at 252, the Court concludes that Plaintiffs have—at this stage—provided sufficient evidence to demonstrate that GM concealed information about the alleged oil defect.  *Cf. In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 1030 (N.D. Cal. 2018) ("whether the 'EcoDiesel' logo amounted to puffery is for purposes of [a motion to dismiss] a question of fact that cannot be decided at this juncture of the proceedings"); *Reser's Fine Foods, Inc. v. Bob Evans Farms, Inc.*, No. 3:13-CV-00098 AA, 2016 WL 3769361, at *14 (D. Or. July 13, 2016) ("Given the evidence of record as discussed above, I find that questions of fact exist as to whether Reser's misrepresented its willingness to continue supply and whether BEF justifiably relied on that misrepresentation to its detriment." (summary judgment stage)); *In re Reingold*, No. ADV 10-01903-RN, 2013 WL 1136546, at *7 (B.A.P. 9th Cir. Mar. 19, 2013) ("Knowledge of the falsity or deceptiveness of a statement is a question of fact." (citations omitted)).

---

[14] Other cases have concluded that active concealment is adequately alleged where a company has taken covert action or denied outright the existence of a defect.  *See, e.g.*, *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Practices & Prod. Liab. Litig.*, 890 F. Supp. 2d 1210, 1215, 1221 (C.D. Cal. 2011) (concluding that plaintiffs adequately alleged concealment where they pled that Toyota "covertly" implemented a critical software update by representing it as a "running production change"); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1193 (C.D. Cal. 2010) (citing *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1135–36 (N.D. Cal. 2010) (concluding that plaintiffs had adequately alleged active concealment because "Plaintiffs' allegations that Toyota repeatedly denied the existence of the alleged SUA defect are sufficient to demonstrate active concealment." (internal citations omitted))); *Tietsworth*, 720 F. Supp. 2d at 1135 (N.D. Cal. 2010) ("Together with Defendants' alleged denial of a defect when Plaintiffs called to request free servicing or replacements, these facts also are sufficient to state a claim for active concealment.").  However, nothing in those opinions indicates that such actions are *required* to show concealment.

1

iii.    Intent to Deceive

2

The next facet of the concealment question is whether GM might have concealed

3

information with the intention of inducing customers to purchase vehicles.  The presence or

4

absence of such intent bears on a number of Plaintiffs' fraudulent omission and consumer

5

protections claims.  *See, e.g.*, Tex. Bus. & Com. Code § 17.46 (requiring that, in a TDTPA claim

6

involving the failure to disclose information, the nondisclosure "was intended to induce the

7

consumer into a transaction into which the consumer would not have entered had the information

8

been disclosed"); N.J. Stat. § 56:8-2 (requiring that "the knowing, concealment, suppression, or

9

omission of any material fact" be made "with intent that others rely upon such concealment,

10

suppression or omission, in connection with the sale or advertisement of any merchandise or real

11

estate" in order to state a valid NJCFA claim).

12

GM contends that Plaintiffs' fraud and consumer protection claims should be dismissed

13

because there is insufficient evidence to show that GM had intent to defraud consumers.  MSJ at 2.

14

However, Plaintiffs have offered evidence upon which a reasonable jury might rely to conclude

15

that GM intended to deceive customers in order to induce them to purchase GM vehicles.  For one

16

thing, Plaintiffs have presented evidence that GM may have been motivated to withhold

17

information about the Oil Consumption Defect because of a desire to make profit.  *See* MSJ Opp.

18

at 7.  Specifically, the company was aware that many GM customers rated "Reliability/Durability"

19

as the most important factor in their decision about which vehicle to purchase.  *See id.* at 32 (citing

20

Exh. 19, Docket No. 193-19).  Thus, GM might have concluded that releasing information about

21

engine defects would have reduced customers' perceptions about the reliability and durability of

22

their vehicles and reduced sales.  In addition, as noted above, Plaintiffs also demonstrated that GM

23

continued to keep information about the Oil Consumption Defect secret.

24

Questions of intent are normally questions of fact properly reserved for the jury.  *See Latta*

25

*v. Rainey*, 202 N.C. App. 587, 600 (2010) (internal quotation marks and citations omitted)

26

("[F]raudulent intent usually is not shown by direct evidence but generally is proven by

27

circumstances.  Oftentimes the intent can be shown by presenting evidence of some motive on the

28

part of the perpetrator.  Whether the defendant acts with the requisite scienter for fraud is

United States District Court
Northern District of California

generally a question of fact for the jury."); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Garber*, 45 F. App'x 564, 565–66 (9th Cir. 2002) (citing *Slater v. Bielsky,* 183 Cal. App. 2d 523, 527 (Cal. Ct. App. 1960)) ("intent is a question of fact reserved for the jury or trial court" (internal quotation marks omitted)); *City of Atl. City v. Zemurray St. Capital, LLC*, No. CV 14-5169 (RBK/AMD), 2017 WL 6638203, at *20 (D.N.J. Dec. 29, 2017) (there are a "wide range of possible explanations" for defendants' conduct and potentially fraudulent intent forecloses summary judgment); *Coleman Cattle Co. v. Carpenter*, 10 S.W.3d 430, 433 (Tex. App. 2000) (quoting *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434 (Tex. 1986)) ("Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony.").

Accordingly, given the generally factual nature of intent, and drawing all reasonable inferences in Plaintiffs' favor, the Court concludes that Plaintiffs' evidence raises issues of material fact regarding fraudulent intent; a reasonable jury could find in Plaintiffs' favor on this issue.

### c.    Analysis of Individual Counts

Having found that a reasonable jury could conclude that the evidence before the Court supports the conclusion that the alleged Oil Consumption Defect constitutes a safety defect and that GM actively concealed information about the defect, the Court turns to each of Plaintiffs' counts and GM's arguments against them.

### i.    Are Certain Claims Time Barred?

First, GM contends that five of Plaintiffs' claims are time barred.

### (a)    Count 4 (CA – Implied Warranty)

A four-year statute of limitations applies to implied warranty claims brought under the Song-Beverly Warranty Act.  *Krieger v. Nick Alexander Imports, Inc.*, 234 Cal. App. 3d 205, 214 (Ct. App. 1991).  That period begins to run upon delivery of the defective goods.  *See Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297, 1306 (2009) ("a cause of action for breach of warranty accrues, at the earliest, upon tender of delivery").  Because the California Plaintiff, Raul Siqueiros, purchased his vehicle more than four years prior to bringing his claims, *see* Siqueiros Int., he relies

on the doctrine of fraudulent concealment to toll his claims.  The party seeking the benefit of tolling the statute of limitations carries the burden of proof.  "A plaintiff may not rely on conclusory statements of fraudulent concealment and lack of actual or constructive knowledge of the facts giving rise to their cause of action." *Eason v. Waste Mgmt. of Alameda Cty.*, No. C-06-06289JCS, 2007 WL 2255231, at *6 (N.D. Cal. Aug. 3, 2007) (internal citations and quotation marks omitted); *see also Bierman v. Int'l Bus. Machines Corp.*, 547 F. App'x 851, 852 (9th Cir. 2013) ("Plaintiffs who rely on the discovery rule bear the burden of proof in establishing that they are entitled to its tolling protection.").

   To toll the statute of limitations under the doctrine of fraudulent concealment, a plaintiff must plead "(a) the substantive elements of the fraud, and (b) an excuse for late delivery of the facts." *Sater v. Chrysler Grp., LLC*, 2015 WL 736273, at *9 (C.D. Cal. Feb. 20, 2015) (fraudulent concealment adequately pled where defendant "intentionally kept" plaintiff ignorant of information, "continued to manufacture" product without disclosing defect, and delay in discovery was reasonable at least until vehicle was recalled).  With respect to the first prong, "[t]he required elements for fraudulent concealment are (1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact." *Hambrick v. Healthcare Partners Med. Grp., Inc.*, 238 Cal. App. 4th 124, 162 (2015) (citing *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 606 (2014)).  Any act of concealment must be affirmative.  *Herremans v. BMW of N. Am., LLC*, No. CV 14-02363 MMM PJWX, 2014 WL 5017843, at *5 (C.D. Cal. Oct. 3, 2014) ("Absent a fiduciary relationship, nondisclosure is not fraudulent concealment—affirmative deceptive conduct is required.") (collecting cases).  In addition, "if there is fraudulent concealment, 'the tolling ceases when those facts are, or should have been, discovered by the plaintiff.'" *Yetter v. Ford Motor Co.*, No. 19-CV-00877-LHK, 2019 WL 3254249, at *5 (N.D. Cal. July 19, 2019) (citing *Credit Suisse Secs. (USA) LLC v. Simmonds*, 566 U.S. 221, 227 (2012)).

United States District Court
Northern District of California

1   First, General Motors alleges that Plaintiffs have provided no evidence "of an affirmative

2   act by GM intended to prevent [the California Plaintiffs] from discovering their claims."  MSJ

3   Reply at 9.  However, as discussed above in Section III.B.1.b, there is evidence to find, for

4   purposes of summary judgment, that GM engaged in an affirmative act to conceal the alleged Oil

5   Consumption Defect.

6   Second, GM contends that Mr. Siqueiros was on inquiry notice with respect to the defects

7   in his vehicle more than four years before the filing of his claims, and therefore that he failed to

8   exercise diligence.  MSJ at 9.  As noted above, "tolling ceases when those facts are, or should have

9   been, discovered by the plaintiff."  *Yetter*, 2019 WL 3254249, at *5.  "A plaintiff has reason to

10  discover a cause of action when he or she has reason to at least suspect a factual basis for its

11  elements"; "to merit application of the discovery rule or fraudulent concealment tolling, a plaintiff

12  must allege that he exercised due diligence to uncover his injury."  *Yetter*, 2019 WL 3254249, at

13  *5 (quoting *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (Cal. 2005)).  "When a

14  plaintiff should have discovered the cause of action is a question of fact unless only one inference

15  can be drawn from the evidence."  *Brown v. Shimano Indus. Co.*, 960 F.2d 152 (9th Cir. 1992).

16  Plaintiffs contend that Mr. Siqueiros's claims were tolled "until 2016 . . . [when he first]

17  learned of the Oil Consumption Defect."  MSJ Opp. at 14; *see also id.* at 15 ("California Plaintiffs

18  were unaware of the Oil Consumption Defect until after Plaintiffs' counsel's investigation in late

19  2016.").  Within the Ninth Circuit, courts have concluded that plaintiffs failed to demonstrate

20  reasonable diligence when repeated repairs should have alerted them to the existence of a defect.

21  *See, e.g.*, *Yetter*, 2019 WL 3254249, at *5 (finding a lack of reasonable diligence where plaintiff

22  tendered vehicle for repeated engine repairs between 2009 and 2012, but claimed not to have

23  discovered the engine defect until 2016); *Finney v. Ford Motor Co.*, No. 17-CV-06183-JST, 2018

24  WL 2552266, at *4 (N.D. Cal. June 4, 2018) (finding no reasonable diligence where plaintiff's car

25  "received several repairs seemingly related to the defect while on warranty").  In the instant case,

26  Mr. Siqueiros first noticed his vehicle's oil level going down a couple of months after he

27  purchased it (in October 2011); he had to keep adding oil on a monthly basis thereafter.  *See*

28  Siqueiros Depo. at 23–24.  Thus, when Mr. Siqueiros filed his claims in December 19, 2016, it

34

was more than five years after he noticed his car's oil consumption problem.  *See* Original Complaint at 1, Docket No. 2.

While Mr. Siqueiros did have oil consumption problems with his vehicle that emerged more than four years before his complaint was filed (and then persisted), those problems did not require repairs, as in *Finney* or *Yetter*.  Siqueiros Depo. at 28.  The dealership also informed him that the consumption was normal because the vehicle used a synthetic oil that clung more to the walls of the engine.  *Id.* at 23–24.  In addition, he did not have a *major* vehicle performance issue until 2016, when his vehicle lost power and the check engine light came on.  *Id.* at 38–39.  While a reasonable jury might conclude that needing to add oil on a monthly basis would have put Mr. Siqueiros on inquiry notice of an oil consumption problem, a reasonable jury might also find he was not on inquiry notice of a defect that could cause a serious or safety-related problem.  Whether Mr. Siqueiros was on inquiry notice before 2016 cannot be decided as a matter of law on summary judgment.

Thus, the Court **DENIES** summary judgment as to Count 4 on the grounds that it is barred by the statute of limitations.

(b)     Count 6 (CA – Unjust Enrichment)

A three-year statute of limitations applies to unjust enrichment claims under California law.  *See Federal Deposit Insurance Corp. v. Dintino*, 167 Cal. App. 4th 333, 348 (2008).  As with Mr. Siqueiros's implied warranty claims, he relies on tolling to bring his unjust enrichment claim within the appropriate time frame.  *See* MSJ Opp. at 14–15.  Specifically, Mr. Siqueiros relies on fraudulent concealment and the discovery rule, which "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action."  *Dintino*, 167 Cal. App. at 349–50.  At the summary judgment stage, "[w]hen a plaintiff reasonably should have discovered facts for purposes of the accrual of a case [sic] of action or application of the delayed discovery rule is generally a question of fact, properly decided as a matter of law only if the evidence . . . can support only one reasonable conclusion."  *Alexander v. Exxon Mobil*, 219 Cal. App. 4th 1236, 1252 (2013) (citing *Broberg v. Guardian Life Ins. Co. of America*, 171 Cal. App. 4th 912, 921 (2009)).

1        As with the tolling of Mr. Siqueiros's implied warranty claim, the analysis of tolling under

2   the doctrines of fraudulent concealment and the discovery rule inquires into whether Mr. Siqueiros

3   "reasonably should have discovered facts" leading to the accrual of his cause of action.  Here,

4   however, the statute of limitations is only three years (as opposed to the four-year window for

5   breach of implied warranty claims).  Thus, to be within the shorter statute of limitations period, the

6   tolling period must be longer – it must have been reasonable for Mr. Siqueiros not to have

7   discovered his vehicle's defects for one additional year.  For the same reasons stated above,

8   despite the slightly greater factual burden on Mr. Siqueiros, the Court cannot find at this juncture

9   that he failed to exercise reasonable diligence as a matter of law.

10       The Court **DENIES** summary judgment as to Count 6 on the grounds that it is barred by

11  the statute of limitations.

12                      (c)      Count 90 (NC – Implied Warranty)

13       In North Carolina, implied warranty claims are governed by a three-year statute of

14  limitations.  *See Smith v. Cessna Aircraft Co.*, 571 F. Supp. 433, 436 (M.D.N.C. 1983).  However,

15  "[f]raudulent concealment may . . . operate to toll the statute of limitations where all the elements

16  may be shown."  *Friedland v. Gales*, 131 N.C. App. 802, 807 (1998).  To make the required

17  showing, the party asserting the claim must demonstrate "that the opposing party [1] knew a

18  material fact, and [2] failed to fully disclose that fact in violation of a pre-existing duty to

19  disclose."  *Id.*  "[A] duty to disclose exists . . . when a party has taken affirmative steps to conceal

20  material facts from the other."  *Harton v. Harton*, 81 N.C. App. 295, 298 (1986); *see also Yancey*

21  *v. Remington Arms Co., LLC*, No. 1:10CV918, 2013 WL 5462205, at *6 (M.D.N.C. Sept. 30,

22  2013), *report and recommendation adopted in part sub nom. Maxwell v. Remington Arms Co.,*

23  *LLC*, No. 1:10CV918, 2014 WL 5808795 (M.D.N.C. Nov. 7, 2014) (quoting *Supermarket of*

24  *Marlinton v. Meadow Gold Dairies,* 71 F.3d 119, 122 (4th Cir. 1995)) ("In order to establish facts

25  supporting equitable tolling based on fraudulent concealment . . . a plaintiff must demonstrate: (1)

26  the party pleading the statute of limitations fraudulently concealed facts that are the basis of the

27  plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period,

28  despite (3) the exercise of due diligence.").  A duty to disclose may also exist where "one party

United States District Court
Northern District of California

1  has knowledge of a latent defect in the subject matter of the negotiations about which the other

2  party is both ignorant and unable to discover through reasonable diligence." *Harton*, 81 N.C.

3  App. at 298; *see also Doe v. Roman Catholic Diocese of Charlotte, NC*, 242 N.C. App. 538, 543

4  (2015) (noting that the statute of limitations "begins to run when the plaintiff first becomes aware

5  of facts and circumstances that would enable him to discover the defendant's wrongdoing in the

6  exercise of due diligence").

7          As discussed above, a reasonable jury could conclude that GM actively concealed defects

8  in vehicle engines. *See* Section III.B.1.b.  Thus, the analysis turns to whether the North Carolina

9  Plaintiff could have discovered the defect in his vehicle, such that his claims would be untimely

10  filed.  William Davis, Jr., the North Carolina Plaintiff, purchased his car on June 28, 2012.  *See*

11  Davis Int.  He filed his claims on December 19, 2016.  *See* Original Complaint at 1, Docket No. 2.

12  Thus, if Mr. Davis discovered (or reasonably should have discovered) the basis for his fraudulent

13  omission claims before December 19, 2013, his claims would be barred by the statute of

14  limitations.

15          GM contends that Mr. Davis "first became aware of oil consumption in his Silverado in

16  early 2013," MSJ at 17, while Plaintiffs contend that Mr. Davis did not become aware of the

17  defect until 2017, MSJ Opp. at 16.  In his deposition, Mr. Davis testified that he first noticed that

18  his vehicle was consuming oil in 2013, although he did not remember exactly when during that

19  year he noticed.  Davis Depo. at 91.  Although somewhat ambiguous, it appears from Mr. Davis's

20  deposition that the dealership where Mr. Davis serviced his vehicle first spoke with him about the

21  low oil levels in 2013, *see id.* at 92–93, but then alerted him to an even higher consumption rate

22  sometime after that, *see id.* at 92.  Service records indicate that Mr. Davis visited the dealership in

23  February 2013, April 2013, and on December 20, 2013.  Davis Depo. at 93.  Thus, if the

24  December 20, 2013 visit was the first time the dealership spoke to Mr. Davis about the oil

25  consumption issue, that would bring him within the three-year window.  It is also possible that he

26  did not have reason to suspect a defect until later; for example, during his deposition, Mr. Davis

27  stated that he believed he first had reason to suspect an Oil Consumption Defect in June 2017,

28  when mechanics at the dealership told him that he might need to have his engine changed because

1  the oil problem "wasn't going to correct itself."  *Id.* at 135–36.

