Jennie Lee Anderson (SBN 203586)
Lori E. Andrus (SBN 205816)
**ANDRUS ANDERSON LLP**
155 Montgomery Street, Suite 900
San Francisco, California 94104
Telephone: 415-986-1400
jennie@andrusanderson.com
lori@andrusanderson.com

Adam J. Levitt (*pro hac vice*)
**DICELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com

W. Daniel "Dee" Miles, III (*pro hac vice*)
**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
Telephone: 334-269-2343
Dee.Miles@beasleyallen.com

*Counsel for Plaintiffs and the Proposed Classes* (*additional counsel appear on signature page*)

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| RAUL SIQUEIROS, TODD AND JILL CRALLEY, LARRY GOODWIN, GABRIEL DEL VALLE, SCOTT SMITH, WILLIAM DAVIS, JR., JOHN GRAZIANO, JOSHUA BYRGE, RUDY SANCHEZ, and MANUEL FERNANDEZ, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GENERAL MOTORS LLC, <br><br> Defendant. | Case No.: 16-cv-07244-EMC <br><br> **PLAINTIFFS' OPPOSITION TO GENERAL MOTORS LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CLAIMS OF PHASE II PLAINTIFFS** <br><br> Judge: Hon. Edward J. Chen <br> Hearing Date: February 4, 2021 <br> Time of Hearing: 1:30 p.m. |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 1

I.     NON-ACCELERATED PLAINTIFFS' VEHICLES SUFFER FROM A DEFECTIVE DESIGN THAT CAUSES EXCESSIVE OIL CONSUMPTION. .................................. 1

II.    GM KNEW OF THE OIL CONSUMPTION DEFECT AS EARLY AS 2008 AND CONCEALED THE DEFECT FROM PURCHASERS. ............................................... 2

III.   GM'S MODIFICATIONS DID NOT REMEDY THE OIL CONSUMPTION DEFECT, AND GM WAS AWARE OF THAT FACT. ...................................................... 3

IV.   GM INTENTIONALLY AND ACTIVELY CONCEALED THE OIL CONSUMPTION DEFECT. ............................................................................................... 4

V.    THE OIL CONSUMPTION DEFECT DAMAGES CLASS VEHICLE ENGINES, AFFECTING OPERABILITY AND CREATING SAFETY RISKS. ........................... 4

VI.   PLAINTIFFS HAVE EXPERIENCED THE OIL CONSUMPTION DEFECT. ......................... 5

     A.    California: Plaintiff Fernandez ............................................................ 5

     B.    Arkansas: Plaintiff Goodwin ............................................................... 6

     C.    Idaho: Plaintiff Del Valle .................................................................... 6

     D.    Massachusetts: Scott Smith ................................................................. 7

     E.    Pennsylvania: John Graziano ............................................................. 7

     F.    Tennessee: Joshua Byrge ...................................................................... 7

LEGAL STANDARD ................................................................................................................ 8

ARGUMENT ............................................................................................................................. 8

I.     PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE ECONOMIC LOSS DOCTRINE. ............................................................................................................. 8

     A.    Pennsylvania ........................................................................................ 8

     B.    Tennessee ............................................................................................. 9

II.    PLAINTIFF GRAZIANO'S CLAIMS ARE NOT TIME BARRED. ....................................... 10

III.   PLAINTIFFS HAVE VIABLE UNJUST ENRICHMENT CLAIMS. ..................................... 10

     A.    Unjust Enrichment Claims Not Barred by the Existence of an Express Contract. ......... 10

     B.    GM's "adequate legal remedies" argument fails because it is actively opposing all of Phase II Plaintiffs' other claims. ................................................... 13

IV.   PLAINTIFFS HAVE VIABLE IMPLIED WARRANTY CLAIMS. ........................................ 13

     A.    GM breached its implied warranties of merchantability. ..................... 13

     1.    California ............................................................................................. 13

     2.    Idaho    ............................................................................................. 16

     3.    Massachusetts ..................................................................................... 16

4.     Pennsylvania..................................................................................... 17

5.     Tennessee ......................................................................................... 18

B.     Idaho and Tennessee Plaintiffs' implied warranty claims cannot be dismissed for lack of privity. ................................................................ 19

C.     Idaho and Pennsylvania Plaintiffs' implied warranty claims cannot be dismissed for lack of pre-suit notice. .............................................. 20

V.     PLAINTIFFS HAVE VIABLE MAGNUSON-MOSS WARRANTY ACT CLAIMS. ............ 22

VI.    PLAINTIFFS HAVE VIABLE FRAUD AND CONSUMER PROTECTION CLAIMS.......... 22

A.     Arkansas ........................................................................................... 22

B.     Idaho ................................................................................................. 23

C.     Massachusetts ................................................................................... 23

D.     Pennsylvania ..................................................................................... 24

E.     Tennessee .......................................................................................... 25

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

Cases

*QHG of Springdale, Inc. v. Archer*,
    373 S.W.3d 318 (Ark. Ct. App. 2009) ................................................................. 12

*Air Prods. & Chem., Inc. v. Eaton Metal Prod. Co.*,
    256 F. Supp. 2d 329 (E.D. Pa. 2003).................................................................... 9

*Am. W. Enter., Inc. v. CNH, LLC*,
    316 P.3d 662 (Idaho 2013)..................................................................................... 20

*Asghari v. Volkswagen Grp. of Am., Inc.*,
    42 F. Supp. 3d 1306 (C.D. Cal. 2013)................................................................. 15

*AutoZone, Inc. v. Glidden Co.*,
    737 F. Supp. 2d 936 (W.D. Tenn. 2010)............................................................ 18

*Avedisian v. Mercedes-Benz USA, LLC*,
    43 F. Supp. 3d 1071 (C.D. Cal. 2014).................................................................. 15

*Banh v. Am. Honda Motor Co., Inc.*,
    2020 WL 4390371 (C.D. Cal. July 28, 2020) .................................................... 21

*Bednarski v. Hideout Homes & Realty, Inc., a Div. of U.S. Homes & Props., Inc.*,
    709 F. Supp. 90 (M.D. Pa. 1988) ......................................................................... 21

*Blackstone Consulting, Inc. v. R&R Food Servs., L.L.C.*,
    2017 WL 6542754 (W.D. Okla. Dec. 21, 2017) ............................................... 13

*Blissard v. FCA US LLC*,
    2018 WL 6177295 (C.D. Cal. Nov. 9, 2018) ..................................................... 15

*Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*,
    417 F. Supp. 3d 531 (E.D. Pa. 2019)............................................................ 10, 11

*Boswell v. Zephyr Lines, Inc.*,
    606 N.E.2d 1336 (Mass. 1993)............................................................................. 12

*Botting v. Goldstein*,
    2015 WL 10324134 (S.D. Fla. Dec. 21, 2015) ................................................. 13

*Brand v. Hyundai Motor Am.*,
    173 Cal. Rptr. 3d 454 (Cal. Ct. App. 2014) ................................................ 14, 15

*Bridges v. United Savings Ass'n*,
  438 S.W.2d 303 (Ark. 1969) ................................................................................... 22

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
  137 S. Ct. 1773 (2017) ........................................................................................... 11

*Browder v. Pettigrew*,
  541 S.W.2d 402 (Tenn. 1976) ................................................................................. 18

*Cabebe v. Nissan of N. Am., Inc.*,
  2018 WL 5617732 (N.D. Cal. Oct. 26, 2018) ........................................................ 17

*Campbell v. Asbury Auto., Inc.*,
  381 S.W.3d 21 (Ark. 2011) ..................................................................................... 11

*Clayton v. Batesville Casket Co.*,
  No. 5:07CV214JMM, 2008 WL 1970312 (E.D. Ark. May 7, 2008) ...................... 22

*Coca-Cola Bottling Works v. Sullivan*,
  158 S.W.2d 721 (Tenn. 1942) ................................................................................. 20

*Coleman v. Wyeth Pharm., Inc.*,
  6 A.3d 502 (Pa. Super. Ct. 2010) ........................................................................... 10

*Cont'l Land Co. v. Inv. Props. Co.*,
  1999 WL 1129025 (Tenn. Ct. App. Dec. 10, 1999) ................................................ 25

*Crandall v. Seagate,*
  *Tech.,* 2011 WL 280990 (D. Idaho Jan. 25, 2011) ................................................. 16

*Dickerson v. Mountain View Equip. Co.*,
  710 P.2d 621 (Idaho Ct. App. 1985) ...................................................................... 16

*Dixon v. Nw. Mut.*,
  146 A.3d 780 (Pa. Super. Ct. 2016) ......................................................................... 9

*Egan v. Daikin N. Am., LLC*,
  2019 WL 438341 (D. Mass. Feb. 4, 2019) ............................................................. 17

*Exprezit Convenience Stores, LLC v. Transaction Tracking Techs., Inc.*,
  2007 WL 307237 (M.D. Tenn. Jan. 29, 2007) ......................................................... 9

*First Choice Armor & Equip., Inc. v. Toyobo Am., Inc.*,
  717 F. Supp. 2d 156 (D. Mass. 2010)...................................................................... 23

*Freeman Indus., LLC v. Eastman Chem. Co.*,
  172 S.W.3d 512 (Tenn. 2005) ........................................................................... 12, 13

*Full Circle, Inc. v. Schelling*,
  701 P.2d 254 (Idaho Ct. App.1985) ........................................................................ 21

*Gnagey Gas & Oil Co. v. Pa. Underground Storage Tank Indemnification Fund*,
  82 A.3d 485 (Pa. Commw. Ct. 2013) ....................................................................... 24

*Hansen-Rice, Inc. v. Celotex Corp.*,
  414 F. Supp. 2d 970 (D. Idaho 2006) ....................................................................... 16

*Hargrove v. Newsome*,
  470 S.W.2d 348 (Tenn. 1971) .................................................................................. 19

*Hill v. Winnebago Indus., Inc.*,
  2018 WL 5721947 (M.D. Tenn. Nov. 1, 2018) ......................................................... 18

*Hittle v. Scripto-Tokai Corp.*,
  166 F. Supp. 2d 142 (M.D. Pa. 2001) ....................................................................... 17

*Hornberger v. Gen. Motors Corp.*,
  929 F. Supp. 884 (E.D. Pa. 1996) ............................................................................ 17

*Hunt v. Perkins Mach. Co.*,
  226 N.E.2d 228 (Mass. 1967) .................................................................................. 17

*Hurley v. BMW of N. Am., LLC*,
  2020 WL 1624861 (E.D. Pa. Apr. 2, 2020) .............................................................. 18

*In re Chrysler-Dodge-Jeep Ecodiesel Marketing, Sales Practices, and Products Liability Litigation*,
  295 F. Supp. 3d 927 (N.D. Cal. 2018) ...................................................................... 23

*In re MyFord Touch Consumer Litig.*,
  46 F. Supp. 3d 936 (N.D. Cal. 2014) ........................................................................ 23

*In re MyFord Touch Consumer Litig.*,
  291 F. Supp. 3d 936 (N.D. Cal. 2018) ................................................................ 14, 15

*In re Rust-Oleum Restore Mktg., Sales Practices and Prods. Liab. Litig.*,
  155 F. Supp. 3d 772 (N.D. Ill. 2016) ........................................................................ 23

*In re Volkswagen Timing Chain Prod. Liab. Litig.*,
  No. 16-2765 (JLL), 2017 WL 1902160 (D.N.J. May 8, 2017) ................................. 22

*Isip v. Mercedes-Benz USA, LLC*,
  65 Cal. Rptr. 3d 695 (Cal. Ct. App. 2007) ............................................................... 14

*Jen–Rath Co. v. Kit Mfg. Co.*,
  48 P.3d 659 (Idaho 2002) ......................................................................................... 21

