1

2

3

4                              UNITED STATES DISTRICT COURT

5                            NORTHERN DISTRICT OF CALIFORNIA

6

7    RAUL SIQUEIROS, et al.,                    Case No.  16-cv-07244-EMC

8                    Plaintiffs,

9            v.                                 **ORDER GRANTING IN PART AND
                                                DENYING IN PART DEFENDANT'S
10   GENERAL MOTORS LLC,                         MOTIONS FOR DECERTIFICATION**

11                  Defendant.                  Docket Nos. 325, 347

12

13

14          Plaintiffs allege that Defendant General Motors ("GM") knowingly manufactured and sold

15   a car engine with an inherent defect that caused excessive oil consumption and engine damage.

16   The alleged defect affected 2011 to 2014 model-year GM vehicles.  Plaintiffs assert claims under

17   various state consumer-protection and fraud statutes on behalf of a nationwide class as well as

18   various statewide classes.  Plaintiffs filed their class action complaint on December 19, 2016.  See

19   Docket No. 2 ("Compl.").  They have since amended their pleadings several times; the operative

20   complaint is the seventh amended complaint.  See Docket No. 286 ("7AC").

21          Before the Court are Defendant's motions (1) motion to decertify all classes for lack of

22   Article III standing under *Transunion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), Docket No. 347

23   ("*Transunion* Decertification Mot."); and (2) motion to decertify the North Carolina and Texas

24   classes, Docket No. 325 ("NC and TX Decertification Mot.").

25          For the following reasons, the Court (1) **DENIES** the motion to decertify for lack of

26   Article III standing, (2) **DENIES** the motion to decertify the North Carolina class, and (2)

27   **GRANTS** the motion to decertify the Texas class.

28

United States District Court
Northern District of California

# I.   **BACKGROUND**

A.   Factual Background

Plaintiffs allege that GM's Gen IV Vortec 5300 LC9 engine suffers from an "inherent" oil-consumption defect.  7AC ¶ 7.  The "primary cause" of the alleged defect is the piston rings installed by GM.  *Id.* ¶ 8.  These piston rings "do not maintain sufficient tension to keep oil in the crankcase," and the oil migration that occurs as a result allows oil to "burn[] or accumulate[] as carbon buildup on the combustion chamber's surfaces."  *Id.* ¶¶ 8–9.  Plaintiffs allege that the oil-consumption defect causes safety problems in three ways:  (1) oil consumption can lead to a lack of adequate lubrication in the engine and dropping oil pressure levels in vehicles, *see id.* ¶ 19; (2) the presence of excess oil in the combustion chamber can cause spark plug fouling, which can cause engine problems, *see id.*; and (3) when drivers experience these problems while driving, they may be forced to pull over and stop alongside a road or highway (or they may be stranded in such a location with an inoperable vehicle), which places them in danger, *see id.* ¶¶ 14, 120–21.

Initially, Plaintiffs sought to include all four Gen IV engine designs (the LC9, the LMG, the LH9, and the LMF) in the class definition, but in the reply in support of Plaintiffs' motion for class certification, Plaintiffs limited the proposed class definition to vehicles with LC9 engines with Active Fuel Management (AFM).  *See* Docket No. 207 ("Reply in Supp. of First Class Cert. Mot.") at 7.  The LC9 engine was installed in the 2010–2014 Chevrolet Avalanche; 2010–2014 Chevrolet Silverado; 2010–2014 Chevrolet Suburban; 2010–2014 Chevrolet Tahoe; 2010–2014 GMC Sierra; 2010–2014 GMC Yukon; and the 2010–2014 GMC Yukon XL (the "Class Vehicles").  7AC ¶ 2; *see also* Reply in Supp of First Class Cert. Mot. at 7.

B.   Current Procedural Posture

This order will not provide the lengthy procedural background of this case because it is unnecessary to decide the instant motions.  Instead, it will provide a brief summary of the individual and class claims that remain live for trial.

1.   Individual Claims

On April 23, 2020, as to individual claims in the four bellwether states (California, New Jersey, Ohio, North Carolina, and Texas), the Court granted summary judgment to Defendant on

all but the following:

**California**
(1) Count 2 – Violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1761;

(2) Count 4 – Violations of the implied warranty under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790;

(3) Count 7 – Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200;

**North Carolina**
(4) Count 88 – Violations of the Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. Ann. § 75-1.1;

(5) Count 90 – Breach of implied warranty of merchantability;

(6) Count 91 – Fraudulent omission;

**Texas**
(7) Count 123 - Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & C. Code § 17.01; and

(8) Count 125 – Breach of implied warranty of merchantability.

