UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAUL SIQUEIROS, et al.,

          Plaintiffs,

    v.

GENERAL MOTORS LLC,

          Defendant.

Case No. 16-cv-07244-EMC

**ORDER GRANTING IN PART AND DENYING IN PART THE PARTIES' *DAUBERT* MOTIONS**

Docket Nos. 363, 365-366

## I.      INTRODUCTION

Plaintiffs allege that Defendant General Motors ("GM") knowingly manufactured and sold a car engine with an inherent defect that caused excessive oil consumption and engine damage. The alleged defect affected 2011 to 2014 model-year GM vehicles. Plaintiffs assert claims under various state consumer-protection and fraud statutes on behalf of individuals as well as various statewide classes. Plaintiffs filed their class action complaint on December 19, 2016. *See* Docket No. 2 ("Compl."). They have since amended their pleadings several times; the operative complaint is the seventh amended complaint. *See* Docket No. 286 ("7AC").

Now pending are three motions to exclude expert opinions and testimony from the trial pursuant to standards articulated in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). GM moves to exclude the opinions of Plaintiffs' experts Dr. Werner J.A. Dahm and Edward Stockton. Docket Nos. 363, 366. Plaintiffs move to exclude certain testimony by GM's technical expert Robert Kuhn. Docket No. 365.

For the following reasons, the Court **GRANTS in part** and **DENIES in part** the motion to exclude the opinions of Dr. Dahm and Mr. Kuhn, and **DENIES** the motion to exclude the opinions

of Mr. Stockton.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

A.   Factual Background

Plaintiffs allege that GM's Gen IV Vortec 5300 LC9 engine suffers from an "inherent" oil consumption defect.  7AC ¶ 7.  The "primary cause" of the alleged defect is the piston rings installed by GM.  *Id*. ¶ 8.  These piston rings "do not maintain sufficient tension to keep oil in the crankcase," and the oil migration that occurs as a result allows oil to "burn[] or accumulate[] as carbon buildup on the combustion chamber's surfaces."  *Id*. ¶¶ 8–9.

Plaintiffs also allege that the Active Fuel Management ("AFM") system in the Gen IV engine "further contributes to the Oil Consumption Defect" because the AFM oil pressure relief valve "spray[s] oil directly on the piston skirts," overloading the piston rings.  *Id*. ¶ 9.  Finally, Plaintiffs allege that the engine contains a "flawed PCV system that vacuums oil from the valvetrain into the intake system."  *Id*. ¶ 10.  Plaintiffs allege that GM "has long known of the Oil Consumption Defect" but has failed to provide an adequate repair and has failed to disclose the alleged defect to consumers.  *Id*. ¶¶ 18-19.

Plaintiffs allege that the oil consumption defect causes safety problems in three ways: (1) oil consumption can lead to a lack of adequate lubrication in the engine and dropping oil pressure levels in vehicles, *see id*. ¶ 19; (2) the presence of excess oil in the combustion chamber can cause spark plug fouling, which can cause engine problems, *see id*.; and (3) when drivers experience these problems while driving, they may be forced to pull over and stop alongside a road or highway (or they may be stranded in such a location with an inoperable vehicle), which places them in danger, *see id*. ¶¶ 14, 120–21.

B.   Procedural Background

At this point in the litigation, the claims of nine plaintiffs remain in the case, and are set for trial in August 2022.  The Court certified three of those claims for class action trials under Rule 23(b)(3): (1) breach of implied warranty under California's Song-Beverly Consumer Warranty Act; (2) breach of implied warranty under North Carolina law; and (3) violation of the Idaho Consumer Protection Act.  Docket No. 354 at 4.  The certified classes are limited to current

United States District Court
Northern District of California

2

1    owners and lessees of model year 2011-2014 Chevrolet Avalanche, Silverado, Suburban, Tahoe,

2    and GMC Sierra, Yukon, and Yukon XL vehicles equipped with aluminum block LC9 Gen IV

3    engines that were manufactured after February 10, 2011.  The California class is further limited to

4    current owners who purchased their vehicles in new condition and the Idaho class is further

5    limited to current owners who purchased their vehicles from GM dealerships.  *Id.* at 12-13.

6         The remaining individual claims are for (1) violation of the California Consumer Legal

7    Remedies Act, (2) breach of the implied warranty under the Song Beverly Consumer Warranty

8    Act, (3) violation of the California Unfair Competition Law, (4) violation of the North Carolina

9    Unfair and Deceptive Trade Practices Act, (5) violation of the Texas Deceptive Trade Practices-

10   Consumer Protection Act, (6) violation of the Massachusetts Regulation of Business Practices and

11   Consumer Protection Act, (7) violation of the Tennessee Consumer Protection Act, (8) violation of

12   the Idaho Consumer Protection Act, (9) violations of the Magnuson-Moss Warranty Act (only as

13   to the California, Texas, Massachusetts, North Carolina, and Pennsylvania plaintiffs), (10) breach

14   of the Massachusetts, North Carolina, Pennsylvania, and Texas implied warranties of

15   merchantability, and (11) fraudulent omission under Massachusetts, North Carolina, Idaho, and

16   Tennessee law.  *Id.* at 2-4.

17   C.    Summary of Relevant Expert Reports

18         1.    Plaintiffs' Expert Dr. Ball

19         In support of their defect theory, Plaintiffs initially sought the expert opinion of Dr. Jeffrey

20   K. Ball.  Dr. Ball provided an initial report on September 16, 2019, in which he opined on the root

21   cause of the oil consumption in the Gen IV engines of certain model year 2010-2014 GM vehicles

22   and the cost to repair those vehicles.  Docket No. 193-12 ("Initial Ball Report") at 18, 20-21.  On

23   November 21, 2019, Dr. Ball submitted a supplemental report in which he opined on the reliability

24   of GM warranty data for model year 2010-2014 vehicles, and extrapolated from that data to

25   produce warranty claim rates.  Docket No. 193-42 ("Suppl. Ball Report").  Dr. Ball is not

26   available to testify at trial because he passed away while this matter was pending.

27         2.    Plaintiffs' Expert Dr. Dahm

28         Dr. Werner J.A. Dahm is the ASU Foundation Professor of Mechanical Engineering and

United States District Court
Northern District of California

Aerospace Engineering at Arizona State University and Professor Emeritus of Engineering at the University of Michigan.  Docket No. 364-2 ("Dahm Report") ¶ 1.  He holds a Ph.D. from the Division of Engineering and Applied Science at the California Institute of Technology, and previously served as the Chief Scientist of the U.S. Air Force.  *Id.* ¶¶ 8, 17.  He has authored over 200 articles "on topics dealing with fluid dynamics, combustion, heat transfer, lubrication, engines, propulsion systems, and related areas, and more broadly with mechanical and aerospace engineering and their relation to defense science and engineering."  *Id.* ¶ 10.  Dr. Dahm is a member of the Society of Automotive Engineers, the American Society of Mechanical Engineers, the American Institute of Aeronautics and Astronautics, and the American Physical Society.  *Id.* ¶ 9.

