United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAUL SIQUEIROS, et al.,

               Plaintiffs,

      v.

GENERAL MOTORS LLC,

               Defendant.

Case No.  16-cv-07244-EMC

**FINAL PRETRIAL CONFERENCE ORDER**

## I.      BACKGROUND

The plaintiffs in this action are current owners of certain General Motors LLC ("GM") trucks and SUVs that allegedly contain an excess oil consumption defect in their vehicles' engines.  Plaintiffs claim that the excessive oil consumption can harm and disrupt the proper functioning of the engine in multiple ways.  Plaintiffs define the alleged engine defect as the "oil consumption defect" caused primarily by wear in the engines' piston ring assembly.  GM denies that there is any such "oil consumption defect," and has also raised various affirmative defenses to plaintiffs' claims.

Not all plaintiffs will be proceeding to trial on September 13, 2022.  Instead, the trial will be limited to the claims of class representatives Garet Tarvin, William Davis, Jr., and Gabriel Del Valle; and specifically, the trial will be limited to the three class claims that the Court has permitted them to assert as representatives on behalf of statewide classes certified under Federal Rule of Civil Procedure 23.

Plaintiff Tarvin, individually and on behalf of the California Class, asserts a breach of implied warranty claim for violation of the Song-Beverly Consumer Warranty Act.  The California

Class is defined as "all current owners or lessees of a Class Vehicle that was purchased or leased the vehicle in new condition in the State of California." Plaintiff Davis, individually and on behalf of the North Carolina Class, asserts a claim for breach of implied warranty under North Carolina law. The North Carolina Class is defined as "all current owners or lessees of a Class Vehicle that was purchased or leased in the State of North Carolina." Plaintiff Del Valle, individually and on behalf of the Idaho Class, asserts a claim for violation of the Idaho Consumer Protection Act. The Idaho Class is defined as "all current owners or lessees of a Class Vehicle that was purchased or leased in the State of Idaho from a GM-authorized dealer."

## II.      TRIAL DATE & LENGTH OF TRIAL

The Court shall hold a hearing on Monday, September 12, 2022, at 12:30 p.m., to discuss the completed jury questionnaires. At this time, the Court will discuss whether any potential jurors should be excused for hardship in advance of jury selection. The Court will also discuss imposing a vaccination requirement on jurors. The hearing shall be conducted via Zoom.

Jury selection shall take place on September 13, 2022, beginning at 1:00 p.m. Counsel shall be present in the Courtroom at 12:30 p.m.

The jury trial shall begin on September 19, 2022. Trial shall last from 8:30 a.m. to 1:30 p.m. on each day, except for Thursdays, which are dark. Friday, September 23, 2022, shall also be dark. On all trial days counsel shall be present in the Courtroom at 8:15 a.m. to discuss any matters requiring resolution prior to commencement of trial at 8:30 a.m.

The trial shall last for eight days. Each party will be limited to fifteen hours to present its case. This includes opening statements, time on direct and cross-examination, and closing arguments, but does not include jury voir dire.

## III.      ADVANCED NOTICE OF WITNESSES AND EXHIBITS

During the pretrial conference, the Court instructed that each party shall provide 48 hours/two court days in advance for notice of witnesses and exhibits to be called each day. The Court reserves the authority to exclude witness for non-compliance.

All objections to witnesses and exhibits must be filed with the Court at least one court day (24 hours) before the witness is scheduled to testify. The Court will address objections before

United States District Court
Northern District of California

2

8:30 a.m. on the following day.  All objections should be provided in writing and filed with the Court, and a courtesy copy should be given to chambers immediately.

Should a party fail to have enough witnesses to complete the trial day, the Court shall charge the surplus time remaining on that day against the party's total allotted time.  For instance, if a party concludes a witness's examination with an hour remaining in the day and is not prepared to call another witness, then the Court will subtract that hour from the party's allotted fifteen hours.

## IV.    WITNESSES

A.    Plaintiffs

Plaintiffs have identified the following individuals as witnesses they may call in their case-in-chief.

(1)    Gabriel Del Valle.  Mr. Del Valle is the Idaho Class Representative.  He will be testifying about the purchase, maintenance, and ownership of his vehicle, along with his oil consumption experience.

(2)    William Davis, Jr.  Mr. Davis is the North Carolina Class Representative.  He will be testifying about the purchase, maintenance, and ownership of his vehicle, along with his oil consumption experience.

(3)    Mrs. Davis.  Mrs. Davis will be testifying about her oil consumption experience.

(4)    Garet Tarvin.  Mr. Tarvin is the California Class Representative.  He will be testifying about the purchase, maintenance, and ownership of his vehicle, along with his oil consumption experience.

(5)    Plaintiff Raul Siqueiros.  GM has objected because Mr. Siqueiros is not a member of the California Class.  The objection is covered in GM's MIL No. 3. Mr. Siqueiros seeks to testify about the purchase, maintenance, and ownership of his vehicle, along with his oil consumption experience.

(6)    Plaintiff Cralley.  As with Mr. Siqueiros, GM has objected to either Todd or Jill Cralley testifying because they are not members of the California Class.  The

United States District Court
Northern District of California

objection is covered in GM's MIL No. 3.  Mr. Crawley seeks to testify about the purchase, maintenance, and ownership of his vehicle, along with his oil consumption experience.

(7)     Ted Stockton (expert).  Mr. Stockton is Plaintiffs' damages expert.

(8)     Dr. Werner Dahm (expert).   Dr. Dahm is Plaintiffs' technical expert.  He will testify regarding the design of the LC9 engines in the Class Vehicles.

(9)     GM Corporate Representative.

(10)    Steve Pfromm.  Mr. Pfromm is a GM engineer who works in program quality for small block engines.  Although Plaintiffs seek to use Mr. Pfromm's deposition testimony because Mr. Pfromm is outside the subpoena power of the Court, GM has offered to make this witness available to testify live during Plaintiffs' case-in-chief.  *See* Docket 452 (Appendix A) at 3 n.6; Docket No. 451 (Joint Pretrial Statement) at 10.  GM contends that Mr. Pfromm's deposition testimony is inadmissible hearsay and GM plans to cross-examine Mr. Pfromm live.

(11)    Dr. Jeffrey K. Ball (expert).  Dr. Ball was Plaintiffs' original technical expert. Plaintiffs seek to introduce his opinions from his expert report and deposition with regard to field performance and warranty data for oil consumption in the Subject Vehicles, among other things.  GM has objected to use of Dr. Ball's testimony on the bases of hearsay and relevance.  The objection is covered in GM's MIL No. 2.

(12)    Yoon Lee.   Lee is currently employed by GM as a design system engineer for small block systems.  Lee served as a design systems engineer for GM's Gen IV LC9 engines.

(13)    Grant Tappen.  As with Mr. Pfromm, Plaintiffs seek to use Mr. Tappen's deposition testimony, and GM has objected on the basis that it will make Mr. Tappen available and thus the deposition testimony is inadmissible hearsay.

(14)    Tom Halka.  As with Mr. Pfromm, Plaintiffs seek to use Mr. Halka's deposition

4

testimony, and GM has objected on the basis that it will make Mr. Halka

available and thus the deposition testimony is inadmissible hearsay.

(15)   Wai Nguyen.  Plaintiffs seek to use Nguyen's deposition testimony regarding

GM's oil consumption investigation, oil consumption causes, Class Vehicle

field performance, and engine operability.

(16)   Lisa Toth.  Plaintiffs seek to use Ms. Toth's deposition testimony regarding

GM's oil consumption investigation, Class Vehicle field performance, GM's

breakpoints, oil consumption causes, and engine operability.

(17)   Rich Ricchi.  Plaintiffs seek to use Mr. Ricchi's deposition testimony regarding

GM's oil consumption investigation, Class Vehicle field performance, and

engine operability.

(18)   Gary Cygan.  As with Mr. Pfromm, Plaintiffs seek to use Mr. Cygan's

deposition testimony, and GM has objected on the basis that it will make Mr.

Cygan available and thus the deposition testimony is inadmissible hearsay.

**B.**    <u>Defendant</u>

GM has identified the following individuals as witnesses it may call in its case-in-chief.

(1)   Rene Befurt, Ph.D. (expert).  Dr. Befurt will offer opinion testimony regarding

consumer expectations, the consumer buying and leasing process in the

automotive market, and rebuttal to Plaintiffs' expert witnesses.

(2)   Gary Cygan, Jr.   Mr. Cygan also appears on Plaintiffs' witness list.

(3)   Thomas Halka.  Mr. Halka also appears on Plaintiffs' witness list.

(4)   Michael C. Keeley, Ph.D. (expert).  Dr. Keeley is GM's damages expert.  He

will offer opinion testimony regarding Plaintiffs' alleged damages, Plaintiffs'

damages model, and rebuttal to Plaintiffs' expert witnesses.

(5)   Stephen Pfromm.  Mr. Pfromm also appears on Plaintiffs' witness list.  Mr.

Pfromm will testify about warranty and repair rates associated with claims of

excessive oil consumption in the Subject Vehicles, design changes to the Gen

IV LC9 engine, and technical service bulletins and service bulletins related to

United States District Court
Northern District of California

1    oil consumption in the Gen IV LC9 engines.

