CROWELL & MORING LLP
Kathleen Taylor Sooy (*pro hac vice*)
ksooy@crowell.com
April N. Ross (*pro hac vice*)
aross@crowell.com
Rachel P. Raphael (*pro hac vice*)
rraphael@crowell.com
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 624-2500
Fax: (202) 628-5116

Counsel for General Motors LLC

CROWELL & MORING LLP
Warrington S. Parker, III (SBN 148003)
wparker@crowell.com
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Phone: (415) 986-2800
Fax: (415) 986-2827

KIRKLAND & ELLIS LLP
Richard C. Godfrey (*pro hac vice*)
richard.godfrey@kirkland.com
Renee Deborah Smith (*pro hac vice*)
renee.smith@kirkland.com
Caitlyn Cheleden (*pro hac vice*)
caitlyn.cheleden@kirkland.com
300 North LaSalle
Chicago, IL 60654
Phone: (312) 862-2310

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| RAUL SIQUEIROS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GENERAL MOTORS LLC, <br><br> Defendant. | Case No.: 16-cv-07244-EMC <br><br> **NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF GENERAL MOTORS LLC'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE, FOR A NEW TRIAL** <br><br> Hearing: February 16, 2023 <br><br> Hon. Edward M. Chen |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTICE OF MOTION AND MOTION**

TO THIS COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that General Motors LLC ("GM") respectfully renews its motion pursuant to Federal Rule of Civil Procedure 50 for judgment as a matter of law in favor of GM on plaintiffs' claims for breach of implied warranty under California's Song-Beverly Consumer Warranty Act, breach of implied warranty of merchantability under North Carolina law, and violation of the Idaho Consumer Protection Act, because the evidence presented at trial permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. In the alternative, GM respectfully moves for a new trial under Federal Rule of Civil Procedure 59, because the verdict was against the weight of the evidence; because plaintiffs and their counsel mischaracterized technical expert testimony, lacked a reliable and admissible damages expert, and used rampant speculation and improper commentary to prejudice the jury; and because the classes should have been decertified.

**STATEMENT OF RELIEF SOUGHT**

Pursuant to Federal Rule of Civil Procedure 50, GM renews its pending motion for judgment as a matter of law on plaintiffs' class claims. Plaintiffs failed to present sufficient evidence at trial on critical elements of these claims, including that a common defect exists in their own vehicles and all other Class Vehicles; the alleged defect caused injury to plaintiffs and all other class members; plaintiffs and all other class members provided notice to GM and were damaged as a result of GM's alleged conduct; and the statute of limitations should be tolled. Plaintiffs' failure to prove any one of these essential elements warrants judgment for GM on each of plaintiffs' claims.

In the alternative, GM moves this court for a new trial pursuant to Federal Rule of Civil Procedure 59. GM is entitled to a new trial because the jury's verdict was against the weight of the evidence; references to excluded evidence and invitations to speculate about non-existent evidence tainted the trial and the verdict; and because the classes should be decertified.

This motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities and Declaration of April N. Ross, the evidence introduced at trial, and such argument as may be presented to the Court.

1

2

Dated: November 15, 2022

CROWELL & MORING LLP

3

*/s/ April N. Ross*
Kathleen Taylor Sooy (*pro hac vice*)

4

April N. Ross (*pro hac vice*)
Rachel P. Raphael (*pro hac vice*)

5

CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.

6

Washington, D.C. 20004
Phone: (202) 624-2500

7

Fax: (202) 628-5116
ksooy@crowell.com

8

aross@crowell.com
rraphael@crowell.com

9

Warrington S. Parker, III (SBN 148003)

10

CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor

11

San Francisco, CA 94111
Phone: (415) 986-2800

12

Fax: (415) 986-2827
wparker@crowell.com

13

KIRKLAND & ELLIS LLP

14

Richard C. Godfrey (*pro hac vice*)
Renee Deborah Smith (*pro hac vice*)

15

Caitlyn Cheleden (*pro hac vice*)
300 North LaSalle

16

Chicago, IL 60654
Phone: (312) 862-2310

17

richard.godfrey@kirkland.com
renee.smith@kirkland.com

18

caitlyn.cheleden@kirkland.com

19

*Attorneys for General Motors LLC*

20

21

22

23

24

25

26

27

28

Crowell
& Moring LLP
Attorneys At Law

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARD ........................................................................................................... 3

ARGUMENT AND AUTHORITIES .................................................................................... 4

I.     THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW BECAUSE THERE WAS NOT A LEGALLY SUFFICIENT BASIS FOR A JURY TO REASONABLY FIND A CLASSWIDE DEFECT. .......................................................... 4

     A.    Plaintiffs' Claims Require Proof Of A Common Classwide Defect. ...................... 4

     B.    No Jury Could Reasonably Conclude On This Record That Plaintiffs Met Their Burden To Prove A Common Defect In All Class Vehicles. .................................... 5

          1.    <u>No Expert Defect Opinions</u>: Plaintiffs' Failure To Offer Expert Opinions On A Common Classwide Defect Is Fatal To Their Claims. ........................... 5

               a.    Plaintiffs' Defect Theory "Cries Out For Expert Interpretation." .... 5

               b.    No Expert Opined That A Defect Existed In Any Class Vehicle—Let Alone All Of Them. .......................................................... 6

          2.    <u>GM Materials</u>: Plaintiffs' Prediction That GM Data Or GM Documents Could Overcome Their Expert Problem Was Not Borne Out At Trial. ........ 7

               a.    GM Warranty Data Belies Plaintiffs' Classwide Defect Claims. .... 7

               b.    The Unrebutted Testimony Shows The Pre-Class Fixes Worked. .... 8

               c.    Internal Documents Cannot Substitute For Expert Testimony. ....... 9

     C.    Plaintiffs Invited The Jury To Rely On Speculation Or Conjecture And Stack Unreasonable Inferences That Are Legally Insufficient To Sustain A Verdict. .... 10

          1.    <u>Unreasonable Inference #1</u>: Plaintiffs' Trucks Consumed Excessive Oil. 11

          2.    <u>Unreasonable Inference #2</u>: GM's Oil Consumption Standard Is Inadequate And Should Be Ignored. ............................................................................. 12

          3.    <u>Unreasonable Inference #3</u>: A Defect Caused Excessive Oil Use Or Other Issues In Plaintiffs' Own Vehicles. ............................................................. 13

          4.    <u>Unreasonable Inference #4</u>: A Lawyer-Invented "Warranty Island" Artificially Lowered Claim Numbers. ....................................................... 15

          5.    <u>Unreasonable Inference #5</u>: Imagined Data That Is Not In The Record Would Send Warranty Rates "To The Moon." .......................................... 16

          6.    <u>Unreasonable Inference #6</u>: All Class Vehicles Had A Common Design Defect That Causes Excessive Oil Consumption. ..................................... 17

     D.    Plaintiffs' Stacked Speculative Inferences Are Legally Insufficient To Prove A

CROWELL
& MORING LLP
ATTORNEYS AT LAW

Classwide Defect Or Sustain The Jury's Verdict.................................................. 18

II.    THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW BECAUSE THERE WAS NO LEGALLY SUFFICIENT BASIS TO FIND FOR PLAINTIFFS ON OTHER ELEMENTS OF THEIR CLAIMS................................................ 19

A.    <u>California</u>: There Is No Evidence That An Alleged Defect Was "Substantially Certain" To Manifest In All Of The Class Vehicles During Their Useful Life..... 19

B.    <u>North Carolina</u>: The Implied Warranty Claim Fails For Additional Reasons. ...... 20

1.    Plaintiffs Cannot Prove An Implied Warranty Claim With Stacked Inferences Based On Circumstantial Evidence. ........................................ 20

2.    Plaintiffs' Damages Model Does Not Fit The North Carolina Class......... 21

3.    There Is No Evidence That All Class Members Gave Timely Notice....... 21

C.    <u>Idaho</u>: The Idaho Consumer Protection Claim Fails For Additional Reasons....... 21

1.    There Is No Evidence Del Valle And All Idaho Class Members Had Any Ascertainable Loss Caused By Any Alleged Deception............................. 21

2.    No Reasonable Jury Could Find That GM Knew Or Should Have Known It Was Engaging In A Deceptive Act. ......................................................... 22

III.   THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW BECAUSE THERE WAS NO LEGALLY SUFFICIENT BASIS TO FIND THAT ALL CLASS MEMBERS' CLAIMS WERE TIMELY. ...................................................... 23

A.    Certain Plaintiffs' And Many Class Members' Claims Are Time-Barred............ 23

B.    Plaintiffs Did Not Meet Their Burden To Show The Limitation Periods Were Tolled Or The Discovery Rule Applies To Plaintiffs <u>And</u> All Class Members. ............... 23

IV.    THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW BECAUSE THERE WAS NO LEGALLY SUFFICIENT BASIS FOR A JURY TO REASONABLY FIND PLAINTIFFS PROVED DAMAGES. ................................... 25

V.     ALTERNATIVELY, THE COURT SHOULD ORDER A NEW TRIAL ON ANY CLAIMS FOR WHICH IT DOES NOT GRANT JUDGMENT AS A MATTER OF LAW IN GM'S FAVOR. ............................................................................. 27

A.    The Verdict Is Against The Clear Weight Of The Evidence ................................ 27

B.    Certain Remarks Tainted The Trial Record With Improper Innuendo. ................ 27

1.    <u>Example #1</u>: Arguing Excluded Expert Defect Opinions. ....................... 28

2.    <u>Example #2</u>: Representations Regarding Discovery Issues. ..................... 28

3.    <u>Example #3</u>: Using Court Orders To "Vouch" For Experts. .................... 29

4.    <u>Example #4</u>: Repeated References To Excluded Materials. ..................... 29

C.   A New Trial Is Warranted Because The Classes Should Be Decertified. ............. 30

**CONCLUSION**.................................................................................................................**30**

1

2

# <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

**Cases**

5

6

*Am. Honda Motor Co. v. Superior Ct.*,
    199 Cal. App. 4th 1367 (2011)............................................................................... 19

7

*Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*,
    69 F.3d 337 (9th Cir. 1995)................................................................................... 27

8

9

*Bahamas Surgery Ctr., LLC v. Kimberly-Clark Corp.*,
    820 F. App'x 563 (9th Cir. 2020) ......................................................................... 30

10

*Beale v. Hardy*,
    769 F.2d 213 (4th Cir. 1985)................................................................................. 19

11

12

*Belville v. Ford Motor Co.*,
    919 F.3d 224 (4th Cir. 2019)............................................................................ 5, 10

13

*Beshwate v. BMW of N. Am., LLC*,
    2017 WL 4410169 (E.D. Cal. Oct. 4, 2017) ........................................................ 12

14

15

*Bezirganyan v. BMW of N. Am., LLC*,
    562 F. Supp. 3d 633 (C.D. Cal. 2021)................................................................... 13

16

17

*Braverman v. BMW of N. Am.*,
    2021 WL 1020408 (C.D. Cal. Mar. 17, 2021) ..................................................... 10

18

*Carlton v. Goodyear Tire & Rubber Co.*,
    413 F. Supp. 2d 583 (M.D.N.C. 2005).............................................................. 14, 20

19

20

*Chartis Specialty Ins. Co. v. Aqua Scis. Eng'rs. Inc.*,
    2014 WL 2730442 (N.D. Cal. June 16, 2014) ....................................................... 3

21

22

*Chisholm Bros. Farm Equip. Co. v. Int'l Harvester Co.*,
    498 F.2d 1137 (9th Cir. 1974)................................................................................. 3

23

*City of Cleveland v. Peter Kiewit Sons' Co.*,
    624 F.2d 749 (6th Cir. 1980)................................................................................. 28

24

25

*Claiborne v. Blauser*,
    934 F.3d 885 (9th Cir. 2019)................................................................................... 4

26

27

*Cnty. Of Maricopa v. Maberry*,
    555 F.2d 207 (9th Cir. 1977)................................................................................. 28

28

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ................................................................................................ 26

*Dickens v. A-1 Auto Parts & Repair Inc.*,
  2021 WL 2367892 (S.D. Miss. June 9, 2021) ....................................................... 17

