1  Jennie Lee Anderson (SBN 203586)
   Lori E. Andrus (SBN 205816)
2  **ANDRUS ANDERSON LLP**
   155 Montgomery Street, Suite 900
3  San Francisco, California 94104
   Telephone: 415-986-1400
4  jennie@andrusanderson.com
   lori@andrusanderson.com
5
6
7
8
9  *Class Counsel*
   (*additional counsel appear on signature page*)
10

Adam J. Levitt (*pro hac vice*)
**DICELLO LEVITT LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com

W. Daniel "Dee" Miles, III (*pro hac vice*)
**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
Telephone: 334-269-2343
Dee.Miles@beasleyallen.com

11  **UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF CALIFORNIA
    SAN FRANCISCO DIVISION**
12

13  RAUL SIQUEIROS, *et al.*,

14       Plaintiffs,

15       v.

16

17  GENERAL MOTORS LLC,

18       Defendant.

19

Case No.: 16-cv-07244-EMC

**PLAINTIFFS' OPPOSITION TO GENERAL MOTORS LLC'S MOTION TO DECERTIFY CLASSES**

Judge: Hon. Edward J. Chen
Hearing Date: February 16, 2023
Time of Hearing: 1:30 p.m.

20
21
22
23
24
25
26
27
28

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................................ 1

LEGAL STANDARD ..................................................................................................................... 1

ARGUMENT ................................................................................................................................... 2

I.      THE TRIAL RESOLVED COMMON QUESTIONS DISPOSITIVE OF ALL CLASS
        MEMBERS' CLAIMS. .................................................................................................... 2

        A.      The Trial Resolved the Common Question of Whether There Is an Oil
                Consumption Defect in the Gen IV LC9 Engines. ................................................ 3

        B.      The Trial Showed a Common Injury with a Common Cause. ................................ 8

        C.      Unmerchantability Was Tried as a Common Question with a Common Answer. .......... 10

        D.      GM's Argument About Barriers to Warranty Claims Is Irrelevant. ................................ 10

        E.      Plaintiffs' Testimony Supports the Jury's Finding of a Common Defect. ...................... 11

        F.      The Tried Claims Were Resolvable, and Resolved, by Class-Wide Evidence. .............. 11

II.     GM'S STATUTE OF LIMITATIONS DEFENSES WERE RESOLVED THROUGH
        COMMON ANSWERS TO COMMON QUESTIONS. ............................................... 13

        A.      The Evidence Presented at Trial Provided Common Answers to the Tolling
                Questions. ........................................................................................................... 14

        B.      The Jury's Note Cannot Support Decertification ............................................... 17

        C.      GM's Due Process Rights Were Not Violated. .................................................. 17

III.    THE EVIDENCE AT TRIAL CONFIRMED EACH CLASS MEMBER'S ARTICLE
        III STANDING ............................................................................................................. 18

        A.      The Law of the Case Establishes That Each Class Member May Show Standing
                Through Economic Injury. ................................................................................. 18

        B.      The Trial Evidence Confirmed Each Class Member's Injury in Fact. ........................... 20

        C.      GM's Rehashed Arguments Fail Again to Rebut the Classes' Common Showing
                of Article III Standing. ...................................................................................... 21

        D.      GM's Challenge to Causation Also Misstates Plaintiffs' Burden. ............................... 24

CONCLUSION .............................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aberin v. Am. Honda Motor Co., Inc.*,
No. 16-cv-04384-JST, 2021 WL 1320773 (N.D. Cal. Mar. 23, 2021) ...............................19

*American Suzuki Motor Co. v. Superior Court*,
37 Cal. App. 4th 1291 (1995)...............................................................................................8

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ............................................................................................................13

*Anderson v. Richardson*,
145 F. Supp. 2d 1139 (D.N.D. 2001) ..................................................................................17

*In re Asacol Antitrust Litigation*,
907 F.3d 42 (1st Cir. 2018) .................................................................................................23

*Bahamas Surgery Ctr. LLC v. Kimberly-Clark Corp.*,
820 F. App'x 563 (9th Cir. 2020)..........................................................................................3

*Bolivar v. FIT Int'l Grp. Corp.*,
No. 12 Civ. 781 (PGG) (DCF), 2019 WL 4565067 (S.D.N.Y. Sept. 20, 2019) ...............24

*In re Bridgestone/Firestone, Inc.*,
288 F.3d 1012 (7th Cir. 2002)...............................................................................................9

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998).........................................................................................11, 12

*Conmar Corp. v. Mitsui & Co. (U.S.A.)*,
858 F.2d 499 (9th Cir. 1988)...............................................................................................14

*Davenport v. Menard, Inc.*,
No. 14-CV-222-KHR, 2016 WL 5346374 (D. Wyo. May 5, 2016) ...................................17

*DeWitt v. Eveready Battery Co., Inc.*,
565 S.E.2d 140 (N.C. 2002) ................................................................................................10

*Dioquino v. Sempris LLC*,
No. CV 11-05556 SJO, 2012 WL 6742528 (C.D. Cal. Mar. 19, 2010)..............................12

*Drazen v. Pinto*,
41 F.4th 1354 (11th Cir. 2022)............................................................................................23

*Edmonson v. Eagle Nat'l Bank*,
922 F.3d 535 (4th Cir. 2019)...............................................................................................14

*Falco v. Nissan N. Am. Inc.*,
  2016 WL 1327474 (C.D. Cal. Apr. 5, 2016)......................................................................20

*Feinstein v. Firestone Tire & Rubber Co.*,
  535 F. Supp. 595 (S.D.N.Y. 1982).....................................................................................9

*Flynn v. FCA US LLC*,
  39 F.4th 946 (7th Cir. 2022).............................................................................................23

*In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.*,
  194 F.R.D. 484 (D.N.J. 2000).............................................................................................9

*Forehand v. Fla. State Hosp. at Chattahoochee*,
  89 F.3d 1562 (11th Cir. 1996)............................................................................................3

*Gartin v. S&M NuTec LLC*,
  245 F.R.D. 429 (C.D. Cal. 2007) ......................................................................................12

*In re Gen. Motors LLC CP4 Fuel Pump Litig.*,
  393 F. Supp. 3d 871 (N.D. Cal. 2019)...............................................................................19

*In re Gen. Motors LLC Ignition Switch Litig.*,
  407 F. Supp. 3d 212 (S.D.N.Y. 2019)................................................................................20

*Grodzitsky v. Am. Honda Motor Co.*,
  957 F.3d 979 (9th Cir. 2020).......................................................................................5, 24

*Hum v. Dericks*,
  162 F.R.D. 628 (D. Haw. 1995) ..........................................................................................9

*Insolia v. Philip Morris Inc.*,
  186 F.R.D. 535 (W.D. Wis. 1998) ......................................................................................9

*Lau v. Mercedes-Benz USA LLC*,
  No. C-11-01940 DMR, 2014 WL 1677552 (N.D. Cal. Apr. 28, 2014) ...........................17

*Lucas v. Breg, Inc.*,
  212 F. Supp. 3d 950 (S.D. Cal. 2016) ...............................................................................12

*Mazza v. American Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012).............................................................................................18

*Mazzei v. Money Store*,
  829 F.3d 260 (2d Cir. 2016) ...............................................................................................3

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008)..............................................................................................13

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002)............................................................................................12

*In re MyFord Touch Consumer Litig.*,
    No. 13-cv-03072-EMC, 2018 WL 3646895 (N.D. Cal. Aug. 1, 2018) (Chen, J.) .............................2

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001) ...........................................................................................................13

*Nguyen v. Nissan N. Am., Inc.*,
    932 F.3d 811 (9th Cir. 2019) ...........................................................................................................19

*Novoa v. GEO Grp., Inc.*,
    No. EDCV 17-2514 ......................................................................................................................1, 2

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ...........................................................................................................22

*Oscar v. BMW of N. Am., LLC*,
    274 F.R.D. 498 (S.D.N.Y. 2011) ......................................................................................................9

*Perez v. McCreary, Veselka, Bragg & Allen, P.C.*,
    45 F.4th 816 (5th Cir. 2022) ...........................................................................................................23

*Performance Chevrolet, Inc. v. Mkt. Scan Info. Sys., Inc.*,
    402 F. Supp. 2d 1166 (D. Idaho 2005) ...........................................................................................14

*Pierre v. Midland Credit Management, Inc.*,
    29 F.4th 934 (7th Cir. 2022) ...........................................................................................................23

*Racies v. Quincy Bioscience, LLC*,
    No. 15-cv-00292-HSG, 2020 WL 2113852 (N.D. Cal. May 4, 2020) ..............................................3

*In re Rail Freight Fuel Surcharge Antitrust Litigation - MDL No. 1869*,
    934 F.3d 619 (D.C. Cir. 2019) .......................................................................................................23

*Russ v. Apollo Grp., Inc.*,
    CV 09-904-VBF(FMOx), 2010 WL 11515297 (C.D. Cal. Mar. 19, 2010) ......................................12

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
    601 F.3d 1159 (11th Cir. 2010) ......................................................................................................12

