1

2

3

4                     UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7    RAUL SIQUEIROS, et al.,                  Case No. 16-cv-07244-EMC

8                    Plaintiffs,

9          v.                                 **ORDER DENYING DEFENDANT'S (1)**
                                              **MOTION FOR JUDGMENT AS A**
10   GENERAL MOTORS LLC,                      **MATTER OF LAW AND (2) MOTION**
                                              **FOR DECERTIFICATION**
11                   Defendant.
                                              Docket Nos. 592, 594

12

13

14              I.       **INTRODUCTION**

15        This is a vehicle defect class action in the post-trial stage.  Plaintiffs are class members

16   from Idaho, California, and North Carolina who have sued Defendant General Motors LLC

17   ("GM") based on their purchase of certain vehicles ("Class Vehicles") which, according to

18   Plaintiffs, consume an excessive amount of engine oil ("Oil Consumption Defect," or "defect").[1]

19        Now pending before the Court is GM's renewed motion for judgment as a matter of law or

20   for a new trial in the alternative (Docket No. 592) and GM's motion to decertify all three classes

21   (Docket No. 594).  As set forth below, the jury's verdict will stand with respect to the California,

22   Idaho, and North Carolina claims: Plaintiffs presented substantial evidence demonstrating the

23   existence of a classwide defect and equitable tolling for the relevant class representatives.  But

24   because the statute of limitations is an affirmative defense that GM is entitled to assert, and

25

26   _____

     [1] The Class Vehicles are 2011-2014 Chevrolet Avalanches, Silverados, Suburbans, and Tahoes,
27   and 2011-2014 GMC Sierras, Yukons, and Yukon XLs with Generation IV Vortec 5300 LC9
     engines manufactured on or after February 10, 2011.  Docket No. 554 (Final Jury Instructions) at
28   3.  Any vehicle that has already received an adequate piston ring replacement is excluded from the
     definition of Class Vehicle.  *Id.*

because GM has not yet had an opportunity to test its theory that some absent class members may have had actual notice of their claims, a post-trial mechanism may be appropriate before entry of judgment.  As explained below, the Court will set a status conference in which the parties shall discuss the scope and the form of this post-trial mechanism.

## II.     <u>BACKGROUND</u>

Plaintiffs contend that the engines in the Class Vehicles contain defective piston rings, which results in excessive oil consumption and engine damage.  *See* Docket No. 412 (Eighth Amended Complaint) ¶¶ 96–104.  The Court certified three claims for trial: (1) breach of implied warranty under California's Song-Beverly Consumer Warranty Act, (2) breach of implied warranty of merchantability under North Carolina law, and (3) violation of the Idaho Consumer Protection Act.  *See* Docket No. 354 (Order Granting in Part and Denying in Part GM's Motion for Decertification) at 4–5.  The three-week jury trial was held from September 13, 2022 to October 4, 2022.

At trial, Plaintiffs presented evidence from three experts (Dr. Werner Dahm, Dr. Jerry Ball, and Edward Stockton); five GM engineers (Grant Tappen, Thomas Halka, Yoon Lee, Wai Nguyen, and Steven Pfromm), and the three class representatives (Garet Tarvin, Gabriel Del Valle, and William Davis Jr.).  *See* Docket Nos. 545, 546, 552, 553, 560–62, 564 (Trial Logs).  GM did not call any witnesses during its case-in-chief.  *See* Docket No. 562 (Sept. 30, 2022 Trial Log).  The following exhibits were introduced into evidence: 36, 38, 44, 51, 57, 58, 59, 60, 121, 131, 132, 136, 139, 146, 148, 150, 155, 162, 163, 165, 168, 169, 183, 184, 187, 192, 202, 207, 209, 214, 216, 221, 504, 523, 524, 527, 538, 540, 541, 542, 550, 551, 552, and 555.

The jury, which found in favor of Plaintiffs on all three claims, awarded the class $2,700.00 in damages per vehicle.  In particular, the jury found that Plaintiffs had proven: (1) a breach of implied warranty under California's Song-Beverly Consumer Warranty Act for Plaintiff Garet Tarvin and all other California class members, (2) a breach of implied warranty of merchantability under North Carolina law for Plaintiff William Davis Jr. and all other North Carolina class members, and (3) a violation of the Idaho Consumer Protection Act for Plaintiff Gabriel Del Valle and all other Idaho class members.  *See* Docket No. 566 (Jury Verdict) at 2–4.

1   The jury also found that Plaintiffs had proven that the statute of limitations was to be tolled for all

2   California, North Carolina, and Idaho class members who purchased their Class Vehicles prior to

3   the statutory window, which was December 19, 2012 for the California and North Carolina

4   classes, and December 19, 2014 for the Idaho class.  *Id.*

5       After the trial, the parties filed four motions.  GM moved for judgment as a matter of law

6   and to decertify all three classes.  *See* Docket Nos. 592, 594.  Plaintiffs moved to clarify the class

7   definition and to seek punitive damages under Idaho law.  *See* Docket Nos. 587, 589.[2]  After full

8   briefing and argument, the Court's ruling follows.

9                       **III.     LEGAL STANDARD**

10  A.    Judgment as a Matter of Law

11      Judgment as a matter of law under Federal Rule of Civil Procedure 50(b) is granted "only

12  if, under the governing law, there can be but one reasonable conclusion as to the verdict."  *Winarto*

13  *v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001).  When evaluating

14  such a motion, "the court must draw all reasonable inferences in favor of the nonmoving party,

15  and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson*

16  *Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000).  The Ninth Circuit has made clear that a court

17  "cannot disturb the jury's verdict if it is supported by substantial evidence."  *Lambert v. Ackerley*,

18  180 F.3d 997, 1012 (9th Cir. 1999).  Substantial evidence means "evidence adequate to support

19  the jury's conclusion, even if it is also possible to draw a contrary conclusion" from the same

20  evidence.  *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (internal quotation

21  marks omitted).  "Thus, although the court should review the record as a whole, it must disregard

22  evidence favorable to the moving party that the jury is not required to believe, and may not

23  substitute its view of the evidence for that of the jury."  *Reeves*, 530 U.S. at 151.  In other words,

24  entry of judgment as a matter of law is warranted only "if the evidence, construed in the light most

25  favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is

26  contrary to the jury's verdict."  *Castro*, 833 F.3d at 1066 (internal quotation marks omitted).  As

27

28  [2] Concurrently with this Order, the Court is issuing a separate Order which addresses Plaintiffs'
    post-trial motions.

United States District Court
Northern District of California

1    noted below, in assessing a motion for judgment as a matter of law, the court does not weigh the

2    credibility of testimony.  *Reeves*, 530 U.S. at 150.

3    B.    Motion for a New Trial

4         Under Federal Rule of Civil Procedure 59(a)(1), a court "may, on motion, grant a new trial

5    on all or some of the issues."  Fed. R. Civ. P. 59(a).  A trial court may grant a new trial, "even

6    though the verdict is supported by substantial evidence, if the verdict is contrary to the clear

7    weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound

8    discretion of the trial court, a miscarriage of justice."  *United States v. 4.0 Acres of Land*, 175 F.3d

9    1133, 1139 (9th Cir. 1999).  In considering a Rule 59(a) motion, the court "is not required to view

10   the trial evidence in the light most favorable to the verdict.  Instead, the district court can weigh

11   the evidence and assess the credibility of the witnesses."  *Experience Hendrix L.L.C. v.*

12   *Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014).

13        The decision to grant a new trial falls within the sound discretion of the trial court.  *Kode v.*

14   *Carlson*, 596 F.3d 608, 611 (9th Cir. 2010).  However, a court should not grant a new trial unless

15   it is "left with the definite and firm conviction that a mistake has been committed."  *Landes*

16   *Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1372 (9th Cir. 1987) (internal quotations

17   omitted).  A trial court's determination that the verdict is not against the clear weight of the

18   evidence is upheld unless there is an "*absolute absence of evidence* to support the jury's verdict."

19   *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1084 (9th Cir. 2017) (internal quotation marks

20   omitted) (emphasis in original).

21   C.    Motion to Decertify

22        "Even after a certification order is entered, the judge remains free to modify it in the light

23   of subsequent developments in the litigation."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160,

24   (1982).  "A district court may decertify a class at any time."  *Rodriguez v. West Publ'g Corp.*, 563

25   F.3d 948, 966 (9th Cir. 2009).  A motion for class decertification is subject to the same standard as

26   a motion for class certification under Federal Rule of Civil Procedure 23.  Accordingly, before

27   certifying a class, the Court "must conduct a 'rigorous analysis' to determine whether the party

28   seeking certification has met the prerequisites of Rule 23."  *Mazza v. Am. Honda Motor Co., Inc.*,

United States District Court
Northern District of California

666 F.3d 581, 588 (9th Cir. 2012) (quoting *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1186, *amended* 273 F.3d 1255 (9th Cir. 2001)).  In the case at bar, the Court certified a class under Rule 23(b)(3).  The Supreme Court has made it clear that Rule 23 "does not set forth a mere pleading standard."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011)).  Rather, the party seeking certification must "affirmatively demonstrate" her compliance with the requirements of both Rules 23(a)—numerosity, commonality, typicality, and adequacy—and 23(b)(3)—predominance and superiority.  *See Wal-Mart Stores*, 564 U.S. at 349.

The underlying merits of the case, while somewhat relevant, should not cloud the Court's decertification analysis—the only question is whether the requirements of Rule 23 (*e.g.*, commonality and predominance) continue to be met.  *See Comcast*, 569 U.S. at 33–34.  The fact that certain elements of proof may favor the defendant on the merits does not negate class certification; the issue is whether the proof is amenable to class treatment.  Moreover, "[n]either the possibility that a plaintiff will be unable to prove [her] allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for [decertifying] a class which apparently satisfies the Rule."  *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).  Ultimately, whether to decertify a class is within the discretion of the Court.  *See Levya v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013).

# IV. **DISCUSSION**

A.    Motion for Judgment as a Matter of Law

GM contends that judgment as a matter of law should be entered in its favor for four reasons: (1) there was not a legally sufficient basis for the jury to find a classwide defect; (2) there was not a legally sufficient basis to find for Plaintiffs on other elements of their claims; (3) there was not a legally sufficient basis to find that all class members' claims were timely; and (4) there was not a legally sufficient basis for a jury to reasonably find that Plaintiffs proved damages.  *See* Docket No. 592 (GM's Motion for Judgment as a Matter of Law or a New Trial, or "JMOL Mot.") at 4–23.  The Court addresses each argument in turn below.

When discussing the evidence in this Order, the Court must draw reasonable inferences in

United States District Court
Northern District of California

1    Plaintiffs' favor.  The Court will describe the evidence as the jury reasonably could have viewed it

2    in reaching the verdict.  It provides citations to some of the evidence in the record, but by no

3    means to all of the relevant evidence.  Occasionally, the Court will simply reference the testimony

4    of particular witnesses rather than provide specific page citations.

5              1.        There Was a Legally Sufficient Basis for the Jury to Find a Classwide Defect

6         The question at the heart of GM's motion is whether there was substantial evidence

7    supporting the jury's finding that there was a classwide defect in the Class Vehicles.  *See* Docket

8    No. 566 (Verdict); Docket No. 554 (Jury Instructions) at 16 (explaining the nature of a class action

9    and defining the three classes at issue).  As set forth below, the Court concludes that—after

10   drawing all reasonable inferences in Plaintiffs' favor—there was sufficient evidence from which

11   the jury could find that a classwide defect exists in the Class Vehicles.

12        First, the Gen IV V-8 engines in the Class Vehicles (the "Class Engines") are uniform in

13   design.  Ball. Depo. at 83:18-84:19.2; Trial Transcript ("TT") 614:23-615:4; TT 619:25-620:5; TT

14   1006:9-14.[3]  Dr. Dahm explained that engines require proper lubrication to operate properly and

15   reliably.  TT 291:24-292:8.  The jury heard evidence that excessive oil consumption affects: (1)

16   loss of lubrication, *see* TT 311:10-312:15; and (2) ignition failure from spark plug fouling.  TX

17   146; TX 209; TT 443:6-14; Ball Depo. at 41:14-20 (testifying that oil burning in the combustion

18   chamber can lead to plug fouling).  Dr. Dahm also explained that piston ring wear can lead to oil

19   consumption and spark plug fouling.  *See* TT 316:12-322:2; *see also* TT 291:18-292:8.  All of the

20   Class Engines have the same piston ring and automatic fuel management (AFM) system, and as

21   explained below, there was evidence that excessive oil consumption was related to piston ring

22   wear and the AFM system common to the Class Engines.

23        Second, the jury heard testimony from GM engineers and saw internal GM documents

24   from which the jury could reasonably have inferred that Gen IV V-8 engines prior to the Class

25   Period had a piston ring wear problem that led to excessive oil consumption.  Mr. Halka testified

26   that in late 2008 there was an increase in the number of warranty claims where customers were

27

28   [3] The relevant portions of the trial transcript, deposition excerpts, and trial exhibits are found at
     Docket Nos. 595, 601, and 608.

United States District Court
Northern District of California

complaining about oil consumption or having low oil in their vehicles.  TT 423:23-424:3.  In 2009, GM engineer Alan Miller suggested that his colleagues examine the piston rings (specifically the top ring) as the root cause of the oil consumption issues in the Gen IV LC9 (pre-Class Vehicle) engines, citing ring wear as a common trait among the Gen IV LC9 engines that they examined for oil consumption issues.  TX 121.  In January 2010, GM's "Red-X" report found that the AFM valve was the root cause for the oil consumption issues in the pre-Class Vehicles because the AFM valve, which was positioned above the oil deflector led to an increased amount of oil spraying into and wearing down the piston rings; the Red-X report concluded that "oil consumption clearly follows piston/ring assembly" within the Gen IV LC9 engine line.  TX 132 at 1, 9.  The Red-X report also found that piston cleaning treatments had "minimal effect" in resolving oil consumption and piston ring wear, and that replacing piston rings reduced oil consumption more than merely repositioning the AFM valve.  TX 132; TT 508:21-509:11; TT 510:13-20; TT 564:21-565:3.  GM used a '251 piston ring coating material in the 2007–2009 Gen IV V-8s, TT 614:23-615:4, and that the combination of the '251 piston rings and AFM valve in the pre-Class Vehicles did not meet GM's expectations for durability and performance.  *See* TT 527:12-528:1; TT 529:11-13.  GM changed the piston ring material for the Class Vehicles: all of the Class Vehicles were equipped with '278 rather than '251 piston rings.  *See* TT 526:25-527:2; TT 1006:9-14.

Mr. Halka supported a switch to PVD because it was a more robust ring than the '278.  TT 317:19-20; TT 538:18-22.  The systemic problems with the pre-Class Vehicle engines are relevant.  While GM argued at trial that it fixed the problems in the pre-Class Vehicles through its installation of an AFM shield and updated baffle cover, referred to as the "breakpoint fixes," *see* TT 468:4-469:5; TT 474:23-475:2, TT 655:2-14, Plaintiffs presented evidence from which the jury could reasonably have inferred that the problems with oil consumption and piston ring wear continued in the Class Vehicles.  *See, e.g.*, TX 146; TX 148; TX 150; TX 155; TX 187; TX 192; TX 202; TX 207; TX 209; TX 216; *see* TT 654:15-656:7 (TSBs issued post-breakpoint).  In 2013, for instance, GM engineer Wai Nguyen concluded his investigation of certain post-breakpoint engines experiencing oil consumption issues by recognizing that "all" of the torn down engines

had "[s]evere top ring wear." TX 192 at 20; *see also* Nguyen Depo. at 83:23-84:7.4. *See* TT 1014:2-5 (oil consumption issues even after the baffle leak fix). And in March of 2015, Halka and another GM employee exchanged emails regarding "field-fix only piston kits" which GM "released several years ago at the request of brand quality in response to the oil consumption issues on Gen IV to help the dealer out." TX 207. When the GM employee asked Mr. Halka whether the old kits should be cancelled because there was a "new updated top compression ring kit" that was just released, Mr. Halka responded that the original piston kits service should still be put together for oil consumption because "Gen IV still has problems." *Id.* There were warranty returns for worn rings even on Gen V vehicles. TT 560:13-21 and TT 560:24-25. Although GM argued that TX 207 is about both Class and non-Class Vehicles, *see* Decert. Reply at 5, the jury could reasonably have concluded that several years after the breakpoint fixes, Gen IV engines (including at least some Class Vehicles) were still having problems with oil consumption and that the problems involved piston rings common to all the Class Engines.

Third, Plaintiffs' expert Dr. Dahm testified regarding "normal" and "excessive" wear on piston rings. Dr. Dahm explained that when an engine is working properly, the engine can go up to 175,000 to 200,000 miles and the piston rings will not wear out. TT 312:20-313:3. Dr. Dahm also testified that piston rings being replaced at 50,000 miles is excessive wear and indicates a problem. TT 313:6-21. Plaintiffs introduced evidence that GM replaced Gen IV V-8 piston rings at 50,000 miles or less in several Class Vehicles. TX 214; TX 216. Further, Mr. Halka testified that there were warranty returns due to oil consumption for the Gen IV V8 engines, including those in Class Vehicles. TT 560:13-21. There was no evidence that the oil consumption problems experienced were due to unique circumstances peculiar to these engines.