2      Viewing the evidence in the light most favorable to Plaintiffs, a jury might conclude that

3  Mr. Davis first learned about the oil consumption problem from the dealership in December 2013,

4  or even—depending on how the dealership characterized the oil consumption issue in 2013—that

5  Mr. Davis didn't learn he had a problem in 2017, when the dealership told him he might need to

6  have his engine replaced.  Thus, a reasonable jury could find that Mr. Davis did not learn of the

7  defect until he was within three years of the date that he filed his claims.  Consequently, a

8  reasonable jury could conclude that the discovery rule tolls his fraudulent omission claim.

9      Accordingly, the Court **DENIES** summary judgment as to Count 90 on this ground.

10              (d)      Count 91 (NC – Fraudulent Omission)

11      In North Carolina, a three-year statute of limitations applies to fraudulent omission claims.

12  *Newton v. Barth*, 788 S.E.2d 653, 662 (N.C. Ct. App. 2016).  However, under the discovery rule,

13  "the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party

14  of the facts constituting the fraud."  *Id.* (citing N.C. Gen. Stat. § 1–52(9) (2015)).  In this context,

15  discovery can mean either actual discovery or "when the fraud should have been discovered in the

16  exercise of reasonable diligence under the circumstances."  *Id.* (citing *Forbis v. Neal,* 361 N.C.

17  519, 524 (2007)); *see also Jennings v. Lindsey,* 69 N.C. App. 710, 715 (1984) ("[W]here a person

18  is aware of facts and circumstances which, in the exercise of due care, would enable him or her to

19  learn of or discover the fraud, the fraud is discovered for purposes of the statute of limitations.").

20  "Ordinarily, a jury must decide when fraud should have been discovered in the exercise of

21  reasonable diligence under the circumstances.  This is particularly true when the evidence is

22  inconclusive or conflicting."  *Newton*, 788 S.E.2d at 662 (citing *Forbis,* 361 N.C. at 524).

23      As discussed with respect to Count 90, there is evidence upon which a reasonable jury

24  could rely to conclude that Mr. Davis could not have discovered the defect in his vehicle prior to

25  December 20, 2013 at the earliest, which would put him within three years of the filing of his

26  claims.  Thus, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury

27  could conclude that the discovery rule tolls his fraudulent omission claim.  Accordingly, the Court

28  **DENIES** summary judgment as to Count 91.

1

(e)      Count 127 (TX – Unjust Enrichment)

2      In Texas, a two-year statute of limitations applies to claims of unjust enrichment.  *Elledge*

3  *v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 870 (Tex. 2007).  "Claims for . . . unjust

4  enrichment begin to accrue when the money is paid."  *Adams v. Nissan N. Am., Inc.*, 395 F. Supp.

5  3d 838, 846 (S.D. Tex. 2018) (internal quotation marks omitted).  Rudy Sanchez is the named

6  Plaintiff from Texas.  5AC ¶ 190.  Mr. Sanchez purchased his vehicle in July 2013.  *Id.* ¶ 191.

7  Thus, without tolling, he would have been required to file any unjust enrichment claims by July

8  2015.  However, he did not file his claims until August 31, 2017.[15]  *See* Second Amended

9  Complaint, Docket No. 67.

10      To toll his claims, Mr. Sanchez relies on the discovery rule.  MSJ Opp. at 17–18.  Under

11  Texas law, the discovery rule "shifts the date of the 'legal injury' from the time the wrongful

12  action occurred to the time when '[Plaintiffs] knew or, exercising reasonable diligence, should

13  have known of the facts giving rise to a cause of action.'"  *Janvey v. Suarez*, 978 F. Supp. 2d 685,

14  708 (N.D. Tex. 2013) (quoting *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998)).  Texas

15  courts have explained that the rule "is a very limited exception to statutes of limitations," that

16  "applies only when the nature of the plaintiff's injury is both inherently undiscoverable and

17  objectively verifiable."  *Clark v. Dillard's, Inc.*, 460 S.W.3d 714, 721 (Tex. App. 2015) (internal

18  citations and quotation marks omitted).  An injury is "inherently undiscoverable" when "the

19  wrong and injury were unknown to the plaintiff because of their very nature and not because of

20  any fault of the plaintiff."  *S.V. v. R.V.*, 933 S.W.2d 1, 7 (Tex. 1996).

21      Plaintiffs contend that Mr. Sanchez, who purchased his vehicle in July 2013, "did not

22  know, and could not have known, of the facts giving rise to his unjust enrichment claims prior to

23  Plaintiffs' counsel's investigation in late 2016."  MSJ Opp. at 18.  Defendant, on the other hand,

24  contends that "[l]ow oil levels would have been obvious to Sanchez while using his vehicle and

25  _____

26  [15] Defendant's Motion for Partial Summary Judgment states that Mr. Sanchez did not file his
   claims until December 19, 2016, when the original complaint was filed.  MSJ at 19.  Mr. Sanchez

27  joined the lawsuit when the second amended complaint was filed in August 2017.  *Compare*
   Docket No. 67 (Second Amended Complaint) *with* Docket No. 2 (original Complaint).  For the

28  reasons stated below, the Court concludes that a reasonable jury could find that Mr. Sanchez's
   claim was timely filed in either case; thus it need not address any relation back issue.

United States District Court
Northern District of California

1    following the instructions and schedule for checking the oil level in his GM Owner's Manual,"

2    (through which GM recommends checking a vehicle's oil level at each fueling stop) and therefore

3    that the injury was not inherently undiscoverable.  MSJ Reply at 11.  From the responses to GM's

4    second set of interrogatories, it appears that the first time Mr. Sanchez actually noticed his vehicle

5    was low on oil was in December 2016.  *See* Sanchez Int.  He was driving the vehicle and heard a

6    "clattering" sound; he pulled over, checked the oil with the dipstick, and found that it was about

7    4.5 quarts short of the recommended level.  Sanchez Depo. at 16–18.  At that point, Mr. Sanchez

8    took the vehicle to be serviced and began checking his oil every day.  Sanchez Int.

9           GM's contention—that Mr. Sanchez could have discovered the problem by routinely

10    monitoring his vehicle's oil level—presupposes both that the oil problem existed prior to the

11    incident that Mr. Sanchez experienced in 2016 and that the problem would have developed

12    gradually enough for Mr. Sanchez to detect it before it caused problems for his vehicle.  However,

13    Mr. Sanchez testified in his deposition that he had not had a problem with the vehicle prior to the

14    2016 incident.  *See* Sanchez Depo. at 17–18.  He also testified: "I had, I think, six free oil changes

15    and I was doing them early, so I never noticed [a problem with oil consumption]."  *Id.* at 46.

16    Given that Mr. Sanchez was having his oil checked and changed ahead of schedule, it is possible

17    that neither he nor the dealership would have observed or been able to observe low oil levels prior

18    to the December 2016 incident.  In addition, the dealership to which Mr. Sanchez brought his

19    vehicle in December 2016 performed an oil consumption test which revealed that "the oil

20    consumption rate [for Mr. Sanchez's vehicle] was at the low end of the allowable parameters."

21    MSJ at 14–15 (citing Sanchez Depo. at 31).  A reasonable jury could conclude that Mr. Sanchez

22    could not have learned of the defect until December 2016 or later.  Thus, under the Texas

23    discovery rule, his unjust enrichment claim could have been tolled until that time, such that his

24    claims were timely filed.

25           Consequently, the Court **DENIES** summary judgment as to Count 127 on this ground.

26                         ii.    Are Certain Claims Barred by the Economic Loss Doctrine?

27           Next, GM contends that several of Plaintiffs' claims are barred by the Economic Loss

28    Doctrine.  The claims are assessed individually below.

                                                        40

1

(a)    Count 5 (CA – Fraudulent Omission)

Defendant contends that the economic loss doctrine bars the California Plaintiff's

fraudulent omission claim because he does not allege personal injury or damage to property.  *See*

MSJ at 19.  In California, the doctrine of economic loss does not apply to all fraud claims.  *See,*

*e.g.*, *Hannibal Pictures, Inc. v. Sonja Prods. LLC*, 432 F. App'x 700, 701 (9th Cir. 2011) (citing

*Robinson Helicopter Co. v. Dana Corp.,* 102 P.3d 268, 275 (2004)) ("The California Supreme

Court has declined to apply the economic loss rule to fraud and misrepresentation claims where, as

here, one party has lied to the other.").  In particular, courts have refused to apply the doctrine to

fraudulent inducement claims.  *See, e.g.*, *Yetter*, 2019 WL 3254249, at *7 ("the economic loss rule

does not bar a claim, like Plaintiff's, for fraudulent inducement of the contract"); *Finney*, 2018

WL 2552266, at *9 (quoting *United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp.*, 660 F.

Supp. 2d 1163, 1188 (C.D. Cal. 2009)) ("The economic loss rule poses no barrier to a properly

pled fraudulent inducement claim: '[I]t has long been the rule that where a contract is secured by

fraudulent representations, the injured party may elect to affirm the contract and sue for fraud.'").

However, courts appear divided as to whether the economic loss rule applies to fraudulent

concealment/omission claims.[16]  Some courts have applied the economic loss rule to claims of

fraudulent concealment, finding that its application is only barred where a party has made

*affirmative* representations that are fraudulent.  *See, e.g.*, *Zagarian v. BMW of N. Am., LLC*, No.

CV 18-4857-RSWL-PLA, 2019 WL 6111731, at *3 (C.D. Cal. Oct. 23, 2019) ("*Robinson* [the

---

[16] Fraudulent omission and fraudulent concealment appear to be analytically synonymous.
*Compare Peel v. BrooksAmerica Mortg. Corp.*, 788 F. Supp. 2d 1149, 1159 (C.D. Cal. 2011)
(citing *Hahn v. Mirda,* 54 Cal. Rptr. 3d 527, 532 (2007)) ("Under California law, **the elements of
a common-law claim for fraudulent omission are**: (1) the defendant concealed or suppressed a
material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the
defendant intentionally concealed or suppressed the fact with intent to defraud the plaintiff; (4) the
plaintiff was unaware of the fact and would have acted differently if she had known of the
concealed or suppressed fact; and (5) the plaintiff sustained damage as a result of the concealment
or suppression." (emphasis added)); *with Hambrick v. Healthcare Partners Med. Grp., Inc.*, 238
Cal. App. 4th 124, 162 (2015) (citing *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 606
(2014)) ("**The required elements for fraudulent concealment are** (1) concealment or
suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff;
(3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the
fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she
had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the
concealment or suppression of the fact." (emphasis added)).

United States District Court
Northern District of California

1    California Supreme Court case which held that the economic loss rule would not apply in certain

2    circumstances] expressly limits its holding to affirmative representations"); *Thompson v. BMW of*

3    *N. Am., LLC*, No. SACV 17-01912-CJC-KS, 2019 WL 988694, at \*5 (C.D. Cal. Jan. 10, 2019)

4    (applying the economic loss rule where plaintiff did "not cite[] a single affirmative

5    misrepresentation" and instead presented a claim "solely premised on [defendant's] purported

6    omission"); *Stewart v. Electrolux Home Prod., Inc.*, 304 F. Supp. 3d 894, 902 (E.D. Cal. 2018)

7    ("Plaintiffs' damages . . . are limited to economic loss, precluding their strict liability and

8    fraudulent concealment claims."); *Traba v. Ford Motor Co.*, No. 218CV00808SVWGJS, 2018

9    WL 6038302, at \*4 (C.D. Cal. June 27, 2018) (holding that economic loss doctrine applies to

10    plaintiffs' allegations of fraudulent concealment). However, other courts have declined to so limit

11    the exception to the economic loss doctrine. *See, e.g.*, *Finney*, 2018 WL 2552266, at \*9 (citing

12    *County of Santa Clara v. Atlantic Richfield Co.*, 137 Cal. App. 4th 292, 329 (2006) as declining to

13    apply to economic loss rule to fraud claims including fraudulent concealment); *see also In re Ford*

14    *Motor Co. DPS6 Powershift Transmission Prod. Liab. Lit.*, No. CV1706656ABFFMX, 2019 WL

15    3000646, at \*6 (C.D. Cal. May 22, 2019) (finding "insufficient support in the California cases

16    [defendant] cites for its distinction between fraudulent inducement by misrepresentation and

17    fraudulent inducement by omission, and therefore declin[ing] to apply the economic loss rule to

18    the omission claims at [the motion to dismiss] stage").

19       While there is some conflict in the law, *Robinson* and the weight of authority within the

20    Ninth Circuit suggest that the economic loss rule applies to fraudulent omission claims under

21    California law. In *Robinson*, the California Supreme Court explained: "The economic loss rule

22    requires a purchaser to recover in contract for purely economic loss due to disappointed

23    expectations, unless he can demonstrate harm above and beyond a broken contractual promise"

24    and added that the rule "prevents the law of contract and the law of tort from dissolving one into

25    the other." *Robinson*, 34 Cal. 4th at 988 (internal citations and quotation marks omitted). It

26    concluded that "the economic loss rule does not bar . . . fraud and intentional misrepresentation

27    claims . . . [that] were independent of [defendant's] breach of contract." *Id.* at 991. However, the

28    *Robinson* court based that determination on the defendant's "affirmative intentional

United States District Court
Northern District of California

misrepresentations of fact" and did not address whether the defendant's "intentional concealment constitutes an independent tort." *Id.*; *see also id.* at 993 ("Our holding today is narrow in scope and limited to a defendant's affirmative misrepresentations on which a plaintiff relies and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss."). Furthermore, as indicated above, many courts within the Ninth Circuit have relied on *Robinson* in holding that affirmative representations are required for exceptions to the rule to apply. *See, e.g.*, *Electrolux*, 304 F. Supp. 3d at 902; *Zagarian*, 2019 WL 6111731, at *3; *Traba v. Ford Motor Co.*, 2018 WL 6038302, at *4.

As a result, the economic loss doctrine applies to the fraudulent omission claims of the California Plaintiffs. Thus, because Plaintiffs do not allege personal injury or damage to property, the Court **GRANTS** Defendant's motion for summary judgment as to Count 5.

(b)     Count 76 (NJ – Fraudulent Omission)

GM also contends that the fraudulent omission claim of the New Jersey plaintiff is barred by the economic loss rule. MSJ at 19–20. In New Jersey, "[t]he economic loss doctrine generally 'prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract.'" *Noble v. Porsche Cars N. Am., Inc.*, 694 F. Supp. 2d 333, 336 (D.N.J. 2010) (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 618 (3d Cir. 1995)) (discussing the economic loss rule in the context of a strict liability claim). More specifically, the economic loss rule "bars tort claims for harm sustained to the product alone, as opposed to harm to persons or other property damage." *Id.*; *see also Alloway v. Gen. Marine Indus., L.P.,* 149 N.J. 620, 632 (1997) ("When the harm suffered is to the product itself, unaccompanied by personal injury or property damage, we concluded that principles of contract, rather than of tort law, were better suited to resolve the purchaser's claim."). In addition, at least one federal court has concluded that the economic loss rule bars claims of fraudulent concealment. *See Peters v. Countrywide Home Loans, Inc.*, No. CV156329FLWLHG, 2016 WL 2869059, at *5 (D.N.J. May 17, 2016) ("unlike Plaintiff's claim for fraud in the inducement, the economic loss doctrine bars Plaintiff's claim that Defendants engaged in fraud in the concealment").

On the one hand, several courts—including state courts in New Jersey and federal courts

United States District Court
Northern District of California

1    interpreting New Jersey law—have rejected the application of the economic loss doctrine to

2    claims involving fraud.  *See, e.g.*, *Coastal Grp., Inc. v. Dryvit Sys., Inc.*, 274 N.J. Super. 171, 177

3    (App. Div. 1994) ("New Jersey law provides that remedies for material misrepresentation or fraud

4    include all remedies available under the UCC for non-fraudulent breach.  Thus, an action based on

5    facts showing fraudulent conduct or material misrepresentation may be redressed by an action in

6    tort for fraud or a contract action for nonfraudulent breach." (internal quotation marks and

7    brackets omitted)); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 219 F. Supp. 2d 600, 608

8    (D.N.J. 2002) (declining to conclude that the New Jersey Supreme Court would apply the

9    economic loss doctrine to cases involving "persons who committed fraudulent commercial

10   practices in connection with the sale of merchandise"); *In re FCA US LLC Monostable Elec.*

11   *Gearshift Litig.*, 355 F. Supp. 3d 582, 591–92 (E.D. Mich. 2018) (reading *Coastal Group* as

12   "expressly recogniz[ing] an exception to the economic loss bar for claims of fraud and

13   misrepresentation").  However, any limitation to the application of the economic loss doctrine

14   appears to pertain only to fraudulent inducement, rather than fraudulent concealment.  *See Florian*

15   *Greenhouse, Inc. v. Cardinal IG Corp.*, 11 F. Supp. 2d 521, 528 (D.N.J. 1998) (declining to apply

16   the economic loss doctrine where the claim "more closely resembles a fraud in the inducement

17   claim"); *Coastal Group*, 274 N.J. Super. at 177 (declining to apply the economic loss doctrine

18   where the court construed the plaintiff's claim as "a single tort, called 'fraudulent

19   misrepresentation'"); *Lithuanian Commerce*, 219 F. Supp. 2d at 608 (declining to apply the

20   economic loss rule "where the fraud alleged more closely resembles a 'fraud in the inducement'

21   claim").

22        Because the cases excepting the application of the economic loss rule appear to limit that

23   exception to fraudulent inducement, the Court follows the weight of authority from both federal

24   and state courts in New Jersey and concludes that the economic loss rule applies to Plaintiffs'

25   claims of fraudulent concealment/omission under New Jersey law.  Thus, it **GRANTS**

26   Defendant's Motion for Summary Judgment as to Count 76.

27                    (c)    <u>Count 88 (NC – Unfair and Deceptive Trade Practices Act)</u>

28        In North Carolina, the economic loss doctrine typically bars claims that involve purely

44

United States District Court
Northern District of California

1   economic losses.  *See Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614, 625 (M.D.N.C.

2   2006) (citing *Moore v. Coachmen Indus., Inc.,* 129 N.C. App. 389, 401–02 (1998)) ("North

3   Carolina has adopted North Carolina's 'economic loss rule' which prohibits the purchaser of a

4   defective product from using tort law to recover purely economic losses.").  However, this Court

5   has previously concluded that, within North Carolina, "the economic loss doctrine is not a bar to a

6   statutory consumer protection claim," *In re Chrysler*, 295 F. Supp. 3d at 1021 (citing *MyFord*

7   *Touch*, 46 F. Supp. 3d at 967 (holding that North Carolina's consumer protection statute "gives

8   rise to a duty independent of the contract and therefore should not be barred by the economic loss

9   rule")).