*JSB Industries, Inc. v. Nexus Payroll Services, Inc.*,
   463 F. Supp. 2d 103 (D. Mass. 2006) ................................................................. 24

*Kantor v. Hiko Energy, LLC*,
   100 F. Supp. 3d 421 (E.D. Pa. 2015) .................................................................. 9

*Keegan v. Am. Honda Motor Co., Inc.*,
   284 F.R.D. 504 (C.D. Cal. 2012) ....................................................................... 15

*Knight v. Springfield Hyundai*,
   81 A.3d 940 (Pa. Super. Ct. 2013) ................................................................ 8, 9

*Leach v. Wiles*,
   429 S.W.2d 823 (Tenn. Ct. App. 1968) .......................................................... 19, 20

*Lee v. Toyota Motor Sales, U.S.A., Inc.*,
   992 F. Supp. 2d 962 (C.D. Cal. 2014) ............................................................... 15

*Lonning v. Jim Walter Homes, Inc.*,
   725 S.W.2d 682 (Tenn. Ct. App. 1986) ............................................................. 25

*Lovelace v. Nationwide Mut. Ins. Co.*,
   2018 WL 3818911 (E.D. Pa. Aug. 10, 2018) .................................................... 9

*M. Leff Radio Parts, Inc. v. Mattel, Inc.*,
   706 F. Supp. 387 (W.D. Pa. 1988) .................................................................... 18

*Mannos v. Moss*,
   155 P.3d 1166 (Idaho 2007) ............................................................................. 13

*Martell v. General Motors, LLC*,
   2020 WL 5913182 (D. Or. Oct. 6, 2020) .......................................................... 11

*Meldco, Inc. v. Hollytex Carpet Mills, Inc.*,
   796 P.2d 142 (Idaho Ct. App. 1990) ............................................................. 16, 21

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. First Nat. Bank of Little Rock, Ark.*,
   774 F.2d 909 (8th Cir. 1985) ............................................................................ 22

*Milner v. Windward Petroleum, Inc.*,
   2007 WL 9706514 (W.D. Tenn. May 31, 2007) ............................................... 9

*Morgan v. Petroleum Prods. Equip. Co.*,
   92 A.3d 823 (Pa. Super. Ct. 2014) ................................................................... 10

*Mross v. Gen. Motors Co.*,
   No. 15-C-0435, 2016 WL 4497300 (E.D. Wis. Aug. 25, 2016) ........................ 23

*Odom v. Oliver*,
    310 S.W.3d 344 (Tenn. Ct. App. 2009) .................................................................................... 25

*Olney v. Beaman Bottling Co.*,
    418 S.W.2d 430 (Tenn.1967) ...................................................................................................... 20

*Patton v. McHone*,
    822 S.W.2d 608 (Tenn. Ct. App. 1991) .................................................................................... 18

*Peters v. Amoco Oil Co.*,
    57 F. Supp. 2d 1268 (M.D. Ala. 1999) .................................................................................... 23

*Petrus Family Tr. Dated May 1, 1991 v. Kirk*,
    415 P.3d 358 (Idaho 2018) ........................................................................................................ 20

*Precision Towers, Inc. v. Nat–Com, Inc.*,
    2002 WL 31247992 (Pa. Ct. Com. Pl. Sept. 23, 2002) .......................................................... 21

*Reser's Fine Foods, Inc. v. Walker Produce Co.*,
    2008 WL 1882671 (D. Idaho Apr. 24, 2008) .......................................................................... 21

*Rice Litig.*,
    No. 4:06-MD-1811 CDP, 2007 WL 3027580 n.2 (E.D. Mo. Oct. 15, 2007) ......................... 22

*Roe v. Ford Motor Co.*,
    2019 WL 3564589 (E.D. Mich. Aug. 6, 2019) ........................................................................ 17

*Ron Bouchard's Auto Store, Inc. v. Godfrey Tr.*,
    2005 Mass. App. Div. 125 (2005) ............................................................................................ 17

*Saia v. Bay State Gas Co.*,
    965 N.E.2d 224 (Mass. App. Ct. 2012) .................................................................................... 12

*Salas v. Toyota Motor Sales, U.S.A., Inc.*,
    2017 WL 11247885 (C.D. Cal. Sept. 29, 2017) ...................................................................... 14

*Santagate v. Tower*,
    833 N.E.2d 171 (Mass. Ct. App. 2005) .................................................................................... 13

*Smith v. Reinhart Ford*,
    68 Pa. D. & C.4th 432 (Com. Pl. 2004) ...................................................................................... 9

*Smith v. Renaut*,
    564 A.2d 188 (Pa. Super. Ct. 1989) ......................................................................................... 24

*Sosik v. Albin Marine, Inc.*,
    2003 WL 21500516 (Mass. Super. Ct. May 28, 2003) ............................................................ 17

*Soutner v. Covidien, LP*,
   2019 WL 3801438 (M.D. Pa. Aug. 13, 2019) ................................................................. 10

*Sullivan v. Panther Petroleum, LLC*,
   2020 WL 1550230 (W.D. Tenn. Mar. 31, 2020) ........................................................... 19

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
   809 F.2d 626 (9th Cir. 1987) ....................................................................................... 8

*Taylor v. Mid-Tenn Ford Truck Sales, Inc.*,
   1994 WL 700859 (Tenn. Ct. App. Dec. 16, 1994) ....................................................... 18

*Thomas v. Thomas*,
   249 P.3d 829 (Idaho 2011) ......................................................................................... 12

*Triangle Mining Co., Inc. v. Stauffer Chem. Co.*,
   753 F.2d 734 (9th Cir.1985) ....................................................................................... 12

*Trinity Indus., Inc. v. McKinnon Bridge Co., Inc.*,
   77 S.W.3d 159 (Tenn. Ct. App. 2001) ......................................................................... 9

*Truck & Trailer Sales, Inc. v. McCampbell*,
   580 S.W.2d 765 (Tenn. 1979) ................................................................................... 19

*Tusch Enter. v. Coffin*,
   740 P.2d 1022 (Idaho 1987) ....................................................................................... 20

*U.S. Welding, Inc. v. Battelle Energy All., LLC*,
   728 F. Supp. 2d 1110 (D. Idaho 2010) ....................................................................... 12

*Varner v. Peterson Farms*,
   371 F.3d 1011 (8th Cir. 2004) ................................................................................... 12

*Verbillis v. Dependable Appliance Co.*,
   689 P.2d 227 (Idaho Ct. App. 1984) ........................................................................... 16

*Wallis v. Ford Motor Co.*,
   208 S.W.3d 153 (Ark. 2005) ..................................................................................... 22

*Werwinski v. Ford Motor Co.*,
   286 F. 3d 661 (3rd Cir. 2002) ..................................................................................... 8

*White v. Volkswagen Grp. of Am., Inc.*,
   No. 11-CV-02243, 2013 WL 685298 (W.D. Ark. Feb. 25, 2013) ................................ 23

*Whitehaven Cmty. Baptist Church v. Holloway*,
   973 S.W.2d 592 (Tenn. 1998) ................................................................................... 13

*Wilson Area Sch. Dist. v. Skepton*,
   895 A.2d 1250 (Pa. 2006) ............................................................................................. 11

*Wolford v. Tankersley*,
   695 P.2d 1201 (Idaho 1984) ......................................................................................... 12

*Yates v. Clifford Motors, Inc.,*
   423 A.2d 1262 (Pa. Super. Ct. 1980) ........................................................................... 21

*Zwiercan v. Gen. Motors Corp.*,
   58 Pa. D. & C.4th 251 (Pa. Ct. Com. Pl. 2002).......................................................... 24, 25

<u>Statutes</u>

13 Pa. Stat. and Cons. Stat. Ann. § 2607(c)(1).................................................................... 21

Idaho Code Ann. § 28-2-607(3) .......................................................................................... 21

T.C.A. § 47-2-714 ............................................................................................................... 19

Tenn. Code Ann. § 29-34-104 ............................................................................................. 19

<u>Rules</u>

Fed. R. Civ. P. 56(a)............................................................................................................. 8

1

2

### INTRODUCTION

On April 23, 2020, the Court granted in part and denied in part GM's Motion for Partial Summary Judgement on the Claims of the Accelerated Plaintiffs. (*See generally* ECF No. 237). In doing so, the Court held that a reasonable jury could conclude the Oil Consumption Defect[1] is a safety defect that GM knew about, but actively and intentionally concealed from Plaintiffs. (*Id.* at 13-31.) Based on the same record, Phase II (or Non-Accelerated) Plaintiffs Larry Goodwin, Gabriel Del Valle, John Graziano, Joshua Byrge, Scott Smith, and Manuel Fernandez ask the Court to deny GM's Motion for Partial Summary Judgement on the Claims of Phase II Plaintiffs.

### STATEMENT OF FACTS[2]

### I.   NON-ACCELERATED PLAINTIFFS' VEHICLES SUFFER FROM A DEFECTIVE DESIGN THAT CAUSES EXCESSIVE OIL CONSUMPTION.

"Modern engines routinely have an engine life that extends to 175,000 miles or more before a 'ring job' may be necessary to replace the worn piston rings." (Ex. 3, Werner Dahm Report ¶ 58.) Indeed, GM engineers have admitted that piston rings are intended to last "well over 100,000 miles," (Ex 4, Halka Dep. at 26) and that GM never expects a customer to change piston rings for oil consumption. (Ex. 5, Ricchi Dep. at 100.)[3] Yet, in the GM 5.3Ls, GM saw rings wear out as fast as 30,000 miles. (Ex. 4, Halka Dep. at 25-27; Ex. 6, MAHLE-001867.) Piston ring wear causes oil consumption in two ways. First, oil migrates past the compromised piston rings from the crankcase below, burning in the combustion chamber during the combustion stroke. (Ex. 5, Ricchi Dep. at 11-12; Ex. 7, Cygan Dep. at 66-67; Ex. 8, GM-000128867.) Second, blowby combustion gas skirts around piston rings and blends with oil in the crankcase, creating an oil/combustion gas mist. (Ex. 4, Halka Dep. at 53-61, 65; Ex. 1, GM-000128725.)

---

[1] "Oil Consumption Defect" means excessive oil consumption associated with premature wear of the Generation IV 5.3-liter V8 Vortec engines' ("Gen IV 5.3L") piston rings. (*See, e.g.,* Ex. 1 GM-000128725; Ex. 2, GM-000578690 at 691.)

[2] To preserve room for their legal arguments, Plaintiffs provide an abridged statement of relevant facts, and incorporate by reference the Statement of Facts set forth in their previous summary judgment opposition brief (ECF No. 192) and the background facts set forth in the Court's earlier summary judgment ruling (ECF No. 237), as if fully set forth herein.

[3] Following the first round of class certification and summary judgement briefing, Dr. Jeffrey K. Ball passed away unexpectedly. Plaintiffs have since retained Dr. Werner Dahm to offer expert testimony on technical issues, and he served his report on November 6, 2020. (*See* Ex. 3.)

The oil mist is then vacuumed through the engine's PCV system into the intake manifold where it is recirculated into the combustion chamber and burned (Ex. 9, Lee Dep. at 27-31), causing additional oil consumption. (Ex. 4, Halka Dep. at 31-32; Ex. 10, Nguyen Dep. at 123-24.)