*See Sloan v. Gen. Motors LLC* ("*Sloan III*"), No. 16-CV-07244-EMC, 2020 WL 1955643, at *52–*53 (N.D. Cal. Apr. 23, 2020).

On May 25, 2021, as to a second batch of states (Arkansas, California, Idaho, Massachusetts, Pennsylvania, and Tennessee), the Court granted summary judgment to Defendant on all but the following individual claims:

**Idaho**
(9) Count 13 – Violation of Idaho Consumer Protection Act, Idaho Code Ann. § 48-601;

(10) Count 16 – Fraudulent omission;

**Massachusetts**
(11) Count 18 – Breach of the Massachusetts Regulation of Business Practices and Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 9(3);

(12) Count 20 – Breach of implied warranty of merchantability;

(13) Count 21 – Fraudulent omission;

**Pennsylvania**
(14) Count 30 – Breach of implied warrant of merchantability;

United States District Court
Northern District of California

**Tennessee**
(15) Count 33 – Breach of Tennessee Consumer Protection Act,
Tenn. Code Ann. § 47-18-101; and

(16) Count 36 – Fraudulent omission.

*See Siqueiros v. Gen. Motors LLC* ("*Siqueiros I*"), No. 16-CV-07244-EMC, 2021 WL 2115400, at

*26 (N.D. Cal. May 25, 2021).

The Court also dismissed the Magnuson Moss Warranty Act (MMWA) claims under

Count 1 of the individual named plaintiffs[1] in every state except:

- California;

- North Carolina;

- Texas;

- Massachusetts; and

- Pennsylvania.[2]

*See id.*; *Sloan III*, 2020 WL 1955643, at *53.

Accordingly, the parties will proceed to try sixteen (16) individual claims.

2.    Class Claims

Of the individual claims that survived summary judgment, the Court certified the following

for class-wide adjudication:

**California**
(1) Count 4 – Violations of the implied warranty under the Song-
Beverly Consumer Warranty Act, Cal. Civ. Code § 1790;

**Idaho**
(2) Count 13 – Violation of Idaho Consumer Protection Act, Idaho
Code Ann. § 48-601.

**North Carolina**
(3) Count 90 – Breach of implied warranty of merchantability; and

**Texas**
(4) Count 125 – Breach of implied warranty of merchantability.

---

[1] In a previous order, the Court dismissed with prejudice Plaintiffs' MMWA *class* allegations. *See* Docket No. 278.

[2] Because MMWA claims rise or fall with the state implied warranty claims, they will not be counted separately for purposes of trial.

4

1    *See Siqueiros I*, 2021 WL 2115400, at \*27; *Sloan III*, 2020 WL 1955643, at \*53.

2        Accordingly, the parties anticipate trying four (4) claims on behalf of subclasses in four

3    separate states.

4        On June 15 and July 15, 2021, Defendant filed the pending motions to decertify the North

5    Carolina and Texas classes, and to decertify all classes for lack of Article III standing under

6    *Transunion*, respectively.  NC and TX Decertification Mot.; *Transunion* Decertification Mot.

7                 **II.**      **LEGAL STANDARD**

8        "Even after a certification order is entered, the judge remains free to modify it in the light

9    of subsequent developments in the litigation." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160,

10    (1982).  "A district court may decertify a class at any time." *Rodriguez v. West Publ'g Corp.*, 563

11    F.3d 948, 966 (9th Cir. 2009).  A motion for class decertification is subject to the same standard as

12    a motion for class certification under Federal Rule of Civil Procedure 23.  Accordingly, before

13    certifying a class, the Court "must conduct a 'rigorous analysis' to determine whether the party

14    seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.*,

15    666 F.3d 581, 588 (9th Cir. 2012) (quoting *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180,

16    1186, *amended* 273 F.3d 1255 (9th Cir. 2001)). The Supreme Court has made it clear that Rule 23

17    "does not set forth a mere pleading standard." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)

18    (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011)).  Rather, the party seeking

19    certification must "affirmatively demonstrate" her compliance with the requirements of both Rules

20    23(a)—numerosity, commonality, typicality, and adequacy—and 23(b)—predominance and

21    superiority.  *See Wal-Mart Stores*, 564 U.S. at 349.