GM challenges Dr. Dahm's qualifications as they relate to the issues in this litigation, arguing that Dr. Dahm "is an aerospace engineer with no educational background or professional experience in automotive engine design or automotive engineering."  Docket No. 363 ("Dahm Motion") at 14.  Plaintiffs respond that the defect affecting the Class Vehicles concerns "the mechanical engineering principles of fluid containment and component friction wear," which are well within Dr. Dahm's subject matter expertise in "lubrication, heat transfer, fluid dynamics and thermodynamic principles in internal combustion engine operation."  Docket No. 373 ("Dahm Opp.") at 7-8.

Dr. Dahm opines that "piston ring war is the root cause of the oil consumption defect" and that "the Class Vehicles experience excessive piston ring wear due to an incorrect 'piston ring system' design."  Dahm Report at 31-45.  He explains that the defective piston ring system design can result in a number of consequences to Class Vehicles, including "increased oil consumption," "engine misfiring," "decreased engine power," "increased internal part wear," piston seizing" and "engine seizing."  Dahm Report ¶ 64.  The Dahm Report also includes discussions of about the effectiveness of GM's design changes, the adequacy of GM's internal studies and warranty claims data as they relate to the oil consumption defect, the adequacy of oil pressure instruments in Class Vehicles, and potential safety risks posed by the oil consumption defect.  Dr. Dahm opines that because all Class Vehicles have the same "piston ring system" design, and because the errors in

the ring system are inherent in the design, all Class Vehicles experience the same defect, whether or not owners have already experienced or reported any of the impacts of the defect. *Id.* ¶ 65.

GM objects to Dr. Dahm's methodology, arguing that he did not perform any independent research on engine design, piston ring design, or on oil consumption in automobiles, and did not inspect of conduct testing of any of the Class Vehicle engines. Dahm Motion at 15. GM further argues that Dr. Dahm fails to explain what exactly is incorrect about the piston ring assembly in the Class Vehicles. *Id.* GM contends that there is no basis for Dr. Dahm's opinion that all Class Vehicles suffer from the same defect, noting that his own calculation is that only 3% of Class Vehicles have needed a piston ring replacement. *Id.* at 16. Moreover, GM argues Dr. Dahm does not provide a methodology or basis for his claims that the various alert systems in the Class Vehicles have a distracting effect on drivers, placing them at risk of personal harm. *Id.* at 15.[1]

Plaintiffs counter that Dr. Dahm's methodology involved the application of "standard and widely accepted principles and engineering methods relevant to fluid dynamics, combustion, heat transfer, lubrication, piston and turbine driven engines" to the available evidence in this litigation. Dahm Report ¶ 30; Exh. C – List of Relied Upon Documents. Dr. Dahm states that he has long used this same method and application of principles throughout his career, including during his work analyzing a "wide range of Air Force systems." *Id.* ¶ 31. Plaintiffs refer to Dr. Dahm's extensive explanation, including a review of deposition testimony and GM's productions, as the basis for his opinion that a defect in the piston ring design is the root cause of the oil consumption problem. *See* Dahm Report ¶¶ 92-133. And Plaintiffs entered a supplemental declaration to clarify that Dr. Dahm has experience through his role as Chief Scientist for the U.S. Air Force in investigating human interaction with instrument warning lights. *See* Docket No. 375 ("Dahm Affidavit") ¶¶ 13-19.

3. <u>Plaintiffs' Expert Stockton</u>

Edward Stockton is the Vice President and Director of Economics Services of the Fontana

---

[1] GM also objects to Dr. Dahm's Report to the extent that is endorses Dr. Ball's opinions without providing an independent basis, methodology or explanation for those opinions. *Id.* at 14 n. 25. Nowhere in Dr. Dahm's Report, however, does Dr. Dahm adopt Dr. Ball's opinions without stating that his independent analysis is consistent with Dr. Ball's opinion.

United States District Court
Northern District of California

Group, Inc. and has experience determining damages in vehicular defect cases and class action litigation. Docket No. 367-3 ("Stockton Report") ¶ 1. Stockton was asked by Plaintiffs' counsel to evaluate whether and to what extent class members have suffered economic damages and to develop methods for quantifying and allocating those damages. *Id.* ¶ 7. To conduct the analysis, Stockton was asked to assume (a) that the Class Vehicles were sold "with a safety defect that was serious enough to create a significant risk of the Subject Vehicles' engines unexpectedly shutting down and causing an accident or stranding drivers and passengers in unsafe situations," *id.* ¶ 14, (b) that the defect "was not disclosed and was unknown to consumers at the time they purchased or leased" the Class Vehicles, *id.* ¶ 16, and (c) that the defect "was 'organic,' meaning that it was present throughout the life" of the Class Vehicles, *id.* ¶ 17. GM contends that Stockton did not validate (nor attempt to validate) these assumptions. Docket No. 366 ("Stockton Motion") at 13.

Stockton's economic framework models the effect of the defect on the consumer's expected utility, and assesses the existence of damages based on what would have happened had the alleged defect been disclosed at the time of purchase or lease. *Id.* ¶¶ 18, 20. He explain that a "consumer receives the benefit-of-the-bargain model when parties' actions place him or her in the position that he or she would have been had the transaction been performed as agreed." *Id.* ¶ 23. Applying the model here, Stockton examined "the economic damages sustained by class members caused by their overpayment for the defective" Class Vehicles. *Id.* ¶ 24. Stockton notes that, based on the assumptions about the seriousness of the defect, "the reasonable consumer…would then demand repair of the defect." *Id.* ¶ 27. Thus, Stockton opines that value of the overpayment due to the defect can be determined "by at least the value or cost of remedying the defect." *Id.* Relying on what Plaintiffs' expert, Dr. Werner J.A. Dahm, opined would be needed to repair the Defect (replacement of the pistons and piston rings), which was derived from data from GM's own cost analysis of that procedure, Stockton notes that the cost would be $2,700 per vehicle, or $3,215 per vehicle on an inflation-adjusted basis. *Id.* ¶¶ 35-37. GM argues that Stockton did not verify or provide any independent analysis to justify his assumption that the cost of a replacement piston ring is $2,700. Stockton Motion at 13.

United States District Court
Northern District of California

4.      GM's Expert Kuhn

GM's technical expert, Robert Kuhn, is an automotive systems engineer.  Docket No. 370-1 ("Kuhn Report") § 2.1.  Kuhn's report concludes that, based on his review of the record evidence and data on non-Class Vehicles with different engine designs, Plaintiffs cannot support their claim of a uniform design defect – in part, because the Class Vehicles have different components.  *Id.* § 1.0(1)-(6).

At issue in the pending motion are two of Kuhn's opinions.  First, Kuhn opines that, based on his GM warranty data, that the oil consumption-related warranty repair rate for the Class Vehicles is approximately three percent.  *Id.* § 1.0(3).  And, second, Kuhn concludes that "this trend and magnitude" of the repair rate is "not consistent with the existence of an inherent oil consumption defect within the entire subject engine population," *id.*, but rather "normal variations in performance due to the use and maintenance of those engines," *id.* § 4.4.  Plaintiffs object that Kuhn did not employ a reliable methodology for reaching either of these two conclusions.  Docket No. 365 ("Kuhn Motion") at 4-5.