2    (6)    Grant Tappen.  Mr. Tappen is also on Plaintiffs' witness list.  Mr. Tappen will

3    testify about GM's design, testing, and validation of the lubrication and

4    ventilation systems in the Gen IV LC9 engines, GM's investigation of claims of

5    oil consumption, and GM's design changes to address excess oil consumption

6    in pre-class period vehicles.

7    The parties are urged to re-examine and condense their witness list in view of the time

8    limits imposed.

9    ## V.    MOTIONS IN LIMINE

10   A.    Plaintiffs' Motions in Limine

11        1.    Motion in Limine No. 1 (Docket No. 469)

12   The National Highway Traffic Safety Administration ("NHTSA") is the U.S. government

13   agency tasked with monitoring vehicle safety and regulating and initiating recalls for safety-

14   related issues.  Plaintiffs seek to exclude two types of NHTSA recall-related evidence: (1)

15   evidence related to a specific NHTSA publication, and (2) evidence or argument regarding the fact

16   that the Class Vehicles were not recalled.  Mot. at 1.  For the reasons explained below, the

17   NHTSA recall-related evidence is relevant, not unfairly prejudicial, and admissible under the

18   public record exception to the hearsay rule.  As a result, the Court **DENIES** Plaintiffs' Motion in

19   Limine No. 1.

20        a.    NHTSA Booklet (Exhibit 504)

21   Under the National Traffic and Motor Vehicle Safety Act, NHTSA has the authority to

22   write and enforce Federal Motor Vehicle Safety Standards, and to require recalls of motor

23   vehicles.  *See* 49 U.S.C.A § 30101.  In this role, NHTSA reviews complaints, and where

24   warranted, conducts investigations into alleged safety defects.  Opp. at 1 (citing NHTSA website).

25   NHTSA also publishes guidance documents and other reports related to motor vehicle compliance

26   and safety.  *Id.*  In August 2017, NHTSA published a booklet titled DOT HS 808 795, *Motor*

27   *Vehicle Safety Defects And Recalls, What Every Vehicle Owner Should Know* ("*Recalls*"), which

28   describes for NHTSA's complaint, investigation, and recall process and sets out NHTSA's view

United States District Court
Northern District of California

on vehicle performance issues it considers to be "safety-related" and those it does not.  *See* Docket No. 469-2 (Exhibit A to Pl.'s MIL No. 1).  *Recalls* lists "excessive oil consumption" under the category "Examples of Defects Not Considered Safety-Related."  *Id.* at 4.  GM cited *Recalls* in connection with its first motion for summary judgment, *see* Docket No. 184 (MSJ) at 28, in support of its argument that the alleged oil consumption defect is not an unreasonable safety hazard.

i.    <u>Relevance and Unfair Prejudice</u>

Plaintiffs argue that NHTSA's statement in *Recalls* that excessive oil-consumption is not a safety-related defect is irrelevant under Federal Rules of Evidence 401 and 402, and would be confusing and unfairly prejudicial under Rule 403.  Neither argument is persuasive.

Evidence is relevant if (i) it has any tendency to make a fact more or less probable than it would be without the evidence, and (ii) that fact is of consequence in determining the action.  Fed. R. Evid. 401.  "Irrelevant evidence is not admissible."  Fed. R. Evid. 402.

Plaintiffs argue that the statement is irrelevant because "the statement is made specifically within the context of recalls under the United States Code for Motor Vehicle Safety, and the issue of whether the excessive oil consumption defect alleged in this case is safety-related under the United States Code for Motor Vehicle Safety will not be before the jury."  Mot. at 2.  This argument is weak.  While the jury will not be considering the question of whether the defect is safety-related pursuant to the United States Code for Motor Vehicle Safety, the NHTSA's assessment of excessive oil defects in general is still relevant.  The NHTSA's determination that excessive oil consumption is not, in general, a safety-related defect under the Code makes Plaintiffs' theory that the alleged Oil Consumption Defect is a breach of the implied warranty of merchantability less likely.  Plaintiffs' motion to exclude the NHTSA pamphlet on the grounds of relevance is denied.

Plaintiffs also argue that *Recalls* is confusing and prejudicial under Rule 403.  "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

United States District Court
Northern District of California

1    Here, Plaintiffs argue that the jury is likely to attach undue weight to a statement of

2    NHTSA, even though NHTSA has not examined the specific oil consumption defect in the Class

3    Vehicles, because the NHTSA is a federal agency.  Mot. at 2.  In support of this theory, Plaintiffs

4    cite cases where courts excluded material produced by federal agencies under Rule 403.  *See id.* at

5    2–3, *see also Hynix Semiconductor Inc. v. Rambus, Inc.*, No. 00-cv-20905, 2008 WL 282376, at

6    *4 (N.D. Cal. Jan. 28, 2008) (excluding Federal Trade Commission opinion because of concern

7    that jury would attach undue weight to the opinion); *Williams v. Nashville Network*, 132 F.3d

8    1123, 1129 (6th Cir. 1997) (excluding EEOC letter because of risk that "a jury would attach undue

9    weight to this type of agency determination"); *Walker ex rel. his Ct. Appointed Curator v. United*

10   *Healthcare of Hardin, Inc.*, 2010 WL 3092648, at *6–7 (W.D. Ky. Aug. 6, 2010) (excluding

11   Office of Inspector General report because jury "could potentially attach undue weight to this type

12   of agency determination").  But these cases are inapposite because they involve agency

13   determinations with regard to one of the parties: the FTC liability opinion considered Rambus's

14   liability; the EEOC letter consisted of a determination that reasonable cause exists to believe

15   Williams's allegations; and the OIG report in *Walker* arose out of Walker's allegations of abuse.

16   *See Hynix*, 2008 WL 282376, at *4; *Williams*, 132 F.3d at 1127; *Walker*, 2010 WL 3092648, at

17   *6.  These cases thus all present a much stronger risk of unfair prejudice.  To the extent that

18   Plaintiffs contend that *Recalls* may confuse the jury because the NHTSA was not examining the

19   specific defect allegedly present in the Class Vehicles, Plaintiffs are free to probe this issue during

20   cross-examination and ensure the distinction is brought to the jury's attention.  Plaintiffs' Rule 403

21   objection is overruled.

22                              ii.    Hearsay

23   Plaintiffs also argue that *Recalls* is inadmissible hearsay under Rule 801.  An out of court

24   statement offered for the truth of the matter asserted is hearsay.  Fed. R. Evid. 801.  Hearsay is

25   inadmissible under the Federal Rules of Evidence unless it falls within a stated exception.  Fed. R.

26   Evid. 802.  Here, GM contends that the public records exception of Rule 803(8) and the treatise,

27   periodical or pamphlet exception of Rule 803(18) apply.

28

United States District Court
Northern District of California

1

(a)      Public Record Exception

Federal Rule of Evidence 803(8)(A) provides in relevant part that "a record or statement of a public office" is not excluded by the rule against hearsay where the record sets out "the office's activities" and is sufficiently trustworthy.  *See* Fed. R. Evid. 803(8)(A)(i) and B.  In GM's view, *Recalls* is a statement by a public office "set[ting] out . . . the office's activities" because *Recalls* "describes in detail NHTSA's process for investigating complaints and its standards for initiating recalls."  Opp. at 3.  Plaintiffs argue that "[t]he Recalls statement is an interpretation of the United States Code for Motor Vehicle Safety; it is not a statement of NHTSA's activities."  Mot. at 3.

*Recalls* is not excluded by the rule against hearsay because it constitutes a statement of a public office that sets out the office's activities and appears sufficiently trustworthy.  As a result, *Recalls* falls under the public records exception to the rule against hearsay.  *See* Fed. R. Evid. 803(8)(A)(i).

(b)      Learned Treatise Exception

In addition, *Recalls* may be read into evidence as a "treatise, periodical, or pamphlet" under Rule 803(18) provided that GM's technical expert Robert Kuhn establishes *Recalls* as a reliable authority.

"A statement contained in a treatise, periodical, or pamphlet" is admissible under Rule 803(18) if "the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination" and "the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice."  Fed. R. Evid. 803(18).

Plaintiffs object that *Recalls* "is not the sort of 'objective scientific evidence contemplated by Rule 803(18).'"  Mot. at 4 (quoting *Dugas v. 3M Co.*, 2016 WL 3966142, at *6 (M.D. Fla. June 30, 2016)).  Assuming *arguendo* that *Recalls* is not "objective scientific evidence," nothing in Rule 803(18) indicates that it should be read so narrowly, and Plaintiffs do not point to any in-circuit authority supporting their theory.  *Cf. Hutchings v. F/V Alaska Beauty*, 191 F.3d 460 (9th Cir. 1999) ("Although the [*North Pacific Fishing Vessel Owners' Association Vessel*] *Safety Manual* was hearsay, it was admissible under the learned treatise exception to the hearsay rule.")

The Court concludes that *Recalls* is admissible under Rules 401–403, that it is not excluded by the rule against hearsay pursuant to the public record exception, and, depending on expert testimony, may qualify for the learned treatise exception (in which case it may be read but not received as an exhibit).