*Draper v. Rosario*,
  836 F.3d 1072 (9th Cir. 2016) ............................................................................... 29

*Edmonson v. Eagle Nat'l Bank*,
  922 F.3d 535 (4th Cir. 2019) ................................................................................. 24

*Est. of Pilgrim v. Gen. Motors LLC*,
  2021 WL 5917584 (9th Cir. 2021) ........................................................................... 5

*Finney v. Ford Motor Co.*,
  2019 WL 79033 (N.D. Cal. Jan. 2, 2019) .............................................................. 25

*Fish v. Tesla, Inc.*,
  2022 WL 1552137 (C.D. Cal. May 12, 2022) ....................................................... 13

*Gillespie v. Am. Motors Corp.*,
  277 S.E.2d 100 (N.C. Ct. App. 1981) .................................................................... 23

*GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*,
  7 F.4th 1320 (Fed. Cir. 2021) ................................................................................ 19

*Gomez v. Stop & Shop Supermarket Co.*,
  670 F.3d 395 (1st Cir. 2012) ........................................................................... 11, 18

*Grimstad v. FCA US LLC*,
  2018 WL 6427339 (C.D. Cal. Dec. 3, 2018) ......................................................... 14

*Grodzitsky v. Am. Honda Motor Co.*,
  957 F.3d 979 (9th Cir. 2020) ................................................................................... 6

*Grunig v. Johnson & Johnson*,
  2019 WL 6868956 (D. Idaho Dec. 16, 2019) .......................................................... 6

*Herremans v. BMW of N. Am., LLC*,
  No. CV 14-02363, 2014 WL 5017843 (C.D. Cal. Oct. 3, 2014) ........................... 24

*Hesselbein v. Beckham*,
  168 F. Supp. 3d 1252 (E.D. Cal. 2016) ............................................................. 4, 27

*Hexcel Corp. v. Ineos Polymers, Inc.*,
  681 F. 3d 1055 (9th Cir. 2012) .............................................................................. 24

*Jack v. DCo, LLC*,
  837 F. App'x 421 (9th Cir. 2021) ............................................................................. 4

CROWELL
& MORING LLP
ATTORNEYS AT LAW

*Jackson v. Wood,*
859 P.2d 378 (Idaho Ct. App. 1993) ................................................................. 22

*Janich Bros., Inc. v. Am. Distilling Co.,*
570 F.2d 848 (9th Cir. 1977) ............................................................................. 4

*Johnson v. Ford Motor Co.,*
2018 WL 1512377 (S.D. W.Va. Mar. 26, 2018), *aff'd sub nom. Belville v. Ford
Motor Co.,* 919 F.3d 224 (4th Cir. 2019) .......................................................... 5

*Kamerik v. Depuy Orthopaedics, Inc.,*
2013 WL 12322041 (C.D. Cal. Jan. 28, 2013) .................................................. 5

*Knipe Land Co. v. Robertson,*
259 P.3d 595 (Idaho 2011) .............................................................................. 22

*Krieger v. Nick Alexander Imports, Inc.,*
234 Cal. App. 3d 205 (1991) ........................................................................... 23

*Lakeside-Scott v. Multnomah Cnty.,*
556 F.3d 797 (9th Cir. 2009) ....................................................................... 4, 25

*Largan Precision Co. v. Genius Elec. Optical Co.,*
2015 WL 2063988 (N.D. Cal. May 4, 2015), *aff'd,* 646 F. App'x 946 (Fed. Cir.
2016) ................................................................................................................ 19

*Manley v. Doe,*
849 F. Supp. 2d 594 (E.D.N.C. 2012) ......................................................... 12, 20

*Marlo v. UPS, Inc.,*
251 F.R.D. 476 (C.D. Cal. 2008) .................................................................. 6, 18

*Martin v. Norfolk S. Ry. Co.,*
2018 WL 6840128 (M.D.N.C. Dec. 31, 2018), *aff'd,* 787 F. App'x 162 (4th
Cir. 2019) .......................................................................................................... 6

*Maybank v. S. S. Kresge Co.,*
273 S.E.2d 681 (N.C. 1981) ............................................................................ 21

*McGee v. Mercedes-Benz USA, LLC,*
--- F. Supp. 3d ---, 2020 WL 1530921 (S.D. Cal. Mar. 30, 2020) ...................... 11

*Mexia v. Rinker Boat Co.,*
95 Cal. Rptr. 3d 285 (Cal. Ct. App. 2009) ....................................................... 23

*Michelman v. Clark-Schwebel Fiber Glass Corp.,*
534 F.2d 1036 (2d Cir. 1976) ............................................................................ 3

*Milling v. Las Vegas Metro. Police Dep't*,
   67 F.3d 307 (9th Cir. 1995)......................................................................................... 2

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724 (9th Cir. 2007)........................................................................................ 4

*Murphy Tugboat Co. v. Crowley*,
   658 F.2d 1256 (9th Cir. 1981)...................................................................................... 17

*Murray v. Farmers Ins. Co.*,
   796 P.2d 101 (Idaho 1990).......................................................................................... 15

*Naturopathic Lab'ys Int'l, Inc. v. Dermal Rsch. Lab'ys, Inc.*,
   415 F. Supp. 2d 1007 (W.D. Mo. 2006), *aff'd*, 224 F. App'x 977 (Fed. Cir.
   2007) .......................................................................................................................... 19

*Nelson-Ricks Cheese Co. v. Lakeview Cheese Co.*,
   331 F. Supp. 3d 1131 (D. Idaho 2018)......................................................................... 22

*Ortega v. Toyota Motor Sales, U.S.A., Inc.*,
   422 F. App'x 599 (9th Cir. 2011) ................................................................................ 14

*Peralta v. Dillard*,
   744 F.3d 1076 (9th Cir. 2014)................................................................................... 3, 4

*Performance Chevrolet, Inc. v. Mkt. Scan Info. Sys., Inc.*,
   402 F. Supp. 2d 1166 (D. Idaho 2005)......................................................................... 23

*Philips v. Ford Motor Co.*,
   2017 WL 635469 (N.D. Cal. Feb. 16, 2017).................................................................. 27

*Pilgrim v. Gen. Motors Co.*,
   2020 WL 7222098 (C.D. Cal. Nov. 19, 2020)......................................................... 5, 13, 27

*Pooshs v. Philip Morris USA, Inc.*,
   2016 WL 860985 (N.D. Cal. Mar. 7, 2016), *aff'd*, 742 F. App'x 335 (9th Cir.
   2018), *aff'd sub nom. Mintz v. Philip Morris USA, Inc.*, 831 F. App'x 363 (9th
   Cir. 2020) ................................................................................................................... 30

*Quackenbush v. Am. Honda Motor Co.*,
   2021 WL 6116949 (N.D. Cal. Dec. 27, 2021) .......................................................... 15, 20

*In re RFC & ResCap Liquidating Tr. Action*,
   399 F. Supp. 3d 804 (D. Minn. 2019) .......................................................................... 19

*Roebuck v. Drexel Univ.*,
   852 F.2d 715 (3d Cir. 1988)........................................................................................ 19

*Shalaby v. Newell Rubbermaid, Inc.*,
  379 F. App'x 620 (9th Cir. 2010) .................................................................. 6, 10

*Sip-Top, Inc. v. Ekco Grp.*,
  86 F.3d 827 (8th Cir. 1996).............................................................................. 19

*SKC Kolon PI, Inc. v. Kaneka Corp*,
  2019 WL 13020360 (C.D. Cal. June 28, 2019), *aff'd sub nom. PI Advanced
  Materials Co. v. Kaneka Corp*., 851 F. App'x 178 (Fed. Cir. 2021) ..................... 18

*St. Louis Convention & Visitors Comm'n v. NFL*,
  154 F.3d 851 (8th Cir. 1998)............................................................................... 3

*In re Toyota Motor Corp. Hybrid Brake Mfg., Sales Pracs. & Prods. Liab. Litig.*,
  959 F. Supp. 2d 1244 (C.D. Cal. 2013) *aff'd sub nom. Kramer v. Toyota Motor
  Corp.*, 668 F. App'x 765 (9th Cir. 2016)............................................................. 12

*TriReme Med., LLC v. AngioScore, Inc.*,
  2017 WL 930777 (N.D. Cal. Mar. 9, 2017)......................................................... 18

*Troup v. Toyota Motor Corp.*,
  545 F. App'x 668 (9th Cir. 2013) ....................................................................... 13

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442,458 (2016) ................................................................................... 21

*United States v. Weber*,
  923 F.2d 1338 (9th Cir. 1990)............................................................................ 19

*Urrutia v. Chipotle Mexican Grill, Inc.*,
  2017 WL 2901717 (C.D. Cal. June 16, 2017) ..................................................... 18

*Villiarimo v. Aloha Island Air, Inc.*,
  281 F.3d 1054 (9th Cir. 2002)............................................................................ 18

*Weaving v. City of Hillsboro*,
  763 F.3d 1106 (9th Cir. 2014).............................................................................. 3

*Wheeler v. BMW of N. Am. LLC*,
  534 F. Supp. 3d 527 (W.D.N.C. 2021) ............................................................... 24

*Wickman v. Henderson*,
  19 F. App'x 740 (10th Cir. 2001) ....................................................................... 18

*Wozniak v. Ford Motor Co.*,
  2019 WL 108845 (E.D. Mich. Jan. 4, 2019)........................................................ 22

*Yetter v. Ford Motor Co.*,
  428 F. Supp. 3d 210 (N.D. Cal. 2019) ................................................................ 25

**Statutes**

Cal. Comm. Code § 2725 ........................................................................................... 23

Idaho Code Ann. § 48-603 ........................................................................................ 22

Idaho Code Ann. § 48-619 ........................................................................................ 23

**Rules**

Fed. R. Civ. P. 23 ..................................................................................................... 30

Fed. R. Civ. P. 50 (adv. cmt. note 1991 amend) ................................................... 3, 17

Fed. R. Civ. P. 50(a)-(b) ............................................................................................. 3

Fed. R. Civ. P. 50(b) .................................................................................................. 4

Fed. R. Civ. P. 59 ....................................................................................................... 4

Fed. R. Civ. P. 403 ................................................................................................... 28

Model Rules of Prof. Conduct r. 3.3, cmt. 2 ........................................................... 30

Model Rules of Prof. Conduct r. 3.4(e) ................................................................... 29

**Other Authorities**

11 Fed. Prac. & Proc. § 2806 (3d ed.) ................................................................. 4, 27

## **INTRODUCTION**

For nearly six years, plaintiffs claimed that the Class Vehicles consume excessive oil caused primarily by a uniform piston-ring design defect. But at trial, they presented no testing, no data, no studies, and no expert opinions supporting their claim that their individual vehicles—much less all Class Vehicles—had a common piston-ring design (or any other) defect or even had the excess oil consumption that they identified as the signature defect symptom. Instead, their experts' defect opinions were excluded, and the evidence at trial showed that plaintiffs' nine- or ten-year-old vehicles, with over 400,000 collective miles, consumed oil at a rate within (and in some cases better than) GM's published standard for *new* vehicles (*i.e.* one quart per 2,000 miles). And the only Class Vehicle population data introduced at trial showed that **less than one percent** had in-warranty piston-ring repairs or replacements. Plaintiffs presented no other data whatsoever on malfunction or repair rates, warranty claims, or customer complaints (for piston rings, oil consumption, or any other issues) in the Class Vehicles.

Lacking data, experts, or other evidence to support a common design defect in all Class Vehicles, plaintiffs invited the jury to speculate about non-existent evidence and to stack together a series of unreasonable inferences to reach an untenable conclusion divorced from the evidence. Instead of presenting expert opinions on the highly technical and complex piston ring defect or oil consumption issues (or even having anyone inspect the named plaintiffs' own vehicles to determine whether they have the piston ring wear they claim is endemic to all Class Vehicles), plaintiffs pointed to a handful of reports of issues that *could be caused* by excess oil consumption, but did not *rule out the myriad other causes* of those same issues. Instead of proving that their vehicles actually consumed excessive oil with reference to an accepted or industry standard rate, plaintiffs offered only their own anecdotal experiences and their own subjective beliefs that their vehicles used more oil than they personally expected. And instead of reconciling their vehicles' normal oil consumption rates with their defect theory, plaintiffs argued that the GM standard (the only oil consumption standard in the trial record) is inadequate and urged the jury to "throw it out," even though the only evidence at trial was that GM's standard is the same or better than its competitors.