*Siqueiros v. Gen. Motors LLC*,
    2021 WL 2115400 (N.D. Cal. May 25, 2021) ...........................................................................19, 22

*Siqueiros v. Gen. Motors LLC*,
    No. 16-cv-07244-EMC, 2021 WL 4061708 (N.D. Cal. Sept. 7, 2021) .......................................2, 19

*Siqueiros v. Gen. Motors LLC*,
    No. 16-cv-07244-EMC, 2022 WL 74182 (N.D. Cal. Jan. 7, 2022) .......................................20, 21, 25

*Sloan v. Gen. Motors LLC*,
    No. 16-cv-07244-EMC, 2017 WL 3283998 (N.D. Cal. Aug. 1, 2017).......................................18, 19

*Sloan v. Gen. Motors LLC*,
  No. 16-cv-07244-EMC, 2020 WL 1955643 (N.D. Cal. Apr. 23, 2020) .................................1, 20, 24

*Stastny v. S. Bell Tel. & Tel. Co.*,
  628 F.2d 267 (4th Cir. 1980) .................................................................................................................3

*Tarkett, Inc. v. Congoleum Corp.*,
  156 F.R.D. 608 (E.D. Pa. 1994) ..........................................................................................................17

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
  445 F.3d 311 (4th Cir. 2006) ...............................................................................................................13

*In re Toyota Motor Corp. Hybrid Brake Marketing, Sales Practices, and Products
  Liability Litigation*,
  288 F.R.D. 445 (C.D. Cal. 2013) ...........................................................................................................7

*Transunion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ...........................................................................................................19, 22, 23

*Vasquez v. Leprino Foods Co.*,
  No. 1:17-cv-00796-AWI-BAM, 2022 WL 1307998 (E.D. Cal. May 2, 2022)....................................1

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ....................................................................................................................2, 13, 14

*Weiner v. Ocwen Fin. Corp.*,
  342 F.R.D. 136 (E.D. Cal. 2022).........................................................................................................23

*Weisel v. Hattenbach*,
  No. CIV. A. 98-2542, 1999 WL 462665 (E.D. Pa. July 6, 1999) .......................................................17

*Williams v. Apple, Inc.*,
  338 F.R.D. 629 ....................................................................................................................................24

*Zakaria v. Gerber Prods. Co.*,
  755 F. App'x 623 (9th Cir. 2018).................................................................................................23, 24

**Statutes**

Idaho Consumer Protection Act ................................................................................................................1, 14

**Other Authorities**

Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.Rev. 97, 132
  (2009) ................................................................................................................................................2, 14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION

At its essence, GM's Motion to Decertify is just another thirty pages in which it argues that the jury should have found for GM and not for the Plaintiffs and the other class members. GM fails to show that anything changed after this Court's rulings on class certification[1] that made the Plaintiffs' California implied warranty, North Carolina implied warranty, and Idaho Consumer Protection Act claims unamenable to class resolution. GM fails to show that the jury was not presented with simple questions, the answers to which could resolve each and every class member's claims.

As the Court recognized, there was a common question of whether there was a piston ring wear defect (the "Oil Consumption Defect") in the Generation IV 5.3 LC9 engines installed in the Class Vehicles. *Sloan v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2020 WL 1955643, at *41-43 (N.D. Cal. Apr. 23, 2020). There were common questions of whether, under California and North Carolina law, this defect rendered the Class Vehicles unmerchantable. There was a common question, under Idaho law, of whether GM knew it was engaging in a deceptive practice by not disclosing the Oil Consumption Defect. There was a common question of whether otherwise time-barred class members' claims were tolled. And there was a common question of how much the class members overpaid for their vehicles at the point of sale. *Id.* at *47-49.

The jury answered these questions in a way that favored Plaintiffs and the other class members. GM may not like these answers, but its challenges to whether there was sufficient evidence to support the jury's conclusions should have been confined to its concurrent Motion for Judgment as a Matter of Law. Its decertification motion is baseless.

## LEGAL STANDARD

"The Ninth Circuit has not affirmatively articulated the burden of proof for decertification." *Novoa v. GEO Grp., Inc.*, No. EDCV 17-2514 JGB (SHKx), 2021 WL 4913286, at *2 (C.D. Cal. Sept. 30, 2021). "Some district courts have held that the burden stays with the plaintiff to show that certification remains appropriate." *Vasquez v. Leprino Foods Co.*, No. 1:17-cv-00796-AWI-BAM, 2022 WL 1307998, at *7 (E.D. Cal. May 2, 2022). Other district courts in the Ninth Circuit have determined "that

---

[1] ECF Nos. 237 and 320.

the party seeking decertification bears the burden of showing that the elements of Rule 23 have not been established because 'decertification and modification should theoretically only take place after some change, unforeseen at the time of the class certification, that makes alteration of the initial certification decision necessary.'" *Novoa*, 2021 WL 4913286, at *2 (quoting *In re MyFord Touch Consumer Litig.*, No. 13-cv-03072-EMC, 2018 WL 3646895, at *1 (N.D. Cal. Aug. 1, 2018) (Chen, J.)). Whichever party bears the burden, "the fact that certain elements of proof may favor the defendant on the merits does not negate class certification; *the issue is whether the proof is amenable to class treatment*." *Siqueiros v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2021 WL 4061708, at *3 (N.D. Cal. Sept. 7, 2021) (emphasis added).

## ARGUMENT

## I.   THE TRIAL RESOLVED COMMON QUESTIONS DISPOSITIVE OF ALL CLASS MEMBERS' CLAIMS.

Rule 23(b)(3) predominance requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23. As the Supreme Court has explained, there are likely to be *some* common questions in any case pled as a class action. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) ("[A]ny competently drafted class complaint literally raises common 'questions.'") (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.Rev. 97, 132 (2009)). What matters for Rule 23 certification is that these common questions "are of such a nature" that they can lead to class wide resolution. In other words, the answers to these common questions should resolve an issue central to the validity of the claims "in one stroke." *Id.* That is exactly what happened at trial in this case.

For the California and North Carolina classes, the trial resolved the common liability questions of: (1) whether GM sold the Class Vehicles with the Oil Consumption Defect, and (2) whether that defect rendered the Class Vehicles' unmerchantable. *See* ECF No. 566, Verdict Form; ECF No. 554, Jury Instructions, at 17, 21. For the Idaho class, the trial resolved the common liability questions of (1) whether GM knew or should have known of the Oil Consumption Defect when it sold the Class Vehicles, and (2) whether the sale of vehicles with this hidden defect had the tendency or capacity to mislead. *See* ECF No. 566; ECF No. 554 at 24. GM does not—and cannot—dispute that these are common questions. Nor

1    does it dispute that the jury's answers to these questions could drive the resolution of all class members'

2    claims. Instead, GM challenges the jury's answers to these questions.[2]

3    **A.    The Trial Resolved the Common Question of Whether There Is an Oil Consumption**
      **Defect in the Gen IV LC9 Engines.**

4

5    Most fundamentally, GM asks the Court to conclude that there was no evidence of an inherent

6    piston ring defect in all of the Gen IV LC9 engines from which the jury could reasonably find class-wide

7    liability. This is a pure merits argument. It cannot warrant decertification.

8    If the merits are considered, however, the jury heard and saw substantial evidence of a class-wide

9    piston ring defect. The record reflects that GM learned of oil consumption issues in the Gen IV 5.3L

10   engine line in 2008 and 2009. Trial Transcript ("TT") 423:23-424:3.[3] In 2009, GM engineer Alan Miller

11   suggested that his colleagues examine the piston rings as the root cause of the oil consumption issues in

12   the Gen IV LC9 engines, citing ring wear as a common trait among the Gen IV LC9 engines that they

13   examined for oil consumption issues. Trial Exhibit ("TE") 121. Then, in January 2010, GM's "Red-X"

14   report concluded that oil consumption followed the piston ring assembly within the Gen IV LC9 engine

15   line. TE 132. GM made changes to the entire Gen IV LC9 engine line to address these issues, TT 467:15-

16   468:20, 476:9-481:21, confirming that there was a piston ring related oil consumption defect across the

17   entire engine line.

18   ───────────────────

19   [2] In GM's cited cases in which courts decertified classes following trial, the trials revealed that the classes
     contained disparate groups of class members, such that all members' claims could not be resolved by

20   common proof. *See Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) (privity was disputed with
     respect to a subset of class members, for which the fact-finder "would have to look at every class

21   member's loan documents to determine who did and who did not have a valid claims"); *Racies v. Quincy
     Bioscience, LLC*, No. 15-cv-00292-HSG, 2020 WL 2113852, at *5 (N.D. Cal. May 4, 2020) (the evidence

22   revealed that that the plaintiff "might have purchased a product that did not contain the challenged
     misrepresentations."); *Forehand v. Fla. State Hosp. at Chattahoochee*, 89 F.3d 1562, 1566 (11th Cir.