Fourth, GM circulated Technical Service Bulletins ("TSBs") to its authorized dealerships to address oil consumption issues in the Class Vehicles, and these TSBs covered the entire Gen IV 5.3 engine line, including the Class Engines in the Class Vehicles manufactured with GM's breakpoint improvements. TX 209 (Nov. 2014 TSB). The TSBs indicate that some customers experienced excessive oil consumption requiring piston ring replacement at 30,000 miles even though Dr. Dahm testified that under normal circumstances, piston rings should not experience

wear at that point.  *See* TX 209, *see also* TX 202; TX 216; TX 214.  The jury could have inferred that the issuance of TSBs indicated that the problems were not ad hoc and isolated, but serious and pervasive enough to warrant TSBs.

Lastly, the three class representatives testified that each—early in the life of their vehicles (*e.g.* 74,000 and 84,000 miles, *see* TT 1056:6-14;  TT 1167:12--1169:24)—experienced unusual oil consumption in their Gen IV LC9 engines, unlike anything they had experienced in any non-LC9 vehicle that they had ever owned.  TT 1031:9-21; TT 1032:9-13; TT 1097:14-19 and 1098:14-21; TT 1103:16-22; TT 1109:19-23; TT 1150:19-21; TT 1166:22-1167:11. The jury could have inferred from this evidence that the defects that the class representatives experienced were not caused by any extraordinary or individualized factors (such as their use) which would have made their experience unique and non-representative.  As noted above, the jury was instructed that they could, if appropriate, apply the evidence at trial to the class.  *See* Docket No. 554 (Jury Instructions at 16).

After drawing all reasonable inferences in Plaintiffs' favor, the Court concludes that there was substantial evidence to support the jury's finding of a classwide defect.

GM nonetheless argues that no jury could reasonably conclude that Plaintiffs proved a common defect in the Class Vehicles.  First, GM claims that Plaintiffs needed to provide expert testimony regarding the existence of a defect.  JMOL Mot. at 5–7.  Second, GM argues that GM's internal documents, warranty data, and testimony from GM's engineers demonstrated there was insufficient evidence of a common classwide defect.  *Id.* at 7–10.[4]  Third, GM argues that Plaintiffs invited the jury to rely on speculation and unreasonable inferences and this tainted the verdict.  *Id.* at 10–18.  None of these arguments is persuasive.

a.    Need for Expert Testimony

GM's first argument is rooted in the premise that Plaintiffs were required to put on expert testimony because Plaintiffs' defect theory, according to GM, is beyond the common experience

---

[4] While GM's arguments regarding the warranty data are addressed separately below, GM's arguments regarding the purported inadequacies of GM's internal documents and engineer testimony are rebutted by the evidence of a classwide defect described above.

of judges and jurors and thus "cries out for expert interpretation." *Id.* at 5.  In GM's view, expert testimony is necessary because the defect involves "questions of physics, metallurgy, and engineering related to the construction, composition, design and operation" of a product.  *See Shalaby v. Newell Rubbermain, Inc.*, 379 F. App'x 620, 622 (9th Cir. 2010).

Plaintiffs disagree that expert testimony was required to prove any of the claims and also dispute GM's characterization of their experts' testimony.  *See* Docket No. 509 (Plaintiffs' Opposition to GM's JMOL, or "JMOL Opp.") at 8.  In Plaintiffs' view, the jury was not required to decide complex issues of "physics, metallurgy, and engineering related to the construction, composition, design and operation" of the vehicles.  *Id.*  Instead, the jury was asked to decide whether the vehicles were "fit for the ordinary purpose in which such vehicles are used," "were not merchantable at the time of sale," or if GM acted in an unfair or deceptive manner.  *Id.*

Although GM directs this argument at all claims under three state laws, the Court focuses on the California claim because Idaho law establishes that, "proof of a malfunction may circumstantially prove the existence of a defect, and that a malfunction may be established based on the testimony of the user alone, without the benefit of expert testimony."  *Murray v. Farmers Ins. Co.*, 118 Idaho 224, 228–29 (1990).  While expert testimony is required when evidence is "extremely technical or difficult to follow," "[g]enerally, a defect may be shown by circumstantial evidence without the benefit of expert testimony."  *Grunig v. Johnson & Johnson*, No. 18-cv-00111, 2019 WL 6868956, at *7 (D. Idaho Dec. 16, 2019) (internal quotations and quotation omitted).  GM has not shown that the evidence of the problems with excessive oil consumption in the Class Engines was so technical or difficult to understand as to require expert testimony under Idaho law.  And under North Carolina law, expert testimony is just one of many factors that courts consider in determining whether a plaintiff has provided sufficient circumstantial evidence of a defect in a products liability case based on a breach of implied warranty of merchantability.  *DeWitt v. Eveready Battery Co., Inc.*, 355 N.C. 672, 689–90 (2002) (describing *DeWitt* factors).  It is not indispensable.

Under California law, when a plaintiff "relies on a theory plainly beyond the common experience of both judges and jurors, expert testimony is required to demonstrate a product is

10

defective." *Kamerik v. Depuy Orthopaedics, Inc.*, No. 11-cv-06920, 2013 WL 12322041, at *4 (C.D. Cal. Jan. 28, 2013) (internal quotation and quotation marks omitted).  In other words, "[i]f the matter in issue is one within the knowledge of experts only and not within the common knowledge of laymen, it is necessary for the plaintiff to introduce expert opinion evidence in order to establish a prima facie case." *Miller v. Los Angeles Cnty. Flood Control Dist.*, 8 Cal. 3d 689, 702 (1973).  The question, then, is twofold: first, whether Plaintiffs' theory was sufficiently complex to require expert testimony, and if so, whether Plaintiffs provided sufficient expert testimony to satisfy this burden.

As for the first question, the Court has previously implicitly held that expert testimony was not required to prove the existence of a defect in this case.  The Court previously refused to allow GM to file a third summary judgment motion following the Court's partial exclusion of Dr. Dahm.  *See* Docket No. 400 (March 29, 2022 Order) at 1–2.  GM argued then (as it does here) that the exclusion of Dr. Dahm meant that Plaintiffs would have no evidence to prove at trial that there was a common defect present in the Class Vehicles.  *Id.* at 1.  The Court ruled that GM's internal documents and deposition testimony from GM's employees created issues of material fact as to whether there was evidence of an oil consumption defect in the Class Vehicles.  *Id.* at 2.  The Court rejected GM's argument that Dr. Dahm's testimony was required to prove a defect.

The cases cited by GM where expert testimony was required are distinguishable.  In *Kamerik*, for instance, the plaintiff alleged that the tibial stem in her knee prosthesis was defectively manufactured and designed, and that this caused the prosthesis to fracture and led to her injury.  *See* 2013 WL 12322041, at *4.  In finding that expert testimony was required, *Kamerik* noted that "[c]ourts have routinely found that strict liability claims involving implanted medical devices, such as the knee prosthesis at issue here, are sufficiently complex that they are outside the understanding of a normal jury."  Notably, *Kamerik* then expressly distinguished between defective cars and medical devices.  *See id.* (quoting *McMillan v. Johnson & Johnson*, No. 04-cv-1180, 2005 WL 2000203, *3 (D. N.J. Aug. 19, 2005)) ("However, while juries are familiar with cars, they are not familiar with the components of an prosthetic knee implant.  Thus*, while common sense might allow a jury to reason from a locked steering wheel to a defective car*, it does

1    not allow a jury to reason from component cement loosening and misalignment to a defective

2    prosthesis.") (emphasis added).  *Shalaby* dealt with a products liability claim where the jury was

3    required to determine the "cause of the explosion," an issue "beyond common experience."

4    *Shalaby*, 379 F. App'x at 622.  The jury was not asked to make such determinations here.

5            *Braverman v. BMW of North America, LLC* is also distinguishable.  In that case, the Ninth

6    Circuit agreed with the district court's assessment that expert testimony was required to show that

7    an optional range extending feature offered in certain electric vehicles had a defective design

8    because—under the consumer-expectations test, which plaintiffs had sought to apply—an ordinary

9    consumer would not have understood whether this "one-of-a-kind feature" (reducing drive power

10   where the battery is near depletion when the gasoline-powered engine kicks in) which "does not

11   exist in even all electric cars" violated minimum safety standards.  *Braverman v. BMW of N. Am.,*

12   *LLC*, No. 21-55427, 2023 WL 2445684, at *2 (9th Cir. Mar. 10, 2023).[5]  Notably, *Braverman*

13   recognized that, in certain situations, a car's design defect may be established without expert

14   testimony.  *Id.* at *2 n.6 (citing *Soule v. Gen. Motors Corp.*, 8 Cal. 4th 548, 566 (1994)); *see also*

15   *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1125 (2002) (finding that the

16   consumer-expectations test could be used to determine whether an airbag was defectively

17   designed).  "The critical question, in assessing the applicability of the consumer expectation test,

18   is not whether the product, when considered in isolation, is beyond the ordinary knowledge of the

19   consumer, but whether the product, *in the context of the facts and circumstances of its failure*, is

20   one about which the ordinary consumers can form minimum safety expectations."  *McCabe*, 100

21   Cal. 4th at 1124 (emphasis in original).  Whereas in *Braverman*, the alleged defect was

22   subtle as it turned on the unique design of the electric engine and thus defied the reasonable

23

24   [5] BMW equipped its i3 electric cars with an optional range extending feature ("REx") which
     throttled power and speed under certain conditions.  *Id.* at *1.  The REx is a small, gasoline-

25   powered engine which engages and recharges the car's electric battery when it runs low, thereby
     extending the range of the vehicle.  *Id.*  The REx kicks in when the battery charge falls below six-

26   and-a-half percent.  *Id.*  When, with the REx engaged, the battery charge falls below two percent, a
     warning on the car's digital display alerts the vehicle of an upcoming reduction in drive power.

27   *Id.*  The power is reduced to help avoid a complete discharge of the high-voltage battery.  *Id.*  At
     below two percent battery charge, all named plaintiffs and plaintiffs' expert experienced

28   deceleration when (1) driving at highway speeds, (2) in extreme temperatures, or (3) when driving
     on steep uphill gradients.  *Id.*  The parties agreed that the REx functions as designed.  *Id.*

1   consumer test without expert evidence, in the instant case, a reasonable consumer could have

2   understood a defect which requires drivers to add oil in between regularly scheduled oil changes, a

3   practice that may not conform to ordinary consumer expectations.

4   　　In any event, even if expert testimony were required, expert testimony was presented here

5   that informed the defect question.  Although Dr. Dahm did not testify that all Class Vehicles

6   consumed an excessive amount of oil or that the piston ring defect was present in all Class

7   Vehicles, he explained the mechanics of engines and role of oil in lubrication as well as the

8   operation of the AFM system.  He opined on piston ring wear and its mechanical consequences,

9   including oil consumption, spark plug fouling, engine misfire, and engine breakdown.  TT 290:2-

10  332:19; TT 334:13-335:19.  Dr. Dahm also testified about "normal" piston ring wear on high

11  mileage engines and that piston ring wear on low mileage engines would be an indication that

12  something was wrong.  TT 312:20-313:5.  In particular, Dr. Dahm testified that piston rings being

13  replaced at 50,000 miles is excessive wear and indicates a problem.  TT 313:6-21.  There was

14  sufficient expert testimony to inform the jury about the basic mechanisms of an engine which

15  allowed jurors to assess the likelihood and effect of the defect of excessive oil consumption.

16  　　GM's argument for judgment as a matter of law based on Plaintiffs' lack of expert

17  testimony is without merit.

18  　　　　b.　　Warranty Data

19  　　GM presents three reasons why the warranty data proves that there is no classwide defect.

20  JMOL Mot. at 7–10.  Over the course of the litigation, GM produced warranty repair data

21  reflecting piston ring repairs and replacements in certain model year GM trucks and SUVs with

22  Gen IV engines.[6]  Mr. Pfromm (who monitored and analyzed warranty claims and trends) testified

23  that only 0.66% of the Class Vehicles had warranty claims for piston ring repairs or replacements

24  because of oil consumption issue, which is the repair that Plaintiffs assert was needed to remedy

25  the defect.  TT 918:6-16.  In GM's view, this "vanishingly low claims rate" refutes a finding there

26  was a classwide defect.  JMOL Mot. at 7.  But Mr. Pfromm also testified the warranty data was

27

28  _____
    [6] GM offered a 5-year/100,000 mile warranty term for the Class Vehicles.

United States District Court
Northern District of California

limited to piston assembly alone, did not include labor codes for pushrods, lifters, crankshaft bearings, and camshafts, among other things, and did not include customer complaints. TT 1015:22-1018:2. Dr. Dahm testified that other parts within an engine, such as crankshaft bearings, lifters, and pushrods, can suffer damage if worn piston rings caused excessive consumption. *See* TT 312:2-15; TT 317:18-332:1. The warranty data was missing this data. It also did not include data related to customer-paid repairs and repairs performed independently. *See* TT 1017:3-1018:2; Ball Depo at 40:21-41:23. Furthermore, the warranty data only reflect those situations where a claim was submitted to GM and piston replacement or repair was authorized and made under warranty. It does not capture any excessive oil consumption that did not result in serious damage requiring piston replacement or repair. *See* TT 1018:3-6. Nor did it capture those owners who gave up in getting their pistons replaced because of the assertedly burdensome protocols imposed by GM. *See* Section IV.A.c.iv, *infra*. Nor did it capture defects which became apparent after the warranty period.

As the Court previously observed, Plaintiffs were entitled to (and did) point out these deficiencies to the jury. *See* Docket No. 476 (Final Pretrial Conference Order) at 13 ("To the extent that Plaintiffs believe that the Warranty Data fails to capture all oil consumption-related complaints or repairs over the relevant timeline, they are free to argue as much during trial."); TT 1015:22-1018:6. While the 0.66% warranty claims rate is strikingly low, it does not conclusively establish that there is no systemic and classwide defect. The jury could reasonably infer that GM's warranty analysis was underinclusive and inaccurate and thus did not prevent a finding that the defect was in fact classwide.

Furthermore, in his deposition, Dr. Ball, in criticizing the evidentiary value of GM's warranty claims rate, testified that he would expect to eventually see a "100 percent" level of warranty claims given that all subject engines are subject to the excessive oil consumption issue. Ball Depo. at 83:17-24.[7] This obviously supports a finding that the defect was classwide. While

---

[7] Dr. Ball studied GM's warranty database for both MY (model year) 2010 pre-Class Vehicles and Class Vehicles. Ball Depo. at 87:8-12. He found that out of 1,850,000 LC9 engines produced, there were 33,000 warranty claims related to piston rings. *Id.* at 87:8-23; 105:19-106:2. Of those

United States District Court
Northern District of California

1  GM attacks Dr. Ball's testimony, as discussed above, there are legitimate reasons why the jury

2  may have decided not to give conclusive weight to GM's warranty data since it appears to have

3  been underinclusive and instead credit Dr. Ball's testimony which essentially asserts the defect

4  was classwide.

5       Finally, GM argues that the warranty data shows that the oil consumption issues with

6  earlier model year engines were remedied by the breakpoint changes that GM implemented before

7  production of the Class Vehicles.  JMOL Mot. at 8.  Mr. Pfromm testified that prior to the fixes

8  that GM implemented in 2010 and 2011 (*i.e.* the AFM shield and the re-designed PCV rocker

9  cover) oil consumption complaints ranked among "the top five" warranty drivers, but after these

10 changes, excessive oil consumption complaints in the Class Vehicles fell to the bottom of that list.

11 TT 910:10-15; 948:17-949:7.  Again, this evidence may be probative but it is not definitive,

12 especially given the evidence that oil consumption and piston ring issues persisted with the Class

13 Vehicles.  *See* Section IV.A.1, *supra* (describing evidence showing that oil consumption and

14 piston ring problems continued after the breakpoints).

15            c.    Plaintiffs Did Not Invite the Jury to Rely on Speculation and Stack

16                  Unreasonable Inferences

17       Next, GM argues that Plaintiffs invited the jury to rely upon six unreasonable inferences

18 and to stack inference upon inference.  *See* JMOL Mot. at 11–18.  Courts have granted summary

19 judgment for the defendant where a plaintiff "stacks inference upon inference without offering

20 evidence that reasonably supports those inferences" and "unreasonably relies upon multiple

21 unsupported inferences to reach his desired triable fact."  *Urrutia v. Chipotle Mexican Grill, Inc.*,

22 No. 16-cv-02065, 2017 WL 2901717, at *17 (C.D. Cal. June 16, 2017) (citing and collecting

23 authorities).  Because the Court concludes that none of the inferences were unsupported or

24 unreasonable, GM's arguments in favor of dismissal are not persuasive.

25            i.    Inference #1: Plaintiffs' Trucks Consumed Excessive Oil

26       GM first argues that the class representatives' testimony that their vehicles consumed

27

28 33,000 warranty claims, he concluded that approximately half of these claims include excessive
   oil consumption as the primary customer complaint.  *Id*. at 87:24–88:2.