10      In those opinions, this Court discussed a number of the cases now advanced by GM in

11   support of its contention that the economic loss doctrine bars the UDTPA claim of the North

12   Carolina Plaintiff.  The Court noted that in *Coker v. DaimlerChrysler Corp.*, 617 S.E.2d 306

13   (2005), the North Carolina Court of Appeals declined to address the applicability of the economic

14   loss rule to the plaintiffs' unfair and deceptive trade practices claim because the plaintiffs lacked

15   standing to assert that claim.  *See MyFord Touch*, 46 F. Supp. 3d at 967 n.11 (citing *Coker*, 617

16   S.E.2d at 319).  Furthermore, the dissenting judge in *Coker* argued that claims under North

17   Carolina's consumer protection statute "are exempt from the economic loss rule because the rule is

18   judicial, not legislative, and must give way to specific legislative policy pronouncement allowing

19   damages for economic loss[;] [i]n other words, by enacting a remedy for economic losses suffered

20   by reason of an act deemed wrongful by the statute, the legislature has effectively preempted the

21   economic loss rule for those cases covered by the act."  *Id.* (citing *Coker*, 617 S.E.2d at 319

22   (Hudson, J., dissenting)).

23      In *In re Chrysler*, the Court also discussed *Buffa v. Cygnature Constr. & Dev., Inc.*, No.

24   COA16-237, 2016 WL 7984216, at *3 (N.C. Ct. App. Dec. 30, 2016), and concluded that it did

25   not compel a contrary conclusion.  In *Buffa*, the Court of Appeals explained that "[e]gregious or

26   aggravating circumstances must be alleged before the provisions of the [UDTPA] may take effect.

27   Aggravating circumstances include conduct of the breaching party that is deceptive."  *Buffa*, 251

28   N.C. App. 526 at *6 (citations omitted).  A mere "breach of contract, even if intentional, is not

45

1   sufficiently unfair or deceptive to sustain a UDTPA claim." *Id.* (citations and internal quotation

2   marks omitted).  Within the specific facts of *Buffa*, the court found that Plaintiffs had presented

3   "no evidence of [a] systematic . . . failure or a design flaw" in the product at issue; consequently, it

4   concluded that Plaintiffs' "claim of unfair and deceptive trade practices [wa]s in essence a claim

5   for breach of warranty and insufficient to sustain a claim for unfair and deceptive trade practices."

6   Moreover, the conclusions reached by the court in *Buffa* do not appear to resolve the question at

7   issue in this case: where, as here, there *is* evidence of both a defect *and* a deceptive act, does the

8   economic loss rule apply to UDTPA claims?

9         GM also cites to *Ellis v. Louisiana-Pac. Corp.*, 699 F.3d 778 (4th Cir. 2012), but—

10  contrary to GM's suggestion that the Fourth Circuit found that "economic loss doctrine bars

11  NCUDTPA claim"—the Fourth Circuit specifically "declined to make a ruling on whether the

12  economic loss rule barred the plaintiffs' claim."  *MyFord Touch*, 46 F. Supp. 3d at 966 (citing

13  *Ellis*, 699 F.3d at 787 n.5 ("North Carolina courts have never addressed whether UDTPA claims

14  are subject to the [Economic Loss Doctrine], and in the absence of such direction, we are well-

15  advised to rely on other grounds.")).

16        Lastly, GM cites five cases from federal district courts in North Carolina, all of which pre-

17  date this Court's rulings in *In re Chrysler* and *MyFord Touch*.  *See Malone v. Tamko Roofing*

18  *Prod. Inc.*, No. 3:13-CV-00089-MOC, 2013 WL 5561628, at *3 (W.D.N.C. Oct. 8, 2013) ("It is

19  well settled in North Carolina that the economic loss rule prohibits recovery for purely economic

20  loss in tort when a contract, an express warranty, or the Uniform Commercial Code operates to

21  allocate risk."); *Wireless Commc'ns, Inc. v. Epicor Software Corp.*, No. 3:10CV556-DSC, 2011

22  WL 90238, at *4 (W.D.N.C. Jan. 11, 2011) (citing *Mecklenburg County v. Nortel Gov't Solutions,*

23  *Inc.,* No. 3:07–CV–00320, 2008 WL 906319 (W.D.N.C. Apr. 1, 2008)) ("This Court has applied

24  the economic loss rule in dismissing fraud, negligent misrepresentation, and unfair and deceptive

25  trade practices claims on a Rule 12(b)(6) motion."); *Mecklenburg Cty.*, 2008 WL 906319, at *5

26  ("Allowing the County to recover a purely economic loss in tort would eviscerate the North

27  Carolina distinction between contract and tort law.  The County's claims of fraud, unfair and

28  deceptive trade practices, and negligent misrepresentation are therefore dismissed."); *Butcher v.*

United States District Court
Northern District of California

1   *DaimlerChrysler Co., LLC*, No. 1:08CV207, 2008 WL 2953472, at *4 (M.D.N.C. July 29, 2008)

2   ("It is clear from the pleadings that Plaintiff's UDTPA claim is intertwined with allegations of a

3   product defect, and he seeks damages only related to the product itself. . . . Plaintiff has pleaded no

4   allegations that could stand separate and apart from the alleged product defect. His UDTPA claim

5   . . . should be dismissed."); *Watson v. Fleetwood Motor Homes of Indiana, Inc.*, No. 1:06CV275,

6   2007 WL 2156351, at *5 (W.D.N.C. July 24, 2007) ("under North Carolina's 'economic loss rule'

7   the purchaser of a defective product is prohibited from using tort law to recover purely economic

8   losses").

9          While these cases may suggest that federal courts in North Carolina have concluded that

10   the economic loss rule bars unfair and deceptive trade practices claims where no personal injury or

11   property damage has occurred, the Fourth Circuit—after all of these cases were decided—noted

12   that "North Carolina courts have never addressed whether UDTPA claims are subject to the

13   [Economic Loss Doctrine], and in the absence of such direction, we are well-advised to rely on

14   other grounds." *Ellis,* 699 F.3d at 787 n.5. In addition, this Court must be guided primarily by the

15   decisions of North Carolina's state courts. *See Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1093

16   (9th Cir. 2017) ("The task of a federal court in a diversity action is to approximate state law as

17   closely as possible in order to make sure that the vindication of the state right is without

18   discrimination because of the federal forum." (citation omitted)). "In the absence of a

19   pronouncement by the highest court of a state, the federal courts must follow the decision of the

20   intermediate appellate courts of the state unless there is convincing evidence that the highest court

21   of the state would decide differently." *Kogler v. State Farm Gen. Ins. Co.*, 788 F. App'x 461, 463

22   (9th Cir. 2019). As in *MyFord Touch*, the Court finds the reasoning set forth by Judge Hudson in

23   *Coker* to be persuasive. As noted above, the majority in that case "specifically decline[d] to

24   address" the question whether the economic loss doctrine applies to UDTPA claims, *Coker*, 617

25   S.E.2d at 314 (majority), and the trial court, at most, "implicitly applie[d]" the doctrine, *Coker*,

26   617 S.E.2d at 319 (Hudson, J., dissenting). Thus, it was only Judge Hudson who spoke directly to

27   the question at issue here. As noted above, she explained that claims brought pursuant to North

28   Carolina's consumer protection statute "are exempt from the economic loss rule because the rule is

1  judicial, not legislative, and must give way to specific legislative policy pronouncement allowing

2  damages for economic loss[;] [i]n other words, by enacting a remedy for economic losses suffered

3  by reason of an act deemed wrongful by the statute, the legislature has effectively preempted the

4  economic loss rule for those cases covered by the act." *MyFord Touch*, 46 F. Supp. 3d at 967 n.11

5  (citing *Coker*, 617 S.E.2d at 319 (Hudson, J., dissenting)).  As a result, this Court finds no reason

6  to depart from its prior conclusion that, within North Carolina, "the economic loss doctrine is not a

7  bar to a statutory consumer protection claim."  *In re Chrysler*, 295 F. Supp. 3d at 1021.

8  　　　　Accordingly, the Court **DENIES** Defendant's motion for summary judgment as to Count

9  88.

10  　　　　　　　　　　iii.　　Are Unjust Enrichment Claims Barred by Express Contracts and/or

11  　　　　　　　　　　　　　　Adequate Legal Remedies? – Count 6 (CA – Unjust Enrichment),

12  　　　　　　　　　　　　　　Count 77 (NJ – Unjust Enrichment), Count 92 (NC – Unjust

13  　　　　　　　　　　　　　　Enrichment), Count 127 (TX – Unjust Enrichment)

14  　　　　GM argues that all of Plaintiffs' "unjust enrichment claims are barred as a matter of law by

15  the existence of an express contract governing the same subject matter and by adequate legal

16  remedies in the form of plaintiffs' fraud, consumer protection, and warranty claims."  MSJ at 20.

17  　　　　With respect to the existence of an express contract, Plaintiffs contend that—because the

18  Court previously dismissed Plaintiffs' express warranty claims and determined that their

19  "allegations do not appear to fall within the terms of the warranty," *see* Order Granting

20  Defendant's Motion to Dismiss at 15, Docket No. 62—there is no express contract governing the

21  subject matter at issue.  *See* MSJ Opp. at 20.  Thus, it appears that the key question is whether the

22  express contract must cover the subject matter of the unjust enrichment claim, or whether the mere

23  existence of a contract defining the parties' relationship and rights is sufficient to bar a claim of

24  unjust enrichment.

25  　　　　Numerous cases indicate that the mere existence of a contract that defines the parties'

26  rights bars a claim for unjust enrichment.  *See Adams*, 395 F. Supp. 3d at 855 ("[W]hether a

27  plaintiff has a meritorious claim for breach of contract does not govern whether that remedy

28  precludes a claim for unjust enrichment; rather, the mere existence of [a] potential contract claim

United States District Court
Northern District of California

1  bars the unjust enrichment remedy." (internal citations omitted)); *Alin v. Am. Honda Motor Co.*,

2  No. CIV A 08-4825 KSH, 2010 WL 1372308, at *16 (D.N.J. Mar. 31, 2010) (dismissing an unjust

3  enrichment claim where the contract was not "alleged to be formed invalidly, rescinded, nor

4  voided"); *see also Gerlinger v. Amazon.Com, Inc.*, 311 F. Supp. 2d 838, 856 (N.D. Cal. 2004) ("A

5  plaintiff may recover for unjust enrichment only where there is no contractual relationship

6  between the parties."); *Gerstle v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2017 WL

7  2797810, at *14 (N.D. Cal. June 28, 2017) ("the case law . . . is clear: a quasi-contract action for

8  unjust enrichment does not lie where express binding agreements exist and define the parties'

9  rights" (internal brackets and quotation marks omitted)).  Plaintiffs have not presented persuasive

10  authority to the contrary.

11  Thus, the Court **GRANTS** Defendant's motion for summary judgment as to Counts 6, 77,

12  92, and 127.

13  iv.  <u>Are Certain Claims Barred Because No Evidence Shows Vehicles</u>

14  <u>Are Unmerchantable?</u>

15  (a)  <u>Count 4 (CA – Implied Warranty)</u>

16  In California, "[t]he core test of merchantability is fitness for the ordinary purpose for

17  which such goods are used."  *Isip*, 155 Cal. App. 4th at 26.  As this Court recently explained in *In*

18  *re MyFord Touch*, "[t]he implied warranty of merchantability does not impose a general

19  requirement that goods precisely fulfill the expectation of the buyer.  Instead, it provides for a

20  minimum level of quality."  291 F. Supp. 3d at 945 (quoting *T & M Solar & Air Conditioning, Inc.*

21  *v. Lennox Int'l Inc.*, 83 F. Supp. 3d 855, 878 (N.D. Cal. 2015) (internal quotation marks omitted)).

22  To state a claim, "a plaintiff must allege a fundamental defect that renders the product unfit for its

23  ordinary purpose."  *Id.* (quoting *T & M Solar*, 83 F.Supp.3d at 878).

24  More specifically, the law in California is clear that to be fit for its ordinary purpose, a

25  vehicle must be "in safe condition and substantially free of defects."  *Isip*, 155 Cal. App. 4th at 27.

26  It must provide "reliable" transportation.  *Brand*, 226 Cal. App. 4th at 1547 (internal quotation

27  marks omitted).  Thus, three factors related to vehicle merchantability are safety, reliability, and

28  substantial freedom from defects.  *See In re MyFord Touch*, 291 F. Supp. 3d at 945–96.

49

United States District Court
Northern District of California

1  "Moreover, courts reject the notion that a vehicle is fit for its ordinary purpose 'merely because

2  [it] provides transportation from point A to point B[.]'" *Id.* at 946 (quoting *Isip*, 155 Cal. App. 4th

3  at 27); *but see Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 537 (C.D. Cal. 2012) ("The

4  basic inquiry, therefore, is whether the vehicle is fit for driving.").

5          GM makes much of the fact that the California Plaintiffs drove their cars for years and for

6  tens of thousands of miles before experiencing problems related to safety or reliability.  *See* MSJ

7  at 22.  GM relies on these facts to argue that Plaintiffs' vehicles "were fit for their ordinary

8  purpose." *Id.*  However, numerous courts within the Ninth Circuit have concluded that safety-

9  related defects which may be slow to emerge may nonetheless furnish a basis for a breach of

10  implied warranty claim.  *See, e.g.*, *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306,

11  1339 (C.D. Cal. 2013) (quoting *Hornberger v. General Motors Corp.*, 929 F. Supp. 884, 888 (E.D.

12  Pa. 1996) ("[A] material question of fact does exist as to whether a normal transmission of a

13  newly leased vehicle would fail after being driven approximately 40,000 miles, rendering the car

14  unfit for the purpose of driving and, therefore, unmerchantable")); *Cholakyan v. Mercedes-Benz*

15  *USA, LLC*, 796 F. Supp. 2d 1220, 1244 (C.D. Cal. 2011) (refusing to dismiss the implied warranty

16  claims of a Plaintiff who discovered a safety-related defect in his vehicle three years after

17  purchasing it and also noting that "[v]ehicles subject to engine failure cannot be said to be

18  merchantable"); *Borkman v. BMW of N. Am., LLC*, No. CV162225FMOMRWX, 2017 WL

19  4082420, at *9 (C.D. Cal. Aug. 28, 2017) (concluding the Plaintiff adequately pleaded breach of

20  implied warranty claim where an alleged safety-related defect in the vehicle's oil filter housing

21  emerged three years and nearly 80,000 miles after Plaintiff purchased the vehicle).  Thus, the fact

22  that Mr. Siqueiros and the Cralleys did not experience engine-power losses until four or five years

23  after purchasing their vehicles does not foreclose their implied warranty claims as a matter of law.

24          The cases cited by GM do not compel a different conclusion.  GM cites *Blissard v. FCA*

25  *U.S., LLC*, No. LA CV18-02765 JAK (JEMx), 2018 WL 6177295 (C.D. Cal. Nov. 9, 2018) for the

26  proposition that "evidence that [a vehicle's] operability was not impaired until a particular part

27  malfunctioned and required replacement is generally insufficient to prove unmerchantability."

28  MSJ at 22.  However, in *Blissard*, plaintiffs alleged a defective heating/cooling system, and the

court—in dismissing the implied warranty claim—focused on the fact that plaintiffs had not alleged that the defect "compromise[d] the vehicle's safety, render[ed] it inoperable," or otherwise "drastically undermine[d] the ordinary operation of the vehicle." 2018 WL 6177295, at *6. It emphasized that other courts had found similar defects to be "mere annoyance[s]." *Id.* GM relies on *Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962 (C.D. Cal. 2014) for the proposition that "[c]ontinued use of a vehicle is evidence that it is reasonably suited for ordinary use." MSJ at 22. In dismissing plaintiffs' implied warranty claims, the *Lee* court did note that plaintiffs had not alleged that they stopped using their vehicles because of the alleged defects in the pre-collision braking system; however, the court also noted that plaintiffs could not "truthfully allege" that their vehicles actually had the alleged defect. *See Lee*, 992 F. Supp. 2d at 980. Finally, GM relies on *Avedisian v. Mercedes-Benz USA, LLC*, 43 F. Supp. 3d 1071 (C.D. Cal. 2014), to show that summary judgment on a breach of implied warranty claim is appropriate "where [a] plaintiff drove [the] vehicle for over four years and 65,000 miles without interruption." MSJ at 22–23. However, *Avedisian* involved a defect related to the chrome detailing inside plaintiff's car. The court concluded that the alleged defect "failed to implicate the vehicle's operability at all." *Avedisian*, 43 F. Supp. 3d at 1079. These cases are far from analogous to the one at bar where plaintiffs have experienced serious engine trouble, and a reasonable jury could conclude that the Oil Consumption Defect constitutes a safety defect in the class vehicles.

GM also contends that Plaintiffs must "provide evidence proving that use of the product is 'substantially certain' to lead to failure." MSJ at 22 (quoting *Keegan*, 284 F.R.D. at 537). However, proof "that the product 'contains an inherent defect which is substantially certain to result in malfunction,'" is only required "[i]f there is no current malfunction." *Victorino v. FCA US LLC*, 326 F.R.D. 282, 291 (S.D. Cal. 2018), *appeal withdrawn,* No. 18-80076, 2019 WL 7187392 (9th Cir. Nov. 21, 2019) (citing *Hicks v. Kaufman and Broad Home Corp.*, 89 Cal. App. 4th 908, 918 (2001)); *see also In re Toyota Motor Corp.*, 754 F. Supp. 2d at 1179 (citing *Hicks*, 89 Cal. App. 4th at 923) ("if the Plaintiffs could prove that the allegedly defective product was 'substantially certain to result in malfunction during the useful life of the product,' they could prevail on their warranty claim notwithstanding the fact that the defect had not manifested itself as

United States District Court
Northern District of California

1   of the time of the filing of the action"); *Birdsong v. Apple, Inc.*, 590 F.3d 955, 959 (9th Cir. 2009)

2   (emphasis added) (affirming dismissal where "[t]he plaintiffs do not allege the iPods failed to do

3   anything they were designed to do nor do they allege that they, or any others, *have suffered or are*

4   *substantially certain to suffer* inevitable hearing loss or other injury from iPod use"). Here, both

5   Mr. Siqueiros and the Cralleys *did experience* significant malfunctions with their vehicles. Thus,

6   for the purposes of GM's Motion for Summary Judgment, there is no need to show that the defect

7   was "substantially certain" to occur; it *did* occur.