Gen IV 5.3L piston rings are coated with an anti-friction and anti-wear material. (Ex. 4, Halka Dep. at 124-126, 163-164.) Improving the ring coating enhances durability and reduces ring wear. (*Id*.) When GM first introduced the Gen IV 5.3L in model year 2007, it featured upper compression rings ("UCRs") coated with a '251 material. (Ex. 11, GM-000579376.) GM soon realized that the '251 rings were subject to premature wear, and from August 2008 forward, GM installed '278 UCR rings as field fix replacement rings in 2007-2009 Gen IV 5.3Ls presented for piston assembly replacement. (Ex. 12, GM's Response to Plaintiff's Second Set of Interrogatories No. 11.) For model year 2010-14 vehicles, GM used rings with the '278 material. (Ex. 11, GM-000579376.) The switch to the '278 material, however, did not solve the problem of excessive ring wear and oil consumption, as stated by a GM engineer: "[w]e are still getting Gen IV LC9 engines returned due to poor oil consumption. They are very similar to the 2007 M.Y. issue – full face top ring at 30k to 50k miles…" (Ex. 6, MAHLE-001867.) Ultimately, GM began installing a more robust PVD coated ring during warranty replacements in late 2014. (Ex. 4, Halka Dep. at 155-159; Ex. 16, GM-000578690.) By switching to PVD coating, GM sought reduced ring wear. (Ex. 1, Halka Dep. at 173; Ex. 2, GM-000578690 at 691.)

## II.    GM KNEW OF THE OIL CONSUMPTION DEFECT AS EARLY AS 2008 AND CONCEALED THE DEFECT FROM PURCHASERS.

GM knew of Gen IV 5.3L's oil consumption problem in 2008. (Ex. 13, Tappen Dep. at 49.)[4] In May 2009, GM engineer Alan Miller recognized that the excessive oil consumption likely followed from a defect in the piston rings. (Ex. 14, GM-000127816.) On June 8, 2009, before it sold the first Gen IV 5.3L powered Class Vehicle, GM launched a "Red X" investigation to determine the root cause of the Gen IV 5.3L oil consumption defect. (Ex. 1, GM-000128725; Ex. 15, Pfromm Dep. at 13.) On January 8, 2010, the Red X team concluded "[o]il consumption clearly follows the piston/ring assembly." (Ex. 1

---

[4] Tappen testified, "[i]n the engines that we had investigated, we found that oil was getting past the piston rings and was causing the piston rings to get stuck, oil deposits in the piston ring, piston ring lands and on the pistons." (Ex. 13, Tappan Dep. at 50.)

GM-000128725). By tearing down Gen IV 5.3L engines that failed in the field, the Red X team confirmed its piston rings exhibited 100% full face wear. (Ex. 16, GM-000312645; Ex. 9, Lee Dep. at 80-81; Ex. 17, GM-000127816.) Most notably, GM's piston ring expert, Mr. Halka, observed the oil consumption was a result of UCR wear. (Ex. 4, Halka Dep. at 202-03.)

GM's warranty data reveals high volumes of piston assembly replacement and oil consumption complaints in 2007-2014 Gen IV 5.3L equipped vehicles. (*See generally* Ex. 18, Jeff Ball Supp. Report.) Indeed, GM engineer Steve Pfromm admitted that he became aware of excessive oil consumption from the warranty data no later than the "2009, early 2010 time frame." (*See* Ex. 15, Pfromm Dep. at 12.) Through in-warranty Gen IV 5.3L engine teardowns, GM confirmed that Class Vehicle '278 piston rings wore prematurely in the field, some as early as 30,000 miles, and allowed oil to migrate past the rings. (Ex. 4, Halka Dep. at 25-26; Ex. 13, Tappen Dep. at 27, 61; Ex. 1, GM-000128725.) The teardowns also revealed that oil consumption caused engine component failure. (Ex. 4, Halka Dep. at 78-80.)

Further, GM's knowledge of the Oil Consumption Defect is evidenced by its Technical Service Bulletins ("TSBs"). (Ex. 19, Toth Dep. at 87.) In August 2010, GM issued its first TSB (for 2007-2009 Gen IV 5.3L powered vehicles and Class Vehicles) for the Oil Consumption Defect where it directed dealerships to pefrom a piston cleaning procedure that GM knew was "ineffective." (Ex. 20, GM-000571921; Ex. 7, Cygan Dep at 119-122; Ex. 21, GM-000128851 at 857.)

### III.   GM'S MODIFICATIONS DID NOT REMEDY THE OIL CONSUMPTION DEFECT, AND GM WAS AWARE OF THAT FACT.

In an attempt to remedy the Oil Consumption Defect, GM shielded the active fuel management ("AFM") relief valve by directing oil spray downward into the sump in October 2010 and designed a new PCV cover in an attempt to better separate the oil/air mixture passing through the valve train and into the intake via engine vacuum in February 2011 ("breakpoints"). (Ex. 20, GM-000571921; Ex. 22, GM-000200212.) GM engineers Toth, Halka, and Lee acknowledged that the engines continued to consume excessive amounts of oil post-breakpoints. (Ex. 19, Toth Dep. at 167-69; Ex. 4, Halka Dep. at 111-13; Ex. 9, Lee Dep. at 147-49; Ex. 23, GM-000118990.)

On October 10, 2012, GM engineer Pfromm wrote that GM continued to receive excessive oil consumption complaints "on vehicle[s] built after the improvements." (Ex. 24, GM-000576733.) In

October 2012, GM engineers "confirm[ed] the new [PCV] valve cover baffle does not completely kill the PCV pullover on the Gen IV engines" and that Class Vehicles still exhibited the Oil Consumption Defect. (Ex. 25, GM-000236672-682.) On October 11, 2013, Halka complained to Class Vehicle piston ring supplier MAHLE that GM was "still getting Gen IV LC9 engines returned due to poor oil consumption." (Ex. 6, MAHLE-001867.) On July 17, 2014, a GM engineer stated: "We would love to see a move for service rings. We continue to see alum[inum] blocks up through 2013 with oil consumption." (Ex. 2, GM-000578690.) On March 10, 2015, in response to the question, "[d]o you still need the below kits service put together for oil consumption?" Halka responded "[y]es, we should. Gen IV still has problems." (Ex. 26, GM-000579468.) GM's piston replacement warranty data also contains records of Class Vehicles purportedly "fixed," but later presented for Oil Consumption Defect repair. (Ex. 15, Pfromm Dep. at 29; *see generally* Ex. 18, Jeff Ball Supp. Report; Ex. 3, Werner Dahm Report.)[5]

## IV.   GM INTENTIONALLY AND ACTIVELY CONCEALED THE OIL CONSUMPTION DEFECT.

When GM engineer Halka was asked what GM did to investigate UCR wear causing oil consumption in post-breakpoint vehicles, he clearly stated: "Nothing that I know of. . . . I'll just leave it at that. . . ." (Ex. 4, Halka Dep. at 114-15.) Although GM knew that ring wear was causing excessive oil consumption, (Ex. 2, GM-000578690), GM required dealers perform the ineffective piston cleaning and breakpoint modifications. (*See, e.g.,* Ex. 28, GM-000579841; Ex. 29, GM-000575234.)

## V.   THE OIL CONSUMPTION DEFECT DAMAGES CLASS VEHICLE ENGINES, AFFECTING OPERABILITY AND CREATING SAFETY RISKS.

"Engine oil must be supplied to the critical surfaces at sufficient volume and pressure to provide lubrication between metal surfaces and prevent premature wear." (Ex. 30, Jeff Ball Report at 6; Ex. 4, Halka Dep. at 35-36; *see generally* Ex. 3, Werner Dahm Report.) When oil levels are low, metal components come into contact with each other, which can result in engine seizure and engine component

---

[5] Despite no material decrease in piston assembly warranty replacements post-breakpoints, the true warranty claim rate relating to the Oil Consumption Defect is unknown, as the produced warranty data is "missing a large portion of warranty claims for things like camshaft and lifter replacement, engine replacement, crankshaft, main bearing fixes," which are engine components that are typical casualties of low oil level operation. (Ex. 27, Jeff Ball Dep. at 30, 40-42; Ex. 18, Jeff Ball Supp. Report; Ex. 3, Werner Dahm Report ¶¶ 141-146.)

damage. (Ex. 4, Halka Dep. at 67, 69, 74; Ex. 13, Tappen Dep. at 41, 48.) Inadequate lubrication and subsequent component failure can cause power loss and abnormal engine noise, shaking, vibration, and, ultimately, engine shutdown (as experienced by Plaintiff Davis's family, whose 2012 Silverado stranded the family after shutting on the highway from the Oil Consumption Defect). (Ex. 30, Jeff Ball Report at 18; Ex. 1, Halka Dep. at 69-70; Ex. 31 Davis Dep. at 97-103; Ex. 3, Werner Dahm Report ¶¶ 77, 225.) Class Vehicles' negative responses to the Oil Consumption Defect force drivers off the road, placing vehicle occupants at elevated risks of accident and/or injury. (Ex. 30, Jeff Ball Report at 18; Ex. 27, Jeff Ball Dep, at 141; Ex. 3, Werner Dahm Report ¶¶ 216-227; Ex. 9, Lee Dep. at 38-40.)

GM noted that, since 2008, Gen IV 5.3Ls created "significantly higher" warranty claims of vehicles with spark plugs described as, "oil fouled, black-grey ash deposits which were caused by burning oil, cracked ceramic (typically caused by excessive oil in combustion chamber, but can be caused by other issues)." (Ex. 32, GM-000574555.) Oil fouled spark plugs reduce vehicle power and mobility by reducing engine torque. (Ex. 4, Halka Dep. at 75-79, 83-85; Ex. 3, Werner Dahm Report ¶¶ 173, 228.)

## VI.   PLAINTIFFS HAVE EXPERIENCED THE OIL CONSUMPTION DEFECT.

### A.   California: Plaintiff Fernandez

Plaintiff Fernandez purchased a new Gen IV 5.3L LC9 powered 2013 GMC sierra from Sturgeon and Beck, Inc. in Tulare, California on April 27, 2013. (Ex. 33, Fernandez Dep. at 26:10-22, 28:15-30:20, 26:23-27:16.) Plaintiff Fernandez maintains his vehicle on schedule, regularly checking his oil and changing it every 3,000 to 4,000 miles. (*Id*. at 50:18-57:14.) Plaintiff Fernandez first noticed unusual oil consumption in 2017 when his oil levels were down one quart of oil. (*Id*. at 60:7-61:6.) Plaintiff Fernandez reported the low oil levels to his dealership who told him it was typical for Gen IV 5.3L engines. (*Id*. at 38:18-24.) Because of the oil consumption, he frequently adds oil to his vehicle. (*Id*. at 60:18-24, 64:18-65:9.) In April 2020, Plaintiff discovered his vehicle to be over three quarts low on oil, when his vehicle behaved erratically, and required him to pull to the side of the road, nearly stranding him and his daughters. (*Id*. at 62:2-65:9.) Plaintiff Fernandez again reported his experience to a GM dealership, which also stated that his vehicle's behavior was typical for Gen IV 5.3L engines. (*Id*. at 65:10-20.) Plaintiff Fernandez does not believe his vehicle is reliable. (*Id*. at 65:4-9.)

**B.      Arkansas: Plaintiff Goodwin**

Plaintiff Goodwin purchased a new Gen IV 5.3L LC9 equipped 2011 Chevrolet Silverado from Landers Chevrolet in Benton, Arkansas on September 16, 2011. (Ex. 34, Goodwin Dep. at 17:5-8, 19:11-19, 22:19-24.) Plaintiff Goodwin maintains his vehicle on schedule, regularly checking and changing his oil. (*Id.* at 40-41, 73.) Plaintiff Goodwin first noticed oil consumption in 2014 at about 40,000 miles when he discovered the oil volume approximately two quarts low. (*Id.* at 44:11-20; 48:20-21). Plaintiff Goodwin reported his experience to his GM dealership, which told him that his vehicle's behavior was typical of Gen IV 5.3L engines and offered no corrective action. (*Id.* at 49:3-8.) Plaintiff Goodwin's Class Vehicle continues to excessively consume oil, requiring that he replace one-quarter to one and a half quarts of oil every three to four weeks. (*Id.* at 43-44; 45-46; 73.) Plaintiff Goodwin does not believe his vehicle is reliable. (*Id.* at 53-54, 70-71.)