22        The underlying merits of the case, while somewhat relevant, should not overly cloud the

23    Court's decertification analysis—the only question is whether the requirements of Rule 23

24    continue to be met.  *See Comcast*, 569 U.S. at 33–34.  The fact that certain elements of proof may

25    favor the defendant on the merits does not negate class certification; the issue is whether the proof

26    is amenable to class treatment.  Moreover, "[n]either the possibility that a plaintiff will be unable

27    to prove [her] allegations, nor the possibility that the later course of the suit might unforeseeably

28    prove the original decision to certify the class wrong, is a basis for [decertifying] a class which

United States District Court
Northern District of California

apparently satisfies the Rule."  *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).  Ultimately, whether to decertify a class is within the discretion of the Court.  *See Levya v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013).

### III.       *TRANSUNION* DECERTIFICATION MOTION

This Court has twice held in this action that "each of the putative class members who purchased a Class Vehicle has standing to receive damages because the alleged defect caused them to overpay for their vehicles."  *Siqueiros I*, 2021 WL 2115400, at *19; *see also Sloan v. Gen. Motors LLC* ("*Sloan I*"), No. 16-CV-07244-EMC, 2017 WL 3283998, at *4 (N.D. Cal. Aug. 1, 2017) ("Plaintiffs' claims of overpayment for a defective product due to GM's fraudulent omissions constitute an injury in fact. . .  [t]he Court therefore denies GM's motion to dismiss for lack of subject matter jurisdiction.").  This holding was compelled by controlling Ninth Circuit decisions establishing that overpaying for a defective product constitutes a sufficiently tangible and concrete injury-in-fact under Article III.  *See Mazza*, 666 F.3d at 595 ("Plaintiffs contend that class members paid more for the CMBS than they otherwise would have paid, or bought it when they otherwise would not have done so . . . .  To the extent that class members were relieved of their money by Honda's deceptive conduct—as Plaintiffs allege—they have suffered an 'injury in fact.'" (quoting *Stearns v. Ticketmaster Corp.,* 655 F.3d 1013, 1021 (9th Cir. 2011)); *Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011) ("Plaintiffs claim that, as a result of defendants' actions, they paid more for their homes than the homes were worth at the time of sale. . . .  This is a quintessential injury-in-fact.").

Defendant urges the Court to reconsider this holding—which is now the controlling law of the case—in light of the Supreme Court's recent decision in *Transunion*, 141 S. Ct. at 2190.  Far from overturning *Mazza*, *Maya*, or this Court's prior decisions, *Transunion* actually confirms that Plaintiffs here suffered a concrete injury by overpaying for their vehicles.  *Transunion* held that putative class members who were incorrectly listed as terrorists on their Transunion credit reports did not suffer a sufficiently concrete injury under Article III unless those reports were disseminated to a third party.  *Id.* at 2201, 2209–11.  In other words, "[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm."

1    *Id.* at 2210.  In so holding, the Supreme Court contrasted the speculative injury at issue in

2    *Transunion* with monetary injuries like Plaintiffs' overpayment for their vehicles at issue here:

3            [C]ertain harms readily qualify as concrete injuries under Article III.
        The most obvious are traditional tangible harms, such as physical
4            harms and *monetary* harms.  If a defendant has caused physical or
        *monetary* injury to the plaintiff, the plaintiff has suffered a concrete
5            injury in fact under Article III.

6    *Id.* at 2204 (emphasis added).  In *Transunion*, there simply was no provable injury.  The plaintiff

7    did not claim they overpaid for a defective product; nor could they identify any concrete injury of

8    the erroneous reports had not been dismissed.  This Court's conclusion that Plaintiffs have Article

9    III standing because they overpaid for their vehicles is thus entirely consistent with the

10   longstanding rule, reaffirmed in *Transunion*, that monetary injuries are sufficiently tangible and

11   concrete under Article III.

12           Defendant also contends "the overwhelming majority of class members in each state" have

13   suffered no concrete injury because they "have not experienced the effects of the alleged oil-

14   consumption defect," just like the majority of the plaintiffs in *Transunion* never had their credit

15   reports disseminated to a third party.  *Transunion* Decertification Mot. at 5.  This analogy does not

16   work, however, because the concrete injury here is the reduction in the Class Vehicle's monetary

17   value, *not* the effects of the oil-consumption defect.  *Id.*  The addition of a terrorist designation did

18   not have diminished the monetary value of the credit reports in *Transunion* because those credit

19   reports—unlike the Class Vehicles here—were free.