## III.      LEGAL STANDARD

A.      Fed. R. Evid. 702 and *Daubert* Challenges

Under *Daubert*, in assessing the admissibility of expert testimony under Federal Rule of Evidence 702,[2] the Court must perform "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Daubert*, 509 U.S. 579, 592–93; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) (*Daubert* standards apply to all expert testimony, not only scientific experts).  The Supreme Court has identified a non-exhaustive list of factors that may bear on the inquiry:

- whether the theory or technique can be or has been tested;

---

[2] "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

- whether the theory or technique has been subjected to peer review and publication;
- the known or potential rate of error with a scientific technique;
- acceptance of the technique by a relevant scientific community;

*Id.* at 593–94; *see also United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000).  None of these factors is dispositive and, ultimately, "[t]he inquiry envisioned by Rule 702 is. . . a flexible one" which is focused "solely on principles and methodology, not on the conclusions that they generate."  *Id.* at 594–95.  Under Rule 702 and *Daubert*, "[t]he duty falls squarely upon the district court to act as a gatekeeper to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards."  *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quotation and citation omitted).  Moreover, "[t]he trial judge also has broad latitude in determining the appropriate form of the inquiry."  *Id.* at 463.

In this role, the "judge is a gatekeeper, not a fact finder," and the "gate [should] not be closed to [a] relevant opinion offered with sufficient foundation by one qualified to give it." *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010).  The purpose of the gatekeeping role is to ensure that expert testimony is "properly grounded, well-reasoned and not speculative," but it is not meant to substitute for "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden and proof [which] are the traditional and appropriate means of attacking shaky but admissible evidence."  Fed. R. Evid. 702, Adv. Comm. Notes (2000) (quotation omitted).  Thus, "[a]fter an expert establishes admissibility to the judge's satisfaction, challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge."  *Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014).

Because the Court acts as a gatekeeper and not a factfinder, an expert whose methodology is otherwise reliable should not be excluded simply because the facts upon which his or her opinions are predicated are in dispute, unless those factual assumptions are "indisputably wrong." *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996); *see also* Fed. R. Evid. 702, Adv. Comm. Notes (2000) (explaining that "[w]hen facts are in dispute, experts sometimes reach different conclusions" and a trial court is not "authorize[d] ... to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other").  Indeed, Rule 702 is

8

1   "broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence."

2   Fed. R. Evid. 702, Adv. Comm. Notes (2000).  "It traditionally falls upon cross-examination to

3   negate the facts or factual assumptions underlying an expert's opinion."  *In re MyFord Touch*

4   *Consumer Litig.*, 291 F. Supp. 3d 936, 967 (N.D. Cal. 2018).

## IV.   ANALYSIS

A.   GM's Motion to Exclude Opinions and Testimony of Dr. Dahm (Docket No. 363)

GM moves to exclude the opinions and testimony of Dr. Dahm from trial in their entirety.

Dahm Motion at 9.  GM advances three arguments in support of its position.  The Court addresses

each in turn.

### 1.   Dr. Dahm's Qualifications

First, GM argues that Dr. Dahm's training and expertise in aeronautical engineering do not

qualify him to opine or testify on issues related to automotive engineering, warranty data, safety,

repair costs or issues related to human behavior.  Dahm Motion at 17-20.  Rule 702 requires that a

witness who seeks to testify as an expert have adequate "knowledge, skill, experience, training, or

education" to qualify as an expert.  Fed. R. Evid. 702.  GM contends that Dr. Dahm is unqualified

under Rule 702 because "[h]e has no experience in designing automobiles or analyzing human

factors in automotive operation," "has never worked for an automobile manufacturer in any

capacity," "has never been asked by an automotive manufacturer to design or evaluate a piston

ring system or engine lubrication system, or to diagnose the root cause of piston ring wear or

excess oil consumption (or any other automotive issues)."  Dahm Motion at 18.

GM's characterization of the requisite expertise to satisfy Rule 702, however, is too narrow

and overstates the topics on which Dr. Dahm opines.  Dr. Dahm need not demonstrate past

experience investigating the precise issues in this litigation.  The scope of Dr. Dahm's assignment

in this case was to provide his "independent opinions regarding combustion, lubrication, ring

sealing, heat transfer and related aspects of the Gen IV 5.3L Vortec engines in the Class Vehicles,

in particular as they relate to oil consumption, engine performance, [and] piston ring wear[.]"

Dahm Report ¶ 24.  It is undisputed that Dr. Dahm has extensive training, expertise in and has

published widely on the topics of fluid dynamics, combustion, heat transfer and engines.  *Id.* ¶ 7;

*see generally id.*, Exh. A ("Dahm CV").  Dr. Dahm explains that, "The fields of mechanical and aerospace engineering are closely related, and both are based on the same major technical disciplines. . . . The main technical subjects involved in this litigation, including fluid dynamics, combustion, heat transfer, lubrication, and engines, are taught to students of both mechanical and aerospace engineering, and engineers practicing in these fields may have degrees in either mechanical or aerospace engineering."  *Id.* ¶ 6; *see also* Dahm Affidavit ("I do not have any degrees in aerospace engineering.  For historical reasons the department at CalTech in which I obtained my Ph.D. degree refers to itself as an aeronautics department, yet not a single technical course offered by that department dealt with aircraft or spacecraft.  Instead, the technical courses that I took as part of my Ph.D. program dealt primarily with fluid dynamics, thermodynamics, and combustion, and the dissertation research that I conducted in my Ph.D. degree program dealt specifically with fluid dynamics relevant to internal combustion systems, including automotive engines.").  Additionally, Dr. Dahm has published in the Society of Automotive Engineering regarding fluid motions in combustion engines, such as those used in automotive, and has published an original design for a combustion engine.  Docket No. 374-2 ("Dahm Depo.") at 17:13 – 21:04.

GM cites cases in which courts excluded the testimony or expressed skepticism about the qualifications of experts whose backgrounds did not clearly align with the issues on which they opined.  *Id.* at 18-19.  Those cases all involved fact-specific inquiries applying Rule 702's standard.  Here, the primary focus of Dr. Dahm's opinions is on the mechanics, design and functioning of a combustion engine, including heat transfer and flow of oil within the engine.  *See* Dahm Report ¶ 233.  These are topics on which Dr. Dahm has demonstrated adequate "knowledge, skill, experience, training" and "education" to qualify as an expert.  Fed. R. Evid. 702.  GM's citation to Magistrate Judge Goodman's recommendation to exclude Dr. Dahm's testimony in *Tershakovec v. Ford Motor Co.*, No. 17-21087-CIV, 2021 WL 2592390, at *9 (S.D. Fla. May 12, 2021).  As an initial matter, as GM notes, Magistrate Judge Goodman's recommendation to exclude Dr. Dahm has not yet been adopted; Judge Moreno will hold an evidentiary hearing on Dr. Dahm's qualification to opine as an expert in that case in January 2022.

United States District Court
Northern District of California

*See Tershakovec v. Ford Motor Co.*, No. 17-21087-CIV, 2021 WL 3578011 at *3 (S.D. Fla. Aug. 13, 2021).  Even so, Magistrate Judge Goodman's reasoning in that case, which involves allegations of Ford's misrepresentations about vehicles that experienced overheating on racetracks despite being advertised as track-capable, is not applicable here.  The recommendation noted that "Dr. Dahm, despite his expertise in aerospace engineering and thermal management technology, lacks a reliable foundation to express his opinions regarding the *Subject Vehicles' capabilities under track or public road conditions* that are central issues to this case."  2021 WL 2592390, at *9 (emphasis added).  By contrast, Dr. Dahm's opinions regarding the design and functioning of the engines at issue does not depend on any specific context in which the vehicles are used.