### iii.   Lack of Recalls of Class Vehicles

Plaintiffs also argue that GM should be precluded from introducing evidence or making arguments regarding the fact that NHTSA has not issued a recall of the Class Vehicles. Mot. at 2. GM does not respond to this argument.

Plaintiffs contend that the fact that NHTSA has not instituted a safety recall of the Class Vehicles is irrelevant because "there is no evidence that NHTSA's determination of what constitutes a safety-related defect is reliable or accurate, and there is no evidence that NHTSA recalls every vehicle that fails to meet its safety standard." Mot. at 2. Again, these are arguments that can be made on cross-examination. The fact that NHTSA did not institute a safety recall of the Class Vehicles is relevant because it tends to make a fact of consequence—the safety of the Class Vehicles—less probable, and Plaintiffs did not establish that this evidence would be unfairly prejudicial.

For the foregoing reasons, the Court **DENIES** Plaintiffs' MIL No. 1.

### 2.   Motion in Limine No. 2 (Docket No. 466)

Plaintiffs move to exclude argument or statements that GM fixed problems with the alleged Oil Consumption Defect. Plaintiffs contend that such statements are belied by GM's engineers' deposition testimony, in which they testified that the design improvements did not eliminate issues related to the alleged Oil Consumption Defect. *See* MIL No. 2 Ex. A (Thomas Halka Depo Tr.) at 252:23-253:6 (acknowledging the AFM cover "didn't stop" oil consumption); MIL No. 2 Ex. B (Yoon Lee Depo. Tr.) at 44:4-19 (acknowledging that "even an improved design can be overwhelmed with oil"); MIL No. 2 Ex. C (Grant Tappen Depo Tr.) at 65:1-4 (acknowledging that there was "an increase in warranty consumption after these design changes were implemented"). Because of a "significant possibility of jury confusion," Plaintiffs seek to bar GM from arguing that it "fixed" or "cured" excessive oil consumption in the Class Vehicles.

United States District Court
Northern District of California

1  Mot. at 1.  For the reasons explained below, the Court **DENIES** Plaintiffs' Motion in Limine No.

2  2.

3  Plaintiffs' argument is unfounded.  First, "having to decide between conflicting evidence"

4  is not the jury "confusion" contemplated by the Federal Rules of Evidence.  *See Positive Ions, Inc.*

5  *v. Ion Media Networks, Inc*., No. 06-cv-4296, 2007 WL 9701734, at *6 (C.D. Cal. Nov. 7, 2007)

6  (denying motion in limine under Rule 403 where "[t]he jury 'confusion' that Plaintiff anticipates

7  therefore amounts to nothing more than the jury having to decide between conflicting evidence").

8  Second, Plaintiffs contend that there is "no support in the record" for arguments that GM fixed the

9  alleged defect.  Mot. at 2.  But GM has pointed to evidence suggesting otherwise.  Opp. at 3

10  (describing that GM's Red-X investigation showed that oil consumption in 2007-2009 model year

11  engines was caused by the unshielded AFM pressure relief valve and exacerbated by the original

12  design of the PCV rocker cover baffle and explaining that GM's design changes fixed these

13  particular issues).  And in any event, Plaintiffs can use the cited deposition testimony to impeach

14  Mr. Halka and Mr. Tappen during cross-examination.

15  Because Plaintiffs have not shown that the probative value from argument or statements

16  from GM that it "fixed" or "cured" excessive oil consumption in the Class Vehicles is outweighed

17  by the risk of unfair prejudice, confusion, or misleading the jury, the Court **DENIES** Plaintiffs'

18  Motion in Limine No. 2.

19        3.  <u>Motion in Limine No. 3 (Docket No. 467)</u>

20  Plaintiffs move under Rule 403 to preclude GM from "misconstruing purported piston

21  replacement data" based on a summary chart ("Chart") showing the number of Class Vehicles

22  which have received new piston rings while under warranty.  The Chart is Exhibit 510 on the Joint

23  Exhibit List.  *See* Docket No. 453 (Appendix C, Joint Exhibit List) at 170; Docket No. 467-2

24  (Exhibit A to MIL No. 3).  Both parties[1] have described the Chart as showing that "3% of class

25  vehicles required new piston rings during the 100,000 mile/5-year warranty term."  Mot. at 1.  For

26

27  ───────────────

28  [1] As part of its *Daubert* briefing, GM cited the chart as showing that "only 3% of class vehicles required new piston rings during the 100,000 mile/5-year warranty term."  Docket No. 370 ("GM's Opp. to Pl.'s Mot. to Exclude Robert Kuhn") at 2 & 2 n.8.

1   the reasons explained below, the Court **DENIES** Plaintiffs' Motion in Limine No. 3.

2        Plaintiffs take issue with Mr. Kuhn's characterization of the Chart in his expert report

3   because Mr. Kuhn described the Chart as showing the "average repair / complaint rate for excess

4   oil consumption" in the Class Vehicles.  *See* Exhibit B to MIL No. 2 ("Kuhn Report") at 13–14.[2]

5   As Plaintiffs point out, the number of vehicles that received *in-warranty piston replacements* is

6   different from the number of Class Vehicles that ever received *any* oil consumption-related repair

7   or were ever the subject of *any* oil consumption-related complaints.  Mot. at 1.  To avoid any

8   confusion or debate at trial, Plaintiffs request an order "excluding GM from misconstruing the

9   Chart and to make clear, in any reference to the Chart, that it purports to show only in-warranty

10  related piston repairs." *Id.*  Plaintiffs also "request an order preventing GM from presenting

11  testimony, documents, demonstratives or argument that indicates that piston replacement warranty

12  data captures the full universe of Class Vehicles affected by the Oil Consumption Defect." *Id.*

13       The Court agrees with Plaintiffs that Mr. Kuhn's representation of the Chart as showing

14  the "average repair / complaint rate for excess oil consumption" appears to be misleading because

15  (1) it does not make clear that the calculations were based on vehicles that were still under

16  warranty, and (2) it assumes that all oil consumption defect repairs are captured by piston

17  replacements.  In GM's response brief, GM professes that there "is no dispute over what the

18  Warranty Data shows—that less than 3% of 2011-2014 GM trucks and SUVs with Gen IV engines

19  manufactured on or after February 10, 2011 and sold nationwide ever needed a piston repair or

20  replacement during the 5-year/100,000-mile warranty term." Opp. at 2.  But this statement is itself

21  inconsistent with Mr. Kuhn's broad characterization: here, GM cabins its statement by referencing

22  the warranty and mileage information and piston replacements, which Mr. Kuhn omits.

23       As for Plaintiffs' request for an order preventing GM from presenting testimony,

24  documents, demonstratives or argument that indicates that piston replacement warranty data

United States District Court
Northern District of California

---

[2] Kuhn's report says "[t]he subject 2011-14 LC9 engines produced with these changes *experienced an average repair/complaint rate for excess oil consumption* that was roughly 6X lower in magnitude (3% vs 18%) than that of the earlier non-subject 2007–2009 L9 engines.  A chart illustrating the repair rates as IPTV (Incidents per Thousand Vehicles) for both the subject engines and prior non-subject versions of the LC9 engine is shown below . . ." Docket No. 467-3 (Kuhn Report) at 13 (emphasis added).

1   captures the full universe of Class Vehicles affected by the Oil Consumption Defect, the Court

2   disagrees that this is necessary.  To the extent that Plaintiffs believe that the Warranty Data fails to

3   capture all oil consumption-related complaints or repairs over the relevant timeline, they are free

4   to argue as much during trial.

5          As a result, the Court **DENIES** Plaintiffs' Motion in Limine No. 3 but requires that Mr.

6   Kuhn shall refrain from mischaracterizing the chart (by ignoring the limited data it represents).

7          4.      Motion in Limine No. 4 (Docket No. 468)

8          Plaintiffs move to exclude two charts found in Exhibits 510 and 511 summarizing GM

9   records of oil consumption-related warranty claims on the basis that the evidence is inadmissible

10  hearsay and unfairly prejudicial.  Mot. at 4, 6.  The chart in Exhibit 510, or the "Pfromm

11  Summary," was created by GM program quality engineer Steven Pfromm in April 2017 "using

12  data from GM's internal warranty database on oil consumption-related warranty repair claims" for

13  all 2007-2014 vehicles equipped with Generation IV engines.  Opp. at 1.  Exhibit 511, or the

14  "Kuhn Summary," was created at GM technical expert Robert Kuhn's request by Mr. Pfromm in

15  July 2021 using a "contemporaneously updated set of oil consumption-related warranty data."  *Id.*

16  Unlike the "Pfromm Summary," which was created before the Court's April 23, 2020 Order

17  limiting the classes to LC9 engines, the "Kuhn Summary" reflects only oil consumption-related

18  warranty claims for vehicles equipped with LC9 engines.  *Id.*  Plaintiffs argue that both summaries

19  should be excluded because GM has not made the raw supporting data available.

20         For the reasons explained below, the summary charts are inadmissible hearsay.  As a

21  result, the Court **GRANTS** Plaintiffs' Motion in Limine No. 4.  The Court will allow testimony

22  regarding the piston ring repair data provided a sufficient foundation is laid by the testifying

23  witness but the summary charts themselves are excluded from evidence.