Finally, unable to grapple with the exceedingly low warranty claim rates for the very repair that they use as a proxy for damages, plaintiffs' lawyers invented a "warranty island" theory. Playing off the "Survivor" reality television show, plaintiffs argued that GM erected warranty repair barriers to decrease reported warranty claims. But this concept was a complete fiction that did not even align with the experiences of the three named plaintiffs (let alone all class members). After trial, plaintiffs' lawyers publicly boasted that this theme was "the golden thread" that wound through their entire case and confessed to crafting it to appeal to what they believed was an anti-GM sentiment based on pre-trial jury testing. But this trial was not a television show; there was in reality no "warranty island;" and this lawyer-crafted fantasy island is precisely the kind of legally insufficient speculation that cannot sustain a verdict. The "golden threads" of plaintiffs' warranty island are no more than "gossamer threads of whimsey, speculation, and conjecture." *Milling v. Las Vegas Metro. Police Dep't*, 67 F.3d 307, *3 (9th Cir. 1995). The Court should enter judgment as a matter of law for GM—or grant a new trial—for multiple, independent reasons.

*First*, on this record, the evidence permitted only one reasonable conclusion: plaintiffs did not prove a classwide defect that rendered all Class Vehicles unmerchantable or unreliable. Armed with only stacked unreasonable inferences, plaintiffs did not present legally sufficient evidence on this indispensable element, and the Court should enter judgment for GM on all of plaintiffs' claims.

*Second*, the Court should enter judgment for additional state-law reasons. There was no evidence that the claimed defect was "substantially certain to result in malfunction during the useful life" of all of the Class Vehicles, as required under *California* implied-warranty law (indeed, there was no evidence that any defect caused any malfunction in plaintiffs' own vehicles). Stacking inference upon inference cannot establish implied-warranty under *North Carolina* law. And there was no proof that the plaintiff or other class members sustained any "ascertainable loss" caused by any deceptive or unfair practice, or that GM knew or should have known that it was engaging in a deceptive or unfair practice, as required under the *Idaho* consumer protection statute.

*Third*, the classes include many members whose claims are barred by the statute of limitations, but plaintiffs did not show that the discovery rule or tolling applied to all of these time-

barred claims. Thus, no reasonable jury could find that *all* class members' claims were timely.

*Fourth*, plaintiffs did not prove classwide damages. Their expert recognized that "there's no damages if there's no defect." Moreover, their data-less damages "model" is one line-item plucked from one document about a piston repair in non-Class Vehicles, without showing that any class member would have required that repair at the time of purchase (or otherwise).

*Fifth*, if the Court declines to enter judgment for GM on any claims, it should grant a new trial because the verdict is plainly against the clear weight of the evidence. Further, references to excluded evidence and improper remarks tainted the trial, which independently calls for a new trial.

## LEGAL STANDARD

GM does not make this motion lightly and appreciates that the Court will accord the utmost respect to the jury's verdict. But entering judgment as a matter of law if the evidence cannot support a verdict "is a performance of the court's duty to assure enforcement of the controlling law." Fed. R. Civ. P. 50 (adv. cmt. note 1991 amend). Because the evidence here precludes a finding that "the jury could reasonably have returned a verdict," the Court should reverse the verdict. *See Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1042 (2d Cir. 1976).

The Court should enter judgment as a matter of law "when it is clear that the evidence and its inferences cannot reasonably support a judgment in favor of the opposing party." *Weaving v. City of Hillsboro*, 763 F.3d 1106, 1111 (9th Cir. 2014) (internal quotation marks and citation omitted); *see also* Fed. R. Civ. P. 50(a)-(b). The "standard is whether or not, viewing the evidence as a whole, there is substantial evidence present that could support a finding, by reasonable jurors, for the nonmoving party." *Chisholm Bros. Farm Equip. Co. v. Int'l Harvester Co.*, 498 F.2d 1137, 1140 (9th Cir. 1974).[1] The Court should enter judgment as a matter of law when the evidence

---

[1] The standard for granting judgment as a matter of law "mirrors" the "standard for summary judgment." *Chartis Specialty Ins. Co. v. Aqua Scis. Eng'rs. Inc.*, 2014 WL 2730442, at *2 (N.D. Cal. June 16, 2014). But denying a pretrial summary judgment motion does not preclude the Court from granting a motion for judgment as a matter of law after trial. *See Peralta v. Dillard*, 744 F.3d 1076, 1088-89 (9th Cir. 2014); *see also St. Louis Convention & Visitors Comm'n v. NFL*, 154 F.3d 851, 860 (8th Cir. 1998) ("court's prior decision on summary judgment does not control the outcome of a Rule 50 motion" after it has "had the benefit of" trial and "extensive legal arguments by the parties").

CROWELL
& MORING LLP
ATTORNEYS AT LAW

presented at trial permits "only one reasonable conclusion," *Peralta*, 744 F.3d at 1085 (9th Cir. 2014), and "the conclusion is contrary to that reached by the jury." *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009) (internal quotation marks and citation omitted). Judgment as a matter of law is also "appropriate when the jury could have relied only on speculation to reach its verdict." *Id.* at 803; *see also Jack v. DCo, LLC*, 837 F. App'x 421, 422 (9th Cir. 2021) (same). The existence of a "mere scintilla" of evidence "is not enough to sustain a verdict" and will not prevent entry of judgment as a matter of law. *Lakeside-Scott*, 556 F.3d at 802; *Janich Bros., Inc. v. Am. Distilling Co.*, 570 F.2d 848, 853 n.2 (9th Cir. 1977).

A renewed motion for judgment as a matter of law "may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). Under Rule 59, the court may "grant a new trial on all or some of the issues" "for any reason," including where the verdict is "against the weight of the evidence." Fed. R. Civ. P. 59; *Claiborne v. Blauser*, 934 F.3d 885, 894 (9th Cir. 2019). "[T]he district court has 'the duty'" to "weigh the evidence as it saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (citation omitted) (alteration in original). On a new trial motion, the court "is not required to view the trial evidence in the light most favorable to the verdict," and "can weigh the evidence and assess the credibility of the witnesses." *Hesselbein v. Beckham*, 168 F. Supp. 3d 1252, 1262 (E.D. Cal. 2016). "If, having given full respect to the jury's findings," the Court "on the entire evidence is left with the definite and firm conviction that a mistake has been committed," it should grant a new trial. 11 FED. PRAC. & PROC. § 2806 (3d ed.).

## ARGUMENT AND AUTHORITIES

### I.    The Court Should Enter Judgment As A Matter Of Law Because There Was Not A Legally Sufficient Basis For A Jury To Reasonably Find A Classwide Defect.

#### A.    Plaintiffs' Claims Require Proof Of A Common Classwide Defect.

Plaintiffs had the burden to present common evidence sufficient for the jury to reasonably find that (1) *all Class Vehicles*, including their own, have a common defect; (2) because of the defect, all of those vehicles were not "in safe condition and substantially free from defects" and

could not "provide safe, reliable transportation" (Jury Instruction Nos. 14, 17, ECF No. 554); and (3) the failure to disclose the alleged defect harmed plaintiffs and *all other class members*. Plaintiffs argued the jury should find in their favor on all claims based on an alleged undisclosed defect in each of their vehicles and in *all* of the Class Vehicles that rendered *all* Class Vehicles unmerchantable.[2] The Court and plaintiffs agreed, this was "an all-or-nothing case." TT 739:2-7.

Because plaintiffs failed to present legally sufficient evidence to support a jury finding of a classwide defect, the Court should grant judgment as a matter of law. *See Johnson v. Ford Motor Co.*, 2018 WL 1512377, at *9 (S.D. W.Va. Mar. 26, 2018) (granting summary judgment where plaintiffs failed to provide evidence of a defect and experts offered evidence only to show notice but not a defect itself), *aff'd sub nom. Belville v. Ford Motor Co.*, 919 F.3d 224 (4th Cir. 2019); *Est. of Pilgrim v. Gen. Motors LLC*, 2021 WL 5917584, at *1 (9th Cir. 2021) (affirming summary judgment where plaintiffs "failed to produce admissible evidence that their vehicles actually contained the alleged valve guide defects") (internal citation and quotation marks omitted).

**B.     No Jury Could Reasonably Conclude On This Record That Plaintiffs Met Their Burden To Prove A Common Defect In All Class Vehicles.**

   **1.     <u>No Expert Defect Opinions</u>: Plaintiffs' Failure To Offer Expert Opinions On A Common Classwide Defect Is Fatal To Their Claims.**

      **a.     Plaintiffs' Defect Theory "Cries Out For Expert Interpretation."**

Plaintiffs' liability theory required them to prove that there is a common defect in all class vehicles. The existence of that defect is "plainly beyond the common experience of both judges and jurors" and, as a result, "expert testimony is required to demonstrate a product is defective." *Kamerik v. Depuy Orthopaedics, Inc.*, 2013 WL 12322041, at *4 (C.D. Cal. Jan. 28, 2013) (citation omitted); *Pilgrim v. Gen. Motors Co.*, 2020 WL 7222098, at *8 (C.D. Cal. Nov. 19, 2020) ("none of the Plaintiffs can overcome the lack of expert testimony"). Expert testimony is especially necessary here because the plaintiffs' purported defect involves "questions of physics, metallurgy, and engineering related to the construction, composition, design and operation" of a product.

---

[2] *E.g.* Trial Transcript ("TT") (relevant excerpts attached to the contemporaneously filed Declaration of April N. Ross; *also available in full at* ECF Nos. 567-576) 1393:7-9; 233:13-235:3; 236:15-237:4; 237:24-238:9; 238:20-239:24; 240:24-241:7; 1367:23-1369:12; 1373:17-1374:21; 1388:7-12; 1392:15-1394:2; 1439:21-1440:2; 1441:6-23; Jury Instr. No. 20, ECF No. 554.

CROWELL & MORING LLP
ATTORNEYS AT LAW

*Shalaby v. Newell Rubbermaid, Inc.*, 379 F. App'x 620, 622 (9th Cir. 2010) (affirming summary judgment); *Martin v. Norfolk S. Ry. Co.*, 2018 WL 6840128, at *13 (M.D.N.C. Dec. 31, 2018) (granting summary judgment because, with no expert, "the lay jury" was left "to engage in pure speculation"), *aff'd*, 787 F. App'x 162 (4th Cir. 2019). Evidence that is "extremely technical or difficult to follow" "cries out for expert interpretation." *Grunig v. Johnson & Johnson*, 2019 WL 6868956, at *7 (D. Idaho Dec. 16, 2019) (quotation marks and citation omitted).

Expert evidence is particularly critical in class actions because plaintiffs must prove there is a defect in their own vehicles *and* in *all* Class Vehicles using "common evidence" that "support[s] extrapolation from individual experiences to a class-wide judgment that is not merely speculative." *Marlo v. UPS, Inc.*, 251 F.R.D. 476, 486 (C.D. Cal. 2008). Without expert opinions or "supporting studies[,] or testing to demonstrate a common design defect," plaintiffs "failed to demonstrate commonality." *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 987 (9th Cir. 2020).

### b.   No Expert Opined That A Defect Existed In Any Class Vehicle—Let Alone All Of Them.

The Court excluded on *Daubert* and *in limine* plaintiffs' expert opinions on classwide defects, and no expert opined that a defect existed in any of plaintiffs' own vehicles or in all Class Vehicles.