23   1996) (at trial it became evident that the class had certified an overly broad class of employees who had
     "allegedly suffered a variety of discriminatory acts"); *Stastny v. S. Bell Tel. & Tel. Co.*, 628 F.2d 267,

24   274-81 (4th Cir. 1980) (no evidence of a statewide pattern or practice such that each member of the
     statewide class had common discrimination claims); *Bahamas Surgery Ctr. LLC v. Kimberly-Clark

25   Corp.*, 820 F. App'x 563, 566 (9th Cir. 2020) (a subset of class members had seen alleged
     misrepresentations, a subset had not).

26

27   [3] The referenced trial testimony, along with the referenced deposition testimony played to the jury and
     the referenced trial exhibits, are attached to the supporting declaration of Clay Barnett, filed with this

28   opposition.

───────────────────

GM argued at trial that it fixed this common defect in the Gen IV LC9 engines through its installation of an AFM shield and updated baffle cover, referred to as the "breakpoint" fixes. TT 474:16-475:6, 488:17-489:5. However, its internal documents all said otherwise. TE 146, 148, 150, 155, 187, 192, 202, 207, 216. For example, the jury was shown the following documents:

- An email with the subject "Gen 4 oil consumption," stating that "[w]e are seeing more oil consumption with [model year] 12 and 13 Gen 4 engine." TE 155.

- An email between GM engineers where they state that they are "[s]till seeing what looks like oil pull over on 2012 engines with post [breakpoint] valve covers" and "[t]his is what I've been talking about with oil consumption complaints after the [breakpoints]." TE 187.

- An email stating: "We would love to see a move for service rings. We continue to see alum blocks up through 2013 with oil consumption." TE 202.

- An email stating: "Gen IV still has problems." TE 207.

- An email stating: "[w]e are still getting Gen IV LC9 engines returned due to poor oil consumption…full face top ring [wear] at 30k to 50k miles." TE 216.

Further, GM's piston ring engineer, Thomas Halka, admitted to testifying in deposition that he did not believe that the AFM pressure relief valve primarily caused Generation IV V-8 ring wear and oil consumption. TT 625:19-626:14.

GM's technical service bulletins ("TSBs") also supported the conclusion that there was an inherent oil consumption defect within the Gen IV LC9 engines and that this defect carried over to the LC9 engines in the Class Vehicles. These TSBs, which told dealers what to do when people complained of oil consumption issues, treated all vehicles with the Gen IV LC9 engines uniformly. TE 162, 163, 165, 168, 169; TT 496:5-16, 875:22-876:22, 924:20-944:16. Moreover, GM issued these TSBs even for the Class Vehicles, which had the "breakpoint" fixes that GM argued resolved the oil consumption problem found in the earlier Gen IV LC9 engines. TE 169; TT 875:22-876:22.

The class representatives also all testified that they experienced unusual oil consumption in their Gen IV LC9 engines, unlike anything they had experienced in any non-LC9 vehicle that they had ever owned. TT 1031:9-1035:7, 1042:22-1043:23 (Tarvin Test.); *id.* 1097:14-1097:16, 1103:16-1104:8, 1109:19-23 (Del Valle Test.); *id.* 1150:17-1151:1, 1166:7-1167:11 (Davis Test.). This consistent testimony from three different individuals, with three different Class Vehicles, further supports the conclusion that there was a common, class-wide oil consumption defect in the post-"breakpoint" Class Vehicles.

1    Finally, Plaintiffs' expert, Dr. Dahm, explained to the jury how oil consumption and spark plug

2    fouling result from piston ring wear. TT 316:12-322:2.

3    In sum, the jury heard and saw the following evidence regarding a uniform, mass-produced,

4    engine:[4] (1) that the engine line indisputably had an oil consumption issue related to the piston rings at

5    one point in its lifespan, (2) numerous documents where GM engineers stated that that the engine line

6    continued to have oil consumption issues after the "breakpoint" fixes and that new piston rings were

7    necessary to fix the issue, (3) GM's TSBs lumping the Class Vehicles in with pre-breakpoint vehicles as

8    vehicles with LC9 engines that had oil consumption issues, (4) Plaintiffs' testimony that their Class

9    Vehicle LC9 engines all experienced oil consumption issues even though they had the breakpoint fixes,

10    and (5) expert testimony regarding how oil consumption and spark plug fouling result from piston ring

11    wear. All of this supports a reasonable conclusion that there was a common, class-wide defect in the

12    Class Vehicles with the Gen IV LC9 engines.[5] *See also generally* Pls.' Opp. to GM's Renewed Mot. for

13    J. as a Matter of Law or in the Alternative, for a New Trial.

14    Ignoring all of this evidence, GM argues that the testimony of Dr. Ball, one of Plaintiff's experts,

15    shows that there was not a common defect. In fact, the exact opposite is true. Dr. Ball testified that the

16    limited warranty data that was produced by GM in this case revealed 33,000 warranty claims for piston

17    repair in Gen IV 5.3L engines. Deposition of Dr. Jeffrey K. Ball ("Ball") at 87:8-88:18. This testimony—

18    33,000 instances of in-warranty piston repair—supports an inference of a common piston ring defect.

19    While GM argues that Dr. Ball testified that "50% [of these 33,000 repairs] had nothing to do with the

20    alleged defect at issue," Mot. at 3, this misrepresents Dr. Ball's testimony. In fact, Dr. Ball said that the

21    spreadsheet he was provided explicitly listed oil consumption as a primary customer complaint with

22    respect to 50% of the piston repairs. Ball 87:8-88:18. There is no evidence in the record from which to

---

[4] It was undisputed that the relevant LC9 engines were uniform. Ball 83:18-84:19; TT 614:23-615:4, 619:25-620:5, 1006:9-14.

[5] GM's cited case, *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 987 (9th Cir. 2020) is not only distinguishable, it supports Plaintiffs. In *Grodzitsky*, the Ninth Circuit affirmed denial of class certification when the sole evidence of a common defect amongst the vehicles was an excluded expert opinion. Here, on the other hand, there is hard evidence of a common defect in the form of the Red-X report, GM's internal emails, and the TSBs.

---

infer that oil consumption was not an issue with respect to those piston repair claims for which it was not explicitly listed as a customer complaint. But even if GM did not misrepresent Dr. Ball's testimony, the jury is still left with 16,000 instances of in-warranty piston repair—which, again, supports an inference of a common engine defect.

Ignoring the thousands of instances of in-warranty piston repair, GM argues that the percentage of vehicles with LC9 engines that had in-warranty piston repair is too low to support an inference of a common piston ring defect. It offers no legal authority to back up this argument. But, moreover, the argument ignores Dr. Ball's testimony that the warranty data GM provided in this litigation was blatantly incomplete, as it was limited only to piston repair, and did not include any information regarding the myriad other engine issues that can likely result from excessive oil consumption, including damaged lifters and fouled spark plugs. Ball 39:4-42:20. In other words, Dr. Ball testified that the piston repair data provided by GM does not tell nearly the whole story regarding the percentage of Class Vehicles that had in-warranty engine repairs as a result of the Oil Consumption Defect.

GM also references Dr. Ball's testimony that he would expect that "eventually" 100% of Class Vehicles would experience issues resulting from the oil consumption defect. Again, this testimony does not help GM. Dr. Ball based that opinion on the fact that the Class Vehicles all have the "same engine." Ball 83:17-84:19. Essentially, he testified that where the data reveals a clear common issue in a large portion of the LC9 engines, and all LC9s are the same engines, one can readily infer that the problem exists in all LC9s.[6]

GM also points to Mr. Pfromm's testimony that GM warranty data only showed warranty claims for piston ring repairs or replacements for .66% of Class Vehicles. Again, GM fails to explain why the jury was compelled to find that a .66% in-warranty piston repair rate is dispositive as to whether the engines suffer from a common defect. But, just as important, GM fails to address the substantial evidence that its .66% warranty repair rate was highly misleading.

- Mr. Pfromm admitted that this rate only accounted for in-warranty piston repairs and did not take into account repairs for any of the other engine parts that require adequate oil to

---

[6] GM also ignores Dr. Ball's testimony that GM tore down engines and "just about every one exhibited significant top ring wear." Ball 90:3-91:4.

operate, nor did it take into account spark plug fouling, which Mr. Pfromm admitted was an effect of too much oil in the combustion chamber. TT 1014:17-1017:2.

- Mr. Pfromm conceded that he did not search GM's warranty data for customer complaints of excessive oil consumption associated with anything other than piston replacement. TT 1018:3-1018:6.

- Mr. Pfromm conceded that he had pulled piston cleaning data in 2017, but he did not testify as to what *that data* showed. TT 1083:21-1084:11. Piston cleaning was a procedure that GM directs its dealers to perform through its TSBs for customers who came in complaining of oil consumption, and thus, would have been highly relevant to a fair calculation of the number of Class Vehicle owners who had sought repairs for excessive oil consumption. TE 162, 163, 165, 168, 169.

- The piston repair/replacement warranty data also showed dealers were forcing people to go through up to four oil consumption tests before they would perform a piston repair. TT 884:20-885:17. This reduces the likelihood that a Class Vehicle owner would receive a piston repair before the warranty's time and mileage limitations expired.