1   excessive oil was unreasonable because there was no evidence that any of the class representatives

2   had to add more oil than the GM standard of one quart per 2,000 miles, nor was there any

3   evidence of industry standard oil consumption rates for V8 internal combustion engines.  JMOL

4   Mot. at 11–12.  Plaintiffs respond that the jury was permitted to afford little or no weight to GM's

5   "self-serving" standard that burning one quart of oil for every 2,000 miles was normal.  JMOL

6   Opp. at 13–14.

7          The jury could have credited the class representatives' testimony that their experiences

8   with the Class Vehicles which consumed about a quart of oil every two or three thousand miles far

9   exceeded the oil consumption rate of their prior vehicles.[8]  *See* TT 1031:9-21; TT 1032:9-13; TT

10  1097:14-19; TT 1103:16-22; TT 1109:19-23; TT 1150:19-21; TT 1166:22-1167:11.

                    ii.     Inference #2: GM's Oil Consumption Standard Is Inadequate

11

12         GM's second argument is very similar to the first.  In closing arguments, Plaintiffs'

13  counsel characterized GM's oil consumption standard as self-serving, arguing that GM was

14  "creating their own standard and they're painting their own bull's-eye to correspond to what's

15  happening with these vehicles."  TT 1376:25-1377:2.  GM objects that this statement cannot

16  support a finding of classwide defect because it is not evidence and is not based on any evidence

17  in the record.  JMOL at 12.

18         GM is correct that statements made by attorneys during closing arguments are not

19  evidence.  *See, e.g.*, Docket No. 554 (Jury Instructions) at 8 (explaining that arguments and

20  statements by lawyers are not evidence).  But as noted above, this does not prevent the jury from

21  deciding how much weight to afford to GM's oil consumption standard when weighed against the

22  class representatives' testimony.  GM's second "unreasonable inference" lacks merit.

                    iii.    Inference #3: A Defect Caused Excessive Oil Use In Plaintiffs' Own
23

24                          Vehicles

25         Third, GM argues that Plaintiffs failed to show that any excessive oil use in their or any

26

27  [8] The class representatives' experience could have been credited by the jury based on the jurors'
    own experiences with oil consumption.  *Grotemeyer v. Hickman*, 393 F.3d 871, 879 (9th Cir.
28  2004); *see also Hard v. Burlington N. R. Co.*, 870 F.2d 1454, 1462 (9th Cir. 1989) ("It is expected
    that jurors will bring their life experiences to bear on the facts of a case.").

United States District Court
Northern District of California

1    other Class Vehicle was caused by a common piston-ring defect or any other common defect in

2    their vehicles.  JMOL Mot. at 13–15.  GM notes that no expert, mechanic, or other witness

3    testified to inspecting Plaintiffs' or any other Class Vehicles and finding piston-ring damage, and

4    the evidence at trial showed that oil consumption can be caused by many things unrelated to a

5    piston ring defect, such as aggressive driving or an improperly installed drain plug.  *Id.* at 13–14.

6    GM cites four authorities (*Grimstad*, *Ortega*, *Carlton*, and *Murray*) which purportedly show that

7    evidence of excessive oil consumption or even a malfunction in an individual's vehicle cannot

8    support a defect finding where "other possible causes had not been eliminated."  *Id.* at 14–15.  But

9    none of these cases establish that it was unreasonable for the jury to infer that Plaintiffs' vehicles

10   were defective.

11         Plaintiffs presented evidence which reasonably negated other potential causes of excessive

12   oil consumption (such as improper maintenance, lifters, improperly installed piston rings, and a

13   supplier issue at Silao).  *See* TX 192 (noting that lifters were not the root cause and identifying

14   vehicles with problems from Silao, Romulus and St. Catharine's); TT 1011:19-22; TT 1014:2-5;

15   TT 1095:15-22.

16         In any event, GM's cases are inapposite.  In *Grimstad*, the *only* evidence that the plaintiffs

17   put forward to support their theory of a vehicle defect were their declarations that the vehicles

18   would not shift into different modes.  *Grimstad v. FCA US LLC*, No. 16-cv-763, 2018 WL

19   6427339, at *6 (C.D. Cal. Dec. 3, 2018).  *Grimstad* entered summary judgment for the defendants

20   because given "the absence of any competent evidence, expert or otherwise, showing that the

21   alleged defect caused the 'Service 4WD' light and lack of four-wheel-drive functionality,

22   Plaintiffs fail[ed] to carry their burden of showing that a defect actually exists in their 2006 Jeep

23   Grand Cherokee."  *Id.*  *Grimstad* is thus plainly distinguishable.  In *Ortega*, like *Grimstad*, the

24   plaintiff failed to put forward evidence that a breach of the implied warranty occurred.  *Ortega v.*

25   *Toyota Motor Sales, U.S.A., Inc.*, 422 F. App'x 599, 601 (9th Cir. 2011).  In contrast, as discussed

26   above, evidence of the defect was not based on Plaintiffs' anecdotal evidence alone.  There was

27   expert testimony on the mechanics of engines and the role of lubrication, and substantial

28   affirmative evidence—some of which came from GM—from which an inference can be drawn

United States District Court
Northern District of California

17

1    that the Class Engines suffered from an oil consumption defect.

2    Second, the cited portion of *Carlton* came from a discussion of *DeWitt*, which set forth

3    various (and non-exclusive) types of circumstantial evidence which a court may consider in

4    determining whether there is enough circumstantial evidence to allow for an inference of a defect

5    in a particular case. *See Carlton v. Goodyear Tire & Rubber Co.*, 413 F. Supp. 2d 583, 589–90

6    (M.D.N.C. 2005) (citing *DeWitt*, 355 N.C. at 689). One of these factors is "evidence that

7    eliminates other causes of the malfunction or accident." *Id.* at 590. But *DeWitt* expressly noted

8    that "a plaintiff need not look to actively 'eliminate' the possibility of reasonable secondary

9    causes" and "[t]he plaintiff does not have to satisfy all of these factors to create a circumstantial

10   case." *DeWitt*, 355 N.C. at 690, 694. Rather, "a plaintiff is merely required to present a case-in-

11   chief that either contains no evidence of reasonable secondary causes or negates any such evidence

12   that was initially present." *Id.* at 694. As discussed, Plaintiffs presented evidence negating

13   alternative causes of excessive oil consumption.

14   Lastly, *Murray* explains that Idaho cases hold that "proof of a malfunction may

15   circumstantially prove the existence of a defect, and that a malfunction may be established based

16   on the testimony of the user alone, without the benefit of expert testimony. However, these cases

17   also hold that an integral part of the proof involves negating other reasonable causes of the

18   accident." *Murray*, 118 Idaho at 228–29 (1990). *Murray* is not applicable because Plaintiffs did

19   not rely "on the testimony of the user alone" and because—as noted above and described below—

20   there was evidence negating other potential secondary causes.

21                    iv.    Inference #4: A Lawyer-Invented "Warranty Island" Artificially
22                           Lowered Claim Numbers

23   Fourth, GM argues that Plaintiffs borrowed from the reality TV series "Survivor" to

24   imagine an "island" where only those who "outwitted, outlasted and outperformed" GM could get

25   warranty repairs and have their claims included in the database. JMOL Mot. at 15. GM says that

26   Plaintiffs argued—with no evidence—that GM erected "an obstacle course" and required "magic

27   words" to prevent customers from receiving timely warranty repairs. *Id.*

28   The jury heard evidence from Mr. Halka and Mr. Pfromm regarding "hurdles" (as

Plaintiffs' counsel put it) that were put into place before a customer would receive replaced pistons.  Mr. Halka testified that in November of 2014 GM was instructing its dealerships to conduct a piston wash and, commonly, an oil consumption test before the vehicle would receive a warranty repair.  TT 617:5-618:16.  Mr. Pfromm testified that GM required dealers to conduct an oil consumption test when a driver came in and complained about excessive oil consumption, and that the oil consumption test required the customer to drive a thousand miles and then return to get the results of the test.  TT 877:13-22; TT 1033:21-25.  The TSBs from September 2014 and November 2014, which provide that "it is no longer necessary to have the customer return multiple times to have the usage verified" before performing the technical service, inferentially indicate that prior to that point, a customer would have needed to go to a dealership multiple times in order to have the usage verified prior to receiving repairs for excessive oil consumption.  *See* TX 165, TX 168, TX 169; TX 209.  Lastly, the jury heard evidence that a GM dealer and an independent dealership told Plaintiffs Tarvin and Davis that their vehicles were using a normal amount of oil when they complained about and sought assistance for their vehicles' oil consumption.  TT 1033:18-1034:9; TT 1162:12-1163:5.  And when Mr. Del Valle took his vehicle to Sullivan Chevrolet (an authorized service center) to address excessive oil consumption, the service center diagnosed his vehicle with a loose and leaky oil filter, even though Mr. Del Valle had not seen any evidence of oil leaking prior to that point.  *See* TT 1099:14-1100:1.

The jury could reasonably have inferred that these protocols reduced the number of warranty claims, and thus counsel's arguments were not improper.

> v.    Inference #5: Imagined Data That Is Not In the Record Would Send Warranty Rates "To The Moon"

Fifth, GM contends that Plaintiffs invited the jury to engage in "wild speculation" about what repair rates might be for other engine components or out-of-warranty repairs.  JMOL Mot. at 16.  This is because, in closing arguments, Plaintiffs' counsel declared that adding unidentified warranty claims would "run[] it to the moon."  TT 1444:1-3.  In GM's view, because plaintiffs' lawyers' speculation about additional warranty claims is "without evidential basis, the jury could only have been engaging in unguided speculation" if it concluded the repair rate was higher or

United States District Court
Northern District of California

1    showed a classwide defect, and thus "the verdict can only have been 'based on speculation or

2    guesswork.'" JMOL Mot. at 17 (quoting *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262-

3    63 (9th Cir. 1981) (internal citation omitted)). However, the jury was instructed that counsel's

4    argument was not evidence.[9] *See* Jury Instructions at 8.

5         The jury could reasonably have inferred that GM's warranty analysis was underinclusive.

6    As noted above, the jury also could have credited Dr. Ball's testimony that if all potential claims

7    had properly been concluded, the claims rate would be expected to reach 100%. *See* Section

8    IV.A.1.b, *supra*.

9                        vi.    Inference #6: All Class Vehicles Had a Common Design Defect

10                               That Causes Excessive Oil Consumption

11        Finally, GM concludes that because Plaintiffs failed to provide evidence demonstrating

12   that all Class Vehicles have a common defect that causes common excessive oil consumption, the

13   jury's contrary conclusion must be an unreasonable inference. JMOL Mot. at 17. GM notes that

14   even if a jury could reasonably find that Plaintiffs' own vehicles were unreliable, that finding

15   cannot sustain a classwide verdict because Plaintiffs did not provide "common evidence to support

16   extrapolation from [their] individual experiences" to the tens of thousands of Class Vehicles. *Id.*

17   at 17–18 (quoting *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 485 (C.D. Cal. 2008), *aff'd*,

18   639 F.3d 942 (9th Cir. 2011)).

19        As the Court has ruled that there was sufficient evidence to support the jury's finding of a

20   classwide defect, GM's challenge based on the lack of common proof is unavailing. *Marlo*

21   explained that "[c]ommon proof could involve simple reference to policies in some cases, but will

22   often require individual employee testimony, expert testimony, generalized surveys, statistical

23   analyses, or some combination of all this evidence. The type of common proof needed will vary

24   based upon the factual circumstances and alleged legal wrong." *Marlo*, 251 F.R.D. at 485 n.7.

25   The TSBs, GM engineer emails, and other evidence previously discussed which allude to oil

---

[9] This ruling is consistent with the Court's prior rulings: during closings, when GM objected to the "to the moon" comment, the Court overruled the objection and noted that "the jury will base its consideration on what it believes the evidence to be." TT 1444:4-8.

United States District Court
Northern District of California

consumption issues in the Class Vehicles imply that the problem was systemic in nature (rather than one-off issues with particular vehicles) and provided common proof. *Id.*[10]  As noted above, all the engines in question were built off the same blueprint. *See* TT 619:25-620:5.  All used the '251 ring. *See* TT 614:23-615:4.  And TSBs were issued during the entire the class period. *See* TT 875:22-876:22 and TT 496:5-16.

2.   <u>The Sufficiency of the Bases to Find for Plaintiffs on the North Carolina, Idaho, and California Claims</u>

In addition to the question of a common defect, GM contends that Plaintiffs failed to provide sufficient evidence for other elements of their claims.  In particular, GM argues that: (1) Plaintiffs did not provide evidence that the defect was "substantially certain" to manifest in all of the Class Vehicles during their useful life, as required by California law, *see* JMOL Mot. at 19; (2) Plaintiffs cannot prove an implied warranty claim with stacked inferences based on circumstantial evidence under North Carolina law, *see id.* at 20; (3) Plaintiffs' damages model does not fit the North Carolina class, *see id.* at 21; (4) there is no evidence that all class members gave timely notice as required under North Carolina law, *see id.*; (5) there is no evidence that all Idaho class members had any ascertainable loss caused by any alleged deception, *see id.* at 21–22; and (6) no reasonable jury could find that GM knew or should have known that it was engaging in a deceptive act, as required under Idaho law, *see id.* at 22.

Plaintiffs respond on the merits, but also say that all of these arguments are procedurally barred because GM did not move on any these grounds in its Rule 50(a) motion and thus waived them in their Rule 50(b) motion.  JMOL Opp. at 1, 15.  Plaintiffs are mostly right.  As set forth below, the Court agrees with Plaintiffs that (3)–(6) were not raised in GM's Rule 50(a) motion and are thus procedurally barred.  But as for the first two issues, GM moved with respect to the sufficiency of the evidence of a defect, which subsumes within it the question of whether Plaintiffs sufficiently proved the element of a defect.  At the very least, GM's arguments that there was insufficient evidence that the defect was "substantially certain" to result in malfunction in all of

---

[10] It bears repeating that the jury instructions provided that if the jurors "found it appropriate," they could "apply the evidence at this trial to all class members."  *See* Jury Instructions at 16.

United States District Court
Northern District of California

1    the Class Vehicles during their useful life and that there is not sufficient circumstantial evidence to

2    allow for an inference of a defect under North Carolina law are "logical extensions" of its

3    argument that there was insufficient evidence of a classwide defect.  *E.E.O.C. v. Go Daddy*

4    *Software, Inc.*, 581 F.3d 951, 962 (9th Cir. 2009).  As a result, GM has preserved its challenge to

5    the first two issues.

6                           a.    GM Waived Its Arguments Regarding "Essential Elements"

7              After the close of evidence, GM orally moved for a directed verdict in its favor as to all

8    three of the claims.  Although GM began by arguing that Plaintiffs "have not presented to the jury

9    evidence sufficient for a reasonable jury to find in their favor on any of those claims, on *the*

10   *essential elements of those claims*, or on our affirmative defense with respect to the statute of

11   limitations," *see* TT 1279:23-1280:2 (emphasis added), GM exclusively focused on the purported

12   lack of evidence regarding a classwide defect, damages, and the statute of limitations.  *See* TT

13   1280:4-1284:17.  In other words, GM's oral motion did not address the specific element issues

14   listed in Section IV.A.2, *supra*.

15             Under Rule 50(a), a pre-verdict motion for judgment as a matter of law must "specify . . .

16   the law and facts that entitle the movant to the judgment."  Fed. R. Civ. P. 50(a)(2).  "Because it is

17   a *renewed* motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the

18   pre-deliberation Rule 50(a) motion.  Thus, a party cannot properly 'raise arguments in its post-trial

19   motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule

20   50(a) motion.'"  *E.E.O.C. v. Go Daddy Software, Inc*., 581 F.3d 951, 961 (9th Cir. 2009) (quoting

21   *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)) (emphasis added).  This

22   requirement exists in part because it gives the non-moving party an opportunity to correct any

23   alleged deficiencies in evidence at a time when the non-moving party is still in a position to

24   correct the problem.  *Freund*, 347 F.3d at 761.  "The Ninth Circuit strictly construes this

25   limitation."  *Idaho Golf Partners, Inc. v. TimberStone Mgmt., LLC*, No. 14-cv-00233, 2017 WL

26   3531481, at *3 (D. Idaho Aug. 17, 2017) (citing *Freund*, 347 F.3d at 761).[11]

27   _____

28   [11] While *Reeves v. Teuscher* explained that Rule 50(b) "may be satisfied by an ambiguous or

United States District Court
Northern District of California

United States District Court
Northern District of California

Where a party has previously asserted an argument in a Rule 50(a) motion, the substantial evidence standard applies to the Rule 50(b) motion.  "Under that standard, the jury's verdict must be upheld if there is 'evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion.'"  *Go Daddy*, 581 F.3d at 963 (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)).  An argument not previously asserted in a Rule 50(a) motion is evaluated under the "deferential plain error standard."  *Id.*  "Under that standard, if there is 'any evidence' to support the jury's verdict, it must be upheld."  *Id.* (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001)).

GM's conclusory reference to "essential elements" in its Rule 50(a) motion is too vague and generalized to have preserved all such issues for Rule 50(b).  "[C]ourts generally require sufficiency-of-the-evidence arguments to be made at the level of a claim's specific elements or sub-elements."  *Idaho Golf Partners*, 2017 WL 3531481, at *3; *see also Gierlinger v. Gleason*, 160 F.3d 858, 869 (2d Cir. 1998) ("The JMOL motion must at least identify the specific element that the defendant contends is insufficiently supported.  A generalized challenge is inadequate.") (internal quotations and citations omitted); *Sec. & Exch. Comm'n v. Jacobs*, No. 13-cv-1289, 2014 WL 12597830, at *4 (N.D. Ohio Aug. 15, 2014) (finding Rule 50(a) argument that "the Government . . .  has not proved and does not have evidence to prove basic elements of their case" insufficient to preserve Rule 50(b) argument that the Government failed to prove specific elements of claim).