8       Thus, the Court **DENIES** summary judgment as to Count 4 on the grounds that there is

9   sufficient evidence that the vehicle was unmerchantable under California law.

10                    (b)     Count 75 (NJ – Implied Warranty)

11       GM contends that Mr. Knoll, the New Jersey Plaintiff, cannot—as a matter of law—prove

12   that his vehicle was unmerchantable. MSJ at 23. Numerous cases from federal courts in New

13   Jersey suggest that, where a car has been driven for years without problems, the implied warranty

14   of merchantability has not been breached. *See, e.g.*, *Stevenson v. Mazda Motor of Am., Inc.*, No.

15   14-5250 FLW DEA, 2015 WL 3487756, at *13 (D.N.J. June 2, 2015) (dismissing implied

16   warranty claim and noting that "the warrant of merchantability is not breached where a car has

17   been driven for years before a defect manifested"); *Suddreth v. Mercedes-Benz, LLC*, No. 10-CV-

18   05130 DMC-JAD, 2011 WL 5240965, at *4 (D.N.J. Oct. 31, 2011) (dismissing implied warranty

19   claim and observing: "A party will not be able to raise a claim of breach of implied warranty of

20   merchantability when they have been able to drive their vehicles for several years without issue.");

21   *Sheris v. Nissan N. Am. Inc.*, No. CIV. 07-2516 (WHW), 2008 WL 2354908, at *6 (D.N.J. June 3,

22   2008) ("plaintiffs may not recover for breach of the implied warranty of merchantability under the

23   facts where plaintiffs have driven their cars without problems for years" (internal quotation marks

24   omitted)); *Glass v. BMW of N. Am., LLC*, No. CIV.A. 10-5259 ES, 2011 WL 6887721, at *15

25   (D.N.J. Dec. 29, 2011) (dismissing claim of breach of implied warranty where "vehicle has been

26   driven without problems for five years"); *Brown v. Hyundai Motor Am.*, No.

27   CV1811249SDWJAD, 2019 WL 4126710, at *5 (D.N.J. Aug. 30, 2019) (noting that "a key factor

28   in dismissing the implied warranty claims was the fact that the plaintiffs were still able to drive

their cars despite the alleged defects").

However, some courts have declined to decide the issue as a matter of law. *See, e.g.*, *Henderson v. Volvo Cars of N. Am., LLC*, No. CIV. 09-4146 (DMC), 2010 WL 2925913, at *10 (D.N.J. July 21, 2010) (quoting *Hornberger v. Gen. Motors Corp.*, 929 F. Supp. at 888, 888 n.3) ("a material question of fact does exist as to whether a normal transmission of a newly leased vehicle would fail after being driven approximately 40,000 miles, rendering the car unfit for the purpose of driving and, therefore, unmerchantable" and although "Plaintiffs will have a very difficult path to hoe to establish their claim for breach of an implied warranty of merchantability . . . this Court cannot hold as a matter of law that Plaintiffs' claim should be dismissed"); *see also Skeen v. BMW of N. Am., LLC*, No. 2:13-CV-1531-WHW-CLW, 2014 WL 283628, at *16 (D.N.J. Jan. 24, 2014) (acknowledging that "there will typically be no claim for breach of implied warranty where plaintiffs have driven their cars without problems for years," but concluding that it "cannot hold as a matter of law that Plaintiffs' claim should be dismissed").

Here, Mr. Knoll purchased his vehicle on January 15, 2013. *See* Knoll Int. In late 2015, when Mr. Knoll's vehicle had around 90,000 miles on it, he experienced a tapping sound in his engine and discovered that the vehicle was 3.5 quarts low on oil. *See* Knoll Depo. at 127–28. He also testified that he has had to change the spark plugs several times per year, that his check engine light would come on repeatedly, *id.* at 58–59, and that his vehicle would sometimes run erratically, *id.* at 122–24. However, the vehicle has never stalled. *Id.* at 123. The current mileage on the vehicle is approximately 157,894 miles. Knoll Int. Mr. Knoll still owns and drives his vehicle. Knoll Depo. at 25.

While a small number of cases appear to leave the door open in some situations, the weight of authority indicates that given the adequate of performance of Mr. Knoll's vehicle, the Court must **GRANT** summary judgment for Defendant as to Count 75.

(c)  Count 90 (NC – Implied Warranty)

As with the New Jersey claims, GM contends that the initial reliability of the North Carolina Plaintiff's vehicle undermines any claim of breach of implied warranty. *See* MSJ at 23–24. Among other requirements, in North Carolina a breach of implied warranty of merchantability

requires that "the goods were defective at the time of sale."  *DeWitt v. Eveready Battery Co.*, 355

N.C. 672, 683 (2002) (quoting *Morrison v. Sears, Roebuck & Co.*, 319 N.C. 298, 301 (1987)).

Where the defect is not immediately apparent, North Carolina courts "have approved the use of

circumstantial evidence" such that "a defect may be inferred from evidence that . . . [a product

was] put to [its] ordinary use and subsequently malfunctioned."  *Id.* at 684.

In determining whether a plaintiff has produced adequate circumstantial evidence of a

defect, a court may consider "such factors as: (1) the malfunction of the product; (2) expert

testimony as to a possible cause or causes; (3) how soon the malfunction occurred after the

plaintiff first obtained the product and other relevant history of the product, such as its age and

prior usage by plaintiff and others, including evidence of misuse, abuse, or similar relevant

treatment before it reached the defendant; (4) similar incidents, when accompanied by proof of

substantially similar circumstances and reasonable proximity in time, (5) elimination of other

possible causes of the accident; and (6) proof tending to establish that such an accident would not

occur absent a manufacturing defect."  *Id.* at 689–90 (internal quotation marks and citations

omitted); *see also Brittain v. Motorola Mobility, LLC*, No. 517CV00134KDBDSC, 2019 WL

3543688, at *3 (W.D.N.C. Aug. 2, 2019) ("the Supreme Court of North Carolina [has] articulated

a non-exclusive, six-factor list of types of circumstantial evidence which a court may consider at

the summary judgment stage").

While a court may rule on implied warranty of merchantability claims as a matter of law,

*see, e.g.*, *Bussian*, 411 F. Supp. 2d at 624, "in most cases, the weighing of [the six circumstantial

evidence] factors should be left to the finder of fact," *id.* at 690 (internal brackets and citations

omitted); *see also Tennessee Carolina Transp., Inc. v. Strick Corp.*, 283 N.C. 423, 439 (1973) ("It

is for the jury to determine, under proper instructions, whether the fitness warranty was breached

as to all.").  In addition, in *Bussian* (which did decide merchantability as a matter of law), the

"Plaintiff ma[de] no allegation that the allegedly defective ball joints caused him to suffer

mechanical problems, lose control of his vehicle, or have an accident," nor did Plaintiff allege

"that his Durango was ever rendered inoperable."  411 F. Supp. 2d at 623.  Those facts are quite

different from the ones alleged here.

United States District Court
Northern District of California

54

1    William Davis, Jr., the Plaintiff from North Carolina, purchased his vehicle on June 28,

2  2012.  *See* Davis Int.  In late 2017, the vehicle stopped running altogether and had to be towed to

3  the shop; this incident left Mr. Davis's wife stranded on the side of the road with their grandchild.

4  Davis Depo. at 98.  The towing incident fell just outside of Mr. Davis's 5-year/100,000 mile

5  warranty.  *Id.* at 101.  The current mileage on Mr. Davis's vehicle is approximately 101,000 miles.

6  Davis Int.  He still owns the vehicle.  Davis Depo. at 46.  Although Mr. Davis did drive his car for

7  a long time without problems, it is possible that a reasonable jury examining the six circumstantial

8  evidence factors (especially (1) the fact that the product malfunctioned, (2) expert testimony as to

9  possible causes of the problem, (5) elimination of other possible causes, and (6) other proof

10  suggesting that the problem would not have occurred absent a manufacturing defect) could infer

11  that there was a problem with the car at the time it was sold.

12    Because North Carolina courts are inclined to treat breach of implied warranty as a

13  question for the finder of fact and because it seems possible that a reasonable jury could conclude

14  that the defect existed at the time the car was sold, the Court **DENIES** summary judgment for

15  Defendant as to Count 90.

16                          (d)      Count 125 (TX – Implied Warranty)

17    Under Texas law, for goods to breach the implied warranty of merchantability "they must

18  be defective—that is, they must be 'unfit for the ordinary purposes for which they are used

19  because of a lack of something necessary for adequacy.'"  *Gen. Motors Corp. v. Brewer*, 966

20  S.W.2d 56, 57 (Tex. 1998) (quoting *Plas-Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 443–44

21  (Tex. 1989)); *see also* Tex. Bus. & Com. Code § 2.314(b)(3).  Defendant contends that—because

22  Mr. Sanchez "found his oil level was low one time in six years," had his vehicle repaired under

23  warranty, and subsequently drove the vehicle for thousands of miles without incident—he cannot,

24  as a matter of law, prove a claim for breach of implied warranty.  MSJ at 25.

25    Defendant relies on *Brewer* for the contention that "[a] product which performs its

26  ordinary function adequately does not breach the implied warranty of merchantability merely

27  because it does not function as well as the buyer would like, or even as well as it could."  MSJ at

28  25 (quoting *Brewer*, 966 S.W.2d at 57); *see also Ford v. Deere & Co.*, No. 1:04-CV-118-C, 2005

United States District Court
Northern District of California

WL 8157985, at *5 (N.D. Tex. Oct. 13, 2005) (citing *Brewer*, 966 S.W.2d at 57) ("A product which performs its ordinary function adequately does not breach the implied warranty of merchantability merely because it does not function as the buyer would prefer.").  GM also argues that, especially where a Plaintiff continues to use a product after a defect emerges, no breach of implied warranty occurs under Texas law.  *See* MSJ at 25 (citing *Ford*, 2005 WL 8157985, at *5).

However, courts in this district have distinguished *Brewer* in cases where the defect fundamentally affects the safety and operability of the vehicles at issue.  *See, e.g.*, *Gen. Motors*, 241 F. Supp. 3d at 1115 (citing *Otis Spunkmeyer*, 30 S.W.3d at 688) ("A later case identified that *Brewer* did not find a defect because the seatbelt failure did not render the vehicle '[un]fit for its ordinary purpose of protecting the' driver—it merely made the vehicle 'more difficult to use than anticipated[.]'"); *Sater*, 2015 WL 736273, at *10 (distinguishing *Brewer* because "Plaintiffs do not claim inconvenience, they allege vehicle-crippling defects").  Federal courts in Texas have also distinguished between inconvenience and defects that make operation of a vehicle impossible. *Strauss v. Ford Motor Co.*, 439 F. Supp. 2d 680, 686 (N.D. Tex. 2006) ("The word unfit connotes incapability, not mere inconvenience.").

Because, for the reasons stated above, a reasonable jury could conclude that the alleged Oil Consumption Defect constitutes a safety problem, they could find that the class vehicles are "unfit for the ordinary purposes for which they are used."  *Brewer*, 966 S.W.2d at 57; *see also Adams*, 395 F. Supp. 3d at 854 (concluding that plaintiffs adequately asserted their vehicles are unfit for transportation where they alleged that "the defective dashboard reflect[ed] off the windshield" and dangerously obstructed drivers' view).  Likewise, some of the problems reported by Plaintiffs could be considered "vehicle-crippling defects."  *Sater*, 2015 WL 736273, at *10.  Accordingly, the Court **DENIES** summary judgment for Defendant as to Count 125.

> v.   Do Magnuson-Moss Warranty Act ("MMWA") Claims Fail for
> Lack of Predicate Claims? (Count 1)

Because MMWA claims rely on underlying warranty claims, the parties' MMWA arguments focus exclusively on whether the Court has disposed of those claims.  *See* MSJ at 26; MSJ Opp. at 27; MSJ Reply at 16.  Because the Court previously dismissed the express warranty

United States District Court
Northern District of California

claims of the Accelerated Plaintiffs, *see* FAC Order at 16, the MMWA claims survive or fail with the Court's decisions regarding the implied warranty claims discussed above.  Thus, the Court rule as follows:

- • MMWA Claims of the California Plaintiffs – **DENY** Summary Adjudication
- • MMWA Claims of the New Jersey Plaintiff – **GRANT** Summary Adjudication
- • MMWA Claims of the North Carolina Plaintiff – **DENY** Summary Adjudication
- • MMWA Claims of the Texas Plaintiff – **DENY** Summary Adjudication

> vi. <u>Do Certain Claims Fail Because No Evidence Shows GM's Knowledge or Duty to Disclose?</u>
>
> (a) <u>California (Counts 2 – Consumer Protection, 5 – Fraudulent Omission, and 7 - Unfair Competition Law ("UCL"))</u>

The parties disagree as to when a manufacturer has a duty to disclose under California law. *See* MSJ at 27; MSJ Opp. at 27.  GM contends that "[a] vehicle manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative representation or a safety issue." MSJ at 27 (internal quotation marks and citations omitted); MSJ Reply at 17 ("California law is that an automobile manufacturer's duty is limited to its warranty obligations unless there is an affirmative misrepresentation or a known safety risk.").  Plaintiffs contend that a safety hazard is not necessary in all cases, MSJ Opp. at 27–28, but because the Court has found that a reasonable jury could conclude that the Oil Consumption Defect constitutes a safety defect, it need not resolve that contention.  Thus, because whether the Oil Consumption Defect constitutes a safety defect cannot be resolved on summary judgment, the Court denies summary judgment on GM's claim that it had no duty to disclose information about the defect.

The Court does note that, even if the Oil Consumption Defect is *not* a safety defect, there is some authority that a safety hazard is not necessary for all omission or consumer protection claims.  *See Hodsdon v. Mars, Inc.*, 891 F.3d 857 (9th Cir. 2018).  As the court noted in *Hodsdon,* "recent California cases show that *Wilson*'s safety hazard pleading requirement is not necessary in *all* omission cases, but that the requirement may remain applicable in some circumstances.  In other words, . . . where the challenged omission does not concern a central functional defect, the

United States District Court
Northern District of California

1  plaintiff may still have to plead a safety hazard to establish that the defendant had a duty to

2  disclose.  For example, even though we offer no binding opinion on the issue, *Wilson* may still

3  apply where the defect in question does not go to the central functionality of the product, but still

4  creates a safety hazard."  Subsequent cases have noted the door has been left open.  *See, e.g.*,

5  *Norcia v. Samsung Telecommunications Am., LLC*, No. 14-CV-00582-JD, 2018 WL 4772302, at

6  *1 (N.D. Cal. Oct. 1, 2018) (internal citations and quotation marks omitted) ("Although *Hodsdon*

7  declined to 'consider whether the later state-court cases have effectively overruled *Wilson*,' it

8  made crystal clear that '*Wilson*'s safety hazard pleading requirement is not necessary in *all*

9  omission cases.'"); *In re MacBook Keyboard Litig.*, No. 5:18-CV-02813-EJD, 2019 WL 1765817,

10  at *6 (N.D. Cal. Apr. 22, 2019) ("This Court will follow the reasoning expressed in *Hodsdon*, and

11  adopted by other Northern District courts, that '*Wilson*'s safety hazard pleading requirement is not

12  necessary in all omission cases.'").

13       The parties agree that knowledge is required for Plaintiffs' fraudulent omission and

14  Consumer Legal Remedies Act claims,[17] *see* MSJ at 28 and MSJ Opp. at 29, but disagree as to

15  whether GM had knowledge of the alleged defect at the time of the sale of the vehicles at issue.

16  However, as discussed above, there is evidence permitting a reasonable jury to find that GM was

17  aware of the Oil Consumption Defect up through 2014.  *See* Section III.B.1.b.i.  GM further

18  contends that California law "requires evidence that GM knew of a direct causal connection

19  between the alleged oil consumption defect and an unreasonable safety hazard."  However, as

20  discussed above, numerous GM engineers acknowledged that low oil levels could lead to damaged

21  crankshaft bearings, rod bearings, valve guides, electric guides, push rod tips, piston pins, and

22  piston rings, as well as engine seizure and total engine failure.  *See, e.g.*, Halka Depo. at 68–70;

23  Tappen Depo. at 48 (testifying that "metal-to-metal contact" and "internal engine damage" can

24  result from oil pressure levels getting too low).  Thus, a reasonable jury might conclude that GM

25  was aware of a causal connection between the alleged Oil Consumption Defect and an

26

27      [17] The parties disagree about whether knowledge is required for Plaintiffs' Unfair Competition

28  Law claim, but because summary judgment has already been granted as to Count 5, the Court does not reach this issue.

United States District Court
Northern District of California

1    unreasonable safety hazard.

2         Finally, because "[r]estitution is the only monetary remedy expressly authorized by" the

3    UCL, *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1136 (2003), GM contends

4    that the California Plaintiffs cannot prevail on their UCL claim because they can present no

5    evidence that they paid money to GM.  MSJ at 29.  GM relies on *In re Ford Motor Co. E-350 Van

6    Prod. Liab. Litig. (No. II)*, No. CIV. A. 03-4558, 2010 WL 2813788 (D.N.J. July 9, 2010),

7    *amended,* No. CIV.A. 03-4558 GEB, 2011 WL 601279 (D.N.J. Feb. 16, 2011) and *Asghari*, 42 F.

8    Supp. 3d 1306, for the proposition that Plaintiffs "cannot recover on their request for restitution

9    and/or restitutionary disgorgement under the UCL because they . . . purchased their vehicles from,

10   and paid money to, independent dealerships, not GM."  MSJ at 29; *see also* MSJ Reply at 18.

11   However, both of those cases are inapposite.  In *Ford Motor Co.*, Plaintiff could not recover from

12   Ford because the vehicle in question had been donated to the Plaintiff (a church), and thus "no

13   funds . . . were paid directly or through intermediaries to Ford."  *Ford Motor Co.*, 2010 WL

14   2813788, at *15.  In *Asghari*, the Plaintiff had purchased her vehicle through a third-party, who

15   had previously purchased the vehicle through an authorized dealer.  *See Asghari*, 42 F. Supp. 3d at

16   1319.  As a result, the court concluded that she had failed to plead a plausible claim for restitution

17   because she "ha[d] not alleged facts indicating that defendants obtained [her] money or property."

18   *Id.* at 1324.