**C.      Idaho: Plaintiff Del Valle**

Plaintiff Del Valle purchased a used Gen IV 5.3L LC9 equipped 2013 Chevrolet Avalanche from Peterson Chevrolet Buick Cadillac in Boise, Idaho in February 2016. (Ex. 35, Del Valle Dep. at 15:21-16:6, 17:14-17, 18:2-11.) Prior to purchase, Plaintiff Del Valle reviewed GM's website, read the window sticker, interacted with at least one sales representative, test drove his vehicle and GM never disclosed the Oil Consumption Defect. (*Id.* at 25:15-29:1, 33:14-34:3, 90:3-91:16.) Plaintiff Del Valle maintains his vehicle on schedule, regularly checking and changing his oil. (*Id.* at 42:20-45:8, 46:13-47:25, 47:24-49:23.) Plaintiff Del Valle's 2013 Chevrolet Avalanche excessively consumed oil from his purchase date in February 2016. (*Id.* at 28:2-25.) Plaintiff Del Valle's vehicle continues to excessively consume oil, requiring half a quart to one quart top-off between oil changes. (*Id.* at 28:4-12, 42:24-43:22, 47:24-49-23, 55:1-56:20.) Plaintiff Del Valle's Class Vehicle suffered fouled spark plugs due to the Oil Consumption Defect and suffers sporadic low oil pressure. (*Id.* at 53:16-54:6, 62:13-63:8, 85:17-90:2.) Plaintiff Del Valle reported his experiences to a GM dealership, which stated that his vehicle's behavior was typical of Gen IV 5.3L engines and offered no corrective action. (*Id.* at 44:1-14, 45:9-24.) Plaintiff Del Valle does not believe his vehicle is reliable. (*Id.* at 67:6-69:1.) Plaintiff Del Valle relied on GM to disclose the Oil Consumption Defect, but it never did. (*Id.* at 90:17-91:16.)

### D.   Massachusetts: Scott Smith

Plaintiff Smith owned a used Gen IC 5.3L LC9 equipped 2011 GMC Yukon which he purchased from Colonial GMC located in Watertown, Massachusetts on September 5, 2012. (Ex. 36, Smith Response to Interrogatory No. 1.) Plaintiff Smith maintained his vehicle on schedule, regularly checking and changing his oil. (Ex. 37, Smith Dep. at 41:3-9, 43:1-15.) Plaintiff Smith first noticed excessive oil consumption in the fall of 2015 when his check engine light illuminated and found the engine oil level to be low. (*Id*. at 43:24-44:14.) Plaintiff Smith's Yukon continued to consume oil between oil changes. (*Id*. at 45:19-46:7.) In January 2017, while driving to work, Plaintiff Smith's vehicle started vibrating and emitting valvetrain noise and the check engine light illuminated, requiring Plaintiff Smith to exit the flow of traffic and pull to the side of the road. (*Id*. 50:7-53:1.) Plaintiff Smith's GM dealership diagnosed engine failure due to loss of engine oil and recommended engine replacement. (*Id*.) Because of the engine failure, Plaintiff traded his vehicle in January 2017 for approximately $8,000 (though his loan balance was approximately $10,000 at time of trade). (*Id*. at 20:1-21:1, 29:10-20, 38:16-18.)

### E.   Pennsylvania: John Graziano

Plaintiff Graziano purchased a new Gen IV 5.3L LC9 equipped 2012 Chevrolet Silverado Reedman Toll Chevrolet in Philadelphia, Pennsylvania on December 31, 2011. (Ex. 38, Graziano Dep. at 15:7-15, 16:7-13.) Plaintiff Graziano maintains his vehicle on schedule, regularly checking and changing his oil. (*Id*. at 45:24-49:2, 57:2-59:7.) Plaintiff Graziano's 2012 Chevrolet Silverado excessively consumed oil as early as 2013 or 2014, when it suffered "sluggish" performance, at which point Plaintiff Graziano discovered the oil volume approximately one and a half to two quarts low. (*Id*. at 49:22-51:12; 55:3-56:7, 59:20-60:12). Plaintiff Graziano reported his experience to his GM dealership, which stated tht his vehicle's behavior was typical of Gen IV 5.3L engines and offered no corrective action. (*Id*. at 50:1-51:12. 59:20-60:12.) Plaintiff Graziano's Class Vehicle continues to excessively consume oil, requiring at least one quart of oil between oil changes. (*Id*. at 56:13-59:7). Plaintiff Graziano does not believe his vehicle is reliable. (*Id*. at 38:6-39:16, 69:8-71:8, 88:5-89:18.)

### F.   Tennessee: Joshua Byrge

Plaintiff Byrge purchased a used Gen IV 5.3L LC9 equipped 2012 Chevrolet Silverado from Rusty Wallace Honda in Knoxville, Tennessee in December 2016. (Ex. 39, Byrge Dep. at 12:23-16:14.)

1   Plaintiff Byrge maintains his vehicle on schedule, regularly checking and changing his oil. (*Id*. at 22:8-

2   24:6.) Plaintiff Byrge confirmed his 2012 Chevrolet Silverado excessively consumed oil as early as 2017

3   when a Castrol Oil technician found his oil volume approximately one-half to one quart low. (*Id*. at 25:19-

4   25:2). Plaintiff Byrge's Class Vehicle also suffers rough idle. (*Id*. at 38:3-5). Plaintiff Byrge reported his

5   experience to a GM dealer, which confirmed his vehicle's behavior was typical of Gen IV 5.3L engines

6   and offered no corrective action. (*Id*. at 26:9-27:7.) Plaintiff Byrge's Class Vehicle continues to

7   excessively consume oil, requiring that he replace one to one and half quarts every 2,000 miles. (*Id*. at

8   26:1-8; 37:21-38:1). Plaintiff Byrge does not believe his vehicle is reliable. (*Id*. at 27:23-29:16.)

## LEGAL STANDARD

10      Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any

11   material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the

12   summary judgment stage, all inferences are "drawn in the light most favorable to the nonmoving party."

13   *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

## ARGUMENT

### I.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE ECONOMIC LOSS DOCTRINE.[6]

#### A.   Pennsylvania

17      GM cites *Werwinski v. Ford Motor Co.*, 286 F. 3d 661, 671 (3rd Cir. 2002) for the proposition

18   that the economic loss doctrine applies to fraud and Pennsylvania Unfair Trade Practice and Consumer

19   Protection Law ("UTPCPL") claim. Lacking a case directly on point from the Supreme Court of

20   Pennsylvania, the Third Circuit predicted that the state's highest court would apply the economic loss

21   doctrine to fraud and UTPCPL claims. *Werwinski*, 286 F.3d at 680-81. But since *Werwinski*,

22   Pennsylvania's appellate courts have ruled otherwise. *See Knight v. Springfield Hyundai*, 81 A.3d 940,

23   951-52 (Pa. Super. Ct. 2013) ("[o]ur research reveals, however, that our Supreme Court has defined the

24   economic loss doctrine as providing 'no cause of action exists for **negligence** that results solely in

25   economic damages unaccompanied by physical injury or property damage.' . . . The claims at issue in

---

[6] Many courts have held that the economic loss doctrine does not bar fraudulent omission claims in California (ECF No. 237 at 41-42) (surveying cases and recognizing the same), but Plaintiffs concede the law of the case precludes Plaintiff Fernandez's fraudulent omission claim. (*Id.* at 43.)

this case are statutory claims brought pursuant to the UTPCPL, and do not sound in negligence. Therefore, the economic loss doctrine is inapplicable and does not operate as a bar to Knight's UTPCPL claims.") (emphasis original); *Dixon v. Nw. Mut.*, 146 A.3d 780, 790 (Pa. Super. Ct. 2016) (holding that economic loss doctrine does not apply to UTPCPL claims). The *Knight* decision prompted a Pennsylvania federal court to find that the "Pennsylvania courts . . . have held that the economic loss doctrine does not apply to UTPCPL claims." *Kantor v. Hiko Energy, LLC*, 100 F. Supp. 3d 421, 427, 429 (E.D. Pa. 2015).[7] Plaintiff's common law fraud claim is similarly not precluded by the economic loss doctrine. *See Smith v. Reinhart Ford*, 68 Pa. D. & C.4th 432, 437 (Com. Pl. 2004) (holding "plaintiff's fraud claim is not barred by the economic loss doctrine . . . ."); *see also Air Prods. & Chem., Inc. v. Eaton Metal Prod. Co.*, 256 F. Supp. 2d 329, 336-37 (E.D. Pa. 2003) (surveying Pennsylvania state court cases and holding the economic loss doctrine does not apply to intentional fraud claims). The Court should therefore decline to apply the economic loss doctrine to Plaintiff Graziano's UTPCPL and common law fraud claims.

### B.    Tennessee

In Tennessee, the economic loss doctrine does not apply to fraud claims based on one party's fraudulent behavior when entering into a contract. *Exprezit Convenience Stores, LLC v. Transaction Tracking Techs., Inc.*, 2007 WL 307237, at *10 (M.D. Tenn. Jan. 29, 2007). GM fails to cite a case to the contrary. Unlike in *Milner v. Windward Petroleum, Inc.*, 2007 WL 9706514, at *6-7 (W.D. Tenn. May 31, 2007), where the court held the economic loss doctrine applied because the alleged fraud related to the *performance* of the contract, Plaintiff alleges here that GM omitted material facts to *induce* the contract. (ECF No. 286 ¶¶ 565-572). In *Trinity Indus., Inc. v. McKinnon Bridge Co., Inc.*, 77 S.W.3d 159 (Tenn. Ct. App. 2001), also cited by GM, the court did not address whether the economic loss doctrine bars fraud claims, but rather held it barred plaintiff's negligence claim. The Court should therefore decline to apply the economic loss doctrine to Plaintiff Byrge's fraud claim.

---

[7] "Although this Court may not be bound by the pronouncement of the Pennsylvania Superior Court on an issue upon which the Pennsylvania Supreme Court has remained silent, the Court should not ignore that current state of the law." *Lovelace v. Nationwide Mut. Ins. Co.*, 2018 WL 3818911, at *3 (E.D. Pa. Aug. 10, 2018) (holding that *Knight* and *Dixon* constitute a clear change in the law and that "[t]he current state of the law does not bar Plaintiff's claims and Plaintiff should not be disadvantaged because he finds himself in federal court.").

## II.    PLAINTIFF GRAZIANO'S CLAIMS ARE NOT TIME BARRED.

In Pennsylvania, the discovery rule will toll the limtiation periods for all causes of action. *Morgan v. Petroleum Prods. Equip. Co.*, 92 A.3d 823, 828 (Pa. Super. Ct. 2014) (citation omitted). The limitations period is tolled "until the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct." *Coleman v. Wyeth Pharm., Inc.*, 6 A.3d 502, 510 (Pa. Super. Ct. 2010). When a Plaintiff knew or should have known about an injury is a question of fact for the jury. *Id.* Here, there is no evidence that Plaintiff Graziano knew he had been sold a defective vehicle, or that GM had committed fraud, outside of the applicable statutes of limitations. While Plaintiff Graziano did, indeed, notice excessive oil consumption shortly after putchase, when he promptly reported the issue to his dealer, the dealer told him it was normal and also *falsely* told him that there were no service bulletins for the issue. (Ex. 38, Graziano Dep. at 50-51). Mr. Graziano did not learn of his right to assert claims until approximately 2016, (*Id.* at 75:16-19), at which point he promptly joined this action as an original named plaintiff. (ECF No. 1.)