20           Courts in this circuit, including the Ninth Circuit, have repeatedly held that putative class

21   members have Article III standing when plaintiffs allege that they overpaid for a defective

22   product, even if the defect at issue does not manifest itself in every putative class member's

23   product.  *See e.g.*, *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 819 (9th Cir. 2019) ("Plaintiff's

24   theory of liability—that Nissan's manufacture and concealment of a defective clutch system

25   injured class members *at the time of sale*—is consistent with his proposed recovery based on the

26   benefit of the bargain. We conclude that the district court abused its discretion when it denied

27   class certification."); *Aberin v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2021 WL

28   1320773, at *6 (N.D. Cal. Mar. 23, 2021) ("Overpayment injury is sufficient to establish Article

United States District Court
Northern District of California

7

United States District Court
Northern District of California

III standing. . . .  Contrary to Honda's contention, Plaintiffs need not show that the alleged defect manifested before they can bring a claim." (citations omitted)); *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 884 (N.D. Cal. 2019) ("[A]llegations of overpayment based on a defendant's failure to disclose a product's limitations are clearly sufficient to satisfy Article III's injury-in-fact requirement." (quoting *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prod. Liab. Litig.* ("*FCA*"), 295 F. Supp. 3d 927, 948–49 (N.D. Cal. 2018))).

Here too, "Plaintiffs allege that the defective piston rings—which are allegedly present in *every* Class Vehicle—diminish the value of the Class Vehicles, regardless of whether they actually cause excessive oil consumption." *Siqueiros I*, 2021 WL 2115400, at *19 (citing FAC ¶¶ 117, 218, 240, 243, 244, 258, 259, 300, 351, 398, 488, 542, 592).  In fact, Plaintiffs presented thus far uncontroverted expert evidence that the oil-consumption defect caused excessive piston ring wear in *all* the Class Vehicles, even if many putative class members have not felt its effects.  *See* Docket No. 305 ("Barnett Decl.") at Ex. 3 (Expert Report of Dr. Werner J.A. Dahm) ¶¶ 54–58, 64, 110, 228; *id.* at Ex. 30 (Am. Expert Report of Jeffrey K. Ball) at 11, 20.

Finally, Defendant unsuccessfully attempts to characterize Plaintiffs' injury here as the fear of "future harm" from the oil-consumption defect.  In *Transunion*, the class members who did not have their credit reports disseminated to third parties "asserted [a] *risk of future harm*," whereby the terrorist designation in their credit reports "exposed them to a material risk that the information would be disseminated in the future to third parties and thereby cause them harm."  141 S. Ct. at 2210.  The Supreme Court rejected that argument because "[i]t is difficult to see how a risk of *future* harm could supply the basis for a plaintiff's standing when the plaintiff did not even know there was a risk of *future* harm."  *Id.* at 2212 (emphases added).  Again, that reasoning does not apply here because Plaintiffs' injury is not the *future* "effects of the oil-consumption defect," but the fact that they overpaid for the defective Class Vehicles in the *past*.  Plaintiffs need not suffer the "effects of the oil-consumption defect"—much like the class members in *Transunion* who did have their credit reports disseminated did not need to suffer the effects of that dissemination—to have Article III standing.  *TransUnion*, 141 S. Ct. at 2209 ("[T]he 1,853 class members whose reports were disseminated to third parties suffered a concrete injury in fact under Article III.").

8

Therefore, Plaintiffs who purchased defective vehicles suffered a *past* concrete injury under Article III when they overpaid for those vehicles, regardless of whether they feel the effects of the oil-consumption defect in the future.  Accordingly, the Court **DENIES** Defendant's motion to decertify the classes for lack of Article III standing under *Transunion*.