GM also overstates the extent to which Dr. Dahm's opinions bear on "human behavior," on which, GM claims, he lacks expertise.  Dr. Dahm's opinions in this regard are limited to his views about how drivers engage with engine alert systems and the risks to safety that may result from their engagement and reactions to the systems.  Dahm Report ¶¶ 192-227.  Dr. Dahm states he has experience to opine on this issue based on his work with "human factors specialists in the Air Force Research Laboratory (AFRL) Human Effectiveness Directorate and Information Directorate."  Dahm Affidavit ¶ 18.  He explains that he reviewed the work of "human factors specialists [who] studied how [remotely piloted aircraft] operators reacted to alerts that were presented to them in various ways and concluded that such sudden alerts caused measurable impairment of operators' situational awareness, which in turn led to safety risks."  *Id.*  Dr. Dahm, thus, has adequate experience to opine on the interaction between drivers and the alert systems in Class Vehicles.  Whether he employed a reliable methodology to do so is a separate question.

### 2.  Dr. Dahm's Methodologies

GM's second argument is that Dr. Dahm's opinion and testimony should be excluded from trial because they fall short of the admissibility standards requiring an expert's testimony to be "based upon sufficient facts or data" and be "the product of reliable principles and methods" that are appropriately applied to those facts.  *Holt v. Finander*, No. 15-CV-05089, 2021 WL 1255418, at *2 (C.D. Cal. Feb. 9, 2021) (internal quotation marks and citation omitted); *Abarca v. Franklin Cnty. Water Dist.*, 761 F. Supp. 2d 1007, 1021 (E.D. Cal. 2011) (opinions must be "grounded in

1   the methods and procedures of science," not the say so of the expert).  GM objects to the bases of

2   three categories of Dr. Dahm's opinions.

3           a.      <u>The Presence of the Alleged Oil Consumption Defect</u>

4         GM argues that Dr. Dahm did not rely on sufficient facts or employ a reliable principle or

5   method to conclude that the alleged oil consumption defect is present, common and the same in all

6   of the Class Vehicles, noting that Dr. Dahm did not test, inspect, examine or physically handle any

7   Class Vehicle, engine or engine component to reach his conclusion.  Dahm Motion at 20-21.  GM

8   further observes that Dr. Dahm did not do any independent research into the rates at which alleged

9   symptoms of oil consumption occur in Class Vehicles relative to industry norms.  *Id.* at 21.  While

10   GM's observations about *what was not included* in Dr. Dahm's analysis is accurate, it does not

11   necessarily follow that the facts and methodology on which Dr. Dahm *did* rely are insufficient and

12   unreliable.  Closer scrutiny is required.

13         Dr. Dahm based his opinion that a defective piston ring design is a cause of the alleged oil

14   consumption defect based on his review of evidence produced in the litigation, including

15   deposition testimony and exhibits, and through application of engineering principles related to

16   fluid dynamics, combustion, heat transfer, lubrication and engine design.  Dahm Report ¶¶ 55-58,

17   63-65, 81-83, 92-133, Exh. C.  Dr. Dahm's report, however, goes further than opining that piston

18   ring wear is *a* cause of the oil consumption defect: he concludes that ring wear is the *root cause* of

19   the oil consumption defect, that it is present in *all* Class Vehicles, is precisely the same in *all* Class

20   Vehicles, that the oil consumption defect is unaffected by how the vehicle owner drives or

21   maintains their vehicle, and the impacts from the oil consumption defect are occurring in each and

22   every class vehicle regardless of whether the owner is aware of those impacts or not.  *Id.* ¶ 65.  Dr.

23   Dahm concludes his analysis demonstrated that "there is no other single root cause [other than a

24   design defect in the piston ring] that explains the totality of the data in this case."  Dahm Depo at

25   87:11-88:04; Dah Report ¶ 94.  Throughout the report, Dr. Dahm cites the record evidence on

26   which he bases his analysis and opinion that abnormal wear on the piston rings is the root cause of

27   the oil consumption defect.  *See* Dahm Report §§ VII-XII.

28         GM argues that Dr. Dahm's methodology is flawed because he did not conduct an

empirical analysis to assess the frequency with which any impacts of the alleged defect actually

occurred in the Class Vehicles, did not compare the prevalence of the defect to industry standards,

and did not analyze that mileage at which the defect has manifested or would manifest in Class

Vehicles.  Dahm Motion at 23.  GM also argues there are internal inconsistencies in Dr. Dahm's

report, such as his opinion that only 3% of Class Vehicles ever required a piston ring replacement

as compared to his conclusion that *all* Class Vehicles suffer from the piston ring design defect.  *Id.*

at 24.  Finally, GM points out that Dr. Dahm concedes that he cannot conclude what exactly is

incorrect or defective about the piston ring design:

> Q. So if I understand what you just said correctly, that you don't
> have an opinion about what specifically is, to use your word,
> incorrect in the piston ring design of these engines?
>
> A. Well, I wouldn't -- I wouldn't state it that way. The piston rings
> are clearly failing to perform the three functions that the piston rings
> have to perform in an engine and the fact that they are failing to
> perform that function as is evidenced. As I said, from the totality of
> the evidence here, it indicates that there is some inadequacy in the
> piston ring system design.
>
> Q. But you are not offering an opinion about specifically what that
> inadequacy is?
>
> A. Correct.

Dahm Depo at 90:04-18.

> Q. What specifically about the piston ring system in the LC9
> engines are you contending is incorrect?
>
> A. And as I testified earlier, the available evidence is not sufficient
> to determine specifically which one or more attributes of the piston
> ring system design were inadequate, but the data are more than
> adequate to show that it has to be an inadequate piston ring system
> design

*Id.* at 137:15-25.

GM's arguments are persuasive.  While Dr. Dahm generally alludes to the fact that he

applied standard engineering principles to his analysis, his report does not specifically describe

what scientific principles or methods he applied to determine that the root cause of the oil

consumption defect is a design defect in the piston rings.  Let alone does he explain how he

reached his conclusion that *every* Class Vehicle experiences the *same* defect.  Dr. Dahm's report

seems to reason backwards, by starting with the conclusion that the piston rings are defective, and then showing how the evidence in the record is consistent with this theory. *See generally* Dahm Report § XI ("Ring Wear is the Root Cause of the Oil Consumption Defect").

But despite Dr. Dahm's assertion that no other root cause can explain the totality of the evidence, Dr. Dahm does not provide a basis for this conclusion. Dr. Dahm does not systematically assess and rule out other possible root causes, nor does he analyze data or create a model to account for his own concession of other factors that could cause the defects shown in the record. *See e.g.,* Dahm Report ¶ 59 ("All piston rings will display gradually increasing wear as they operate. . . Modern engines routinely have an engine life that extends to 175,000 miles or more before a 'ring job' may be necessary to replace the worn piston rings."); Dahm Depo at 85:15-86:21 ("Q: But you would agree with me there are, for example, a variety of reasons that an engine may experience engine noise? A: Sure, there are other reasons as well, yeah. Q: And there's a number of reasons why an engine may run rough? A: There can be, yes. Q: And a number of reasons that could cause an engine to stall? A: Yes, yes."). Dr. Dahm does not explain the methodology underlying his opinion that a defective piston design is *the root cause* of the problems, and is present in *every* vehicle, regardless of any differences in maintenance or use of that vehicle.