24             a.      Business Records

25         GM originally contended that the summary charts were exempt from the rule against

26  hearsay as business records under Rule 803(6) or as voluminous records pursuant to Rule 1006.

27  *See* Docket No. 453 (Appendix C, Joint Exhibit List) at 170–72.  But the summary charts are not

28  business records under Rule 803(6) because they were both prepared in response to litigation

United States District Court
Northern District of California

13

rather than in the regular course of business.  *See United States v. Miller*, 771 F.2d 1219, 1238 (9th Cir. 1985) ("We agree that the lists should not have been admitted under Rule 803(6).  The summaries were prepared in response to litigation rather than in the regular course of business.  Business records prepared solely for purposes of litigation lack trustworthiness.").  Metadata indicates that the Pfromm Summary was created on April 3, 2017, four months after the lawsuit was filed, and ten years after the product went into production, while the Kuhn Summary was created on July 20, 2021.  Mot. at 4.  As a result, the summary charts are not business records.

b.    <u>Voluminous Records</u>

Nor are the charts admissible as voluminous records under Rule 1006 because GM did not provide all of the underlying data.  Under Rule 1006, "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."  Fed. R. Evid. 1006.  "The proponent of a summary must establish a foundation that (1) the underlying materials upon which the summary is based are admissible in evidence; and (2) the underlying documents were made available to the opposing party for inspection."  *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1259 (9th Cir. 1984).  In keeping with *Paddack*, summaries are inadmissible under Rule 1006 where the underlying documents were not made available to the opposing party for inspection prior to their introduction.  *See Miller*, 771 F.2d at 1238 (summary inadmissible because the proponent failed to provide the underlying data); *Amarel v. Connell*, 102 F.3d 1494, 1517 (9th Cir. 1996), *as amended* (Jan. 15, 1997) ("The district court's explanations unfortunately ignore the requirement—embodied in the mandatory language of Federal Rule of Evidence 1006 and explicitly required by our *Paddack* decision, that a party must make available to the opposing party the materials that have gone into preparing the summary exhibit.").  That was not done here.

c.    <u>Rule 703</u>

In its opposition to Plaintiffs' motion, GM asserted for the first time that the summary charts are admissible pursuant to Rule 703.  Opp. at 1.

Rule 703 provides that:

> An expert may base an opinion on facts or data in the case that the

14

1

> expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  *But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.*

Fed. R. Evid. 703 (emphasis added).  In GM's view, the summary charts are admissible because (1) the facts or data is of a type reasonably relied on by experts in the particular field, and (2) the probative value of the underlying data substantially outweighs its prejudicial effect.  Opp. at 1.

Assuming, *arguendo*, that (1) is satisfied, the Court disagrees that the probative value of the summaries "substantially outweighs" their prejudicial effect.  Plaintiffs contend—and GM does not dispute—that both charts purport to be a summary of "oil consumption complaints," but GM did not produce the underlying data (i.e., spreadsheets and reports capturing the alleged 158,182 oil consumption complaints).  GM also did not produce any documents illustrating GM's method for quantifying or qualifying "oil consumption complaints."  Mot. at 5.  And Mr. Kuhn testified at his deposition that he too did not see the underlying data—he based his analysis off summary data provided by Mr. Pfromm.  *See* Docket No. 468-5 (Exhibit D, Kuhn Depo. Tr.) at 41:22–42:3 ("I believe all I looked at has been summary data, not necessarily raw claims.").

Without access to the underlying data, Plaintiffs are prejudiced by an inability to cross-examine GM witnesses on the collection methods and calculations used to generate the reported "oil consumption complaints" totals.  Plaintiffs cannot test the summaries' reliability, thus hindering their cross-examination.  It is telling that the Federal Rules of Evidence only admit summaries to prove content when "the proponent has made the originals . . . available for examination or copying."  Fed. R. Evid. 1006; *see also United States v. Lefevbre*, 29 F.3d 636 (9th Cir. 1994) (Table) ("The underlying materials of a summary chart must be available to the opponent for inspection."); *City of Phoenix v. Com/Sys., Inc.*, 706 F.2d 1033, 1038 (9th Cir. 1983) (holding that summary exhibit was admissible where underlying documents were available for inspection).

Given the significant prejudice to Plaintiffs, the probative value of the summaries does not substantially outweigh their prejudicial effect under Fed. R. Evid. 703.  The Court **GRANTS**

United States District Court
Northern District of California

1   Plaintiffs' Motion in Limine No. 4 because the summary charts are thus inadmissible hearsay.

2   GM may, however, elicit testimony from its witnesses regarding the underlying data provided a

3   foundation is laid therefor.

4   B.      Defendant's Motions in Limine

5            1.      Motion in Limine No. 1 (Docket No. 459)

6            GM moves to exclude evidence, testimony, and argument relating to (1) Gen IV engine

7   models other than the Gen IV aluminum block (LC9) engine currently at issue,[3] and (2) Gen IV

8   engines manufactured before February 10, 2011.  GM contends that such evidence should be

9   excluded under Rules 401 and 402 because it is not relevant to Plaintiffs' class claims concerning

10  engines with a materially different design.  Mot. at 1.  GM also contends that such evidence and

11  related argument should be excluded under Rule 403 because the purported risk of jury confusion

12  and unfair prejudice substantially outweighs any probative value that could be derived "from

13  evidence about different engines with different components including different piston rings."  *Id.*

14  at 2.  Finally, GM argues that forcing a "mini-trial" on what the Court has already determined are

15  materially different engines and uncommon evidence "would be a significant waste of the Court's

16  time."  *Id.*

17          The critical question, and the key disagreement between the parties, is whether evidence of

18  the other Gen IV engines makes it more probable that the Gen IV engine at issue contains an oil-

19  related defect.  As discussed below, because the Court agrees with Plaintiffs that evidence of an

20  oil-related defect in the other Gen IV engines may make it more likely that (1) the alleged Oil

21  Consumption Defect exists in the Gen IV Class LC9 engines, and (2) that GM knew of the alleged

22  defect in the Class Engines, the Court **DENIES** GM's Motion in Limine No. 1 given the asserted

23  relatedness of the engines.

24

25

26

27

28

[3] The broader Gen IV engine family includes four different models with different designs: (i) the aluminum block (LC9) engine, (ii) the iron block (LMG) engine, (iii) LH9 model engine, and (iv) the LMF engine.  Mot. at 2.  During the class certification briefing, Plaintiffs narrowed their proposed definition of "Class Vehicles" to Gen IV LC9 engines.  Docket No. 237 (April 23, 2020 Order) at 72.

United States District Court
Northern District of California

1

a.    Relevance (Rules 401 and 402)

2

GM contends that because the Gen IV LC9 engine models are "materially different in

3

design" from other Gen IV models, evidence relating to the other Gen IV models is irrelevant.

4

Mot. at 3.  GM made a series of design changes to its engine models after receiving "elevated

5

warranty claims related to oil consumption" for 2007 model year vehicles with LC9 engines.  Mot

6

at 2.[4]  At the class certification stage, the Court concluded that these changes "introduce[d] a

7

sufficient variability in proof" to render class certification inappropriate, and limited the Class to

8

those vehicles made after the modifications.  *See* Docket 237 (April 23, 2020 Order) at 75.

9

Plaintiffs contend that documents and testimony relating to the presence of excessive oil

10

consumption in other Gen IV engines are highly relevant.  Opp. at 3.  From Plaintiffs' perspective,

11

the Gen IV LC9s in the Class Vehicles "are part of the Gen IV family," and they "share the same

12

piston rings as other engines in the LC9 family." (Exs. 5 and 6).  Plaintiffs reason that documents

13

and testimony evidencing an oil consumption defect in Gen IV engines, generally, thus make it

14

more probable than it would be without such evidence that: (1) this same alleged oil consumption

15

defect exists in the Gen IV Class LC9s, and (2) that GM knew of the defect in the Class LC9s.  *Id.*

16

"Generally, different models of a product will be relevant if they share with the accident-

17

causing model those characteristics pertinent to the legal issues raised in the litigation." *Barcenas*

18

*v. Ford Motor Co.*, No. 03-cv-04644-EAI, 2004 WL 2827249, at *3 (N.D. Cal. Dec. 9, 2004)

19

(quoting *Fine v. Facet Aerospace Products Co.*, 133 F.R.D. 439, 441 (S.D.N.Y.1990)).

20

In support of their opposition to this motion in limine, Plaintiffs attached exhibits

21

purporting to show that the alleged Oil Consumption Defect existed in all variants of the Gen IV

22

engine, not just the LC9 aluminum-block variant present in the Class Vehicles.  For instance,

23

GM's 2014 technical service bulletin ("TSB"), which addresses the causes of engine oil

24

consumption in the Gen IV engines, encompasses "all 2007–2014 vehicles with Gen IV LC9

25

engines," including vehicles with iron-block Gen IV engines.  *See* Opp. at 1; Ex. 1 at 1.  Plaintiffs

26

27

[4] Beginning with model year 2010, GM: (1) switched from '251 piston ring material to more wear-resistant '278 piston ring material, (2) added a metal "umbrella shield" over the AFM oil pressure relief valve in the crankcase, and (3) added a redesigned rocker cover in all vehicles with Gen IV engines manufactured on or after February 10, 2011.  *Id.* at 2–3.