Engineering Expert Werner Dahm provided a generic tutorial about engine operation, and offered a litany of potential "impacts" of piston ring wear, which he admitted could occur for any number of other reasons. He did not opine at trial that all Class Vehicles consume excess oil, or that there *is* a piston-ring (or other) defect in the Class Vehicles, and he admitted that he had no opinions about whether any of the problems that could be caused by piston wear or excess oil consumption actually did occur or were *substantially certain* to occur in plaintiffs' own vehicles or any other Class Vehicles. TT 409:11-23. He offered no opinions whatsoever specific to the Class Vehicles or to any supposed defect in those vehicles, nor did he inspect or test any piston rings or testify to a classwide defect in any of the Class Vehicles. TT 341:15-342:1; 344:5-15; 345:19-23.

Engineering Expert Jeffrey Ball similarly did not offer any opinion that a defect existed in any or all Class Vehicles, and (as discussed below) his admitted deposition testimony only

CROWELL & MORING LLP ATTORNEYS AT LAW

underscored the *absence* of a common defect in all Class Vehicles.

Damages Expert Ted Stockton also conceded that he had no opinion about whether a defect actually existed. Mr. Stockton instead based his damages theory on the bare "assumption" (fed to him by lawyers) that a uniform safety defect that could be fixed with a piston ring replacement existed in all Class Vehicles. TT 806:21-807:1; 807:2-25; 808:9-809:4; 813:10-16.

Without expert opinions supporting plaintiffs' defect claims, the verdict cannot stand.

>    **2.**    **GM Materials: Plaintiffs' Prediction That GM Data Or GM Documents Could Overcome Their Expert Problem Was Not Borne Out At Trial.**

After the Court excluded plaintiffs' expert's opinions on the existence and root cause of an alleged classwide defect (ECF No. 395), they forecasted that they could prove a common classwide defect from "GM's internal documents" and testimony from "GM engineers," which they promised would "completely validate" their claims. ECF No. 398 at 1, 4.[3] But the GM documents and GM engineer testimony introduced at trial did not support a classwide defect. Five GM engineers (Grant Tappen, Thomas Halka, Steven Pfromm, Yoon Lee, and Wai Nguyen) testified and gave evidence, corroborated by plaintiffs' own expert, that there is no classwide defect.

>    **a.**    **GM Warranty Data Belies Plaintiffs' Classwide Defect Claims.**

The only classwide vehicle performance data at trial refutes the classwide defect theory.

*First*, Mr. Pfromm (who monitored and analyzed warranty claims and trends) testified that only 0.66% of the Class Vehicles had warranty claims for piston ring repairs or replacements, which is the repair plaintiffs contend is needed to remedy the alleged defect. TT 918:6-919:9. Critically, this is ***the only warranty data in evidence, and it is undisputed***. This vanishingly low claims rate refutes, and cannot support, a classwide defect finding.

*Second*, plaintiffs' expert Dr. Ball testified that if there were a classwide defect, he would expect to see warranty claims for "100%" of the vehicles, yet admitted that his review of the data found that less than 1% of model year 2010-2014 vehicles had in-warranty piston repairs. Ball Dep. 83:17-24; 112:12-22; TT 675. Dr. Ball thus corroborated the undisputed warranty data showing

---

[3] The Court relied on this assurance to deny GM leave to file for summary judgment. ECF No 400.

that 99.34% of Class Vehicles did not need piston replacements at any time during the 5-year/100,000-mile warranty term, and by his own terms confirmed he would expect to (but did not) see a 100-fold increase in warranty rates if there was in fact a common, classwide defect.[4]

*Third*, the warranty data underscores the overwhelming evidence that any oil consumption issues with earlier model year engines were remedied by the design changes that GM implemented before production of any Class Vehicles. Mr. Pfromm explained that prior to the fixes GM introduced in 2010 and 2011—the AFM shield, the piston ring change, and the re-designed PCV rocker cover—oil consumption complaints in pre-Class Period Gen IV engines ranked among the top five warranty drivers. TT 910:5-20. After the changes, excess oil consumption complaints in the Class Vehicles fell to the bottom of that list. *Id.* at 948:17-949:12 (oil consumption complaints dropped to below 70 of 80 tracked warranty issues). This data analysis, which again was the *only* data at trial about the Class Vehicles' field performance, confirmed the effectiveness of the pre-Class period design changes in fixing any oil consumption problem. *Id.* at 913:19-919:9.

### b. The Unrebutted Testimony Shows The Pre-Class Fixes Worked.

The GM engineers' undisputed testimony also explained how the fixes worked and confirmed there was no common classwide defect in the Class Vehicles.

*First*, Mr. Tappen (former Gen IV Engine Design Release Engineer for the lubrication and ventilation systems (TT 446:20-447:2; 448:2-18)) testified that although GM engineers observed a small but unexpected uptick in oil consumption-related warranty claims shortly after release of the pre-Class 2007 model year Gen IV engine, this was an "anomaly" limited to pre-Class "early builds" (*i.e.*, engines not at issue in this case). TT 517:15-518:1. He explained that GM fundamentally changed the design of the LC9 Gen IV engines before manufacturing any Class Vehicles to (i) shield the AFM valve and thereby eliminate the root cause of the oil consumption issue in earlier model year vehicles; and (ii) employ an improved rocker cover baffle design for the positive crankcase ventilation (PVC) system that redirected oil to the oil pan preventing oil

---

[4] Plaintiffs cannot overcome this problem with speculation about what other data (which they did not develop or introduce) could show. They filed no discovery motion on this, and their attempt to conjure up a *de facto* adverse inference is improper and cannot sustain a verdict. *See* Section V.B.2.

consumption through "PVC pull-over."[5] Mr. Tappen provided undisputed testimony about the multiple tests carried out by GM validation engineers that confirmed the effectiveness of the AFM shield and the re-designed rocker cover in eliminating excessive oil consumption in vehicles equipped with new (*i.e.*, unused) piston rings, like the Class Vehicles. The fixes returned those vehicles' oil consumption to "Best of the Best" levels.[6]

*Second*, Mr. Halka (Design Release Engineer for piston assemblies in the Gen IV engines), similarly testified that oil problems in the pre-Class Vehicles were due to the unshielded AFM valve that was corrected *before* the Class Period. TT 527:6-529:17.[7]

*Third*, neither of the GM engineers called by deposition, Mr. Nguyen (Valvetrain Design Responsible Engineer) or Mr. Lee (Small Block Design Systems Engineer), testified that they (or GM) were ever aware of an inherent oil consumption defect in all Class Vehicles. Mr. Nguyen testified he did not know of any oil consumption problems in Gen IV engines generally, and Mr. Lee testified that "no," GM never concluded "that all of the Gen IV 5.3-liter vehicles suffered from oil consumption problems." Lee Dep. at 179:3-6; TT 668; Nguyen Dep. at 38:21-39:2; TT 670.

### c.  Internal Documents Cannot Substitute For Expert Testimony.

Plaintiffs' reliance on internal GM documents is also insufficient. Of the 43 total exhibits introduced into evidence at this trial, only a very few discuss oil consumption in Class Vehicles, and none creates a reasonable inference of a common classwide defect in the Class Vehicles.

*First*, several documents relate to vehicles built in Silao, Mexico, where a supplier manufacturing issue affected baffle sealant for a small number of vehicles. *See* TX146, TX150, TX155, TX192, TX555. This supplier issue could cause misfires, PCV pull-over, or oil consumption in some vehicles, but this issue was not a piston ring problem and was not the result

---

[5]  TT 453:6-16; 465:9-468:15; 469:1-13; 475:12-476:5; 470:15-471:3; 476:9-478:13; 493:3-21; 512:4-513:22; 517:15-518:1.

[6]  TT 471:17-475:6; 479:19-484:11; 485:14-488:2; 513:24-514:14; TX 131; TX 132.016-17; TX 542. ("TX" refers to "Trial Exhibit," which are also attached to the Ross Declaration).

[7]  He also directly refuted plaintiffs' lawyers' speculation that any piston ring coating (even the less durable '251 material used in pre-2010 vehicles) causes excessive oil consumption or that rings with a more robust PVD coating would have reduced the possibility of excess oil consumption "by itself." *Id.* at 462:9-1; 463:24-464:6; 527:18-528:14; 623:7-19; 636:24-638:7; 639:15-640:5.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

of a GM design. The evidence showed that this was a temporary issue of limited duration, that neither applied classwide nor reflected any common design defect. TX555; TT 909:11-909:21.

*Second*, two emails discuss one anecdotal vehicle with manually mis-installed piston rings that otherwise "looked good" and did not cause oil problems. TT 1018:19-1019:15; TX538; TX540.

*Third*, three emails reference ongoing oil consumption issues in an unquantified number of Gen IV vehicles, without distinguishing between pre-Class and Class Vehicles. The emails do not refer to "post-fix, post-February 2011 engines" but instead to "engines that had '278 [ring coating] before AFM valve fixes"—i.e. pre-Class vehicles *without* the later fixes—that came in needing those service fixes, *not the Class Vehicles* that already had the fixes from production. TT 630:3-11 (TX202); 632:23-633:1 (TX207); 633:3-634:4 (TX216); 634:6-9.

*Fourth,* a spreadsheet reflects some of the underlying data Mr. Pfromm used to calculate the undisputed 0.66% in-warranty piston repair rate for the post-fix Class Vehicles. TX214.

*Fifth*, a document shows GM's standard guideline on acceptable oil consumption rates in gasoline-powered light-duty vehicles (no more than 1 quart per 2,000 miles), which is the only oil consumption standard in evidence, and which is "very typical" if not better than other manufacturers' standards. TX36; TT 651:7-651:18.

*Finally*, two Technical Service Bulletins (TSBs) include (1) repairs for the Silao supplier issue described above, and (2) fixes for the pre-Class Vehicle (the AFM shield and updated rocker cover), which were already included in all the Class Vehicles. TX169; TX209; TT 948:7-16.

In short, there was zero testimony from GM company employees and no internal company evidence at trial from which the jury could reasonably find that *all* Class Vehicles have a common design defect or that any defect must be fixed by replacing the pistons or piston rings. The Court should enter judgment in GM's favor. *Shalaby*, 379 F. App'x at 622; *Braverman v. BMW of N. Am.*, 2021 WL 1020408, at *3 (C.D. Cal. Mar. 17, 2021); *Belville*, 919 F.3d at 236.

### C.    Plaintiffs Invited The Jury To Rely On Speculation Or Conjecture And Stack Unreasonable Inferences That Are Legally Insufficient To Sustain A Verdict.

Without expert or any other evidence of a classwide piston defect, plaintiffs asked the jury to stack unreasonable inference upon unreasonable inference, "until the entire pyramid topples of

its own weight." *Gomez v. Stop & Shop Supermarket Co.*, 670 F.3d 395, 398 (1st Cir. 2012).

### 1. Unreasonable Inference #1: Plaintiffs' Trucks Consumed Excessive Oil.

Plaintiffs argued that it was just "common sense" that their own vehicles used too much oil. TT 1437:21-22. But there is no evidence that any plaintiffs' vehicle consumed oil in excess of the GM standard of one quart per 2,000 miles—a standard that applies to every gasoline-powered GM car and light-duty truck of every make, model, and model year over several decades. *See* TX36.

Mr. Tarvin testified that he has "to add about a half a quart" or oil "every thousand miles" (which is consistent with GM's one quart per 2,000 mile standard), and also that a professional oil consumption test performed on his vehicle last year showed that his oil consumption was normal and within GM's standards. TT 1031:22-25; 1057:15-22; 1060:14-20; TX36. While he speculated that the oil in his ten-year-old Sierra "must be consumed internally," he admitted that he has no technical expertise and this assumption was based only on (1) what he "learned" from sitting at trial (which was admitted for state of mind and not for the truth), and (2) that he did not add oil to other vehicles, even though he did not perform the maintenance on those vehicles and "couldn't tell you exactly what [those other vehicles] burned." *Id.* at 1032:5-17; 1079:3-6.

Mr. Del Valle testified he adds approximately one quart of oil every 3,000 to 4,000 miles— an amount substantially less than GM's accepted standard for passenger cars and gasoline-powered light duty trucks, including the other GM vehicles Mr. Del Valle has owned. *Compare* TT 1092:5, 13-14; 1100:19-22; 1110:24-1111:9 *with* TX36.