- Finally, the in-warranty piston repair data does not reflect any oil consumption repairs that may have been performed at non-GM dealerships or by the class members themselves. TT 1017:3-1018:2.

In sum, there was ample reason for the jury to reject Mr. Pfromm's .66% number as indicative of the number of Class Vehicles that received in-warranty repairs stemming from the Oil Consumption Defect and to reject GM's contention that the number is dispositive as to whether there was a uniform defect in the Class Vehicles.[7]

GM's cited cases are distinguishable. In *In re Toyota Motor Corp. Hybrid Brake Marketing, Sales Practices, and Products Liability Litigation*, 288 F.R.D. 445, 449 (C.D. Cal. 2013), the court found that plaintiffs presented "no evidence to contradict" Toyota's "substantial evidence" that they had rectified an alleged software defect through updated software. The named plaintiffs in *Toyota*, who had received the update software, had no issues arising from the alleged defect. Here, not only does GM not have "substantial evidence" that its "breakpoint" fixes worked, Plaintiffs have GM's internal documents discussing how GM's "breakpoint" fixes did not work. Further, unlike in *Toyota*, all Plaintiffs in this case experienced oil consumption issues in their post-breakpoint vehicles. Similarly, the court in GM's cited

---

[7] GM also argues that Plaintiffs promised that they would prove at trial certain warranty claim rates in their class certification brief. Plaintiffs did nothing of the sort. Plaintiffs listed those claim rates in their class certification brief based on the findings of Dr. Ball. Dr. Ball died before trial, and thus could not testify to them at trial. In any event, GM fails to explain how the absence of this evidence is in anyway dispositive. It does not change the fact that there was evidence of thousands of warranty claims for oil consumption related piston ring issues in the Class Vehicles, nor does it negate GM's internal documents recognizing that the piston ring defect existed in the Class Vehicles.

case, *American Suzuki Motor Co. v. Superior Court*, 37 Cal. App. 4th 1291, 1298-99 (1995), found that there was not a defect in the class vehicles. As discussed above, the evidence in this case shows the opposite.

**B.      The Trial Showed a Common Injury with a Common Cause.**

GM argues that Plaintiffs presented no evidence at trial of class-wide injury or a common cause of any class-wide injury. Again, these are merits arguments that are misplaced in a decertification brief. GM does not, and cannot, dispute, that the jury was presented with the question of whether class members suffered a common injury with the common cause of the Oil Consumption Defect. GM simply challenges the jury's findings.

But if the merits are considered, Plaintiffs presented evidence showing that: (1) there was an inherent piston ring defect in the Class Vehicles;[8] (2) that it was a safety defect;[9] and (3) that, as a result, of the defect, Plaintiffs and the other class members did not receive the benefit of their bargain when they paid for their vehicles.[10] GM sold trucks that were less valuable than what the class members thought they were buying. As explained by Mr. Stockton, this is class-wide economic injury. TT 686:13-697:15.

With respect to only the California class, GM argues that there was no evidence that the defect was substantially certain to manifest in all Class Vehicles. This ignores the evidence that there was an inherent defect manifest in all Class Vehicles at the time of sale;[11] Dr. Ball's testimony that, because it is the same engine, all vehicles will eventually be damaged by the defect;[12] Dr. Dahm's testimony as to how the nature of ring wear is a downward spiral, in which ring wear leads to oil consumption, which in turn leads to increasing ring wear and increasing oil consumption;[13] and the named Plaintiffs all testifying

---

[8] *See* Section I.A, *supra*.

[9] TT 293:5-23, 321:14-18, 329:10-330:4, 403:11-407:18 (Dahm Test.); 1167:19-1171:12 (Davis Test.).

[10] TT 1041:16-23, 1043:24-1044:11 (Tarvin Test.); TT 1104:17-1106:20 (Del Valle Test.); TT 1298:4-21 (Davis Test.); TT 697:16-699:13 (Stockton Test.).

[11] *See* Section I.A, *supra*.

[12] Ball 83:17-84:19.

[13] TT 316:12-322:2.

---

1    to experiencing unusual oil consumption in their Class Vehicles.[14] This issue is further addressed at

2    Section II.B of Plaintiffs' Opposition to GM's Renewed Motion for Judgment as a Matter of Law.

3    GM's argument that that there was no common evidence that $2,700 was an appropriate amount

4    for class-wide damages fails for the reasons stated in Section III.

5    As to the common evidence of causation, GM's argument borders on frivolous. As discussed

6    above, the class members were injured because they did not receive the benefit of their bargain—they

7    received defective vehicles. The cause of that injury—common to all class members—is the piston ring

8    defect within each of the Class Vehicles.[15]

9    GM's causation argument is, essentially, that there was evidence that oil consumption can be

10   caused by issues other than the piston ring defect, and this means that there was not a uniform piston ring

11   defect in the Class Vehicles. This reasoning is unsound. There can be both a piston ring defect in all Class

12   Vehicles and, for example, an improperly screwed on oil filter or a sealant leak in a baffle covers in some

13   Class Vehicles. For the reasons stated in Section I.A., *supra*, the evidence supported a finding that there

14   was a common piston ring defect.

15   GM also misstates Dr. Ball's testimony in support of its causation argument. As noted above, he

16   did not testify, as GM states, that he reviewed 33,000 warranty claims relating to oil consumption, and

17

18   ---

19   [14]TT 1031:9-21, 1032:14-17, 1034:5-18 (Tarvin Test.); TT 1094:22-1095:14, 1097:14-1100:22 (Del
     Valle Test.); TT 1162:22-1167:11 (Davis Test).

20   [15] GM's cited cases are inapposite. In *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1019 (7th Cir.
     2002), the court held that "it would not be possible to make a once-and-for-all decision about whether all
21   60 million tires were defective" because there were 67 different specifications amongst the universe of
     allegedly defective tires. In *Oscar v. BMW of N. Am., LLC*, 274 F.R.D. 498, 503 (S.D.N.Y. 2011), the
22   plaintiff sought certification of a class of drivers whose tires had punctured, but lacked evidence of a
     common defect responsible for each puncture. Likewise, in *In re Ford Motor Co. Ignition Switch Prod.
23   Liab. Litig.*, 194 F.R.D. 484, 490 (D.N.J. 2000), the plaintiffs sought certification of a class of drivers
     whose cars had caught fire, but lacked evidence that a common defect was responsible for each fire. In
24   *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 603-04 (S.D.N.Y. 1982), there was no
     evidence of a common defect that rendered all class vehicles unfit for ordinary use. *Insolia v. Philip
25   Morris Inc.*, 186 F.R.D. 535, 537 (W.D. Wis. 1998) was a tobacco case in which the question of whether
     cigarettes were the cause of each class members' lung cancer was individualized. In *Hum v. Dericks*, 162
26   F.R.D. 628, 640 (D. Haw. 1995), where the plaintiff argued that a defendant surgeon had wrongly
     implanted an artificial ligament on behalf of a class of patients, the court concluded that "the individual
27   medical history of each patient, the interaction of the ligament with each patient's body, and the possible
     multiple causes of the damages destroy[ed] commonality."
28

that 50% were related to something other than the Oil Consumption Defect. Rather, Dr. Ball testified that he was presented with a spreadsheet showing 33,000 in-warranty piston repairs, and that about half of those expressly noted oil consumption as a customer complaint. Ball 86:11-88:18. Neither Dr. Ball, nor any other witness, testified that the only relevant piston repairs in the warranty data were those in which a technician expressly included a note about a consumer complaining of oil consumption.

### C.   Unmerchantability Was Tried as a Common Question with a Common Answer.

GM argues that there was no common evidence of unmerchantability because there was no common evidence that the vehicles were unreliable or unsafe. This argument only pertains to the California class. Under North Carolina law, the law is simply that "[g]oods that are defective at the point of sale are not merchantable." See ECF No. 554, Jury Instructions, at 21.; *see also DeWitt v. Eveready Battery Co., Inc.*, 565 S.E.2d 140, 147 (N.C. 2002). With respect to the California class, there was significant evidence that the Oil Consumption Defect renders the Class Vehicles unsafe and unreliable. Dr. Dahm testified to the effects of oil consumption and how it renders vehicles unreliable and unsafe. TT 293:5-23, 309:14-310:23, 321:14-18, 329:10-330:4, 403:11-407:18. This was supported by Plaintiffs' testimony,[16] as well as the testimony of GM engineers.[17]

### D.   GM's Argument About Barriers to Warranty Claims Is Irrelevant.

GM argues that "there is no commonality regarding alleged barriers to making warranty claims." Mot. at 10-12. GM, however, fails to explain what this has to do with class certification. Plaintiffs' evidence that there were barriers to receiving warranty repairs was not a "centerpiece of [Plaintiffs'] case," as GM argues; it simply rebutted GM's argument that a supposedly low warranty rate demonstrated that there was not a defect in the Class Vehicles. The evidence that there were barriers to receiving in-warranty repairs helped put GM's reliance on the rate of in-warranty piston repairs in context. This, along with the fact that the warranty data that GM pulled and relied upon was blatantly insufficient, helps explain why the jury was not swayed by GM's warranty rate argument. GM could have put on a defense that attempted to explain why there were thousands of warranty claims for piston repairs in the LC9

---

[16] TT 1043:21-1044:18 (Tarvin Test.); 1101:16-1103:22 (Del Valle Test.); TT 1167:19-1171:12 (Davis Test.).