*Idaho Golf Partners* is instructive.  In that case, counsel for the plaintiff and counter-defendant, IGPI, made the following oral motion under Rule 50(a) for judgment as a matter of law at the conclusion of TimberStone management's case-in-chief:

> I don't believe TimberStone Management has satisfied its prima facie showing on the myriad of claims, trademark, infringement, both under the Lanham Act and common law.

---

inartfully made motion" under Rule 50(a), this standard is used to determine whether a Rule 50(a) motion was made *at all*.  881 F.2d 1495, 1498 (9th Cir. 1989).  In *Reeves*, for example, the judge interrupted the parties who were attempting to move for a directed verdict.  *Id.*  Under these circumstances, the Ninth Circuit found that they had sufficiently moved under Rule 50(a). Whether the particular grounds for a Rule 50(a) motion were made with sufficiency specificity presents a different issue.

> Particularly, though, I guess I would like to talk about two issues, and that is the cybersquatting. . .
>
> The other issue is with respect to the intentional interference claim, there is no evidence of actual damages. . . .

*Idaho Golf Partners*, 2017 WL 3531481, at *3–4. The court concluded that IGPI's oral Rule 50(a) motion challenged the sufficiency of evidence on only two issues: (1) bad faith, an element of the cybersquatting claim, and (2) actual damages. *Id.* at *4. Although IGPI argued that the opening line of its oral motion presented a comprehensive sufficiency-of-the-evidence challenge to the "myriad of [Defendant's] claims," this argument was deemed "not persuas[ive]" because IGPI's motion fell "far short of the specificity required by Rule 50." *Id.* *Idaho Golf Partners* reasoned that "[c]ourts have stressed that a pre-verdict motion must bring into focus the precise claims that a movant contends are insufficiently supported; a generalized challenge as to 'the myriad of claims' fails to do so. Permitting this sort of all-encompassing motion would eviscerate the preservation requirement." *Id.*[12]

The Court finds the reasoning in *Idaho Golf Partners* and *Gierlinger* to be persuasive. Some degree of specificity is required in order to fulfill Rule 50(a)'s purpose of giving fair notice to the opponent. GM's generalized challenge to "essential elements" was insufficient to notify Plaintiffs as to which specific elements of the three claims were at issue. By failing to identify the particular elements GM contended to be deficient, GM made the kind of "generalized challenge" which courts have rightfully found to be insufficient. *Id.*; *see also Gierlinger*, 160 F.3d at 869; *Jacobs*, 2014 WL 12597830, at *4. Because GM did not assert any of the latter four arguments described in Section IV.A.2.c–e below in its Rule 50(a) motion, these arguments must be evaluated under the highly deferential "any evidence" standard. *Go Daddy*, 581 F.3d at 961–62.

---

[12] *Idaho Golf Partners* explained that "[t]he purpose of this preservation requirement is to protect the Seventh Amendment right to trial by jury to provide notice of the alleged deficiencies at a time when the opposing party still has time to correct them." *Id.* at *3 n.1 (citing *Waters v. Young*, 100 F.3d 1437, 1441 (9th Cir. 1996). *Idaho Golf Partners* also approved of Judge Carnes' articulation of the purpose of this requirement. *Id.* (quoting *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1265 (11th Cir. 2016) (J. Carnes, dissenting) ("A Rule 50(a) motion must be made . . . on terms sufficient to alert the opposing party and the court of the ground for the motion. Otherwise, a sly movant, discerning a deficiency in his adversary's presentation of the evidence, could lie in wait . . . until after a verdict when it would then be too late for the adversary to correct what might have been a readily fixable omission.")).

United States District Court
Northern District of California

b.   GM Preserved Its Arguments Regarding a Defect Under California and Idaho Law

But all is not lost for GM.  Although its invocation of "essential elements" was insufficient to preserve its state-law specific arguments, GM expressly challenged the sufficiency of the evidence with respect to a classwide defect.  *See, e.g.*, TT 1281:18-20 ("There is no evidence in the record sufficient for a reasonable jury to determine that there is a class-wide piston ring defect in these engines."); TT 1283:7-11 ("I would submit that there is no evidence in this case, after six days of the jury sitting here, from which they could find a common defect in all of these tens of thousands of class vehicles, and to submit that question to the jury is entirely unnecessary."). GM's argument that there was insufficient evidence that the defect was "substantially certain" to manifest in all of the Class Vehicles during their useful life is a "logical extension" of its argument that there was insufficient evidence of a classwide defect, as is GM's argument regarding the insufficiency of the evidence under North Carolina law.

In *Go Daddy*, the Ninth Circuit determined that an argument first asserted in a movant's Rule 50(b) motion was the "logical extension" of an argument asserted in the movant's Rule 50(a) motion, and therefore the new argument raised under Rule 50(b) was not waived.  *See* 581 F.3d at 962; *see also Coach, Inc. v. Celco Customs Servs. Co.*, Case No. 11-cv-10787, 2014 WL 12573411, at *6 (C.D. Cal. June 5, 2014) (citing *Go Daddy* to consider whether Rule 50(b) arguments were a "logical extension" of any argument from Rule 50(a) motion).  *Go Daddy* involved a plaintiff who allegedly reported to a human resources manager that two of his supervisors made discriminatory comments about him.  581 F.3d at 955, 957.  The plaintiff was later terminated by a panel that included the human resources manager to whom the plaintiff complained.  *Id.* at 957, 959.  The plaintiff filed suit, alleging discrimination and retaliation claims; the jury returned a plaintiff's verdict on the retaliation claim.  *Id.* at 959–60.  The Ninth Circuit considered a Rule 50(b) argument that the plaintiff's alleged reports to the manager could not have motivated the panel's termination decision, and the court determined that this was a logical extension of the defendant's sole Rule 50(a) argument that there was insufficient evidence

the manager told her fellow panel members of the plaintiff's reports.  *Id.* at 962–63.[13]  "The Ninth Circuit's analysis suggests that one argument is the logical extension of another if the arguments are highly interrelated.  Indeed, the argument that the plaintiff's alleged reports to a manager could not have motivated the panel's termination decision is dependent upon the related argument that the manager did not tell her fellow panel members about the plaintiff's alleged reports."  *Raymond v. Wilcox Mem'l Hosp.*, 403 F. Supp. 3d 868, 877 (D. Haw. 2019).  In short, the two claims were inseparable.

Following *Go Daddy*, district courts in this Circuit have considered arguments raised in Rule 50(b) motions that are "logical extension[s]" of a Rule 50(a) argument.  *See, e.g.*, *Coach*, 2014 WL 12573411, at *8; *Ivie v. AstraZeneca Pharms., LP*, No. 19-cv-01657, 2021 WL 5167283, at *2 (D. Or. Nov. 5, 2021); *cf. Raymond*, 403 F. Supp. 3d at 877 (declining to consider arguments from Rule 50(b) motion that were "completely unrelated" from arguments in Rule 50(a) motion).  In *Ivie*, for example, the court concluded that the defendant's constitutional and choice of law arguments against extraterritoriality that were raised in the first time in a Rule 50(b) motion were "logical outgrowths" of the defendant's Rule 50(a) motion that plaintiff had failed to show that Oregon state laws applied; because these additional arguments "address[ed] the *same legal issue*" and "rel[ied] on the *same basic premise* of the Rule 50(a) submission" that Oregon law did not apply, *Ivie* concluded that they were properly preserved for Rule 50(b) purposes.  *See* 2021 WL 5167283, at *2 (emphasis added).

The question of whether Plaintiffs presented sufficient evidence of a defect under California or North Carolina law is a logical extension of the question of whether Plaintiffs presented evidence of a classwide defect.  As in *Ivie*, this additional argument addresses the same legal issue—the sufficiency of the evidence of a classwide defect—and relies on the same basic

---

[13] Go Daddy raised two other Rule 50(b) arguments: (1) there was insufficient evidence for the jury to conclude that the plaintiff engaged in protected activity; and (2) Go Daddy had already decided to terminate the plaintiff on April 4, three days before he engaged in protected activity.  *Id.* at 963–65.  The Ninth Circuit determined that these arguments were not logical extensions of the defendant's sole Rule 50(a) argument that there was insufficient evidence that the manager told the other panel members of the plaintiff's reports and were therefore subject to review for plain error.  *Id.*

premise that Plaintiffs' evidence of a defect is lacking. *Id.* Said differently, had Plaintiffs

presented no evidence of a classwide defect, as GM argued in its Rule 50(a) motion, *see* TT

1283:7-11, then by definition Plaintiffs would not have met the "defect" standard under California

law, as GM argues in its Rule 50(b) motion. Conversely, as described in greater detail below,

given the nature of the defect here (excessive oil consumption occurring during the normal life of

the engine), the existence of a classwide defect implies that there is a substantial certainty that the

defect will manifest during the useful life of the vehicle. These issues, in this case, are

inextricably related. Consequently, the Court evaluates these first two arguments under the

substantial evidence standard applicable to arguments made in a Rule 50(a) motion. *Go Daddy*,

581 F.3d at 963.

The Court turns now to the six challenges that GM made to specific elements of Plaintiffs'

claims, beginning (as GM does) with the California claim. *See* JMOL Mot. at 19–22.

c.   <u>California</u>

GM contends that there was insufficient evidence that the defect was "substantially

certain" to manifest in all of the Class Vehicles during their useful life as required under California

law. JMOL Mot. at 19. The Court disagrees.

California permits plaintiffs to bring breach of implied warranty claims under California's

Song-Beverly Act for defects that have not yet manifested. *See Mexia v. Rinker Boat Co., Inc.*,

174 Cal. App. 4th 1297, 1304–05 (2009); *Czuchaj v. Conair Corp.*, No. 13-cv-01901, 2016 WL

4272374, at *6 (S.D. Cal. Aug. 15, 2016). But just because "the law does not require a current

malfunction to prove breach of warranty does not mean it should not require proof of *any*

malfunction, present or future. A breach of warranty cannot result if the product operates as it was

intended to and does not malfunction during its useful life." *Am. Honda Motor Co. v. Superior*

*Ct.*, 199 Cal. App. 4th 1367, 1375 (2011) (emphasis in original). As a result, a breach of implied

warranty claim requires showing that the product contains a defect which is "substantially certain

to result in malfunction during the useful life of the product." *Id.* at 1375; *Hicks v. Kaufman &*

*Broad Home Corp.*, 89 Cal. App. 4th 908, 918 (2001) (holding the same). Stated slightly

differently, the question is whether the defect was substantially certain to "manifest" during such

period.  *Quackenbush v. Am. Honda Motor Co., Inc.*, No. 20-cv-05599-WHA, 2021 WL 6116949, at *6 (N.D. Cal. Dec. 27, 2021), *on reconsideration in part*, 2022 WL 1240866 (N.D. Cal. Apr. 27, 2022) (denying class certification where warranty data demonstrated occurrence of the defect in fewer than 15 percent of the vehicles and plaintiffs did not present other evidence to show that the defect was "substantially certain" to manifest); *Sonneveldt v. Mazda Motor of Am., Inc.*, No. 19-cv-01298, 2023 WL 1812157, at *7 (C.D. Cal. Jan. 25, 2023) (decertifying class where "there is no evidence from which a trier of fact could conclude that the Design Defect is 'substantially certain' to cause the Class Vehicles to malfunction during their useful life" and noting that "there is no question that under California substantive law plaintiffs bringing warranty claims must offer proof that a product either has malfunctioned or that it contains an inherent defect which is substantially certain to result in malfunction during the useful life of the product").[14]  It must be first noted that neither party, including GM, requested an instruction regarding this standard under California law; nor did GM ever argue to the jury that Plaintiffs failed to satisfy this particular test. Having not sought a jury determination of this element, GM arguably waived a challenge to the verdict on this basis.  *See* Fed. R. Civ. P. 51(c) and (d)(1)(B).

Even if GM could belatedly assert this argument implicitly through its Rule 50(a) motion and expressly in its Rule 50(b) motion, it would fail on the merits.  The evidence discussed in Section IV.A.1 which demonstrates that there is substantial evidence of a classwide oil consumption defect in the Class Vehicles also demonstrates that the oil consumption defect is substantially certain to manifest within the useful life of the Class Vehicles.  The jury finding that the defect is classwide and that the Class Vehicles were not fit for the ordinary purpose implies that all (or virtually all) vehicles suffered from the defect; since the defect of excessive oil consumption is not latent, it would be apparent and hence manifest during the useful life of the

---

[14] Federal courts have described the California law standard as both "substantially certain to manifest" and "substantially certain to result in malfunction."  *See Sonneveldt*, 2023 WL 1812157, at *1, *6 (using both formulations); *Quackenbush*, 2021 WL 6116949, at *6 (same).  The meaning of "manifest" appears synonymous with "malfunction."  *See Hicks*, 89 Cal. App. 4th at 918 (describing "malfunction" as a question of "whether an inherently defective product is presently functioning as warranted); *see also Sonneveldt*, 2023 WL 1812157, at *1, *6 (using substantially certain to result in malfunction and substantially certain to manifest standards interchangeably); *Quackenbush*, 2021 WL 6116949, at *6 (same).

United States District Court
Northern District of California

vehicle.[15]  If the defect only occurred after the useful life of the vehicle, it would not be a "defect."  *See* Jury Instructions at 17 (providing that Plaintiff must prove that "the Class Vehicles were not fit for the ordinary purpose for which such vehicles are used" and "[f]itness for the ordinary purpose of a vehicle means that the vehicle should be in safe condition and substantially free from defects").  Hence, the two issues are essentially two sides of the same coin.

Further, as noted above, Dr. Ball testified in his deposition that the Gen IV V-8 engines are uniform in design and that he believed that all such engines will eventually experience engine damage due to the oil consumption defect.  In particular, Dr. Ball testified as follows:

> QUESTION: What level of warranty claims for excessive oil consumption and/or engine damage caused thereby would you expect to see if your opinion that all subject engines are subject to this issue is correct?

> ANSWER: I would expect to see, you know, eventually 100 percent. So, you know, again, it's – the design of the engine – the oil – excessive oil consumption is a symptom.  It's like a guy going to the doctor with a 103-degree temperature.  The fever is not his issue; there's an underlying problem that needs to be fixed.

> That's the same thing here.  And that's what GM engineers were working toward, trying to find the underlying cause of the – not just the excessive oil consumption but the fact that it gets low enough, people were experiencing engine damage.

> So, again, it's the same engine.  So at some point, it's going to manifest itself.  And there are numerous variables as to when it's going to manifest itself, but because you've got the same design, you know, as a mechanical engineer, it's going to manifest itself at some point.

*Id.* at 83:18-84:19.  The Court admitted this testimony over GM's objection because it fell within the scope of Dr. Ball's testimony previously deemed permitted by the Court.  *See* Docket No. 476 (Pretrial Conference Order) at 24 (permitting Dr. Ball to testify regarding "the quality and scope of GM's warranty data").  GM did not seek a limiting instruction either prior to or immediately following this testimony, and thus the jury could have considered his testimony for all purposes.[16]

---

[15] GM does not argue—nor did the Court independently find any such cases—suggesting that "manifest" requires a mechanical breakdown.

[16] The Court overruled GM's objection to the quoted testimony because Dr. Ball's testimony bore on the quality and scope of GM's warranty data.  *See* Docket No. 535-1 at 2.

United States District Court
Northern District of California

1    Finally, the jury heard testimony from each of the class representatives that they

2    experienced excessive oil consumption during the useful lives of their vehicles. *See* TT 1047:23-

3    1048:1 (Tarvin: drove about 95,000 miles); TT 1134:4-6 (Del Valle: drove about 95,000 miles

4    during ownership), TT 1300:5-13 (Davis: drove 220,711 miles). As noted above, there was no

5    evidence that their vehicles were not representative of the Class Vehicles, and the jury was

6    instructed that, if it found it appropriate, it could apply the evidence to all class members. *See* Jury

7    Instruction No. 13. This testimony provided further evidence that the defect was substantially

8    certain to manifest during the useful life of the vehicle.

9    In sum, GM's challenge on the ground that there was not sufficient evidence to support a

10   finding that the defect was substantially certain to manifest under California law was waived by

11   GM's failure to seek an instruction to the jury. Even if it were not waived and was deemed

12   properly reserved by GM's Rule 50(a) and 50(b) motions, GM's argument fails on the merits:

13   there was substantial evidence demonstrating that the oil consumption defect was classwide and

14   substantially certain to manifest in the Class Vehicles during their useful life. GM's motion on

15   this ground is without merit.

16                    d.    North Carolina

17   GM argues that there are three issues with the breach of implied warranty claim under

18   North Carolina law: (1) Plaintiffs have improperly stacked inferences based on circumstantial

19   evidence; (2) Plaintiffs' damages model does not fit the North Carolina class; and (3) there is no

20   evidence that all class members gave timely notice. JMOL Mot. at 20–21. Because only the first

21   argument was made in GM's Rule 50(a) motion, the deferential "any evidence" standard of review

22   applies to the second and third arguments. *Go Daddy*, 581 F.3d at 961–62. The Court addresses

23   each issue in turn below, beginning with whether Plaintiffs improperly stacked inferences based

24   on circumstantial evidence under North Carolina law.