19        In a more analogous case, one court has explained: "That Indirect Purchaser Plaintiffs

20   allege such funds were paid to [defendants] through an intermediary does not change the fact that

21   Indirect Purchaser Plaintiffs are seeking funds in which they have an ownership interest.  If

22   Indirect Purchaser Plaintiffs can demonstrate that the amount they overpaid for [the product] was

23   the amount that [defendant] overcharged, and that any intermediaries merely passed on the

24   overcharge from [defendant] to the Indirect Purchaser Plaintiffs as end-paying customers, they

25   may recover such funds as restitution under the UCL."  *In re Ditropan XL Antitrust Litig.*, 529 F.

26   Supp. 2d 1098, 1105 (N.D. Cal. 2007).  Thus, *Ditropan* indicates that Plaintiffs may recover

27   restitution if they are able to prove the amount they paid is traceable to GM.

28        In light of the foregoing analysis, the Court **DENIES** summary judgment for Defendant as

1   to Counts 2 and 7.  As summary judgment has already been granted as to Count 5, the Court does

2   not reach the alternative bases asserted here.

3              (b)        New Jersey (Counts 74 – Consumer Protection and 76 –

4                         Fraudulent Omission)

5       Plaintiffs contend that GM's omissions regarding the Oil Consumption Defect are

6   actionable under the New Jersey Consumer Fraud Act ("NJCFA").  *See* 5AC ¶ 1091.  Under New

7   Jersey law, "an omission occurs where the defendant (1) knowingly concealed (2) a material fact

8   (3) with the intention that the consumer rely upon the concealment."  *Arcand v. Brother Int'l*

9   *Corp.*, 673 F. Supp. 2d 282, 297 (D.N.J. 2009) (citing *Judge v. Blackfin Yacht Corp.,* 357 N.J.

10  Super. 418, 426 (App. Div. 2003)).  "Implicit in the showing of an omission is the underlying duty

11  on the part of the defendant to disclose what he concealed to induce the purchase."  *Id.*

12      However, "where a claim for fraud is based on silence or concealment, New Jersey courts

13  will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement

14  true or the parties share a special relationship."  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153,

15  1185 (3d Cir. 1993) (internal quotation marks omitted).  "Three categories of relationships give

16  rise to a duty to disclose: (1) fiduciary relationships, such as principal and agent, client and

17  attorney, or beneficiary and trustee; (2) relationships where one party expressly reposits trust in

18  another party, or else from the circumstances, such trust necessarily is implied; and (3)

19  relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence

20  is required to protect the parties."  *Id.*

21      GM contends that no "special relationship" existed between the parties and that it did

22  nothing "to encourage the plaintiff to place special trust or confidence in their advice."  MSJ at 31.

23  In response, Plaintiffs contend that "GM encouraged consumers, including New Jersey Plaintiff, to

24  place their confidence in the reliability of the Class Vehicles" and that the company "used the

25  durability and dependability of the Class Vehicles as a selling point."  *Id.*[18]  In support of this

---

[18] There is no contention that a fiduciary relationship exists between the parties here, nor do
Plaintiffs assert that the relevant "transactions [are] so intrinsically fiduciary that a degree of trust
and confidence is required to protect the parties."  *Id.*  Thus, the Court has examined only whether
Plaintiffs "expressly reposit[ed] trust in" GM or whether "such trust necessarily is implied."  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1  contention, Plaintiffs cite to an internal GM PowerPoint presentation that indicates that 63% of

2  GM customers who purchased model-year 2010–2012 vehicles rated "Reliability/Durability" as

3  the most important factor in their choice of vehicle.  *See* MSJ Opp. at 32 (citing Exh. 19, Docket

4  No. 193-19).  However, the slide does not contain any information about actions taken by GM to

5  encourage the perception of reliability/durability with respect to its vehicles or to "encourage

6  plaintiffs to repose special trust or confidence in their advice, thereby inducing plaintiffs'

7  reliance."  *Green v. G.M.C.*, No. A-2831-01T-5, 2003 WL 21730592, at *8 (N.J. Super. Ct. App.

8  Div. July 10, 2003) (citing *United Jersey Bank v. Kensey,* 306 N.J. Super. 540, 551 (App. Div.

9  1997)).  It merely attests to the fact that those factors featured prominently in consumers'

10  purchasing decisions.  There is no evidence of a special relationship between GM and its

11  customers within the meaning of NJCFA.

12       However, one New Jersey case may offer Mr. Knoll's position arguable support.  In

13  *Green*, the court concluded that where "none of the plaintiffs had researched the safety features of

14  available automobiles prior to making their car purchase . . . [or] questioned the salespeople

15  regarding the safety features of the cars they intended to buy" the defendant could not be said to

16  have induced plaintiffs' reliance with respect to those safety features.  *See Green*, 2003 WL

17  21730592, at *8.  Here, in contradistinction to the facts of *Green*, Mr. Knoll testified in his

18  deposition that he *had* researched various vehicles using the GMC website and the dealer catalog,

19  Knoll Depo. at 89–91, and that he wanted the particular vehicle he purchased because of the active

20  fuel management feature in the engine, *id.* at 89.  (Although he did not speak with any sales people

21  about the specific engine when he visited dealerships or test-drove vehicles.  *Id.* 94–96.)

22  However, that Mr. Knoll wanted that engine does not establish he was induced to buy the car by

23  GM's representations about the engine and its oil consumption.  Nor does Mr. Knoll's testimony

24  demonstrate the type of "special relationship" that gives rise to a duty to disclose.  To the contrary,

25  the cases relied upon in *Green* suggest that, to create a "special relationship" requiring a duty to

26  disclose, one party must "actively encourage[]" the other to rely upon individually tailored advice

27  or guidance.  *See Kensey,* 306 N.J. Super. at 555–56 (discussing, *e.g.*, an instance in which a bank

28  "pressured" and "coaxed" a business to make an unsound purchase and another instance in which

1   a loan officer counseled a customer to invest in a business he knew to be unsound).

2          Thus, because New Jersey law does not imply a duty to disclose under the circumstances

3   presented here, the Court **GRANTS** summary judgment on Count 74.  Having granted summary

4   judgment for GM as to Count 76 on the grounds of the economic loss doctrine, the Court does not

5   address Count 76 again here.

6                              (c)        North Carolina (Counts 88 – UDTPA and 91 – Fraudulent

7                                         Omission)

8          In North Carolina, a claim under the Unfair and Deceptive Trade Practices Act requires a

9   duty to disclose, which "arises where: (1) there is a fiduciary relationship between the parties to a

10  transaction; or (2) no fiduciary relationship exists yet a party has taken affirmative steps to conceal

11  material facts from the other; or (3) no fiduciary relationship exists and one party has knowledge

12  of a latent defect in the subject matter of the negotiations about which the other party is both

13  ignorant and unable to discover through reasonable diligence."  *Hutton v. Hydra-Tech, Inc.*, No.

14  1:14CV888, 2018 WL 1363842, at *7 (M.D.N.C. Mar. 15, 2018) (internal quotation marks

15  omitted).  Similarly, a claim for fraudulent omission requires a duty to disclose: "Outside of a

16  fiduciary relationship, a duty to disclose may also arise in situations where parties are dealing at

17  arm's length and one party has taken affirmative steps to conceal material facts from the other, or

18  where one party has knowledge of a latent defect in the subject matter of the dealings about which

19  the other party is both ignorant and unable to discover through reasonable diligence."  *Breeden v.*

20  *Richmond Cmty. Coll.*, 171 F.R.D. 189, 196 (M.D.N.C. 1997).

21         GM contends that there is no evidence showing that "GM knew of a latent oil consumption

22  defect at the time of sale or affirmatively concealed a defect."  MSJ at 32.  As discussed above,

23  however, there is evidence upon which a reasonable jury could rely to conclude that GM was

24  aware of the alleged Oil Consumption Defect.  *See* Section III.B.1.b.  Mr. Davis also testified that

25  he was unaware of the defect at the time he purchased the vehicle.  Davis Depo. at 129.  While

26  GM contends that "[t]he record evidence also shows no diligence by Davis, despite his testimony

27  of learning in 2013 that his vehicle was consuming oil," MSJ Reply at 20, as discussed above

28  (regarding Count 90), there is also evidence upon which a reasonable jury could rely to conclude

United States District Court
Northern District of California

United States District Court
Northern District of California

1   that Mr. Davis could not have discovered the defect in his vehicle prior to 2017. *See* Section

2   III.B.1.c.i.c. As a result, a reasonable jury could conclude that GM should have disclosed the

3   defect to him under New Jersey law under (3) above.

4          Intent is not an element of NCUDPTA claims. *See Lucky Ducks, Ltd. v. Leeds*, 191 N.C.

5   App. 610, 664 S.E.2d 78 (2008) ("a suit for unfair or deceptive trade practices does *not* require

6   proof of a defendant's motive, intent to deceive, or bad faith" (emphasis in original)). Intent is

7   required, however, for claims of fraudulent omission under North Carolina law. *See Ace, Inc. v.*

8   *Maynard*, 108 N.C. App. 241, 250, 423 S.E.2d 504, 510 (1992) (citing *Myers & Chapman, Inc. v.*

9   *Thomas G. Evans, Inc.,* 323 N.C. 559, 568 (1988) for the proposition that "an intent to deceive [is]

10  required in order to establish the *scienter* necessary for fraud"). GM contends that "plaintiff

11  provides no evidence that GM intended to deceive him." MSJ at 32. However, as discussed

12  above, there is evidence upon which a reasonable jury could rely to conclude that GM intended to

13  deceive consumers by concealing information about the Oil Consumption Defect. *See* Section

14  III.B.1.b.iii.

15         Consequently, the Court **DENIES** Defendant's Motion for Summary Judgment as it relates

16  to Counts 88 and 91.

17                     (d)      Texas (Counts 123 – TDTPA and 126 – Fraudulent

18                              Omission)

19         GM contends that it is entitled to summary judgment on the Texas Plaintiff's Deceptive

20  Trade Practices-Consumer Protection Act ("TDTPA") claim and his common law fraudulent

21  omission claim because Plaintiffs have provided no evidence that GM knew of the Oil

22  Consumption Defect at the time Mr. Sanchez purchased his vehicle. GM further contends that

23  there is no evidence that the company concealed the defect with the intent of inducing Mr.

24  Sanchez to purchase his vehicle. MSJ at 34. However, as discussed above, there is evidence upon

25  which a reasonable jury could rely to conclude that GM was aware of the alleged Oil Consumption

26  Defect. *See* Section III.B.1.b.i. It is also possible that a jury could reasonably find that GM

27  concealed information about the Oil Consumption Defect with the intent to induce customers to

28  purchase the company's vehicles. *See* Section III.B.1.b.ii and iii.

GM further contends that, with respect to a fraudulent omission claim (although not a TDTPA claim), "[n]o duty [to disclose] arises in an arms-length transaction between a manufacturer and consumer, particularly where plaintiffs did not purchase or lease their vehicles directly from the manufacturer." MSJ at 34 (citing *Adams*, 395 F. Supp. 3d at 850). Instead, a duty only arises where "there is a fiduciary relationship between the parties or the manufacturer learns that a prior affirmative misrepresentation was false." *Id.* (citing *Adams*, 395 F. Supp. 3d at 850). Plaintiffs contend that "GM [had] a duty to disclose the Oil Consumption Defect under Texas common law because of its affirmative representations regarding the dependability and durability of the Class Vehicles," which Plaintiffs believe were false. MSJ Opp. at 35. In support of that contention, Plaintiffs rely on the same internal GM PowerPoint presentation (indicating that 63% of GM customers who purchased model-year 2010–2012 vehicles rated "Reliability/Durability" as the most important factor in their choice of vehicle) discussed in the context of the New Jersey Plaintiff's claims. *See* Section III.B.1.c.vi.b; *see also* MSJ Opp. at 35. However, as discussed above, nothing in that presentation indicates what, if any, actions GM might have taken to encourage the perception of reliability/durability with respect to its vehicles

Thus, the Court **GRANTS** summary judgment for Defendants as to Count 126 (fraudulent omission) and **DENIES** summary judgment with respect to Count 123 (TDTPA claim).

      2.   <u>Exclusion of Expert</u>

          a.   <u>Legal Standard</u>

The Federal Rules of Evidence permit an expert to testify where he or she "is qualified as an expert by knowledge, skill, experience, training, or education" and his or her testimony (1) "will help the trier of fact to understand the evidence or to determine a fact in issue," (2) "is based on sufficient facts or data," (3) "is the product of reliable principles and methods," and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The expert's testimony must be both relevant and reliable. *Daubert*, 509 U.S. at 590–91, 597; *Vallejo*, 237 F.3d at 1019.

"Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary

1    determination that the expert's testimony is reliable." *Ellis*, 657 F.3d at 982.  Because Plaintiffs

2    are the proponents of the expert testimony, it is their burden to prove admissibility.  *Lust*, 89 F.3d

3    at 598.

4                    b.    Analysis

5            Rule 702 requires that a witness who seeks to testify as an expert have adequate

6    "knowledge, skill, experience, training, or education" to qualify as an expert.  Fed. R. Evid. 702.

7    GM first asserts that "Dr. Ball is not qualified to testify as an expert on . . . [the issue of warranty

8    data] because he lacks any scientific, technical or specialized knowledge on GM's warranty data."

9    Motion to Exclude ("MTE") at 6, Docket No. 201; *see also* Reply in Support of Motion to

10   Exclude ("MTE Reply") at 2, Docket No. 219 ("While plaintiffs point out [Dr.] Ball's degree in

11   'Engineering Science' and his 'specialty' in 'combustion modeling and misfire detection in spark

12   ignition engines,' they provide no basis for those credentials to qualify Ball as an expert on

13   calculating GM's warranty claim rate.").  However, GM's characterization of the requisite

14   expertise is too narrow.  Dr. Ball's CV documents extensive experience working with safety-

15   related vehicle data.  He has published reports that involve the analysis and interpretation of safety

16   data, published industry papers on safety-related modeling, probability-based models and

17   simulations, and statistical analyses of various types of vehicle data.  *See* Appendix B to Amended

18   Expert Report of Jeffrey K. Ball, Docket No. 214-3.  The fact that he has not applied his modeling

19   techniques, statistical examinations, or other mathematical analyses to warranty data specifically

20   does not establish he is unqualified to do so.  Dr. Ball's topical expertise in engineering,

21   combustion modeling, and spark ignition engines provides a critical foundation of understanding

22   that informs his analysis of the piston-assembly warranty data.  *Id.*  Accordingly, Dr. Ball has

23   adequate "knowledge, skill, experience, training, or education" to qualify as an expert.  Fed. R.

24   Evid. 702.

25           Next, GM seeks to exclude Tables 5 and 6 from Dr. Ball's Supplemental Expert Report on

26   the grounds that these tables do not fulfill the requirements of Rule 702.  The information that Dr.

27   Ball provides in Tables 5 and 6, which estimates the total number of piston repairs, is deduced

28   from the number of piston replacements.  Tables 5 and 6 take warranty claim data from Tables 1

United States District Court
Northern District of California

and 2 (piston assembly replacement data) and divide it by 27% (the alleged percentage of repairs that first involved piston *cleaning* and subsequently involved piston *replacement*). *See* Supplemental Expert Report of Jeffrey K. Ball, Docket No. 201-1.

"Under Federal Rule of Evidence 702 the trial court may exercise discretion to allow expert testimony if the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue; (1) it is based upon sufficient facts or data; (2) it is the product of reliable principles and methods; and (3) the expert has applied the principles and methods reliably to the facts of the case." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (internal quotation marks omitted). Where a party challenges the expert's assumptions or arguments, the challenges may go to impeachment, rather than admissibility. *Id.* Thus, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.*; *see also id.* at 969–70 ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury."); *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010), *as amended* (Apr. 27, 2010) ("Given that the judge is a gatekeeper, not a fact finder, the gate could not be closed to this relevant opinion offered with sufficient foundation by one qualified to give it."); *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014) ("The test is not the correctness of the expert's conclusions but the soundness of his methodology, and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony." (internal quotation marks omitted)).

Although the numbers that Dr. Ball uses to construct Tables 5 and 6 are contested, the process that he uses for his calculations involves only simple multiplication/division; in other words, GM does not appear to contest the accuracy of Dr. Ball's methodology and math, but rather the data upon which he based his calculations. Specifically, GM contends (1) that the numbers that Dr. Ball relies on in Tables 1 and 2 (which form part of the basis for Tables 5 and 6) are over-inclusive because they include repairs that had nothing to do with the alleged Oil Consumption Defect, and (2) that the 27% rate that Dr. Ball used to deduce overall warranty claim rates for Tables 5 and 6 was improper for several reasons. MTE at 7.

With respect to the over-inclusive nature of the numbers in Tables 1 and 2, GM argues that "Dr. Ball incorrectly summarizes the GM warranty and vehicle sales data relevant to oil consumption in Class Vehicles in four tables."  MTE at 3.  Specifically, GM asserts that, because those tables include *all* piston replacements, rather than only those related to excessive oil consumption, the numbers in the tables are over-inclusive and therefore overstate warranty claims related to oil consumption.  *See id.*  GM provides an alternative table that it asserts contains the accurate warranty claim rates.  Pfromm Decl. ¶ 11.

**Plaintiffs' Table**

Table 2. Year-to-Year Piston Assembly Replacement Warranty Trends for Each Engine Type

| Engine | 2010 | 2011 | 2012 | 2013 | 2014 |
|--------|------|------|------|------|------|
| LC9 | 4.10% | 3.35% | 2.51% | 3.29% | 0.81% |
| LH9 | 0.33% | 0.26% | 0.08% | N/A | N/A |
| LMF | 0.03% | 0.02% | 0.01% | 0.04% | 0.13% |
| LMG | 0.20% | 0.14% | 0.12% | 0.20% | 0.65% |

**GM's Table**

Ball Supplemental Table 2 Adjusted to Include Only Customer Complaints of Oil Consumption:

| Engine | 2010 | 2011 | 2012 | 2013 | 2014 |
|--------|------|------|------|------|------|
| LC9 | 3.49% | 2.95% | 2.21% | 2.89% | 0.77% |
| LH9 | 0.26% | 0.24% | 0.08% | N/A | N/A |
| LMF | 0.02% | 0.01% | 0.01% | 0.04% | 0.11% |
| LMG | 0.18% | 0.14% | 0.12% | 0.19% | 0.62% |

In addition, GM contends that Dr. Ball drew improper inferences based on the data in Table 1 and an internal GM document entitled "GenIV V8 Oil Consumption field fix cost progression."  MTE at 4.  Those inferences led Dr. Ball to calculate an overall warranty claim rate for excessive oil consumption based on the data that GM had provided regarding claims for piston assembly replacement.  *Id.*  GM contends that the inferences were improper because:

(1) The internal document that contained the 27% rate referred to model-year 2007–2009 vehicles, which had a different design

and less-durable piston rings than the class vehicles.  MTE at 4.