Further, in Pennsylvania, fraudulent concealment will toll the limitations period for implied warranty, fraud, and unjust enrichment claims.[8] It is already the law of the case that a reasonable juror could conclude that GM actively concealed the Oil Consumption Defect by directing its service centers to respond to complaints of excessive oil consumption by performing a piston cleaning remedy, which GM knew to be ineffective and which concealed the true nature and severity of the issue (ECF No. 237 at 27-30.) The Court further concluded that this active concealment supports Plaintiffs' reliance on fraudulent concealment tolling. (*Id.* at 32-36.) GM provides no justification to revisit these holdings.

## III.    PLAINTIFFS HAVE VIABLE UNJUST ENRICHMENT CLAIMS.

### A.    Unjust Enrichment Claims Not Barred by the Existence of an Express Contract.

GM argues that Phase II Plaintiffs' unjust enrichment claims are barred because its express limited warranty covers the Phase II Plaintiffs' vehicles. GM, however, successfully argued, earlier in this litigation, that its express limited warranty does not cover the Oil Consumption Defect at issue in this

---

[8] *See Soutner v. Covidien, LP*, 2019 WL 3801438, at *5 (M.D. Pa. Aug. 13, 2019) ("the doctrine of fraudulent concealment tolls the running of the limitations period."); *Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*, 417 F. Supp. 3d 531, 551 (E.D. Pa. 2019) (recognizing the implied warranty limitations period can be tolled by fraudulent concealment).

litigation. (*See* ECF No. 62, Order granting dismissal of express warranty claims at 15 ("[Plaintiffs']
allegations do not appear to fall within the terms of the warranty.").) Thus, as the Court put it in its earlier
summary judgment ruling, "the key issue is whether the express contract must cover the subject matter
of the unjust enrichment claim, or whether the mere existence of a contract defining the parties'
relationship and rights is sufficient to bar a claim of unjust enrichment." (ECF No. 237 at 48.) Citing
California and New Jersey district cases, the Court previously held that, under the laws of the
Accelerated Plaintiffs' respective states, the "mere existence of a contract that defines the parties' rights
bars a claim for unjust enrichment." (*Id.*) The Court noted that the Accelerated Plaintiffs had "not
presented persuasive authority to the contrary." (*Id.* at 49.) With the exception of California Plaintiff
Fernandez and Pennsylvania Plaintiff Graziano,[9] the Phase II Plaintiffs respectfully submit that the laws
of their respective states compel a different result.

*Martell v. General Motors, LLC*, 2020 WL 5913182, at *10 (D. Or. Oct. 6, 2020) is instructive.[10]
Judge Simon rejected the same argument that GM makes here, that its express limited warranty barred
the plaintiff's unjust enrichment claim arising from the Oil Consumption Defect. Analyzing Oregon state
law, Judge Simon stated that the unjust enrichment claim would only be barred by GM's express warranty
*if the warranty is found to apply to the Oil Consumption Defect*. *Id.* Judge Simon's opinion shows that
the success of GM's argument hinges on the law of the relevant states.

Under **Arkansas** law, "the mere existence of a contract between the parties does not automatically
foreclose a claim of unjust enrichment." *Campbell v. Asbury Auto., Inc.*, 381 S.W.3d 21, 37 (Ark. 2011).
"[W]hen an express contract does not fully address a subject, a court of equity may impose a remedy to
further the ends of justice." *Id.* In *Campbell*, the Supreme Court of Arkansas reversed summary
disposition of plaintiffs' unjust enrichment claim where "the circuit court based its grant of summary
judgment solely on the fact that a contract existed between the parties." *Id.* at 37-38. Likewise, in *QHG
of Springdale, Inc. v. Archer*, where the plaintiff had entered into an express contract with the defendant,

---

[9] Plaintiff Graziano concedes his unjust enrichment claim because GM's cited case, *Wilson Area Sch.
Dist. v. Skepton*, 895 A.2d 1250 (Pa. 2006), stands for essentially the same proposition that the Court
previously held to bar Accelerated Plaintiffs' unjust enrichment claims.

[10] Mr. Martell filed his Oregon case after GM successfully argued for his dismissal from this action under
*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773 (2017). (ECF No. 235.)

Plaintiffs' Opposition to GM's Motion for          11          Case No. 16-cv-07244-EMC
Partial Summary Judgment on Claims of
Phase II Plaintiffs

the Arkansas Court of Appeals reversed a directed verdict disposing of the plaintiff's unjust enrichment claim. 373 S.W.3d 318, 324–26 (Ark. Ct. App. 2009). In that case, the contract between the doctor plaintiff and hospital defendant addressed rotating call coverage, but did not "fully address" the matter, such that the plaintiff could recover in unjust enrichment for the extra call coverage provided by the doctor. *Id.*[11] Here, GM's limited warranty does not address design defects like the Oil Consumption Defect, and is thus no bar to Plaintiff Goodwin's unjust enrichment claim.

The Supreme Court of **Idaho** has stated that "[t]he existence of an express agreement does not in and of itself signify that an action for unjust enrichment cannot be brought." *Wolford v. Tankersley*, 695 P.2d 1201, 1203 (Idaho 1984). An unjust enrichment claim is barred only "where there is an express contract covering *the same subject matter*." *Thomas v. Thomas*, 249 P.3d 829, 836 (Idaho 2011) (emphasis added). "The reason for this rule presently is that the remedies for breach of an express contract, whether by law or by express agreement, afford adequate relief." *Id.* (quoting *Triangle Mining Co., Inc. v. Stauffer Chem. Co.*, 753 F.2d 734, 742 (9th Cir.1985)). Here, there is no express contract covering the same subject matter of Plaintiff Del Valle's unjust enrichment claim, and there is no remedy for breach of an express contract that might afford adequate relief.[12]

Likewise, under **Massachusetts** law, recovery in unjust enrichment is only barred when a "valid contract covers the *subject matter of a dispute*." *Boswell v. Zephyr Lines, Inc.*, 606 N.E.2d 1336, 1342 (Mass. 1993) (emphasis added). In *Saia v. Bay State Gas Co.*, 965 N.E.2d 224 (Mass. App. Ct. 2012), cited by GM, the water heater contract at issue clearly covered the "subject matter" of the unjust enrichment claim, and there was no argument to the contrary.

**Tennessee** law recognizes claims for unjust enrichment, *see Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005), and GM has failed to cite any case supporting its

---

[11] In *Varner v. Peterson Farms*, 371 F.3d 1011, 1015 (8th Cir. 2004), cited by GM, there was apparently no dispute that the express terms of the contract between plaintiffs and the defendant fully addressed the subject matter of the unjust enrichment claim.

[12] *U.S. Welding, Inc. v. Battelle Energy All., LLC*, 728 F. Supp. 2d 1110, 1116-17 (D. Idaho 2010), cited by GM, recognized that an express contract must cover the same "subject matter" as an unjust enrichment claim in order to bar that claim. In that case, where the plaintiff claimed unjust enrichment because they had filled cylinders with natural gas for the benefit of the defendant, the parties' entire relationship was based on a contract that addressed when the defendant had to pay the plaintiff for cylinders and natural gas. Here, GM's limited warranty of repair is entirely silent on the issue of design defects.

argument that the existence of an express contract that defines parties' rights with respect to *some* issues, can serve to bar an unjust enrichment claim directed to an issue on which the contract is completely silent. Certainly, *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592 (Tenn. 1998), cited by GM, does not stand for that proposition. In *Whitehaven*, the court affirmed the dismissal of an unjust enrichment claim because the defendants had provided ample consideration for certain property, and it was, therefore, "not unjust for the defendants . . . to retain [the] property." *Id.* at 596-97.

### B. GM's "adequate legal remedies" argument fails because it is actively opposing all of Phase II Plaintiffs' other claims.

GM's alternative argument, that the Phase II Plaintiffs' unjust enrichment claims should be dismissed because these Plaintiffs "have adequate legal remed[ies] in their consumer protection, fraudulent omission, and warranty claims," fails for the obvious reason that GM is actively seeking the dismissal of these claims.[13] None of the cases cited by GM support the absurd proposition, inherent in GM's argument, that a party must first litigate its fraud and warranty claims against a defendant, and only if it loses on those can the plaintiff then bring another case seeking unjust enrichment.[14]

## IV. PLAINTIFFS HAVE VIABLE IMPLIED WARRANTY CLAIMS.

### A. GM breached its implied warranties of merchantability.

#### 1. California

The Court previously denied GM's motion for summary judgment on California Plaintiffs Cralley's and former California plaintiff Siqueiros' implied warranty claims. (ECF No. 237 at 49-52.) The same result is warranted with respect to new California Plaintiff Fernandez, who asserts an identical

---

[13] *See Botting v. Goldstein*, 2015 WL 10324134, at *3 (S.D. Fla. Dec. 21, 2015) ("Therefore, until or unless an adequate remedy at law is proved, dismissal of Plaintiffs' [unjust enrichment] claim is premature."); *Blackstone Consulting, Inc. v. R&R Food Servs., L.L.C.*, 2017 WL 6542754, at *4 (W.D. Okla. Dec. 21, 2017) ("However, while it is true that an unjust enrichment claim is unavailable if a party has an adequate remedy at law, it is premature to conclude now that defendants' claims are necessarily precluded by the existence of its contract or other claims.").

[14] In *Freeman*, 172 S.W.3d at 525 (Tenn.), the defendants submitted affidavits showing that the plaintiff may have been able to recover for his loss from a third party but did not pursue those claims against the third party. There is nothing of the sort here. In *Mannos v. Moss*, 155 P.3d 1166 (Idaho 2007), the court affirmed dismissal of the plaintiff's unjust enrichment claim because it determined that the plaintiff had a viable fraud claim. In *Santagate v. Tower*, 833 N.E.2d 171, 176 (Mass. Ct. App. 2005), the court said nothing to suggest that an unjust enrichment claim should be dismissed while the viability of other legal remedies was still in question.

1  implied warranty claim arising from the exact same Oil Consumption Defect, and whose vehicle has

2  continually suffered from significantly excessive oil consumption. (SOF Section VI.A, *supra*.)