## IV.   MOTION TO DECERTIFY NORTH CAROLINA AND TEXAS CLASSES

In *Sloan III*, the Court certified for class-wide adjudication Plaintiffs' claims for breach of the implied warranty of merchantability in Texas and North Carolina because "there is evidence upon which a reasonable jury could rely to conclude that the alleged oil-Consumption defect constitutes a safety defect."  2020 WL 1955643, at *46.  In *Siqueiros I*, by contrast, the Court concluded that Plaintiffs' "implied warranty claim [in Pennsylvania] is not suitable for class-wide adjudication because an individualized inquiry is required to establish whether the oil-consumption defect manifested in each of the individual Pennsylvania class member's vehicles, *i.e.* caused them personal injury or property damage."  2021 WL 2115400, at *22.

Defendant argues that this Court should decertify the implied warranty claims in North Carolina and Texas because the laws of those states, like the law of Pennsylvania, adhere to the manifest defect rule which requires each putative class member to demonstrate that the oil-consumption defect actually manifested in their vehicles, *i.e.*, caused excessive oil consumption or engine wear in a manner which caused personal injury or property damage.  NC and TX Decertification Mot. at 6–7.  This order will separately address the merits of this argument for each of these states.

A.   North Carolina

Under North Carolina law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  N.C. Gen. Stat. § 25-2-314(1).  To qualify as "merchantable," goods must meet various requirements.  *Id.* § 25-2-314(2)(a)-(f).  Those requirements include fitness for "the ordinary purposes for which such goods are used," which is at issue here.  *Id.* § 25-2-314(2)(c).

To state a claim for a breach of the implied warranty of merchantability, a plaintiff must plausibly plead: "(1) that the goods in question were subject to an implied warranty of

9

merchantability; (2) that the goods were defective at the time of the sale and as such did not comply with the warranty; (3) that the resulting injury was due to the defective nature of the goods; and (4) that damages were suffered." *Williams v. O'Charley's, Inc.*, 728 S.E.2d 19, 21 (N.C. Ct. App. 2012); *DeWitt v. Eveready Battery Co.*, 565 S.E.2d 140, 147 (N.C. 2002) (same elements). "The burden is upon the purchaser to establish a breach by the seller of the warranty of merchantability by showing that a defect existed *at the time of the sale*." *Morrison v. Sears, Roebuck & Co.*, 354 S. E. 2d 495, 497 (N.C. 1987). Neither the North Carlina Supreme Court nor the intermediate appellate courts of that state have held that the manifest defect rule applies to implied warranty claims. The North Carolina courts have not held that the "injury" and "damages" required to have been suffered need be a manifest personal injury or property damage.

Defendant cites only *Bussian v. DaimlerChrysler Corp.* for the proposition that North Carolina law requires a defect to manifest for a plaintiff to have a cognizable implied warranty claim. 411 F. Supp. 2d 614 (M.D.N.C. 2006). The plaintiff in *Bussian* discovered that the ball joints in his vehicle "had worn out prematurely and that failing to replace them would constitute a safety hazard" when he took his Dodge Durango to a mechanic for a routine inspection. *Id.* at 618. As a result, he paid the mechanic $700 to replace the ball joints. *Id.* The federal court in the Middle District of North Carolina concluded that the plaintiff "fail[ed] to make a legally sufficient allegation that his Durango was not merchantable" because he "ma[de] no allegation that the allegedly defective ball joints caused him to suffer mechanical problems, lose control of his vehicle, or have an accident." *Id* at 623. In other words, "[the p]laintiff's complaint ma[de] out no allegations that his Durango was not fit for the purposes for which it was intended, *i.e.*, to provide safe and reliable transportation." *Id.*

*Bussian*, while supporting Defendant's position, is not a persuasive source of law. It is a decision by a federal court that did not rely on North Carolina law. *Bussian* did not cite any North Carolina legal authority requiring each putative class member to establish that a product defect caused them mechanical problems or personal injury in order to bring an implied warranty claim under North Carolina law. Nor has Defendant cited to any other applicable authority, state or otherwise, for this proposition.

1    Accordingly, the Court **DENIES** Defendant's motion to decertify the North Carolina

2    Class.

3    B.    Texas

4    "Under Texas law, products sold or leased by a merchant carry an implied warranty of

5    merchantability that the goods are 'fit for the ordinary purpose for which such goods are used.'"