Dr. Dahm's deficient analysis and lack of clear methodology is apparent in his failure to identify any particular defect in the piston rings, despite his conclusion that *all* Class Vehicles suffer from the same defect. In *Grodzitsky v. Am. Honda Motor Co.*, the Ninth Circuit found that an expert was properly excluded from testifying to his opinion that there was "a common defect in over 400,000 window regulators for class vehicles" where the expert examined only 26 of the regulators at issue, "conceded he did not conduct a comparison with window regulators from other manufacturers," "did not review any industry data concerning replacement rates for window regulators," and "confirmed that he did not 'have an opinion on what [Honda] should have done' in designing a proper window regulator." 957 F.3d 979, 986 (9th Cir. 2020). Such an approach, the court concluded, did not constitute a reliable methodology. *Id.*; *see also Cates v. Whirlpool Corp.*, No. 15-CV-5980, 2017 WL 1862640, at *12 (N.D. Ill. May 9, 2017) (excluding testimony

where expert failed to "identify . . . precisely what he believes the common defect to be that causes failure during self-cleaning").  Dr. Dahm's method to arrive at his opinion as to the *root cause* of the oil consumption defect suffers from similar deficiencies.  Dr. Dahm calculated that approximately 3% of Class Vehicles received a piston assembly replacement, but does not explain how that rate supports his conclusions that *all* vehicles have the same defect that manifests in the same way.  *Cf.* Dahm Report ¶¶ 189-90.  He provides no scientific explanation or methodology for his extrapolation.  Dr. Dahm summarizes the testimony of defects in the vehicles owned by named Plaintiffs, but provides no showing that the select testimony of Plaintiffs is a representative sample of all owners of the Class Vehicles.  *Cf. id.* ¶¶ 78-79.  Again, he provides no basis from which to extrapolate the experience of a handful of named plaintiffs to the general population of all owners.  And to the extent Dr. Dahm's conclusions are drawn from his review of GM's internal document and deponent testimony, Dr. Dahm does not apply a scientific methodology to analyze that record evidence.  *See infra* Analysis § A(3) (Whether Dr. Dahm's Opinions Invade the Province of the Jury).  Without determining *how* the Class Vehicles are allegedly defective through scientific testing and analysis, without opining what GM should have done differently to correct the defect, and without ruling out alterative causes of the purported impacts of oil consumption, and without explaining how he can derive a general conclusion about all vehicles from the points of evidence he cites, Dr. Dahm has not shown that his opinions as to the root cause and issues in *all* Class Vehicles are "the product of reliable principles and methods" that are appropriately applied to the facts in the record.  *Holt*, 2021 WL 1255418, at *2.

Thus, the Court excludes Dr. Dahm's testimony as to the root cause of the oil consumption defect, his opinion that a piston ring design defect is present in *all* Class Vehicles, and his conclusions as to other issues in *all* Class Vehicles as summarized in ¶ 65 of the Dahm Report.

b.    Repair Cost

GM argues that Dr. Dahm fails to provide a reliable methodology that the cost to replace a defective piston ring is $2,700.  This objection lacks merit, however, because Dr. Dahm does not *opine* on the issue of the cost of repair, but references the cost of repair that was recited in a document produced by GM providing a cost analysis of the replacement cost of a piston ring.  *See*

United States District Court
Northern District of California

1    Dahm Report ¶¶ 229-232.  GM is welcome to challenge the propriety or relevance of Dr. Dahm's

2    reliance on that document, but his reference to that figure need not be excluded.  *See Alaska Rent-*

3    *A-Car v. Avis Budget Grp., Inc*., 738 F.3d 960, 969 (9th Cir. 2013) ("Shaky but admissible

4    evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of

5    proof, not exclusion.").

6              c.    Adequacy of Oil Pressure Instruments and Safety Risks Posed by Alert

7                   System

8        GM asserts that Dr. Dahm fails to provide a reliable method to support his opinions that (a)

9    the oil pressure instrumentality in Class Vehicles leads drivers to incorrectly believe that they have

10   adequate oil pressure, and (b) that the Class Vehicles' alert systems create unsafe driving

11   distractions and the possible need to pull over puts drivers at risk of injury, including robbery,

12   assault, rape and murder.  Dahm Motion at 20 (citing Dahm Report ¶¶ 148-83, 192-233).

13       As to Dr. Dahm's opinions that the oil pressure instruments in the Class Vehicles are

14   insufficient to allow drives to monitor their oil level, Dr. Dahm based his opinion a review of 17

15   videos of tests performed by Dr. Ball about the functionality of the oil pressure sensors and

16   corresponding alert system.  *Id.* ¶¶ 202-208.  Dr. Dahm explains that the methods used in the tests

17   are consistent with those used by mechanical engineers, and concludes that the sensor system is

18   faulty based on the results from the tests.  *Id.*  GM does not contest the propriety of reliability of

19   this method.  Thus, there is no basis to exclude Dr. Dahm's opinions about the adequacy of the oil

20   pressure instruments for lack of reliable methodology.

21       However, Dr. Dahm fails to provide a scientific basis for his opinions that the Class

22   Vehicles' alert system would be distracting to drivers, and necessarily would place the safety of

23   drivers at risk.  Although Dr. Dahm has experience through his time in the U.S. Air Force

24   examining the interaction between people and instrument panels, including alert systems, Dr.

25   Dahm does not describe any methodology from that experience that he applied to arrive at these

26   conclusions in this case.  Dr. Dahm asserts that the appearance of "warnings can have a

27   substantially distracting effect on [drivers'] driving safety, since part of their attention and

28   situational awareness shifts from being focused on driving."  *Id.* ¶ 224.  Dr. Dahm does not

United States District Court
Northern District of California

1    explain how he came to this conclusion, that the appearance of a warning light in the context of

2    the Class Vehicles could shift a driver's attention from the road.  Nor does Dr. Dahm provide any

3    methodology underlying his opinion that drivers who are forced to pull over due to a warning

4    from the alert system will be at "elevated risk of harm" including from "robbery, assault, rape" or

5    "murder."  *Id.* ¶ 222.  For instance, he cites no data or study about such risks.  And again, that is

6    not an issue to which he has applied his scientific expertise.

7        Thus, the Court finds that Dr. Dahm's opinions as to the safety risks posed by the Class

8    Vehicles' alert system are not grounded in a scientific methodology.  However, he may opine as to

9    the inadequacy of the oil pressure instruments.

10        3.    Whether Dr. Dahm's Opinions Invade the Province of the Jury

11        GM's third argument is that Dr. Dahm's opinions and testimony should be excluded to the

12    extent they are "merely summariz[ing]" and "gratuitously interpret[ing]" GM's documents, fact-

13    witness testimony, and other record evidence.  *See Exeltis USA Inc. v. First Databank, Inc.*, No.

14    17-CV-04810, 2020 WL 7025089, at *5 (N.D. Cal. Nov. 30, 2020) (internal quotation marks and

15    citation omitted); *Dep't of Toxic Substances Control v. Technichem, Inc.*, No. 12-CV-05845, 2016

16    WL 1029463, at *1 (N.D. Cal. Mar. 15, 2016) (excluding expert opinion in part because expert

17    "often does no more than regurgitate information given to him by other sources . . .").