28

United States District Court
Northern District of California

1    also attached emails from GM engineers discussing how iron block variants of the Gen IV engine

2    have the same "root cause" of ring/piston wear as with LC9 Gen IV engines.  *See* Exs. 2 and 3; *see*

3    *also* Ex. 4 (GM engineer writing that GM is "still getting Gen IV LC9 engines returned due to

4    poor oil consumption" and the engines are "very similar to the 2007 M.Y. issue").

5         The Court has never found that the oil consumption issues in the other Gen IV engines are

6    different or unrelated to the alleged Oil Consumption Defect in the Gen IV LC9 engines in Class

7    Vehicles.  In fact, during in the class certification order, the Court characterized Plaintiffs'

8    evidence as supporting the argument that "the same piston ring problem contributed to the Oil

9    Consumption Defect and persisted across the class period."  Docket No. 237 (April 23, 2020)

10   Order) at 74.  The fact that differences precluded broader class certification under Fed. R. Civ. P.

11   23 does not imply the engines are not sufficiently related as to satisfy relevance under Fed. R.

12   Evid. 401 and 402.

13        In sum, the Court agrees with Plaintiffs that documents and testimony evidencing an oil

14   consumption defect in Gen IV engines make it more probable than it would be without such

15   evidence that: (1) this same alleged oil consumption defect exists in the Gen IV Class LC9s, and

16   (2) that GM knew of the defect in the Class LC9s.  GM is, of course, free to attack the weight of

17   this evidence on cross-examination, but the evidence is not irrelevant.

18                    i.        Unfair Prejudice, Confusion, and Wasted Time (Rule 403)

19        GM argues that the Court should also exclude evidence relating to non-Class vehicles and

20   earlier versions of the Gen IV engines under Rule 403.  Mot. at 5.  GM contends that admitting

21   evidence related solely to non-LC9 Gen IV engine models or to Gen IV engines that do not have

22   GM's design changes "is likely to confuse the jury and create a strong likelihood of unfair

23   prejudice to [GM] by inviting jurors to infer that because [of oil consumption complaints in] other

24   unrelated [GM] vehicles, there must have been an actionable defect in [the Class Vehicles]."  *Id.* at

25   6 (quoting *Fahimian v. BMW of N. Am., LLC*, No. 19-cv-3587, 2021 WL 4786678, at *1 (C.D.

26   Cal. Aug. 18, 2021) ("Evidence regarding complaints, service bulletins, and/or recalls issued for

27   other year, make, and model BMW vehicles is likely to confuse the jury and create a strong

28   likelihood of unfair prejudice to BMW NA by inviting jurors to infer that because recalls occurred

United States District Court
Northern District of California

1   for other unrelated BMW vehicles, there must have been an actionable defect in Plaintiff's

2   vehicle.")).

3          GM has not shown that the probative value of this evidence is substantially outweighed by

4   a danger of unfair prejudice, confusing the issues, or misleading the jury. *Fahimian* is not

5   analogous to the instant case because *Fahimian* involved *unrelated* vehicle models, and, for the

6   reasons discussed above, the other Gen IV models are assertedly not unrelated.  Additionally,

7   Plaintiffs make a good point that GM's request to exclude "evidence, testimony, and argument

8   *relating to* (1) Gen IV engine models other than the Gen IV aluminum block (LC9) engine

9   currently at issue, and (2) Gen IV engines manufactured before February 10, 2011" cuts too

10  broadly because it would eliminate documents that discuss both the Gen IV LC9 and other models

11  (such as Exhibit 1).  Mot. at i (emphasis added).

12         The Court **DENIES** GM's Motion in Limine No. 1 to exclude evidence related to non-

13  class vehicles and out-of-scope engines.

14             2.       Motion in Limine No. 2 (Docket No. 460)

15         GM moves to exclude the opinions, reports, and deposition testimony of Plaintiffs' former

16  technical expert witness, Dr. Jeffrey K. Ball, under Rules 401–403 and 801.  Plaintiffs designated

17  Dr. Ball to opine on one subject: GM's "untrustworthy and misleading" warranty data, based on

18  testimony elicited by both sets of lawyers during Dr. Ball's deposition.  Opp. at 1.

19         Because Dr. Ball's expert reports are hearsay and Plaintiffs have not shown that any

20  exception to the hearsay rule applies, the Court **GRANTS in PART** GM's Motion in Limine No.

21  2 and excludes Dr. Ball's expert reports.  The Court **DENIES** GM's motion as to Dr. Ball's

22  deposition testimony.

23         Dr. Ball was Plaintiffs' original technical expert witness.  On September 16, 2019, Dr. Ball

24  submitted an expert report in which he sought to opine that all of the "Class Vehicles" suffer from

25  "a common design defect . . . leading to excessive oil consumption."  Docket No. 193-12 ("Initial

26  Ball Report") at 20.  According to GM, in his initial expert report, Dr. Ball did not "precisely

27  identify the purported defect or address the very low frequency of oil consumption concerns or

28  piston assembly replacements shown in GM's warranty data."  Mot. at 2.  GM deposed Dr. Ball on

United States District Court
Northern District of California

1    October 11, 2019, and a month later Dr. Ball submitted a supplemental report that included

2    analysis of the warranty claim rate for each of the four engines[5] that were then included in the

3    Class Vehicles.  No. 194-12 ("Supplemental Ball Expert Report") at 2.

4         On December 23, 2019, GM moved under Federal Rule of Evidence 702 to exclude Dr.

5    Ball's supplemental warranty claim calculations on the grounds that he lacked sufficient and

6    reliable facts and data and was not qualified to offer those opinions.  *See* Docket No. 201 ("Mot. to

7    Exclude Ball").  The Court declined to exclude Dr. Ball's opinions, finding that GM's criticisms

8    went to weight rather than admissibility, and GM could deal with his opinions and any issues

9    through cross-examination of Dr. Ball at trial.  *See* Docket No. 237 (Order) at 68.

10        Dr. Ball passed away over two years ago.  After he died, plaintiffs retained another

11   technical expert, Dr. Dahm, who submitted his initial report in November 2020.  In his report, Dr.

12   Dahm opined that the root cause of alleged oil consumption in all Class Vehicles is a piston ring

13   defect—a theory he claimed was "consistent with the opinions of Dr. Ball in his reports and in his

14   deposition testimony."  Docket No. 364-2 ("Dahm Report") ¶ 36.  On August 30, 2021, Dr. Dahm

15   submitted an updated report that included his view on the nature and cost of an adequate repair.

16   Docket No. 367-8 ("Updated Dahm Report").  The Court excluded Dr. Dahm from testifying at

17   trial that (1) a piston ring design defect in the Gen IV engine is the root cause of the alleged oil

18   consumption in Class Vehicles; (2) a piston ring design defect is present in all Class Vehicles; and

19   (3) the Class Vehicles' alert systems pose a purported safety risk.  Docket No. 395 (*Daubert*

20   Order) at 15.

21        GM now seeks to exclude any reference or evidence related to Dr. Ball's opinions on the

22   bases that: (1) his opinions and deposition testimony are inadmissible hearsay; (2) allowing Dr.

23   Dahm to testify about Dr. Ball's opinions would circumvent the rules against hearsay and the

24   Court's Order precluding Dr. Dahl from testifying on the nature and existence of an alleged defect;

25

26   _____

27   [5] Dr. Ball's opinions and testimony, which predated the Court's rulings on class certification and
     summary judgment, were based on Plaintiffs' initial proposed class.  This class included all model
     year 2010-2014 GM trucks and SUVs with any type of Gen IV engine, including LMG, LH9, and
28   LMF engine models and Gen IV engines manufactured on or before February 10, 2011, which
     have since been excluded from the certified classes.

(3) Dr. Ball's deposition testimony is inadmissible under Rule 403 because it is unnecessarily cumulative and prejudicial; and (4) Dr. Ball's opinions and testimony are inadmissible under Rules 401 and 402 because they are predicated on information about engines in non-Class Vehicles and the subjective experiences of non-Class members and non-trial plaintiffs. The Court addresses each argument in turn.

### a. Hearsay

GM contends that Dr. Ball's opinions and testimony are inadmissible hearsay because he is unavailable to testify at trial and no hearsay exception (including the residual exception under Rule 807) applies. Mot. at 3. In the Joint Trial Exhibit List, Plaintiffs had indicated that Dr. Ball's expert report was admissible under Rule 807. In their opposition, though, Plaintiffs clarified that they "intend to present Dr. Ball's reports on cross examination." Opp. at 2.

### i. Dr. Ball's Deposition Testimony

Dr. Ball's deposition testimony is admissible under Rule 804(b), which provides that "former testimony" "which was given as a witness at a . . . lawful deposition" is admissible under certain circumstances where the declarant is "unavailable." Fed. R. Evid. 804(b)(1). There is no question that Dr. Ball's death makes him unavailable. *See* Fed. R. Evid. (a)(4) ("A declarant is considered to be unavailable as a witness if the declarant . . . cannot be present or testify at the trial or hearing because of death . . ."). GM had an opportunity to cross-examine Dr. Ball at his deposition.