There was no factual evidence of excess oil consumption for Mr. Davis—only his own subjective and unsupported lay opinions. He admitted that his vehicle was "consuming oil at what GM considers a normal rate" but speculated that the amount was still "excessive" in his subjective opinion, and that the oil consumption increased with mileage, which his own expert Dr. Dahm testified is normal and expected for all vehicles. TT 355:18-22; 1220:23-1221:2; 1293:8-13. A consumers' subjective disappointment with a vehicle that did what it was represented to do cannot sustain a verdict either. *See McGee v. Mercedes-Benz USA, LLC*, --- F. Supp. 3d ---, 2020 WL 1530921, at *6 (S.D. Cal. Mar. 30, 2020) (plaintiffs' "lost faith and confidence in the safety of

vehicle" due to recall is not sufficient "to establish non-merchantability"); *Beshwate v. BMW of N. Am., LLC*, 2017 WL 4410169, at *10 (E.D. Cal. Oct. 4, 2017) (alleged "increase in the frequency of maintenance and/or replacement of parts is insufficient" to state implied warranty claim).

Plaintiffs also did not introduce any evidence on industry standard oil consumption rates for V8 internal combustion engines, or any independent testing of oil consumption rates in the plaintiffs' vehicles or any other Class Vehicles relative to similar vehicles. Plaintiffs' testimony shows that their vehicles' oil use was within GM's guidelines, and there is absolutely no evidence that any of plaintiffs' individual vehicles consumed oil in excess of any industry or other standard. Plaintiffs' subjective beliefs that their vehicles consumed too much oil and/or that they consumed more oil than other vehicles they had owned, are both insufficient to prove a classwide defect and, even as to their own vehicles, constitute improper lay opinion testimony. *See* ECF No. 395 at 15; *In re Toyota Motor Corp. Hybrid Brake Mfg., Sales Pracs. & Prods. Liab. Litig.*, 959 F. Supp. 2d 1244, 1254 (C.D. Cal. 2013) (insufficient defect proof where the "only evidence" "is [plaintiff's] own description of his experiences driving the vehicle.") *aff'd sub nom. Kramer v. Toyota Motor Corp.*, 668 F. App'x 765 (9th Cir. 2016); *Manley v. Doe*, 849 F. Supp. 2d 594, 600-01 (E.D.N.C. 2012) (granting judgment where plaintiff relied on his own testimony to infer a defect).

### 2. Unreasonable Inference #2: GM's Oil Consumption Standard Is Inadequate And Should Be Ignored.

Plaintiffs' lawyer's claim that GM's published oil consumption standard is unreasonable cannot support a finding of classwide defect because it is not evidence and is not based on any evidence in the record. Plaintiffs presented no evidence of any other oil consumption standard in the industry or elsewhere that is different than the GM standard, and they offered no industry benchmarks, studies, expert testimony, or documentary evidence of any kind supporting this claim. The *only* documentary evidence introduced at trial on the relevant oil consumption standard is Trial Exhibit 36, which reflects GM's "Engine Oil Consumption Guidelines" for *all* GM vehicles including the Class Vehicles. This exhibit explains that "the accepted rate of oil consumption for engines used in the vehicles… is 0.946 liter (1 qt) in 3200 km (2000 miles)." While plaintiffs' counsel in closing arguments invited the jury to simply ignore GM's guideline (TT 1376:3-6;

1376:20-1377:3), neither their own experts nor any other evidence in the record provided a basis from which a reasonable jury could find that GM's guideline is inconsistent with industry norms or otherwise improper. The only evidence on this issue is Mr. Halka's unrebutted testimony that based on other manufacturers' service manuals, one quart per 2,000 to 3,000 miles is "very typical. If anything, GM is probably at the higher end of that list," meaning "the other manufacturers will require that you're using a quart of oil in even fewer miles." TT 651:7-651:18.

Without a benchmark comparator, neither plaintiffs' subjective beliefs that their trucks used too much oil nor their attorneys' "common sense" arguments are sufficient to show a defect, much less one making all Class Vehicles "unmerchantable." *See Pilgrim*, 2020 WL 7222098, at *9 (dismissing implied warranty claim; without "admissible evidence on industry standards and wear rates, [plaintiffs] cannot demonstrate that the length of time until the engine failed 'fell so below industry standards as to render the product unmerchantable'") (internal citation omitted); *Bezirganyan v. BMW of N. Am., LLC*, 562 F. Supp. 3d 633, 642 (C.D. Cal. 2021) (dismissing implied warranty claim where the plaintiff "offer[ed] nothing to help the Court understand how loud the squeal of his brakes in fact is, other than to say that it is 'extremely loud'") (internal citation omitted); *Fish v. Tesla, Inc.*, 2022 WL 1552137, at *1, *12 (C.D. Cal. May 12, 2022) (dismissing unmerchantability claim based on "several self-tests to measure his vehicle's energy usage and determine[] his battery was operating at consistently less than 70% of" "represented capacity"); *Troup v. Toyota Motor Corp.*, 545 F. App'x 668, 669 (9th Cir. 2013) (affirming dismissal of implied warranty claim because "the defect alleged" "did not implicate the Prius's operability," but only "required the [plaintiffs] to refuel more often").

### 3.   Unreasonable Inference #3: A Defect Caused Excessive Oil Use Or Other Issues In Plaintiffs' Own Vehicles.

Anecdotal evidence about plaintiffs' three trucks does not create a reasonable inference of a defect at all, let alone a *common* defect rendering *all* Class Vehicles unmerchantable. Plaintiffs failed to show that any excessive oil use in their or any other Class Vehicle was caused by a common piston-ring defect or any other common defect in their vehicles. No expert, mechanic, or other witness testified to inspecting plaintiffs' or any other Class Vehicles and finding piston ring

damage, and the unrebutted evidence (including from plaintiffs' own experts) confirms that oil consumption can be caused by many things having nothing to do with a piston ring defect.

*First*, oil consumption, even in "excess" of a standard, does not necessarily reflect a malfunction or design defect. Dr. Dahm conceded that oil consumption and piston ring wear are normal and will increase as vehicles age and accumulate mileage. TT 356:8-20; 449:4-10. Trial Exhibit 36 also details the myriad, undisputed driver-dependent factors that impact oil consumption such as aggressive driving, towing, or improper maintenance.[8]

*Second*, oil consumption in a particular vehicle can be explained by a multitude of alternative causes. Dr. Dahm testified that an improperly installed drain plug or oil filter could cause excessive oil consumption. TT 408:10-13.[9] And there are multiple other causes of excess oil consumption, including: (i) the intermittent Silao supplier issue, (ii) excessive towing or aggressive driving, (iii) external leaks and worn gaskets, and (iv) improper piston-ring installation by suppliers or dealers. TT 647:3-22; 918:17-919:12; 936:10-14; 936:16-23; TX538.

*Third*, there are myriad causes for claimed downstream "impacts" of the alleged defect. Dr. Dahm admitted that engine noise, rough running, an engine stall, an activated service engine light, and spark plug misfiring can be caused by a number of different issues unrelated to excess oil consumption or piston ring wear. TT 410:8-13, 14-18, 22-24; 410:25-411:4; 411:8-11, 12-16, 20-24. Dr. Ball testified that there are many reasons for an engine replacement or misfire. Ball Dep. at 109:23-110:2; 136:24-137:2; TT 675. There was no evidence ruling out these alternative causes.

Accordingly, evidence of excessive oil consumption in a particular vehicle is insufficient to establish a defect. That "[p]laintiffs' vehicle had a problem or needed a repair does not equate to proof of any defect." *Grimstad v. FCA US LLC*, 2018 WL 6427339, at *6 (C.D. Cal. Dec. 3, 2018). Nor could any alleged problem or repair support a breach of warranty claim where (as here) "other possible causes had not been eliminated." *Carlton v. Goodyear Tire & Rubber Co.*, 413 F. Supp. 2d 583, 590 (M.D.N.C. 2005); *Ortega v. Toyota Motor Sales, U.S.A., Inc.*, 422 F. App'x 599, 601

---

[8] Mr. Del Valle also agreed that "towing increases oil consumption." TT 1143:4-6.

[9] Mr. Del Valle testified that the one and only time he brought his vehicle to a dealership to be examined for oil consumption, "their diagnosis was a loose and leaky oil filter." TT 1099:18-23.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

(9th Cir. 2011) (affirming judgment as a matter of law where plaintiff's expert "could not identify the cause of the vehicle's defects"); *Murray v. Farmers Ins. Co.*, 796 P.2d 101, 105–06 (Idaho 1990) ("proof of a malfunction may circumstantially prove the existence of a defect," but "an integral part of the proof involves negating other reasonable causes of the accident").

### 4. <u>Unreasonable Inference #4</u>: A Lawyer-Invented "Warranty Island" Artificially Lowered Claim Numbers.

The record evidence overwhelmingly and irrefutably shows that the relevant piston ring warranty claims are less than one percent, and that 99.34% of Class Vehicles did not need piston ring repairs during the entire warranty term. That data "represent[s] our common proof" on this issue and is the only data in the trial record. *See Quackenbush v. Am. Honda Motor Co.*, 2021 WL 6116949, *6 (N.D. Cal. Dec. 27, 2021). Yet plaintiffs repeatedly invited the jurors to speculate that this number was not real and to "throw it out," arguing in both opening and closing arguments— ***with no evidence whatsoever***—that GM erected "an obstacle course" and required "magic words" to dupe consumers out of bringing their vehicles to dealerships for warranty repairs or replacements until the vehicles fell out of warranty coverage. TT 233:25-234:17; 241:12-17; 894:3-19; 1364:6-12. This is ***pure fiction***. This theme was designed, according to their lawyers' public, post-trial podcast, to pander to what they believed was an anti-GM bias based on their pre-trial jury testing.[10] Borrowing from the reality TV series "Survivor," plaintiffs imagined an "island" where only those who "outwitted, outlasted and outperformed" GM could get warranty repairs and have their claims included in the database. TT 240:24-241:7; 1373:12-16. There is no evidence of this.

Plaintiffs' own testimony confirms that this is fantasy island. Mr. Tarvin claimed he believed his truck was consuming excess oil for seven years, but concedes he did nothing, including during the several years when he was still under warranty, incredibly claiming he did not know whether a repair would have been covered by warranty because he never asked. TT 1035:24-1036:2; 1052:4-6; 1053:5-1053:6; 1055:20-24. Mr. Del Valle visited his dealership months after he purchased his vehicle, where they diagnosed a leaky oil filter, which he claims the dealership fixed.

---

[10] Exhibit E, (podcast transcript); avail. at https://www.youtube.com/watch?v=9SvuB3wba6M.

TT 1120:15-21. Since then, he only took his Avalanche to a dealership for "an unrelated issue[,]" despite allegedly knowing of excessive oil consumption "on the date of purchase in Idaho." *Id.* 1097:17-19; 1121:25-1123:1. Nor do the applicable TSBs require multiple dealership visits or "magic words" before repairs. *See* TX169; TX209. Finally, Mr. Davis did take his vehicle to a dealership, which near the end of his warranty period replaced his spark plugs for free (TT 1252:7-14), and then a year after the warranty expired, the dealership replaced his engine and GM voluntarily paid for most of that cost as an act of customer goodwill. TX51.

There is no evidence that dealers denied any plaintiff repairs because he did not use some imaginary "magic words" or jump through fictional hoops concocted by plaintiffs' counsel.

### 5. <u>Unreasonable Inference #5</u>: Imagined Data That Is Not In The Record Would Send Warranty Rates "To The Moon."

The only repair data in evidence are warranty claims data for piston assembly repairs and replacements, reflecting (1) plaintiffs' approach to pretrial discovery, (2) their theory that the primary cause of an oil consumption defect is defective piston rings, and (3) that the remedy for that alleged defect is the cost to replace the piston assemblies. Plaintiffs' theory seems to be that piston warranty data is both over-inclusive (in that it includes replacements and repairs regardless of whether they had anything to do with a defect or excessive oil consumption) and potentially under-inclusive (in that it does not include other repairs to other components that plaintiffs now speculate may also relate to oil consumption issues). But plaintiffs did not pursue discovery of other warranty claims during the discovery period, and never raised with the Court any dispute over that data. Plaintiffs also chose not to survey any independent repair shops, dealers, or absent class members. As a result, the warranty data showing that less than one percent of Class Vehicles required piston repairs is the only classwide repair evidence in the trial record.