[17] 439:16-443:13 (Tappen Test.); 1015:7-1016:19 (Pfromm Test.).

1   engines, why GM's internal documents continued to discuss a piston ring-related oil consumption defect

2   in the LC9 engines after the breakpoint, or why Plaintiffs all experienced unusual oil consumption in

3   their post-breakpoint vehicles. GM did not do so. It relied on a self-serving and clearly insufficient

4   warranty data pull, and the jury rejected its argument.

5       **E.      Plaintiffs' Testimony Supports the Jury's Finding of a Common Defect.**

6       While arguing that the Plaintiffs had differing experiences with their vehicles, GM fails to explain

7   how any of these differences require class decertification. GM fails to cite a single case that suggests that

8   all class members must have the exact same experience with a defective product to make class

9   certification appropriate. The fact is that all named Plaintiffs testified that they experienced unusual oil

10  consumption in their post-breakpoint Class Vehicles,[18] which is evidence that GM's "breakpoint" fixes

11  did not work and that the Oil Consumption Defect recognized in the Red-X report carried over to the

12  Class Vehicles.

13      **F.      The Tried Claims Were Resolvable, and Resolved, by Class-Wide Evidence.**

14      GM argues that Plaintiffs lacked common, class-wide evidence, and instead amalgamated

15  unrelated pieces of evidence into a fictional, "perfect plaintiff." Mot. at 13-15 (quoting *Broussard v.*

16  *Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 344 (4th Cir. 1998)). For all of the reasons discussed

17  above, this is untrue. Plaintiffs presented evidence of a common defect in the LC9 engines that caused

18  common economic injury. GM utterly fails to explain how this case is anything like *Broussard*, where

19  the court found that the named plaintiffs were allowed to stitch together disparate misrepresentations and

20  contractual terms, which were not made or did not apply to all class members, in order to prove their

21  case. *Id.* at 344.

22      Indeed, *Broussard* differs remarkably from this case; and the contrast only serves to highlight the

23  propriety of class-wide resolution here. In *Broussard*, the court's primary reason for decertification was

24  its finding that there was an irreconcilable "conflict of interest" amongst various groups of class members.

25  *Id.* at 337-39. GM does not argue that is the case here. The *Broussard* court also found that class

26

27

28  [18] TT 1031:9-1035:7, 1042:22-1043:23 (Tarvin Test.); 1097:14-1097:16, 1103:16-1104:8, 1109:19-23
    (Del Valle Test.); 1150:17-1151:1, 1166:7-1167:11 (Davis Test.).

decertification was appropriate because of "[f]ive significant variations" in the franchisees' factual and legal arguments, none of which are present in this case:

- First, the *Broussard* court held that the plaintiffs could not advance a class-wide breach of contract claim where there were differing contracts, with differing material terms, amongst the class members. *Id.* at 340. Here, none of the class members' claims are premised on the language of written contracts that might have varied from class member to class member.

- Second, the *Broussard* court held that the plaintiffs could not advance fraud-based claims on a class-wide basis because these claims were premised on individualized, non-uniform, misrepresentations to class members. *Id.* at 340-41. Here, none of the claims asserted by Plaintiffs are based on individualized, non-uniform, misrepresentations.

- Third, the *Broussard* court held that the necessity of providing reliance under certain fraud-based claims precluded class-wide resolution. *Id.* at 341-42. Here, none of the tried claims required proof of reliance.

- Fourth, the *Broussard* court held that the class members' tolling arguments hinged on "alleged misrepresentations and obfuscations" that "differed from franchisee to franchisee." *Id.* at 342. As discussed at Section II, *infra*, the Class tolling arguments in this case were provable through common evidence.

- Fifth, the *Broussard* court held that the class members' lost profits damages calculations required individualized proof. *Id.* at 342-43. Plaintiffs, here, did not seek lost profits damages.

In sum, none of the *Broussard* court's reasons for decertifying the class are applicable here.[19] Nor, for the reasons stated above, does each class member's claim turn upon individual facts. Again, the class members claim turns upon the presence of the Oil Consumption Defect in the Class Vehicles, the significance of that defect, and GM's knowledge of that defect. GM had a fair opportunity to convince

---

[19] GM's other cited cases are likewise distinguishable, and amount to not much more than a string citation of random cases in which courts have found class certification inappropriate. In *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1176 (11th Cir. 2010), the court decertified the class's breach of contract claim because there was "substantial variation" in the "material terms" of the class members' contracts. In *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1256 (2d Cir. 2002), the Second Circuit affirmed denial of class certification of fraud-based claims premised on individualized oral misrepresentations. This was also the basis for denial of class certification in *Dioquino v. Sempris LLC*, No. CV 11-05556 SJO (MRWx), 2012 WL 6742528, at *9 (C.D. Cal. Mar. 19, 2010). In *Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950, 971-72 (S.D. Cal. 2016), the defendant had issued different instructions and warnings to the various class members, which uniquely affected resolution of their claims. In *Russ v. Apollo Grp., Inc.*, CV 09-904-VBF(FMOx), 2010 WL 11515297, at *7 (C.D. Cal. Mar. 19, 2010), the class members' claims were premised on differing contracts. In *Gartin v. S&M NuTec LLC*, 245 F.R.D. 429, 442 (C.D. Cal. 2007), issues of reliance, contributory negligence, and individualized damages were held to predominate.

the jury that the Oil Consumption Defect did not exist or could not support the class members' claims. Its Due Process rights were not violated.[20]

## II.   GM'S STATUTE OF LIMITATIONS DEFENSES WERE RESOLVED THROUGH COMMON ANSWERS TO COMMON QUESTIONS.

GM's statute of limitations argument is also a merits argument that cannot warrant class decertification. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (finding, with respect to class certification, "merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied"). GM argues that the evidence presented at trial *does not* support a finding that the otherwise time-barred class members' claims were tolled. GM fails to confront the issue of whether evidence, common to the class, *could* support a finding that the otherwise time-barred class member' claims were tolled. GM, in other words, fails to show that the otherwise time-barred class members' tolling arguments were incapable of being resolved on a class-wide basis through the jury's resolution of issues common to all class members.

Specifically, GM's argument dances around and avoids a critical aspect of each state's tolling laws, which is that any class member with otherwise time-barred claims need not prove their individual diligence during a period in which they could not have known they had a claim. This issue—whether the class members could not have known that they had a claim arising from the Oil Consumption Defect—is a common one. It is resolvable on a class-wide basis. *See Dukes*, 564 U.S. at 350 ("There was a 'common contention' that was capable of being resolved in 'one stroke'").

The jury was instructed on this point. For the California class, the jury was instructed that a plaintiff "need not show the exercise of reasonable diligence in discovering the oil consumption defect

---

[20] GM's cited case, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 232 (2d Cir. 2008) is distinguishable because, in that case, the plaintiffs received an estimated, aggregate damages award that was "likely to result in an astronomical damages figure that does not accurately reflect the number of plaintiffs actually injured by defendants and that bears little or no relationship to the amount of economic harm actually caused by defendants." In *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191-92 (3d Cir. 2001), a securities case, plaintiffs could not establish injury on a class-wide basis. And while GM cites *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir. 2006) for the proposition that a defendant has the righ to "present facts or raise defenses that are particular to individual class members," GM has simply failed to show that it was precluded from doing so in this case. !

unless, and until, he became aware of facts that would cause a reasonable person to inquire into whether his vehicle was sold with this defect."[21] For the North Carolina class, the jury was instructed that if a plaintiff "that he was not, and should not have been, aware of facts that should have led to the discovery of the oil consumption defect, then the plaintiff need not show the exercise of any other due diligence."[22] And for the Idaho Class, the jury was instructed that an ICPA claim is tolled if an Idaho class member, "through the exercise of reasonable diligence could not have known, that their cause of action under the Idaho Consumer Protection Act might exist before December 19, 2014."[23]

GM does not challenge the propriety of any of these instructions. Nor does GM dispute that there can be "common answers" to the questions, under each state law, of whether a class member could have known of their cause of action. *Dukes*, 564 U.S. at 350 (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). This should end the decertification analysis with respect to GM's statute of limitation argument. Rule 23 certification does not hinge on a jury's conclusions, which is what GM is essentially challenging.

### A.    The Evidence Presented at Trial Provided Common Answers to the Tolling Questions.

Because the issue of whether the evidence presented at trial could lead a reasonable juror to conclude that the class members could not have known of their causes of action is not properly raised in a Rule 23 decertification motion, the Court should not entertain this argument. However, if the Court chooses to do so, the evidence presented at trial only supports a finding that the class members could not have discovered their claim prior to this case's filing in 2016.

As discussed above, from 2010-2016, GM issued technical service bulletins concerning oil consumption issues in vehicles with the Gen IV 5.3 LC9 engine.[24] These "TSBs" were supposed to

---

[21] ECF No. 554, Jury Instructions, at 19-20; *see also Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 504 (9th Cir. 1988).