25                    i.    Plaintiffs Provided Substantial Circumstantial Evidence of a Defect

26                          Under North Carolina Law

27   Plaintiffs invoke the *DeWitt* test to argue that they provided substantial evidence of a

28   defect. In North Carolina, "a plaintiff need not prove a specific defect to carry his or her burden of

                                              30

proof in a products liability action based upon a breach of implied warranty of merchantability." *DeWitt*, 355 N.C. at 689.  Rather, in North Carolina:

> To aid in determining whether there is enough circumstantial evidence to allow for an inference of a defect in a particular case, North Carolina uses a non-exclusive six "factor" list of types of circumstantial evidence which a court may consider.  These items are: (1) evidence that the product malfunctioned, (2) expert testimony as to possible causes of the malfunction, (3) the amount of time that passed between plaintiff getting the product and the occurrence of the malfunction, (4) similar accidents with the same product, (5) evidence that eliminates other causes of the malfunction or accident, and (6) proof that the malfunction does not happen unless a defect is present.

*Carlton*, 413 F. Supp. 2d at 590 (citing *DeWitt*, 355 N.C. at 689–90).  "The plaintiff does not have to satisfy all these factors to create a circumstantial case."  *DeWitt*, 355 N.C. at 690.

Under *DeWitt*, the Court agrees that Plaintiffs presented substantial evidence to allow for the inference of a defect.  First, Plaintiffs provided evidence of a product malfunction.  *See* TT 1163:4-1165:21 (Mr. Davis's testimony about needing to add an extra one-half to three-quarters of a quart of oil every month); TX 44 (Car records from Davis on misfiring engine; internal failure of engine on #7 cylinder causing oil to get past rings and spark plug); *see also* Section IV.A.1, *supra*. Second, although Dr. Dahm did not opine as to a specific cause of the defect of the Class Vehicles, he identified causes known among mechanical engineers for piston ring failure and oil consumption.  Third, the TSBs indicate that some customers experienced excessive oil consumption requiring piston ring replacement at 30,000 miles even though Dr. Dahm testified that under normal circumstances, piston rings should not experience wear at that point.  TT 313:6-21.  *See* TX 209 (Nov. 2014 TSB); *see also* TX 214; TX 216.  Fourth, the GM emails, warranty data, and TSBs showed that many other Class Vehicles experienced similar incidents.  *See generally* Section IV.A.1, *supra.*  Fifth, Plaintiffs presented evidence which reasonably negated other potential causes of excessive oil consumption (such as improper maintenance, lifters, improperly installed piston rings, and a supplier issue at Silao).  *See* TX 192 (identifying vehicles with problems from Silao, Romulus and St. Catharine's, and noting that lifters were not the root cause and that replacing valvetrain components will not fix the issue); TT 1011:19-22; TT 1014:2-

5; TT 1095:15-22.[17]  Finally, Plaintiffs presented evidence that inadequate combustion chamber sealing leads to too much oil getting into the pistons, and that while normally piston rings should not be replaced for oil consumption before 150,000 to 200,000 miles, *see* TT 312:20-313:5, GM replaced some piston rings even at 30,000-40,000 miles.  *See* TX 209.

The Court concludes that there was sufficient evidence under *DeWitt* to give rise to an inference of a defect.[18]  GM's argument that Plaintiffs improperly stacked inferences based on circumstantial evidence is denied.

ii.    There Was Sufficient Evidence That Plaintiffs' Damages Model Fit the North Carolina Class

Second, GM argues that Plaintiffs' damages model does not fit the North Carolina class because it includes all "current owners" who purchased both new and used vehicles.  JMOL Mot. at 21.  GM points to a hypothetical class member who purchased an eleven-year-old truck a few months before trial with hundreds of thousands of miles in salvage condition at auction for less than $1,000, and who was aware of this lawsuit at the time of purchase.  *Id.*  GM says that there was no evidence from which a reasonable jury could conclude that such an owner overpaid by $2,700 because of alleged GM conduct.  *Id.*

Plaintiffs respond that GM's argument lacks factual or legal support.  JMOL Opp. at 18.  They say that GM's argument rests on the existence of a hypothetical class member who purchased their Class Vehicle only a few months ago with knowledge of the lawsuit, but no

---

[17] *DeWitt* explained that the plaintiff does not need to eliminate the possibility of reasonable secondary causes; instead, the plaintiff "is merely required to present a case-in-chief that either contains no evidence of reasonable secondary causes or negates any such evidence that was initially present."  *See* 355 N.C. at 694 (quoting *Hamilton v. Emerson Elec. Co.*, 133 F. Supp. 2d 360, 366 (M.D. Pa. 2001)) (internal quotation marks omitted).  Here, although GM pointed to several alternate causes for excessive oil consumption, *see* Decert. Mot. at 8–9, in their briefing and at the hearing, Plaintiffs pointed to evidence rebutting each of these secondary causes.  *See* February 23, 2023 Hearing Transcript at 52:16–54:13.  This showing appears sufficient, especially in light of *DeWitt*'s guidance that the plaintiff "does not have to satisfy all of these factors to create a circumstantial case . . . and if the trial court determines that the case may be submitted to the jury, in most cases, the weighing of these factors should be left to the finder of fact."  *DeWitt*, 355 N.C. at 690 (internal quotation and quotation marks omitted).

[18] This evidence would constitute substantial evidence even if GM were deemed to have preserved the argument in its 50(a) motion.

United States District Court
Northern District of California

evidence was presented at trial of such a person. *Id.* Because the jury did not hear any evidence regarding any such hypothetical class member, the Court cannot conclude that the jury acted unreasonably in finding that Plaintiffs' damages model fit with the North Carolina class. And more to the point, as explained in the damages section analysis below, the Court does not agree that Mr. Stockton's cost-of-repair / benefit-of-the-bargain methodology turns on a vehicle owner's subjective expectations of their vehicle. *See* Section IV.C.3.b, *infra.* In any event, the Court has determined that the class definition turns on the date of the class notice, at which point it is fair to assume that the public had notice of the alleged defect.[19]

GM's argument regarding the purported mismatch between the damages model and the North Carolina class is without merit.

### iii. There Was Sufficient Evidence that GM Had Timely Notice of the Class Members' Claims

Finally, GM argues that there is no evidence of timely notice to GM. JMOL Mot. at 21. To prevail on his class claim for implied warranty under North Carolina law, Mr. Davis needed to prove that the North Carolina class provided timely notice of their claim for breach of implied warranty of merchantability under the Uniform Commercial Code. *See* Final Jury Instruction No. 17; *Maybank v. S. S. Kresge Co.*, 302 N.C. 129, 133 (1981) ("[T]he burden of pleading and proving that seasonable notification has been given is on the buyer."). In GM's view, because Plaintiffs presented no evidence of any action taken by any absent North Carolina class member to give GM notice of his or her claim, "no reasonable jury could conclude that each and every North Carolina Class member gave timely notice to GM." JMOL Mot. at 21.[20]

---

[19] As the Court noted in its Order addressing Plaintiffs' post-trial motions, it is reasonable to presume that the May 23, 2022 class notice put the public on notice of the lawsuit and therefore informed buyers and sellers of the alleged Oil Consumption Defect in the Class Vehicles. *See* Class Clarification Order at 8 n.4.

[20] In a footnote, GM also says that "[a] verdict for plaintiffs without allowing GM to raise affirmative defenses in each individual case violates Due Process and the Rules Enabling Act." JMOL Mot. at 21 n.13. To the extent that GM is suggesting that the failure to provide timely notice is an affirmative defense, this argument is squarely foreclosed by *Maybank. See* 302 N.C. at 133 ("We disagree with the Court of Appeals that lack of notification is an affirmative defense and hold that the plaintiff-buyer has the burden of proving compliance with G.S. 25-2-607(3)(a) in an action against the immediate seller.").

The jury could reasonably have found that Plaintiffs satisfied the notice requirement by filing the complaint in this action on behalf of the North Carolina class.  The filing of a complaint provides timely notice.  *See Maybank*, 302 N.C. at 133, 136; *see also Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 679 (E.D. Mich. 2020) ("Under Arizona, North Carolina, Ohio, and Pennsylvania law, the filing of a civil action is deemed to satisfy the notice requirement."); *In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. & Prod. Liab. Litig.*, 288 F. Supp. 3d 1087, 1273 (D.N.M. 2017) ("The Supreme Court of North Carolina has ruled that filing a lawsuit may serve as notice.").

The two policy considerations undergirding North Carolina's notice requirement— enabling the seller to make efforts to cure the breach and learn facts to defend himself—support the jury's determination that notice had been satisfied.  *Maybank*, 302 N.C. at 134–35.  First, by the time that Plaintiffs gave GM notice of the North Carolina class's implied warranty claims by the filing of the complaint in 2016, there was evidence that GM had known that it was selling Class Vehicles with the Oil Consumption Defect for over four years, and in the seven years since suit was filed, GM has not issued a recall on any of the Class Vehicles, nor has it publicly acknowledged the defect.  And as for the second policy consideration, Plaintiffs say that GM, which has continued to publicly deny that the Oil Consumption Defect even exists, cannot argue that there was a "delay [that] operate[d] to deprive [it] of a reasonable opportunity to discover facts which might provide a defense or which might lessen [its] liability."  *Id.* at 134.  Thus, the second policy consideration does not apply, either.  GM does not respond to these arguments in its reply.  Nor does GM provide any authorities demonstrating that in a class action, each individual plaintiff needed to provide notice beyond that provided by the class action lawsuit.

The Court concludes that the jury's determination that the notice requirement had been satisfied is supported by law and substantial (and also by "any") evidence.

> e.  <u>Idaho</u>

GM raises two challenges to the Idaho claim.  First, GM asserts that there was no evidence that Mr. Del Valle and all of the other Idaho class members had any ascertainable loss caused by any alleged unfair or deceptive act.  JMOL Mot. at 21–22.  Second, GM argues that no reasonable

1    jury could find that GM knew or should have known that it was engaging in a deceptive act.  *Id.* at

2    22.  Again, because these are new arguments, the question is whether "any evidence" supports the

3    jury's findings on these points.  *Go Daddy*, 581 F.3d at 961–62.

                    i.    There Was Sufficient Evidence for the Jury to Find that the Idaho
4
                          Class Members Had An Ascertainable Loss
5

6            Plaintiffs' claim under the ICPA required them to prove that Plaintiff Del Valle and the

7    other class members suffered an ascertainable loss.  *See* Jury Instructions at 24 (requiring

8    "Plaintiff Del Valle and all other Idaho class members suffered an ascertainable loss"); *Jackson v.*

9    *Wood*, 859 P.2d 378, 380 (Idaho Ct. App. 1993) (holding that with "no ascertainable loss . . .

10   neither actual damages nor statutory damages under the ICPA can be awarded").  The Idaho

11   Supreme Court recently explained that a consumer suffers an ascertainable loss under the ICPA

12   when they receive a different benefit than what they bargained for which results in an

13   "ascertainable loss of money," which can be "[a]ny deprivation" of money that "is capable of

14   being discovered, observed, or established."  *Litster Frost Inj. Laws., PLLC v. Idaho Inj. L. Grp.,*

15   *PLLC*, 518 P.3d 1, 13 (2022), *as amended* (Sept. 2, 2022), *reh'g denied* (Oct. 14, 2022).

16           There was sufficient evidence supporting the jury's finding that Mr. Del Valle and the

17   other Idaho class members suffered an ascertainable loss.  Mr. Del Valle testified that although he

18   had experienced oil consumption with his 2010 Chevy Avalanche (a pre-Class Vehicle), he did not

19   expect that the 2013 Avalanche would have those same problems because 2013 was "the final

20   model year for the Chevy Avalanche," and Mr. Del Valle "just assumed that all of the bugs had

21   been worked out."  TT 1095:7-14.  And while Mr. Del Valle is able to use his vehicle, he carries

22   "at least a quart of oil" with him wherever he goes, including just for local travel, *see* TT 1102:12-

23   15; 1103:16-22, and has "dedicated [himself] to a religious checking of the oil levels" in his

24   vehicle.  TT 1103:25-1104:1.  Additionally, he uses high-quality full synthetic Hamm's oil and a

25   special brand of oil filters to address the oil consumption problems in his vehicle.  TT 1103:23-

26   1104:4.  This evidence, when combined with the other evidence showing that there was a defect,

27   provides a basis from which the jury could find that Mr. Del Valle did not receive the benefit of

28   the bargain.  He expected a vehicle without a defect but got one with a defect; the jury found the

United States District Court
Northern District of California

                                              35

United States District Court
Northern District of California

1   damages in such a case is $2700.  Mr. Stockton testified that each class member can be made

2   whole by $2,700.  *See* TT 695:15-696:1 (testifying that the cost of repair—here, $2,700—brings

3   the value of the vehicle into alignment with the original value placed on it by the consumer).

4   Under *Litser*, this sum is an "ascertainable loss of money" because it is an amount of money that is

5   capable of being established.  *Litser*, 518 P.3d at 13.

6       GM argues that Mr. Del Valle's claim that he had an ascertainable loss is belied by his

7   repeated public professions of love for (and his stated plan to never get rid of) his truck, "Avie,"

8   and his admissions that he still regularly drives his truck across state lines and has previously used

9   it to tow boats 12-15 times a year.  *See* TT 1125:3-13; TT 1130:17-20; TT 1132:5-14; TT

10  1134:11-1135:10; TT 1141:23-1143:20.  But the jury heard evidence that Mr. Del Valle managed

11  to continue using his vehicle only through frequent engine maintenance.  TT 1095:15-22; TT

12  1097:14-1098:21; 1101:25-1102:9; 1103:23-1104:6.  And despite Mr. Del Valle's vigilant

13  maintenance, his vehicle continued to experience issues which he believed were related to

14  excessive oil consumption.  *See* TT 1095:15-22; 1097:14-1098:21; 1101:25-1103:1. Mr. Del Valle

15  also testified that he believed that he had not received the benefit of the bargain because (1) he had

16  to be "hypervigilant" to make sure that at no point did he go less than half a quart from concern

17  that oil consumption would "lead to lubrication issues in other areas of the engine," *see* TT

18  1105:23-1106:3; and (2) he believed that he had suffered a "loss of residual value due to the

19  stigma of this LC9 engine, which is well-known in the automotive industry."  *See* TT 1106:13-16.

20      The Court concludes that there was sufficient evidence (indeed substantial) that Mr. Del

21  Valle and the other Idaho class members suffered an ascertainable loss; GM's challenge to this

22  element is unavailing.

23              ii.    There Was Sufficient Evidence for the Jury to Find that GM Knew

24                     It Was Engaging in a Deceptive Act

25      Second, GM argues that the jury could not reasonably have concluded that GM knew or

26  should have known that it was engaging in a deceptive act with respect to the sale of each and

27  every Idaho Class Vehicle.  JMOL Mot. at 22.

28      The jury heard evidence that GM became aware of a problem with excessive oil

consumption in late 2008, *see* TT 423:23-424:7, and in 2009, a GM engineer suggested that his colleagues examine the piston rings to see if they were responsible for the oil consumption issues because all of the Gen IV V-8 engines reviewed showed a specific piston ring wear characteristic. TX 121.  In January 2010, GM's Red-X report concluded that oil consumption "clearly follow[ed]" the piston ring assembly.  TX 132.  The Red-X report confirmed that piston cleaning treatments had "minimal effect" in resolving oil consumption and piston ring wear, and that replacing piston rings reduced oil consumption more than merely repositioning the AFM valve. TX 132; TT 508:21-509:11; TT 510:13-20; TT 564:21-565:3.  Despite this, GM instructed dealers to offer a piston wash rather than replacing the rings.  *See, e.g.*, TX 209.  Mr. Halka testified that replacing piston rings was expensive.  TT 552:9-16.  The jury could have inferred that this high cost explained why GM chose cheaper methods of repair, such as piston cleaning and AFM shield installation.  TX 139 (March 2012 email that includes oil consumption on a list of Gen IV warranty "heavy hitters" for pre-Class Vehicles); TX 209; TT 525:4-14; *see also* TT 552:5-13 (Halka testifying that because it was expensive to replace piston rings, some of the vehicles experiencing piston ring wear may not have had the rings replaced).  Plaintiffs also cite evidence demonstrating that oil consumption continued past GM's breakpoints.  *See* TX 146; TX 148; TX 155; TX 187; TX 192; TX 202; TX 207; TX 209; TX 216.  This evidence sufficiently supports the jury's finding that GM knew it was engaging in a deceptive act.  *See Nelson-Ricks Cheese Co., Inc. v. Lakeview Cheese Co., LLC*, 331 F. Supp. 3d 1131, 1145 (D. Idaho 2018).

In sum, GM mounted six challenges to the other elements of Plaintiffs' claims in Section Two of its brief.  *See* JMOL Mot. at 19–22.  All of these challenges are unavailing.  There was substantial evidence to support the jury verdict against these challenges.

Next, the Court addresses the question of whether the jury reasonably found that tolling applied.

///

///

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

3. <u>There Was A Legally Sufficient Basis to Find that Plaintiffs' Claims Were Timely</u>

GM also argues that the Court should enter judgment as a matter of law because there was no legally sufficient basis to find that all class members' claims were timely.[21]  JMOL Mot. at 23. Absent application of tolling (in California or North Carolina) or the discovery rule (in Idaho), the claims of Mr. Tarvin, Mr. Davis, and other class members are time-barred.  *See* Jury Instructions at 18–20, 22–23, 25–26.