(2) The class vehicles were built with AFM shields, which GM contends reduced oil consumption problems such that relying on a pre-AFM-shield claim rate would overstate oil consumption problems for the class vehicles.  *Id.*

(3) It was improper to extend the 27% rate across all model years and engine types.  *Id.*

The nature of GM's attack on the data upon which Dr. Ball relied illustrates that these are issues that go to impeachment and weight, not admissibility.  Dr. Ball has indicated the facts and data (provided to him by GM) upon which he relied to conduct his analysis; although GM disagrees with the data relied upon, it cannot be said that Dr. Ball's opinion is not based on facts or data; to the contrary, it is based on data provided to him by Defendant.  To the extent that GM argues that Dr. Ball relied on improper assumptions, that is a matter in dispute for the jury to assess.  As the court noted in *McCurley v. Royal Seas Cruises, Inc.*, 331 F.R.D. 142 (S.D. Cal. 2019): "The fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible."  331 F.R.D. at 159 (quoting *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013)); *see also id.* (quoting *Martin v. F.E. Moran, Inc.*, No. 13 C 03526, 2017 WL 1105388, at *6 (N.D. Ill. Mar. 24, 2017)) ("[t]here is no need to evaluate an expert's underlying data or factual assumptions so long as 'there is a basis in the record supporting the expert's factual assumptions.'"); *see also Alaska Rent-A-Car*, 738 F.3d at 969 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

Accordingly, the Court **DENIES** Defendant's Motion to Exclude the Testimony of Dr. Ball.

3.      Class Certification

As noted above, Plaintiffs initially sought to include all four Gen IV engine designs (the LC9, the LMG, the LH9, and the LMF) in the class definition, but they have now limited the proposed class definition to vehicles with LC9 engines with Active Fuel Management ("AFM").  *See* CC Reply at 7.  The LC9 engine was installed in the 2010-2014 Chevrolet Avalanche; 2010-2014 Chevrolet Silverado; 2010-2014 Chevrolet Suburban; 2010-2014 Chevrolet Tahoe; 2010-

2014 GMC Sierra; 2010-2014 GMC Yukon; and the 2010-2014 GMC Yukon XL.  *Id.* ¶ 2; *see also* CC Reply at 7.

Plaintiffs seek to certify the following bellwether classes:

> 1. **California Class.** All current and former owners or lessees of a Class Vehicle that was purchased or leased in the State of California. The California Class seeks class certification of claims for: (a) violation of the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*; (b) violation of the Song-Beverly Consumer Warranty Act for breach of implied warranty, Cal. Civ. Code § 1790 *et seq.*; (c) fraudulent omission; (d) unjust enrichment; and (e) violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*. Plaintiffs move for the appointment of Raul Siqueiros . . . as the class representative[] for the California Class.[19]

> 2. **New Jersey Class.** All current and former owners or lessees of a Class Vehicle that was purchased or leased in the State of New Jersey. The New Jersey Class seeks class certification of claims for: (a) violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 *et seq.*; (b) breach of implied warranty of merchantability; (c) fraudulent omission; (d) and unjust enrichment. Plaintiffs move for the appointment of John Knoll as the class representative for the New Jersey Class.

> 3. **North Carolina Class.** All current and former owners or lessees of a Class Vehicle that was purchased or leased in the State of North Carolina. The North Carolina Class seeks class certification of claims for: (a) violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq.*; (b) breach of implied warranty of merchantability; (c) fraudulent omission; (d) and unjust enrichment. Plaintiffs move for the appointment of William Davis, Jr. as the class representative for the North Carolina Class.

> 4. **Texas Class.** All current and former owners or lessees of a Class Vehicle that was purchased or leased in the State of Texas. The Texas Class seeks class certification of claims for: (a) violation of the Texas Deceptive Trade Practices – Consumer Protection Act, Tex. Bus. & Com. Code § 17.01 *et seq.*; (b) breach of implied warranty of merchantability; (c) fraudulent omission; (d) and unjust enrichment. Plaintiffs move for the appointment of Rudy Sanchez as the class representative for the Texas Class.

Notice of Motion for Class Certification ("Notice") at 1–2, Docket No. 175.[20]  The Court notes

---

[19] As noted above, the Cralleys no longer seek to serve as California class representatives.  *See* CC Reply at 1 n.2.

[20] GM lodged several evidentiary objections regarding evidence presented in Plaintiffs' Reply in Support of Class Certification.  *See* Docket No. 210.  Defendant contends that emails produced by a third-party were not authenticated and were hearsay, and that the Supplemental Report of Dr.

1    that summary judgment has been granted in favor of GM as to some of the above claims; in

2    addition, summary judgment has been granted in favor of GM as to all claims of the New Jersey

3    Plaintiff; accordingly, no New Jersey class remains.[21]

4            a.    Rule 23(a) Requirements

5                 i.    Numerosity

6            The requirement for numerosity is met where "the class is so numerous that joinder of all

7    members is impracticable." Fed. R. Civ. P. 23(a)(1).  Plaintiffs contend that "[s]preadsheets

8    produced by GM, and referenced in GM's response to Plaintiffs' Interrogatory No. 1, show that

9    GM sold thousands of Class Vehicles with the Gen IV. 5.3 LC9 engine in each of the relevant

10   states: California (49,326); New Jersey (17,398); Texas (58,703); and North Carolina (26,558).

11   GM sold a total of 997,681 LC9 Class Vehicles."  CC Reply at 17.

12           Because "courts have routinely found the numerosity requirement satisfied when the class

13   comprises 40 or more members," *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 606 (N.D. Cal.

14   2014), and tens of thousands of class vehicles are located in each of the accelerated states, the

15   numerosity requirement has been met.

16                ii.    Commonality

17           For Plaintiffs to maintain this class action, there must be "questions of law or fact common

18   to the class."  Fed. R. Civ. Proc. 23(a)(1).  In *Dukes*, the Supreme Court recognized that "[w]hat

19   matters to class certification . . . is not the raising of common 'questions' . . . but, rather the

20

21   _____

22   Ball is improper and unqualified expert opinion.  *See id.*  First, to the extent that the evidentiary
     challenges go to the merits of the underlying claims, they do not bear on the issue of class

23   certification.  *See Nguyen*, 932 F.3d at 821 (noting that inquiries into the merits of a case are
     merits "unrelated to class certification"); *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1123 (9th Cir.

24   2017) ("These discussions, however, encompass the merits of Plaintiffs' claim, which we decline
     to address as it is not relevant to determining whether Plaintiffs met the requirements for class

25   certification.").  Second, the Court has deemed Dr. Ball's report to be admissible, and GM's
     objection to it is therefore overruled.  Finally, with respect to the emails produced by a third party,

26   evidence submitted in support of class certification "need not be admissible evidence."  *Sali v.
     Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018), *cert. dismissed*, 139 S. Ct. 1651

27   (2019).  Thus, GM's objection to the emails produced is also overruled.

28   [21] Although no New Jersey class remains, where removing reference to the New Jersey Plaintiff
     would make the parties' arguments as to class certification less clear, the Court has left such
     references in place.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the

2    litigation."  564 U.S. at 350 (citation and internal quotation marks omitted).  "Dissimilarities

3    within the proposed class are what have the potential to impede the generation of common

4    answers."  *Id.*  Nonetheless, the Court also recognized that "even a single common question will

5    do."  *Id.* at 359 (internal bracket omitted).

6        In analogous cases, courts have often found commonality when claims involved problems

7    with one vehicle part or system, but not when multiple parts or numerous or unrelated systems are

8    implicated.  *See, e.g.*, *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 552 (C.D. Cal.

9    2012) (finding no commonality where "despite [Plaintiff's] efforts to identify a 'water

10   management system' in the class vehicles, the evidence that has been adduced shows that this so-

11   called 'system' is in fact an amalgamation of many different vehicle parts.  There is no evidence

12   that these disparate parts are conceptually part of a single system or physically connected to one

13   another in any material way"); *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172

14   (9th Cir. 2010) ("Appellants easily satisfy the commonality requirement.  The claims of all

15   prospective class members involve the same alleged defect, covered by the same warranty, and

16   found in vehicles of the same make and model."); *Butler v. Porsche Cars N. Am., Inc.*, No. 16-

17   CV-2042-LHK, 2017 WL 1398316, at *6 (N.D. Cal. Apr. 19, 2017) (quoting *Grodzitsky v. Am.

18   Honda Motor Co., Inc.*, 2014 WL 718431, at *5 (C.D. Cal. Feb. 19, 2014)) ("[C]ourts have found

19   class treatment inappropriate where 'the relevant components of a device differ' across class

20   members such that 'proof that one device is defective may not lend itself to establishing that

21   another device is defective.'").

22       Plaintiffs contend that class claims share common questions of fact and law because "all of

23   the Class Vehicles suffer from the same Oil Consumption Defect, caused by the same defective

24   piston rings."  Plaintiffs' Motion for Class Certification ("Mot.") at 8, Docket No. 175.  More

25   specifically, Plaintiffs assert that the Oil Consumption Defect is caused by three things: (1) "The

26   primary cause of excessive oil consumption in the Class Vehicles is that the piston rings GM

27   installed within the Gen IV 5.3-liter V8s wear down and do not maintain a sufficient seal to keep

28   oil in the crankcase."  *Id.* at 2.  (2) The engines utilized "a PCV system that vacuumed oil from the

United States District Court
Northern District of California

valvetrain into the intake system," Mot. at 5," where the oil was "recirculated into the combustion chambers and burned," Mot. at 2.  And (3) there was also a problem with "the Active Fuel Management ('AFM') system," Mot. at 5, such that the system would "spray[] oil directly at the piston skirts," which would "foul[] the defective piston rings, triggering oil migration past the rings," 5AC ¶ 9.  Although all three of these problems are discussed in the Motion for Class Certification, Plaintiffs identify the piston rings as the "primary cause" of the Oil Consumption Defect, Mot. at 2, and note that the allegedly defective "piston rings were installed across all GM engine plants for Gen IV 5.3-liter V8s," *id.*; *see also id.* at 8 ("all of the Class Vehicles suffer from the same oil consumption defect, caused by the same defective piston rings").  (Plaintiffs also note that "[a]ll GM pistons have three rings," *id.* at 2, and that "[t]he Gen IV 5.3-liter V8s in the Class Vehicles used piston rings coated with what GM referred to as '278' material," which led to excessive wear and tear, *id.* at 3.)  Plaintiffs further contend that, even where the AFM and PCV problems were remedied, Class Vehicles "continued to suffer from the oil consumption defect." *Id.* at 5.  GM raises several challenges to Plaintiffs' assertion of commonality; each is addressed in turn.

(a)    <u>Common Defect or Different Engines with Different Designs?</u>

GM's first contention with respect to challenging commonality is that individual issues will dominate because the class vehicles include different makes and models, as well as different engines and designs.  Opposition to Motion for Class Certification ("CC Opp.") at 15, Docket No. 190.  In Plaintiffs' Reply, they submit a narrowed definition of "Class Vehicle" that includes only vehicles with Gen IV 5.3 LC9 engines.  *See* CC Reply at 7.  Thus, GM's contention that four different engine designs are at issue is no longer relevant.  However, the "material design changes in production and service parts," namely the addition of the metal AFM shield and the redesigned rocker cover, CC Opp. at 16, are still relevant to commonality analysis.

At the core of Plaintiffs' arguments about commonality is the contention that all Class

Vehicles have the same piston rings[22] and "[t]he primary cause of excessive oil consumption in the Class Vehicles is that the piston rings GM installed within the Gen IV 5.3-liter V8s wear down and do not maintain a sufficient seal to keep oil in the crankcase."  Mot. at 2 (citing Ex. B, Halka Dep. at 83).  Chief among GM's objections to this contention is the fact that GM made two design changes to engines during the class period, which it contends drastically reduced warranty claims related to oil consumption.  As a result, GM argues that there is no common defect among vehicles that span the various design changes.  *See* CC Opp. at 16; *see also id.* at 17 (arguing that differences in the engines of Class Vehicles undermine the notion that the question "is there a defect?" is "capable of classwide resolution").

The first design change that GM made to Gen IV 5.3 LC9 engines was the addition of "a metal 'umbrella shield' to the AFM oil pressure relief valve in the crankcase" in late 2010.  *Id.* at 4.  GM asserts that "[w]ith the umbrella shield and '278 material piston rings, GM saw a 75% drop in warranty claims for oil consumption in the 2010 model year Gen IV engine compared to earlier years."  *Id.* at 5.  In addition to the implementation of the AFM shield, "on February 10, 2011, GM [also] added a redesigned rocker cover, which relocated certain inlets and drains to more effectively separate oil particles from gases pulled from the crankcase through the engine's positive crankcase ventilation system."  CC Opp. at 5 (the rocker cover is sometimes referred to as a "PCV cover").  Because these changes were implemented during the class period, CC Opp. at 4, some Class Vehicles were produced prior to one or both changes and some were produced after.  Thus, if the addition of the AFM shield and the rocker cover were effective, oil consumption problems across the class period could have had different causes or the various causes could have contributed to oil consumption to different degrees.

However, in arguing that the addition of the AFM shield and rocker cover drastically reduced oil consumption warranty claims, GM relies on information "from 2011 and 2012 interpreting 2010 warranty data, in order to suggest that these modifications had a meaningful impact on excessive oil consumption.  Of course, as of 2011 and 2012, warranty claim rates for

---

[22] As noted above, GM notes that "at the start of production of the 2010 model year, GM changed from '251 piston ring material to more durable '278 piston ring material."  CC Opp. at 4.

United States District Court
Northern District of California

2010 model year vehicles would necessarily be lower than for earlier model year vehicles because the 2010 model year vehicles had been in use for less time."  CC Reply at 1.  In addition, GM engineers testified at their depositions that the addition of the AFM shield and rocker cover improved oil consumption but did not fully "cure" the problem.  *See* Halka Depo. at 253; Lee Depo. at 147–49.  This information suggests that it is unlikely that the reduction in warranty claims for oil consumption was as large as GM contends, but also that the implementation of these changes was at least somewhat effective in reducing oil consumption problems.  Thus, the changes indicate that there may be some variation in the causes of excessive oil consumption across the class period (or at least variation in the degree to which the various factors contributed to the problem).

At the same time, Plaintiffs put forward meaningful evidence that a common piston ring defect persisted in afflicting class vehicles across the relevant time period:

- The issuance of Technical Service Bulletins continuing into 2014, well past the implementation of the AFM shield and rocker cover redesigns, that involve piston cleaning and piston replacement.  *See* Mot. at 5; *see also* Mot., Exh. R, Technical Service Bulletin – Nov. 26, 2014.

- Testimony by GM engineers that problems with oil consumption persisted beyond the implementation of the AFM shield and rocker cover redesigns.  *See* Halka Depo. at 170–71, 253; *see also* Lee Dep. at 147-49; *see also* Mot., Exh. O, Internal Emails; *see also* Toth Depo. at 167–68;

- "GM's warranty data contains records of customers who received dealership AFM shield installation but then subsequently returned to the dealership complaining of oil consumption problems."  Mot. at 5 (citing Pfromm Depo. at 29).

- Warranty records linking complaints of oil consumption to piston replacement.  Mot. at 4 (citing Pfromm Depo. at 12).

Taken together, this information further supports the argument that—even if the implementation of the AFM shield and the rocker cover reduced the incidence of oil consumption problems—the same piston ring problem contributed to the Oil Consumption Defect and persisted across the class period.

On the one hand, the persistence of oil consumption problems over time, coupled with

United States District Court
Northern District of California

1    information that suggests that piston ring replacement was a significant part of the solution to

2    those problems, indicates that there may be a classwide answer to the question of whether the

3    piston rings used by GM in the class vehicles were defective.  *See, e.g.*, *Wolin*, 617 F.3d at 1172

4    (finding commonality where "[t]he claims of all prospective class members involve the same

5    alleged defect").  On the other hand, "courts have found class treatment inappropriate where 'the

6    relevant components of a device differ' across class members such that 'proof that one device is

7    defective may not lend itself to establishing that another device is defective.'" *Butler*, 2017 WL

8    1398316, at *6 (quoting *Grodzitsky*, 2014 WL 718431, at *5); *see also Cholakyan*, 281 F.R.D. at

9    551 (explaining that to meet the commonality requirement, a claim "must be of such a nature that

10   it is capable of classwide resolution—which means that determination of its truth or falsity will

11   resolve an issue that is central to the validity of each one of the claims in one stroke" (internal

12   citations omitted)).

13        Here, the changes implemented by GM appear to introduce a sufficient variability in proof

14   such that the "relevant components of a device differ across class members." *Butler*, 2017 WL

15   1398316, at *6 (internal quotation marks and citations omitted).  Plaintiffs themselves anticipated

16   this problem, stating: "[S]hould the Court . . . find that these breakpoints [*i.e.* redesigns]

17   potentially affect the uniformity of the classes, certification is still appropriate for those vehicles

18   manufactured after the 2010 and 2011 breakpoints, for which there is ample evidence of continued

19   excessive oil consumption and no arguable differences amongst the Gen IV 5.3L LC9 engines."

20   CC Reply at 11.

21        For that reason, the Court **LIMITS** the class to vehicles that were manufactured after the

22   introduction of the redesigned rocker cover on February 10, 2011 (which thereby includes only

23   vehicles that were manufactured after the addition of the umbrella shield to the AFM oil pressure

24   relief valve in October 2010).[23]

25

26   _____

[23] Plaintiffs did not suggest the creation of subclasses, but merely stated that certification would be
27   appropriate for those vehicles manufactured after the breakpoints. CC Reply at 11; *see also id.* at
     11 n.16 (citing *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1139 (9th Cir. 2016) ("If necessary
28   . . . the district court may construe the class definition more narrowly, or otherwise conform its
     interpretation of the class definition with the prevailing theory of liability.")).

United States District Court
Northern District of California

United States District Court
Northern District of California

1

(b)      Is a Class-Wide Inference About GM's Knowledge Possible?

2

GM contends that because "GM made design changes during the Class Period," (namely

3

the addition of the AFM shield and the redesigned rocker cover), "GM's knowledge about oil

4

consumption changed during the Class Period."  CC Opp. at 19.  Because of that fact, GM argues

5

there is no class-wide inference possible regarding GM's knowledge of the alleged defect.