3  Under the Song-Beverly Consumer Warranty Act, an implied warranty of merchantability

4  guarantees that consumer goods are fit for the ordinary purposes for which they are used. *Isip v.*

5  *Mercedes-Benz USA, LLC*, 65 Cal. Rptr. 3d 695, 699 (Cal. Ct. App. 2007). A vehicle fails to satisfy the

6  implied warranty of merchantability if it is not "in safe condition and substantially free of defects." *Id.* at

7  700. Further, a vehicle fails to satisfy the implied warranty of merchantability if does not provide

8  "reliable" transportation. *Brand v. Hyundai Motor Am.*, 173 Cal. Rptr. 3d 454, 460 (Cal. Ct. App. 2014);

9  *see also In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 945–49 (N.D. Cal. 2018) (stating

10 that, in addition to safety issues, "[r]eliability, operability, and substantial freedom from defects related

11 thereto are independent grounds for demonstrating unmerchantability."). Whether a vehicle is unfit for

12 its ordinary purpose is a question for the trier of fact. *Id.*

13 The Oil Consumption Defect affects the drivability of the Class Vehicles. Even if oil levels are

14 carefully monitored, the Oil Consumption Defect leads to damaged and fouled spark plugs, and

15 correspondent loss of power and inability to properly accelerate. (*See* SOF Section V, *supra*.) Further, if

16 oil levels are not carefully maintained, the excessive oil consumption leads to a loss of lubricity in the

17 engine, which causes damage to engine components, and ultimately, engine failure. (*See* SOF Section V,

18 *supra*.) The Oil Consumption Defect, moreover, requires a costly fix. (*See* Ex. 30, Jeff Ball Report at 17-

19 18.) Specifically, it requires replacement of the piston assemblies, (Ex. 4, Halka Dep. at 171; Ex. 30, Jeff

20 Ball Report at 18), or in the case of California Plaintiff Cralley and Massachusetts Plaintiff Smith,

21 complete engine replacement. (Ex. 40, Cralley Dep. at 90-92.) In sum, the evidence shows that the Oil

22 Consumption Defect is a substantial defect that affects the reliability and operability of the Class

23 Vehicles, and thus renders them unfit for the ordinary purpose of providing reliable transportation.[15]

24 ─────────────────

25 [15] *See Isip*, 65 Cal. Rptr. 3d at 696 (affirming breach of implied warranty of merchantability where car emitted an offensive smell and the transmission hesitated); *MyFord Touch*, 291 F. Supp. at 945– (denying

26 summary judgment on implied warranty claim where intermittent and unexpected problems with "infotainment" system caused distractions and impaired reliability and operability of vehicle); *Salas v.*

27 *Toyota Motor Sales, U.S.A., Inc.*, 2017 WL 11247885, at *3–4 (C.D. Cal. Sept. 29, 2017) (denying summary judgment on implied warranty claim where offensive odor emitted from vehicle caused plaintiff

28

The Oil Consumption Defect, moreover, is a safety hazard. As stated, it causes a loss of power and inability to properly accelerate, and can further lead to unexpectant engine failure. (*See* SOF Section V, *supra*.) Indeed, the Oil Consumption Defect not only forced Plaintiff Fernandez to pull to side of the road when, three quarts low on oil, his vehicle began behaving erratically (Ex. 33, Fernandez Dep. at 62:2-65:9), it also: caused former Plaintiff Siqueiros to experience a sudden loss of power on the highway (Ex. 41, Siqueiros Dep. at 38-41), caused North Carolina Plaintiff Davis's wife and grandbaby to be stranded (Ex. 31, Davis Dep. at 97-103), and forced Plaintiff Smith to suddenly pull over (Ex. 37, Smith Dep. at 50:7-53:1.) A reasonable jury could conclude that the risks of being unable to accelerate out of the way of harm and of unexpectedly breaking down are sufficiently hazardous as to render the Class Vehicles unmerchantable.[16]

GM's cited cases fail to establish that, as a matter of law, its sale of Plaintiff Fernandez's vehicle with the Oil Consumption Defect did not breach the Song-Beverly implied warranty of merchantability. In *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504 (C.D. Cal. 2012), a class certification decision, the court recognized the viability of implied warranty claims in instances where a product had not yet malfunctioned, but were substantially certain to malfunction. Here, where Plaintiff Fernandez's vehicle has malfunctioned through consumption of excessive oil, *Keegan* is inapposite. In *Blissard v. FCA US LLC*, 2018 WL 6177295, at *7 (C.D. Cal. Nov. 9, 2018), the court dismissed implied warranty claims because the alleged problems with heating and cooling systems could be viewed as a mere "annoyance." There is no basis for concluding, as a matter of law, that the Oil Consumption Defect is a mere "annoyance." In *Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 980 (C.D. Cal. 2014), there was no evidence that the plaintiff's vehicle suffered from any defect, which is unequivocally not the case here. And, finally, *Avedisian v. Mercedes-Benz USA, LLC*, 43 F. Supp. 3d 1071, 1079 (C.D. Cal.

---

to have to drive with windows open); *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1338–39 (C.D. Cal. 2013) (stating that "[v]ehicles subject to engine failure cannot be said to be merchantable," and holding that allegations that excessive oil consumption could lead to engine failure sufficient to state an implied warranty claim).

[16] *See Brand*, 173 Cal. Rptr. 3d at 461 ("[A] reasonable jury could conclude that a vehicle sunroof that opens and closes *on its own* creates a substantial safety hazard."); *MyFord Touch*, 291 F. Supp. 3d at 948-49 (jury could reasonably conclude that distractions presented by defective "infotainment" system rendered vehicles so unsafe as to be unmerchantable).

2014), is easily distinguishable because it involved peeling chrome trim on interior car components, which "did not impact the operability of [the plaintiff's] vehicle."

### 2. Idaho

Whether a defendant "breached its implied warranty of merchantability [is] a question for the trier of fact." *Dickerson v. Mountain View Equip. Co.*, 710 P.2d 621, 626 (Idaho Ct. App. 1985). Under Idaho law, the issue of non-conformance to an implied warranty of merchantability "turns on the existence of a defect." *Id.*; *see also Verbillis v. Dependable Appliance Co.*, 689 P.2d 227, 229 (Idaho Ct. App. 1984) ("The question of nonconformity [with an implied warranty] turns upon the existence of a defect when the compressor was installed."). In particular, the Idaho implied warranty of merchantability protects against "latent defect[s]—that is a defect that lies dormant in the product until it manifests itself sometime after delivery." *Hansen-Rice, Inc. v. Celotex Corp.*, 414 F. Supp. 2d 970, 977-78 (D. Idaho 2006). And a product need not be rendered unusable for it not to conform to the implied warranty of merchantability. *See Meldco, Inc. v. Hollytex Carpet Mills, Inc.*, 796 P.2d 142, 145 (Idaho Ct. App. 1990) (affirming ruling that implied warranty of merchantability was breached when a motel carpet prematurely "uglied out.")

Here, the evidence shows that Plaintiff Del Valle's vehicle is defective. *See, e.g., Dickerson,* 710 P.2d at 726. The Court has already found that Plaintiffs "have presented sufficient evidence that the alleged Oil Consumption Defect is a safety defect within the context of implied warranty . . . claims." (ECF No. 237 at 24.) That Plaintiff Del Valle's vehicle, in particular, suffers from the Oil Consumption Defect is evident from the fact that it continuously consumes excessive amounts of oil, requiring half a quart to one quart top-off between oil changes, suffered fouled spark plugs, and suffers sporadic low oil pressure. (*See* SOF Section VI.C, *supra*.). Moreover, the evidence shows that the Oil Consumption Defect was present in the Class Vehicles at the time of sale.[17] (*See* SOF Sections I and III, *supra*.)

### 3. Massachusetts

"Recovery for breach of an implied warranty of merchantability in the sale of a vehicle requires proof that it was not fit for the ordinary purposes for which an automobile is generally used and that the

---

[17] *Crandall v. Seagate Tech.,* 2011 WL 280990, at *7 (D. Idaho Jan. 25, 2011), cited by GM, is distinguishable because the court in that case concluded that the evidence clearly showed the hard drives at issue "were not defective at the time of delivery."

defect existed at the time the vehicle was sold or leased." *Ron Bouchard's Auto Store, Inc. v. Godfrey Tr.*, 2005 Mass. App. Div. 125 (2005). Whether a product is merchantable is an issue to be decided by the trier of fact. *See Sosik v. Albin Marine, Inc*., 2003 WL 21500516, at *9 (Mass. Super. Ct. May 28, 2003). A vehicle need not be inoperable in order to be found unmerchantable. *See Hunt v. Perkins Mach. Co*., 226 N.E.2d 228, 232 (Mass. 1967) (holding that a jury could conclude that a boat that worked, but had an engine that emitted black smoke, was unmerchantable). Moreover, the mere fact that a plaintiff did not notice any problems with a product for years following purchase is not dispositive as to merchantability. *See Egan v. Daikin N. Am., LLC*, 2019 WL 438341, at *1-5 (D. Mass. Feb. 4, 2019) (denying defendant's motion for summary judgment on implied warranty claim where plaintiff began experiencing problems with allegedly defective HVAC coils seven years after purchase). Here, where Massachusetts Plaintiff Smith's vehicle regularly consumed excessive amounts of oil until its engine failed due to what his dealership diagnosed as a loss of oil (Ex 37, Smith Dep. at 45:19-46:7; 50:7-53:1), a jury could reasonably conclude that GM breached the implied warranty of merchantability.

### 4. Pennsylvania

Under Pennsylvania law, "[w]hether a product is merchantable is a question of fact for the jury." *Hittle v. Scripto-Tokai Corp.*, 166 F. Supp. 2d 142, 157 (M.D. Pa. 2001). In the automobile context, a vehicle may be unmerchantable when it is not "substantially free of defects." *Hornberger v. Gen. Motors Corp.*, 929 F. Supp. 884, 888 (E.D. Pa. 1996). In *Hornberger*, the court held that the plaintiff's allegation that the "car was defectively manufactured or substandard in its construction or performance, preclude[d] th[e] Court from granting GM's Motion for Summary Judgment." *Id.* Courts inside and outside of the Ninth Circuit have relied on *Hornberger* in rejecting defendants' arguments that vehicles were merchantable as a matter of Pennsylvania law.[18] Most significantly, the Eastern District of Pennsylvania recently cited *Hornberger* in holding that, under Pennsylvania law, vehicles that suffer from excessive

---

[18] *See Cabebe v. Nissan of N. Am., Inc.*, 2018 WL 5617732, at *10–11 (N.D. Cal. Oct. 26, 2018) (where defect was first noticed shortly after purchase, but car was still operated for tens of thousands of miles); *Roe v. Ford Motor Co.*, 2019 WL 3564589, at *12 (E.D. Mich. Aug. 6, 2019) ("Sure, cars are supposed to get people from A to B; but they, like other durable goods, are expected to work for a good while. . . . So when a car buyer drops $30,000 or so on a 2011 Ford Edge, it might be reasonable for her to expect it to run 75,000 miles (to pick a number) without needing a critical engine part.").

oil consumption that can lead to engine failure "cannot be said to be merchantable." *Hurley v. BMW of N. Am., LLC*, 2020 WL 1624861, at *6–7 (E.D. Pa. Apr. 2, 2020). Here, Plaintiff Graziano's vehicle has continuously consumed excessive oil and has suffered sluggish performance due to oil consumption induced spark plug fouling. (Ex. 38, Graziano Dep. at 49:22-51:12; 55:3-60:12). It cannot be concluded, as matter of law, that his vehicle was substantially free of defects.[19]

### 5. Tennessee

In Tennessee, whether a product is merchantable is a question for the trier of fact. *Hill v. Winnebago Indus., Inc.*, 2018 WL 5721947, at *4 (M.D. Tenn. Nov. 1, 2018). Goods are only "merchantable" when they are "fit for the ordinary purposes for which such goods are used." *Id.* Establishing that goods are not fit for their ordinary purposes "requires only proof, in a general sense and as understood by a layman, that something was wrong with the product." *AutoZone, Inc. v. Glidden Co.*, 737 F. Supp. 2d 936, 948–49 (W.D. Tenn. 2010) (quoting *Browder v. Pettigrew*, 541 S.W.2d 402, 406 (Tenn. 1976)). To be merchantable, a vehicle "must be in reasonably safe condition and substantially free of defects that could render it inoperable . . . and must perform up to the level reasonably expected of a car of the same age, mileage, and price." *Patton v. McHone*, 822 S.W.2d 608, 617 (Tenn. Ct. App. 1991).