6    *Click v. Gen. Motors LLC*, No. 2:18-CV-455, 2020 WL 3118577, at *11 (S.D. Tex. Mar. 27,

7    2020) (quoting Tex. Bus. & Com. Code § 2.314(b)(3)). To establish a breach of the implied

8    warranty of merchantability, a plaintiff must show that the product (1) contained a defect that

9    renders it unfit for its ordinary purpose, (2) the defect existed when it left the manufacturer's

10   possession, and (3) the defect caused the plaintiff to suffer injury.  *Gen. Motors Corp. v. Garza*,

11   179 S.W.3d 76, 81 (Tex. App. 2005).  The Texas Supreme Court has not addressed whether the

12   manifest defect rule bars class certification of implied warranty claims in Texas, but the Court of

13   Appeals have held that it does.

14   For example, the plaintiffs in *Garza* alleged that their Chevy Malibus "ha[d] a brake

15   system defect that *will*, at some point during the life of the vehicle, cause the vehicle to pulsate

16   when the brakes are applied."  179 S.W.3d at 78 (emphasis added).  They also argued—as do

17   Plaintiffs here—"that individual questions about the Class members' experiences are irrelevant

18   because the damages arose at the moment of purchase."  *Id.* at 83.  The Texas Court of Appeals

19   rejected this argument and held that "[f]or purchasers who never experienced a problem during the

20   time they owned the car, they got what they paid for—a vehicle that provided transportation with a

21   brake system that safely stopped the car."  *Id.* at 83.  Certification of the implied warranty claim

22   was therefore inappropriate because "questions regarding causation outweigh the common issues"

23   given that "even if a jury found that the brakes on *all* Malibus will pulsate at some time, the expert

24   testimony establishes that it is impossible to predict *when* the pulsation will occur during the life

25   of the vehicle."  *Id.* at 81.  In other words, "the trial court's class definition and trial plan [did] not

26   allow GM to challenge the claims of those individuals who either never experienced pulsation or

27   knew of the brake problem but did not care enough to bring it back for repair within a reasonably

28   short period of time."  *Id.* at 83.  Under *Garza*, class-wide adjudication of the Texas Plaintiffs'

United States District Court
Northern District of California

11

implied warranty claims is inappropriate because a jury would have to make individual determinations as to whether each putative class member experienced excessive oil consumption or engine damage.  Importantly, *Garza* requires a manifestation of the defect to bring an implied warranty claim.

Similarly, in *Everett v. TK-Taito, LLC* the plaintiffs alleged that, "by virtue of a defective design," the seatbelt buckles in their vehicles "were susceptible to partial engagement, leaving the seat belt essentially unrestrained."  *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 849 (Tex. App. 2005).  As in the instant case, the Everetts "alleged economic injury damages, arguing that purchasers of vehicles fitted with the [] buckles did not receive the benefit of the bargain that they made in the purchase of their vehicles and will suffer $500 per vehicle cost-of-replacement damages."  *Id.* at 849–50.  In the context of standing under Texas law, the *Everett* court explained that "to cause redressable injuries in the breach of the implied warranty of merchantability context, a 'defect' must either have manifested during the product's normal use or such manifestation must be inevitable when the defective feature of the product is used."  *Id.* at 855.  Under that rule, the Everetts did not have standing because "[a]lthough the Everetts' vehicles [were] over a decade old, the defect that they allege [] caused them economic injuries ha[d] not manifested itself, nor [did] the Everetts claim that it [would] inevitably manifest itself."  *Id.* (emphasis added).  The *Everett* court—like the *Garza* court—rejected the benefit of the bargain theory of liability under Texas's implied warranty law.

In sum, Plaintiffs do not cite a single case where a Texas state court held that the economic harm of purchasing an allegedly defective vehicle was sufficient to recover for a breach of the implied warranty of merchantability under Texas law.  To the contrary, *Garza* and *Everett* conclusively held that the manifest-defect rule in Texas requires the defect to "manifest" in a way that disrupts the operation of the vehicle such that it renders the vehicle unfit for its ordinary purpose of moving people safely from one place to another.  Here, because the oil-consumption defect did not disrupt the operation of all the Texas class members' vehicles, class certification is inappropriate.

Accordingly, the Court **GRANTS** Defendant's motion to decertify the Texas class.

12

## V.   CONCLUSION

The Court (1) **DENIES** the motion to decertify for lack of Article III standing, (2) **DENIES** the motion to decertify the North Carolina class, and (2) **GRANTS** the motion to decertify the Texas class.

This order disposes of Docket Nos. 325 and 347.


**IT IS SO ORDERED**.


Dated: September 7, 2021

_____
EDWARD M. CHEN
United States District Judge