18        Significant portions of Dr. Dahm's report involves his review of evidence in the record,

19    including of deposition testimony and internal GM documents produced during discovery.  *See*

20    *e.g.,* Dahm Report § XI (reviewing GM's January 2010 Red-X Executive Report, deposition

21    testimony of Thomas Halka, and deposition testimony of Wai Nguyen).  An expert may review the

22    record evidence to extract factual bases from which to apply reliable methodologies in deriving an

23    opinion.  An expert, however, may not restate or summarize record evidence and then state a

24    conclusion without applying a methodology that is reliable and which evinces his/her expertise.

25    *Huawei Techs., Co. v. Samsung Elecs. Co.*, 340 F. Supp. 3d 934, 992 (N.D. Cal. 2018) (expert

26    testimony should be excluded "[w]here the jury is in as good a position as the expert to draw

27    conclusions from the evidence, and is capable of drawing its own inferences . . .") (internal

28    quotation marks and citation omitted).

United States District Court
Northern District of California

1    Here, Dr. Dahm quotes extensively from the deposition testimony of GM deponent

2    Thomas Halka, and then concludes that that Halka's testimony "shows that GM changed from the

3    '251 material to the '278 ring material in the Class Vehicles, it saw continued excessive piston

4    ring wear in the Gen IV 5.3L engines that then caused it to switch to a more wear-resistant '525

5    material, and then eventually switch[ed] to the even more wear-resistant PVD wring material."

6    Dahm Report ¶¶ 116-19.  Dr. Dahm's "conclusion" is nothing more than a summary of Mr.

7    Halka's testimony.  Dr. Dahm provides no analysis or reliable methodology interpreting the

8    testimony which employs his expertise.  Such testimony is inappropriate under Rule 702, as the

9    "jury is in as good a position as [Dahm] to draw conclusions from the evidence, and is capable of

10   drawing its own inferences."  *Huawei*, 240 F. Supp. at 992.

11   As another example, Dr. Dahm dedicates a section of his report to his "opinion" that "GM

12   had ample evidence of the oil consumption defect."  Dahm Report § XV.  Throughout this section,

13   Dr. Dahm cites deposition testimony and internal GM documents produced through discovery to

14   restate nothing more than that what is stated in the testimony or documents.  *See e.g., id.* ¶ 170

15   ("The evidence shows that soon after the 2007 introduction of its Gen IV 5.3L Vortec engines. . .

16   GM became aware of excessive oil consumption in these engines.  This is clearly verified in the

17   deposition testimony of GM's Grant Tappen. . . and in the deposition testimony of GM's Thomas

18   Halka"); *id.* ¶¶ 169-78.  Again, such summarizing of the record evidence by the expert without

19   applying any methodology is not appropriate under Rule 702.  *Huawei*, 240 F. Supp. at 992.

20   Thus, the Court finds that the portions of Dr. Dahm's report which essentially summarize

21   evidence already in the record without the application of his expertise through reliable

22   methodologies invade the province of the jury and are not appropriate under Rule 702.  Dr.

23   Dahm's opinions and testimony are therefore excluded to the extent that they consist of unadorned

24   restatements or summaries of evidence already in the record.  By contrast, Dr. Dahm's opinions

25   which employ his expert knowledge to explain the scientific and engineering principles relevant to

26   the issues in this case, such as his discussion of the purpose of piston rings and their relation to

27   engine operation in general, are permissible under Rule 702.  *See e.g.,* Dahm Report ¶¶ 41-63.

28

### 4.      Conclusion Re Dahm Motion

For the reasons explained above, the Court **grants in part** and **denies in part** GM's motion to exclude Dr. Dahm's opinions and testimony from trial.  The Court excludes Dr. Dahm's opinions that (1) a deficiency in the design of the piston rings in Class Vehicles is the *root cause* of the alleged oil consumption defect, (2) that the piston ring design defect is present in *all* Class Vehicles (and his additional opinions as to common issues in *all* Class Vehicles), and (3) that Class Vehicles' alert system causes distractions to drivers that pose safety risks to drivers.  Additionally, the Court **excludes** Dr. Dahm's testimony to the extent it summarizes or restates evidence already in the record without applying a reliable methodology to interpret or analyze such evidence.  The remainder of Dr. Dahm's report and opinions are consistent with Rule 702.

B.      GM's Motion to Exclude Opinions and Testimony of Stockton (Docket No. 366)

GM moves to exclude the opinions and testimony of Plaintiffs' expert Stockton in their entirety.  Stockton Motion at 8.  GM's arguments amount to two objections.  The Court addresses each in turn.

### 1.      Stockton's Reliance on Assumptions

First, GM argues that Stockton's opinions lack a sufficient factual basis before the opinions are based on unverified assumptions.  Stockton Motion at 15.  Specifically, GM objects to Stockton's reliance on the assumptions that (a) all Class Vehicles are defective, (b) the defect inevitably results in dangerously excessive oil consumption, (c) the defect is organic and present at the time of sale, and (d) the defect would affect all consumers in the same way and could be remedied in the same way, through a $2,700 repair.  *Id.*

GM's argument, however, fails to grapple with the fact that Stockton is a *damages expert*, and, thus, is entitled to *assume* liability in order to model the damages.  *See e.g., Indect USA Corp. v. Park Assist, LLC,* No. 318CV02409BENDEB, 2021 WL 4311002, at *3 (S.D. Cal. Sept. 22, 2021) ("[I]t is well established that experts on damages can assume causation."); *Orthofix, Inc. v. Gordon*, Case No. 1:13-cv-1463, 2016 WL 1273160, at *3 (C.D. Ill. Mar. 31, 2016) ("It is entirely appropriate for a damages expert to assume liability for the purpose of his or her opinion.  To hold otherwise would be illogical."); *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. für Chemische*

19

*Industrie*, No. 11-cv-681, 2015 WL 5459662, at *10 (S.D.N.Y. Sept. 16, 2015) ("[A] damages expert does not need to perform her own causation analysis to offer useful expert testimony.").

Moreover, Stockton's reliance on the $2,700 cost of repair figure is well-grounded, not only because Mr. Stockton is entitled to rely on this technical opinion provided by a technical expert, but also because the figure itself is supported in the record by GM's own cost analysis. *See United States ex rel. Jordan v. Northrop Grumman Corp.*, No. CV 95-2985 ABC (EX), 2003 WL 27366224, at *6 (C.D. Cal. Jan. 6, 2003) (Damages expert's "reliance on assumptions provided by counsel or other experts is not a bar to her testimony.").

Finally, GM faults Mr. Stockton for assuming "that the alleged defect would impact prices paid in precisely the same way for all consumers," Stockton Motion at 17, yet this flows from the assumption that defect is a safety defect for all consumers and that Stockton's damages calculation is based on the response that an objectively reasonable consumer would make.  As Stockton explains in describing the assumptions in his model, any consumer "applies the reasonable expectation that the vehicle is materially safe and free of defects, with an emphasis on the vehicle's safety elements," and thus would seek repair of the assumed safety defect.  Stockton Report ¶ 31; *see also id.* ¶ 19 ("In seeking to maximize their expected benefits from transactions, consumers make comparative assessments" which "inform the judgments that they make about the expected outcomes associated with purchasing certain products"); *id.* ¶ 22 ("In accordance with economic theory, concealing a safety defect from consumers and potential consumers directly impairs the consumer's assessment of a potential transaction and leads to a different outcome . . . that what would have occurred had the defect been disclosed").