GM argues that Rule 804(b) does not apply to Dr. Ball's deposition testimony because "when the unavailable witness is an expert, courts have historically designed to recognize the exception when there is another expert available who could offer testimony." Mot. at 4. In support of this proposition, GM cites two out-of-circuit cases, *Carter-Wallace, Inc. v. Otte* and *Livers v. Schenk*.

In response, Plaintiffs point out that Rule 804(b)(1) does not differentiate between lay witnesses and expert witnesses, and that the Ninth Circuit has explicitly held that testimony of an unavailable expert witness was admissible at trial pursuant to Rule 804(b)(1). Opp. at 1; *see also Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1019 (9th Cir. 2004) (admitting

United States District Court
Northern District of California

1   expert's deposition testimony under Rule 804(b)(1) where expert's residence in Alabama placed

2   him outside of the court's subpoena power and defendants had an opportunity to cross-examine

3   expert at earlier deposition).  GM's out-of-circuit authority is neither binding nor persuasive.

4          Dr. Ball's deposition testimony satisfies the requirements of Rule 804(b)(1).  As a result,

5   his deposition testimony is not excluded by the rule against hearsay.

6                    ii.    Dr. Ball's Expert Reports

7          Dr. Ball's expert reports, on the other hand, are inadmissible hearsay.  In the Joint Trial

8   List, Plaintiffs indicated just one possible exception to the rule against hearsay—the residual

9   exception under Rule 807.  *See* Joint Trial List at 9–11.  As explained below, this exception is

10  unavailing.

11         "FRE 807 involves discretion.  It exists to provide judges a 'fair degree of latitude' and

12  'flexibility' to admit statements that would otherwise be hearsay."  *United States v. Bonds*, 608

13  F.3d 495, 501 (9th Cir. 2010) (quoting *U.S. v. Valdez–Soto*, 31 F.3d 1467, 1471 (9th Cir. 1994)).

14  Under the residual exception, a hearsay statement is not excluded by the rule against hearsay if:

15  (1) "the statement is supported by sufficient guarantees of trustworthiness," and (2) "it is more

16  probative on the point for which it is offered than any other evidence that the proponent can obtain

17  through reasonable efforts."  Fed. R. Evid. 807.  Dr. Ball's declaration does not satisfy prong two,

18  which "essentially creates a 'best evidence' requirement."  *Larez v. City of Los Angeles*, 946 F.2d

19  630, 644 (9th Cir. 1991).

20         Courts have excluded hearsay statements under Rule 807 where the evidence was not the

21  "best available evidence."  In *Larez*, for example, the district court admitted newspaper articles

22  quoting statements made by Gates, a police chief, under this exception.  The Ninth Circuit

23  concluded that the articles were erroneously admitted "because the newspaper quotations were not

24  the best available evidence of what Gates said; testimony from the reporters themselves would

25  have been better."  *Id.* at 644.  *DeMars*, also cited by GM, is on point: there, the district court

26  admitted a letter by plaintiff's expert, who had died before trial.  *See deMars v. Equitable Life

27  Assur. Soc. of U.S.*, 610 F.2d 55, 60 (1st Cir. 1979).  The First Circuit concluded that the residual

28  hearsay exception did not apply because plaintiff reasonably could have retained another expert

United States District Court
Northern District of California

United States District Court
Northern District of California

who could testify at trial.  *Id.* at 61 ("Since Dr. Rattigan's opinion was based solely on his examination of the decedent's medical and hospital records, the death certificate and the report of the postmortem examination any other physician could have been obtained to render an opinion on fairly short notice . . . [w]e find that the requirements of Fed. R. Evid. 804(b)(5)(B) were not complied with and, therefore, the district court erred in admitting the letter.").

Live testimony regarding the warranty data would be a better form of evidence, as compared to Dr. Ball's expert reports.  *Cf. Phoenix Techs. Ltd. v. VMware, Inc.*, No. 15-cv-01414-HSG, 2017 WL 8069609, at *1 (N.D. Cal. June 7, 2017) (describing the "longstanding presumption that live testimony is clearly preferable to deposition testimony, especially for important witnesses . . ."); *Wilson v. Walgreen Co.*, No. 11-cv-2930-EMC, 2011 WL 4345079, at *4 (N.D. Cal. Sept. 14, 2011) (stating that "for trial, live testimony is as a general matter preferable over deposition excerpts").  Plaintiffs' new expert could have provided the best evidence via Dr. Dahm.  Plaintiffs did not explain why Dr. Dahm did not independently analyze the warranty data following Dr. Ball's death.  Dr. Ball's expert reports may not be admitted under Rule 807.

In sum, Dr. Ball's expert reports are hearsay and Plaintiffs have not shown that any exception to the hearsay rule applies.  As a result, these reports are inadmissible.

### iii.    Rule 403: Dr. Ball's Testimony is not Cumulative

GM argues that Dr. Ball's opinions run afoul of Rule 403 because they are "unnecessarily cumulative and prejudicial."  Mot. at 6.  GM insists that "[a]llowing plaintiffs to present evidence to the jury about Dr. Ball's opinions, when Dr. Dahm has reviewed the same materials and will testify live at trial, would be unnecessarily duplicative and would also cause undue delay and wasted time, both of which Rule 403 also seeks to prevent."  *Id.*  GM also contends that it would be prejudiced if Dr. Ball's testimony reached the jury without cross-examination.  *Id.*

Plaintiffs counter that Dr. Ball's testimony is not cumulative because Dr. Ball will testify as to one issue: "the dangerously deficient quality and scope of GM's warranty data."  Opp. at 2. In particular, Dr. Ball will testify that GM's warranty data "excludes replacement claims for numerous piston assembly sister components that must be considered in any credible oil

consumption failure rate analysis." *Id.*  Dr. Dahm, on the other hand, will testify that only considering "oil consumption complaints," as GM's expert did (who was disclosed after Dr. Ball's death), does not capture the full universe of damaged vehicles.  In other words, Dr. Ball will testify that GM's warranty data is devoid of critical sister part replacement data, while Dr. Dahm will testify that relying on "oil consumption" complaints alone hid the true total of vehicles damaged by the defect.  At the hearing, Plaintiffs also explained that they would narrow their designations of Dr. Ball's deposition testimony to ensure that it would not run afoul of the Court's *Daubert* order and the ruling herein permitted on the narrow scope of Dr. Balls' admitted deposition testimony, and that the parties would further meet and confer regarding Dr. Ball's deposition designations.

The Court will limit Dr. Ball's deposition testimony to the quality and scope of GM's warranty data.  Plaintiffs shall not designate portions of Dr. Ball's deposition that include topics covered by Dr. Dahm.  Because Dr. Ball and Dr. Dahm will testify regarding different issues, Dr. Ball's testimony will not be cumulative.  The Court thus denies GM's motion in limine on this ground.

iv.   <u>Relevance Under Rules 401 and 402</u>

Finally, GM argues that the Court should also exclude any evidence and argument about Dr. Ball's opinions, reports, and deposition testimony because they are based entirely on data that includes pre-Class Period vehicles without GM's design changes and vehicles with other Gen IV engine types that are not at issue in this case.  Mot. at 6.  According to GM, Dr. Ball's opinions, reports, and deposition testimony are irrelevant to the question of whether the Gen IV LC9 engines in the Class Vehicles have a common, oil consumption defect caused by the piston rings, and are inadmissible under Federal Rules of Evidence 401 and 402.  *Id.*

Plaintiffs respond that Dr. Ball is not providing any opinions on any particular engines or vehicles.  According to Plaintiffs, "Dr. Ball will testify on the narrow issue of warranty data credibility, quality, and completeness.  His opinions are offered to assist the jury in understanding the warranty data, GM's search criteria, and what is not included in the data but should be."  Opp. at 3.  For this reason, and for the reasons described in the Court's analysis in Part B.1.a, GM's

United States District Court
Northern District of California

objection regarding relevance is overruled.

In conclusion, the Court **GRANTS in PART** and **DENIES in PART** GM's Motion in Limine No. 2.  Dr. Ball's expert reports are hearsay and are inadmissible.  Dr. Ball's deposition testimony is not hearsay but the Court will limit his testimony to the quality and scope of GM's warranty data on Rule 403 grounds.

3.    Motion in Limine No. 3 (Docket No. 462)

GM moves to exclude evidence and testimony of non-class-member plaintiffs (including the original proposed California class representatives, Raul Siqueiros and Todd and Jill Cralley[6]), under Rules 401–403.  Mot. at 1.  In their opposition, Plaintiffs object that this motion in limine is "premature," and indicated that they may seek to call non-Class Plaintiffs to be used to rebut any arguments by GM that oil consumption issues experienced by the Class Plaintiffs were not the result of an inherent Oil Consumption Defect but the result of issues particular to these Class Plaintiffs' vehicles.  Opp. at 1.