Because no reasonable jury could find a classwide piston defect where more than 99% of vehicles did not need piston repairs, plaintiffs invited the jury to engage in wild speculation about what repair rates might be for other engine components or out-of-warranty repairs. Just moments before the case was submitted to the jury, plaintiffs' lawyer declared that adding unidentified additional data would "run[] it the moon." TT 1444:1-3. This resort to pure conjecture confirms the

lack of evidence. Dr. Ball speculated there "*may* be more" relevant warranty claims, but admitted he had not seen such data and agreed that claims or repairs could have alternative causes. [11]

Of course, what matters under Rule 50 is not speculation, or conjecture, or lawyer argument. What matters is whether the actual evidence is sufficient to support the verdict. At trial, there was no evidence or data from which a jury could reasonably find any relevant repair rate other than the 0.66% piston repair rate. Where, as here, plaintiffs' lawyers' speculation about additional warranty claims is "without evidential basis, the jury could only have been engaging in unguided speculation" if it concluded the repair rate was higher or showed a classwide defect, and thus "the verdict can only have been 'based on speculation or guesswork.'" *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262-63 (9th Cir. 1981) (internal citation omitted). Such a verdict cannot stand. *See Dickens v. A-1 Auto Parts & Repair Inc.*, 2021 WL 2367892, at *2 (S.D. Miss. June 9, 2021) (granting summary judgment where plaintiffs "would invite the factfinder to run further calculations of possible exposure . . . and determine that potentially higher exposure could result" because "[t]hese speculative possibilities cannot create a genuine issue of material fact").

### 6. Unreasonable Inference #6: All Class Vehicles Had A Common Design Defect That Causes Excessive Oil Consumption.

The key question in this case is whether plaintiffs proved that all Class Vehicles have a common defect that causes common excessive oil consumption. They did not, and the jury's contrary conclusion is neither reasonable nor plausible based on this record.

*First*, as shown above, plaintiffs' stacked unreasonable inferences based on conjecture and speculation are contrary to the actual evidence at trial, and do not show a classwide defect.

*Second*, even if a jury could reasonably find that the plaintiffs' own vehicles were unreliable, that finding cannot sustain the *classwide* verdict. Plaintiffs did not show that the three plaintiffs' vehicle experiences have the same root cause, much less "provide common evidence to support extrapolation from [their] individual experiences" to the tens of thousands of vehicles in

---

[11] Ball Dep. 40:1-8; 42:21; 101:22-102:08; 109:23-110:2; 136:24-137:11; 137:24-138:07; TT 675 (emphasis added). And plaintiffs introduced no evidence to support this surmise or to refute Mr. Pfromm's testimony that "piston replacement data is the most accurate way to assess the scope of oil-consumption-related claims" here. TT 922:6-924:11.

the California, Idaho, and North Carolina classes "that is not merely speculative." *Marlo*, 251 F.R.D. at 486; ECF No. 395, at 14 (Dr. Dahm did not show the plaintiffs' select testimony "is a representative sample" of all Class Vehicle owners or provides a "basis from which to extrapolate the experience of a handful of named plaintiffs to the general population of all owners.").

### D.    Plaintiffs' Stacked Speculative Inferences Are Legally Insufficient To Prove A Classwide Defect Or Sustain The Jury's Verdict.

Without expert evidence or other direct or circumstantial evidence of a classwide defect, the jury here was "left to rely"—indeed, plaintiffs repeatedly *invited* the jury to rely—on speculation to stitch together plaintiffs' defect claims. "Each inference argued . . . was not only speculative in itself, but rested upon predicate speculation, thus compounding the error." *Wickman v. Henderson*, 19 F. App'x 740, 743-44 (10th Cir. 2001) (quotation omitted). Having put "no *facts* into evidence" to support key elements of the classwide defect claims, "[t]he jury's determination 'could only have been based on speculation and conjecture, an impermissible ground upon which to base its verdict.'" *Id.* (quotation marks and citation omitted).

Here, the "danger" of leaving the jury to stitch together a series of assumptions is compounded because no expert testified that there is a classwide defect in these Class Vehicles, and no evidence supports finding a classwide defect. Instead, the jury was left with a "pile of inferences" without "the aid of an expert who might be able to assist in stitching them all together." *SKC Kolon PI, Inc. v. Kaneka Corp*, 2019 WL 13020360, at *6 (C.D. Cal. June 28, 2019), *aff'd sub nom. PI Advanced Materials Co. v. Kaneka Corp*., 851 F. App'x 178 (Fed. Cir. 2021).

"Assumptions are not a substitute for evidence." *Gomez*, 670 F.3d at 398. The "court need not draw *all* possible inferences in [plaintiffs'] favor, but only all *reasonable* ones." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 n.10 (9th Cir. 2002) (original emphasis). Where, as here, a plaintiff "unreasonably relies upon multiple unsupported inferences," and "stacks inference upon inference without offering evidence that reasonably supports those inferences," the resulting record is legally "insufficient to raise a genuine issue for trial." *Urrutia v. Chipotle Mexican Grill, Inc.*, 2017 WL 2901717, at *17 (C.D. Cal. June 16, 2017) (granting summary judgment); *see also TriReme Med., LLC v. AngioScore, Inc.*, 2017 WL 930777, at *14 (N.D. Cal. Mar. 9, 2017)

("Stacked inferences and speculation do not generally raise issues for trial."); *Largan Precision Co. v. Genius Elec. Optical Co.*, 2015 WL 2063988, at *3 (N.D. Cal. May 4, 2015), *aff'd*, 646 F. App'x 946 (Fed. Cir. 2016) ("The Court doubts that a reasonable jury could pile inference upon inference[.]"); *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1348–49 (Fed. Cir. 2021)("[I]f too many inferences must be strung together to support the verdict, the verdict is likely unsupportable"); *Roebuck v. Drexel Univ.*, 852 F.2d 715, 736 (3d Cir. 1988) ("at some point too many inferences become[s] mere speculation "); *cf. United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1990) ("[W]ith each succeeding inference, the last reached is less and less likely to be true."); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (plaintiff "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.").[12]

## II. The Court Should Enter Judgment As A Matter Of Law Because There Was No Legally Sufficient Basis To Find For Plaintiffs On Other Elements Of Their Claims.

### A. <u>California</u>: There Is No Evidence That An Alleged Defect Was "Substantially Certain" To Manifest In All Of The Class Vehicles During Their Useful Life.

Plaintiffs did not present any evidence that the alleged defect is "substantially certain to result in malfunction during the useful life" of *all the class members' vehicles*, as required by California law. *Am. Honda Motor Co. v. Superior Ct.*, 199 Cal. App. 4th 1367, 1375 (2011) ("A breach of warranty cannot result if the product operates as it was intended to and does not malfunction during its useful life."); ECF No. 237 at 81 (finding plaintiffs' "breach of implied warranty claim was susceptible to common proof because either [GM] would demonstrate that the defect was not substantially certain to lead to problems, or plaintiffs would demonstrate that the

---

[12] *See also GlaxoSmithKline*, 7 F.4th at 1348-49("[T]he operative word here is 'reasonable;'" "only all *reasonable*" inferences need be drawn in plaintiffs' favor, not "*all* possible inferences") (citation omitted); *Largan Precision Co.*, 2015 WL 2063988, at *3  (the non-movant "is not entitled all possible inferences"); *In re RFC & ResCap Liquidating Tr. Action*, 399 F. Supp. 3d 804, 810–11 (D. Minn. 2019) (A court "may not accord a party the benefit of unreasonable inferences or those at war with the undisputed facts," and "because a 'reasonable inference' is only 'one which may be drawn from the evidence *without resort to speculation*,' a court may grant a party JMOL, and thereby remove an issue from the jury's province, if 'the record contains no proof beyond speculation to support' a jury finding for the non-movant on that issue.") (quoting *Sip-Top, Inc. v. Ekco Grp.*, 86 F.3d 827, 830 (8th Cir. 1996)); *Naturopathic Lab'ys Int'l, Inc. v. Dermal Rsch. Lab'ys, Inc.*, 415 F. Supp. 2d 1007, 1014 (W.D. Mo. 2006), *aff'd*, 224 F. App'x 977 (Fed. Cir. 2007) (granting judgment for defendant where the "record contains no proof beyond speculation to support the jury's verdict").

CROWELL
& MORING LLP
ATTORNEYS AT LAW

defect was substantially certain to do so."). At trial, no witness suggested that the alleged oil consumption defect was "substantially certain" to manifest in all Class Vehicles during their useful life. The only evidence presented shows the opposite. Both plaintiffs' expert and GM's engineers testified that the available data showed warranty claims rates of less than one percent. Ball Dep. 112:12-22; TT 675; TT 918:5-10; 1023:25-1024:3; 913:19-919:9. Aside from plaintiffs' legally insufficient speculation that repair rates could be higher if other hypothetical data were included, there is no other evidence in the record on any other warranty data, and absolutely no evidence regarding post-warranty repair rates. Without evidence sufficient to show a defect-caused malfunction was "substantially certain" to occur in all class vehicles, the verdict on the California claims cannot stand. *See Quackenbush*, 2021 WL 6116949, at *6 (denying certification where data suggested a 15% in-warranty occurrence rate but there was no evidence for "after the end of the warranty period in order to prove or disprove a 'substantial certainty' of manifestation'").

      **B.**    <u>**North Carolina:**</u> **The Implied Warranty Claim Fails For Additional Reasons.**

          **1.**    **Plaintiffs Cannot Prove An Implied Warranty Claim With Stacked Inferences Based On Circumstantial Evidence.**

      The stacked inference problem described above creates additional insurmountable obstacles to sustaining the North Carolina implied warranty verdict. Under North Carolina law, "a claim for a breach of an implied warranty of merchantability is a products liability claim." *Manley*, 849 F. Supp. 2d at 600-01. Because North Carolina "does not recognize strict liability in product liability actions," while "a plaintiff claiming breach of implied warranty of merchantability may use circumstantial evidence to establish that the product at issue was defective at the time of sale," he may not "stack inference upon inference" when making an implied warranty claim. *See id.* (internal quotation marks omitted). As described above, there is not "enough circumstantial evidence to allow for an inference of a defect in [this] particular case"—particularly where (1) there is no expert testimony supporting a defect, (2) any alleged malfunctions or issues in plaintiffs' individual vehicles could be explained by a multitude of alternative causes, and (3) plaintiffs presented no proof that any alleged malfunction could not happen in the absence of a defect. *See Carlton*, 413 F. Supp. 2d 590–91; *see also id.* ("The evidence must establish a sufficient probability of there being

a product defect, not a mere possibility or speculation of a defect," and observing that one appellate court "found that no inference of a defect could be drawn" from a tire blow out "even though the tire had only been in use for ten days").

### 2. Plaintiffs' Damages Model Does Not Fit The North Carolina Class.

Plaintiffs' damages "model" fundamentally cannot be reconciled with the scope of the North Carolina class, which includes all "current owners" who purchased both new and used vehicles, in any condition at any time from any source. The North Carolina class would include, for example, a person who purchased an eleven-year-old truck a few months before trial with hundreds of thousands of miles in salvage condition at auction for less than $1,000, and who was aware of this lawsuit at the time of purchase. There was no evidence from which a reasonable jury could conclude that this vehicle was unmerchantable more than a decade earlier, much less that the purchaser (the current owner class member) "overpaid" by $2,700 because of alleged GM conduct.

### 3. There Is No Evidence That All Class Members Gave Timely Notice.

To prevail on his class claim for implied warranty under North Carolina law, plaintiff Davis needed to prove that all North Carolina class members provided timely notice of their claims for breach of implied warranty of merchantability under the Uniform Commercial Code. Final Jury Instruction No. 17, ECF No. 554; *Maybank v. S. S. Kresge Co.*, 273 S.E.2d 681, 683 (N.C. 1981) ("the burden of pleading and proving that seasonable notification has been given is on the buyer"). Because plaintiffs presented no evidence whatsoever of any action taken by any absent North Carolina class member to give GM notice of his or her claim, no reasonable jury could conclude that each and every North Carolina Class member gave timely notice to GM.[13]

### C. **Idaho**: The Idaho Consumer Protection Claim Fails For Additional Reasons

#### 1. There Is No Evidence Del Valle And All Idaho Class Members Had Any Ascertainable Loss Caused By Any Alleged Deception.