[22] ECF No. 554, Jury Instructions, at 23; *see also Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 554 (4th Cir. 2019)

[23] ECF No. 554, Jury Instructions, at 26; *see also Performance Chevrolet, Inc. v. Mkt. Scan Info. Sys., Inc*., 402 F. Supp. 2d 1166, 1171 (D. Idaho 2005).

[24] TT 875:22-876:22, 924:20-944:16.

---

provide dealers with "up-to-date information" on how to repair known issues within GM vehicles.[25] The TSBs, however, never disclosed that there was an inherent piston ring defect—the defect that gave rise to the class members' claims—in the vehicles.[26] Further, the early versions of these TSBs only addressed oil consumption issues in vehicles that predated the Class Vehicles.[27] The Class Vehicles were not added to the bulletins until September 2014.[28] Thus, GM never disclosed, even to its dealers, the defect that gave rise to the class members' claims. And GM never disclosed any possible oil consumption issues in the Class Vehicles, much less an inherent defect that could give rise to the causes of action, until September 2014.

This evidence supports a finding that GM concealed the Oil Consumption Defect, preventing class members from uncovering that they may have had a claim. This finding is further supported by the Plaintiffs' testimony that: (1) dealers did not disclose the oil consumption issue,[29] (2) oil consumption issues were presented as normal,[30] and (3) that there was no way they could have known of the Oil consumption issue prior this case's filing.[31]

On the other hand, there is not a shred of evidence in the record that shows that Plaintiffs could or should have known of the Oil Consumption Defect prior to the case being filed, much less in 2014. There was no evidence presented at trial that North Carolina and California class members might have discovered, prior to December 19, 2016, that, at the point of sale, GM sold them a vehicle with a piston

---

[25] TT 496:5-16 (Tappen Test.).

[26] TT. 443:15-444:4 (Tappen Test.), 875:22-877:6 (Pfromm Test.).

[27] TT 924:16-932:9, 943:4-944:16 (Pfromm Test.).

[28] TT 943:4-944:16 (Pfromm Test.).

[29] TT 1097:14-1100:18 (Del Valle Test.).

[30] TT. 1162:22-1163:12 (Davis Test.).

[31] TT. 1038:4-18 (Tarvin Test. (Q. Before 2016 when this case was filed, did you have any reason to know that you had a legal claim? A. No. I don't know how you would even know that.)).

ring defect that renders their cars unmerchantable.[32] There was no evidence presented at trial that Idaho class members might have discovered, prior to December 19, 2014, that GM might have *knowingly* sold a vehicle with a piston ring defect.[33]

In fact, GM has consistently denied the presence of the Oil Consumption Defect in the Class Vehicles. Its witnesses denied it at trial. GM recognizes this very fact in its motion: "GM's engineers testified there was no defect of the type plaintiffs claim exists in each and every Class Vehicle." Mot. at 5. A reasonable juror could easily conclude that a class member could not have discovered a defect that GM continues to proclaim does not exist.

Moreover, GM did not put on a defense. If GM had presented a single witness that said the otherwise time-barred class members could have known that they had a claim, GM might have a leg to stand on to challenge the jury's conclusion on tolling, even if it would still essentially just be arguing that the jury reached the wrong decision. But GM did not present such a witness.

GM argues that some otherwise time-barred class members could have known of their claims because GM's warranty data showed that people received piston ring replacements. However, anybody who received an adequate piston ring replacement is, by definition, not a class member. GM does not explain how any class member should have known that these in-warranty piston replacements in non-class member vehicles even took place. GM also argues that otherwise time-barred class members could have known they had a claim because Plaintiff Del Valle testified that he noticed oil consumption in an older non-Class Vehicle and shortly after buying his Class Vehicle in 2016. GM fails to explain how the fact that Del Valle noticed oil consumption in a non-Class Vehicle could have led someone to discover the Oil Consumption Defect in the Class Vehicles. Certainly, GM does not explain how Plaintiff Del Valle's noticing oil consumption in a non-Class Vehicle *necessitates* a reasonable jury finding that other

---

[32] *See* ECF No. 555, Final Jury Instructions, at 18 (under California implied warranty law, a "car should be in safe condition and substantially free of defects") and 22 (under North Carolina implied warranty law, "[g]oods that are defective at the point of sale are not merchantable.").

[33] *See* ECF No. 554, Final Jury Instructions, at 26 (plaintiffs had to prove that "GM knew or in the exercise of due care should have known it was engaging in an unfair or deceptive practice" to show an ICPA violation).

1   Class members could have known they had a claim against GM prior to December 19, 2014. Likewise,

2   the fact that Del Valle noticed oil consumption issues in his truck shortly after buying it in 2016 does not

3   *necessitate* a reasonable jury finding that any class member could have discovered the piston ring defect

4   that gave rise to the class members' claims. The jury's verdict must stand.

### B.    The Jury's Note Cannot Support Decertification

6        GM grasps for a lifeline in the jury's note, which asked if there is "a specific time frame in which

7   due diligence must be shown." Mot. at 18. GM argues, without explaining why or how, that this note

8   somehow proves that the elements of each tolling doctrine are necessarily subjective. In fact, it is entirely

9   unclear why the jury submitted its note, or whether it even played any role in their deliberations. "Neither

10  the Court, nor the parties, nor anyone other than the jury, knows or will ever know the precise details of

11  the deliberations, including why the jury chose to ask the question it did and how it used the answer."

12  *Anderson v. Richardson*, 145 F. Supp. 2d 1139, 1142 (D.N.D. 2001). The verdict cannot be tossed aside

13  based on GM's speculations on a jury note. *See Tarkett, Inc. v. Congoleum Corp.*, 156 F.R.D. 608, 611

14  (E.D. Pa. 1994) ("A verdict will not be disturbed on the basis of conjecture as to how the jurors arrived

15  at their decision….The Court declines [Plaintiff's] invitation to speculate based on the jury's note….").[34]

16  The jury's note, whatever may have been its intention, does not change the fact that it can be proven—

17  and was proven in this case—with common evidence, sufficient to satisfy Rule 23, that the otherwise

18  time-barred class members could not have known of the Oil Consumption Defect prior to this case's

19  filing.

### C.    GM's Due Process Rights Were Not Violated.

21       The verdict form clearly instructed the jury that they had to find, for *all* of the otherwise time-

22  barred class members, that their claims were tolled. ECF No. 555. GM had ample opportunity to defeat

---

[34] *See also Lau v. Mercedes-Benz USA LLC*, No. C-11-01940 DMR, 2014 WL 1677552, at *3-4 (N.D. Cal. Apr. 28, 2014) (refusing, on a motion for new trial, to speculate on what a jury meant by its note); *Weisel v. Hattenbach*, No. CIV. A. 98-2542, 1999 WL 462665, at *3 (E.D. Pa. July 6, 1999) ("To read anything more into the jury's question would amount to pure speculation about the jury's deliberations. The jury's question alone does not justify the granting of plaintiffs' request to overturn the verdict."); *Davenport v. Menard, Inc.*, No. 14-CV-222-KHR, 2016 WL 5346374, at *8 (D. Wyo. May 5, 2016) ("Plaintiff's interpretation of the jury question is speculative, and it is not the Court's position to question the intent behind the jury's question.").

class-wide tolling by proving to the jury that some class members should have known that they had claims. GM failed to do so, and if it even attempted to do so, it is not apparent from the record. GM chose to live by its insistent denial of the Oil Consumption Defect, and it cannot now complain if it must die because of that same insistent denial.

## III.   THE EVIDENCE AT TRIAL CONFIRMED EACH CLASS MEMBER'S ARTICLE III STANDING.

GM's latest challenge to Plaintiffs' and the other class members' Article III standing suffers from the same fundamental misunderstanding of Plaintiffs' claims as each of the previous challenges: GM ignores that Plaintiffs brought (and have now tried to verdict) a case resting on the *economic* damages Plaintiffs suffered when they overpaid for their vehicles, rather than their personal experience with excessive oil consumption. Following trial, these economic damages are now well supported by expert evidence that both withstood repeated *Daubert* challenges and was uncontroverted at trial. Each class member's showing of economic harm under Article III confirms the commonality of this issue that continues to bind the certified Classes together.

### A.   The Law of the Case Establishes That Each Class Member May Show Standing Through Economic Injury.

The ability of each class member to satisfy Article III is a thoroughly litigated issue in this matter. While GM's latest decertification bid wholly fails to acknowledge this Court's prior rulings on this issue, GM does not argue that they were incorrect. This law of the case provides the best starting point for understanding the nature of class members' Article III showing.