To trigger tolling in California and North Carolina, Plaintiffs had to prove (1) GM engaged in an affirmative act of concealment and (2) none of the Plaintiffs or class members had inquiry notice of facts giving rise to their claims despite their diligence.  *Id.* at 19–20, 23.  To trigger application of the discovery rule under Idaho law, Plaintiffs needed to show that the Idaho class members "did not know, and through the exercise of reasonable diligence could not have known, that their cause of action under the Idaho Consumer Protection Act might exist before December 19, 2014."  *Id.* at 26.  As set forth below, Plaintiffs presented sufficient evidence for both prongs.

a. <u>Affirmative Act of Concealment (California and North Carolina)</u>

The Technical Service Bulletins issued by GM demonstrate a systemic approach to oil consumption issues in the Class Vehicles.  The jury heard evidence that the TSBs were supposed to provide dealers with "up-to-date" information on how to repair known issues.  *See* TT 496:9-11. But the TSBs did not disclose that there was a design problem with the piston rings in the Class Vehicles.  Instead, the TSBs from 2010 through 2014 addressing oil consumption issues in the Gen IV LC9 engines instructed dealers to perform a piston cleaning for customers bringing in their vehicles with oil consumption complaints, *see* TX 162 (Sept. 2010 TSB); TX 163 (Mar. 2011 TSB); TX 165 (Oct. 2012 TSB); TX 168 (Dec. 2013 TSB); TX 169 (Sept. 2014 TSB); and TX 209 (Nov. 2014 TSB), even though the Red X report concluded that piston ring cleaning had "minimal effect" on the oil consumption problem, *see* TX 132 at 26.  Mr. Halka testified that in

---

[21] The Court addresses the jury's application of tolling with respect to Mr. Tarvin and Mr. Davis in this section, and takes up the availability of tolling for absent class members in Section IV.C.2, *infra*.

1    his opinion the piston wash was not effective.  *See* TT 616:17-25.[22]

2        In light of the evidence that piston cleaning was not effective, the fact that the TSBs

3    systematically instructed dealers to clean pistons rather than replace them is sufficient evidence of

4    affirmative concealment.  So is the fact that dealers were instructed to tell vehicle owners that

5    burning a quart of oil every 2,000-3,000 miles was normal, when according to Plaintiffs, it was

6    not.  *See, e.g.*, TX 209.

7        At summary judgment, the Court surveyed several vehicle-defects cases involving active

8    concealment and concluded that active concealment may exist where a company implements a

9    "fix" it knows is not effective.  *See* Docket No. 237 (April 23, 2020 Summary Judgment Order) at

10   28–29 (citing and collecting authorities).  For instance, in *Falk v. General Motors*, plaintiffs

11   alleged that GM actively concealed the existence of defective speedometers.  *Falk* concluded that

12   the fact that GM replaced broken speedometers with equally defective ones "suggests that GM

13   tried to gloss over the problems with its speedometers . . . [by] giving the impression that any

14   defects were unique cases."  496 F. Supp. 2d 1097, 1098 (N.D. Cal. 2007) (finding active

15   concealment adequately pleaded).  Similarly, in *In re MyFord Touch Consumer Litig.*, 46 F. Supp.

16   3d 936 (N.D. Cal. 2014), plaintiffs alleged that Ford actively concealed information about a

17   defective "infotainment" system in some of its vehicles.  This Court—in the context of a motion to

18   dismiss—found that it would be active concealment "[i]f, as Plaintiffs allege, Ford pretended to

19   fix the problems with MFT instead of actually admitting that the problems could not be fixed."  46

20   F. Supp. 3d at 961 (citing *Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 999 (N.D. Cal. 2013)

21   (finding that plaintiffs had adequately pleaded active concealment by alleging, *inter alia*, that

22   defendants repaired the class vehicles' headlamps only temporarily or replaced them with other

23   defective parts).

24       Since the date of the Court's summary judgment ruling, other courts have agreed that

25   active concealment can be shown where a company implements a "fix" that it knows to be

26

27   ───────────────────────
     [22] Although GM points out that Mr. Pfromm testified that the piston cleaning procedure was
28   effective 66% of the time, *see* TT 883:7-11, the Court may not credit and weigh the evidence,
     because the jury could have found it not credible.  *Reeves*, 530 U.S. at 150.

United States District Court
Northern District of California

ineffective.  *See, e.g.*, *Edwards v. FCA US LLC*, No. 22-cv-01871-WHO, 2022 WL 1814144, at *4 (N.D. Cal. June 2, 2022) (finding active concealment sufficiently pleaded by allegations that "technical service bulletins and recalls" purported to fix the problem but "these efforts did not actually fix the stalling defect"); *Zakikhani v. Hyundai Motor Co*., No. 20-cv-01584, 2022 WL 1740034, at *7 (C.D. Cal. Jan. 25, 2022) (finding active concealment sufficiently pleaded by allegations that "Defendants offered remedies in the recalls that do not remove the risk posed by the defect"); *see also Cho v. Hyundai Motor Co., Ltd*., No. 22-cv-00448, 2022 WL 16966537, at *8 (C.D. Cal. Oct. 21, 022) (finding active concealment sufficiently pleaded by allegation that "when the vehicles were presented to authorized dealerships with excessive oil consumption, Defendants 'advised customers that the excessive oil consumption is normal and that oil should be added to the engine on a regular basis . . . '"); *but see Hackler v. Gen. Motors LLC*, No. 21-cv-19, 2022 WL 17337470, at *4 (S.D. Ga. Nov. 22, 2022).  Based on the Court's previous reasoning, and the line of cases cited above, the Court holds that there was substantial evidence of affirmative concealment sufficient to support the jury's verdict on this point.[23]

     b. <u>Reasonable Diligence (California, North Carolina, and Idaho)</u>

   The second question is whether Plaintiffs provided sufficient evidence demonstrating that the class representatives exercised due diligence in seeking to uncover the facts giving rise to their claims.  Because reasonable diligence is not required until a person becomes aware of facts which would cause a reasonable person to investigate, the question then becomes whether Plaintiffs presented evidence showing that the class representatives lacked awareness of facts that would have caused a reasonable person to inquire or lead to discovery of any alleged oil consumption defect in their own vehicle.  *See* Jury Instructions at 20, 23, 26; *see also Madani v. Volkswagen Grp. of Am., Inc.*, No. 17-cv-07287-HSG, 2019 WL 3753433, at *7 (N.D. Cal. Aug. 8, 2019)

---

[23] *Hackler* is also distinguishable.  The court acknowledged that the TSBs "might, under different circumstances, be evidence of fraudulent concealment," but found that there was no evidence that GM "acted as instructed by the TSBs, or in any manner, to prevent Plaintiff from discovering his claim."  *See* 2022 WL 17337470, at *4.  Here, the jury heard evidence that dealers told Plaintiffs Tarvin and Davis that their vehicles were using a normal amount of oil when they complained about and sought assistance for their vehicles' oil consumption.  TT 1033:18-1034:9 (Tarvin testimony); TT 1163:4-5 (Davis testimony).

United States District Court
Northern District of California

("Notice in this context concerns awareness of the relevant facts from which a diligent plaintiff would learn of potential claims.") (cleaned up).

There was sufficient evidence for the jury to find that the named class representatives did not become aware of facts that would cause a reasonable person to investigate as to whether they had a potential claim for a defect. The class representatives testified that dealers did not disclose the oil consumption issue and oil consumption issues were presented as normal. *See* TT 1098:2-13 (Del Valle testimony); TT 1034:4-9 (Tarvin testimony); 1162:22-1163:5 (Davis testimony). The TSBs did not disclose that there was a piston ring defect and the pre-2014 TSBs only addressed oil consumption issues in vehicles that predated the Class Vehicles—Mr. Pfromm testified that the Class Vehicles were not added to the TSBs until September 2014. *See* TT 943:4-944:16. There was thus evidence that GM concealed—even from its dealers—the piston ring defect, such that the class representatives would not have been on inquiry notice of their claims.

As the Court previously ruled at summary judgment, "[w]hile a reasonable jury might conclude that needing to add oil on a monthly basis would have put [Plaintiff] on inquiry notice of an oil consumption problem, a reasonable jury might also find he was not on inquiry notice of a defect that could cause a serious or safety-related problem. Whether [Plaintiff] was on inquiry notice before 2016 cannot be decided as a matter of law on summary judgment." *See* Docket No. 237 (April 23, 2020 Summary Judgment Order) at 35. The evidence at trial did not change the calculus. As the named Plaintiffs were told that their oil consumption was normal and the TSBs indicated that their oil consumption was normal, the jury could reasonably conclude they were not aware of the relevant facts from which a diligent plaintiff would learn of potential claims of a defect. *See Rita M. v. Roman Catholic Archbishop*, 187 Cal. App. 3d 1453, 1461 (1986); *Madani*, 2019 WL 3753433, at *7.

The Court's analysis of the classwide aspect of this issue appears in Section IV.C.2, *infra*.

4.      There Was A Legally Sufficient Basis for the Jury to Reasonably Find Plaintiffs
        Proved Damages

GM asserts that judgment as a matter of law is warranted because there was insufficient evidence for a jury to reasonably find that Plaintiffs proved damages. JMOL Mot. at 25. GM

reiterates its arguments regarding the lack of evidence (including technical and expert evidence) of a common defect, and raises two other arguments: (1) there was no technical testimony that the defect could be remedied by replacing the piston rings in the Class Vehicle with a different coating material; and (2) Plaintiffs did not show that all class members overpaid for their vehicles due to a common piston ring defect, or that the $2,700 figure used by Mr. Stockton was the appropriate measure of overpayment. *Id.* at 25–27.

As set forth below, because there was substantial evidence with respect to both issues, GM's motion for judgment as a matter of law on these grounds is denied.

        a.      <u>There Was Substantial Evidence to Support the Jury's Verdict that Replacing the Piston Rings with Different Coating Was An Appropriate Repair</u>

The jury heard evidence which indicated that the appropriate repair for the Oil Consumption Defect was replacing the piston rings with new rings with different coating. Dr. Dahm testified that new piston rings with better wear characteristics would prevent the excessive oil consumption caused by worn piston rings: "[I]f you replaced those piston rings with new rings that have better antiwear characteristics, then that would stop the excessive oil consumption because it would stop the blowby…." *See* TT 334:14-22. Dr. Dahm also testified that PVD coating would improve the wear resistance for piston rings. TT 335:8-13. Mr. Halka agreed that a more wear-resistant ring could result in improved oil consumption. *See* TT 639:25-640:5 (testifying that "a more wear-resistant ring . . . reduces possibility of wear getting to full face contact and wear in the piston groove" which "could result in improved oil consumption after the wear issues"). And while Mr. Halka testified at trial that not all Class Vehicles required PVD, *see id.* at 645:11-18, he advocated internally in 2014 for a complete switch to PVD. *See id.* at 537:4-20; TX 202.

The Court concludes that the testimony described above is substantial evidence from which the jury could have reasonably concluded that the defect could be remedied by replacing the piston rings with a more wear-resistant coating.

United States District Court
Northern District of California

b.    There Was Substantial Evidence to Support the Jury's Award of $2,700

GM contends that Plaintiffs failed to show that $2,700 fit the cost of installing PVD-coated piston rings in Class Vehicles.  JMOL Mot. at 26–27.  The Court disagrees.

Mr. Stockton, Plaintiffs' damages expert, testified that—assuming that Plaintiffs proved that the Class Vehicles were defective—the class members were injured in the amount of $2,700 because they did not receive the benefit of the bargain.  TT 686:12–687:2.  Mr. Stockton testified that the cost of repair could be used as a basis for damages to restore the benefit of the bargain.  TT 697:25–698:24.  Mr. Stockton assumed that $2,700 was the cost of repair based on Dr. Dahm's report, which in turn came from an internal GM memo created in mid-2011 by Mr. Pfromm.  TT 699:2-13.

Mr. Pfromm's memo analyzed the cost of various repair options, including piston ring repairs/replacement.  *See* TX 184 (GM's internal cost analysis).  GM contends—and Plaintiffs do not dispute—that this memo, which was based on pre-Class Vehicles, concluded that the cost to replace the piston rings with '278-coated rings was $2,700.  *See* JMOL Mot. at 26–27 (describing TX 184 as regarding pre-Class Period Vehicles and a different piston ring replacement).  At trial, Mr. Pfromm testified that he calculated $2,700 based on his analysis of labor codes, and that he never calculated the cost of replacing with PVD-coated rings.  *See* TT 890:11-891:13.  Although the jury did not hear evidence regarding the repair cost for PVD-coated rings, in the absence of any indication to the contrary, the jury could reasonably have assumed that the cost of replacing the PVD-coated rings would be equivalent to the cost of replacing with '278-coated rings.[24]

B.    GM's Motion for a New Trial

In the alternative, GM argues that a new trial is warranted because the verdict is against the clear weight of the evidence, certain remarks purportedly tainted the trial record with improper innuendo, and the classes should be decertified.  JMOL Mot. at 27–30.

As noted above, unlike with a Rule 50 determination, the district court, in considering a

---

[24] This assumption is supported by Dr. Dahm, who concluded that "the repair cost for PVD coated rings should be consistent with the cost of the '278 rings, considering the cost of the rings themselves represent a small fraction of the calculated repair cost."  Dahm Report ¶¶ 231–32.

United States District Court
Northern District of California

1    Rule 59 motion for new trial, is not required to view the trial evidence in the light most favorable

2    to the verdict.  Instead, the district court can weigh the evidence and assess the credibility of the

3    witnesses.  *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir.

4    2014).  The Court has substantial discretion in deciding whether to grant a new trial; a district

5    court's determination that the verdict is not against the weight of the evidence will be upheld

6    unless there is "an *absolute absence of evidence* to support the jury's verdict."  *Hung Lam*, 869

7    F.3d at 1084 (internal quotation marks omitted) (emphasis in original).  The Court addresses each

8    argument below.

9          1.       The Verdict Was Not Against the Clear Weight of the Evidence

10          GM does not raise any new arguments here, but instead claims that in light of the

11   purported evidentiary void, improper stacking of inferences, and record taint addressed below, the

12   Court should conclude that the verdict was against the clear weight of the evidence.  JMOL Mot.

13   at 27.  For the reasons stated in this Order, substantial evidence supported the jury's verdict, and

14   Plaintiffs did not improperly stack inferences or taint the trial record.  *See* Section IV.A.1–4,

15   *supra*; Section IV.B.2, *infra*.  While the evidence presented by Plaintiffs was not overwhelming

16   and the jury could have found otherwise, the record does not compel a new trial because the

17   verdict was not against the clear weight of the evidence; there was no "absolute absence of

18   evidence to support the jury's verdict."  *Hung Lam*, 869 F.3d at 1084.

19          2.       Plaintiffs Did Not Taint the Trial Record

20          GM also argues that the Court should order a new trial because Plaintiffs' counsel

21   purportedly repeatedly impermissibly elicited testimony, presented prejudicial testimony and

22   argument, and made reference to matters previously ruled inadmissible with the sole purpose of

23   bringing to the jury something it should not have heard.  JMOL Mot. at 27.

24          "A new trial is warranted on the ground of attorney misconduct during the trial where the

25   'flavor of misconduct  . . .  sufficiently permeates an entire proceeding to provide conviction that

26   the jury was influenced by passion and prejudice in reaching its verdict.'"  *Anheuser-Busch Inc. v.*

27   *Nat. Beverage Distribs.*, 69 F.3d 337, 346 (9th Cir. 1995) (ellipsis in original) (quoting *Kehr v.*

28   *Smith Barney, Harris Upham & Co.*, 736 F.2d 1283, 1286 (9th Cir. 1984)); *see also First Fin.*

United States District Court
Northern District of California

United States District Court
Northern District of California

*Sec., Inc. v. Freedom Equity Grp., LLC*, No. 15-cv-01893-HRL, 2017 WL 3593369, at *4 (N.D. Cal. Aug. 21, 2017) ("To grant a new trial based on attorney misconduct under Rule 59, the flavor of the misconduct must sufficiently permeate an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.") (internal quotation marks and quotation omitted).  Courts consider "the totality of circumstances" in evaluating the likelihood of prejudice from improper comments made by counsel.  *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002) (internal quotation marks omitted).  Considerations include "the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself."  *Id.* (internal quotation marks omitted).

GM cites four examples of improper testimony.  None of these examples, viewed under the totality of the circumstances, persuades the Court that a new trial is warranted.

### a.    Example #1: Arguing Excluded Expert Defect Opinions

First, according to GM, Plaintiffs impermissibly argued in closings that Dr. Ball had offered an opinion regarding the existence of a classwide piston ring defect.  During closings, Plaintiffs' counsel said, while discussing what could be inferred from the warranty data, that "[a]t least with respect to Dr. Ball, his indication was: Listen, this -- everything will fail here eventually relative to this design and, in particular, we're talking about piston rings."  TT 1380:16-22.