6

However, this Court has limited the class to vehicles that were manufactured after the two engine

7

redesigns; whether GM had knowledge is thus resolvable by a singular answer applicable to the

8

class.

9

(c)      Can Reliance Be Established on a Class-Wide Basis?

10

GM also asserts that "[a]ccelerated Plaintiffs have no common evidence to prove the

11

reliance required for monetary recovery under their fraud-based claims," and that it would be

12

improper for the Court to "presume reliance when there is evidence that materiality and reliance

13

would vary from consumer to consumer."  CC Opp. at 19.  The answer to that question informs

14

class certification of the consumer-protection claims for California and Texas (the Court having

15

granted Defendant's Motion for Summary Judgment as to the New Jersey and North Carolina

16

consumer-protection claim) and the North Carolina fraudulent omission claim (the Court having

17

granted Defendant's Motion for Summary Judgment as to the fraudulent omissions claims for the

18

other bellwether states).

19

Turning first to the California consumer-protection claims, reliance is presumed when an

20

omission is material.  *See Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 902 (N.D. Cal. 2015)

21

("reliance [in the Consumers Legal Remedies Act ("CLRA") context] can be established on a

22

class-wide basis by materiality"); *Herremans*, 2014 WL 5017843, at *18 ("Actual reliance [in the

23

UCL and CLRA contexts] is presumed (or at least inferred) if the omission is material.").  Where

24

an alleged defect poses an unreasonable safety risk, materiality may be inferred.  *See, e.g.*, *Daniel*

25

*v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) ("Alleged defects that create

26

'unreasonable safety risks' are considered material."); *In re Toyota Motor Corp. Hybrid Brake*

27

*Mktg., Sales, Practices & Prod. Liab. Litig.*, 890 F. Supp. 2d 1210, 1219 (C.D. Cal. 2011)

28

("Plaintiffs' allegations also establish that the omission was material to an ordinary consumer

United States District Court
Northern District of California

deciding to purchase a car since the undisclosed defect posed and poses a safety risk . . . .").  The

inquiry is an objective one.  *Daniel*, 806 F.3d at 1225.  Because the Court has concluded that the

Oil Consumption Defect could constitute a safety defect, it is possible that reliance could be

established on a classwide basis.

However, to establish reliance, Plaintiffs "must also show that they would have been aware

of the omitted information, had disclosure been made."  *Id.* at 1226.  There are various ways to

show that a plaintiff would have been aware of the disclosure, had one been made; examples

include the fact that a plaintiff viewed advertising materials and/or received information from a

sales representative.  *Id.*

To permit a classwide inference as to reliance where customers have viewed advertising,

"it is necessary for everyone in the class to have viewed the allegedly misleading advertising."

*Mazza*, 666 F.3d at 596.  However, regarding the facts of *Mazza*, the Ninth Circuit concluded

that—in contrast to a ubiquitous, "decades-long" advertising campaign that might permit such an

inference about classwide exposure—the "limited scope" of the defendant's three-year advertising

campaign did not give rise to a classwide presumption of reliance.  *Id.*; *see also MyFord Touch*,

2016 WL 7734558, at *21 ("Plaintiffs have not shown that this was an 'extensive and long-term

fraudulent advertising campaign,' sufficient to warrant an inference of reliance on the part of the

entire class.").  Because there is no evidence of a sufficiently ubiquitous, widespread advertising

campaign on the part of GM, whatever advertising GM did is not enough to furnish a classwide

inference of reliance.

Plaintiffs rely on *Daniel* for the proposition that, even where customers have not viewed

any advertising materials, where they have demonstrated that they "interacted with and received

information from sales representatives," that is sufficient evidence "to sustain a factual finding that

Plaintiffs would have been aware of the disclosure if it had been made" through authorized

dealerships.  *Daniel*, 806 F.3d at 1226.  However, the experiences of the named California

Plaintiffs suggest that individualized inquiry would be necessary to determine whether class

members spoke with sales representatives; Mr. Siqueiros testified that he spoke with sales

representatives at the dealership, who told him the vehicle was "pretty reliable."  Siqueiros Depo.

United States District Court
Northern District of California

at 64–65.  In contrast, Mr. Cralley testified that he could not remember asking the sales

representatives any questions, nor did he recall any statements that might have been made to him

at the dealership.  Cralley Depo. at 53.  Notably, Plaintiffs conclusorily assert, "It can be presumed

that all Class members received information regarding the vehicles at the point of sale."  Reply at

14.  But they allege no facts in support of this assertion.

Turning next to the North Carolina fraudulent omission claim, North Carolina courts have

made clear that fraudulent omission claims require a plaintiff to show that "reliance on the

omission was both reasonable and detrimental."  *Breeden*, 171 F.R.D. at 195.  In *MyFord Touch*,

this Court declined to certify the plaintiffs' claim for fraudulent concealment under North Carolina

law.  It explained the issue of reasonable reliance as follows:

> North Carolina courts require the plaintiff's reliance on the
> defendant's representations to be "reasonable."  The North Carolina
> Supreme Court has observed that "[j]ust where reliance ceases to be
> reasonable . . . is frequently very difficult to determine."  *Johnson v.
> Owens*, 263 N.C. 754, 758 (1965).  Relying on this principle, the
> Fourth Circuit has held class certification improper when plaintiffs
> state a fraud claim based on North Carolina law.  *See Broussard v.
> Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998).
> Because North Carolina courts hold that reliance is not reasonable
> when a plaintiff has conflicting information, "proof of reasonable
> reliance would depend upon a fact-intensive inquiry into what
> information each [plaintiff] actually had."  *Id.* at 341 (citing
> *Johnson*).  Even though the determination of whether reliance is
> "reasonable" is an objective inquiry, it cannot readily be determined
> on a classwide basis, where, as here, reasonable reliance turns on
> *e.g.*, exposure (or not) to misleading advertising and to media
> disclosing the problems/defects to the public—factors which vary
> amongst class members.  Certification would thus be inappropriate
> even if the Court presumed classwide exposure.

*MyFord Touch*, 2016 WL 7734558, at *23 n.22.  For the same reasons noted in *MyFord Touch*,

the Court finds that the North Carolina fraudulent omission claim is not suitable for class

resolution.

Finally, turning to the Texas consumer-protection claim, "Texas courts have been reluctant

to certify a class when proof of reliance is required as an element of a claim."  *Sw. Bell Tel. Co. v.

Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010); *see also Texas S. Rentals, Inc. v. Gomez*,

267 S.W.3d 228, 237 (Tex. App. 2008) (noting that "although the [Texas] supreme court in *Schein*

'did not entirely preclude class actions in which reliance was an issue, . . . it did make such cases a

near-impossibility,'" questioning "whether given the individualized nature of reliance, any class action could ever be certifiable under *Schein*," and noting that, as of 2008, "no court since *Schein* has ever found evidence of class-wide reliance"). Plaintiffs have pointed to no case showing that, under Texas law in this context, it may be appropriate to presume reliance on a classwide basis based on materiality.

Plaintiffs rely on *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919 (C.D. Cal. 2015), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), and *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 674 F. App'x 654 (9th Cir. 2017) for the proposition that the reliance requirement of a Texas DTPA claim "is susceptible to class-wide proof." Mot. at 16 (citing *In re ConAgra*, 90 F. Supp. 3d at 1016–17 ("the Texas Supreme Court has held that reliance and causation [in the context of a DTPA claim] can be proved on a classwide basis when appropriate"). However, *ConAgra* involved an affirmative misrepresentation, not an omission. Moreover, the facts of that case stand in contrast to the facts here. In *ConAgra*, plaintiffs demonstrated classwide materiality by submitting a report by the Consumer Reports National Research Center (which surveyed a nationally representative sample of consumers), the defendant's own market research and internal strategy documents, and other market surveys, all of which indicated that consumers generally considered the representation at issue to be material. Here, by contrast, no nationally representative survey (or any other survey) or marketing survey has been produced. The GM PowerPoint presentation shows that GM customers rated "Reliability/Durability" as the most important factor in their choice of vehicle, but does not demonstrate how consumers' perceptions of reliability/durability would have been influenced by information about the Oil Consumption Defect in particular. Thus, *ConAgra* does not establish that Plaintiffs' Texas DTPA claims are suitable for classwide proof in this context.

In addition, to the extent that Plaintiffs rely on *Brazil v. Dell Inc.*, 585 F. Supp. 2d 1158 (N.D. Cal. 2008) for the proposition that the Texas DTPA statute is "[l]ike other state consumer fraud statutes" and should be analyzed similarly to CLRA, the Court notes that it has already concluded that Plaintiffs' CLRA claims were unsuitable for certification. As noted above, because there is neither evidence of a sufficiently ubiquitous advertising campaign nor evidence that class

members had uniform interactions with sales representatives, Plaintiffs cannot show that "they would have been aware of the omitted information, had disclosure been made," as *Daniel* requires. 806 F.3d at 1226.  Thus, even if the Court were to overlook the reluctance of Texas courts to certify class claims where proof of reliance is required and instead treat the DTPA claim as if it were a CLRA claim under California law, the claim would run into the same problems that Plaintiffs' California consumer protections did.  Consequently, the Court declines to certify the Texas DTPA claim.

Accordingly, the Court will not certify Plaintiffs' consumer-protection claims.  For the reasons noted above, the California and Texas consumer-protection claims are not suitable for certification, nor is the North Carolina fraudulent omission claim.

(d)    Is an Individualized Inquiry Required on Merchantability (for Implied Warranty) Claims?

GM contends that "record evidence establishes significant variability across the Accelerated Plaintiffs for vehicle use and performance" and that this fact necessitates "an individualized inquiry into each class members' vehicle use and performance," which makes classwide resolution impossible.  Given the grant of summary judgment as to the claims of the New Jersey Plaintiffs, the Court looks only to whether a classwide determination regarding merchantability is possible for California, North Carolina, and Texas.

For breach of implied warranty claims in those states, Plaintiffs must allege that a vehicle is not fit for its ordinary purpose, and demonstrating the existence of a safety defect is sufficient to establish that a vehicle is not fit for its ordinary purpose.  *Brand*, 226 Cal. App. 4th at 1546 (internal quotation marks and citations omitted) ("[A] core test of merchantability is fitness for the ordinary purpose for which such goods are used.  Such fitness is shown if the product is in safe condition and substantially free of defects."); *Ford Motor Credit Co. LLC v. McBride*, *257 N.C. App. 590, 594* (2018) (finding that plaintiffs stated a claim for breach of implied warranty of merchantability where they alleged that the "vehicle failed to provide safe and reliable transportation"); *Adams*, 395 F. Supp. 3d at 854 (finding that Plaintiffs had stated a claim for breach of implied warranty under Texas law where evidence suggested the problem "pose[d] a

United States District Court
Northern District of California

80

significant safety hazard").  As discussed above, this Court has already concluded that there is

evidence upon which a reasonable jury could rely to conclude that the alleged Oil Consumption

Defect constitutes a safety defect.  *See* Section III.B.1.a.  Thus, Plaintiffs implied warranty claims

are amenable to classwide resolution and do not require individualized inquiry under California,

North Carolina, and Texas laws.  GM appears to concede as much, by negative implication,

noting: "With no classwide evidence of a safety defect in the Class Vehicles, an individualized

inquiry into each class members' vehicle use and performance is required."  CC Opp. at 20–21.

GM cites several cases in support of the contention that "continued use of a vehicle is

evidence that it is reasonably suited for ordinary use."  CC Opp. at 21.  However, all are

distinguishable.  In *Bussian*, the court noted that "Plaintiff makes no allegation that the allegedly

defective ball joints caused him to suffer mechanical problems, lose control of his vehicle, or have

an accident.  Plaintiff does not allege that his Durango was ever rendered inoperable."  411 F.

Supp. 2d at 623.  Those facts stand in contrast to the ones alleged here.  In *Lee*, the court

dismissed plaintiffs' implied warranty claims, noting that plaintiffs had not stopped using their

vehicles because of the alleged braking system defects; however, the court also found that

plaintiffs could not "truthfully allege" that their vehicles actually had the reported defect.  *See* 992

F. Supp. 2d at 980.  Finally, *Deere & Co.*, involved a farming tool which plaintiff admitted

"performed the ordinary function of planting seeds."  2005 WL 8157985, at *5.  No allegation of a

safety defect was made.

To the extent that GM contends that Plaintiffs must "provide evidence proving that use of

the product is 'substantially certain' to lead to failure," MSJ at 22 (citing *Keegan v. Am. Honda

Motor Co., Inc.*, 284 F.R.D. 504, 537 (C.D. Cal. 2012)), this contention does not make class

certification inappropriate.  Even in *Keegan*, the case cited by GM, the court concluded that the

plaintiffs' breach of implied warranty claim was susceptible to common proof because either

defendants would demonstrate that the defect *was not* substantially certain to lead to problems, or

plaintiffs would demonstrate that the defect *was* substantially certain to do so.  *Keegan*, 284

F.R.D. at 537; *see also Victorino*, 326 F.R.D. at 299 (quoting *Keegan*, 284 F.R.D. at 535–36)

("[T]he court cannot discern why, at the class certification stage, plaintiffs must adduce evidence

that a defect is substantially certain to arise in all class vehicles during the vehicles' useful life.  *A merits inquiry will resolve that question in one stroke*.") (emphasis added); *Salas v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 15-8629 FMO (EX), 2019 WL 1940619, at *10 (C.D. Cal. Mar. 27, 2019) ("While plaintiffs will need to prove that the HVAC Defect is substantially certain to result in the odors emanating from the HVAC system, the court is persuaded that this issue is susceptible to common classwide proof.").  This issue is driven by an answer that likely affects the whole class.

(e)     Is an Individualized Inquiry Required for Unjust Enrichment Claims?

Because the Court granted summary judgment for Defendant as to Plaintiffs' unjust enrichment claims, it need not address GM's arguments related to unjust enrichment here.

(f)     Is the Issue of Damages a Class-Wide Issue?

To be suitable for class certification, claims must allege damages that are "capable of measurement on a classwide basis."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013); *see also Vaccarino v. Midland Nat. Life Ins. Co.*, No. 2:11-CV-05858-CAS, 2014 WL 572365, at *12 (C.D. Cal. Feb. 3, 2014) ("*Comcast* requires that courts determine whether damages are susceptible of classwide measurement, not whether that measurement is precisely correct.").  In addition, "*Comcast* requires that plaintiffs be able to show that their damages stemmed from the defendant's actions that created the legal liability," *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817 (9th Cir. 2019) (internal quotation marks omitted) (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)), such that "any model supporting a plaintiff's damages case *must be consistent* with its liability case," *Nguyen*, 932 F.3d at 817 (internal quotation marks omitted) (quoting *Comcast*, 569 U.S. at 35).

Plaintiffs contend that current and former purchasers and lessees of Class Vehicles "were damaged in that they paid more for their Class Vehicles than they would have paid had they known about the defect that GM failed to disclose."  5AC ¶ 20.  They also contend that some class members "would not have purchased or leased their Class Vehicles at all," had they known about the alleged defect.  *Id.*  To remedy this harm, Plaintiffs have advanced a "cost of repair" damages

82

United States District Court
Northern District of California

model.  *See* Mot. at 21.  Plaintiffs value their alleged overpayment as being equal to the cost of replacing the defective piston rings in Class Vehicles.  *See id.*; *see also* Expert Report of Edward M. Stockton, M.S. ("Stockton Report") ¶ 28, Docket No. 207-11.  Plaintiffs rely on information produced by GM to conclude that average cost of piston replacement would be $2700.[24]  Stockton Report ¶ 36.  They note that "[o]n a class-wide basis, the proper aggregate damage amount is calculated at the vehicle level," but that it would also be possible "to allocate damages among multiple owners of a single vehicle" based on mileage.  *Id.* ¶¶ 39, 42.

In support of this model, Plaintiffs rely on the Ninth Circuit's recent decision in *Nguyen*.  In *Nguyen*, the plaintiff brought a putative class action against Nissan, alleging a design defect in the hydraulic clutch system of class vehicles.  932 F.3d at 813.  The plaintiff's damages theory was a "benefit-of-the-bargain" theory, which sought to recover the average cost of repairing the clutch for each class member.  *Id.* at 815–16.  The district court rejected plaintiff's damages theory on the grounds that it deemed the defective clutches to be completely valueless, despite the fact that the plaintiff seemed to have derived at least some value from the faulty clutch because the vehicle had been driven for approximately 26,629 miles before the problem emerged.  *Id.* at 816.  Accordingly, the district court concluded that the plaintiff's damages model was an incorrect measure of the benefit of the bargain, and it denied class certification.  *Id.*  The Ninth Circuit reversed.  It noted that "Plaintiff's theory is that the defect was inherent in each of the Class Vehicles at the time of purchase, regardless of when and if the defect manifested."  *Id.* at 819.  It concluded that the plaintiff's "benefit-of-the-bargain model of damages align[ed] with" his legal theory "that Nissan concealed the clutch system's defects from consumers, that the defect was material because it adversely affected the 'safety and reliability' of the Class Vehicles, and that he did not get what he bargained for—a transmission 'fit for [its] intended use.'"  *Id.* at 821.

Thus, the Ninth Circuit, in a factually analogous case, has approved of the damages model that Plaintiffs put forward here.  In addition, benefit-of-the-bargain theories, as the one asserted by Plaintiffs herein, are a classic measure of damages in both contract and tort contexts.  *See, e.g.,*

---

[24] However, Plaintiffs' expert also argues that the $2700 figure should be inflation-adjusted to reach an appropriate "current dollar remedy."  *See* Stockton Report ¶¶ 37–38.

Restatement (Second) of Torts § 549 (1977) ("the great majority of the American courts [have adopted] a broad general rule giving the plaintiff, in an action of deceit, the benefit of his bargain with the defendant"); Restatement (Second) of Contracts § 347 (1981) ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed.").  One obvious measure of such damages is the cost to repair the defective product.  *See, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 225–26 (S.D.N.Y. 2019), *motion to certify appeal granted, reconsideration denied,* No. 14-MC-2543 (JMF), 2019 WL 6827277 (S.D.N.Y. Dec. 12, 2019) ("the cost of repair is an appropriate measure of damages in product-defect cases").  *See also Falco v. Nissan N. Am. Inc.*, No. CV1300686DDPMANX, 2016 WL 1327474, at *12 (C.D. Cal. Apr. 5, 2016) ("By receiving restitution in the amount of average repairs, the class would be getting the benefit of their bargain because they would be put in the same position they would have been had the car not been sold with the defective timing chain system — it is the cost necessary to make the vehicles conform to the value Plaintiffs thought they were getting in the price tendered.").