Here, there is certainly evidence that "something [is] wrong" with Plaintiff Byrge's vehicle. *AutoZone*, 737 F. Supp. 2d at 949. He has experienced continual excessive oil consumption and associated engine problems. (Ex. 39, Byrge Dep. at 26:1-8; 37:21-38:5.) Further, as the Court has already ruled, there is evidence from which a trier of fact could conclude that the Oil Consumption Defect is a safety defect that could render Plaintiff Byrge's vehicle inoperable. *See Patton*, 822 at 617. And, what is more, the oil consumption experienced by Plaintiff's vehicle is not what is "reasonably expected of a car of the same age, mileage, and price." *Id.*[20]

---

[19] In GM's cited case, *M. Leff Radio Parts, Inc. v. Mattel, Inc.*, 706 F. Supp. 387, 395 (W.D. Pa. 1988), the plaintiff had "failed to demonstrate a genuine issue of fact that the goods were defective." Here, on the other hand, this court has already found that there is a genuine issue of fact as to whether the Class Vehicles are dangerously defective. (ECF No. 237 at 23.)

[20] In GM's cited case, *Taylor v. Mid-Tenn Ford Truck Sales, Inc.*, 1994 WL 700859, at *5 (Tenn. Ct. App. Dec. 16, 1994), the court affirmed a *jury verdict* because there was "no evidence that the truck was not merchantable" at the time of sale, and "all the proof demonstrate[d] that the truck was fit for the ordinary purposes for which trucks are used" at the time of sale.

**B.    Idaho and Tennessee Plaintiffs' implied warranty claims cannot be dismissed for lack of privity.**

**Tennessee** law does not require vertical privity for implied warranty claims like that asserted by Plaintiff Byrge. In *Sullivan v. Panther Petroleum, LLC*, 2020 WL 1550230 (W.D. Tenn. Mar. 31, 2020), the defendant manufacturer argued that the claim was barred by a lack of privity. *Id.* at *5. Addressing that argument, the court cited Tenn. Code Ann. § 29-34-104, holding that this "statute eliminates the requirement of vertical privity in lawsuits covered by the act." *Id.* Significantly, the court rejected the defendant's argument that the plaintiff's alleged damages, the purchase price of the defective lubricant, did not fit within the term "property damage," as used in Tenn. Code Ann. § 29-34-104. In doing so, the court relied on the Tennessee Supreme Court's holding that "statutory warranties are made to run with the product, at least in the range of its intended and reasonably anticipated use." *Id.* (quoting *Com. Truck & Trailer Sales, Inc. v. McCampbell*, 580 S.W.2d 765, 772–73 (Tenn. 1979)).

*McCampbell* is the last Tennessee Supreme Court case to address a privity requirement for warranty claims. The court stated that Tenn. Code Ann. § 29-34-104 was enacted "to eliminate the requirement of 'vertical' privity." 580 S.W.2d at 773, and, more specifically, to eliminate the privity requirements that had previously been erected by Tennessee courts with respect to implied warranty claims involving personal injury or damage to property other than the defective product itself. *Id.* at 772 (citing *Hargrove v. Newsome*, 470 S.W.2d 348 (Tenn. 1971) (implied warranty claim seeking damages from personal injury) and *Leach v. Wiles*, 429 S.W.2d 823 (Tenn. Ct. App. 1968) (implied warranty claim seeking damages for ponies that died from eating defective oats)). *There has never been, however, any Tennessee Supreme Court holding that a plaintiff seeking UCC benefit of the bargain damages[21], like Plaintiff Byrge, is barred by a vertical privity requirement.* Thus, this Court should take the Tennessee Supreme Court at its word when it said Tenn. Code Ann. § 29-34-104 "eliminat[ed] the requirement of 'vertical' privity" and that "warranties are made to run with the product, at least in the range of its intended and reasonably anticipated use." *McCampbell*, at 772-773.[22]

---

[21] *See* T.C.A. 47-2-714.

[22] In GM's cited case, *Americoach Tours, Inc. v. Detroit Diesel Corp.*, the court relied on pre-*McCampbell* Tennessee cases, which addressed a privity requirement in the context of claims alleging damage to other property or physical injuries. *Americoach Tours*, 2005 WL 2335369, at *6–7 (W.D.

1    Under Supreme Court of **Idaho** precedent, "privity of contract is required to recover economic

2    loss flowing from a breach of implied warranty '*unless the application of this rule would have the effect*

3    *of unfairly prejudicing the plaintiff.*'" *Petrus Family Tr. Dated May 1, 1991 v. Kirk*, 415 P.3d 358, 367

4    (Idaho 2018) (quoting *Am. W. Enter., Inc. v. CNH, LLC*, 316 P.3d 662, 666–68 (Idaho 2013)) (emphasis

5    added). *Tusch Enter. v. Coffin*, 740 P.2d 1022, 1034–36 (Idaho 1987), provides an example of what the

6    Supreme Court of Idaho considers "unfair prejudice." In *Tusch*, the court held that, despite the absence

7    of privity, "subsequent purchasers of residential dwellings, who suffer purely economic losses from latent

8    defects manifesting themselves within a reasonable time, may maintain an action against the builder (or

9    builder-developer, as the case may be,) of the dwelling based upon the implied warranty of habitability."

10   *Id.* at 1035-36. The court stated that "[a]ny other holding would lead to an absurd result." *Id.* at 1036.

11   The same reasoning that supported the *Tusch* court's conclusion that application of a privity bar would

12   unfairly prejudice the plaintiff applies to the facts here. Like the latent defect discussed in *Tusch*, the Oil

13   Consumption Defect was "not discoverable by a subsequent purchaser's [e.g. Plaintiff Del Valle]

14   reasonable inspection." *Id.* at 1035. Further, the Oil Consumption Defect is even more "catastrophic on

15   a subsequent owner as on an original buyer," *id.*, because, in this instance, it is the subsequent owner that

16   actually relies on the vehicle for transport, whereas the original buyer (i.e. the dealership) re-sells the

17   vehicle. Just as in *Tusch*, it would be "absurd" to deny Plaintiff Del Valle a remedy against GM "when it

18   was the conduct of [GM] which created the [Oil Consumption Defect] in the first place." *Id.* at 1036.

19          **C.    Idaho and Pennsylvania Plaintiffs' implied warranty claims cannot be dismissed for
               lack of pre-suit notice.**

20

21          In its motions to dismiss, GM argued that a failure to provide pre-suit notice required the dismissal

22   of nine plaintiffs' implied warranty claims. (ECF Nos. 47 and 70.) Notably, it did not then believe that

23   such an argument was warranted under Idaho and Pennsylvania law. The **Idaho** notice requirement,

24   Idaho Code Ann. § 28–2–607(3), is "neither burdensome nor difficult" and only requires "appropriate

25   _____

26   Tenn. Sept. 23, 2005) (citing *Leach*, 429 S.W.2d 823 and *Olney v. Beaman Bottling Co.,* 418 S.W.2d 430
     (Tenn.1967)). Both of these cases relied on *Coca-Cola Bottling Works v. Sullivan*, 158 S.W.2d 721, 723

27   (Tenn. 1942), which held that personal injury claims against a product manufacturer lie in an omission
     of duty or an act of negligence, as opposed to implied warranty. Simply put, the Tennessee cases cited

28   by *Americoach* do not hold that that there is a privity requirement when a plaintiff asserts a UCC benefit
     of the bargain claim.

1   notice." *Reser's Fine Foods, Inc. v. Walker Produce Co.*, 2008 WL 1882671, at *5–7 (D. Idaho Apr. 24,

2   2008) (quoting *Full Circle, Inc. v. Schelling,* 701 P.2d 254, 259 (Idaho Ct. App.1985)). Section 28–2–

3   607(3) does not require "any particular *form* of communication." *Meldco, Inc. v. Hollytex Carpet Mills,*

4   *Inc.,* 796 P.2d 142, 146 (Idaho Ct. App. 1990). "[T]he issue turns on whether notification was made

5   within a reasonable time and is a question of fact for the trial court." *Id.* What constitutes reasonable

6   notice is a "question of fact that 'depends on the nature, purpose, and circumstances of the notification.'"

7   *Reser's Fine Foods*, 2008 WL 1882671 at *5 (quoting *Jen–Rath Co. v. Kit Mfg. Co.,* 48 P.3d 659, 664

8   (Idaho 2002)).

9         Here, Idaho Plaintiff Del Valle notified GM of its breach of warranty through filing this suit. Prior

10  to that, former plaintiff Donald Ludington notified GM of its breach of warranty, with respect to Plaintiff

11  Del Valle and other owners of the Class Vehicles, through a notice letter dated October 27, 2016. (*See*

12  Declaration of H. Clay Barnett, III.) Prior to that, Plaintiff Del Valle brought his vehicle to a GM

13  dealership and raised the issue of excessive oil consumption. (Ex. 35, Del Valle Dep. 42:20-43:14.) The

14  Court should reject GM's pre-suit notice argument with respect to Idaho law for the same reasons it

15  previously rejected GM's arguments with respect to Georgia (notice through filing of lawsuit sufficient),

16  New York (same), Minnesota (classwide notice sufficient), and South Carolina (complaints to a

17  dealership regarding the oil consumption problem sufficient). (*See* ECF No. 99 at 48-50.)

18        **Pennsylvania** law provides that, for the purpose of 13 Pa. Stat. and Cons. Stat. Ann. § 2607(c)(1),

19  "the filing of a complaint is adequate notice." *Banh v. Am. Honda Motor Co., Inc.*, 2020 WL 4390371,

20  at *7 (C.D. Cal. July 28, 2020) (citing *Precision Towers, Inc. v. Nat–Com, Inc.*, 2002 WL 31247992, at

21  *5 (Pa. Ct. Com. Pl. Sept. 23, 2002)).[23] For this reason, Pennsylvania Plaintiff Graziano's implied

22  warranty claim cannot be dismissed on the basis of insufficient pre-suit notice. Moreover, GM has cited

23  no authority suggesting that the classwide notice provided by former Plaintiff Ludington does not suffice

24

25

26  [23] *See also Yates v. Clifford Motors, Inc.,* 423 A.2d 1262, 1270 (Pa. Super. Ct. 1980) (holding that, in a
    suit for damages resulting in the rescission of a contract for the purchase for a truck, the filing of the
    complaint was adequate notice that the truck was being rejected given the fact that Section 1–102(1) of

27  the UCC requires liberal construction of the Code's provisions); *Bednarski v. Hideout Homes & Realty,*
    *Inc., a Div. of U.S. Homes & Props., Inc.*, 709 F. Supp. 90, 94 (M.D. Pa. 1988) ("[T]he filing of a civil

28  complaint satisfies the requirement of providing breach of warranty notice under section 2607.")

as reasonable notice under Pennsylvania law, nor any authority suggesting that Mr. Graziano's complaints to a Chevrolet dealership about excessive oil consumption (Ex. 38, Graziano Dep. at 51-54) do not constitute such reasonable notice.

## V.     PLAINTIFFS HAVE VIABLE MAGNUSON-MOSS WARRANTY ACT CLAIMS.

Because the California, Pennsylvania, Idaho, Tennessee, and Massachusetts Plaintiffs each have viable state law warranty claims, summary judgment cannot be entered for GM on their MMWA claims.

## VI.    PLAINTIFFS HAVE VIABLE FRAUD AND CONSUMER PROTECTION CLAIMS.

### A.     Arkansas

The evidence that Arkansas Plaintiff's vehicle suffers from a safety defect is sufficient to satisfy the "actual injury" requirement of *Wallis v. Ford Motor Co.*, 208 S.W.3d 153, 161-62 (Ark. 2005). As the court in *Clayton v. Batesville Casket Co.*, No. 5:07CV214JMM, 2008 WL 1970312 (E.D. Ark. May 7, 2008) explained, "the [*Wallis*] court noted did not allege any personal injury or property damage caused by the design defect, *nor did he allege that the vehicle malfunctioned in any way*." *Id.* at *1 (emphasis added).[24] Here, Arkansas Plaintiff relies on the same evidence of unsafe excessive oil consumption that this Court has already held to be sufficient, *see Sloan*, 2020 WL 1955643, at *7-13, and thus he has suffered an actual injury under Arkansas law. *See Clayton*, 2008 WL 1970312, at *2 (holding that "Plaintiff has stated a malfunction and manifestation of defect" and sustaining ADTPA and fraud claims).