GM is entitled to challenge Stockton's assumptions at trial – as much as GM's own economic expert, Dr. Befurt assumes in his report opining that the oil consumption defect is not a safety defect.  *See generally* Docket No. 367-6.  The fact that GM disagrees with Stockton's assumptions is not a ground to exclude Stockton's testimony altogether under *Daubert*.  Where a party challenges the expert's assumptions, the challenges may go to impeachment, rather than admissibility.  *Alaska Rent-A-Car, Inc*, 738 F.3d at 969.

2.      Stockton's Methodology

GM argues that although Stockton "purports to rely on the economic theory of 'expected utility;" his methodology as applied is unreliable because he fails to account for "each individual purchaser's level of perceive risk and tolerance for that risk" in his model.  Stockton Motion at 19. GM argues that for Stockton to correctly apply the expected utility theory here, we would have needed to consider "1) the rate at which the alleged defect manifested in the Class Vehicles, (2) how the alleged defect manifested in the Class Vehicles, (3) whether and to what extent any needed repairs may be covered by warranty, and (4) variations in consumers' risk-tolerance and decision-making process when purchasing and/or leasing automobiles." *Id.*  Stockton's failure to do so and *assumption* that the defect poses a serious safety defect in all vehicles and all consumers will seek the same fix renders his methodology unreliable, or so GM contends.

GM's argument is premised on its same, incorrect objection to Stockton's *assumptions* that the alleged defect is a safety defect present in all Class Vehicles.  As already explained, Stockton is entitled to assume liability on the theories that Plaintiffs have alleged in this action in order to develop his damages model.  The Court previously analyzed Stockton's benefit-of-the-bargain theory and damages model at the class certification stage of this litigation, and found it consistent with Ninth Circuit precedent.  Stockton's opinions are consistent with that model of damages by permissibly assuming that reasonable consumers who are subjected to the same safety defect in their vehicle would each be expected to seek a remedy that restores them to the position of receiving the non-defective vehicle for which they bargained.  *See Sloan v. Gen. Motors LLC*, No. 16-CV-07244-EMC, 2020 WL 1955643, at *48 (N.D. Cal. Apr. 23, 2020) ("[T]he Ninth Circuit, in a factually analogous case [*Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817 (9th Cir. 2019)], has approved of the damages model that Plaintiffs put forward here.  In addition, benefit-of-the-bargain theories, as the one asserted by Plaintiffs herein, are a classic measure of damages in both contract and tort contexts. . . One obvious measure of such damages is the cost to repair the defective product."); *see also Falco v. Nissan N. Am. Inc.*, No. CV1300686DDPMANX, 2016 WL 1327474, at *12 (C.D. Cal. Apr. 5, 2016) ("By receiving restitution in the amount of average repairs, the class would be getting the benefit of their bargain because they would be put in the

United States District Court
Northern District of California

United States District Court
Northern District of California

same position they would have been had the car not been sold with the defective timing chain system — it is the cost necessary to make the vehicles conform to the value Plaintiffs thought they were getting in the price tendered."). Thus, the Court rejects GM's challenge to the reliability of Stockton's damages methodology.

### 3. Conclusion Re Stockton Motion

For the reasons explained above, the Court **denies** GM's motion to exclude the opinions and testimony of Plaintiff's damages expert Edward Stockton.

C. Plaintiffs' Motion to Exclude Certain Opinions and Testimony of Kuhn (Docket No. 365)

Plaintiffs seek to exclude two opinions from Kuhn's expert testimony: (1) that the Class Vehicle Oil Consumption failure rate is approximately 3%, and (2) that the warranty data provided by GM is inconsistent with any design defect across the entirety of the Class Vehicles. Kuhn Motion at 4.

### 1. Factual Basis for Kuhn's Replacement Rate Calculation

Plaintiffs argue that Kuhn did not have the data necessary to reliably evaluate vehicle component failure rates, and thus, did not employ a sound methodology for determining a 3% failure rate, nor to opine about what that rate implies about the presence of a design defect across the Class Vehicles. *Id.* Specifically, Plaintiffs contend that Kuhn did not follow his own typical methodology for evaluating component failure rates, which entails looking at customer complaints and raw warranty data. *Id.* at 6. Instead, Plaintiffs object to Kuhn's reliance on summary information of warranty claims compiled by GM, which did not include the raw warranty data for piston rings or other components that could fail from oil starvation or excess heat caused by oil loss. *Id.* at 7.

For clarity, the Court observes that, contrary to Plaintiffs' suggestion, Kuhn's report does *not* include any opinions about or refer to a "failure rate," but, rather, mentions only an "engine repair rate" or "repair rate." *See* Kuhn Report at 13-14. The parties' briefing treats the terms "failure rate" and "repair rate" as interchangeable, and the parties do not contend that there is a meaningful distinction between the terms. Thus, the Court understands the parties to be referring to the same 3% "repair rate" that Kuhn identifies in his report.

United States District Court
Northern District of California

1    Semantics aside, Plaintiffs' dispute over the Kuhn's determination of a 3% repair rate

2    amounts to a challenge to the adequacy of the data on which Kuhn based his opinions.  This

3    challenge goes to the weight of Kuhn's opinions, not to the admissibility of those opinions.  *See*

4    *e.g., Sloan v. Gen. Motors LLC,* No. 16-CV-07244-EMC, 2020 WL 1955643, at *38 (N.D. Cal.

5    Apr. 23, 2020) ("The nature of GM's attack on the data upon which Dr. Ball relied illustrates that

6    these are issues that go to impeachment and weight, not admissibility.  Dr. Ball has indicated the

7    facts and data (provided to him by GM) upon which he relied to conduct his analysis; although

8    GM disagrees with the data relied upon, it cannot be said that Dr. Ball's opinion is not based on

9    facts or data; to the contrary, it is based on data provided to him by Defendant."); *POM Wonderful*

10   *LLC v. Coca Cola Co.*, No. CV 08-06237, 2016 WL 5929336, at *8 (C.D. Cal. Mar. 9, 2016)

11   (question of under-inclusiveness of data affects weight not admissibility and "can be adequately

12   addressed on the witness stand, both through cross-examination and through rebuttal testimony.").

13   Plaintiffs do not identify anything in particular that was deficient in the specific data on

14   which Kuhn relied to derive his conclusion of a 3% repair rate.  Indeed, it appears that Plaintiffs'

15   own technical expert reviewed the *same data* and arrived at substantially the *same conclusion*

16   about the repair rate.  Kuhn testified that in preparing his report, he reviewed the warranty data

17   from GM's expert Mr. Pfromm which reflected "all service related to oil consumption claims" and

18   explained his reasoning for why he excluded data on repairs related to replacement of valvetrain

19   components would be overbroad and unnecessary to his analysis.  *See* 307-2 ("Kuhn Depo.") at

20   66:9-25; 68:6-15; 103:8-104:13; 105:23-107:13; 103:8-104:13; 105:23-107:13.  Plaintiffs' expert,

21   Dr. Dahm conducted an analysis of GM's data produced during the litigation and determined that

22   the percentage of class vehicles sold that received piston assembly replacement was 3.2%.  Dahm

23   Report ¶ 189.  Dr. Dahm, during his deposition, stated that his review of the GM data regarding

24   the piston assembly replacement rate was in agreement with Kuhn's.  Dahm Depo. at 120:8-20

25   ("[G]iven the limited data that GAM provided. . . by my calculation, the [piston assembly

26   replacement rate] comes out to be about 3.0 percent when you limit the subject engines the way I

27   did, and that agrees with Mr. Kuhn's report.  It's about 3 percent.  That's the important thing.").