GM echoes its arguments from MIL No. 1 (in which it sought to exclude evidence and arguments relating to other Gen IV engine models).  Here, GM asserts that: (1) testimony from non-class members including Siqueiros and the Cralleys about their experiences with materially different engines in their non-Class Vehicles should be excluded under Federal Rules of Evidence 401 and 402 because it is not relevant to Plaintiffs' class claims; (2) this evidence and testimony should be excluded under Federal Rule of Evidence 403 because the risk of jury confusion and unfair prejudice substantially outweighs any probative value that could be derived from evidence about different engines with different designs and different components, including different piston rings; and (3) forcing a mini-trial on what the Court has already determined are materially different engines and uncommon evidence would be a significant waste of the Court's and the jury's time.  Mot. at 1–2.

Plaintiffs contend that this testimony is relevant because "it makes it more probable than it

---

[6] As noted earlier, the certified classes are limited to owners and lessees of Gen IV LC9 aluminum block engines limited on or after February 10, 2011.  Mr. Siqueiros and the Cralleys own vehicles with different engines and thus are not members of the certified California Class.

United States District Court
Northern District of California

otherwise would be that the Gen IV engines in the Class Vehicles suffer from an inherent oil consumption defect." Opp. at 2. To the extent that GM argues that Class Plaintiffs' issues with their vehicles stemmed from owner misuse, then allowing Mr. Siqueiros or Mr. Cralley to testify about their own experiences with their vehicles would rebut the argument that there is not an inherent defect. To be clear, their testimony would seem to be less useful to Plaintiffs because it is specifically limited to non-Class Vehicles, but it is *relevant*.

As for the risk of unfair prejudice and confusion under Rule 403, there is a *risk* of prejudice over this evidence. Compared to GM's MIL No. 1, the probative value of this evidence is less obvious because it is anecdotal. On the other hand, though, GM's concerns about unfair prejudice may fairly be addressed on cross-examination by eliciting testimony that the relevant vehicles are not included in the Class.

Because GM has not shown that the risk of unfair prejudice substantially outweighs the probative value of this evidence, the Court **DENIES** GM's Motion in Limine No. 3.

4.      Motion in Limine No. 4 (Docket No. 463)

GM moves to exclude any evidence related to the Gen V engine under Rules 401–403 and 407. The evidence subject to this MIL includes correspondence, documents, deposition testimony, and any potential trial testimony from GM witnesses discussing the design, testing, production, and implementation of the Gen V engine. In support of this MIL, GM asserts that the Gen V engine: (1) is completely different from the Generation IV internal combustion engine found in the Class Vehicles, (2) was used only in GM vehicles produced after the Class Period, and (3) is not the subject of any of the Plaintiffs' claims in this case. Plaintiffs counter that this evidence is relevant and admissible because evidence of GM's piston ring design change in the Gen V engines reveals GM's knowledge about the "actual primary root cause of oil consumption in the Class Vehicles," and GM's knowledge is an element of the Idaho Consumer Protection Act claim, as well as for fraudulent concealment tolling. Opp. at 1 n.1.

The Court **GRANTS in PART** and **DENIES in PART** this motion in limine. For the reasons discussed below, Plaintiffs may not introduce evidence related to the Gen V engine design to argue that design differences between the Gen IV LC9 engines at issue and the later Gen V

United States District Court
Northern District of California

United States District Court
Northern District of California

1  engines prove that there is an oil consumption defect in the Class Vehicles.  Plaintiffs may,

2  however, introduce evidence to impeach any contention that GM lacked knowledge of the defect.

3  They may not, however, elicit details about Gen V engines that are not necessary to show GM's

4  knowledge of defects in Gen IV engines.  The Court instructs Plaintiffs to be judicious in its use of

5  such evidence.

6                 a.     <u>Relevance</u>

7       First, GM argues that the Court should exclude any evidence and argument about or

8  relating to the Gen V engine under Rules 401 and 402 because it is irrelevant to the question of

9  whether Class Vehicles with Gen IV engines have an oil consumption defect caused by defective

10  piston rings.  Mot. at 3.  GM cites one of the Court's early decisions, in which the Court held that

11  evidence and argument about the Gen V engine is "of little to no probative value" in the case:

> The fact that GM chose not to use the low-tension oil rings in the
> context of its redesign of the full engine is of little or no probative
> value as to whether it knew the rings were defective; it could have
> chosen not use the rings for independent design or engineering
> reasons.  Thus, the mere fact that GM used different oil rings when
> redesigning its engines does not show its prior knowledge of the
> defect.

*Sloan v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2017 WL 3283998, at *6 (N.D. Cal. Aug. 1,

2017).

     In response, Plaintiffs note that this finding came on a motion to dismiss before any

discovery had taken place.  Opp. at 1.  Plaintiffs argue that the record now demonstrates that GM's

decision to employ a different piston ring coating material was driven primarily by its knowledge

that the material used in the Gen IV engines was causing excessive oil consumption.  *Id.*  Plaintiffs

attach documents from the Gen V engine development process which show that GM's experience

with the Gen IV engines informed its design of the Gen V engines.  *See, e.g.*, Ex. 1 (discussing

testing on Gen V engines to prevent the oil consumption issues for which "most of our Gen IV

field issues are on the 5.3L"); Ex. 5 (Halka testifying about issues with the Gen IV engines as

compared to the Gen V engines).

     The Court agrees with Plaintiffs that evidence regarding the Gen V engine is relevant

because it makes it more probable that GM knew that the Gen IV engines suffered from the

1    alleged Oil Consumption Defect.

2              b.    Rule 403

3         Second, GM contends that any probative value is substantially outweighed by the risk of

4    jury confusion, unfair prejudice, and wasted time.  Mot. at 3–4.  In particular, GM asserts that

5    evidence concerning a different engine with design differences that was implemented only in GM

6    vehicles after the Class Period "is likely to confuse the jury and create a strong likelihood of unfair

7    prejudice to [GM] by inviting jurors to infer that because [of differently designed engines in] other

8    unrelated [GM] vehicles, there must have been an actionable defect in [the Class Vehicles]."  *Id*. at

9    4 (quoting *Fahimian*, 2021 WL 4786678, at *1–2).

10        In response, Plaintiffs contend that the purpose for which Plaintiffs seek to offer Gen V

11   evidence is not to turn the trial into a referendum on the Gen IV versus Gen V design; the purpose

12   "is simply to demonstrate GM's knowledge of the defect in the Gen IV engine."  Opp. at 3–4.

13   Because GM's knowledge of the defect is a central issue in the case (and, as noted above, one of

14   the elements that Plaintiffs must prove), the probative value of this evidence is not substantially

15   outweighed by the risk of jury confusion, unfair prejudice, and wasted time.  As a result, GM's

16   objection under Rule 403 is overruled.

17             c.    Rule 407

18        Finally, GM argues that Plaintiffs are also barred by Federal Rule of Evidence 407 from

19   introducing evidence related to the Gen V engine to the extent they intend to suggest that the

20   design differences between the Gen IV LC9 engines at issue and the later Gen V engines were

21   adopted in order to address an alleged oil consumption defect in the Class Vehicles.  Mot. at 5.

22        Under Federal Rule of Evidence 407, subsequent remedial measures are not admissible to

23   prove design defect, "[b]ut the court may admit this evidence for another purpose, such as

24   impeachment or—if disputed—proving . . . feasibility of precautionary measures."  Fed. R. Evid.

25   407.  The Court agrees with GM that Rule 407 forecloses Plaintiffs from arguing that Gen V's

26   design differences shows that the Gen IV engine was defective.

27        Plaintiffs explained that they seek to introduce this evidence for a different purpose,

28   namely, to demonstrate GM's knowledge of the alleged Oil Consumption Defect.  Opp. at 4.  Rule

United States District Court
Northern District of California

407 allows for the admission of evidence of subsequent remedial measures for certain purposes. Courts have admitted evidence to show a defendant's knowledge of a defective design and impeach any contention to the contrary.  For example, in *Rozier v. Ford Motor Co.*, an engineer's memorandum analyzing alternate designs was "admissible as proof of subsidiary issues in the case, such as knowledge of the dangerous condition."  573 F.2d 1332, 1343 (5th Cir. 1978); *see also Prokenpek v. Los Angeles Cnty. Sheriff's Dep't*, No. 13-cv-0094, 2015 WL 13918084, at *6 (C.D. Cal. Dec. 22, 2015), *report and recommendation adopted*, 2016 WL 11759098 (C.D. Cal. Jan. 19, 2016) ("And even if the CCJV Report itself could be considered a subsequent remedial measure, such report would still be admissible on issues such as knowledge and causation."); *Kirkland v. Marriott Int'l Inc.*, 416 F. Supp. 2d 480, 489 (E.D. La. 2006) (holding that "evidence of such remedial measures may be admissible for certain purposes, including impeachment" which may include "proving defendants' knowledge of the alleged dangerous condition").  To the extent that GM seeks to argue that it had no knowledge of the alleged Oil Consumption Defect, Rule 407 does not bar Plaintiffs from introducing this evidence for impeachment.  However, the scope of evidence is limited to that purpose and may not focus on, *e.g.*, details about how the Gen V engines differ from Gen IV engines.