The Court should enter judgment on the Idaho claims because there was no legally sufficient

---

[13] A verdict for plaintiffs without allowing GM to raise affirmative defenses in each individual case violates Due Process and the Rules Enabling Act. *See* GM's Motion to Decertify Classes at Sec. II, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442,458 (2016) (class device does not provide parties "different rights in a class proceeding than they could have asserted in an individual action").

evidence that any alleged unfair or deceptive act caused Mr. Del Valle and all other class members to suffer "an ascertainable loss." Final Jury Instruction No. 20, ECF No. 554; *Jackson v. Wood*, 859 P.2d 378, 380 (Idaho Ct. App. 1993) (with "no ascertainable loss," "neither actual damages nor statutory damages under the ICPA can be awarded."); *see also Knipe Land Co. v. Robertson*, 259 P.3d 595, 606 (Idaho 2011). Any claim that Mr. Del Valle had an ascertainable loss because he could not use his truck is belied by his repeated public professions of love for (and his stated plan to never get rid of) his truck and his admissions that he still regularly drives his truck across states, and uses it to tow boats 12-to-15 times a year.[14] On this record, there is no evidence of an ascertainable loss for Mr. Del Valle, and the only reasonable conclusion is the opposite. Nor did plaintiffs introduce evidence of ascertainable loss for any of the other thousands of Idaho class members. Instead, the warranty data showed that the vast majority have not needed repairs.

### 2.    No Reasonable Jury Could Find That GM Knew Or Should Have Known It Was Engaging In A Deceptive Act.

The Court should also enter judgment for GM on the Idaho claims because the jury could not reasonably find that GM knew, or in the exercise of due care should have known, that it was engaging in a deceptive or unfair act with respect to the sale of each and every Idaho Class Vehicle. *See* Idaho Code Ann. § 48-603; *Nelson-Ricks Cheese Co. v. Lakeview Cheese Co.*, 331 F. Supp. 3d 1131, 1145 (D. Idaho 2018) (granting summary judgment where plaintiff "failed to establish the requisite knowledge requirement of the ICPA"). The evidence shows that GM did not know or have reason to know of any deception regarding a common design defect (which was not even proven in the first place). Instead, GM corrected the issue before the start of the class period, and its validation testing and warranty data fixes only reinforced the reasonable (and correct) belief that that the fixes were effective. "In the absence of adequately [showing] knowledge of the defect—which [p]laintiffs certainly have not" done, plaintiffs did not meet their burden to show the ICPA's "require[d] knowledge of present or past engagement in unfair or deceptive practices. *See Wozniak v. Ford Motor Co.*, 2019 WL 108845, *3 n.5 (E.D. Mich. Jan. 4, 2019) (applying Idaho law).

---

[14] TT 1125:3-13; 1130:17-20; 1132:5-14; 1134:11-1135:10; 1141:23-1143:20.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1

2

**III.    The Court Should Enter Judgment As A Matter Of Law Because There Was No Legally Sufficient Basis To Find That All Class Members' Claims Were Timely.**

3

GM is also entitled to judgment as a matter of law because the claims of certain plaintiffs

4

and many class members are time-barred, and plaintiffs failed to prove a classwide basis for tolling

the limitations period (in California or North Carolina) or to apply the discovery rule (in Idaho).

5

**A.    Certain Plaintiffs' And Many Class Members' Claims Are Time-Barred.**

6

The two-year limitations period for an Idaho Consumer Protection Act claim runs from the

7

date of the alleged deceptive act, which here is the date of sale.[15] The limitations period for claims

8

under California's Song-Beverly Act and breach of implied warranty under North Carolina law is

9

four years and runs from the date of the vehicle purchase and is not subject to the discovery rule.[16]

10

<u>California and North Carolina</u>. Plaintiffs first filed this case on December 19, 2016. The

11

statutes of limitations also bar recovery for California and North Carolina class members who

12

purchased their Class Vehicles before December 19, 2012. Final Jury Instructions Nos. 15, 18, ECF

13

No. 554. This includes plaintiffs Tarvin and Davis, who bought their vehicles in May 2012 and

14

June 2012, respectively. TT 1046:3-12; 1151:20-24. Plaintiffs presented no evidence with respect

15

to the number or circumstances of other class members who also purchased their vehicles before

16

December 19, 2012.

17

<u>Idaho</u>. The statute of limitations bars claims of any Idaho class members who knew, or

18

through the exercise of reasonable diligence should have known, of their claim prior to December

19

19, 2014. Final Jury Instruction No. 21, ECF No. 554. The sales data shows that many Idaho class

20

members purchased their vehicles through independent dealerships in Idaho prior to December 19,

21

2014. *See* TX57-TX60. These class members' claims may be barred by the statute of limitations.

22

**B.    Plaintiffs Did Not Meet Their Burden To Show The Limitation Periods Were Tolled Or The Discovery Rule Applies To Plaintiffs <u>And</u> All Class Members.**

23

24

---

25

[15] Idaho Code. § 48-619; *Performance Chevrolet, Inc. v. Mkt. Scan Info. Sys., Inc*., 402 F. Supp. 2d 1166, 1171 (D. Idaho 2005).

26

[16] Cal. Comm. Code § 2725; *Krieger v. Nick Alexander Imports, Inc.*, 234 Cal. App. 3d 205, 215 (1991); *Gillespie v. Am. Motors Corp.*, 277 S.E.2d 100, 102 (N.C. Ct. App. 1981); *Mexia v. Rinker Boat Co.*, 95 Cal. Rptr. 3d 285, 291-92 (Cal. Ct. App. 2009) ("A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach[.]"); *Gillespie*, 277 S.E.2d 100 at 102 (same).

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

California and North Carolina: To trigger tolling in California and North Carolina, plaintiffs had to prove (1) that GM engaged in an affirmative act of concealment, and (2) no plaintiffs or class members had inquiry notice of facts giving rise to their claims despite their diligence. Final Jury Instruction Nos. 16, 19, ECF No. 554.[17] Plaintiffs Tarvin and Davis did not establish either element for themselves or all California and North Carolina class members.

Plaintiffs offered no evidence that GM took affirmative actions intended to prevent them or any other class members from discovering facts relevant to their claims. Although plaintiffs' counsel insinuated that GM tried to delay warranty repairs by recommending an ineffective piston cleaning procedure and/or requiring multiple dealership visits before service, the evidence introduced at trial shows the opposite. *First*, GM revised its TSBs *before* adding any Class Vehicles to remove the required oil consumption test (which logically required more than one visit to complete). *Compare* TX163 *with* TX165. Not a single TSB applicable to the Class Vehicles requires multiple dealership visits before repairs. TX169; TX209. *Second*, although Mr. Halka personally thought the piston cleaning was ineffective, he had no supporting data. TT 565:24-566:2. Mr. Pfromm, the only witness who studied piston-cleaning-procedure data, testified that even including pre-Class Period vehicles, the procedure was effective 66% of the time. *Id.* at 883:7-11.[18]

Plaintiffs also failed to introduce any evidence from which a reasonable jury could infer that *each and every* California and North Carolina class member exercised due diligence in seeking

---

[17] *Herremans v. BMW of N. Am., LLC*, No. CV 14-02363, 2014 WL 5017843, at *5, *7 (C.D. Cal. Oct. 3, 2014) (dismissing claims where plaintiff failed to allege "an affirmative deceptive act" by defendant or "why, in the exercise of reasonable diligence, she could not have discovered the defect earlier"); *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F. 3d 1055, 1060 (9th Cir. 2012) ("limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence"); *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 548 (4th Cir. 2019) ("to toll a limitations period based on fraudulent concealment, 'a plaintiff must demonstrate: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence'") (citation omitted); *Wheeler v. BMW of N. Am. LLC*, 534 F. Supp. 3d 527, 535 (W.D.N.C. 2021).

[18] The Court previously held that a reasonable jury could find that GM actively concealed the existence of the alleged oil consumption defect because GM purportedly knew that the piston cleaning procedure found in the TSBs was ineffective for certain pre-Class Vehicles. ECF No. 237, at 27-30. Given Mr. Pfromm's uncontroverted trial testimony regarding the *observed effectiveness* of the piston cleaning procedure, no reasonable jury could conclude that the inclusion of the piston cleaning procedure in its TSBs constituted affirmative concealment. TT 883:7-11.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

to uncover the facts giving rise to their individual claims. *Yetter v. Ford Motor Co.*, 428 F. Supp. 3d 210, 223 (N.D. Cal. 2019) (fraudulent concealment tolling did not apply when "[p]laintiff should have been aware of a problem…after his engine had already had multiple unsuccessful repairs"); *Finney v. Ford Motor Co.*, 2019 WL 79033, at *3 (N.D. Cal. Jan. 2, 2019) (fraudulent concealment tolling did not apply because claims that dealership told plaintiff "after each of four repairs that the problems with her engine were fixed is not sufficient to plead delayed discovery"; "[a]fter four visits to the dealership for repairs in as many years, [plaintiff] should have suspected something was amiss, regardless of representations that the problem was fixed"). This separately warrants judgment for GM as a matter of law. Final Jury Instruction Nos. 16, 19, ECF No. 554.

Idaho: Plaintiffs did not meet their burden to show that any Idaho class member (let alone all of them) who purchased a vehicle before December 19, 2014 "did not know, and through the exercise of reasonable diligence could not have known, that their cause of action under the Idaho Consumer Protection Act might exist before" that date. Final Jury Instruction No. 22, ECF No. 554.

In sum, the evidence "permits only one reasonable conclusion," which is—contrary to the verdict—that many class members' claims were not timely, and GM is entitled to judgment as a matter of law. *Lakeside-Scott*, 556 F.3d at 802. Moreover, as explained in GM's decertification motion, the Rules Enabling Act and Due Process Clause require that GM be able to challenge the timeliness of each class member's individual claim, which is an individualized question that bars certification and cannot be reconciled with a verdict finding all class members' claims were timely.

## IV. The Court Should Enter Judgment As A Matter Of Law Because There Was No Legally Sufficient Basis For A Jury To Reasonably Find Plaintiffs Proved Damages.

Plaintiffs' theory of injury is overpayment at the time of sale—when the market value of all Class Vehicles was allegedly diminished by an undisclosed common defect. ECF No. 354, at 6-7; TT 685:20-687:2. To establish classwide injury (and requisite Article III standing[19]), plaintiffs had to prove that (1) each and every Class Vehicle was defective, (2) the alleged defect is remedied by replacing the '278 material coated piston rings with PVD-coated rings, and (3) had the alleged

---

[19] *See* GM's Motion to Decertify Classes at Section III.

defect been disclosed at the time of sale, every plaintiff and every absent class member would have insisted on a price reduction equal to the cost of installing PVD-coated piston rings. Plaintiffs failed to present sufficient evidence on each of these elements.

*First*, as explained above, plaintiffs failed to provide sufficient evidence of a defect in their individual vehicles, let alone a common piston defect present in all Class Vehicles. As plaintiffs' damages expert Mr. Stockton recognized, "there's no damages if there's no defect." TT 794:13-15.

*Second*, there was no technical testimony, expert or otherwise, that every Class Vehicle had an inherent defect, or that such a defect could be remedied by replacing the piston rings in the Class Vehicles with a different coating material. Not one of the three plaintiffs actually paid for a piston ring replacement. No plaintiff testified that they were ever told that their vehicles had excessive piston ring wear or that different piston rings would have improved any alleged excessive oil consumption. *Id.* at 1075:4-14; 1125:18-1126:1; 1127:12-1128:3; 1295:15-1296:3. Nor did any expert opine that PVD piston rings would fix the alleged defect. The only evidence at trial regarding piston ring material *disproves* plaintiffs' damages theory. Mr. Halka testified that he never saw evidence that all LC9 Gen IV engines required PVD-coated rings because of excessive oil consumption, and he confirmed that a change in ring material would not have cured excessive oil consumption "by itself," because it would not have addressed the root cause (the unshielded AFM valve in pre-Class vehicles). *Id.* at 639:19-640:5; 645:11-647:2.