GM first unsuccessfully challenged Plaintiffs' Article III standing in moving to dismiss the complaint. This Court recognized that Plaintiffs' showing of Article III standing rested on their allegations that they each overpaid for their defective vehicles. *Sloan v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2017 WL 3283998, at *4 (N.D. Cal. Aug. 1, 2017) ("[I]n this case, Plaintiffs allege that all engines [in the Class Vehicles] are inherently defective, and that they would not have paid the same amount had they known of the defect."). This Court further noted that the Ninth Circuit found that similar allegations were sufficient to establish Article III standing in *Mazza v. American Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012). *See Sloan*, 2017 WL 3283998, at *4 ("The Ninth Circuit has held that overpayment itself is 'injury in fact' under Article III.") (citing *Mazza*, 666 F.3d at 595). Thus, it has

1    been clear since the outset of this case that "Plaintiffs' claims of overpayment for a defective product due

2    to GM's fraudulent omissions constitute an injury in fact." *Sloan*, 2017 WL 3283998, at *4.

3         At the class certification stage, GM again challenged Plaintiffs' common proof with respect to

4    standing. Although this Court held that GM's challenge was "premature[]," *Siqueiros v. Gen. Motors*

5    *LLC*, 2021 WL 2115400, at *19 (N.D. Cal. May 25, 2021), it nevertheless reached the substance of GM's

6    argument and held that "Plaintiffs have therefore already demonstrated— assuming the case reaches the

7    damages stage—that each of the putative class members who purchased a Class Vehicle has standing to

8    receive damages because the alleged defect caused them to overpay for their vehicles," *id.* This is because

9    the injury stems not from each class member's own personal experience with excessive oil consumption,

10   but from "the defective piston rings—which are allegedly present in every Class Vehicle." *Id.*

11        This Court affirmed and further expanded on this "controlling law of the case" in *Siqueiros v.*

12   *Gen. Motors LLC*, No. 16-cv-07244-EMC, 2021 WL 2115400 (N.D. Cal. Sept. 7, 2021) (denying GM's

13   motion to decertify the Classes in light of *Transunion LLC v. Ramirez*, 141 S. Ct. 2190 (2021)). Far from

14   supporting GM's position, this Court noted that "*Transunion* actually confirms that Plaintiffs here

15   suffered a concrete injury by overpaying for their vehicles." *Siqueiros v. Gen. Motors LLC*, 2021 WL

16   4061708, at *4 (N.D. Cal. Sept. 7, 2021); *see also id.* ("If a defendant has caused physical or *monetary*

17   injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III.") (quoting

18   *Transunion*, 141 S. Ct. at 2204) (emphasis added in *Siqueiros*). This Court also relied on the growing

19   number of decisions in this circuit that "have repeatedly held that putative class members have Article

20   III standing when plaintiffs allege that they overpaid for a defective product, even if the defect at issue

21   does not manifest itself in every putative class member's product." *Siqueiros*, 2021 WL 4061708, at *4

22   (citing *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 819 (9th Cir. 2019), *Aberin v. Am. Honda Motor*

23   *Co., Inc.*, No. 16-cv-04384-JST, 2021 WL 1320773, at *6 (N.D. Cal. Mar. 23, 2021), and *In re Gen.*

24   *Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 884 (N.D. Cal. 2019)).

25        In light of these rulings, decertification would only be appropriate if GM were able to show that

26   Plaintiffs somehow failed at trial to follow through with their common showing of class members'

27   economic injury in fact. As discussed in the next section, the uncontroverted damages evidence at trial,

28   as the jury found, demonstrated a common overpayment of $2,700 affecting all class members.

**B.** **The Trial Evidence Confirmed Each Class Member's Injury in Fact.**

Edward Stockton, Plaintiffs' expert economist, testified at length during trial regarding the damages suffered by each class member that resulted from the Oil Consumption Defect. Stockton testified as an expert on economics and applied econometrics with a subject matter expertise in the retail automotive industry. TT 685:6-15. Stockton brought a wealth of experience in analyzing damages in automotive defect class actions, having served as an expert in the Volkswagen diesel defeat device litigation, the Toyota unintended acceleration, and the Takata airbag litigation, among other cases. TT 682:1-20. As Plaintiffs' damages expert here, Stockton assumed that Plaintiffs had made each of their showings regarding liability, TT 686:3-15, an assumption that this Court had previously held he was entitled to make. *Siqueiros v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2022 WL 74182, at *10 (N.D. Cal. Jan. 7, 2022) ("Stockton is a *damages* expert, and, thus, is entitled to assume liability in order to model the damages.") (emphasis in original). As an economist, making assumptions on technical matters is "an absolutely common way" to proceed. TT 689:17-23.

In this case, Stockton concluded that the cost to repair the Oil Consumption Defect serves as the best measure of each class member's damages. TT 694:8-15. Using the cost of repair is both consistent with economic principles, *see* TT 694:16-697:15, and with case law from this case and others concerning benefit-of-the-bargain damages, *see Sloan*, 2020 WL 1955643, at *48 ("One obvious measure of such [benefit-of-the-bargain] damages is the cost to repair the defective product.") (citing *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 225-26 (S.D.N.Y. 2019) and *Falco v. Nissan N. Am. Inc.*, 2016 WL 1327474, at *12 (C.D. Cal. Apr. 5, 2016)). In light of Dr. Dahm's testimony that replacement of the piston rings with new rings with better coating would be an appropriate repair,[35] *see*

---

[35] GM's argument concerning the commercial availability of PVD rings for any such replacement, *see* Mot. at 27, ignores that: (1) the evidence shows that GM's resistance to switching to PVD was not due to a complete lack of commercial availability but rather PVD "was very expensive," TT 643:5-11; (2) there is no indication that Pfromm's analysis for the cost of a piston ring replacement varies significantly based on which coating material is used for the new rings; (3) there is similarly no indication that the jury's verdict is premised on replacement with PVD rings, rather than replacement with what was simply the best commercially available piston ring coating at the time of the Class Vehicle's purchase; (4) no matter what point in time PVD became commercially available, it is undisputed that it is now available for class members to restore their Class Vehicles to their originally expected condition.

TT 334:13-22, and GM's own internal estimate that a piston replacement costs $2,700, *see* TT 699:2-13, Stockton testified that each class member has suffered $2,700 in economic damages, TT 686:22-687:9.

Stockton's expert testimony at trial plainly establishes a class-wide finding of Article III injury in fact, and GM has done nothing to rebut it. GM did not offer any of its own fact or expert testimony on the issue, and its motions to exclude Stockton's testimony were both denied. *Siqueiros*, 2022 WL 74182, at *10-12; TT 1184:1-17. The only trial testimony from a GM engineer on the $2,700 cost of repair figure was from Steven Pfromm, the engineer who originally generated it, who confirmed at trial that $2,700 was the result of his piston replacement labor code analysis. TT 890:24-891:7.[36]

Additionally, each of the three Plaintiffs confirmed that the overpayment that Stockton found class-wide applied to each of their purchases. They each testified that the Class Vehicles did not provide the value they had paid for due to the unreliability stemming from the Oil Consumption Defect. TT 1044:3-4 (Tarvin: "No, I don't believe I got what I paid for."); TT 1105:20-22 (Del Valle: "Q. Overall, do you think you got what you paid for when you purchased this vehicle? A. I did not."); TT 1238:22-1239:2 (Davis: "No, I didn't get what I paid for on either incident, the new truck or the new engine, either one.").

This trial evidence all points to a common economic injury in fact suffered by each Class member in the amount of $2,700, a conclusion with which the jury agreed. Thus, nothing in the trial record would support decertification of the certified Classes; instead, the trial evidence confirms that certification of these Classes was appropriate.

### C. GM's Rehashed Arguments Fail Again to Rebut the Classes' Common Showing of Article III Standing.

GM's arguments regarding Article III are nothing more than repeated variations of the same misguided theme: that the class members' claimed injury is based on their personal experience with oil

---

[36] GM's criticism of Stockton for not having done his own analysis of GM's warranty database, *see* Mot. at 29 n.16, disregards that its own engineer had already conducted the necessary analysis using the full data, which GM has refused to make available to Plaintiffs in its entirety. *See* TT 1185:7-9 "([T]hat is a number—that is a data point that a reasonable expert in his position can rely upon because it came from an internal GM document."); *Siqueiros*, 2022 WL 74182, at *10 ("Stockton's reliance on the $2,700 cost of repair figure is well-grounded…because the figure itself is supported in the record by GM's own cost analysis.").

consumption. This Court has consistently and correctly recognized, however, that it is the overpayment that each class member made for their Class Vehicle that bestows Article III standing. Most recently, in rejecting the same application of *Transunion* that GM again urges in its Motion, this Court held "that reasoning does not apply here because Plaintiffs' injury is not the *future* 'effects of the oil-consumption defect,' but the fact that they overpaid for the defective Class Vehicles in the *past*." *Siqueiros*, 2021 WL 2115400, at *5 (emphasis in original). "Therefore, Plaintiffs who purchased defective vehicles suffered a *past* concrete injury under Article III when they overpaid for those vehicles, regardless of whether they feel the effects of the oil-consumption defect in the future." *Id.* at *5 (emphasis in original).