As noted above, the Court overruled the objection to Dr. Ball's testimony and GM never sought a limiting instruction.  In its closing argument, GM expressly and repeatedly noted that neither Dr. Ball nor Dr. Dahm provided "an opinion that the vehicles were defective."  *See* TT 1399:3-9; *see also* TT 1416:11-13 ("They have two experts, Dahm and Ball.  They gave you no opinion that the class vehicles were defective, not a single one.").  It was up to the jury to assess the evidence admitted at trial.  The jury was not improperly influenced by passion and prejudice in reaching its verdict.  *Anheuser-Busch*, 69 F.3d at 346.

### b.    Example #2: Representations Regarding Discovery Issues

Second, GM asserts that throughout trial and especially during closings, Plaintiffs' counsel referenced discovery issues, including making representations that were contrary to legal burdens,

1    obligations, and procedures.  *See* JMOL Mot. at 28–29 (quoting statements by Plaintiffs' counsel).

2    Plaintiffs note that the jury was instructed that argument and statements by lawyers are not

3    evidence and that GM's objection to the first statement was sustained.  JMOL Opp. at 29.

4        While Plaintiffs' response is not entirely satisfactory, the Court does not believe that the

5    statements cited by GM demonstrate that the "flavor of misconduct . . . sufficiently permeates an

6    entire proceeding to provide conviction that the jury was influenced by passion and prejudice in

7    reaching its verdict."  *Anheuser-Busch*, 69 F.3d at 346.  Although GM cites *Pavemetrics Systems*

8    *v. Tetra Tech* on this issue, *Pavemetrics* is factually distinct.  In that case, the court granted a new

9    trial on the basis of attorney misconduct: specifically, counsel "raising discovery disputes,

10   presenting misstatements of law and fact, and discouraging the jury from weighing the relevant

11   facts of the case."  *See* 21-cv-01289, 2023 WL 1836331, at *2, *4 (C.D. Cal. Jan. 23, 2023).  But

12   the severity of the misconduct in *Pavemetrics* is a far cry from the issues raised by GM in its

13   motion.  In *Pavemetrics*, for instance, counsel for plaintiff was repeatedly reminded at sidebar of

14   the court's prior rulings and ordered to move on, but counsel "deliberately" continued to raise

15   issues for which the attorney had already been admonished.  *Id.* at *3.  And although the court

16   issued several curative instructions over the course of the trial, the court noted that these curative

17   instructions arguably contributed to the prejudice to the defendant.  *Id.* at *5 (noting that "the

18   frequent curative instructions in this case may have improperly affected the jury verdict" and that

19   the curative instructions "may have exacerbated the poor optics of the trial" by "affect[ing] [the

20   jury's] view of the proceedings and the parties' credibility").  Here, GM does not contend that

21   counsel repeatedly defied rulings by the Court or that any curative instructions improperly affected

22   the jury verdict.

23       In sum, Plaintiffs' counsel's arguments regarding discovery issues do not demonstrate that

24   a new trial is warranted.

25           c.    Example #3: Using Court Orders to "Vouch" for Experts

26       Third, GM argues that Plaintiffs' counsel improperly alluded to matters not in evidence by

27   using the Court's pretrial orders to vouch for Mr. Stockton.  GM points to two questions that

28   Plaintiffs' counsel asked Mr. Stockton during his examination.  *See* JMOL Mot. at 29 (citing TT

United States District Court
Northern District of California

1    844:2-4 (asking Mr. Stockton: "Are you aware that in this case, Judge Chen has held that your cost

2    of repair model was a valid basis for certifying the three classes that we're on trial here for

3    today?"); *see also* TT 844:8-18 ("Mr. Stockton, what is your understanding about Judge Chen's

4    rulings on the validity of your cost of repair model in this case?")).

5          GM opened the door to this line of questioning by attacking Mr. Stockton's credibility;

6    Plaintiffs' questions were proper attempts to rehabilitate their witness.  During GM's cross-

7    examination of Mr. Stockton, GM's counsel extensively questioned the history of Mr. Stockton's

8    opinions and any instances where his opinions had been excluded.  *See, e.g.*, TT 835:7-10 ("Over

9    the last three years, how many times has a federal court excluded and/or criticized your opinions

10   as being speculative, unreliable, untested, and unworthy for consideration?"); TT 835:25-836:1

11   ("And did anyone tell you that in that case Judge Breyer excluded your opinions?"); TT 836:23-25

12   ("And are you aware that the [Federal Court of Claims] Court there held your assumptions

13   regarding government payments of warranty work was based on, quote, 'pure speculation?'").

14   Upon re-direct, Plaintiffs' counsel sought to correct the record by clarifying and rehabilitating Mr.

15   Stockton's credibility.  And although GM objected to these questions, the Court eventually

16   overruled GM's objections based on Plaintiffs' counsel's argument that GM had opened the door

17   to questions about the Court's legal ruling.  *See* TT 844:2-845:9.

18         These questions asked on redirect were not improper and in any event did not taint the trial

19   under the Rule 59 standards for attorney misconduct set forth above.

20                    d.    Example #4: Repeated References to Excluded Materials

21         Lastly, GM argued that a new trial was warranted because of Plaintiffs' proclivity to blurt

22   out comments or suggestions regarding materials the Court had excluded.  JMOL Mot. at 29–30.

23   GM points to four comments by Mr. Del Valle made during his direct and cross and one comment

24   by Mr. Davis where Mr. Davis purportedly "testified to hearsay regarding an alleged incident that

25   was specifically precluded by the Court's ruling."  *Id.*

26         GM's objection to Mr. Davis's testimony is unwarranted.  Although Mr. Davis began to

27   describe the incident that his wife experienced with the vehicle's malfunction (which the Court

28   had ruled was inadmissible), defense counsel interrupted before Mr. Davis said anything

47

1    substantive.  *See* TT 1217:19-21 (Question: "are you alone?"  Answer: "No.  My wife's in – in the

2    truck with me, and she points out to me that that was the same incident the way her –").  Mr.

3    Davis's truncated testimony regarding his wife's experience does not warrant a new trial; it is

4    unclear what, if anything, the jury inferred from such truncated testimony.

5         GM's objection to Mr. Del Valle's testimony has more force, but the Court does not

6    believe that it rises to the level of requiring a new trial.  Mr. Del Valle repeatedly referenced the

7    fact that he was not able to testify about problems with his vehicle after 2020.[25]  *See* TT 1106:9-

8    12; TT 1102:7-9; TT 1129:11-14.  He also testified that he was experiencing "major mechanical

9    issues" which were "borderline catastrophic."  TT 1126:2-5.  GM did not object to two of these

10   statements at the time.  As for the other two statements to which GM did object, the Court struck

11   one of them, and the second one does not contain any substantive testimony.  On the whole, these

12   statements by Mr. Del Valle do not lead the Court to conclude that the trial was so tainted as to

13   justify a new trial.

14        In sum: none of the four examples cited by GM demonstrate that Plaintiffs substantially

15   tainted the trial record.

16        The Court **DENIES** GM's motion for a new trial.  The verdict was not against the clear

17   weight of the evidence as it was supported by substantial evidence and not undermined by an

18   absolute absence of evidence; nor did Plaintiffs taint the trial record in a way that warrants a new

19   trial.

20   C.    GM's Motion to Decertify Classes

21        GM argues that the Court should decertify the classes for three main reasons: (1)

22   individual issues predominate; (2) trying the statutes of limitations defenses on a classwide basis

23   violated Rule 23 and GM's due process rights; and (3) Plaintiffs failed to prove Article III

24   standing for all class members at trial.  *See* Docket No. 594 (Motion to Decertify Classes, or

25   "Decert. Mot.") at 2–30.  The Court addresses each issue in turn.

26

27

28   ───────────────
     [25] The Court had precluded Mr. Del Valle from testifying about specific issues following his May
     2020 deposition because he had failed to comply with discovery obligations.

United States District Court
Northern District of California

1               1.         <u>The Evidence at Trial Did Not Show that Individual Issues Predominate</u>

2        GM argues that Plaintiffs' own evidence and arguments established that uncommon facts

3 predominate.  In particular, GM argues that the trial evidence established that there was no oil

4 consumption or piston ring problems common to all class vehicles, *see* Decert. Mot. at 3; GM's

5 warranty data disproves the existence of a common defect, *see id.* at 4–6; there was no

6 commonality regarding injury, *see id.* at 6–7, there was no commonality regarding the cause of

7 any alleged injury, *see id.* at 7–9, there was no commonality regarding all class vehicles' alleged

8 unmerchantability, *see id.* at 9–10, there was no commonality regarding the alleged barriers to

9 making warranty claims, *see id.* at 10–12, and there was no commonality regarding Plaintiffs'

10 experiences with their Class Vehicles, *see id.* at 12–13.

11        The Court has addressed these issues elsewhere in this Order.  First, the Court concluded

12 that there was sufficient evidence for the jury to find that there was a common, classwide defect in

13 the Class Vehicles.  *See* Section IV.A.1, *supra.*  As a result, GM's arguments regarding the

14 existence of the defect, commonality of injury, causation, and unmerchantability are unavailing.

15 Second, as for GM's arguments regarding the warranty data, the Court has already explained why

16 the low in-warranty claims rate for piston ring replacement and repair is not dispositive.  *See*

17 Section IV.A.1.b, *supra.*  Third, the Court concluded that the TSBs, when coupled with the class

18 representatives' and GM engineers' testimony, give rise to the reasonable inference that there were

19 hurdles that vehicle owners would have to overcome before a customer would receive upgraded

20 piston rings.  *See* Section IV.A.1.c.4, *supra.*  Finally, the Court concluded that the jury could

21 reasonably infer that the defect caused excessive oil consumption in Plaintiffs' own vehicles.  *See*

22 Section IV.A.1.c.iii, *supra.*  None of GM's arguments or the evidence at trial causes the Court to

23 reconsider its earlier analyses.

24        Also in this section, GM cites *Broussard* to assert that Plaintiffs resorted to selectively

25 picking a piece of evidence here and an unrelated one there for different engines, class members,

26 and Class and non-Class Vehicles, and then amalgamating the differing, unrelated pieces of

27 evidence into a composite "fictional, perfect plaintiff" in violation of Rule 23 and due process.

28 Decert. Mot. at 13–15.  The Court disagrees that this case is analogous to *Broussard*.

United States District Court
Northern District of California

In *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998), the district court certified a nationwide class of franchisee plaintiffs who sued franchisor Meineke and others for breach of their franchise agreements, along with various torts and statutory claims. *Id.* at 335–36.  The jury found defendants liable, and after post-trial motions, judgment was entered in the amount of over $390 million.  *Id.* at 336–37.  The Fourth Circuit reversed and decertified the class, which the court said was "no more than 'a hodgepodge of factually as well as legally different plaintiffs.'"  *Id.* at 343 (citation omitted).  But as the full quotation makes clear, *Broussard* presents a very different set of facts from the present case:

> The class the district class certified was thus no more than "a hodgepodge of factually as well as legally different plaintiffs," *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996), *aff'd, Amchem, supra*, that should not have been cobbled together for trial: franchisees' contractual rights and obligations differ; Meineke directed different representations to different franchisees; franchisees relied on these representations in a different manner or to a different degree; each franchisee's entitlement to toll the statute of limitations is fact-dependent[26]; and the profits lost by franchisees also differed according to their individual business circumstances. Plaintiffs do not "advance the same factual and legal arguments" as the class they are supposed to represent.  And frankly, in these circumstances, we doubt that any set of claims is common to or typical of this class.

*Id.* at 343.  In their opposition brief, Plaintiffs point out that *Broussard* found that class decertification was appropriate because of "[f]ive significant variations" in the franchisees' factual and legal arguments, none of which are present in this case:

- First, the *Broussard* court held that the plaintiffs could not advance a class-wide breach of contract claim where there were differing contracts, with differing material terms, amongst the class members. *Id.* at 340.  Here, none of the class members' claims are premised on the language of written contracts that might have varied from class member to class member.

---

[26] The statute of limitations analysis in *Broussard* is also different than in the present case.  In *Broussard*, "tolling the statute of limitations on each of plaintiffs' claims depend[ed] on individualized showings that are non-typical and unique to each franchisee" because "the alleged misrepresentations and obfuscations on which plaintiffs base their argument for tolling differed from franchisee to franchisee." *Broussard*, 155 F.3d at 342.  In other words, the representations made to each franchisee varied considerably.  *Id. Broussard* concluded that the statute of limitations issues precluded class certification because some class members may be able to point to fraudulent misrepresentations while others cannot.  *Id.*

- Second, the *Broussard* court held that the plaintiffs could not advance fraud-based claims on a class-wide basis because these claims were premised on individualized, non-uniform, misrepresentations to class members. *Id.* at 340–41. Here, none of the claims asserted by Plaintiffs are based on individualized, non-uniform, misrepresentations.

- Third, the *Broussard* court held that the necessity of providing reliance under certain fraud-based claims precluded class-wide resolution. *Id.* at 341–42. Here, none of the tried claims required proof of reliance.

- Fourth, the *Broussard* court held that the class members' tolling arguments hinged on "alleged misrepresentations and obfuscations" that "differed from franchisee to franchisee." *Id.* at 342. Plaintiffs assert that the class tolling arguments in this case were provable through common evidence.

- Fifth, the *Broussard* court held that the class members' lost profits damages calculations required individualized proof. *Id.* at 342–43. Plaintiffs, here, did not seek lost profits damages.

Decert. Opp. at 12. For the reasons Plaintiffs state, *Broussard* does not support GM.

### 2. GM Is Entitled to Challenge Whether Absent Class Members Had Actual Notice of Their Claims

Next, GM argues that the Court must decertify all three classes because inquiry notice and due diligence are individualized and subjective topics that are not susceptible to classwide resolution. *See* Decert. Mot. at 18–19. As set forth below, many courts—including this Court—have found that a statute of limitations problem for certain class members is not enough to defeat class certification. Here there was a classwide basis for the jury to find tolling. That being said, Plaintiffs' theories of equitable tolling require that a class member neither knew nor reasonably should have known of the facts giving rise to their claim.[27] Because a class member who had

---

[27] *See* Jury Instructions at 19–20, 23, 25; *see also Rambus Inc. v. Samsung Elecs. Co.*, No. 05-cv-00334-RMW, 2007 WL 3444376, at *4 (N.D. Cal. Nov. 13, 2007) ("California law clearly considers a plaintiff's subjective knowledge relevant to the fraudulent concealment inquiry."); *SD3 II LLC v. Black & Decker (U.S.) Inc.*, 888 F.3d 98, 108 (4th Cir. 2018) ("To prove fraudulent concealment, SawStop must show (1) fraud by the Table Saw Manufacturers, (2) a lack of actual notice by SawStop of its claim, and (3) either a lack of inquiry notice or, in the event it was on inquiry notice, that it exercised reasonable diligence in investigating the claim."); *Wheeler v. BMW of N. Am. LLC*, 534 F. Supp. 3d 527, 536 (W.D.N.C. 2021) (reserving ruling on whether fraudulent concealment doctrine did not apply based on plaintiff's purported actual knowledge of

United States District Court
Northern District of California

1    actual or subjective notice of his or her claim would not be entitled to tolling, and because the trial

2    was limited to common, classwide issues that did not enable GM to probe whether any absent

3    class members had actual notice, the Court agrees that additional measures must be taken before

4    entry of final judgment to satisfy GM's due process rights.  But this does not defeat class

5    certification.

6            "The Ninth Circuit has repeatedly held that '[t]he existence of a statute of limitations issue

7    does not compel a finding that individual issues predominate over common ones.'"  *Nitsch v.*

8    *Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 308 (N.D. Cal. 2016) (citing *Williams v.*

9    *Sinclair*, 529 F.2d 1383, 1388 (9th Cir. 1975)); *see also Cameron v. E.M. Adams & Co.*, 547 F.2d

10   473, 478 (9th Cir. 1976) ("We hold that the presence of individual issues of compliance with the

11   statute of limitations here does not defeat the predominance of the common questions.").  Courts

12   have certified class actions involving fraudulent concealment tolling claims even where the

13   defendant argues that individualized proof is required to determine whether the plaintiffs had

14   actual or constructive knowledge.  *See Nitsch*, 315 F.R.D. at 311–13 (certifying class where "the

15   overwhelming majority of the evidence upon which plaintiffs will rely to show concealment is

16   common proof" and noting that "[c]ertification of the proposed class will not deny Defendants the

17   ability to raise individualized statute of limitations defenses, should the evidence indicate that the

18   question must be resolved separately as to particular class members"); *Waldrup v. Countrywide*

19   *Fin. Corp.*, No. 13-cv-08833, 2018 WL 799156, at *14 (C.D. Cal. Feb. 6, 2018) (certifying class

20   despite defendant's objection that a "borrower-by-borrower analysis was necessary to determine

21   when each putative class member became aware of potential claims" where relevant news article

22   was publicly available; "thus whether it placed class members on inquiry notice of their injuries

23   could be adjudicated on a class-wide basis"); *Brasko v. Howard Bank*, No. 20-cv-3489, 2022 WL

24   951771, at *7 (D. Md. Mar. 29, 2022) (noting that "[t]he question whether the statute of

25   limitations should be tolled due to fraudulent concealment presents a common question and can be

26   _____

27   defect so that the parties could further develop the facts); *Performance Chevrolet, Inc. v. Mkt.*
     *Scan Info. Sys., Inc.*, 402 F. Supp. 2d 1166, 1171–73 (D. Idaho 2005) (granting summary

28   judgment under Idaho law where plaintiff had discovered the facts constituting the fraud before
     the limitations period had run and thus the discovery rule did not apply).