Accordingly, the Court concludes that the issue of damages is a classwide issue.  However, it also clarifies two points.  First, to the extent that some owners may have already received piston replacements (or any other replacement that encompasses a piston replacement, *e.g.* an engine replacement), that variability can be accounted for in adjusting damages awarded to those individuals who received replacement pistons under warranty to prevent, *e.g.*, double recovery.  *See Sater v. Chrysler Grp. LLC*, No. EDCV14700VAPDTBX, 2016 WL 7377126, at *7 (C.D. Cal. Oct. 25, 2016) ("As Defendant has repaired Johnson's truck, Johnson is already in essentially the same position he would have been in had Defendant sold him a non-defective truck.  Permitting Johnson to retain benefit-of-the-bargain damages for the difference in value between a non-defective truck and the defective truck, even though Defendant has repaired his truck, would afford him . . . [a] double-recovery windfall.").

Second, the Court notes that Plaintiffs' damages theory is inconsistent with Plaintiffs'

overbroad assertion of the proposed class, which currently includes former owners or lessees.  *See* 5AC ¶ 20.  While prior owners or lessees may have been harmed by paying more for their vehicles than they would have had they been aware of the Oil Consumption Defect or by paying for repairs, current owners will only be made whole by receipt of the cost of repairing the defective pistons. As Plaintiffs note, "by repairing the defect, Plaintiffs will receive the benefit of their bargain and be restored to the position they would have occupied but for the defect."  Mot. at 22.  Were the value of piston replacement to be apportioned between prior and current owners, any current owners who bought their vehicles used would have to split the proposed monetary relief with previous owners, thereby receiving a remedy insufficient to cover the cost of repairing the defect. This would prohibit them from "be[ing] restored to the position they would have occupied but for the defect."  Mot. at 22.  On the other hand, requiring GM to pay a current owner of a used vehicle the full cost of repair in addition to paying some pro-rata benefit to prior owners would subject GM to multiple recovery.  Thus, the Court **LIMITS** the class to only current owners and lessees of Class Vehicles and notes that this is consistent with *Nguyen*, in which the proposed class included only current owners and/or lessees.  *See* Docket No. 63 at 17 in *Huu Nguyen v. Nissan N. Am., Inc.*, Case No 5:16-cv-05591-LHK (N.D. Cal., filed Sept. 30, 2016).

Taking all of the foregoing analysis together, having limited class vehicles to those produced after the incorporation of the metal AFM shield and the redesigned rocker cover and to current owners or lessees of the class vehicles, the issues are sufficiently susceptible to common answers to merit class certification.

### iii.    Typicality

Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23.  "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citing *Weinberger v. Thornton,* 114 F.R.D. 599, 603 (S.D. Cal. 1986)).  "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same

course of conduct.'" *Id.* (quoting *Schwartz v. Harp,* 108 F.R.D. 279, 282 (C.D. Cal. 1985)). "Under the 'permissive standards' of Rule 23(a)(3), the 'representative's claims are "typical" if they are reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Azar v. Blount Int'l, Inc.*, No. 3:16-CV-0483-SI, 2019 WL 7372658, at *5 (D. Or. Dec. 31, 2019) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

GM contends that the Accelerated Plaintiffs cannot be typical of the class because they own "vehicles manufactured at different stages of the GM's various design changes," because "no representative is a lessee or former owner," and because "each representative is subject to unique defenses." CC Opp. at 23–24.

However, the Court has limited the class to vehicles manufactured after the two engine redesigns, so GM's first objection is moot. The Court has also limited the class to current owners and lessees; thus GM's objection as to former owners is also moot. To the extent that GM contends that current owners cannot represent the interests of current lessees, GM's assertion that the owners' "claims, interests, and remedies are different from those of lessees," CC. Opp. at 24, is without support. No evidence suggests that the named Plaintiffs—as current owners—could not faithfully represent the interests of current lessees; their interests are parallel.

As to GM's third contention (that "each representative is subject to unique defenses," CC Opp. at 24), it is true that "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508. However, "[t]o be typical, a class member need not prove that he is immune from any possible defense, or that his claim will fail only if every other class member's claim also fails. Instead, he must establish that he is not subject to a defense that is "[a]typical of the defenses which may be raised against other members of the proposed class." *Cholakyan*, 281 F.R.D. at 556–57. Here, GM highlights the defenses of statutes of limitations and economic loss laws; however, these defenses are not likely to be unique to the class representatives. To the contrary, in a case where the alleged defect may or may not manifest over the course of several years, statute of limitations defenses may pertain to a substantial portion of the proposed class, and thus will not

be unique to the named plaintiffs. Likewise, as GM repeatedly argued in its Motion for Summary Judgment, it appears that many class members are likely to have experienced injuries that are only economic and resolution of issues relevant thereto will in all likelihood similarly affect large portions of the class.

The cases that GM cites are inapposite. *See Hanon*, 976 F.2d at 509 ("Because of Hanon's unique situation [including his extensive prior litigation experience], it is predictable that a major focus of the litigation will be on a defense unique to him. Thus, Hanon fails to satisfy the typicality requirement of Rule 23(a)."); *Lindblom v. Santander Consumer USA, Inc.*, No. 15-CV-0990-BAM, 2018 WL 573356, at *6 (E.D. Cal. Jan. 26, 2018) ("While Plaintiff is subject to a statute of limitations defense unique to her, no other class members face the same defense. The entire class—with the exception of Plaintiff—would therefore be able to proceed to the merits of their claims without the need to litigate any statute of limitations defense. The unique defense against her renders Plaintiff's claim atypical from that of the class."). Unlike the plaintiffs in *Hanon* and *Lindblom*, Plaintiffs here are not subject to any singular or unique defenses that would apply only to them.

The class representatives' claims are typical of those of the class; the interests of the representatives are sufficiently aligned with the interests of the class.

iv. <u>Adequacy</u>

Under Rule 23, class certification is only appropriate where "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23. "To determine whether the representation meets this standard, [courts] ask two questions: (1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citing *Hanlon,* 150 F.3d at 1020). GM contends that "Accelerated Plaintiffs are not adequate representatives because of multiple conflicts within the interests of their classes." CC Opp. at 24. In particular, GM alleges (1) conflicts between former and current owners, (2) differences in alleged injuries and potential remedies, and (3) the allegation that certain claims are time-barred. *Id.* at 24–25.

1    With respect to the first challenge, GM contends that former owners "do not benefit from

2    the 'cost of repair' remedy," and that conflicts exist regarding "who gets the remedy where former

3    owners sold their vehicles to current owners (both would be class members)." *Id.* at 24.  However,

4    because the Court has limited the class to only current owners, no "former owners" remain in the

5    class, and GM's arguments as to this issue are moot.

6    In addition, to the extent that GM's objections are grounded in contentions that certain

7    Plaintiffs' claims are time-barred, the Court denied Defendant's Motion for Summary Judgment

8    on the grounds of statute of limitations violations and those objections may still be raised at trial.

9    This is not a sufficient basis upon which to conclude that the representatives would be inadequate

10    advocates for the interests of the class.

11                      b.      Rule 23(b) Requirements

12    The Court may certify the class where it "finds that the questions of law or fact common to

13    class members predominate over any questions affecting only individual members, and that a class

14    action is superior to other available methods for fairly and efficiently adjudicating the

15    controversy." Fed. R. Civ. P. 23(b)(3).

16                              i.      Predominance

17    "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

18    cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S.

19    591, 623 (1997); *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 612

20    (N.D. Cal. 2015) ("proving predominance does not require plaintiffs to prove that every element

21    of a claim is subject to classwide proof: they need only show that common questions predominate

22    over questions affecting only individual class members").  Although related to the commonality

23    analysis that is part of Rule 23(a), "[i]n contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the

24    relationship between the common and individual issues.  'When common questions present a

25    significant aspect of the case and they can be resolved for all members of the class in a single

26    adjudication, there is clear justification for handling the dispute on a representative rather than on

27    an individual basis.'" *Hanlon*, 150 F.3d at 1022 (quoting 7A Charles Alan Wright, Arthur R.

28    Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE § 1778 (2d ed.1986)).  Courts have

United States District Court
Northern District of California

88

noted that the predominance factor is "far more demanding" than Rule 23(a)'s commonality requirement.  *See Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 268 (N.D. Cal. 2011) (quoting *Amchem*, 521 U.S. at 623–24, for the proposition that the "predominance criterion is 'far more demanding' than Rule 23(a)'s commonality requirement").

 In opposing class certification, GM combines its challenges to commonality and predominance.  It contends that the differences across vehicle engines, stemming from the different designs during the class period, mean that individual issues will predominate and prevent a classwide inference regarding GM's knowledge of the defect.  *Id.* at 15–19.  It further contends that individualized inquiry will be required as to reliance, implied warranty of merchantability claims, the unjust enrichment claims, and damages.  However, as discussed above, the Court has limited the class to post-breakpoint vehicles with the same engine design and concluded that a classwide inference regarding GM's knowledge (or not) of the defect is possible.  In addition, the Court has granted summary judgment for Defendants on the unjust enrichment claims.  Lastly, it has resolved GM's arguments as to reliance and fitness for ordinary purpose, as discussed above, and finds that the relevant classwide inquiries predominate over individualized factors with respect to the classes certified herein.  As to damages, the Court has already explained that Plaintiffs' damages theory makes the issue of damages amenable to resolution by classwide proof.  Any individualized inquiry into damages (where necessary) does not undermine the fact that common questions predominate.

 Courts have found predominance in cases involving similar facts as those at issue here. *See, e.g.*, *Wolin*, 617 F.3d at 1173 (finding predominance where Plaintiffs "assert that the defect exists in the alignment geometry, not in the tires, that [the defendant] failed to reveal material facts in violation of consumer protection laws, and that [the defendant] was unjustly enriched when it sold a defective vehicle" and noting that "[a]ll of these allegations are susceptible to proof by generalized evidence"); *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir. 2005) (affirming class certification where the district court "affirmatively found that a common nucleus of facts and potential legal remedies dominate this litigation, such as whether Ford was aware of alleged design defects and whether Ford had a duty to disclose its knowledge and failed to do so");

1   *see also MyFord Touch*, 2016 WL 7734558, at *29 (certifying similar claims brought under

2   California, North Carolina, and Texas state law, among others).

3          In this case, "common questions predominate over questions affecting only individual

4   class members." *In re Cathode Ray Tube*, 308 F.R.D. at 612.  This is not one of the cases in

5   which the "main issues . . . require the separate adjudication of each class member's individual

6   claim or defense," and therefore it cannot be said that "a Rule 23(b)(3) action would be

7   inappropriate." *Zinser*, 253 F.3d at 1189.

8                         ii.      Superiority

9          Generally, "Rule 23(b)(3)'s superiority test requires the court to determine whether

10  maintenance of this litigation as a class action is efficient and whether it is fair.  This analysis is

11  related to the commonality test.  Underlying both tests is a concern for judicial economy." *Wolin*,

12  617 F.3d at 1175–76.  Typically, "the factors relevant to assessing superiority include (A) the class

13  members' interests in individually controlling the prosecution or defense of separate actions; (B)

14  the extent and nature of any litigation concerning the controversy already begun by or against

15  class members; (C) the desirability or undesirability of concentrating the litigation of the claims in

16  the particular forum; and (D) the likely difficulties in managing a class action." *Id.* at 1175

17  (quoting Fed. R. Civ. P. 23(b)(3)(A–D)) (internal quotation marks omitted).

18         The parties present only cursory arguments as to whether and why class litigation is or is

19  not superior. *See* Mot. at 22–23; CC Opp. at 25; CC Reply at 20.  Plaintiffs focus on the

20  efficiencies presented by litigating many small claims in one lawsuit and the fact that individual

21  monetary recoveries in individual suits would be dwarfed by the cost of litigating each claim. *See*

22  *Wolin*, 617 F.3d at 1175 ("[w]here recovery on an individual basis would be dwarfed by the cost

23  of litigating on an individual basis, this factor weighs in favor of class certification.").  Where

24  "classwide litigation of common issues will reduce litigation costs and promote greater efficiency,

25  a class action may be superior to other methods of litigation." *Valentino v. Carter-Wallace, Inc.*,

26  97 F.3d 1227, 1234 (9th Cir. 1996).  For its part, GM has not identified any other lawsuits that

27  have been filed by any other class members, aside from the case at bar. *See* CC Reply at 20.

28         Although GM contends that the small individual recovery amounts could be eaten up by

United States District Court
Northern District of California

1  class procedural requirements, *see Gartin v. S & M NuTec LLC*, 245 F.R.D. 429, 442 (C.D. Cal.

2  2007) ("procedural requirements inherent in class litigation may outweigh the efficiency of a class

3  suit"), this Court, having concluded that common issues of fact and law predominate, finds GM's

4  arguments unavailing.  Class litigation would be a superior method of resolving class members'

5  claims.

6  iii.  <u>Conclusion as to Class Certification</u>

7  To summarize, the Court **GRANTS IN PART** class certification, subject to the following

8  modifications:

9  **Class vehicles** are 2011-2014 Chevrolet Avalanches; 2011-2014 Chevrolet Silverados;

10  2011-2014 Chevrolet Suburbans; 2011-2014 Chevrolet Tahoes; 2011-2014 GMC Sierras; 2011-

11  2014 GMC Yukons; and the 2011-2014 GMC Yukon XLs with LC9 engines (whether new or

12  used), and manufactured on or after February 10, 2011 (the date upon which the redesigned rocker

13  cover was incorporated into vehicle production).  Any vehicle that has already received adequate

14  piston replacement (*i.e.* piston replacement in which the new pistons were not merely new

15  versions of the same defective pistons) is excluded from the class.  The classes are defined as

16  follows:

17

18  1. **California Class.** All current owners or lessees of a Class Vehicle
that was purchased or leased in the State of California. The Court
19  certifies the claims of the California Class for: violation of the Song-
Beverly Consumer Warranty Act for breach of implied warranty,
20  Cal. Civ. Code § 1790 *et seq.* The Court appoints Raul Siqueiros as
the class representative for the California Class.

21  2. **North Carolina Class.** All current owners or lessees of a Class
Vehicle that was purchased or leased in the State of North Carolina.
22  The Court certifies the claims of the North Carolina Class for:
breach of implied warranty of merchantability. The Court appoints
23  William Davis, Jr. as the class representative for the North Carolina
Class.

24  3. **Texas Class.** All current owners or lessees of a Class Vehicle that
25  was purchased or leased in the State of Texas. The Court certifies
the claims of the Texas Class for: breach of implied warranty of
26  merchantability. The Court appoints Rudy Sanchez as the class
representative for the Texas Class.

27

28

United States District Court<br>Northern District of California

91

1

## IV.  CONCLUSION

For the forgoing reasons, the Court **GRANTS** in part and **DENIES** in part Defendant's

Motion for Partial Summary Judgment as follows:

**California**
- Count 2 – Consumer Legal Remedies Act – **DENY**
- Count 4 – Violation of the Song-Beverly Consumer Warranty Act for Breach of Implied Warranty – **DENY**
- Count 5 – Fraudulent Omission – **GRANT**
- Count 6 – Unjust Enrichment – **GRANT**
- Count 7 – Violation of the California Unfair Competition Law – **DENY**

**New Jersey**
- Count 74 – Violations of the New Jersey Consumer Fraud Act – **GRANT**
- Count 75 – Breach of Implied Warranty of Merchantability – **GRANT**
- Count 76 – Fraudulent Omission – **GRANT**
- Count 77 – Unjust Enrichment – **GRANT**

**North Carolina**
- Count 88 - Violations of the North Carolina Unfair and Deceptive Trade Practices Act – **DENY**
- Count 90 – Breach of Implied Warranty of Merchantability – **DENY**
- Count 91 – Fraudulent Omission – **DENY**
- Count 92 – Unjust Enrichment – **GRANT**

**Texas**
- Count 123 – Violation of Texas Deceptive Trade Practices – Consumer Protection Act – **DENY**
- Count 125 – Breach of Implied Warranty of Merchantability – **DENY**
- Count 126 – Fraudulent Omission – **GRANT**
- Count 127 – Unjust Enrichment – **GRANT**

**Nationwide**
- Count 1 – MMWA – **GRANT** as to New Jersey Plaintiffs, but **DENY** as to California, North Carolina, and Texas plaintiffs.

1      The Court **DENIES** Defendant's Motion to Exclude Expert Testimony.

2      The Court **GRANTS IN PART** Accelerated Plaintiffs' Motion for Class Certification.  As

3  noted above, certification is with the following terms: **Class vehicles** are 2011-2014 Chevrolet

4  Avalanches; 2011-2014 Chevrolet Silverados; 2011-2014 Chevrolet Suburbans; 2011-2014

5  Chevrolet Tahoes; 2011-2014 GMC Sierras; 2011-2014 GMC Yukons; and the 2011-2014 GMC

6  Yukon XLs with LC9 engines (whether purchased new or used) and manufactured on or after

7  February 10, 2011 (the date upon which the redesigned rocker cover was incorporated into vehicle

8  production).  Any vehicle that has already received adequate piston replacement (*i.e.* piston

9  replacement in which the new pistons were not merely new versions of the same defective pistons)

10  is excluded from the class.  The classes are defined as follows:

11          1. **California Class.** All current owners or lessees of a Class Vehicle
12          that was purchased or leased in the State of California. The Court
            certifies the claims of the California Class for violation of the Song-
13          Beverly Consumer Warranty Act for breach of implied warranty,
            Cal. Civ. Code § 1790 *et seq.* The Court appoints Raul Siqueiros as
14          the class representatives for the California Class.

15          2. **North Carolina Class.** All current owners or lessees of a Class
            Vehicle that was purchased or leased in the State of North Carolina.
16          The Court certifies the claims of the North Carolina Class for breach
            of implied warranty of merchantability. The Court appoints William
17          Davis, Jr. as the class representative for the North Carolina Class.

18          3. **Texas Class.** All current owners or lessees of a Class Vehicle that
            was purchased or leased in the State of Texas. The Court certifies
19          the claims of the Texas Class for breach of implied warranty of
            merchantability. The Court appoints Rudy Sanchez as the class
20          representative for the Texas Class.

21      This order disposes of Docket Nos. 175, 184, and 201.

22

23      **IT IS SO ORDERED**.

24

25  Dated: April 23, 2020

26

27  _____
    EDWARD M. CHEN
28  United States District Judge

United States District Court
Northern District of California