Moreover, GM's unique knowledge of a safety defect in Arkansas Plaintiff's vehicle gives rise to a duty to disclose under Arkansas law. "When a fact is peculiarly within the knowledge of one party and of such a nature that the other party is justified in assuming the *existence* of that fact, then there is a duty to disclose the fact." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. First Nat. Bank of Little Rock, Ark.*, 774 F.2d 909 (8th Cir. 1985) (citing *Bridges v. United Savings Ass'n*, 438 S.W.2d 303, 306 (Ark. 1969)).

---

[24] *See also In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-2765 (JLL), 2017 WL 1902160, at *25 (D.N.J. May 8, 2017) (sustaining Arkansas plaintiff's claims because they "sufficiently pled that the malfunction has already either manifested itself in their vehicles and/or that the vehicles have already malfunctioned"); *In re Genetically Modified Rice Litig.*, No. 4:06-MD-1811 CDP, 2007 WL 3027580, at *3 n.2 (E.D. Mo. Oct. 15, 2007) (applying Arkansas law) ("The [*Wallis*] plaintiffs had not alleged that they did not receive the automobiles they bargained for-as the vehicles had not malfunctioned in any way-and for that reason the court rejected the fraud claim.")

Thus, a duty to disclose arises where, as here, the defendant has exclusive knowledge of a defect, regardless of any special relationship between the parties. *See, e.g.*, *Mross v. Gen. Motors Co.*, No. 15-C-0435, 2016 WL 4497300, at *4 (E.D. Wis. Aug. 25, 2016) (holding that allegations of a safety defect give rise to a duty to disclose). GM's citation to *White v. Volkswagen Grp. of Am., Inc.*, No. 11-CV-02243, 2013 WL 685298 (W.D. Ark. Feb. 25, 2013) is inapposite because the defect at issue in that case did not implicate safety concerns, but merely resulted in excessive repair costs. *Id.* at *2.

## B.   Idaho

GM's challenge to Idaho Plaintiff's standing under the Idaho Consumer Protection Act has already been rejected by this Court. In *In re Chrysler-Dodge-Jeep Ecodiesel Marketing, Sales Practices, and Products Liability Litigation*, 295 F. Supp. 3d 927 (N.D. Cal. 2018), this Court held that there was no basis in Idaho law to dismiss an ICPA claim even if the plaintiff's contractual relationship was with the dealer rather than the defendant manufacturer. *Id.* at 1021-22. GM cites to no subsequent authority calling this Court's ruling into question.  Moreover, the oil consumption defect was also material to Del Valle's decision. Indeed, Mr. Del Valle testified that had GM disclosed the Oil Consumption Defect it would have affected the decision to purchase the vehicle and that, if he did still decide to purchase the vehicle he "definitely would have negotiated a better price." (Ex 35, Del Valle 91:5-16.)

## C.   Massachusetts

GM's argument regarding notice is foreclosed by this Court's ruling that GM received adequate notice from Massachusetts Plaintiff through the October 28, 2016 notice letter. *See Sloan*, 2017 WL 3283998, at *8. GM provides no reason to revisit this law of the case. Also, Massachusetts law recognizes a duty to disclose where the defendant has exclusive knowledge of a material defect. Thus, this Court has found a duty to disclose an automotive safety defect under these circumstances. *See In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 958-60 (N.D. Cal. 2014) (Chen, J.) (applying Massachusetts law).[25]

---

[25] Other authorities are in accord. *See, e.g.*, *In re Rust-Oleum Restore Mktg., Sales Practices and Prods. Liab. Litig.*, 155 F. Supp. 3d 772 (N.D. Ill. 2016) (under Massachusetts law "a duty to disclose may exist…where one party has knowledge of material facts to which the other party does not have access") (quoting *Peters v. Amoco Oil Co.*, 57 F. Supp. 2d 1268, 1282 (M.D. Ala. 1999)).*See also First Choice Armor & Equip., Inc. v. Toyobo Am., Inc.*, 717 F. Supp. 2d 156, 162 (D. Mass. 2010) (holding that

GM's sole citation to *JSB Industries, Inc. v. Nexus Payroll Services, Inc.*, 463 F. Supp. 2d 103, 107 (D. Mass. 2006) is unavailing since the defendant in that case was not the entity engaging in fraudulent activity and thus had no special knowledge of the kind that GM has of its defective products. *Id.* at 105.

### D.   Pennsylvania

GM fails to inform the Court that, for both common law fraud and UTPCPL claims, Pennsylvania courts recognize fraud by "intentional concealment calculated to deceive." *Smith v. Renaut*, 564 A.2d 188, 192 (Pa. Super. Ct. 1989) (common law fraud); *see also Zwiercan v. Gen. Motors Corp.*, 58 Pa. D. & C.4th 251 (Pa. Ct. Com. Pl. 2002) (UTPCPL). "To create a cause of action, concealment must have been intentional and effective—the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact. The affirmative suppression of the truth must have been with intent to deceive." *Gnagey Gas & Oil Co. v. Pa. Underground Storage Tank Indemnification Fund,* 82 A.3d 485, 502 (Pa. Commw. Ct. 2013). Here, the Court previously recognized the Plaintiffs' evidence showing that despite GM's knowledge, by February 2010, that the piston cleaning procedure it directed its dealerships to perform to address complaints of excessive oil consumption was ineffective, "it still directed servicers of GM vehicles to complete the procedure as part of the recommended response to oil consumption problems without addressing the root of the procedure." (ECF No. 237 at 28.) Accordingly, the Court held that "there is at least a genuine issue of material fact as to whether GM actively concealed information about the Oil Consumption Defect" as well as "fraudulent intent." (*Id.* at 30, 32.) Thus, with evidence of intentional affirmative concealment, the Court cannot grant summary judgment on Plaintiff Graziano's fraud-based claims.

Further, under Pennsylvania law, an automobile manufacturer has a duty of disclosure, for the purpose of fraud and UTPCPL claims, when a plaintiff is an "ordinary purchaser of an automobile, does not have access to the same information as the [d]efendant manufacturer . . . [and] is at the mercy of the [d]efendant to inform her of a known safety defect." *Zwiercan*, 58 Pa. D. & C.4th 251. Indeed, *Zwiercan* did not limit its language to safety defects, and stated that "a duty to speak exists, in the context of a

---

defendant's "position of 'superior knowledge' with respect to the plaintiff also triggered a duty to disclose information" about the defective product).

business transaction with an ordinary non-business consumer, when the seller has superior knowledge of a material fact that is unavailable to the consumer." *Id.* GM's argument that the Oil Consumption Defect must have already placed Plaintiff Graziano in a life-threatening situation for there to be a duty to disclose thus fails. GM had a duty to disclose the Oil Consumption Defect because Plaintiff Graziano was at GM's mercy to disclose this known safety defect. (*See* SOF Sections III and V, *supra*.)

### E.   Tennessee[26]

With respect to Plaintiff Byrge's fraudulent concealment claim, GM wrongly asserts that the "duty to disclose under Tennessee law is limited to fiduciary relationships." (Mot. at 24.) In fact, Tennessee courts recognize that "contracting parties have a duty to disclose material facts affecting the essence of a contract's subject matter." *Odom v. Oliver*, 310 S.W.3d 344, 349–51 (Tenn. Ct. App. 2009).[27] Here, because the Oil Consumption Defect affects the functionality, reliability, and safety of the Class Vehicles, GM had a duty to disclose the defect.

Further, even in the absence of a duty to disclose, Tennessee courts recognize a claim for actionable concealment when that concealment "constitutes a trick or contrivance." *Odom*, 310 S.W.3d at 349. "Concealment in this sense may consist in withholding information asked for, or in making use of some device to mislead, thus involving act and intention." *Cont'l Land Co. v. Inv. Props. Co.*, 1999 WL 1129025, at *5 (Tenn. Ct. App. Dec. 10, 1999). Here, GM intentionally made use of a "device to mislead" when it conveyed to customers complaining of excessive oil consumption that a simple piston cleaning was an effective remedy, when GM knew that was not true. (*See* ECF No. 237 at 30.)

### **CONCLUSION**

For the foregoing reasons, GM's Motion should be denied.

---

[26] GM argues that the Tennessee Consumer Protection Act ("TCPA") does not allow for class actions. Plaintiff Byrge has not sought class certification for his TCPA claim, and thus, this is not a disputed issue.

[27] *See also Lonning v. Jim Walter Homes, Inc.*, 725 S.W.2d 682, 685 (Tenn. Ct. App. 1986) (*"*A party to a contract has a duty to disclose to the other party any material fact affecting the essence of the subject matter of the contract, unless ordinary diligence would have revealed the undisclosed fact.").

Dated: December 30, 2020

/s/ Adam J. Levitt
Adam J. Levitt (*pro hac vice*)
John E. Tangren (*pro hac vice*)
Daniel R. Ferri (*pro hac vice*)
**DICELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
dferri@dicellolevitt.com

W. Daniel "Dee" Miles, III (*pro hac vice*)
H. Clay Barnett, III (*pro hac vice*)
J. Mitch Williams (*pro hac vice*)
**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
Telephone: 334-269-2343
Dee.Miles@Beasleyallen.com
Clay.Barnett@BeasleyAllen.com
Mitch.Williams@Beasleyallen.com

Jennie Lee Anderson (SBN 203586)
Lori E. Andrus (SBN 205816)
**ANDRUS ANDERSON LLP**
155 Montgomery Street, Suite 900
San Francisco, California 94104
Telephone: 415-986-1400
jennie@andrusanderson.com
lori@andrusanderson.com

Christopher L. Coffin (*pro hac vice*)
**PENDLEY, BAUDIN & COFFIN, L.L.P.**
1515 Poydras Street, Suite 1400
New Orleans, Louisiana 70112
Telephone: 504-355-0086
ccoffin@pbclawfirm.com

Anthony J. Garcia, Esq. (*pro hac vice*)
**AG LAW**
742 South Village Circle
Tampa, Florida 33606
Telephone: 813-259-9555
anthony@aglawinc.com

Timothy J. Becker (*pro hac vice*)
**JOHNSON BECKER, PLLC**
444 Cedar Street, Suite 1800
St. Paul, Minnesota 55101
Telephone: 612-436-1800
tbecker@johnsonbecker.com

Eric J. Haag (*pro hac vice*)
**ATTERBURY, KAMMER, & HAAG, S.C.**
8500 Greenway Boulevard, Suite 103
Middleton, Wisconsin 53562
Telephone: 608-821-4600
ehaag@wiscinjurylawyers.com

*Counsel for Plaintiffs and the Proposed Classes*

**ECF ATTESTATION**

Pursuant to Civil L.R. 5-1(i)(3), the filing attorney attests that concurrence regarding the filing of this document has been obtained from the signatory above.

Date: December 30, 2020                          */s/ Jennie Lee Anderson*
                                                 Jennie Lee Anderson

                                                 Jennie Lee Anderson (SBN 203586)
                                                 jennie@andrusanderson.com
                                                 Lori E. Andrus (SBN 205816)
                                                 lori@andrusanderson.com
                                                 ANDRUS ANDERSON LLP
                                                 155 Montgomery Street, Suite 900
                                                 San Francisco, CA 94104
                                                 Telephone: (415) 986-1400
                                                 Facsimile: (415) 986-1474

                                                 *Counsel for Plaintiffs and the Proposed Classes*