28   Plaintiffs' expert's agreement with the 3% repair rate found by Kuhn tends to undermine

1    Plaintiffs' argument that Kuhn's methodology was unreliable.  Plaintiffs' challenge goes to the

2    weight of Kuhn's opinion as to the repair rate, not its admissibility.

3              2.        Methodology for Kuhn's Opinion Re "Normal Performance Variations"

4         Plaintiffs object to Kuhn's opinion that the 3% repair rate is inconsistent with a defect

5    affecting *all* Class Vehicles.  Plaintiffs' first argument is premised on their same contention that

6    Kuhn's calculation of the repair rate was "based upon his review of an incomplete and misleading

7    slice of GM warranty data."  Kuhn Motion at 4.  Thus, this objection fails for the same reason that

8    their challenge to the 3% rate fails.

9         Plaintiffs also argue, more generally, that Kuhn "employed no methodology whatsoever –

10   reliable or otherwise," *id.* at 5, to support his challenged opinions, including his view that the 3%

11   repair rate is consistent with "normal performance variations," Kuhn Report § 4.4.  The Court

12   agrees.  Kuhn fails to provide any basis for his conclusion that the 3% failure rate is inconsistent

13   with a design defect across all class vehicles.  Kuhn's reasoning in support of this opinion is as

14   follows:

15              The use of field exposure data in defect trend analysis is also an
               accepted reliability and investigatory practice used by the NHTSA
16             and experienced technical investigators such as me. Therefore, it is
               also important to note that the subject engine population (2011-2014
17             MY) is 7 to 10 years old and was subject to a 60 month/100,000-
               mile powertrain warranty. Consequently, the subject engine
18             population has had significant field exposure in terms of time and
               accumulated mileage to reliably show that the current repair rate is
19             indicative of the performance of the entire subject engine
               population. **This 3% repair rate over the course of 7 to 10 years,**
20             **is not consistent with or indicative of the existence of an inherent**
               **oil consumption defect within the entire subject engine**
21             **population. It is consistent with normal variations in**
               **performance due to the use and maintenance of those engines**.
22

23   Kuhn Report § 4.4.

24        Kuhn gestures to the notion that "defect trend analysis" is an accepted investigatory

25   practice.  Kuhn's report includes a chart which demonstrates that the repair rate fell over time as

26   GM introduced various fixes to its engines:

27

28

United States District Court
Northern District of California



Subject Engine Repair Rates as of July 2021

*See id.*

But Kuhn does not explain if or how he applied defect trend analysis here.  While the data shows a decline in the repair rates of the subject engine, it does not demonstrate that the 3% repair rate "is not consistent with or indicative of the existence of an inherent oil consumption defect."  A declining trend does not necessarily negate the existence of an inherent defect, and Kuhn does not explain why it does here.  Nor does the chart or data support Kuhn's conclusions that the 3% repair rate here is "consistent with normal variations in performance due to the use and maintenance of those engines."  *Id.*  Nowhere in Kuhn's report does he explain the methodology he used to arrive at these conclusions.  There is no data, for instance, what the repair rate is for normal variations in engines which are not inherently defective.  The Court is left without key information necessary to understand Kuhn's conclusion: what repair rate would indicate an inherent defect with oil consumption*?*  What is the range of repair rates engines that is consistent for normal variations in performance?  What is the basis for those values?  Just because the repair rate for engines decreased from 18% for 2007-09 engines to 3% for 2011-14 engines, *id.* § 4.4,

how does that justify the conclusion that there is no inherent defect?  How is the Court to know that the baseline repair rate for engines is not .1%, such that the 3% rate is 30 times more than what would be expected?  Would such a range be consistent with a range of "normal variations in performance?"  Kuhn does not answer any of these questions nor otherwise explain the methodology underlying his opinions.

Without such information or explanation of the methodology that Kuhn applied to reach these conclusions, Kuhn's conclusions are grounded in nothing more than his say so.  GM cites cases such as *Allstate Ins. Co. v. Kia Motors Am. Inc.* for the proposition that an expert's training may provide a sufficient basis for the expert's testimony.  *See* No. CV 16-06108, 2017 WL 10311211, at *6 (C.D. Cal. Sept. 20, 2017).  But Plaintiffs do not challenge Kuhn's qualifications in general – they challenge his methodology to justify his specific conclusions.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."  *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Thus, the Court excludes Kuhn's opinions that (1) "This 3% repair rate over the course of 7 to 10 years, is not consistent with or indicative of the existence of an inherent oil consumption defect within the entire subject engine population," and (2) "It is consistent with normal variations in performance due to the use and maintenance of those engines," Kuhn Report § 4.4.

### 3. Conclusion Re Kuhn Motion

For the reasons explained above, the Court **grants in part** and **denies in part** Plaintiffs' motion to exclude certain opinions and testimony of GM's technical expert Robert Kuhn.  Kuhn's opinions regarding what the 3% repair rate indicates regarding the existence or non-existence of an inherent defect are **excluded**.  There remainder of his testimony and opinions are consistent with Rule 702.

## V.   CONCLUSION

- GM's Motion to Exclude Dr. Dahm (Docket No. 363): The Court **excludes** Dr. Dahm's opinions that (1) a deficiency in the design of the piston rings in Class Vehicles is the *root cause* of the alleged oil consumption defect, (2) that the piston

United States District Court
Northern District of California

United States District Court
Northern District of California

1  ring design defect is present in *all* Class Vehicles, and (3) that Class Vehicles' alert

2  system causes distractions to drivers that pose safety risks to drivers.  Additionally,

3  the Court **excludes** Dr. Dahm's testimony to the extent it summarizes or restates

4  evidence already in the record without applying a reliable methodology to interpret

5  or analyze such evidence.  Any such testimony improperly invades the province of

6  the jury.

7  •  GM's Motion to Exclude Mr. Stockton (Docket No. 366): The Court **DENIES** the

8  motion.

9  •  Plaintiffs' Motion to Exclude Portions of Mr. Kuhn's Opinions (Docket No. 365):

10  The Court **excludes** Mr. Kuhn's opinion that the 3% piston replacement rate "is not

11  consistent with or indicative of the existence of an inherent oil consumption defect

12  within the entire subject engine population" and that the rate is "consistent with

13  normal variations in performance due to the use and maintenance of those engines."

14  Kuhn Report § 4.4.  The remainder of Mr. Kuhn's report satisfies Rule 702.

15

16  This order disposes of Docket Nos. 363, 365 and 366.

17

18  **IT IS SO ORDERED**.

19

20  Dated: January 7, 2022

21

22  _____

23  EDWARD M. CHEN
   United States District Judge