In sum, the Court **GRANTS** GM's Motion in Limine No. 4 **in PART** and bars Plaintiffs from introducing evidence related to the Gen V design to argue that design differences between the Gen IV LC9 engines at issue and the later Gen V engines prove that there is an oil consumption defect in the Class Vehicles.  Plaintiffs may, however, introduce this evidence to impeach any contention that GM lacked knowledge of the alleged defect in the Gen IV engines.

### 5. Motion in Limine No. 5 (Docket No. 464)

Lastly, GM moves to exclude evidence relating to (1) the existence or status of other claims against GM, including experiences of other individuals who are not members of the certified Classes; (2) the total number of lawsuits against GM; and (3) settlements and negotiations between GM and third parties related to other claims and lawsuits.  Plaintiffs do not oppose Parts II and III of the motion in limine to exclude evidence of the total number of lawsuits against GM, and settlements and negotiations between GM and third parties.  Opp. at 1.  Plaintiffs

1   exclusively oppose Part I to the extent that it overlaps with GM's MIL No. 3.

2       For the first issue, GM contends that evidence relating to the existence or status of other

3   lawsuits and claims against GM, including experiences of other individuals who are not members

4   of the Classes at issue, should be excluded under Federal Rules of Evidence 401, 402 and 403,

5   because it is not probative of the plaintiffs' class claims, and any marginal probative value is

6   significantly outweighed by a danger of misleading the jury, confusing the issues, unfairly

7   prejudicing GM, and wasting the Court's time.  Mot. at 1.

8       Plaintiffs do not disagree.  They merely want to introduce evidence and testimony from

9   non-Class members under Rules 401–403.  This issue is identical to GM's Motion in Limine No.

10  3.  For the reasons explained in Part B.3, Plaintiffs may elicit testimony from non-Class members.

11  The Court thus **DENIES** this motion in limine with respect to testimony from non-Class members.

12  GM's Motion in Limine No. 5 is otherwise **GRANTED**.

### VI.    EXHIBITS

14      Pursuant to the Court's Civil Pretrial Instructions, the parties each submitted a list of

15  bellwether objections to up to fifteen proposed exhibits, set forth in the Joint Exhibit List, Docket

16  No. 453.  *See* Docket No. 457 ("Bellwether Objections").  The Court's rulings on these bellwether

17  objections follow in the attached chart.

### VII.    USE OF DISCOVERY RESPONSES

19      The parties submitted seventy pages of objections to deposition testimony as part of their

20  other pretrial filings.  *See* Docket No. 458.  Many of these evidentiary objections (*i.e.* with Dr.

21  Ball, the GM engineers, other Gen IV engines, etc.) have been addressed by the Court's rulings

22  from the pretrial conference.  As a result, the Court orders the parties to submit a modified and

23  narrowed list of the deposition objections that incorporates the Court's evidentiary rulings from

24  the pretrial conference.  The parties shall submit an updated joint memorandum identifying any

25  deposition testimony for which objections remain by Monday, September 12, 2022, at 12:00 p.m.

### VIII.    JURY INSTRUCTIONS

27      The Court will address the jury instructions in a separate order following the informal jury

28  instruction conference.  The Court intends to file proposed jury instructions and give the parties an

30

United States District Court
Northern District of California

1   opportunity to raise objections.

2                           **IX.    PRELIMINARY STATEMENT OT THE JURY**

3          The parties have submitted a joint proposed preliminary statement to be read to the jury.

4   *See* Docket No. 449.  Per the Court's Standing Order, the statement is supposed to be limited to

5   one paragraph unless the case is "extremely complex."  Because the proposed preliminary

6   statement is longer than advisable, the Court revised the parties' proposed statement to read as

7   follows:

> "Plaintiffs own model year 2012 and 2013 GM trucks with Gen IV
> LC9 engines purchased in California, Idaho, and North Carolina.
> Plaintiffs allege that their vehicles, and all other model year 2011-
> 2014 GM trucks and SUVs with the Gen IV LC9 engine
> manufactured after February 10, 2011, have an "Oil Consumption
> Defect" caused primarily by wear in the engines' piston ring
> assembly.  Plaintiffs' position is that these vehicles consume or
> "burn" an excessive amount of oil, which endangers the vehicles'
> engines and renders the vehicles unreliable. Plaintiffs further allege
> that GM knew about the alleged Oil Consumption Defect but failed
> to disclose it.  Plaintiffs seek damages based on their contention that
> if they had known about the Oil Consumption Defect, they would
> not have purchased their vehicles or, at least, would have paid much
> less for them.
>
> GM denies Plaintiffs' allegations, and contends the evidence will
> show that internal combustion engines, including the Gen IV LC9
> engines at issue, consume oil as part of their normal operation.  GM
> contends that issues with excess oil consumption are rare, and when
> they do occur, do so for a multitude of different reasons having
> nothing to do with an engine's pistons or piston rings.  GM's
> position is that there is no oil consumption defect caused by the
> piston rings in plaintiffs' own vehicles; nor is there a common oil
> consumption defect in all model year 2011-2014 GM trucks and
> SUVs with the Gen IV LC9 engine.  Finally, GM contends that
> plaintiffs have continued to use and drive their vehicles on a daily
> basis, long past their vehicles' warranty expiration dates, and that
> Plaintiffs have no damages caused by GM."

23                                  **X.    JURY VERDICT FORM**

24          Each side has submitted a proposed special verdict form.  *See* Docket Nos. 445, 447.  Both

25   of the proposed special verdict forms have several questions and multiple sections: GM proposes

26   seventeen questions; Plaintiffs suggest thirteen.  During the hearing, after the Court noted its

27   preference for a general verdict form, the parties expressed their intent to confer regarding a

28   narrower verdict form and contended that some form of special verdict is necessary.  The Court is

United States District Court
Northern District of California

1   not yet convinced that a special verdict form is necessary.  In any event, the parties are directed to

2   meet and confer regarding the verdict form.  The parties shall file the updated verdict form(s) by

3   September 12, 2022, at 12:00 p.m.

## XI.      JURY VOIR DIRE

5   The parties have submitted joint proposed voir dire questions for the electronic

6   questionnaire.  Docket No. 446.  In addition to the standard eleven questions included in the

7   Court's Standing Order, the parties included eight case-specific questions.  The Court added

8   additional questions.  The completed questionnaires should be available by September 8 or 9.

## XII.      OTHER MATTERS

10  All lawyers, clients and client representatives, and witnesses must be fully vaccinated and

11  boosted or test negative before entering the courtroom.  Additionally, anyone present in the

12  courtroom who is not speaking must wear a mask.

13  In the Joint Pretrial Conference Statement, the parties identified two issues for which they

14  request the Court's guidance at the pretrial conference.  *See* Joint Pretrial Conference Statement at

15  9 n.4, 10.

16  First, the parties disagree regarding the length of the statute of limitations for Plaintiff

17  Davis's claim for breach of implied warranty of merchantability.  GM contends that the statute of

18  limitations is three years, while Plaintiffs counter that it is four years.  *See* Joint Pretrial

19  Conference Statement at 9 n.4.  During the hearing, GM conceded that the statute of limitations is

20  four years because Plaintiffs are seeking to recover the value of the defective vehicles, not

21  damages associated with personal injuries or damage to property.  *See* N.C. Gen. Stat. Ann. § 25-

22  2-725; *see also Withers v. BMW of N. Am., LLC*, 560 F. Supp. 3d 1010, 1021 (W.D.N.C. 2021)

23  ("The applicable statute of limitations for Plaintiff's warranty-based claims is four years after the

24  cause of action has accrued.  N.C. Gen. Stat. § 25-2-725(1)").

25  Second, the parties disagree about whether Plaintiffs can use the deposition testimony of

26  four GM witnesses who are outside the subpoena power of the Court but (according to GM) will

27  be physically present at trial.  *See* Joint Pretrial Conference Statement at 10.  In GM's view, this

28  deposition testimony is inadmissible hearsay because the declarants are available to testify (and, in

United States District Court
Northern District of California

fact, will provide live testimony for GM's cross-examination).

The Court agrees with GM.  Rule 804 creates a carveout for deposition testimony where the declarant is "unavailable"—but the Court cannot countenance how a witness who is present at the courthouse and willing to testify could be "unavailable" under Rule 804.  *See* Fed. R. Evid. 804(a) (listing various criteria for being "unavailable as a witness"); *cf. Phoenix Techs. Ltd. v. VMware, Inc.*, No. 15-cv-01414-HSG, 2017 WL 8069609, at *1 (N.D. Cal. June 7, 2017) (admitting deposition testimony under Rule 32 where witness was farther than 100 miles at the time that the deposition testimony was being offered in trial).

Because GM has agreed to make these witnesses available to testify in person within 48-hour's notice, these witnesses are not unavailable within the meaning of Rule 804.  As a result, their deposition testimony is inadmissible hearsay.[7]

**IT IS SO ORDERED**.

Dated: August 31, 2022

_____
EDWARD M. CHEN
United States District Judge

---

[7] Like any other witness, the scope of GM's cross-examination shall be limited to the scope of the direct.