*Third*, plaintiffs did not present legally sufficient evidence that all class members overpaid for their Class Vehicles due to a common piston ring defect, or that the $2,700 figure that Mr. Stockton "calculated" is the appropriate measure of overpayment.[20] Plaintiffs presented no evidence that a piston ring replacement was the appropriate remedy for the alleged defect (the existence of which they also failed to prove). And they did not even attempt to show that the $2,700 figure— which Mr. Stockton did not "calculate" using any model, but instead plucked from a GM document about **pre**-Class Period vehicles and a **_different_** piston ring replacement—fit the cost of installing

---

[20] *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case") (internal question marks and citation omitted).

PVD piston rings in Class Vehicles with a different engine design.[21] Mr. Stockton testified that he did not collect or analyze any economic data in reaching his opinion and did not validate his conclusion that $2,700 is the appropriate cost of repair. TT 778:6-9; 779:5-10; 781:7-782:9.[22]

## V.   Alternatively, The Court Should Order A New Trial On Any Claims For Which It Does Not Grant Judgment As A Matter Of Law In GM's Favor.

### A.   The Verdict Is Against The Clear Weight Of The Evidence

The Court should enter judgment as a matter of law because the verdict is not supported by substantial evidence. At a minimum, and alternatively, if the Court does not grant judgment on any claims, it should order a new trial on such claims because the verdict is "against the clear weight of the evidence." *Hesselbein*, 168 F. Supp. 3d at 1262. Having presided over and personally observed the evidence presented at trial, this Court is uniquely positioned to "weigh the evidence and assess the credibility of witnesses," and is not limited to viewing "the trial evidence in the light most favorable to the verdict." *Id.* Given the evidentiary void, the improper stacking of inferences, and the record taint addressed below, even giving "decent respect to the collective wisdom of the jury," (*id.* at 1261), GM respectfully submits that this trial record should lead the Court to the "definite and firm conviction that a mistake has been committed." 11 FED. PRAC. & PROC. § 2806.

### B.   Certain Remarks Tainted The Trial Record With Improper Innuendo.

Independently, the Court should order a new trial because plaintiffs' counsel "repeatedly and impermissibly elicited testimony" and repeatedly presented "prejudicial testimony and argument" and "made reference to matters previously ruled inadmissible with the sole purpose of bringing to the jury something it should not have heard." *Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 347 (9th Cir. 1995) (internal quotation marks and citation omitted). On multiple occasions, plaintiffs' counsel encouraged the jury to speculate about "what was purposely

---

[21] Mr. Stockton relied on the testimony of plaintiffs' technical experts, but neither of them testified at trial about the cost of PVD piston ring replacement in the Class Vehicles. TT 806:4-6, 806:18-20. The only other person to suggest that $2,700 is the appropriate cost of a repair for the Class Vehicles was plaintiffs' lawyer in opening statement. *Id.* at 230:10-11. That is not evidence.

[22] *Pilgrim*, 2020 WL 7222098, at *8 (granting summary judgment where "Plaintiffs cannot establish what portion, if any, of the total amount paid was supposedly due to New GM's alleged deception"); *Philips v. Ford Motor Co.*, 2017 WL 635469, at *11 (N.D. Cal. Feb. 16, 2017) (granting summary judgment where there is no evidence of damages).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

being kept from them." *Cnty. Of Maricopa v. Maberry*, 555 F.2d 207, 217, 219 (9th Cir. 1977) (remanding for a new trial where counsel "testified to something not within the record" and it was, in the court's opinion, "impossible to fairly conclude from the record that the jury was not influenced by the question and answer"). This was not a one-off or isolated incident, but instead permeated the entire trial—both the evidence and argument presented to the jury. The "cumulative effect of counsel's remarks undoubtedly served to leave the intended, indelible impression upon the minds of the jurors." *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 758–59 (6th Cir. 1980). The following are some examples:

### 1. Example #1: Arguing Excluded Expert Defect Opinions.

The Court limited Dr. Ball's testimony "to the quality and scope of GM's warranty." ECF No. 476 at 25. But plaintiffs argued that Dr. Ball had offered an opinion on the *existence of a classwide piston ring defect*—the subject on which neither of their experts were allowed to opine. After playing selected deposition excerpts, plaintiffs' counsel asserted that "At least with respect to ***Dr. Ball, his indication was:*** Listen, this -- ***everything will fail here eventually relative to this design and, in particular, we're talking about piston rings***." TT 1380:15-24 (emphasis added).[23]

### 2. Example #2: Representations Regarding Discovery Issues.

Throughout trial, plaintiffs' counsel waded into issues of discovery, including making representations that were contrary to legal burdens, obligations, and procedures. For example, plaintiffs suggested that GM violated some discovery obligation, asking Mr. Pfromm: "[W]ould it come as a surprise to you here that *plaintiffs were never provided oil consumption test data or piston cleaning data in this case*?" TT 885:19-23 (emphasis added). During closing, plaintiffs said:

> We know *there's a ton of information that General Motors knows that they're not sharing*. . . . because *if this data would have been even remotely useful to General Motors* as far as their warranty data, you can be darn sure *you would have seen it*, we would have seen it. *It is not helpful to General Motors, and that's why you did not see it*. TT 1380:1-14 (emphasis added).

---

[23] This argument exacerbated the unfair prejudice to GM that the Court tried to limit in its Final Pretrial Order, ECF No. 476 at 25 (limiting testimony on "Rule 403 grounds"), while also circumventing the Court's order barring plaintiffs' expert, Dr. Dahm, from opining about the nature or existence of an alleged defect in all Class Vehicles. Order, ECF No. 395 at 26-27.

You don't have it [warranty claim data]. Folks, you think that's a mistake? You think that's a coincidence? No way. That's -- *that is what happens when a company sets up to keep a failure rate from the jury*. And it didn't happen just this past week or two. *It happened years ago when we asked for this information and didn't get it*.

. . .

GM came up with -- basically came up with the lowest number it could come up with to put in front of the jury. It's like they thought over there, "Well, we can't use zero because that's impossible. They've got three plaintiffs that have got the problem. But why not just come up with, I don't know, .66 percent?" *The data that's in their -- the data that's in their computers* about how many of these LC9s got this repair work, whether it be the piston cleaning job, whether it be the service engine light examination for oil consumption, whether it be the rough running condition that the owner -- that the owner reported, or how about just -- how about this? . . .

what happens when you put those warranty claims in the warranty data that came into the court today or this week? *It runs it to the moon*. TT 1442:23-1444:3 (emphasis added).[24]

### 3.   Example #3: Using Court Orders To "Vouch" For Experts.

It is axiomatic that attorneys cannot vouch for evidence or "in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence…or state a personal opinion as to the…credibility of a witness[.]"[25] Plaintiffs alluded to matters not in evidence by using the Court's pre-trial orders to vouch for their expert. *See* TT 844:2-4 (asking Mr. Stockton: "Are you aware that in this case, *Judge Chen has held that your cost of repair model was a valid basis* for certifying the three classes that we're on trial here for today?") (emphasis added); *see also* TT 844:8-18 ("Mr. Stockton, what is your understanding about Judge Chen's rulings on the validity of your cost of repair model in this case?") (emphasis added).

### 4.   Example #4: Repeated References To Excluded Materials.

Plaintiffs' proclivity to blurt out comments or suggestions regarding materials the Court had clearly excluded, often at times in direct response to plaintiffs' lawyers' questions, also supports a new trial. For example, despite the Court's instruction that Mr. Del Valle not testify about specific issues following his May 2020 deposition (because he failed to comply with discovery obligations),

---

[24] Plaintiffs also argued they could not present dealer testimony at trial because the dealers believed that doing so would "'risk our relationship, our livelihood, by sending in some technicians to testify against the'-- 'against our bank.'" TT 1447:8-1448:6. This was a lawyer testifying to "evidence" that was not in the record. More importantly, that lawyer-testimony was incorrect. Plaintiffs could have deposed dealers and used their testimony at trial; they simply chose not to do so.

[25] Model Rules of Prof. Conduct r. 3.4(e); *Draper v. Rosario*, 836 F.3d 1072, 1084 (9th Cir. 2016) ("prohibition on improper vouching based on evidence outside the record extends to civil trials").

CROWELL
& MORING LLP
ATTORNEYS AT LAW

Mr. Del Valle responded to his lawyer's question: "I now *have major mechanical expenses looming in my future* based on what I'm seeing more recently which I can't speak to, this depo 2020. The – *I'll have some major mechanical issues ahead, big expenses*." TT 1106:9-12. Mr. Del Valle repeatedly raised similar issues throughout his direct and cross examinations, despite clear instructions from the Court that this testimony was not allowed:

> "[I]t it may be something else, which I can't speak to because of the limit on the dates here." TT 1102:7-8.

> "And if one day somebody would let me talk about life with the truck today after this magic depo date, I can explain to you what I'm experiencing, which is now borderline catastrophic at this point in my vehicle ownership." *Id.* at 1126:2-5.

> "Well, you won't let me talk about anything post-2020, so I'll go with 2020. I love it. I think it's very significant in this case. I don't understand the legalese. Okay." *Id.* at 1129:11-14.

Similarly, Mr. Davis testified to hearsay regarding an alleged incident that was specifically precluded by the Court's ruling. TT 1217:20-21.[26]

**C.     A New Trial Is Warranted Because The Classes Should Be Decertified.**

Finally, as detailed in GM's motion to decertify the classes, the trial evidence shows that plaintiffs failed to carry their burden under Rule 23 to introduce predominate common evidence on both liability and tolling, and plaintiffs failed to demonstrate that all class members have Article III standing. Because the classes should be decertified, GM is entitled to a new trial on the claims of the named plaintiffs alone. *See Bahamas Surgery Ctr., LLC v. Kimberly-Clark Corp.*, 820 F. App'x 563, 565-66 (9th Cir. 2020) (following a jury trial and on appeal, holding that district court abused its discretion in refusing to decertify the class and remanding for further proceedings).

## <u>CONCLUSION</u>

For these reasons, the Court should (i) grant judgment as a matter of law in GM's favor, or in the alternative (ii) grant a new trial.

---

[26] Attorneys have a duty to avoid introducing evidence that is excluded. Model Rules of Prof. Conduct r. 3.3, cmt. 2 (describing "special duties" "to avoid conduct that undermines the integrity of the adjudicative process") and 3.4(c) (lawyer shall not "knowingly disobey" a court rule); *Pooshs v. Philip Morris USA, Inc.*, 2016 WL 860985, at *10 (N.D. Cal. Mar. 7, 2016), *aff'd*, 742 F. App'x 335 (9th Cir. 2018), *aff'd sub nom. Mintz v. Philip Morris USA, Inc.*, 831 F. App'x 363 (9th Cir. 2020) (sanction lawyer who "intentionally flout[ed]" court orders regarding admissible evidence).

DATED: November 15, 2022

Respectfully submitted,

*/s/ April N. Ross*
Kathleen Taylor Sooy (*pro hac vice*)
April N. Ross (*pro hac vice*)
Rachel P. Raphael (*pro hac vice*)
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 624-2500
ksooy@crowell.com
aross@crowell.com
rraphael@crowell.com

CROWELL & MORING LLP
Warrington S. Parker, III (SBN 148003)
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Phone: (415) 986-2800
Fax: (415) 986-2827
wparker@crowell.com

**KIRKLAND & ELLIS LLP**
Richard C. Godfrey (*pro hac vice*)
Renee Deborah Smith (*pro hac vice*)
Caitlyn Cheleden (*pro hac vice*)
300 North LaSalle
Chicago, IL 60654
Phone: (312) 862-2310
richard.godfrey@kirkland.com
renee.smith@kirkland.com
caitlyn.chelden@kirkland.com

*Attorneys for General Motors LLC*