Undeterred by this clear law of the case, GM's latest Motion again mischaracterizes the class members' injuries as the effects of the Oil Consumption Defect rather than the class-wide economic harm. GM argues that not all class members suffered an injury in fact because not all of them made warranty claims for piston ring repair.[37] Mot. at 23-24 (relying on GM's contested assertion that 99.34% of class members did not seek warranty repair for piston ring issues), 26 (criticizing Stockton for not accounting for the warranty repair rate). But whether or not a class member later sought warranty repair has no effect on the overpayment they already made due to a class-wide design defect. Thus, just as in *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (*en banc*), *cert. denied sub nom. Starkist Co. v. Olean Wholescale Grocery*, No. 22-131, 2022 WL 16909174 (U.S. Nov. 14, 2022), this Court "need not consider [GM's] argument that the possible presence of a large number of uninjured class members raises an Article III issue, because [Plaintiffs] have demonstrated that all class members have standing here." *Id.* at 682.

GM's challenge to Plaintiffs' causation showing suffers from the same problem. GM similarly (and incorrectly) assumes that it is the effects of oil consumption that is the purported injury when it argues that "there are multiple alternative causes for excess oil consumption, piston ring, and other engine problems that have nothing to do with the defect plaintiffs allege." Mot. at 27. Yet whatever the incidence

---

[37] There was copious evidence at trial casting doubt on the veracity of GM's warranty rate calculations and supporting any jury determination that piston ring issues were much more widespread among Class members. *See* Section I.A, *supra*; Pls.' Opp. to GM's Renewed Mot. for J. as a Matter of Law, Evidence of Class-Wide Defect.

of excessive oil consumption *not* caused by the Oil Consumption Defect might be,[38] it has no impact on the showing Plaintiffs made that the Oil Consumption Defect caused the price of the Class Vehicles to be inflated by $2,700, causing each class member to overpay.

None of the authorities GM cites feature the class-wide showing of economic harm that Plaintiffs made at trial. GM's reliance on *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816 (5th Cir. 2022), *Drazen v. Pinto*, 41 F.4th 1354 (11th Cir. 2022), *Pierre v. Midland Credit Management, Inc.*, 29 F.4th 934 (7th Cir. 2022), and *Weiner v. Ocwen Fin. Corp.*, 342 F.R.D. 136 (E.D. Cal. 2022) suffers from the same defect as its reliance on *Transunion*; in each of these cases, at least some class members were subject to at best an intangible harm that did not qualify as an injury in fact under Article III. *See Perez*, 45 F.4th at 820 (noting some class members received debt collection letter but did not make any debt payments); *Pierre*, 29 F.4th at 939 (same); *Drazen*, 41 F.4th at 1362 (analyzing whether receiving a single unwanted text message qualifies as an injury in fact under Article III); *Weiner*, 342 F.R.D. at 143 (holding that some class members were merely assessed, rather than paid, the challenged fee, and thus had no monetary injury). In *In re Rail Freight Fuel Surcharge Antitrust Litigation - MDL No. 1869*, 934 F.3d 619 (D.C. Cir. 2019) and *In re Asacol Antitrust Litigation*, 907 F.3d 42 (1st Cir. 2018), the courts found that the claimed antitrust injury could not have impacted all class members. *See Asacol*, 907 F.3d at 46-47 (finding that a portion of the class was unharmed by the allegedly anticompetitive conduct because those class members would not have purchased the generic product at issue anyway); *Rail Freight*, 934 F.3d at 623 (noting that the plaintiffs' own expert's damages model showed that a portion of the class had only "negative overcharges"). In *Flynn v. FCA US LLC*, 39 F.4th 946 (7th Cir. 2022), none of the vehicles at issue had "ever been successfully hacked," and the vehicles received a software patch that eliminated the defect going forward. *Id.* at 950. In *Zakaria v. Gerber Prods. Co.*, 755 F. App'x 623 (9th Cir. 2018) the defendant had presented "undisputed evidence" that the challenged conduct would not

---

[38] There is no evidence in the trial record that such incidence was particularly high, given that Mr. Halka's reaction when confronted with recurring excessive oil consumption was to recommend a change in the piston ring coating without addressing any other potential causes, *see* TT 537:4-20, a change to which GM ultimately agreed, *see* TT 530:21-531:9

have affected the price of the product at issue.[39] In *Grodzitsky*, 957 F.3d 979, the court affirmed the exclusion of an *engineering* expert that was insufficiently supported, *id.* at 982; it does not speak to what an economic expert's testimony must establish to show Article III injury in fact. Moreover, *Grodzitsky* is inapposite because the expert in that case "articulated no scientific basis for his observations," *id.* at 986, while here Stockton laid out the firm economic basis for his opinions in expected utility theory, TT 694:16-697:15. Finally, in *Bolivar v. FIT Int'l Grp. Corp.*, No. 12 Civ. 781 (PGG) (DCF), 2019 WL 4565067 (S.D.N.Y. Sept. 20, 2019), the class was decertified, not because of any inherent lack of Article III standing, but instead "due to the inadequacy of Class Counsel" who had failed when given four opportunities to provide the requisite submissions to support their damages. *Id.* at *1. GM's motion fails to identify any authority finding a lack of Article III standard where the unrefuted expert testimony establishes class-wide economic injury.

### D. GM's Challenge to Causation Also Misstates Plaintiffs' Burden.

In addition to relying on a mistaken notion of Plaintiffs' claimed injury, GM's challenge to Plaintiffs' showing that GM caused their injuries also misstates what Plaintiffs must show. Citing no authority, GM argues that Plaintiffs' theory "required them to prove that all class members would not have purchased their Class Vehicles unless GM first fixed or repaired the alleged defect or would have purchased for $2,700 less." Mot. at 27. This assertion is wrong, both as a matter of law and as a matter of economic theory. Plaintiffs did not need to prove the purchasing behavior of every class member; rather, as the jury was instructed, "the economic harm that Plaintiffs seek to recover is the difference between the purchasing price of the Class Vehicles and the *market value* of the Class Vehicles if the alleged defect was known." (ECF No. 554 at 27 (emphasis added)).[40] Showing an impact on market value does not require proof that all Class members would have behaved in the same way; instead, as this Court previously noted, "Stockton's damages calculation is based on the response that an objectively reasonable

---

[39] In *Williams v. Apple, Inc.*, 338 F.R.D. 629, the court further distinguished *Zakaria* on the grounds that the *Zakaria* plaintiff did not "allege breach of contract and seek contract damages." *Id.* at 655. *Zakaria* is inapplicable here for the same reason. Stockton's damages model rests on well-settled principles applying the cost of repair to measure benefit-of-the-bargain damages. *See Sloan*, 2020 WL 1955643, at *48.

[40] This language was proposed by GM. ECF No. 448 at 33.

---

consumer would make." *Siqueiros*, 2022 WL 74182, at *11. Stockton's testimony bears out that the market for new vehicles, including the Class Vehicles, operate on the assumption that vehicles sold are "free of defects, safe and reliable," and that market prices change to the extent necessary to restore those assumptions, even if different class members would subjectively value the vehicles differently. TT 687:23-688:16; see also *Siqueiros*, 2022 WL 74182, at *11 ("Stockton's opinions are consistent with that model of damages by permissibly assuming that reasonable consumers who are subjected to the same safety defect in their vehicle would each be expected to seek a remedy that restores them to the position of receiving the non-defective vehicle for which they bargained."). Stockton's testimony at trial established a plain causal link between the Oil Consumption Defect and its expected impact on market prices had it been disclosed; this satisfies Plaintiffs' causation burden.

## <u>CONCLUSION</u>

For the foregoing reasons, GM's Motion to Decertify should be denied. Plaintiffs established GM's liability as to themselves and the absent Class members with class-wide evidence.

Dated: December 15, 2022

*/s/ Adam J. Levitt*
Adam J. Levitt (*pro hac vice*)
John E. Tangren (*pro hac vice*)
Daniel R. Ferri (*pro hac vice*)
Christopher S. Stombaugh (*pro hac vice*)
**DICELLO LEVITT LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
dferri@dicellolevitt.com
cstombaugh@dicellolevitt.com

Mark Abramowitz (*pro hac vice*)
**DICELLO LEVITT LLC**
7556 Mentor Avenue
Mentor, Ohio 44060
Tel: (440) 953-8888
mabramowitz@dicellolevitt.com

W. Daniel "Dee" Miles, III (*pro hac vice*)
H. Clay Barnett, III (*pro hac vice*)
J. Mitch Williams (*pro hac vice*)
Rebecca D. Gilliland (*pro hac vice*)
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
Telephone: 334-269-2343
Dee.Miles@beasleyallen.com
Clay.Barnett@beasleyallen.com
Mitch.Williams@beasleyallen.com
Rebecca.Gilliland@beasleyallen.com

Jennie Lee Anderson (SBN 203586)
Lori E. Andrus (SBN 205816)
**ANDRUS ANDERSON LLP**
155 Montgomery Street, Suite 900
San Francisco, California 94104
Telephone: 415-986-1400
jennie@andrusanderson.com
lori@andrusanderson.com

Anthony J. Garcia (Pro Hac Vice)
**AG LAW P.A.**
3602 W. Euclid Ave
Tampa, Fl 33629
Tel. 813.259.9555
anthony@aglawinc.com

***Class Counsel***