United States District Court
Northern District of California

established without individual issues predominating").  Courts have, conversely, denied class

certification where the determination of whether class members were on notice of their claims was

not susceptible to generalized proof.  *See, e.g.*, *Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950, 971–72

(S.D. Cal. 2016) (denying class certification where generalized proof could not be used to

determine whether class members were on inquiry notice for purposes of fraudulent concealment

tolling); *In re SFPP Right-of-Way Claims*, No. 15-cv-07492, 2017 WL 2378363, at *17–18 (C.D.

Cal. May 23, 2017) (denying class certification where statute of limitations defense "will likely

require individualized proof of notice").

    The Court previously rejected GM's argument that Plaintiffs' claims were inappropriate

for class certification because individualized evidence was required on the timeliness of each

putative class member's claims:

> GM finally contends that Plaintiffs' claims are inappropriate for
> class certification because individualized evidence is required on the
> timeliness of each putative class member's claims. Opp'n to Second
> Class Cert. Mot. at 21. This contention fails for several reasons.
> First, the trier of fact can conclude, in one stroke, that certain
> (perhaps most) class members' claims are timely because they
> purchased or leased their vehicles within two to six years—
> depending on the claim—before the complaint was filed—a simple
> determination.  […]
>
> Second, there is a common question as to whether fraudulent
> concealment (or equitable estoppel, as it is referred to in Idaho) bars
> GM from asserting the statute of limitations defense against any
> putative class member whose claims are otherwise untimely.  […]
> In fact, the Court already held that there is common evidence
> indicating that GM knew about the oil-consumption defect and
> actively concealed that information from its customers to deceive
> them. *Sloan III*, 2020 WL 1955643, at *13–*17.  A jury could
> reasonably rely on that same evidence to conclude that GM
> fraudulently concealed the oil-consumption defect from all the
> putative class members, such that it cannot raise a statute of
> limitations defense.  GM's conduct—whatever it is found to be—is
> the source relative to all class members.
>
> Third, there is simply no basis for GM's vague contention that an
> individualized inquiry is necessary to determine "when and how
> each class member was on notice of the alleged oil consumption
> defect, and whether he or she acted with reasonable diligence in
> response to that information." Opp'n to Second Class Cert. Mot. at
> 21.  There is no indication in the record that there were ways for the
> putative class members to discover the oil-consumption defect
> outside of GM's representations about it.  The jury can conclude, in
> one stroke, whether the putative class members knew about the

1    defect until the lawsuit was filed.

2    Finally, and most importantly, GM's statute of limitations defense
     does not automatically preclude class certification where common
3    questions otherwise predominate. The Ninth Circuit "has repeatedly
     held that '[t]he existence of a statute of limitations issue does not
4    compel a finding that individual issues predominate over common
     ones.'" *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270,
5    308 (N.D. Cal. 2016) (quoting *Williams v. Sinclair*, 529 F.2d 1383,
     1388 (9th Cir. 1975)); *see also Cameron v. E.M. Adams & Co.*, 547
6    F.2d 473, 478 (9th Cir. 1976) ("We hold that the presence of
     individual issues of compliance with the statute of limitations here
7    does not defeat the predominance of the common questions.")). If
     need be, the trier of fact can adjudicate all the other common
8    questions "in one stroke" and then address GM's statute of
     limitations defense on an individual basis. *Wal-Mart*, 564 U.S. at
9    350.

10   Docket No. 320 (May 25, 2021 Order) at 38–39. So although there are predominant classwide

11   issues affecting the availability of tolling which warranted class certification, the Court reserved

12   the possibility that GM's statute of limitations defense would be addressed on an individual basis

13   where appropriate after adjudication of common questions.

14        GM contends that two pieces of evidence at trial support the inference that some class

15   members may have been on inquiry notice prior to the expiration of the statute of limitations.

16   Decert. Mot. at 19–20. First, the warranty data includes claims for piston ring replacements in

17   Class Vehicles before December 12, 2012. *Id.* at 19. Because at least half of the repairs were

18   linked to oil consumption, GM says that there were individuals who were subjectively aware of, or

19   suspected, an oil consumption issue in their Class Vehicles before December 12, 2012. *Id.*

20   Second, GM notes that some Class Vehicle owners may have known or been on notice of the fact

21   that the Class Vehicles had an oil consumption issue based on their experiences with pre-Class

22   Vehicles. *Id.* GM notes that Mr. Del Valle testified that he previously owned a pre-Class year

23   Chevy Avalanche, that he noticed that it consumed "quite a bit of oil," and had brought it to the

24   dealer "several times over oil consumption issues." *See* TT 1094:17-21; TT 1112:9-13; TT

25   1112:18-21.

26        The Court is not convinced that either example shows that certain class members

27   necessarily had notice of the facts giving rise to their claim. "Courts have . . . recognized that a

28   consumer without sophisticated knowledge of automobiles might not suspect a defect, and

United States District Court
Northern District of California

therefore not investigate further, when it appeared that a repair fixed the problem." *Aberin v. Am. Honda Motor Co., Inc.*, No. 16-cv-04384-JST, 2018 WL 1473085, at *6 (N.D. Cal. Mar. 26, 2018) (finding that plaintiff had adequately alleged tolling applied where "plaintiffs allege[d] that they had the cars repaired by dealerships who purported to fix the reported problems but never identified the underlying HFL issue causing those problems"). And the Ninth Circuit recently rejected a car manufacturer's similar arguments against imposition of the discovery rule:

> FCA argues that Zuehlsdorf had "reason to at least suspect" his car was defective when he bought it because the car always exhibited a lag in acceleration. *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 920 (Cal. 2005). But a rational jury could find that Zuehlsdorf was not on inquiry notice at the time of purchase because he testified that after reading the owner's manual, he came to understand that transmissions are now designed to operate with a lag and so he did not believe the car was defective.
>
> FCA also argues that Zuehlsdorf should have suspected the defect when his car overheated in 2014. But the dealership purported to fix the issue and the car did not overheat again until 2018. A jury could find that Zuehlsdorf was first put on notice of the defect when a dealership mechanic told him in 2018 after a second overheating event that the transmission could not be repaired. Accordingly, we cannot conclude that Zuehlsdorf's claims are time-barred as a matter of law.

*Zuehlsdorf v. FCA US LLC*, No. 22-55270, 2023 WL 385175, at *2 (9th Cir. Jan. 25, 2023). Moreover, as noted below and above, just because an owner experiences oil consumption with his, her, or their vehicle does not necessarily suggest that the owner knows that it could give rise to a potential claim.

Plaintiffs argue that any class member with otherwise time-barred claims need not prove their individual diligence during a period in which they could not have known they had a claim. Plaintiffs contend that this issue—whether the class members could not have known that they had a claim arising from the Oil Consumption Defect—is a common one that is resolvable on a class-wide basis. Decert. Opp. at 13 (citing *Wal-Mart Stores*, 564 U.S. at 350 ("That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.")). But Plaintiffs do not address the actual notice prong of their equitable tolling theories. Nor do they explain how actual notice could be addressed on a

classwide basis.

Because the statute of limitations is an affirmative defense that GM is entitled to assert, and because GM has not yet had an opportunity to test its theory that some absent class members may have had actual notice of their claims, it appears that a post-trial mechanism may be appropriate before entry of judgment.  The Court shall set a status conference in which the parties shall discuss the scope and the form of this post-trial mechanism; if needed, following the status conference, the parties will submit briefing regarding these issues, including which party shall bear the burden of demonstrating that actual notice has (or has not) been shown, and whether, *e.g.*, GM need make a *prima facie* showing as to those individual class members whose notice (or non-notice) they intend to challenge.

### 3.   Article III Standing

Finally, GM argues that the class members lack Article III standing because Plaintiffs failed to prove that all class members suffered an injury in fact caused by GM.  Decert. Mot. at 23. Because—according to GM—the vehicles are not defective, "the buyers have no injury and thus no Article III standing."  *Id.* at 24.  GM largely recycles its arguments raised elsewhere in the briefing such as the lack of evidence establishing a defect, *see id.* at 24; its challenges to Mr. Stockton's damages methodology, *see id.* at 24–27; and causation (*i.e.* that Plaintiffs failed to eliminate the alternative causes for excess oil consumption and piston ring problems), *see id.* at 27–28.

As discussed below, the Court's previous rulings make clear that class members have Article III standing based on overpaying for an allegedly defective product.  The Court's prior ruling stands, and the evidence of a classwide defect presented at trial, if anything, substantiates this Court's holding on standing.

#### a.   GM's Previous Challenges to Article III Standing

Over the course of the litigation, GM has attacked Plaintiffs' Article III standing on three previous occasions.  Each time, the Court has found that Plaintiffs have Article III standing based on economic injury.

GM first challenged Plaintiffs' Article III standing in moving to dismiss the complaint.

United States District Court
Northern District of California

1   The Court recognized that Plaintiffs' showing of Article III standing rested on their allegations

2   that they each overpaid for their inherently defective vehicles.  *See* Docket No. 62 (August 1, 2017

3   Order) at 7 ("Plaintiffs allege that all engines [in the Class Vehicles] are inherently defective, and

4   that they would not have paid the same amount had they known of the defect.").  The Court further

5   noted that the Ninth Circuit found that similar allegations were sufficient to establish Article III

6   standing in *Mazza v. American Honda Motor Co*., 666 F.3d 581 (9th Cir. 2012).  *Id.* at 6–7.  Since

7   the outset of this case, then, the Court has held that "Plaintiffs' claims of overpayment for a

8   defective product due to GM's fraudulent omissions constitute an injury in fact."  *Id.* at 7.

9       At the class certification stage, GM challenged Plaintiffs' common proof with respect to

10  standing.  Although the Court noted that GM's challenge was "premature[]," *see* Docket No. 320

11  at 31, it nevertheless reached the substance of GM's argument and held that "Plaintiffs have

12  therefore already demonstrated — assuming the case reaches the damages stage — that each of the

13  putative class members who purchased a Class Vehicle has standing to receive damages because

14  the alleged defect caused them to overpay for their vehicles."  *Id.*

15      Lastly, following the Supreme Court's decision in *TransUnion*, GM again challenged

16  Plaintiffs' Article III standing.  *See* Docket No. 347; *see also TransUnion v. Ramirez*, 141 S. Ct.

17  2190 (2021)).  The Court rejected GM's challenge to the "controlling law of the case" because

18  *TransUnion* "actually confirm[ed] that Plaintiffs here suffered a concrete injury by overpaying for

19  their vehicles."  *See* Docket No. 354 (Sept. 7, 2021 Order) at 6; *see also id.* at 7 ("If a defendant

20  has caused physical or *monetary* injury to the plaintiff, the plaintiff has suffered a concrete injury

21  in fact under Article III.") (quoting *TransUnion*, 141 S. Ct. at 2204 (emphasis added)).  The Court

22  also cited the growing number of decisions in this circuit that "have repeatedly held that putative

23  class members have Article III standing when plaintiffs allege that they overpaid for a defective

24  product, even if the defect at issue does not manifest itself in every putative class member's

25  product."  *See* Sept. 7, 2021 Order at 7–8 (citing *Nguyen* v. *Nissan N. Am., Inc*., 932 F.3d 811,

26  819–822 (9th Cir. 2019), *Aberin v. Am. Honda Motor Co., Inc*., No. 16-cv-04384-JST, 2021 WL

27  1320773, at *6 (N.D. Cal. Mar. 23, 2021), and *In re Gen. Motors LLC CP4 Fuel Pump Litig*., 393

28  F. Supp. 3d 871, 884 (N.D. Cal. 2019)).

1    In sum: the law is clear that "overpayment is a viable theory of economic injury" and that

2    Plaintiffs can satisfy the injury in fact requirement by showing that the defect caused them to

3    overpay for their vehicles.  *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 706 (9th Cir. 2020); *see also*

4    *Mazza*, 666 F.3d at 595.  GM's challenge to Article III standing on the basis of a purported lack of

5    injury is unavailing.

6            b.      Mr. Stockton's Methodology Does Not Require Individualized Proof

7            Next, GM contends that decertification is warranted because whether each class member

8    would have paid anything less for a Class Vehicle "depends on their own individual expectations,

9    among other class-member-specific factors."  Decert. Mot. at 27.  According to GM, Plaintiffs'

10   benefit-of-the-bargain / cost-of-repair theory required them to "prove that *all* class members would

11   not have purchased their Class Vehicles unless GM first fixed or repaired the alleged defect or

12   would have purchased for $2,700 less."  *Id.* (emphasis in original).

13           The cost-of-repair model does not require individualized proof regarding each consumer's

14   subjective expectations, nor does GM cite any cases demonstrating that this is a subjective

15   inquiry.[28]  This argument is similar to a challenge that the Court rejected in GM's first *Daubert*

16   challenge to Mr. Stockton's methodology:

17               Finally, GM faults Mr. Stockton for assuming "that the alleged
                 defect would impact prices paid in precisely the same way for all
18               consumers," Stockton Motion at 17, yet this flows from the
                 assumption that defect is a safety defect for all consumers and that
19               Stockton's damages calculation is based on the response that an
                 objectively reasonable consumer would make.  As Stockton explains
20               in describing the assumptions in his model, any consumer "applies
                 the reasonable expectation that the vehicle is materially safe and free
21               of defects, with an emphasis on the vehicle's safety elements," and
                 thus would seek repair of the assumed safety defect.  Stockton
22               Report ¶ 31; *see also id.* ¶ 19 ("In seeking to maximize their

23   ─────────────────────────

24   [28] In *Nguyen*, the Ninth Circuit approvingly quoted an Eleventh Circuit case, *Carriuolo v. General
     Motors Co.*, which ruled that "damages should reflect the difference between the market value of
25   what was promised and what was delivered; [u]nlike the calculation of an individual consumer's
     direct pecuniary loss, which would limit the plaintiff to the difference of what she paid and the
26   actual value received, the [applicable] 'benefit of the bargain' model provides a standardized
     class-wide damages figure because the plaintiff's out-of-pocket payment is immaterial."  *Nguyen,*
27   932 F.3d at 821 n.7 (quoting *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 987 (11th Cir. 2016)
     (some internal quotation marks omitted).  Thus, while *Nguyen* did not expressly state that a
28   benefit-of-the bargain methodology would use a reasonable consumer (rather than subjective)
     standard, it endorses a standard class-wide damages figure for this methodology.

United States District Court
Northern District of California

> expected benefits from transactions, consumers make comparative
> assessments" which "inform the judgments that they make about the
> expected outcomes associated with purchasing certain products");
> *id.* ¶ 22 ("In accordance with economic theory, concealing a safety
> defect from consumers and potential consumers directly impairs the
> consumer's assessment of a potential transaction and leads to a
> different outcome . . . that what would have occurred had the defect
> been disclosed").

Docket No. 395 (Jan. 7, 2022 Order) at 20.  The Court previously concluded that Mr. Stockton's

cost-of-repair damages model was based on an objectively reasonable consumer standard, and

does not turn on the subjective expectations of each owner.

Plaintiffs cite the jury instructions to argue that they did not need to prove the purchasing

behavior of each class member.  Decert. Opp. at 24.  The jury instructions—using language

proposed by GM—instructed that the "economic harm that Plaintiffs seek to recover is the

difference between the purchasing price of the Class Vehicles and the market value of the Class

Vehicles if the alleged defect was known."  Jury Instructions at 27.  As used in this context,

"market value" inherently means the value that an objectively reasonable consumer would place

on the vehicle, given the existence of the defect.[29]

Mr. Stockton's testimony at trial provided a roadmap for the jury to find that the cost of

repairing the Class Vehicles ($2,700) to cure the oil consumption defect would have made

consumers whole by restoring to them the original value of the bargain.  Mr. Stockton testified

that in his experience, reasonable consumers assume that new vehicles are "free of defects, safe

and reliable, and equipped with remedies in the case that those first two conditions are not met,"

*see* TT 687:24-688:4; that a consumer would have paid less for a defective vehicle as compared to

a non-defective vehicle, *see* TT 695:15-20; and the cost of repair brings the value of the vehicle

into alignment with the original value placed on it by the consumer.  *See* TT 695:21-696:1; TT

697:18-698:24 (explaining how using the cost of repair as a basis for damages restores to the

consumer the benefit of the bargain).  Mr. Stockton's testimony thus outlined how the cost of

repairing the Class Vehicles to cure the defect would have made consumers whole by restoring to

---

[29] *Cf. Daniel v. Ford Motor Co.*, No. 11-cv-02890, 2016 WL 2899026, at *7 (E.D. Cal. May 18, 2016) (rejecting challenge to damages calculation because "a reasonable jury could conclude that a consumer would demand that the purchase price of a vehicle with a defect be reduced by the cost of remedying that defect").

United States District Court
Northern District of California

them the original value of the bargain.  It is based on an objective standard, not the individual subjective expectations of each consumer.

The Court concludes that Mr. Stockton's methodology does not require individualized evidence.  GM's motion to decertify on this basis is **DENIED**.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court **DENIES** GM's motion for judgment as a matter of law and GM's motion for decertification.  The Court sets a status conference for June 29, 2023 at 1:30 p.m. to discuss further proceedings.

This order disposes of Docket Nos. 592 and 594.


**IT IS SO ORDERED**.


Dated: June 8, 2023

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California